**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO. 05-40049-FDS

**J.J. REIDY & CO., INC.,**

           **Plaintiff,**

**v.**

**AIRWATER CORPORATION AND**
**AIRWATER PATENTS**
**CORPORATION,**

           **Defendants.**

**DEFENDANTS AIRWATER CORPORATION'S AND AIRWATER PATENTS**
**CORPORATION'S MEMORANDUM OF LAW OF IN SUPPORT OF THEIR**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

The Defendants, AirWater Corporation and AirWater Patents Corporation, hereby

submit their Memorandum of Law in support of their Motion to Dismiss for Lack of

Personal Jurisdiction.

**I. BACKGROUND**

On or about March 21, 2003, J.J. Reidy & Co., Inc. ("J.J. Reidy") and AirWater

Corporation entered into a Global Manufacturing and Marketing Licensing Agreement

(the "Agreement"), pursuant to which J.J. Reidy granted to AirWater Corporation an

exclusive license to a number of United States Patents related to a water production

generation system known as the WaterStar System, including but not limited to an

exclusive right to design, manufacture, market and sell the WaterStar System. Amended

Complaint, at ¶ 4; Answer, at ¶ 4; Zayoti Affidavit, Exh. A.

On or about June 25, 2003, AirWater Corporation assigned all rights and liabilities under the Agreement to AirWater Patents, Inc., and J.J. Reidy consented to the assignment. Amended Complaint, at ¶¶ 4-5; Zayotti Affidavit, Exh. B.

In its First Amended Complaint, J.J. Reidy asserts a breach of contract claim against AirWater Corporation and AirWater Patents Corporation, alleging that these Defendants breached the Agreement by failing to make certain minimum monthly royalty payments, and by failing to commit resources and put forth best efforts to establish and maintain awareness and exposure of the WaterStar System. Amended Complaint, at ¶¶ 6-9.

Defendants AirWater Corporation and AirWater Patents Corporation deny liability, and assert by way of affirmative defense that this Court lacks personal jurisdiction over the Defendants. Answer, at 3.

In a parallel action initiated by AirWater Patents, Inc. in the Circuit Court for the 11th Judicial District in and for Miami-Dade County, Florida, and removed by J.J. Reidy to the United States District Court for the Southern District of Florida, AirWater asserts claims against J.J. Reidy for declaratory judgment, breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. AirWater Patents, Inc. alleges that it has performed and or tendered performance in good faith, and that J.J. Reidy has breached the Agreement and the covenant of good faith and fair dealing implied therein by, among other things, failing to deliver world-wide patents or registrations relative to the WaterStar System; wrongfully terminating the Agreement without cause based on J.J. Reidy's wholly insubstantial, frivolous, bad faith interpretation of the minimum monthly royalties provisions of the Agreement; and

soliciting new investors and licensees in violation of AirWater's exclusive license. Additionally, AirWater alleges that it has conferred a substantial benefit to J.J. Reidy and that J.J. Reidy has been unjustly enriched in that AirWater has paid J.J. Reidy approximately $420,000 for an exclusive license for the WaterStar System and related patents; AirWater has positively advertised, promoted and publicized the WaterStar System for the past twenty months; and AirWater undertook, at a cost in excess of $180,000, the entire burden of defending a subsequent lawsuit attacking the validity of the patents. Zayotti Affidavit, Exhs. E and F.

On March 30, 2005, the Florida Court held a Scheduling Conference and issued an Order Setting Schedule, Requiring Mediation, and Referring Certain Motions to a Magistrate Judge, including but no t limited to setting the Florida Court Action for trial during the Court's two-week trial calendar beginning on January 23, 2006, and establishing a schedule for completing discovery and filing all pretrial motions (other than motions *in limine*). Id., Exh. I.

## II. FACTS

Michael J. Zwebner is the President of AirWater Corporation and AirWater Patents, Inc. (collectively "AirWater"), both of which are Florida corporations, with a principal place of business located at 407 Lincoln Road, Suite 12F, Miami Beach, Florida, 33139-3028. Zwebner Affidavit, at ¶ 1.

AirWater is in the business of designing, manufacturing, and marketing machines to extract drinkable water from the air. Its business operations, including sales and marketing, are located in Miami Beach, Florida. AirWater's design and manufacturing operations are primarily overseas, in Israel and in China. Id., at ¶ 6.

3

In or about February, 2003, Zwebner learned of J.J. Reidy and the WaterStar System through an internet search. In response to J.J. Reidy's solicitation on its website, accessed by Zwebner in Miami Beach Florida, Zwebner contacted J.J. Reidy through its internet site. Thereafter, through internet and phone communications, J.J. Reidy's President, James John Reidy, provided Zwebner information regarding the WaterStar System and related patents. Zwebner met with Mr. Reidy at the airport in Boston at a coffee shop for an initial discussion of the WaterStar System, and later, on Zwebner's way to Canada, Zwebner met again with Mr. Reidy during a brief stopover at the Boston airport. Id. at ¶ 7.

Negotiations for AirWater's licensing of the AirWater System and related patents continued via phone and internet communications. Ultimately, Mr. Reidy traveled to Miami Beach for further negotiations. Subsequently, Mr. Reidy traveled to Miami Beach again for a final negotiation session at Zwebner's apartment, during which time Zwebner and Mr. Reidy prepared the Agreement in its final form. Zwebner and Mr. Reidy then signed the Agreement in Miami Beach, Florida. Id. at ¶ 8.

During the course of performance of the Agreement, approximately ninety percent of Zwebner's communications with J. J. Reidy occurred through the internet and the remainder of their communications took place by telephone. In October, 2004, Mr. Reidy traveled to Miami and attended AirWater's annual meeting in Miami Beach, Florida. Id. at ¶ 9.

All acts required of AirWater under the terms of the Agreement were to be performed in Florida and overseas. Because there is little market for the WaterStar System in the United States where clean water of good quality is plentiful, marketing or

sales of the WaterStar System were not anticipated for the domestic United States, other than in limited, niche markets. AirWater's business operations under the Agreement were anticipated to occur, and have occurred, primarily overseas, including the design and manufacture of machines in Israel and in China, and developing markets for the WaterStar System in Sri Lanka, India and Australia. Id. at ¶ 10.

The Agreement does not require AirWater's performance in Massachusetts, nor does it require AirWater to do anything in Massachusetts. AirWater does not do business in the Commonwealth of Massachusetts. AirWater does not own or lease any property, and has no offices, in Massachusetts. AirWater has no employees or agents or representatives in Massachusetts. AirWater does not advertise, solicit or otherwise market any business targeting residents of Massachusetts. AirWater has no bank accounts in Massachusetts. AirWater does not pay taxes in Massachusetts. Id. at ¶ 11.

The only additional performance required of J.J. Reidy under the Agreement consists of possible applications for foreign patent and trademark registrations. Zayotti Affidavit, Exh. A at 10.

Other than two short airport meetings with Mr. Reidy prior to negotiating and executing the Agreement, Zwebner has never been to the Commonwealth of Massachusetts in connection with AirWater's Agreement with J.J. Reidy, or in connection with any business of AirWater. Id. at ¶ 12.

All AirWater officers, directors and employees reside in Florida or in states other than Massachusetts. No AirWater employees have been sent to the Commonwealth of Massachusetts in connection with AirWater's Agreement with J.J. Reidy, or in connection with any business dealing of AirWater. Id. at ¶ 13. AirWater does not

5

produce, offer to sell, or sell, any AirWater systems or components in Massachusetts.
AirWater does not generate any, let alone a substantial percentage, of its sales revenue
from Massachusetts sales. Further, AirWater does not create, control or employ the
actions or business of J.J. Reidy in Massachusetts. Id. at ¶ 14. Finally, AirWater has
neither sent any of its products into Massachusetts nor shipped any of its products to
Massachusetts through an established distribution channel. Id. at ¶ 15

Zwebner suffers from severe poliomyelitis and is confined to a wheelchair.
Zwebner has no usage of his lower limbs and cannot stand or walk. As a result of his
medical condition, Zwebner suffers continuously from blood circulation issues in his legs
and continuous pain in the base of his spine and lower abdomen. Additionally, Zwebner
suffers from diabetes and takes medication on a daily basis in an attempt to control his
blood sugar ratios. Zwebner is under the care of physicians for his medical conditions,
both in Israel and the United Kingdom where he resides, and also in Miami-Dade County,
Florida, when he is in the United States. Zwebner, a dual citizen of Israel and the United
Kingdom, spends approximately ten days per month, on average, in Miami Beach to
personally attend to AirWater's business. In order to accommodate his physical needs,
AirWater leases an apartment for Zwebner, specially adapted for handicapped access, in
Miami Beach. These adaptations include special doors and ramps to enable access to
rooms and bathrooms. Id. at ¶¶ 3-4, 18.

In addition to Zwebner, the following individuals are knowledgeable of facts
relevant to the present dispute: Rolando Sablon (AirWater's Office Manager); Bob
DeCosta (AirWater's Sales Director); Clint Snyder (AirWater's Accountant); and Lavi

Krasney (Financial Consultant), all of whom are located either in Florida or Tel Aviv, Israel. Id. at ¶ 18.

In addition to this action and the parallel proceedings in the United States District Court for the Southern District of Florida, Zwebner and/or AirWater is/are presently involved in five other litigation matters pending in Miami-Dade County, Florida, , all of which are part of an effort by Zwebner to curtail anonymous cyber basher manipulation of UCSY stock through the financial message boards which are hosted on the internet, specifically, the Raging Bull web site, hosted by LYCOS, Inc., the financial boards hosted by YAHOO!, and others. Id. at ¶¶ 20-21.

### III. ARGUMENT

#### A.    STANDARD UNDER FED. R. CIV. P. 12(B)(2)

When a motion to dismiss for lack of personal jurisdiction is filed under Fed. R. Civ. P. 12(b)(2), "the plaintiff bears the burden of proving the existence of personal jurisdiction." Merced v. JLG Industries, Inc., 170 F.Supp.2d 65, 69 (D.Mass. 2001). In considering the defendant's motion to dismiss, this Court "employs the *prima facie* standard under which the Court considers whether the plaintiffs have proffered evidence that, 'if credited, is enough to support findings of all facts essential to personal jurisdiction.'" Merced, 170 F.Supp.2d at 69. In determining whether a *prima facie* showing has been made, the Court "does not act as a factfinder, but instead accepts properly supported proffers of evidence by a plaintiff as true." Id. "Therefore, while allegations of fact in an uncontroverted affidavit must be accepted as true for the purposes of a Rule 12 motion, the plaintiff . . . bears the burden of establishing sufficient facts on which to predicate jurisdiction over the defendant." Id. The Court then "add[s]

to the mix facts put forward by the defendant[], to the extent that they are

uncontradicted." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290

F.3d 42, 51 (1st Cir.), cert. denied, 537 U.S. 1029, 123 S.Ct. 558, 154 L.Ed.2d 444

(2002).

"In determining whether a non-resident defendant is subject to its jurisdiction, a

federal court exercising diversity jurisdiction is the functional equivalent of a state court

sitting in the forum state." Daynard, 290 F.3d at 51. "Under Massachusetts law,

jurisdiction over a nonresident defendant is appropriate if it is both authorized by statute

and consistent with the due process requirements of the United States Constitution."

Merced, 193 F.Supp.2d at 292. "Jurisdiction is authorized only where the answer to both

inquiries is yes." Cunningham v. Ardrox, Inc., 40 Mass. App. Ct. 279, 281 (1996).

Since the Massachusetts long arm statute, Mass. Gen. L. ch. 223A, functions as

"an assertion of jurisdiction over the person to the limits allowed by the Constitution of

the United States, the two questions tend to converge." Good Hope Indus., Inc. v. Ryder

Scott, Co., 378 Mass. 1, 6 (1979). "General Laws c. 223A, § 3, cannot authorize

jurisdiction which is constitutionally unacceptable, even though the fact pattern asserted

in support of jurisdiction apparently satisfies the statute's literal requirements. Id.

Similarly, "G.L. c. 223A, § 3, asserts jurisdiction over the person to the constitutional

limit only when some basis for jurisdiction enumerated in the statute has been

established." Id. Accordingly, "[a]lthough presented with jurisdictional facts sufficient

to survive due process scrutiny, a judge would be required to decline to exercise

jurisdiction if the plaintiff was unable to satisfy at least one of the statutory

prerequisites." Id.

**B.    THE LONG ARM STATUTE DOES NOT AUTHORIZE PERSONAL JURISDICTION OVER AIRWATER BECAUSE AIRWATER DOES NOT TRANSACT ANY BUSINESS, CONTRACT TO SUPPLY SERVICES OR THINGS, OR HAVE AN INTEREST IN ANY REAL PROPERTY, IN MASSACHUSETTS**

AirWater is not subject to personal jurisdiction under the relevant provisions of

the Massachusetts long arm statute because AirWater does not transact any business or

contract to supply services or things in Massachusetts, nor does AirWater have any

interest in using or possessing real property in Massachusetts.

The Massachusetts long arm statute provides, in relevant part, that a court may

exercise personal jurisdiction over a person, who acts directly or by an agent, as to a

cause of action in law or equity arising from the person's:

> "(a) transacting any business in this commonwealth;
>
> "(b) contracting to supply services or things in this commonwealth; . . .
>
> "(e) having an interest in, using or possessing real property in this commonwealth. . . ."

Mass. Gen. L. ch. 223A, § 3.

Under circumstances similar to the present case, the Court of Appeals for the First

Circuit held in <u>Lyle Richards International, Ltd. v. Ashworth, Inc.</u>, 132 F.2d 111, 113 (1st

Cir. 1997), that the defendant's "purely incidental contacts . . . were insufficient to

support an assertion of personal jurisdiction over [the defendant]." In that case, the

plaintiff, a Massachusetts corporation, and the defendant, a Delaware corporation with a

principal place of business in California, entered into a one-year contract, pursuant to

which the plaintiff agreed to act as the defendant's purchasing agent for footwear

manufactured in China and Taiwan. Significantly, the contract did not require the

defendant to undertake any specific contractual responsibilities in Massachusetts. The

plaintiff argued that the defendant had transacted business in Massachusetts because the defendant had, among other things, periodically forwarded purchase orders to the plaintiff in Massachusetts; communicated with the plaintiff two or three times a week regarding ongoing contract performance; and accompanied the plaintiff to three trade shows in Massachusetts. Id. at 112. In affirming the dismissal of the action for lack of personal jurisdiction, the Court of Appeals noted that most performance required under the agreement was "to be rendered *outside* Massachusetts . . ." and, therefore, the "performance of various attendant chores in Massachusetts was incidental to the formation of the agreement." Id. at 113 (emphasis in original).

Similarly, in Automatic Sprinkler Corp. of America v. Seneca Foods Corp., 361 Mass. 441, 446 (1972), the Massachusetts Supreme Judicial Court held that the defendant's contacts with Massachusetts were insufficient to confer personal jurisdiction under the long arm statute where the defendant's only contacts with Massachusetts consisted of the affirmance of a contract and the making of partial payments pursuant to the contract through the mails. In that case, the defendant's agent signed a purchase order in New York and mailed it to the plaintiff in Massachusetts. Thereafter, the defendant in New York received the plaintiff's invoice mailed from Massachusetts, as well as another letter acknowledging and accepting the defendant's purchase order. Id. at 444. In holding that these contacts were insufficient to afford jurisdiction under Mass. Gen. L. ch. 223As 3(a), the Court opined that the defendant's activity had little impact on commerce in Massachusetts, and concluded that the defendant did not "purposefully (avail) itself of the privilege of conducting activities within the forum State." Id. at 446.

In Nichols Associates, Inc. v. Starr, 4 Mass. App. Ct. 91, 97 (1976), the

Massachusetts Appeals Court ruled that the defendant was not transacting business in

Massachusetts for purposes of Mass. Gen. L. ch. 223A, § 3, where the defendant, a

Connecticut-based land developer, never traveled to the plaintiff's offices but

communicated by telephone with the plaintiff or in person when the latter's

representatives were in Connecticut, and where invoices and completed work done in the

plaintiff's Massachusetts office were mailed to the defendant in Connecticut.  4 Mass.

App. Ct. at 94-95.

Finally, in Droukas v. Divers Training Academy, Inc., 375 Mass 149, 151 (1978),

the SJC held that the defendant, a Florida corporation with no offices or assets in

Massachusetts, had not transacted business in Massachusetts where the plaintiff

purchased two marine engines from the defendant in response to the defendant's

advertisements in a trade magazine distributed in Massachusetts.  There, the transaction

came about as follows:

> The plaintiff, in Massachusetts, telephoned the defendant's
> place of business in Florida, spoke with its president, and
> ordered the engines.  Thereafter, the plaintiff forwarded a
> check for the purchase price to the defendant.  The
> defendant's president sent a letter to the plaintiff in
> Massachusetts confirming the sale.  Several other letters
> sent by the defendant relative to the sale were received by
> the plaintiff in Massachusetts.  Subsequently, the defendant
> shipped the engines ['collect'] from Florida to
> Massachusetts.

Id.  In holding that these contacts were insufficient to assert jurisdiction under Mass. Gen.

L. ch. 223A, § 3(a), the SJC pointed out that the defendant's conduct had only a "slight

effect on the commerce of the Commonwealth" and was "void of any purposeful intent

on the part of the defendant to avail itself of the privilege of conducting activities within

the forum State."  Id. at 154.  The Droukas transaction, therefore, was an isolated one

lacking a justifiable ground on which to assert jurisdiction. Id. See also, Intech, Inc. v. Triple "C" Marine Salvage, Inc., 2005 WL 927441, *4 (Mass. April 25, 2005) (no continuing relationship amounting to transacting business notwithstanding that defendant advertised in two trade journals circulated in Massachusetts, separately sold two amphibious vehicles to plaintiff, agreed to help find the second amphibious vehicle, and contacted plaintiff by telephone to initiate second sale).

Similar to the defendants in Lyle Richards, Automatic Sprinkler, Nichols and Droukas, in this case AirWater does not transact any business, contract to supply services or things, or have any interest in any real property, in Massachusetts. Indeed, AirWater is a corporation organized and existing under the laws of the State of Florida, with a principal place of business in Miami Beach, Florida. Amended Complaint, at ¶¶ 2-3; Answer, at ¶¶ 2-3; Zwebner Affidavit, at ¶ 1. AirWater has no offices, employees, agents or representatives in Massachusetts, nor does it advertise, solicit or otherwise market any business targeting residents of Massachusetts. Zwebner Affidavit, at ¶ 11. Further, AirWater derives no income from Massachusetts, has no bank accounts here and pays no taxes in Massachusetts. Id. at ¶¶ 11, 14. Other than the two brief airport meetings in Boston prior to negotiating and executing the Agreement, neither Zwebner nor any other AirWater employee has ever been to Massachusetts for any reason related to the Agreement. Id. at ¶¶ 12-13.

By the same token, AirWater cannot reasonably be deemed to have transacted business in Massachusetts by virtue of its Agreement with J.J. Reidy. The parties engaged in initial negotiations by telephone and internet communications and, thereafter, Mr. Reidy actually traveled to Miami Beach for further negotiations on two occasions,

including the final negotiation session during which the Agreement was actually prepared in its final form and signed by both parties. Additionally, Mr. Reidy traveled to Miami Beach in October, 2004, to attend AirWater's annual meeting. <u>Zwebner Affidavit</u>, at ¶¶ 8-9. Moreover, the Agreement contemplates performance by AirWater in Florida and overseas, including the design and manufacture of machines in Israel and China and the development of markets for the WaterStar System in Sri Lanka, India and Australia, and does not require performance of any actions by either party in Massachusetts. <u>Id.</u> at ¶ 10. Thus, fore the reasons stated in <u>Lyle Richards</u>, <u>Automatic Sprinkler</u>, <u>Nichols Associates</u> and <u>Droukas</u>, J.J. Reidy's First Amended Complaint must be dismissed for lack of personal jurisdiction.

## C.    J.J. REIDY'S FIRST AMENDED COMPLAINT MUST BE DISMISSED BECAUSE AIRWATER LACKS THE REQUISITE MINIMUM CONTACTS WITH MASSACHUSETTS FOR PURPOSES OF SATISFYING DUE PROCESS REQUIREMENTS

For the reasons stated below, AirWater has not purposefully availed itself of the privilege of conducting activities within Massachusetts, thus invoking the benefits and protections of its laws. Therefore, AirWater lacks the requisite minimum contacts with Massachusetts, and this Court may not exercise jurisdiction over AirWater without offending the requirements of due process.

As stated above, where a party seeks to bring an action in Massachusetts against a non-resident party to a contract, it is the plaintiff who has the burden of showing "certain minimum contacts with [Massachusetts] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." <u>Droukas</u>, 375 Mass. at 152. Where, as here, a plaintiff seeks to establish personal jurisdiction over a nonresident defendant who has not agreed to it by contract, the plaintiff must prove "some act by

which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Leasecomm Corp. v. Crawford, 2003 WL 1826537, *3 (Mass.App.Div. 2003), citing, Droukas, 375 Mass. at 153; Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Where a defendant has purposefully availed itself of the privilege of conducting activities within Massachusetts, thus invoking the benefits and protections of its laws, our courts have held that such defendant "should reasonably anticipate being haled into court [here]." New England Welding Contractors, Inc. v. Hydra-Machinery Sales, Inc., 704 F.Supp. 315, 317 (D.Mass. 1989). "[T]he effect of a nonresident's activity on the commerce of the Commonwealth is still an important factor to be considered in deciding the sufficiency of contacts with Massachusetts." Droukas, 375 Mass. at 154 n. 5. Finally, due process requires that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Daynard, 290 F.3d at 52.

It is well-settled, however, that "[w]here an out-of-state party contracts with a resident of the forum state, that contract *alone* does not establish sufficient minimum contacts." New England Welding, 704 F.Supp. at 317 (emphasis in original). Where, as here, the claim arises from an alleged breach of contract, a finding of personal jurisdiction requires an "evaluation of the relations between the parties, their respective activities under the contract, and the linkages, if any, between the defendant's participation in the transaction and Commonwealth of Massachusetts." Energy Capital and Services LP, II v. Hill Refrigeration, Inc., 989 F.Supp. 353, 355 (D.Mass. 1997). The court must "look at all of the communications and transactions between the parties, before, during and after the consummation of the contract, to determine the degree and

type of contacts the defendant has with the forum, apart from the contract alone." <u>Energy Capital</u>, 989 F.Supp. at 355. <u>See also</u>, <u>A-Connoisseur Transp. Corp. v. Celebrity Coach, Inc.</u>, 742 F.Supp. 39, 43 (D.Mass. 1990) (court must look at all communications and transactions between parties, before, during and after consummation of contract, to determine degree and type of contacts defendant has with forum, apart from contract alone).

Applying these principals under circumstances similar to this case, this Court held in <u>New England Welding</u> that due process requirements were not satisfied where the defendant's only contact with the Commonwealth was an "isolated transaction with its attendant negotiations and communications. . . ." 704 F.Supp. at 317. The parties in that case – a Massachusetts buyer and a South Carolina seller – entered into an agreement regarding the sale of certain used equipment. It was undisputed that the seller advertised in national trade journals and that there were many telephone calls and much correspondence concerning the transaction. The plaintiff sued to recover its initial $25,000 deposit when the defendant failed to deliver the equipment by the agreed upon date.

In dismissing the case, the Court distinguished <u>Marine Charter & Storage Ltd., Inc. v. Denison Marine, Inc.</u>, 701 F.Supp. 930 (D.Mass.1988), in which the Court exercised personal jurisdiction over a Florida defendant on grounds that there was a continuing relationship under the sales contract concerning defendant's care of the yacht. In so doing, the Court in <u>New England Welding</u> noted that there was "nothing which reveals a continuing relationship between the parties with regard to this contract such as maintaining or servicing the [equipment]." <u>Id.</u> As a result of the relationship between

15

the parties and the defendant's limited activity in the Commonwealth, the Court

concluded that "it would not be in keeping with the law defining due process on this

question to allow the maintenance of this action against [the defendant] in this forum."

Id.

Similarly, in A-Coinnoisseur, this Court held that the defendant's contacts with

Massachusetts were insufficient for purposes of establishing personal jurisdiction. 742

F.Supp. at 43. There, a Pennsylvania defendant sold a van to a Massachusetts plaintiff.

The defendant drove the van to Massachusetts before entering into an agreement with the

plaintiff; signed the contract for the sale thereof in Massachusetts, and came back to

Massachusetts to retrieve the van and drove it back to Pennsylvania for repairs after the

contract was signed. Noting that "[t]he mere fact that an entity in Massachusetts executes

a contract with an entity in another state does not automatically constitute sufficient

contact so as to confer a finding of personal jurisdiction," the Court concluded that the

defendant had not conducted any additional purposeful activity in Massachusetts, such

that the defendant could be deemed to have "had any expectation of being haled into a

Massachusetts court or any desire to avail itself of the privileges and protections of

[Massachusetts] state law." Id.

By the same token, AirWater's contacts with the Commonwealth of

Massachusetts in this case are comprised of an isolated Agreement with J.J. Reidy, which

contemplates no additional activities or performance on the part of either party in

Massachusetts. Indeed, the Agreement and, to a very limited extent, the attendant

communications and negotiations conducted by internet and telephone, and the two brief,

pre-contract negotiation meetings at Boston's Logan Airport, are AirWater's only

16

contacts with Massachusetts. While the term of the license granted to AirWater is for a period of not less than ten years, the Agreement in this case is similar to the contracts in New England Welding and A-Coinnoisseur in that it does not contemplate any continuing obligations or activities to be performed in Massachusetts. On the contrary, all acts required of AirWater, i.e., designing, manufacturing, promoting and selling the WaterStar System, are to be performed in Florida and overseas. Zwebner Affidavit, at ¶ 10. Likewise, the only continuing obligations contemplated on the part of J.J. Reidy consist of possible applications for foreign patent and trademark registrations. Zayotti Affidavit, Exh. A at 10.

Consistent with the SJC's recent holding in Intech, Inc. v. Triple "C" Marine Salvage, Inc., 2005 WL 927441, * (Mass. April 25, 2005), Zwebner's two brief, initial meetings with Mr. Reidy at Logan Airport were essentially exploratory and insufficient for purposes of establishing minimum contacts to support personal jurisdiction in this case. Likewise, although AirWater agreed to make royalty payments to J.J. Reidy over the term of the Agreement, the mere mailing, wiring and/or promise to make payments to J.J. Reidy in Massachusetts is insufficient to establish constitutionally required minimum contacts. See Automatic Sprinkler, supra, 361 Mass. at 445 (personal jurisdiction denied where defendant's Massachusetts contacts were simply "in the nature of affirming a contract and making payments through the mail"). See also, Stuart v. Spademan, 772 F.2d 1185, 1192, 1194 (5th Cir.1985) (combination of a contractual relationship, defendant's mailing payments to forum state and engaging in communications in forum state regarding execution and performance of a contract do not constitute the minimum contacts necessary to constitutionally exercise jurisdiction); Asset Alloc. & Mgmt. Co. v.

Western Empl. Ins. Co., 892 F.2d 566, 569-70 (7th Cir.1989) (payment of checks insufficient for minimum contacts); United Financial Mortg. Corp. v. Bayshores Funding Corp., 245 F.Supp.2d 884, 894 (N.D.Ill. 2002) (sending payments to Illinois alone may not establish minimum contacts); Verde Capital Corp. v. Lausell Aluminum Jalousies, Inc., 729 F.Supp. 92, 93 (S.D.Fla. 1989) ("standing alone, a promise to make payments in the forum state does not constitute minimum contacts and therefore does not comport with the due process clause"); Lakeside Bridge & Steel Co. v. Mountain State Constr. Co., Inc., 597 F.2d 596, 598-99, 603 (7th Cir.1979), cert. denied, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980) (defendant did not purposefully avail itself by sending purchase orders, other mail, and making telephone calls during contract negotiations).

Accordingly, for the reasons set forth in New England Welding and A-Coinnoisseur, AirWater cannot possibly be deemed to have purposefully availed itself of the privileges and protections of Massachusetts law, such that AirWater should have anticipated being haled into court in Massachusetts, and this Court must dismiss J.J. Reidy's First Amended Complaint for lack of personal jurisdiction.

## D.    TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE MILITATE AGAINST EXERCISING PERSONAL JURISDICTION OVER AIRWATER

Traditional notions of fair play and substantial justice weigh heavily against exercising personal jurisdiction over AirWater in this case.

The "hallmark of reasonableness in the context of personal jurisdiction is 'fair play and substantial justice.'" Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 150 (1st Cir. 1995). In considering whether it would be reasonable to exercise personal jurisdiction, the following factors are relevant:

(1) the defendant's burden of appearing, (2) the forum

18

> state's interest in adjudicating the dispute, (3) the plaintiff's
> interest in obtaining convenient and effective relief, (4) the
> judicial system's interest in obtaining the most effective
> resolution of the controversy, and (5) the common interests
> of all sovereigns in promoting substantive social policies.

Id. at 150. These factors, known as "the gestalt factors" may "neither be amenable to

mechanical application nor be capable of producing an open-and-shut result." Id. The

purpose of considering these factors is "simply to illuminate the equitable dimensions of

a specific situation, thereby putting into sharper perspective the reasonableness and

fundamental fairness of exercising jurisdiction in that situation." Id.

In this case, the so-called gestalt factors militate against exercising jurisdiction

over AirWater. Indeed, if required to litigate this dispute in Massachusetts, AirWater will

suffer substantial hardship in that its principal and chief witness, Zwebner, suffers from

severe poliomyelitis and is confined to a wheelchair. When in Miami for AirWater

business, Zwebner stays in an apartment specially adapted to accommodate his physical

needs and receives medical treatment in Miami for his blood circulation problems,

continuous back and abdominal pain, and diabetes. Zwebner Affidavit, at ¶¶ 3-5. In

addition to the unreasonable personal and professional burden on Zwebner if he is forced

to litigate in Massachusetts, Zwebner and AirWater will be further inconvenienced

because they are parties to multiple litigations pending in Florida. Id. at ¶¶ 20-22.

Further, the majority of AirWater's non-party witnesses with material, substantive

testimony regarding the performance of the Agreement are located in Florida and

overseas, and the absence of AirWater's employees out of state for an extended period of

time would work a substantial hardship on AirWater's business. Id. at ¶ 17.

Moreover, the United States District Court for the Southern District of Florida has

a greater interest than this Court in adjudicating this dispute because performance under

the Agreement occurred and is contemplated to occur primarily in Florida and oversees,

not in Massachusetts. As such the nexus between the claims raised in this dispute and

Florida are far more extensive than in Massachusetts, and J.J. Reidy cannot point to any

significant countervailing interest that the forum state may have in adjudicating this case.

Finally, dismissal of J.J. Reidy's First Amended Complaint is in the interest of

judicial economy and, therefore, will promote the judicial system's interest in obtaining

the most effective and efficient resolution of this matter, because the United States

District Court for the Southern District of Florida has already established a pretrial

scheduled for completing discovery and filing motions, and has set this matter for trial in

January, 2006.

In light of the foregoing factors, traditional notions of fair play and substantial

justice militate against exercising personal jurisdiction over AirWater in this case.

## IV.  CONCLUSION

WHEREFORE, based upon the foregoing points and authorities the Defendants

AirWater Corporation and AirWater Patents Corporation respectfully request that this

Honorable Court grant their Motion to Dismiss for Lack of Personal Jurisdiction.

DEFENDANTS AIRWATER
CORPORATION AND AIRWATER
PATENTS CORPORATION
Respectfully submitted,

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan, Werlin & Pabian, LLP
265 Franklin Street
Boston, Massachusetts  02110-3113
(617) 951-1400

Dated: June 20, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by (hand) (mail) on June 20, 2005

20

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-40049-FDS

| |
|---|
| **J.J. REIDY & CO., INC.,** |
| **Plaintiff,** |
| **v.** |
| **AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,** |
| **Defendants.** |

## <u>DECLARATION OF MICHAEL J. ZWEBNER</u>

I, MICHAEL J. ZWEBNER, declare and state as follows:

1.     I am the President of AirWater Patents, Inc. ("AirWater"), a Florida corporation, incorporated in 2003, with its principal place of business located at 407 Lincoln Road, Suite 12F,  Miami Beach, Florida, 33139-3028.

2.     I have personal knowledge of the facts set forth in this Declaration related to the litigation against J. J. Reidy & Co., Inc. ("Reidy"), currently pending in the United States District Court for the Southern District of Florida, Case No. 20650-CIV-JORDAN/Brown and in the United States District Court for the Central District of Massachusetts, Case No. 05-40049-FDS, except as otherwise noted.  In my corporate capacity as the President of AirWater, I have undertaken an investigation into the facts attested to herein to the extent such facts are not

{M1331965_1}

within my personal knowledge. I am competent to testify as to all matters stated in this Declaration. I am not under any legal disability which would in any way preclude me from testifying. If called upon to do so, I would testify to the facts set forth in this Declaration.

3.    Since I was one year old, I have suffered from severe poliomyelitis. Since about 1999 to the present, I have been confined to a wheelchair. I have no usage of my lower limbs and cannot stand or walk. As a result of this ailment, I suffer continuously from blood circulation issues in my legs and continuous pain in the base of my spine and lower abdomen. In addition, I suffer from diabetes, and take medication on a daily basis in my attempt to control my blood sugar ratios. I am under the care of physicians for the foregoing conditions, both in Israel and the UK where I reside, and also in Miami-Dade County, Florida, when I am in the United States.

4.    In order to accommodate my physical needs, I stay in Miami each in a leased apartment specially adapted for handicapped access. These adaptations include special doors and ramps to enable access to rooms and bathrooms.

5.    The transfer of this action from this District Court to the U.S. District Court for the Central District of Massachusetts will create unreasonable personal hardship for me because of my difficulties in travel and the limited availability of living accommodations to suit my needs.

6.    AirWater is in the business of designing, manufacturing, and marketing machines to extract drinkable water from the air. Its business

operations, including sales and marketing, are located in Miami Beach, Florida. AirWater's design and manufacturing operations are located overseas, in Israel and in China.

7.      On or about February 2003, I learned of Reidy, the Reidy Patents, and the WaterStar System in Miami, Florida, through Reidy's advertisement on the internet. I contacted Reidy from Miami through its internet site and then, through internet and phone communications, Reidy provided information regarding the Reidy Patents and the WaterStar system. I met with J. J. Reidy at the airport in Boston at a coffee shop for an early discussion of the Reidy Patents, and later, on my way to Canada, I met again with J. J. Reidy during a brief, fortuitous stopover at the Boston airport. I have never met with Reidy in Worcester, Massachusetts, and have not traveled to Worcester for any reason.

8.      Negotiations for AirWater's licensing of the Reidy Patents continued via phone and internet communications. Ultimately, J. J. Reidy traveled to Miami Beach for further negotiations. Subsequently, J. J. Reidy traveled to Miami Beach again for a final negotiation session at my apartment, during which time we prepared the Licensing Agreement in its final form. J. J. Reidy and I then signed the Licensing Agreement in the apartment where I stay in Miami Beach, Florida.

9.      During the course of performance of the Licensing Agreement, approximately ninety percent of my communications with J. J. Reidy occurred through the internet and the remainder of our communications took place by

telephone.   In October, 2004, Mr. Reidy traveled to Miami and attended AirWater's annual meeting in Miami Beach, Florida.

10.    All acts required of AirWater under the terms of the Licensing Agreement were to be performed in Florida and overseas.  Because there is little market for the WaterStar and AirWater Machines and systems in the United States where clean water of good quality is plentiful, marketing and sales of the WaterStar System were not anticipated for the domestic United States, other than in limited, niche markets.  AirWater's business operations under the Licensing Agreement were anticipated to occur, and have occurred primarily overseas, including the design and manufacture of machines in Israel and in China, and the development of markets for the WaterStar/AirWater System in Sri Lanka, India and Australia.

11.    The Licensing Agreement does not require AirWater's performance in Massachusetts and does not require AirWater to do anything in Massachusetts. AirWater has not and does not do business in the Commonwealth of Massachusetts. AirWater does not own or lease any property and has no offices in Massachusetts.  AirWater has no employees or agents or representatives in Massachusetts.   AirWater does not advertise, solicit or otherwise market any business targeting residents of Massachusetts.  AirWater has no bank accounts in Massachusetts. AirWater does not pay taxes in Massachusetts.

12.    Other than two short airport meetings with J. J. Reidy in Boston prior to negotiating and executing the Licensing Agreement, I have never been to

the Commonwealth of Massachusetts in connection with AirWater's Licensing Agreement with Reidy, or in connection with any business of AirWater.

13.    All AirWater officers, directors and employees reside in Florida or in states other than Massachusetts. No AirWater employees have been sent to the Commonwealth of Massachusetts in connection with AirWater's Licensing Agreement with Reidy, or in connection with any business dealing of AirWater.

14.    AirWater has not and does not produce, offer to sell, or sell any WaterStar Systems or components in Massachusetts. AirWater does not generate any, let alone a substantial percentage, of its sales from Massachusetts sales. Further, AirWater does not create, control or employ the actions or business of Reidy in Massachusetts.

15.    AirWater has neither sent any of its products into Massachusetts nor shipped any of its products to Massachusetts through an established distribution channel.

16.    I had no knowledge that Reidy had filed an action against AirWater and AirWater Corporation in Massachusetts state court on December 16, 2004. Although I received several written communications from Reidy's counsel and e-mail communications from Reidy during December 2004 and January 2005, neither Reidy nor its counsel even hinted to me that Reidy's Massachusetts lawsuit had been filed. It was not until February 18, 2005, that I learned for the first time that the Reidy Complaint was filed in December, 2004, when Reidy's February

17, 2005 Amended Compliant was served via mail to AirWater's Miami Beach office.

17.    If required to litigate the Licensing Agreement dispute in Massachusetts, the interests of AirWater would be prejudiced because it is a small business operation and the absence of its employees out of state for an extended period of time would work a hardship on the business.  In contrast, the absence of its employees and corporate representative from the extended trial in Worcester, Massachusetts would prejudice AirWater given the presence of J. J. Reidy throughout the trial, from jury selection through verdict.  In addition, all of AirWater's documents related to this patent licensing dispute, from inception of negotiations in Miami on Reidy's internet site, through negotiation in Miami Beach and the execution of the Licensing Agreement in Miami Beach, and continuing through and including its current business activities, are located in Miami Beach, Florida, where AirWater's business is located.

18.    In addition to myself, a dual citizen of Israel and the United Kingdom where I reside, my company leases an apartment in Miami Beach, where I stay for approximately ten days per month on average to personally attend to AirWater's business, the following individuals are known to me to have personal knowledge of facts relevant to the Licensing Agreement dispute:

    Rolando Sablon, Office Manager
    AirWater Patents, Inc.
    Miami, Florida

    Bob DeCosta, Sales Director

AirWater Patents, Inc.
Miami, Florida


Clint Snyder, Accountant
AirWater Patents, Inc.
Miami, Florida

Lavi Krasney, Financial Consultant
Tel Aviv, Israel

19.    The transfer of this action to the U. S. District Court for the Central

District of Massachusetts will also create an unreasonable professional burden

upon myself and AirWater's limited professional staff who are needed to assist me

in this litigation and upon the witnesses who are anticipated to be called in support

of AirWater's claims and defenses.

20.    I am presently involved, or AirWater Corporation is presently

involved, in other litigation pending in Miami-Dade County, Florida, (the

"Concurrent Litigation"), specifically:

a.    *Universal Communications Systems, Inc. & Michael J.*

*Zwebner v. Lycos, Inc. & Terra Networks, Inc., d/b/a THE LYCOS NETWORK*,

Case No. 04-21618-CIV-MARTINEZ/KLEIN (S.D. Florida);[1]

---

[1] Although the file in this action was transferred to the U.S. District Court, District of
Massachusetts (Boston) on March 8, 2005, in Case No. 1:05-CV-10435-REK, upon
information and belief, it is my understanding that the file transfer was either in error or
premature as Judge Martinez' February 17, 2005 order transferring this action is stayed
pending rehearing and the matters related to transfer were still being briefed after the
transfer occurred.

b.    *Universal Communications Systems, Inc. & Michael J. Zwebner v. Turner Broadcasting System, Inc., et al,* Case No. 05-20047-CIV-JORDAN/BROWN (S.D. Florida);

c.    *Zwebner, et al. v. Coughlin, et al.,* Case No. 05-CIV-20168-COOKE;

d.    *Universal Communications Systems, Inc. & Airwater Corporation v. Xcentric Ventures, LLC, Creative Business Investment Corp. & BadBusinessBureau.com, LLC,* Case No. 05-000175-CA-01 (11th Judicial Circuit Miami-Dade County, Florida); and

e.    *Universal Communications Systems, Inc. & Airwater Corp. v. Pedro Dembovich & Roberto Villasenor, a/k/a John Does ##1-20,* Case No. 04-27383-CA-01 (11th Judicial Circuit Miami-Dade County, Florida).

All of the above matters are part of a concerted effort, by me, to curtail anonymous, cyber basher manipulation of UCSY stock through the financial message boards which are hosted on the internet, specifically, the Raging Bull web site, hosted by LYCOS, Inc., the financial boards hosted by YAHOO!, and others.

21.    Based upon the foregoing facts and circumstances, the transfer of this action to the U.S. District Court for the Central District of Massachusetts will seriously prejudice both my ability and the ability of AirWater to effectively assist our counsel in this action and the matters related to this litigation, and in the Concurrent Litigation identified above.

22. Finally, for the reasons set forth in Paragraphs 3 through 5 above, I believe that the transfer of this action to Worcester, Massachusetts, will violate my fundamental rights to participate in this action.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
MICHAEL J. ZWEBNER

OFFICIAL NOTARY SEAL
ROLANDO S SABLON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD083309
MY COMMISSION EXP. JAN. 9,2006

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on June 20, 2005

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-40049-FDS

| |
|---|
| **J.J. REIDY & CO., INC.,** |
| **Plaintiff,** |
| **v.** |
| **AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,** |
| **Defendants.** |

### AFFIDAVIT OF MATTHEW P. ZAYOTTI, ESQ.

I, Matthew P. Zayotti, Esquire, do hereby state and depose as follows:

1.      I am an associate with the law firm Keegan Werlin, LLP and I am an attorney in good standing of the bar of the Commonwealth of Massachusetts.

2.      Attorney Richard Kirby and I represent the Defendants AirWater Corporation and AirWater Patents Corporation in connection with the above-captioned action.

3.      Attached to this affidavit as <u>Exhibit A</u> is a true and accurate copy of the parties' Global Manufacturing and Marketing Licensing Agreement.

4.      Attached to this affidavit as <u>Exhibit B</u> is a true and accurate copy of a letter of assignment from AirWater Corporation to J. J. Reidy & Co., Inc. dated June 25, 2003.

5.      Attached to this affidavit as <u>Exhibit C</u> is a true and accurate copy of a Notice of Default from Bowditch & Dewey to AirWater Corporation dated December 15, 2004.

6.      Attached to this affidavit as <u>Exhibit D</u> is a true and accurate copy of a a

Notice of Default from Bowditch & Dewey dated January 13, 2005 to AirWater Patents

Corporation.

7.      Attached to this affidavit as <u>Exhibit E</u> is a true and accurate copy of the

Complaint that AirWater Patents, Inc. filed against J.J.Reidy & Co., Inc. on February 11,

2005, in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County,

Florida, General Jurisdiction Division, Case No. 05-3140 CA24.

8.      Attached to this affidavit as <u>Exhibit F</u> is a true and accurate copy of a

Complaint filed by Electric & Gas Technology, Inc. and Richard Ehrlich against

Universal Communications Systems, Inc., AirWater Corporation and J.J. Reidy, Inc. on

August 12, 2003, in the United States District Court for the Northern District of Texas,

Dallas Division, Civil Action No. 03-1798G.

9.      Attached to this affidavit as <u>Exhibit G</u> is a true and accurate copy of a

certified letter, return receipt requested, from Bowditch & Dewey to AirWater

Corporation dated February 18, 2005.

10.      Attached to this affidavit as <u>Exhibit H</u> is a true and accurate copy of the

electronic docket relating to the matter of AirWater Patents, Inc. v. J.J. Reidy & Co., Inc.,

United States District Court Southern District of Florida, Civil Action No. 05-20650.

11.      Attached to this affidavit as <u>Exhibit I</u> is a true and accurate copy of the

Court's Order Setting Schedule, Requiring Mediation, and Referring Certain Motions to

Magistrate Judge dated March 30, 2005, relating to the matter of AirWater Patents, Inc.

v. J.J. Reidy & Co., Inc., United States District Court Southern District of Florida, Civil

Action No. 05-20650.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

_____20th_____ DAY OF JUNE, 2005.

Matthew P. Zayotti

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by (hand) (mail) on _June 20, 2005_

3

**EXHIBIT A**

# GLOBAL
# MANUFACTURING AND MARKETING
# LICENSING AGREEMENT

This Agreement is made and entered this **21ST** day of March 2003 by and between;

**J.J. Reidy & Co., Inc.,** a Massachusetts Corporation whose principal address is 1260 Main Street, Holden Massachusetts 01520-1020, hereinafter referred to as "LICENSOR" and;

**AirWater Corporation,** a Florida Corporation, whose principal address is suite 6K, Lincoln Road, Miami Beach Florida 33139, hereinafter referred to as "LICENSEE".

## WITNESSETH

**WHEREAS, LICENSOR** represent and warrants that it has the entire right, title, and interest in and to United States Patents numbered 5,106,512, 5,149,446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and any patents to issue, foreign or domestic on any continuation or division thereof and any new patents, foreign or domestic, granted to LICENSOR relating to the Water Production/Generations System (hereinafter collectively referred to as "LICENSED PATENTS"), and generally known as the WATERSTAR systems, and that LICENSOR has the absolute and undisputed rights to grant the licenses under the LICENSED PATENTS as specified hereinafter; and,

**WHEREAS LICENSEE** represents that it is a US Corporation formed and registered in the State of Florida, and so licensed to do business, and,

**WHEREAS LICENSEE** is a wholly owned subsidiary of Universal Communications Systems Inc. a publicly traded company trading on the NASD OTC BB under the symbol "UCSY", and,

**WHEREAS LICENSEE** has indicated to LICENSOR of its interest in both manufacturing and marketing the WATERSTAR systems and technologies, on a world wide basis, and,





1    JR

**WHEREAS LICENSEE** is desirous of obtaining a global right and license to manufacture, assemble, use and sell Water Production/Generation System products, and component parts therefore, falling under the scope of any LICENSED PATENT (hereinafter referred to as "LICENSED PROPERTY"); and

**WHEREAS LICENSOR** is willing to grant such right and license to LICENSEE under the conditions hereinafter set forth;

**NOW THEREFORE**, in consideration of mutual covenants, promises and undertakings contained herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby reciprocally acknowledged, the undersigned parties agree as follows.

# TERMS OF AGREEMENT

### GRANT OF LICENSE:

LICENSOR hereby grants to LICENSEE, for the term of this AGREEMENT, as a right and license to use and sell LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS, according to the provisions set forth hereinafter with the full right and privilege to alter, change and / or modify the contents and peripheral materials associated with LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY

RIGHTS with the conditions set forth herein, and the right to sublicense sale and distributions of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS according to the provisions and the conditions set forth hereinafter.

### TERM OF LICENSE:

The term of this Agreement shall commence upon the date of execution of this agreement and shall remain binding and continue for a period of not less than 10 years, and / or for the life of the last expiring LICENSED PATENT, whichever comes last, unless terminated sooner as provided herein.

2  JR

## OWNERSHIP OF LICENSED PROPERTY:

This license agreement is not a sale or lease of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS from LICENSOR and the full title, rights and interests shall remain in the name of LICENSOR unless otherwise expressed herein and upon written mutual consent of both parties.

## PURPOSE

The purpose of LICENSEE will be, but is not limited to, the manufacture, sale and distribution of Water Production Generation Systems, and being of the invention of the LICENSOR, or derived or evolved there from, which system(s) is/are designed to produced potable water from the air.

## THE TERRITTORY

LICENSEE agrees that this Global Marketing and License Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions.

## VALIDITY

LICENSOR grants to LICENSEE this LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS for a period not less than 10 years, and / or the life of the last expiring patent, whichever comes last, and in any event agrees that it will not sell, allocate, transfer or sublicense to any third party without the expressed written permission of the LICENSOR.

## PAYMENT AND CONSIDERATION

LICENSEE further agrees to deliver 2 payments to LICENSOR's designated individuals a Global Marketing and Licensing Fee in the amount totaling $100,000 on or before July 1st 2003, (one payment due July 1st 2003, the second payment payable on August 1st 2003) plus four (4) million shares of UCSY to be delivered to the LICENSOR, (or his designees) within 21 days from the date of the execution of this Agreement.



3    JR

These 4 million UCSY shares shall be issued as 144 shares, which in line with SEC regulations are restricted from sale for a period of not less than one year, unless subjected to a registration with the SEC and such registration is approved. These shares will be included in any company filing / registration, which the company undertakes to effect in not more than 180 days from the date of execution of this agreement.

## ROYALTY PAYMENTS

LICENSEE further agrees to pay a royalty fee on all sales of manufactured models in the amount of five per cent (5%) of all gross sales less any applicable taxes, for any machines and or components sold in the amounts not exceeding $10,000 each. For all other sales of units and or components, the Royalty Fee shall be seven percent (7%).

LICENSOR shall receive royalties on the quarterly gross sales of LICENSEE, and any of its sub LICENSEES. The royalties shall be computed based on the sales price, less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes, and other such amounts.

This royalty levied on gross sales shall be paid for all sales made on a Quarterly basis.

The payment will be remitted to the LICENSOR on or before the 30th day following the closing of the quarterly period.

LICENSEE will provide LICENSOR on a quarterly basis a full accounting of units shipped, units billed, and a receivables aging, until that time both parties agree to waive this requirement.

The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:

Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales during that fiscal quarter.



4    JR

## MINIMUM MONTHLY ROYALTY PAYMENTS:

LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above whichever is the more.

LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

## LATE PAYMENT OF ROYALTIES:

LICENSOR may elect, to accept late payment fees from LICENSEE of two percent (2.0%) of any gross amount due LICENSOR should any payment due not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

## MANUFACTURING BY LICENSEE & THIRD PARTIES

LICENSOR further acknowledges that LICENSEE intends to offer to manufacture the said units and models in other countries around the world, and LICENSOR hereby confirms that the LICENSEE is granted the absolute right to so offer 3rd parties the sub-rights at all times adhering to the terms and conditions of this agreement.

## SUBLICENSE CONTRACTS

LICENSEE shall have the right to sublicense the LICENSED PROPERTY to any and all third parties it deems creditable and trustworthy to distribute and or market and or sell the LICENSED PROPERTY within the geographical limits as shall be agreed.

Both parties agree that the definition of Sublicense shall mean, "The right granted by the Licensee to any third party to manufacture, market and or distribute the LICENSED PROPERTY pursuant to the provisions and conditions provided herein, and as shall be amended to accommodate the particular situation.



5   JR

LICENSEE retains the rights to charge and retain, and or waive, finance and or to accept partial payments (down payments) for any and all sublicense fees, as shall be the case on a case-by-case basis.

LICENSEE shall provide and deliver sublicense contracts to LICENSOR as a matter of record.

LICENSEE agrees that all sublicenses and related contracts are to encompass and embrace the parameters of this Agreement, and shall be created so as not to be in violation of any of the provisions contained herein, in part or in whole.

## SUBLICENSE PROPERTY

All sublicenses shall be considered proprietary and confidential and shall remain the property of the LICENSEE and/or the introducing party.

## PRODUCT ENDORSEMENT

LICENSEE may seek endorsements, including celebrity endorsements that LICENSEE deems qualified to represent LICENSED PROPERTY, and such endorsements obtained by LICENSEE shall remain the property of LICENSEE. LICENSOR agrees to acknowledge by letter the right of LICENSEE to use the prior or future endorsements at the discretion of LICENSEE in an appropriate manner of marketing with the consent of the endorser.

## LICENSEE OBJECTIVE AND GLOBAL MARKETING

LICENSEE's overall objective is to establish and maintain the awareness and the exposure of LICENSED PROPERTY to enhance sales and future growth.

LICENSEE will maintain the image and integrity of LICENSED PROPERTY for duration of this License Agreement. No marketing campaign shall be undertaken which fails to project good moral and ethical values. This specifically includes companies, which fail to reflect the highest of moral standards.

6   JR

LICENSEE hereby commits the resources and puts forth best efforts in accomplishing, completing, and fulfillment of the promises contained herein.

LICENSEE shall have the right to create commercial production (radio, television, print) and other means in which to fulfill License Agreement.

LICENSE may create a long-term public relations strategy in which to achieve awareness \ sales, and growth.

## PRODUCT NAME AND LOGO's

LICENSEE retains the right to change the LICENSED PRODUCTS's name without the expressed written consent of LICENSOR.

## DESIGN PACKAGING.

LICENSEE shall hereby have the right to alter, change, add and or remove any item, color, format or material in any existing design packaging with the expressed written consent hereby granted by LICENSOR.

## COPYRIGHT USAGE

LICENSOR hereby grants the right to LICENSEE the use of any and all, in part or in whole, copyright materials as they currently relate to the LICENSED PROPERTY.

## TRADEMARK REGISTRATION – US. / FOREIGN

LICENSEE shall make application and pay filing fees in registering changes to trademark and or trade names, registrations, and service marks when and where applicable.

## GRANT OF TRADEMARK USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trademarks as they currently relate to the LICENSED PROPERTY under the conditions contained herein.



7 -JR

## GRANT OF TRADE NAME USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trade names, symbols, or logo's associated with LICENSED PROPERTY as they currently relate, under the conditions contained herein.

## TRADEMARK QUALITY CONTROL

LICENSOR has the right to approve LICENSED PROPERTY sold bearing the trademark licensed herein for conformance with LICENSOR's quality standard.

Before implementing changes in the goods sold under the trademark, LICENSEE shall provide LICENSOR a specimen of the proposed changes.

LICENSOR shall have 2 weeks in which to pass comment, denying or approving the said changes within reason. If LICENSOR does not object within the said 2 weeks, the said changes are deemed approved.

## PRODUCT AND MATERIAL ADDITIONS

LICENSEE shall have the right to make any additions to the LICENSED PROPERTY without the expressed written consent of the LICENSOR for market appeal and or added value. Any such added materials shall remain the property of the LICENSEE at all times, subject to continuing payment of royalties.

## ASSEMBLY

LICENSEE has the right to assemble and or have assembled LICENSED PROPERTY where and whenever applicable.

## UNIVERSAL PRODUCT CODE

LICENSOR shall provide LICENSEE any existing UPC codes for the LICENSED PROPERTY.



8  JR

## LICENSE PARAMETER

LICENSOR agrees and confirms that this exclusive Agreement is not limited to any county, state or country worldwide.

## MAINTENANCE OF PATENT(s)

LICENSOR hereby agrees and confirms that the above referenced patents are all valid, in good standing and that he has disclosed all pertinent and relevant information relative to the patents, and further confirms that he will maintain the validity and good standing of the patents.

## PRODUCT LIABILITY INSURANCE

LICENSEE shall during the entire term of this agreement, maintain an adequate Insurance Policy, to commence upon the first commercial production and sales of product, such product liability insurance to cover LICENSED PROPERTY sold by LICENSEE or any of its sub licensees, and J.J. Reidy & Co Inc., shall be named "additional insured" thereon with respect to any claims made against LICENSOR as a result of LICENSEE's or any of its sub licensee's sales of LICENSED PROPERTY.

LICENSEE agrees to provide a copy of such insurance policy within 30 days of execution of its marketing opening dates of sales. LICENSEE shall also indemnify and hold harmless J.J. Reidy & Co Inc, its employees, directors, officers, shareholders as to any claims, lawsuits, threatened litigation or judgments rendered, relating to the LICENSED PROPERTY sold by the LICENSEE and /or any of its sub licensees.

## TRADE SECRETS

Both parties acknowledge and agree that the other party possesses trade secrets that are proprietary property, and constitute a valuable trade secret. Both parties agree not to disclose and or make available to third parties the information that shall include, but be limited to, this Agreement and any other Agreement that may be entered into between the parties, without the expressed written consent of the other party.



9    JR

## FOREIGN PATENT AND TRADEMARK AND REGISTRATIONS

If at the LICENSEES request the LICENSOR shall make application for foreign trademark and or trade name registration, then the LICENSEE shall pay all fees necessary.

LICENSEE, when applicable shall retain the full rights, title, and interest in any and all trademark(s) and trade name(s) registration in foreign countries as long as this license Agreement is in force.

LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSOR, at his own expense.

## RECORDS AND INSPECTION

LICENSEE shall reduce all sublicenses granted herein written Agreements and copies will be provided to LICENSOR.

## TRANSFER OF CUSTODY, KNOW HOW AND TECHNICAL ASSISTANCE

LICENSOR agrees to provide all information in its possession to assist LICENSEE to distribute and sell LICENSED PROPERTY. LICENSOR shall transfer to the care and custody of LICENSEE within 30 days from the execution of this Agreement, all information requested by LICENSEE in its possession pertaining to the LICENSED PROPERTY, and all information material and pertaining to the sales thereof, and consisting of, for example, but not limited to:

All design Data, films, disks, camera work, negatives, layouts, registration mark copy for production and reprint, logos, type fonts, etc.

Process Specifications-All details, processes, steps and procedures concerning, but not limited to care of product, storage, the do's and don'ts, print specifications, packaging specifications, etc.



10  JR

Commercial Operation Data-volume discounts, minimum order levels, maximum order levels, turn-around production time, shipping costs and requirements, etc.

Endorsement Grant-granting the permission to LICENSEE the use of any and all previous or future endorsements with the permission of the endorser.

LICENSOR shall also make available in timely fashion, all future improvements relating to the LICENSED PROPERTY, including change, and modifications and specifications, methods and materials, during the term of this Agreement.

## TERMINATION OR REVOCATION OF LICENSE

This Agreement and the rights and licenses granted herein shall wholly cease and terminate prior to the termination of the license as described hereinabove upon the occurrence of any of the following events.

Any material breach by either party of the terms of this Agreement, provided the non-breaching party in the one seeking the termination and gives the other party written notice on intention to terminate, which shall state the fault or breach upon which the party relies.  The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time; or

If the LICENSOR does not receive the Licensing fee at the time of the joint approval and signing of this agreement or any other subsequent payment due LICENSOR that is not paid within 5 business days within its due date.

This agreement shall terminate upon the insolvency and/or criminal conviction of either party unless other agreed to in writing.

Upon termination, LICENSOR shall have the first right of refusal to purchase Licensee's inventory for cost payable within 30 days of written offer.

The written offer must be accepted within 30 days of being made. In no event shall LICENSEE sell existing inventory after a period of 12 months following the termination notice.



11  -JR

The mutual consent of the parties expressed in writing.

This agreement will terminate with notice, if LICENSEE does not make any required payments to LICENSOR as specified within the stated and agreed time periods.

The LICENSOR agrees to grant to the LICENSEE a 14 day period of notice / grace in which the LICENSEE can make good on any outstanding amount.

## EFFECT OF TERMINATION OR REVOCATION

The termination of this agreement shall not release LICENSEE from the obligation to pay LICENSOR any accrued sums owed to LICENSOR or from fulfilling any other accrued obligation. Additionally such termination shall be without prejudice to any right or remedy, which either party may have or believes it has against the other party.

The termination of this agreement as a result of the provisions and conditions provided herein, and/or the breach thereof, or an uncontrolled act of G-d, government, laws, etc., which prohibit the fulfillment of this Agreement shall not bind the LICENSEE to fulfill any projected sales figures.

In no case shall LICENSEE have any claims for repayment or offset of any sum or sums, which shall have been paid, as required under the terms of this agreement

Upon termination, each party will retain proprietary property(s) and the complete rights title, and interest of any and all proprietary property, information and material introduced.

Upon termination and revocation of License Agreement, each party will properly return, in a timely fashion and all proprietary property to the owner, in the same manner and condition received in relation to paragraph above.

Upon termination and revocation of License Agreement, LICENSOR has the right to purchase from LICENSEE any items not considered LICENSED PROPERTY, such as, but not limited to, changes in the LICENSED PROPERTY name, trade mark or trade name, universal product codes,



12    JR

marketing materials changes, alterations, and/or modifications duly registered etc., at a fair market price.

## DURATION/TERM/MAINTANENCE OF EXCLUSIVITY

The License granted herein exclusive to a geographical territory as defined above and shall remain exclusive unless terminated in accordance with the terms of this agreement.

LICENSEE agrees to put forth its best efforts to sell LICENSED PROPERTY during the period of exclusivity of the Licenses granted herein.

## INFRINGEMENT:

In the event any infringement of LICENSOR's patents is discovered in any country recognizing such patents and/or litigation commences with respect to any claim of infringement of LICENSOR's patents, LICENSEE has the option to pursue any and all litigation to protect the marketing effort.

LICENSEE has the sole discretion to determine how much to incur in legal expenses in pursuing any infringement claim or litigation based upon what is reasonable and in the best interest of LICENSEE.

LICENSOR shall have the option to participate in such claim in proportion to the expense LICENSEE bears, i.e. 50% of litigation expenses = 50% of the claim/settlement. In the event LICENSOR exercises this option to participate, LICENSOR shall be entitled to retain an equal percentage amount, in relation to the percentage amount of expenses incurred, of the receipts from such settlement, judgment, compromise or arbitration.

In the event infringement is discovered and LICENSEE does not act upon settlement of infringement or litigation in a reasonable amount of time as not to effect the marketing campaign, sales, and/or growth, LICENSOR shall have the right to pursue the infringing party for damages, and retain the proceeds.

13   JR

## USE RESTRICTIONS:

LICENSEE agrees not to use LICENSED PROPERTY in any illegal fraudulent, or deceptive manner to damage the good name and / or standing of the LICENSED property

## TRANSFER RESTRICTIONS/ASSIGNABILITY/SUB-LICENSE/SALE

Any party may assign and/or sell this Agreement to any third party, subject to first offering the other party a first right of refusal. Any such assignment and/or sale shall be made in accordance with the provisions herein.

LICENSEE has the right to have other parties manufacture for it, provided the manufacturer enters into a Non-Compete and Non-Disclosure Agreement with LICENSOR. If LICENSEE sells or assigns this License, LICENSOR will receive from LICENSEE fifteen percent (15%) of the assignment/sale price.

## ASSIGNMENT/SALE

LICENSOR agrees to notify LICENSEE of any contemplated assignment /sale of LICENSOR's patents during the term of this Agreement with thirty (30) days notice.

LICENSEE agrees to notify LICENSOR of any contemplated assignment /sale of this License during the term of this Agreement with thirty (30) days notice.

In either of the above cases, each party shall offer the other party the right of first refusal.

14  

## WAIVERS:

No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.

The waiver by any party of any of the conditions precedent to its respective obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement.

## BENEFITS:

Except as expressly provided in this Agreement, nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligation, or liability under or by reason of this Agreement

## CONSTRUCTION/JURISDICTION:

Inasmuch as the transactions, which may arise or occur between the parties and/or their principals may cross boundaries of national and or international jurisdiction, this Agreement shall be construed and interpreted in Accordance with the laws of the United States of America and the resident state of the Plaintiff.

## SEVERABILITY:

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

15   ᴊℛ

## ARBITRATION

The parties may elect to settle and differences by submitting to Arbitration in the resident state of the plaintiff. The Arbitrators decision shall be and remain binding to either and both parties.

## NOTIFICATION

Any notice hereunder must be in writing and by courier service with signed receipt and shall be deemed to have been given when such notification, properly addressed to the addressee indicated above, is sent by courier and receipt acknowledged. Either party hereto may at any time by thirty (30) days notice to the other; designate any other address in place of those given above.

## FURTHER DOCUMENTS:

Each of the parties hereto agrees to execute and deliver all such documents and to do any and all acts, matters and things as may be necessary or proper in order to carry out the intended purposes of this Agreement.

## PRIOR AGREEMENTS:

This Agreement shall supersede and replace any and all prior Agreements entered into between the parties hereto related to the subject matter hereof and any such prior Agreements shall be, and they are hereby, canceled.

## EMPLOYEE STATUS:

It is understood and agreed by both parties that neither party is an employee of the other.

## EFFECTIVE DATE:

The effective date of this Agreement shall be upon the acceptance and execution thereof by both parties.

16

**ENTIRE AGREEMENT**:

This instrument of 18 pages contains the entire Agreement between LICENSOR and LICENSEE, and no modification hereof shall be binding on the parties unless it is in writing and signed by a duly authorized officer of the parties to be bound.

**AUTHORITY**:

All parties warrant that they have the requisite authority and capacity to execute this Agreement and that its terms and provisions constitute valid and legally enforceable rights and obligations against the parties, their successors, administrators, etc.

**DOCUMENT ORIGINALS:**

This document is considered as an original, binding and enforceable Agreement, whether executed in original, binding counterparts or Facsimile.

**INTENTIONALLY LEFT BLANK.**



17

IN WITNESS WHEREOF, the parties have affixed their names, signatures, and seals, by their executive officers thereto duly authorized, on the day and year first above written.

**ON BEHALF OF LICENSEE:**

M J Zwebner - Chairman
AirWater Corporation

**ON BEHALF OF LICENSOR:**

James J. Reidy, President
J.J. Reidy & Co., Inc.

Subscribed and sworn to before me

This _21st_ day of _March_ 2003

Notary Public Notary Public
My commission expires: _1/9/03_

OFFICIAL NOTARY SEAL
ROLANDO S SABLON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD083309
MY COMMISSION EXP. JAN. 9 2004

18

**EXHIBIT B**

**AirWater Corporation**
Suite 6K, 407 Lincoln Road
Miami Beach FL 33139
Tel 305 672 6344
Fax 305 672 1965

J&J Reidy & Co Inc
1260 Main Street,
Holden 01520
Mass

June 25, 2003

Dear Jim,

Please be advised that in accordance with our discussion and agreement, we have transferred all the rights and liabilities of the Global Manufacturing and Marketing Licensing Agreement entered into between us on March 21st 2003, to **AirWater Patents Inc**, a Florida Corporation.

This company recently formed, is also to be a wholly owned subsidiary of Universal Communication Systems Inc.

Please signify your agreement to this transfer by signing below on the space designated.

Thank you for your co-operation.

Yours sincerely,

Michael Zwebner - President
AirWater Corporation.

I have read this letter, and pursuant to the terms of the agreement relevant, I/we hereby give my/our consent to this request for approval for the transfer of the Agreement to **AirWater Patents Inc**., as stated above.

Date June 25, 2003
James Reidy – President
J&J Reidy & Co Inc.



**EXHIBIT C**



*Bowditch
&Dewey*
ATTORNEYS



December 15, 2004

Mr. Michael Zwebner
President
AirWater Corporation
Suite 12F
407 Lincoln Road
Miami Beach, FL 33139

Re:  **NOTICE OF DEFAULT**

Dear Mr. Zwebner:

This firm represents J.J. Reidy & Company, Inc. ("J.J. Reidy"). This letter is to inform you that AirWater Corporation ("AirWater") is in default of the Global Manufacturing and Marketing Licensing Agreement (the "License") executed on March 21, 2003 between AirWater and J.J. Reidy. AirWater has failed to make its required monthly royalty payments to J.J. Reidy on November 1, 2004 and December 1, 2004 and has thus breached the terms of the License. Additionally, AirWater has made eight (8) payments of monthly royalties to J.J. Reidy more than fifteen (15) days past the due date. This letter is notice to AirWater that J.J. Reidy has elected to accept late payment fees from AirWater of 2% of the gross amount of these late royalty payments.

The "Minimum Monthly Royalty Payments" section of the License, page 5, states: "LICENSEE is to pay LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1, 2003." Moreover, the "TERM OF LICENSE" section of the License, page 2-3, states that "…this agreement shall remain binding and continue for a period of not less than 10 years…." AirWater has failed to make its $10,000 monthly royalty payments to J.J. Reidy on November 1, 2004 and December 1, 2004 and is in default of its obligations under the License. According to the "TERMINATION OR REVOCATION OF LICENSE" section of the License, page 11-12, AirWater has a 14-day period of notice / grace in which it can make good on its outstanding amount of $20,000 owed to J.J. Reidy. If said payment is not received by J.J. Reidy within this time, J.J. Reidy reserves the right to Terminate and Revoke the License.

This letter further notifies AirWater that J.J. Reidy has elected to accept late payment fees from AirWater of 2% of the gross amount of royalty payments either unpaid as of this date or paid more than fifteen days past their due date, pursuant to the "LATE PAYMENT OF ROYALTIES" section of the License, page 5, which states:

{J:\CLIENTS\lit\304269\0002\00491696.DOC:1}

BOWDITCH & DEWEY, LLP  311 MAIN STREET   PO BOX 15156   WORCESTER, MA 01615-0156
T 508 791 3511  F 508 756 7636  www.bowditch.com          *Boston · Framingham · Worcester*

Page 2

        LICENSOR may elect to accept late payment fees from LICENSEE of two percent of any gross amount due LICENSOR should any payments not be made within 15 (fifteen) days of its dues date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

        As payments due to J.J. Reidy on December 1, 2003, January 1, 2004, February 1, 2004, March 1, 2004, July 1, 2004, September 1, 2004, November 1, 2004, and December 1, 2004 were all paid or have not yet been paid more than fifteen days from their due dates, AirWater owes to J.J. Reidy a 2% late payment fee totaling $1,600 (8 late payments of $10,000 per month at 2%). Failure to make this payment within fourteen (14) days of receipt of this letter will constitute a further a breach of the License and grant J.J. Reidy the option to Terminate and Revoke the License without waiving its right to any monies owed it by AirWater pursuant to the "TERMINATION OR REVOCATION OF LICENSE" section of the License, page 11.

        Please remit payment directly to J.J. Reidy and copy the undersigned on your correspondence.

        J.J. Reidy reserves all of its rights to pursue any and all legal remedies available to it to enforce its rights under the License.

                  Sincerely,

                  Daniel P. Flynn

Cc: Thomas J. Conte, Esquire

**EXHIBIT D**

EX.B



**Bowditch**
**&Dewey**
ATTORNEYS

Direct telephone: (508) 926-3431
Direct facsimile: (508) 929-3046
Email: dflynn@bowditch.com

<u>**VIA FEDERAL EXPRESS**</u>                                January 13, 2005

Mr. Michael Zwebner
AirWater Patents Corporation
Suite 12F
407 Lincoln Road
Miami Beach, FL 33139

Re:    **NOTICE OF DEFAULT**

Dear Mr. Zwebner:

This firm represents J.J. Reidy & Company, Inc. ("J.J. Reidy"). This letter is to inform you that AirWater Patents Corporation ("AirWater Patents") is in default of the Global Manufacturing and Marketing Licensing Agreement (the "License") executed on March 21, 2003 between AirWater Corporation and J.J. Reidy and assigned to AirWater Patents on June 25, 2003. AirWater Patents has failed to make its required monthly royalty payments to J.J. Reidy on November 1, 2004 and December 1, 2004 and has thus breached the terms of the License. Additionally, AirWater Patents has made eight (8) payments of monthly royalties to J.J. Reidy more than fifteen (15) days past the due date. This letter is notice to AirWater Patents that J.J. Reidy has elected to accept late payment fees from AirWater Patents of 2% of the gross amount of these late royalty payments.

The "Minimum Monthly Royalty Payments" section of the License, page 5, states: "LICENSEE is to pay LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1, 2003." Moreover, the "TERM OF LICENSE" section of the License, page 2-3, states that "...this agreement shall remain binding and continue for a period of not less than 10 years...." AirWater Patents has failed to make its $10,000 monthly royalty payments to J.J. Reidy on November 1, 2004 and December 1, 2004 and is in default of its obligations under the License. According to the "TERMINATION OR REVOCATION OF LICENSE" section of the License, page 11-12, AirWater Patents has a 14-day period of notice / grace in which it can make good on its outstanding amount of $20,000 owed to J.J. Reidy. If said payment is not received by J.J. Reidy within this time, J.J. Reidy reserves the right to Terminate and Revoke the License.

DECLIEN ISIII3042(6\0002\00500583.DOC;1}

BOWDITCH & DEWEY, LLP  311 MAIN STREET  PO BOX 15156  WORCESTER, MA 01615-0156
T 508 791 3511  F 508 756 7636  www.bowditch.com

Boston  Framingham  Worcester

Page 2

This letter further notifies AirWater Patents that J.J. Reidy has elected to accept late payment fees from AirWater Patents of 2% of the gross amount of royalty payments either unpaid as of this date or paid more than fifteen days past their due date, pursuant to the "LATE PAYMENT OF ROYALTIES" section of the License, page 5, which states:

> LICENSOR may elect to accept late payment fees from LICENSEE of two percent of any gross amount due LICENSOR should any payments not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

As payments due to J.J. Reidy on December 1, 2003, January 1, 2004, February 1, 2004, March 1, 2004, July 1, 2004, September 1, 2004, November 1, 2004, and December 1, 2004 were all paid or have not yet been paid more than fifteen days from their due dates, AirWater Patents owes to J.J. Reidy a 2% late payment fee totaling $1,600 (8 late payments of $10,000 per month at 2%). Failure to make this payment within fourteen (14) days of receipt of this letter will constitute a further breach of the License and grant J.J. Reidy the option to Terminate and Revoke the License without waiving its right to any monies owed it by AirWater Patents pursuant to the "TERMINATION OR REVOCATION OF LICENSE" section of the License, page 11.

Please remit payment directly to J.J. Reidy and copy the undersigned on your correspondence.

J.J. Reidy reserves all of its rights to pursue any and all legal remedies available to it to enforce its rights under the License.

Sincerely,

Daniel P. Flynn

Cc: Thomas J. Conte, Esquire

**EXHIBIT E**

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: __05 - 3 1 4 0__  CA2 4

AIR WATER PATENTS, INC., a
Florida corporation,

      Plaintiff,

vs.

J. J. REIDY & CO., INC., a
Massachusetts corporation,

      Defendant.

_____/

## COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Plaintiff, AirWater Patents, Inc., files this Complaint for declaratory relief and damages against Defendant, J. J. Reidy & Co., Inc. ("Reidy") and alleges:

### Parties, Jurisdiction and Venue

1.    AirWater Patents, Inc. is a Florida corporation with its principal place of business located in Miami Beach, Miami-Dade County, Florida. AirWater is the assignee of Air Water Corporation, a Florida corporation, with its principal place of business located in Miami Beach, Miami-Dade County, Florida (collectively, "AirWater").

2.    Reidy is a Massachusetts corporation with its principal place of business located in Holden, Massachusetts.

{M1313258_2}

ADORNO & YOSS LLP
2525 PONCE DE LEON BLVD. • SUITE 400 • MIAMI, FLORIDA 33134 • TELEPHONE 305-460-1000 • TELEFAX 305-460-1422

CASE NO.:_____

3.     This is an action for declaratory judgment pursuant to Chapter 86, Florida Statutes (2004), and for damages which exceed the jurisdictional limits of this Court, exclusive of interest, costs and attorneys fees.

4.     Venue of this action is proper as Reidy's actions and omissions which give rise to the allegations of AirWater's Complaint occurred in Miami-Dade County, Florida.

5.     All conditions precedent to the bringing of this action have been performed or waived, or were otherwise excused.

### General Allegations

6.     AirWater was formed for the purpose of obtaining and owning United States and overseas patents, particularly in the technology for the extraction of water from air. AirWater is a wholly owned subsidiary of Universal Communication Systems Inc. ("UCSY"), a publicly traded company.

7.     Reidy claims to have been the sole inventor of a water production generation system, generally known as the Waterstar System, which produces drinkable water from the air. Reidy also claims all right, title and interest to four patents, U.S. Patent Nos. 5,106,512; 5,149,446; 5,203,989; and 5,366,705 (the "Reidy Patents") for the Waterstar System. In addition, Reidy has represented to AirWater and others that the design for Reidy's Waterstar System has been patented or protected world-wide.

8.     On or about February, 2003, AirWater and Reidy commenced negotiations for AirWater's exclusive license to manufacture, market and sell Reidy's Waterstar System. The parties agreed in principle upon the basic terms for a licensing agreement,

{M1313258_2}

2

CASE NO.:_____

which included Reidy's grant to AirWater of an exclusive, world-wide license for the Waterstar System for a ten year term upon AirWater's payment to Reidy of $100,000 cash, 4 million shares of stock issued and valued at about $300,000, and quarterly royalty payments during the term of the license.

9.     Throughout the course of their negotiations, both parties reasonably anticipated and expressly acknowledged that there would be a substantial delay in the flow of AirWater's royalty payments to Reidy because sales of the Waterstar System would not be immediately generated for a number of reasons, including (a) the time need to re-design Reidy's Waterstar machines, (b) the time needed to develop and build a range of new Waterstar machines, (c) the time necessary to obtain national and international permits and licenses for the sale of the Waterstar products, and, finally, (d) the need to allow a reasonable time for AirWater's sales and marketing efforts to generate sales. Air Water estimated, and Reidy agreed, that this start-up process would take at least one to one and one-half years from the date of the execution of a global licensing agreement.

10.     Since the stock Reidy would receive was legally restricted pursuant to SEC rules and could not be traded for one year, and because quarterly royalties were not anticipated during the start-up phase of the Waterstar system's design, manufacture, marketing and sales, Reidy requested, and AirWater agreed, to a minimum monthly royalty of $10,000 for a limited period of one year, after which AirWater's quarterly royalty payments would commence.

ADORNO & YOSS LLP
2525 PONCE DE LEON BLVD. • SUITE 400 • MIAMI, FLORIDA 33134 • TELEPHONE 305-460-1000 • TELEFAX 305-460-1422

CASE NO.:_____

11.    On March 21, 2003, AirWater and Reidy executed the Global Manufacturing & Marketing Licensing Agreement (the "Agreement"), a true and correct copy of which is attached as Exhibit "A."

12.    On June 25, 2003, Air Water Corporation assigned its rights and obligations under the Agreement to Air Water Patents, Inc., which assignment was approved by Reidy.  A true and correct copy of this Assignment is attached as Exhibit "B."

13.    Under the terms of the Agreement, Reidy granted AirWater an exclusive, world-wide license of the Reidy Patents for a term of the later of ten years or the life of the last expiring Reidy Patent. (Agreement, p. 3)

14.    AirWater timely performed its obligations under the Agreement by paying Reidy $100,000.00 and transferring 4 million shares of stock to Reidy.  (Agreement, pages 3 – 4.)

15.    Consistent with the parties' negotiations, and because there would be no royalties during the initial one to one and one-half year start-up phase to market the Waterstar System, AirWater agreed to Minimum Monthly Royalty Payments to Reidy of $10,000 per month for twelve months, commencing November 1, 2003, through October 31, 2004.  During this 12-month period, Reidy was required to credit any unearned monthly royalty to any earned royalties. (Agreement, p. 5)

16.    Under the terms of the Royalty Payments provisions of the Agreement, AirWater's first quarterly royalty payment for the period ending December 31, 2004, is

ADORNO & YOSS LLP
2525 PONCE DE LEON BLVD. • SUITE 400 • MIAMI, FLORIDA 33134 • TELEPHONE 305-460-1000 • TELEFAX 305-460-1422

CASE NO.:_____

due February 15, 2005, and its first quarterly payment for period ending March 31, 2005, is due May 15, 2005. (Agreement, p. 4.)

17.    Immediately upon the execution of the Agreement, AirWater commenced its recruitment of individuals and corporations on a worldwide basis to help develop, design, and build state of the art Waterstar machines. Through its parent corporation and sister company Air Water Corporation, AirWater spent in excess of $2 million in direct and indirect costs, wholly attributable to the WaterStar Project. The details of these substantial expenditures, including research and development costs, manufacture and shipping of Waterstar sample machines, advertising, promotion, exhibitions, travel and marketing expenses, has been fully disclosed in public filings with the SEC.

18.    Whereas the Reidy Patents and the concept of air to water technology was little known, and even less exploited, prior to the execution of the Agreement, now, due to the substantial efforts of AirWater, the concept, the Waterstar System, and the reality of the technology, have been well publicized on a world-wide basis to the benefit of both AirWater and Reidy.

## The ELGT Patent Infringement Litigation Challenging the Reidy Patents

19.    Unfortunately, throughout the first eighteen months of the Agreement, a significant amount of AirWater's time, money and effort were diverted from the Waterstar Project to its defense of the validity of the Reidy Patents.

20.    On or about August 8, 2003, AirWater (and UCSY, its parent company) were served with a complaint for patent infringement by a Texas company, Electric Gas

CASE NO.:_____

& Technologies Inc. ("ELGT"), in the action styled *Electric & Gas Technology, Inc.,*
*Atmospheric Water Technology, Inc., and Richard Ehrlich, Plaintiffs, v. Universal*
*Communications Systems, Inc., AirWater Corp., and J. J. Reidy, Inc., Defendants,* U.S.
District Court for the Northern District of Texas, Case No. 03CV1798G. A true and
correct copy of ELGT's Complaint is attached as Exhibit "B."

21.     In essence, ELGT alleged that Reidy fraudulently obtained and registered
Ehrlich's Patents for its water production generation system. (See Paragraphs 13 through
17 of ELGT's Complaint at Exhibit "B.")

22.     Reidy deliberately avoided service of process of ELGT's summons and
complaint (ELGT claimed, under oath, that it attempted to serve Reidy's registered agent,
J. J. Reidy, on 12 separate occasions without success) and took no steps to defend the
validity of the Reidy Patents, leaving the entire burden of the defense of ELGT's action
upon AirWater. Reidy simply stood by silently, failed to cooperate in good faith with
AirWater's defense of the Reidy Patents, and even refused to contribute funds to the costs
of the patent litigation.

23.     Ultimately, on grounds other than the validity of the Reidy Patents,
AirWater was able to negotiate a settlement with ELGT, and the action was settled in
favor of AirWater. However, the questions raised by ELGT as to the validity of the
Reidy Patents remains unresolved.

24.     AirWater incurred attorney's fees and costs in excess of $180,000
defending the validity of the Reidy Patents.

CASE NO.:_____

25.    As a direct consequence of the ELGT action, AirWater suffered damage to its reputation, loss of international credibility, considerable business downturn, and many lost business opportunities. In addition, AirWater lost valuable time which further delayed the progress and development of the new range of WaterStar machines, and further postponed and delayed the arrival of the Waterstar System and its deployment in the market.

26.    Even during the time AirWater defended the Reidy Patents, AirWater honored its obligations under the Agreement and continued to pay the Minimum Monthly Royalty of $10,000 to Reidy.

## Reidy's Failure to Provide Global Patents

27.    Under the terms of the Agreement, Reidy represented that the Reidy Patents were valid all over the world without restrictions. (Agreement, p. 3.) Indeed, the Agreement is titled, *Global* Manufacturing and Marketing Licensing Agreement.

28.    During all times material to this action, Reidy also represented that the Reidy Patents were valid, registered, and enforceable "world-wide."

29.    Contrary to its representations, however, Reidy had only obtained patents in the United States and in three other overseas countries.

30.    Upon learning that Reidy's Patents were not licensed in several foreign countries which were the known targets of AirWater's marketing for the Waterstar System, Air Water made demand upon Reidy to register his patents with the PLC.

CASE NO.:_____

31.    Although the Agreement expressly provides that Reidy is required to make applications for foreign trademark and trade name registration and for filing any foreign patents (Agreement, p. 10), Reidy refused to cooperate and file the essential applications for foreign patent and trademark protection for the Reidy Patents and the Waterstar System, despite AirWater's continuing demands.

32.    Reidy and his Patent Attorney subsequently sought to excuse Reidy's performance under the Agreement, claiming that the time limits for filing such patent protections in the various overseas countries had lapsed and that the Reidy Patents could no longer be registered in those overseas countries.

33.    As of the date of this pleading, Reidy has not yet submitted an application with the PLC to register the Reidy Patents in various overseas countries. Consequently, AirWater has been deprived of the benefit of its bargain with Reidy to license the Reidy Patents.

### Reidy's Anticipatory Breach of Agreement by "Jumping the Gun" to Wrongfully Terminate

34.    In addition to the Royalty Payments of either 5% or 7%, based on the size and number of Waterstar machines sold, the Agreement also contained the following provision for AirWater's payment of a Minimum Monthly Royalty for twelve months to Reidy:

> LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st, 2003, or the Royalty payments due in accordance with those stated above whichever is the more.

CASE NO.:_____

> LICENSEE agrees that for a period of 12 months commencing November 1st, 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

35.    In accordance with these terms, from November 1, 2003, through October 31, 2004, AirWater made monthly royalty payments to Reidy. Commencing November 1, 2004, in accordance with the Royalty Payments provisions of the Agreement, AirWater's quarterly royalty fee (of either 5% or 7% ) on gross sales is due to be paid to Reidy for the last quarter of 2004, on February 15, 2005, and its first quarter 2005 royalty payment is due for the period ending on March 31, 2005 by May 15, 2005.

36.    Contrary to Reidy's negotiations inducing AirWater to enter into the Agreement, contrary to the terms if the Agreement set forth above, and contrary to the clear intent of the parties as manifest in their course of performance of the Agreement over the past twenty months, Reidy now wrongfully claims that AirWater is obligated to continue to pay Reidy Minimum Monthly Royalty Payments beyond the limited one year term, in addition to AirWater's quarterly Royalty Payments of either 5% or 7% based on AirWater's actual sales.

37.    Under the express terms of the Agreement, "The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time." (Agreement, p. 11)

CASE NO.:_____

38.    On January 13, 2005, Reidy's counsel sent written notice of default to AirWater, thereby triggering the thirty day notice period under the Agreement.

39.    Rather than wait the mandatory thirty days required under the Agreement, however, Reidy and its counsel "jumped the gun" and sent a second letter on January 31, 2005, again ostensibly terminating the Agreement.

40.    AirWater contests the validity of the notice of default, Reidy's interpretation of the Agreement, and the facts which Reidy believes support termination of the Agreement.

41.    Moreover, Reidy has engaged in a smear campaign, going public with its allegations that AirWater breached the Agreement for non-payment of the disputed Minimum Monthly Royalty. Indeed, in interviews with the press, Reidy announced his intention to reject AirWater's tender of the disputed Minimum Monthly Royalty Payment (under Reidy's interpretation of the Agreement, due thirty days from the date of Reidy's counsel's January 13, 2005, demand letter), because "its too late. I don't want to have anything to do with them."

42.    Upon information and belief, in furtherance of its strategy to announce a premature termination of the Agreement, it appears that Reidy has recently negotiated most, if not all, of the shares of UCSY stock received from AirWater in consideration for the exclusive, world-wide license for the Reidy Patents.

43.    Further, Reidy has publicly announced it is looking for a new group of investors and a new manufacturer to produce the Waterstar System and is actively

CASE NO.:_____

recruiting licensees and sub-licensees. Upon information and belief, prior to November,

2004, Reidy openly solicited licensees via Reidy's web site

(www.drinkingwaterfromtheair.com), offered international patent license agreements, and

offered to accept candidates for awarding new licenses and distributorships for the

WaterStar machines. AirWater has also been informed that prior to seeking to terminate

the Agreement, Reidy was and continues to secretly negotiate with potential companies

and licensees, including AirWater's direct competitors, offering opportunities to obtain

the Reidy Patents directly from Reidy.

44.    Despite Reidy's multiple anticipatory breaches and its actual breaches of

the Agreement, AirWater is ready, willing, and able to tender its first quarterly royalty

payments, that is, royalties for the quarter ending December 31, 2004 (due February 15,

2005) and on the date due, May 15, 2005 (assuming this action is not concluded), will

also tender the estimated quarterly royalty payment for the first quarter of 2005, into the

Registry of the Circuit Court upon entry of a Court Order authorizing the Clerk of the

Circuit Court to accept same.

### Count I - Petition for Declaratory Relief

45.    AirWater incorporates herein the allegations of Paragraphs 1 through 44 of

its Complaint.

46.    Based upon a tortured, unreasonable and self-serving interpretation of the

Minimum Monthly Royalty Payments provision, Reidy unilaterally and wrongfully

terminated the Agreement, in a manner wholly inconsistent with the intent of the parties

CASE NO.:_____

as expressed through their negotiations during the preparation of the Agreement and the twenty month course of their performance under the Agreement.

47.    AirWater is insecure, uncertain, and has a bona fide doubt as to the parties' respective rights, obligations, privileges and status under the terms of the Agreement as it relates to its Minimum Monthly Royalty Payments.

48.    Specifically, AirWater believes that the terms of the Agreement provide that Minimum Monthly Royalty Payments are limited to the one-year period commencing November 1, 2003, and ending October 31, 2004, following which AirWater's quarterly Royalty Payments commence and continue for the duration of the ten year term of the Agreement.

49.    There is an actual and justiciable controversy between the adverse interests of AirWater and Reidy concerning AirWater's obligations under the Minimum Monthly Royalty provisions of the Agreement.

50.    All entities and persons with an adverse interest are before the Court and can be brought before the Court by proper process.

51.    The declaration sought by AirWater is based upon the current state of the facts.

52.    In light of the ambiguity of contract terms as interpreted and exploited by Reidy, AirWater seeks more than mere legal advice from the Court. Rather, there is a present, bona fide need for a declaration that AirWater is in compliance with the terms of the Agreement.

CASE NO.:_____

WHEREFORE, AirWater requests this Court to construe the terms of the Agreement and to enter a declaratory judgment that (a) AirWater complied in good faith with its obligations by payment of the Minimum Monthly Royalty Payments for the one-year period commencing November 1, 2003, and ending October 31, 2004; (b) that AirWater is not obligated to make any further Minimum Monthly Royalty Payments to Reidy under the terms of the Agreement; (c) that no contractual grounds existed for Reidy to terminate the Agreement; (d) that Reidy's January 13, 2005, and January 31, 2005, attempts to terminate the Agreement are void and of no effect; (e) that Reidy is barred by the terms of its exclusive licensing of the Reidy Patents from recruiting new investors and licensees for the Reidy Patents; and (f) that AirWater is entitled to such other and further relief as the Court may deem just and proper under the circumstances, including the recovery of AirWater's costs pursuant to Section 86.01, Florida Statutes (2004).

## Count II - Breach of Contract

53.    AirWater incorporates herein the allegations of Paragraphs 1 through 44 of its Complaint.

54.    AirWater and Reidy entered into the Global Manufacturing and Marketing Agreement for the Reidy Patents, attached as Exhibit "A."

55.    Reidy breached the Agreement by the following actions and omissions:

a.    Reidy wrongfully demanded continuing Minimum Monthly Royalty Payments from AirWater beyond the limited one year term of the Agreement, wholly

CASE NO.:_____

inconsistent with the intent and expectations of the parties in entering into the Agreement;

        b.     Reidy prematurely and wrongfully terminated the Agreement without cause;

        c.     Reidy terminated the Agreement prematurely, depriving AirWater of its thirty day contractual cure period;

        d.     Reidy breached the exclusivity provisions of the Agreement by soliciting new investors and licensees for the Reidy Patents; and

        e.     Reidy breached the Agreement by failing to deliver world-wide patents or registrations and further breached the Agreement by failing to cooperate to register the patents and trademarks in other countries or with the PLC.

        f.     The adverse publicity of James J. Reidy's untimely and false statement to the *Miami New Times,* in which he announced prematurely and falsely announced that the Agreement was terminated, was calculated by Reidy to enhance Reidy's opportunities to re-sell the Reidy Patents and was also calculated to cause, and has caused, damage to AirWater, its business and its reputation.

        g.     Predictably, as a direct result of Reidy's public statements, AirWater has received many inquiries from all over the world, including from AirWater's business contacts, its customers, its manufacturers, and others, questioning AirWater regarding Reidy and the Reidy Patents.

{M1313258_2}          14

ADORNO & YOSS LLP
2525 PONCE DE LEON BLVD. • SUITE 400 • MIAMI, FLORIDA 33134 • TELEPHONE 305-460-1000 • TELEFAX 305-460-1422

CASE NO.:_____

56.    As a direct result of Reidy's breaches of the Agreement, AirWater has been damaged.

WHEREFORE, AirWater demands judgment against Reidy for consequential damages and the costs incurred in this action.

### Count III - Breach of Covenant of Good Faith and Fair Dealing

57.    AirWater incorporates herein the allegations of Paragraphs 1 through 44 of its Complaint.

58.    The Agreement includes not only its written provisions, but also terms that, though not actually expressed, are implied by law, including implied covenants of good faith, fair dealing and commercial reasonableness. These implied terms are as binding as the terms that are actually written.

59.    Based upon the covenant of good faith and fair dealing, Reidy had a duty to act reasonably and in good faith to observe the terms of the Agreement.

60.    At all material times, AirWater performed its obligations in good faith under the Agreement and reasonably expected Reidy to do the same.

61.    Reidy breached its covenant of good faith and fair dealing by willfully and unilaterally interpreting or changing the material terms in an arbitrary, fanciful and unreasonable manner.

62.    Reidy breached the terms of the Agreement without cause of business necessity for the intended purpose of causing substantial economic injury to AirWater.

CASE NO.:_____

63.    Upon information and belief, Reidy's actions evidence a misguided effort to unilaterally re-negotiate the terms of the Agreement in order to wrest a better "bargain" on its royalty fees.

64.    Reidy breached its duty of good faith and fair dealing and commercial reasonableness owed to AirWater in the following ways:

    a.    Rather than honoring the material terms of its Agreement with AirWater, Reidy entered into the Agreement in bad faith with the secret intent of unilaterally extending the one year Minimal Monthly Royalty Payments for the ten year term of the Agreement or, alternatively, charging a breach of the Agreement in order to "re-negotiate" a better financial deal for Reidy;

    b.    Reidy arbitrarily and capriciously altered the material terms of the Agreement by unilaterally changing the royalty payment terms, by prematurely terminating the Agreement;

    c.    Reidy, during the validity period of the agreement, unilaterally continued to offer the Reidy Patents to third parties and industry competitors, in direct breach of the terms of exclusivity as outlined in the agreement.

65.    These actions by Reidy establish a breach of its duty of good faith and fair dealing and entitle AirWater to consequential damages.

66.    As a direct and proximate result of Reidy's breach of the duty of good faith and fair dealing, AirWater has been damaged.

CASE NO.:_____

WHEREFORE, AirWater demands judgment against Reidy for consequential damages, together with AirWater's costs incurred in this action.

### Count IV - Unjust Enrichment

66.    AirWater incorporates herein the allegations of Paragraphs 1 through 44 of its Complaint.

67.    Upon information and belief, this is the third time Reidy has accepted substantial monetary and other benefits from licenses of the Reidy Patents and then attempted to renegotiate Reidy's prior licenses of the Reidy Patents or terminated its prior licensing agreements in order to obtain higher royalty fees to which it was not contractually entitled.

68.    AirWater has conferred substantial benefits upon Reidy. To date, AirWater paid Reidy approximately $420,000.00 for the exclusive license of the Reidy Patents – patents which AirWater has now learned may or may not be valid, may or may not be exclusive, and may or may not be worldwide.

69.    For the past twenty months, AirWater has positively advertised, promoted and publicized the Reidy Patents in all corporate publications, brochures on AirWater's web site as well as in all contracts, invoices and agreements with all third parties, all of which have directly benefited Reidy.

70.    AirWater also conferred additional benefits upon Reidy by taking on the entire burden of defending the validity of the Reidy Patents in the ELGT patent litigation, at a cost in excess of $180,000.

CASE NO.:_____

71.     AirWater also conferred substantial benefits upon Reidy by creating new markets for the Waterstar System in the United States and overseas in China, Australia, Sri Lanka, Iraq, India, South Africa, Ethiopia, Kenya, Israel, Turkey, the Middle East, Gabon, France, Spain, Germany, Morocco, Thailand, Mexico, and other countries still in negotiation.

72.     Reidy knowingly accepted these benefits from AirWater's performance under the Agreement for twenty months and now intends to retain these benefits received from AirWater while acting wrongfully to terminate the Agreement and cut AirWater out of the benefits of its substantial payments and hard work.

73.     Based upon the foregoing, the circumstances are such that it would be inequitable for Reidy to retain these benefits without honoring the terms of its ten year exclusive licensing Agreement and providing AirWater the benefit of its bargain or, alternatively, returning to AirWater all benefits conferred, including funds received from AirWater for the licensing of the Reidy Patents.

WHEREFORE, AirWater seeks entry of a judgment awarding AirWater the benefit of its bargain with Reidy, or alternatively, requiring Reidy AirWater to return the benefits conferred upon it by AirWater forthwith, and for such other and further relief as the Court deems proper under the circumstances.

## Demand for Attorneys Fees

AirWater seeks the recovery of its attorneys fees and costs incurred in this action which may be recoverable pursuant to the applicable Florida Statutes, Florida

CASE NO.:_____

Rules of Civil Procedure (*See Caufield v. Cantele,* 837 So.2d 371 (Fla. 2002)), together

with such other and further relief as the Court deems just and equitable.

### Demand for Jury Trial

AirWater demands a jury trial of all issues so triable.

Dated: _February 11, 2005_

**ADORNO & YOSS LLP**

By:_____.
Elizabeth M. Schwabedissen
Florida Bar Number: 442232
2525 Ponce de Leon Blvd., Suite 400
Miami, Florida 33134
Phone: (305) 460-1000
Fax: (305) 460-1422

Attorneys for Plaintiff, Air Water Patents,
Inc.

**EXHIBIT F**



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

AUG 1 2 2003

CLERK, U.S. DISTRICT COURT
By_____
Deputy

ELECTRIC & GAS TECHNOLOGY, INC.     &
ATMOSPHERIC WATER TECHNOLOGY, INC.  &
  and                                &
RICHARD EHRLICH                      &
      Plaintiffs                     &
                                     &
                                     &    CIVIL ACTION NO.
vs.                                  &
                                     &
UNIVERSAL COMMUNICATIONS SYSTEMS, INC. &   03 CV 1798 G
and IT'S SUBSIDIARY AIRWATER CORP.   &
  and J. J. REIDY, INC.              &
      Defendants                     &
                                     &

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff's, Electric & Gas Technology, Inc., Atmospheric Water Technology, Inc., and Richard Ehrlich, by counsel, hereby complains of Defendants, Universal Communications Systems, Inc. and it's subsidiary Airwater Corp. and J. J. Reidy, Inc. and alleges as follows:

### PARITIES

1.     Electric & Gas Technoloyg, Inc. ("ELGT") is a corporation organized and existing under the laws of Texas and has its principal place of business at 13636 Neutron Road, Dallas, Texas 75244-4410.

2.     Atmospheric Water Technology, Inc. ("AWT") is a corporation and subsidiary of ELGT and organized and existing under the laws of the State of Texas.

        Both ELGT and AWT shall hereinafter be referred to as "ELGT".

3.     Richard Ehrlich is an individual scientific inventor residing at 175 N.W. 21st, North Miami, Florida   33138.


EXHIBIT
C

A.    Universal Communications Systems, Inc. and its wholly owned

subsidiary Airwater, Inc. are Florida based corporation located at

Miami Beach, Florida 33139 herein after referred to as "UCSY".

B.    J. J. Reidy, Inc. is located at 1260 Main St. Holden, Mass.  01520.

## JURISDICTION AND VENUE

4.    The court has subject matter jurisdiction pursuant to 28 U.S.C. & 1338,

granting the United States District courts exclusive original jurisdiction of any civil action

arising under the Act of Congress relating to patents.

5.    Venue is proper in this Court pursuant to 28 U.S.C. & 1391(b)(1) because the

Defendants are corporations subject to the personal jurisdiction of the U.S. district Courts

and thus deemed to reside in this judicial district pursuant to 28 U.S.C. & 1391(c).

## FACTS GIVING RISE TO THE CAUSE OF ACTION

6.    ELGT, a publicly traded corporation employing including its subsidiaries

approximately 250 people.  Richard Ehrlich is an individual scientific inventor who

received a U.S. Patent No. 4,255,937 on March 17, 1981 and received a U.s. copyright on

May 28, 1981 on both the information in the U.S. Patent but  also additional enhancement

of intellectual property which information was public information even prior to the March

17, 1981 receipt of Ehrlich U.S. Patent.  Such U.S. Patent is now owned by ELGT, a copy of

which is attached as Exhibit "A".

In addition ELGT owns copyright and trademarks describing such technology

indicated in the Ehrlich U.S. Patent and the Trademark known as "WATERMAKER"

as indicated in (attached Exhibit "A-1") the Ehrlich U.S. Patent prior to expiration in 2001

was augmented and enhanced using the fundamental claims of the Ehrlich patent by the

filing in 1994 and receipt of U.S. Patent No., 5,553,459 on September 10, 1996 by Larry G. Harrison, Garland, Texas (copy attached hereto as Exhibit ("A-2") which is owned by the Watermaker Corp. which was acquired  and now owned by ELGT.

7.    On June 24, 2003 ELGT sent a certified letter (attached as Exhibit "B") to UCSY in care of its CEO Mr. Michael J. Zwebner demanding that UCSY, its affiliates, subsidiaries and employees cease and desist in selling, manufacturing, either directly or indirectly, its Airwater products in violation of ELGT's U.S. Patents and enhanced intellectual property.

8.    Upon information and belief, Defendant, either directly, or by and through its parents, subsidiaries and/or affiliates, manufacturers, offered for sale, and sells such Watermaker products.  Defendant has advised by Press announcements the sale of such products in several locations including the U.S. Defense Dept. and to the military in the State of Israel (copies attached as Exhibit "C").  Such products are covered by one or more claims of the Ehrlich U.S. Patents and enhanced intellectual property owned by ELGT. Upon information and belief, Defendant continues to offer for sale such Watermaker products throughout the U.S. and world wide customers.

9.    On December 4, 1996 Richard Ehrlich was awarded a final judgement against Russell B. Adler, Melvin Adler and Air & Watermaker, Inc. rendering Ehrlich 's U.S. Patent No. 4,255,936 (Exhibit "A" attached) back to Ehrlich (See copy of judgement attached as Exhibit "D").

10.    On March 24, 2003 UCSY documented the formation of Airwater Corporation as a wholly owned subsidiary of UCSY and had acquired international manufacturing and marketing licenses as well as patent and copyright from J. J. Reidy &

Co., Inc. of Holden, Mass.

11.     Under the terms of said UCSY/Reidy agreement UCSY issued four (4) million shares of UCSY common stock to J. J. Reidy pursuant to rule 144 of the SEC plus a one time payment of $100,000.00. In addition UCSY agreed to pay J. J. Reidy & Co., Inc. royalties.

12.     All of said above information in items 9, 10, 11 above are disclosed in public filings of UCSY to the Securities & Exchange Corp. as evidenced in Exhibit "E" attached hereto.

13.     During the late 1980's and early 1990's James J. Reidy, owner of J. J. Reidy, Inc. visited the offices of Daveco, Inc. in Garland, Texas owner of the Watermaker Corp. and he obtained full disclosures on the Ehrlich Patent based on an actual WATERMAKER (tm) product 5 gallon per day production models which included improvements and enhancements of the Ehrlich patent technology including addition of fans and ultra violet enhanced filtering and components. (See Exhibit "E-1").

14.     Also in said period of time and even thereafter James J. Reidy met with Russell b. Adler in Miami, Florida who had by virtue of the Circuit Court judgement NO RIGHTS TO said Ehrlich patent or intellectual property including Reidy's contact with Richard Ehrlich to observe and view typical pre production Watermaker prototypes.

15.     On the basis of such full disclosure from Daveco, Inc. and the Watermaker Corp, Richard Adler, and Richard Ehrlich, J. J. Reidy filed a U.S. Patent application on August 16, 1991 and received U.S. Patent No. 5, 106, 512 on April 21, 1992 (Exhibit "F" attached hereto).

16.    By virtue of having copies of the Ehrlich Patent and having observed and made notes of the actual WATERMAKER (tm) product by J. J. Reidy and then copying said patent claims coupled with the improvements already made in the actual Ehrlich production model, J. J. Reidy not only infringed on such patent and enchanted technology but also violated the must important requirement of a sworn statement to the United States Department of Commerce and U.S. Patent and Trademark office regarding his absolute previous knowledge of such known technology (Exhibit "F-1") attached hereto.

17.    Notwithstanding the reference in Reidy's wrongfully obtained patent regarding the 1981 Ehrlich patent Reidy's stated comment was that said Ehrlich patent did not contain certain controls and a fan.  Reidy was well aware of the Daveco production model which he knew was already incorporated with controls and fan blowers  which he observed prior to his improper patent filing in 1991. Yet such statement made by Reidy was untrue and a mispresentation to the U.S. Patent office since the Ehrlich patent contained a control foat as seen in componet 38, a valve and pump switch for control of activation  of water flow.  A check valve component 44 for further pump water flow control which therefore totally falsifies  such statement by Reidy and in addition the Ehrlich patent clearly indicates a dehumidifer which Reidy was fully aware that such convential dehumidifiers  all by necessity contain  a fan  or blower required to disspate or remove condensation which is the source of water thus again mistating to the U.S. Patent examiner as to Reidy stating "no fan".  Even in addition to amplify his  "prior art"  notice by the actual inspection and observation of the prototype and production model Watermaker.  Reidy filed his improper U.S. Patent application with such mistatements by

being fully knowledgeable of such "prior art" which should nullify and cancel his U.S. Patent.

A.    ELGT also emphasizes and claim that even in addition to the direct infringement by UCSY the infringement is also based on section 217a of the U.S. Patent Code concerning the "DOCTRINE OF EQUIVALENTS" if a device performs substantially the same function in substantially the same way to obtain the same result. The U.S. Patent improperly filed by Reidy is a perfect example of the violation of the "Doctrine of Equivalents" which gives cause for proof of infringement by USCY.

In addition, the Ehrlich U.S. Patent filed on March 17, 1981 in accordance with Section 154 of the U.S. Patent Code warrants protection through March 17, 2001 which covers the period of time that the 1992 patent owned by UCSY and the previous Adler judgement and Reidy violation prior to 1991 took place that created such infringement.

Such infringement herein can be passed on and applied to Defendants distribution chain including a manufacturer, importer, exporter, distributor, retailers and or ultimate customers.

18.    ELGT made payment of $575,000.00 in the form of cash and stock to Daveco based on $250,000 cash and a $325,000 second promissory note through its ownership of the Watermaker Corp. and thereby received assignment and ownership of said Ehrlich U.S. Patent to ELGT and its subsidiary Atmospheric Water Technology, Inc. (which name was changed from Atmospheric & Magnetics Technology, Inc.) and ELGT has since invested many millions of dollars using the basic technology to design and modify

Watermaker units larger than the basic 5 gallon production models to 50, 150, 500, 1000, 7500 and 10,000 and more gallons per day of purified healthy drinking water derived from the "air we breathe" which ELGT calls the "infinite fountain of water" (see Exhibit "F-2") attached hereto.

19.    UCSY in accordance with its 10Q SEC filings as a public corporation disclosure on Note 2 on page 6 has been confirmed by its auditors of the present risks and concerns and uncertainties of the continuation of UCSY as a going concern due to UCSY's losses and an accumulated deficit of $30,089,856 as of March 31, 2003 (See exhibit "G") attached hereto.  Such almost bankrupt financial condition, in spite of UCSY's patent infringment could jeopardize any alleged warranties on the Airwater Products that could be damaging to Plaintiffs manufacturing program to innocent distributors and customers.


20    Michael J. Zwebner, CEO of UCSY has issued almost daily Press Releases regarding UCSY's promotion and sales of the Watermaker products all in violation of ELGT's U.S. Patent and intellectual property position such copies of Press Releases attached hereto as Exhibit "H").  It is unknown by Plaintiff at this time whether or not Zwebner was aware of Reidy's infringement when UCSY acquired said improper Reidy patent but if not there was no EXCUSE by UCSY to acquire such Reidy patent and thus participate in the infringement.

21.    The Court is advised that the 2003 market as confirmed by industry reports is presently a $60 billion market for all types of Water products due to the growing contamination of drinking water containing arsenic and other contaminants.

22.    Attached hereto is an Exhibit "I" (attached hereto) is a copy of an affidavit

and supporting document by Richard Ehrlich regarding the U.S. Patents owned by Electric & Gas Technology, Inc. and it's subsidiary Atmospheric Water Technology, Inc.

The Court is advised that several additional affidavits by individuals who are knowledgeable of this infringement will be filed by an amendment by ELGT as soon as completed.

## COUNT ONE

## CLAIM FOR PATENT INFRINGEMENT

ELGT herein incorporates each averment contained in Paragraphs 1 though 22.

Defendant has maliciously infringed the Ehrlich U.S. Patent and accompanying intellectual property in violation of 35 U.S.C. & 271(a) by making, using, offering to sell and/or selling products that infringe one or more of the claims and disclosed enhancements of the Ehrlich patent.

Defendant, specifically, has infringed the Ehrlich U.S. Patent and accompanying intellectual property in violation of 35 U.S.C. & 271(a) by making, using, offering to sell and/or selling Watermaker products.

Defendant has infringed the Ehrlich patent in violation of 35 U.S.C. & 271(b) by actively inducing others to infringe one or more claims on said Ehrlich patent and enhancement and intellectual property.

Defendant has made, and continues to be, willful and harmful to Plaintiffs under 35 U.S.C. & 283 because Defendant has had written certified notice of said patents since June 24, 2003.

Plaintiff ELGT is being irreparably harmed by substantial damages of such infringement.

Defendant will continue its infringement if not enjoined by this Court.

Plaintiff ELGT had no adequate remedy of law.

Defendant is aware by its own admissions that the total market for said

Water Maker products is in excess of $60 billion annually.

## JURY DEMAND

Plaintiff, ELGT demands trial by jury for all claims so triable.

WHEREFORE, Plaintiff respectfully prays that this Court grant judgement against Defendant as follows:

A.    Declaring that Defendant has infringed said U.S. Patent prior to 1991 and Enhancement of the actual production models known by Defendant in violation of 35 U.S.C. & 271(a), and has actively induced others to infringe the said patent in violation of 35 U.S.C. & 271(b);

B.    Declaring that Defendant has willfully infringed on the Ehrlich patent and enhancement technology under 35 U.S.C. & 284 and trebling the damages found or assessed as a result of such infringement.

C.    Granting a permanent injunction under 35 U.S.C. & 283 enjoining the Defendant and its parents, subsidiaries, affiliates, agents, employees and/or servants and all those acting in concert therewith, from further acts of infringement of said Ehrlich Patent enhancement technology.

D.    Ordering an accounting and an award of actual and punitive damages under 35 U.S.C. & 284, together with prejudgment interest and costs as fixed by the Court and to amount to at least  one tenth (1/10) of one percent (1%) on the $60 billion annual market or damages of at lease $60 million.

E.    Awarding to Plaintiff its costs and counsel fees incurred herein pursuant to

35 U.S.C. & 285, or reasonably attorney's fees and costs as otherwise

permitted by law;

F.    Awarding post-judgement interest at the maximum legal rate; and

G.    Any other or further relief that this Court deems proper.


Dated: July 16, 2003

Respectfully submitted.

Joe B. Abbey

State Bar No. 00789000
13636 Neutron Road   suite "B"
Dallas, Texas 75244-4410
Phone: (972) 661 5870
Fax:    (972) 991 3265

Attorney for Plaintiffs

**EXHIBIT G**



**Bowditch
&Dewey**
ATTORNEYS

Direct telephone: (508) 926-3431
Direct facsimile: (508) 929-3046
Email: dflynn@bowditch.com

February 18, 2005

**VIA CERTIFIED MAIL/
RETURN RECEIPT REQUESTED**

Mr. Michael Zwebner
AirWater Corporation
Suite 12F
407 Lincoln Road
Miami Beach, FL 33139

*Re:*    *J.J. Reidy & Co., Inc. v. AirWater Corporation and AirWater Patents Corporation*
         *Worcester Superior Court*

Dear Mr. Zwebner:

Enclosed please find the following documents in connection with the above-referenced matter:

1.    Original Summons on AirWater Corporation;
2.    Copy of Civil Action Coversheet;
3.    Copy of Complaint; and
4.    Copy of First Amended Complaint

Please note that this constitutes service of process pursuant to Massachusetts' long-arm statute, General Laws Chapter 223A, §1, et seq.

Very truly yours,

Daniel P. Flynn

Daniel P. Flynn

DPF/rl
Encls:
cc:    Thomas J. Conte, Esquire

**EXHIBIT H**

---

# U.S. District Court

## Southern District of Florida (Miami)

### CIVIL DOCKET FOR CASE #: 05-CV-20650

### Airwater Patents v. J.J. Reidy & Co.

Filed: 03/07/05
Assigned to: Judge Adalberto Jordan
Jury demand: Both
Demand: $0,000
Nature of Suit: 190
Lead Docket: None
Jurisdiction: Diversity
Dkt # in 11th Jud Cir Court : is 05-3140-CA24
Cause: 28:1441 Notice of Removal-Contract Dispute

---

AIRWATER PATENTS, INC., a          Elizabeth Mar Schwabedissen
Florida corporation                FTS 858-4777
    plaintiff                      [COR LD NTC]
                                   Adorno & Yoss
                                   2525 Ponce De Leon Boulevard
                                   Suite 400
                                   Miami, FL 33134
                                   305-460-1084


    v.


J.J. REIDY & CO., INC., a          Jerald Charles Cantor
Massachusetts corporation          FTS 963-6523
    defendant                      [COR LD NTC]
                                   Phillips Eisinger Koss & Brown
                                   4000 Hollywood Boulevard
                                   Suite 265-S
                                   Hollywood, FL 33021-6755
                                   954-894-8000

                                   Richard A. Savrann
                                   FTS 964-3520
                                   [COR LD NTC]
                                   Richard A Savrann
                                   477 S Rosemary Avenue
                                   Suite 220
                                   West Palm Beach, FL 33401
                                   561-964-6404


=========================

J.J. REIDY & CO., INC.             Jerald Charles Cantor

```
        counter-claimant          FTS 963-6523
  ☐

                                  [COR LD NTC]
                                  Phillips Eisinger Koss & Brown
                                  4000 Hollywood Boulevard
                                  Suite 265-S
                                  Hollywood, FL 33021-6755
                                  954-894-8000

---------------------------

AIRWATER PATENTS, INC.            Elizabeth Mar Schwabedissen
     counter-defendant            FTS 858-4777
                                  [COR LD NTC]
                                  Adorno & Yoss
                                  2525 Ponce De Leon Boulevard
                                  Suite 400
                                  Miami, FL 33134
                                  305-460-1084

  ☐
```

# DOCKET   PROCEEDINGS

DATE    #         DOCKET   ENTRY


3/7/05   1    NOTICE OF REMOVAL  from: 11th Judicial Circuit Court (case
              number 05-3140-CA24) (answer filed) FILING FEE $250.00
              RECEIPT # 916750 ;  Magistrate Judge Stephen T. Brown (gz)
              [Entry date 03/08/05]

3/7/05   1    ANSWER to Complaint  and COUNTERCLAIMby J.J. Reidy & Co. ()
              against Airwater Patents (filed in county Court) (gz)
              [Entry date 03/08/05]

3/7/05   2    MOTION by J.J. Reidy & Co. (Attorney ) for Richard A.
              Savrann to appear pro hac vice (gz) [Entry date 03/08/05]

3/7/05   --   Filing Fee Paid;  FILING FEE $ 75.00   RECEIPT # 916749 (per
              DE 2) (gz) [Entry date 03/08/05]

3/9/05   3    ORDER granting [2-1] motion for Richard A. Savrann to
              appear pro hac vice ( Signed by Judge Adalberto Jordan on
              3/9/05) [EOD Date: 3/10/05] (wc) [Entry date 03/10/05]

3/14/05  4    ORDER requiring parties to file a Joint Scheduling Report
              by  no later than  3/25/05 ( Signed by Judge Adalberto
              Jordan on 3/11/05) [EOD Date: 3/15/05] (gz)
              [Entry date 03/15/05]

3/18/05  5    ANSWER and affirmative defenses by Airwater Patents  to
```

[1-2] counter claim (gz) [Entry date 03/21/05]

3/18/05   5    RESPONSE by Airwater Patents  in opposition to [1-1] answer
               and affirmative defense (gz) [Entry date 03/21/05]

3/21/05   6    DEMAND for jury trial by Airwater Patents (gz)
               [Entry date 03/22/05]

3/24/05   7    Joint Scheduling Report  by Airwater Patents, J.J. Reidy &
               Co. (gz) [Entry date 03/25/05]

3/25/05   8    RESPONSE by Airwater Patents  in opposition to JJ Reidy &
               Co., Inc.'s Motion for Judgment on the pleadings (wc)
               [Entry date 03/28/05]

3/30/05   9    ORDER setting Schedule, Requiring Mediation and Referring
               Certain Motions to Magistrate Judge Jury trial set for
               1/23/06 Calendar call set for 9:00 1/17/06 Discovery cutoff
               9/21/05 ; Deadline for filing of all motions by 10/19/05
               Pretrial Stipulation due on or before 11/21/05 ( Signed by
               Judge Adalberto Jordan on 3/30/05) [EOD Date: 3/31/05]
               CCAP (gz) [Entry date 03/31/05]

3/30/05   9    ORDER referring case to mediation.  15 days to appoint
               mediator ( Signed by Judge Adalberto Jordan on 3/30/05)
               [EOD Date: 3/31/05] (gz) [Entry date 03/31/05]
□

3/30/05   9    ORDER REFERRING DISCOVERY MATTERS to  Magistrate Judge
               Stephen T. Brown ( Signed by Judge Adalberto Jordan  on
               3/30/05)    CCAP [EOD Date: 3/31/05] (gz)
               [Entry date 03/31/05]

4/4/05    10   ORDER/Certification Regarding Referred Case pursuant to
               Administrative Order # 2005-9,  the above-captioned case
               has no pending, fully briefed, referred motions and is
               ready for reassignment to Magistrate Judge Theodore Klein (
               Signed by Magistrate Stephen T. Brown on 4/1/05) [EOD Date:
               4/5/05] (gz) [Entry date 04/05/05]

4/4/05    --   Magistrate identification:  Magistrate Judge Theodore Klein
               (gz) [Entry date 04/05/05]

4/4/05    11   MOTION by J.J. Reidy & Co. to transfer case pursuant to
               title 28 USCS 1404(a) (gz) [Entry date 04/05/05]

4/4/05    12   MEMORANDUM by J.J. Reidy & Co.  in support of [11-1] motion
               to transfer case pursuant to title 28 USCS 1404(a) (gz)
               [Entry date 04/05/05]

4/4/05    13   AFFIDAVIT by J.J. Reidy & Co.  Re: [11-1] motion to
               transfer case pursuant to title 28 USCS 1404(a) (gz)
               [Entry date 04/05/05]

4/4/05    14   AFFIDAVIT of James Reidy by J.J. Reidy & Co.  Re: [11-1]
               motion to transfer case pursuant to title 28 USCS 1404(a)
               (gz) [Entry date 04/05/05]

4/14/05   15   MOTION by Airwater Patents to extend time to serve
               response in opposition to JJ Reidy & Co. Inc's motion to
               transfer (gz) [Entry date 04/15/05]

4/18/05   16   ORDER granting [15-1] motion to extend time to serve

response in opposition to JJ Reidy & Co. Inc's motion to transfer ( Signed by Judge Adalberto Jordan on 4/18/05) [EOD Date: 4/19/05] (gz) [Entry date 04/19/05]

4/20/05   17   RESPONSE by Airwater Patents  to [11-1] motion to transfer case pursuant to title 28 USCS 1404(a) (gz) [Entry date 04/21/05]

4/29/05   18   NOTICE of non-consent to trial and final disposition by the Magistrate by Airwater Patents (gz) [Entry date 05/02/05]

6/16/05   19   MOTION by J.J. Reidy & Co. (Attorney ) for leave to file Reidy Supplemental Affidavit in support of motion to transfer  (proposed document attached) (sk) [Entry date 06/17/05]

---

Case Flags:
TK
MEDREQ
MAGDSC
STB

---

END OF DOCKET: 1:05cv20650

---

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/20/2005 12:01:29 | | |
| **PACER Login:** | kw0205 | **Client Code:** | |
| **Description:** | docket report | **Search Criteria:** | 1:05cv20650 |
| **Billable Pages:** | 4 | **Cost:** | 0.32 |

**EXHIBIT I**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 05-20650-CIV-JORDAN

AIRWATER PATENTS, INC., a Florida )
corporation )
)
       Plaintiff )
)
vs. )
)
J.J. REIDY & CO., INC., a Massachusetts )
corporation )
)
       Defendant )



FILED by _____ D.C.

_____ 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

---

## ORDER SETTING SCHEDULE, REQUIRING MEDIATION, AND REFERRING CERTAIN MOTIONS TO MAGISTRATE JUDGE

    This case is set for trial during the Court's two-week trial calendar beginning on January 23, 2006. Calendar call will be held at 9 a.m. on January 17, 2006, in Courtroom Eight of the United States Courthouse, 301 N. Miami Avenue, Miami, Florida. No pre-trial conference will be held unless a party requests one no later than 30 days prior to the calendar call or the Court determines that one is necessary. The parties shall adhere to this schedule:

| | |
|---|---|
| May 1, 2005 | The parties shall notify the Court whether they consent to trial and final disposition by Magistrate Judge Brown. |
| June 1, 2005 | All motions to amend pleadings or join parties are filed. |
| July 22, 2005 | Parties exchange expert witness summaries and reports required by Local Rule 16.1.K. |
| August 22, 2005 | Parties exchange rebuttal expert witness summaries and reports required by Local Rule 16.1.K. |
| September 21, 2005 | All discovery, including expert discovery, is completed. |
| October 5, 2005S | Parties to have completed mediation. |
| October 19, 2005 | All pre-trial motions other than motions *in limine* are filed. |
| November 21, 2005 | Parties to submit joint pre-trial stipulation and proposed jury instructions. |

    Within thirty days of the date of this order, the parties shall select a mediator certified under Local Rule 16.2.B, shall schedule a time, date, and place for mediation, and shall jointly file a proposed order scheduling mediation in the form specified by Local Rule 16.2.H. If the parties cannot agree on

a mediator, they shall notify the Clerk in writing as soon as possible and the Clerk shall designate a certified mediator on a blind rotation basis. Counsel for all parties shall familiarize themselves with and adhere to all provisions of Local Rule 16.2.

The parties shall submit their proposed jury instructions jointly, though they need not agree on each or any proposed instruction. Where the parties do agree on a proposed instruction, that instruction shall be set forth in roman typeface. Instructions proposed only by a plaintiff shall be underlined. Instructions proposed only by a defendant shall be bold-faced. Every instruction must be supported by citation of authority. The parties shall use as a guide the Eleventh Circuit Pattern Jury Instructions for Civil Cases, including the directions to counsel contained therein. The parties shall submit their proposed jury instructions on paper and on a 3½-inch floppy disk in a format compatible with WordPerfect for Microsoft Windows-based computers. Each exhibit must be labeled in accordance with the exhibit list in the joint pre-trial stipulation and shall also bear the case number of this action.

Pursuant to 28 U.S.C. § 636 and this District's Magistrate Judge Rules, all discovery motions and non-dispositive motions filed pursuant to Federal Rules of Civil Procedure 12, 13, and 14 in this case are referred to Magistrate Judge Stephen T. Brown.

The parties may stipulate to extend the time to answer interrogatories, produce documents, and answer requests for admissions. The parties shall not file with the Court notices or motions memorializing any such stipulation unless the stipulation interferes with the time set for completing discovery, for hearing a motion, or for trial. Stipulations that would so interfere may be made only with the Court's approval. *See* Fed. R. Civ. P. 29. In addition to the documents enumerated in Local Rule 26.1.B, the parties shall not file notices of deposition with the Court. Strict compliance with the Local Rules is expected, particularly with regard to motion practice. *See* Local Rule 7.1.

If the parties should seek to file anything under seal in this case, they must comply with Local Rule 5.4.B.2, submitting a memorandum describing the information to be sealed and setting forth a reasonable basis for departing from the general policy of public filings. The parties cannot override Local Rule 5.4 through a joint protective order. In other words, if a party who has received material from the opposing party, labeled confidential by that party, intends to file the material with the court, that material cannot be filed with the court under seal just because it has been labeled confidential by the opposing party. The parties must confer in preparing the motion to file under seal to ensure compliance with Local Rule 5.4. Moreover, only material labeled confidential may be filed under seal.

Mere filings that reference confidential materials may not be filed under seal.  If the parties are successful in filing anything under seal, they must nevertheless file a redacted copy in the public record. Any attempts to file matters under seal that do not comply with Local Rule 5.4 and this order will result in the matters being filed in the public record.

DONE and ORDERED in chambers in Miami, Florida, this 30ᵗʰ day of March, 2005.

_____
Adalberto Jordan
United States District Judge

Copies to:     Magistrate Judge Brown
               All counsel of record

3