UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS.                          CIVIL ACTION NO. 05-40049-FDS

J.J. REIDY & CO., INC.,                     )
                                            )
                        Plaintiff,          )
                                            )
v.                                          )
                                            )
AIRWATER CORPORATION and                    )
AIRWATER PATENTS CORPORATION,               )
                                            )
                        Defendants.         )

**OPPOSITION OF PLAINTIFF J.J. REIDY & CO., INC. TO MOTION OF
DEFENDANTS AIRWATER CORPORATION AND AIRWATER PATENTS
CORPORATION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

## INTRODUCTION

Plaintiff, J.J. Reidy & Company, Inc. ("Reidy") opposes Defendants AirWater

Corporation ("AirWater") and AirWater Patents Corporation's ("AirWater Patents") Motion

to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2). Reidy brought this lawsuit because

Defendants have breached a patent licensing agreement, which they purposefully solicited,

negotiated, and performed, in part, in Massachusetts, by failing to make monthly royalty

payments. Contrary to the assertions of the Defendants, Reidy has brought its claims in the

proper court.

## BACKGROUND

Beginning in early 2002, Defendants purposefully engaged in a series of contacts

with Massachusetts, in person and through mail, email and telephone communications.

After reaching and executing an agreement, Defendants reached into the forum and

solicited Reidy's assent to assign the agreement. Defendants and Reidy performed many

obligations under the license in Massachusetts and through communications between

Reidy in Massachusetts and Defendants outside the Commonwealth. From February 2002 until early 2005, Defendants sent countless emails and other communications to Reidy in Massachusetts pursuant to their performance of their obligations under the license agreement. The extent of Defendants' purposeful contacts with Massachusetts are described in greater detail below.

### Solicitation and Negotiation of the License Agreement

In February of 2002, Universal Communication Systems, Inc. ("UCS"), the parent company and 100% owner of AirWater and AirWater Patents, willfully and intentionally contacted Reidy, a small, closely-held Massachusetts Corporation located in Holden, Massachusetts, seeking to acquire its rights to United States Patents related to a water purification system. Affidavit of James J. Reidy ("Reidy Aff."), ¶ 1-3, Exh. A. UCS followed up this initial email with a series of phone calls and written correspondence soliciting Reidy to enter into a licensing agreement with its wholly owned subsidiary, AirWater. Reidy Aff., ¶ 3. Reidy spoke with Michael Zwebner ("Zwebner"), the Chief Executive Officer of UCS, and President of AirWater and AirWater Patents, on an almost daily basis in the next months and had frequent email correspondence with Zwebner. Id. These phone and email negotiations between Reidy, in Massachusetts, and Zwebner, in Israel, Miami, Toronto, Los Angeles, the United Kingdom, and New York, continued for several months. Id., ¶ 4. On March 15, 2003, at Zwebner's suggestion, Zwebner traveled to Boston to meet with Reidy's President, James J. Reidy, to further negotiate an agreement regarding the patents. Id., ¶ 4, Exh. B.

### Execution of and Solicitation to Assign the License Agreement

Sometime in late March, the parties agreed to the basic terms of what became the Global Manufacturing and Marketing Licensing Agreement (the "Agreement"). Id., ¶ 5,

Exh. C.  In the following months, email and phone calls from Zwebner to Reidy in Massachusetts remained frequent, often occurring many times in a single day.  Id., ¶ 6, Exhs. G and Q.  In three months from April to June of 2003, Zwebner sent at least 41 separate email messages to Reidy in Massachusetts from locations such as Lima, Peru and Sao Paulo, Brazil as well as Miami and Israel.  Id., Exhs. D, F, G, H, I and Q.  Numerous and frequent telephone calls occurred between the parties as well.  Id., ¶ 6.  These extensive, purposeful contacts with Reidy were undertaken by AirWater for the purpose of securing and formalizing what would become the Agreement.  Id., ¶ 6.  In or about late June of 2003, Reidy and Zwebner executed the written Agreement, back-dating it to March 21, 2003.  Id., ¶ 7, Exh. E.  Zwebner soon thereafter solicited Reidy's assent to assign the Agreement to UCS's newly formed subsidiary, AirWater Patents.  Id., ¶ 7; Affidavit of Matthew P. Zayotti, Esq. ("Zayotti Aff."), Exh. B.

### Defendants' Meeting with Reidy in Massachusetts Regarding Technical Advice

AirWater also purposefully and frequently contacted Reidy in Massachusetts during the performance of the Agreement.  Reidy Aff., ¶ 8, Exhs. G and Q.  Zwebner traveled to Massachusetts and regularly contacted Reidy there seeking advice and consultation on matters pertaining to the Agreement, technical assistance regarding design and production of products, the maintenance of existing patents, and application for additional patents.  Id.  On July 4, 2003, Zwebner emailed Reidy stating, "I leave for Los Angeles tomorrow for a day. I will return to Miami to arrive Monday morning, and then I am planning to go to NY on Tuesday afternoon.  I have Wednesday morning free for a few hours before I leave for Tel Aviv….I have to be in Boston on an unrelated matter on Tuesday the 29th of July, so I could (as I will) be there a day early, and we can meet on the Monday 28th." (emphasis added). Id., Exh. F.  Per Zwebner's suggestion, he and Mr. Reidy met in Boston on July 28, 2003 to

discuss technical details regarding the production and design of AirWater products.  Id., ¶ 10.

### Defendants' Contacts with Reidy in Massachusetts Regarding Technical Advice

AirWater repeatedly requested technical advice from Reidy in Massachusetts.  Id., ¶ 9.  For example, on June 26, 2003, Zwebner requested that Reidy evaluate an image file attached to his email.  Id., Exh. G.  On June 27, Zwebner discussed design drawings with Reidy, stating "...we need to give this to a technical expert at the factory, and using your input and knowledge, come up with the final design and style and then go to the manufacturer....you need to do all u can to help me/us."  Id.  On June 29, 2003, Zwebner emailed Reidy, stating "...please fax, mail or FedEx the stuff to us to have a look at, and we can jointly evaluate them....we will have final proofs of the new literature, and you can then approve the specs, etc...."  Id.  Again on June 29, 2003, Zwebner emailed Reidy stating, "In the meanwhile, I will...keep our interactions related to the patents and set up of manufacturing issues appertaining thereto."  Id.  A July 4, 2003 email from Zwebner requests that Mr. Reidy and Reidy's electrical engineer meet with him regarding production and design of products.  Id., Exh. F.  In two July 23, 2003 emails from Zwebner to Reidy, Zwebner asks James J. Reidy to call two manufacturers in Israel regarding the manufacturing of filtering tubes and safety devices and states, "YOU need to give him all the input, tell him exactly what goes in, and approx sizes and weights, and what YOU feel the machine needs, then he will do as YOU say.  Please copy me in on your communications." (no emphasis added).  Id., Exh. G.  On August 28, 2003, Reidy emailed Zwebner discussing and advising on the appearance and packaging of a product manufactured by Defendants and submitted to Reidy in Massachusetts for review.  Id.  On October 29, 2003, Zwebner emailed James J. Reidy, asking him to update AirWater product pricing information.  Id.  On November 4,

2003, Zwebner emailed Reidy stating, "…please confirm the package I sent u by fedex arrived. Please also let me know of the Saudi arrangements?" Id. AirWater also solicited Reidy to distribute its products in a June 28, 2004 email from Zwebner. Id. These are just several examples illustrating Defendants' purposeful contacts with Reidy in Massachusetts concerning technical advice. Id., Exhs. F, G, and Q.

### Defendants' Contacts with Reidy in Massachusetts Regarding Patent Litigation

AirWater repeatedly contacted and sought Reidy's assistance in connection with various lawsuits involving Zwebner, UCS, and AirWater throughout the country. Id., ¶ 11. The following are a few examples of such email communications. On June 26, 2003, Zwebner emailed Reidy stating, "I need you to send me a letter, as an official letter, itemizing who / which company you feel is infringing the patents." Id., Exh. H. On July 7, 2003, Zwebner emailed Reidy asking him to help "set the record straight for the legal work to begin" and stating "…per our agreement, we want to be there and help…." Id. On August 15, 2003, Zwebner emailed Reidy's attorney, Brian Dingman, and asked for advice on a pending lawsuit. Id. On December 31, 2003, Zwebner emailed Mr. Reidy suggesting that he immediately serve a complaint in Boston or Rhode Island before he was served first. Id.

### Terms of the Agreement Requiring Defendants' Contact with Massachusetts

The terms of the Agreement demonstrate that Defendants willingly agreed to have extensive contacts with Massachusetts, including consenting to the choice of Massachusetts law should Reidy bring suit there. Id., Exh. E. The Agreement contains the following choice of law clause:

> Inasmuch as the transactions, which may arise or occur
> between the parties and/or their principals may cross
> boundaries of national or international jurisdiction, *this*

> Agreement shall be construed and interpreted in
> Accordance (sic) with the laws of the United States of
> America and the resident state of the Plaintiff.
>
> Id., Agreement, p. 15. (*emphasis added*).

Additional relevant terms of the Agreement include that AirWater was to make initial

payments and transfers of stock to Reidy in Massachusetts (pp. 3-4); AirWater was to make

monthly royalty payments to Reidy in Massachusetts (p. 5); AirWater was to "provide and

deliver sublicense contracts" to Reidy in Massachusetts (p. 5-6); Reidy had the right to

approve products designed using its patents (p. 8); AirWater was to provide product liability

insurance to Reidy in Massachusetts and deliver copies of the policies to Reidy in

Massachusetts (p. 9); Reidy was obligated to maintain the validity and good standing of the

patents from Massachusetts (p. 9); Reidy was required to make application for any foreign

patents desired by Defendants from Massachusetts (p. 10); Reidy was required to provide

know-how and technical assistance from Massachusetts (p. 10-11), and AirWater was

required to provide Reidy in Massachusetts with all documents necessary to carry out the

Agreement (p. 16). Id., Exh. E.

### Defendants' Contacts with Massachusetts Regarding Royalty Payments

Pursuant to the Agreement, AirWater made monthly payments of royalties to Reidy

in Massachusetts and engaged in telephone and email communications with Reidy regarding

these payments. Id., ¶ 12. Reidy's claim is based on Defendants' refusal to continue

making these payments per the terms of the Agreement. Complaint, ¶¶ 3-6, 9-11. The

parties communicated frequently regarding disputes about payment of Reidy's royalties.[1]

Reidy Aff., ¶ 12. For example, on April 4, 2004, Reidy emailed Zwebner notice that he was

---

[1] The example listed in this paragraph are but a few emails from the extensive record of communications regarding payments between the parties and are not an exhaustive list. Further emails are submitted as Exhibit Q to the Reidy Aff.

concerned with AirWater's payment history in an effort to resolve the conflict. Id., Exh. I.

Zwebner replied the next day that "as a result of your comments we will over the next few

days re-evaluate our contractual terms with you." Id. On October 25, 2004, Zwebner

emailed Reidy, warning him that "getting into an argument or litigation with us will not suit

your purpose." Id. On November 10, 2004, in response to Reidy's inquiries about the lack

of royalty payments, AirWater sent a letter to Reidy stating that it had the right to halt its

payments because of disputes over patents. Id., Exh. J.

### Procedural History and Background

In response to AirWater's lack of cooperation in resolving the payment dispute,

Reidy exercised its rights under the Agreement, and, through counsel, sent AirWater a notice

of default for failure to make minimum monthly royalty payments on December 15, 2004.

Id., ¶ 14, Exh. K. This triggered a fourteen (14) day period in which AirWater had a right to

bring its payments to Reidy up to date. Id., Exh. E. If AirWater did not do so, the contract

was terminated. Id. In light of AirWater's refusal to negotiate, on December 16, 2005,

Reidy filed a complaint in Massachusetts Superior Court for breach of contract against

AirWater. Id., ¶ 16, Exh. L.

Zwebner replied to Reidy in a December 27, 2004 letter denying that he owed Reidy

any payments. Id., ¶ 15. Subsequently, Reidy realized that the Agreement had been

assigned to AirWater Patents in June of 2003. Id., ¶ 17. Accordingly, he sent a second

notice of default to AirWater Patents on January 13, 2005, which also triggered a fourteen

(14) day cure period. Id., ¶ 17, Exh. E. When AirWater Patents did not respond to this letter

within the fourteen days, on January 31, 2005, Reidy notified AirWater Patents that the

Agreement had been terminated. Id., ¶ 17.

On February 11, 2005, AirWater Patents filed a complaint for declaratory judgment against Reidy in the Circuit Court for the 11th Judicial Circuit in and for Miami-Dade County, Florida. Zayotti Aff., Exh. E. AirWater served its complaint on Reidy on February 14, 2005. On February 17, 2005, Reidy amended its Complaint to add AirWater Patents as a defendant and attempted to effectuate service on both Defendants by certified mail, return receipt requested, on February 18, 2005. Reidy Aff., ¶ 18, Exh. M. Defendants, and, in particular, Zwebner, refused to accept the certified mailing and it was eventually returned to Reidy's counsel in mid-March. Id. Eventually Defendants were served by first class mail.

### Zwebner's Participation in Litigation in Massachusetts and Elsewhere

Zwebner, who claims to be unable to litigate in Massachusetts, is currently involved in two cases in United State District Court for the District of Massachusetts which were transferred from the United State District Court for the Southern District of Florida in 2005. Id., Exh. N (docket sheets for Universal Communication Systems, Inc. and Michael J. Zwebner v. Lycos, Inc. (1:05-CV-11172-REK) (transferred on May 25, 2005) and Universal Communication Systems, Inc. and Michael J. Zwebner v. Lycos, Inc. d/b/a The Lycos Network (1:05-CV-10435-REK) (transferred on February 28, 2005)). Zwebner has also recently been both a plaintiff and a defendant in Massachusetts Superior Court. Id., Exh. O (docket sheets from Zwebner v. Villasenor, SUCV2000-02239 (Mass. Super. Ct.) and Polk v. Zwebner, SUCV2003-01176 (Mass. Super. Ct.)). Zwebner has also pursued litigation in New Hampshire, Oregon, Utah, Texas, and California. Id., Exh. P ( Zwebner v. Dumont, 1998-CV-682 (D.N.H. 1998); Zwebner v. John Does Anonymous Found, Inc., 2000-CV-01322 (D. Or.); Reddi Brake Supply Corp. v. Corporate Stock Transfer, Inc., No.020911604 (3rd D. Ct. Salt Lake County, Utah) (filed June, 2004); Electric & Gas Tech., Inc. v. Universal Communication Systems, Inc., 2003-CV-01798 (N.D. Texas) (filed August 2003);

Talk Visual Corp. v. John Doe, No. 901274 (3d D. Ct. Salt Lake County, Utah) (filed

February 2000); and Zwebner, Universal Communication Systems, Inc., and AirWater Corp.

v. Coughlin, 05-CV-1263 (S.D. Ca.) (filed June 21, 2005)).

**ARGUMENT**

## I .    BURDEN OF PROOF

Reidy has the burden of making a prima facie showing of personal jurisdiction over

the Defendants.  See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, 290 F.3d

42, 51 (1st Cir. 2002); Foster-Miller v. Babcock & Wilcox Canada, 46 F.3d 138, 144 (1st

Cir. 1995).  The Court must accept Reidy's properly documented evidentiary proffers as

true for the purpose of determining the adequacy of the prima facie jurisdictional showing.

See Foster-Miller, 46 F.3d at 145.  The Court must then take these facts as true, whether or

not disputed, and construe them in the light most favorable to the Reidy's jurisdictional

claim.  See Daynard, 290 F.3d at 51; Foster-Miller, 46 F.3d at 145.  Facts put forward by

the Defendants are considered only to the extent that they are uncontradicted.  See

Daynard, 290 F.3d at 51; Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir.

1998).

## II..    THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS

This Court has personal jurisdiction over AirWater and AirWater Patents because

jurisdiction is authorized by the Massachusetts long arm statute and comports with

constitutional due process requirements.  See M.G.L. c. 223, § 3; Daynard, 290 F.3d at 52;

Foster-Miller, 46 F.3d at 144; Hahn v. Vermont Law School, 698 F.2d 48, 50 (1st Cir. 1983).

Defendants' purposeful solicitation, negotiation, assignment and performance of its patent

licensing agreement with Reidy subject Defendants to the Massachusetts long arm statute

9

and satisfy the constitutional requirements of due process. <u>See</u> M.G.L. c. 223, § 3(a);

<u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 291 (1980).

**A.    Defendants' Contacts with Massachusetts Satisfy the Requirements of the Massachusetts Long-Arm Statute**

This Court has specific personal jurisdiction over the Defendants under M.G.L. c.

223A, §3(a) because the Defendant transacted business in the Commonwealth and the

present cause of action arises from the transaction of that business. [2] <u>See</u> M.G.L. c. 223A,

§3(a); <u>Daynard</u>, 290 F.3d at 52; <u>Foster-Miller</u>, 46 F.3d at 145; <u>Boudreau v. Scitex</u>, 1992

U.S. District LEXIS 9629, 4-5;  <u>Good Hope Indus., Inc. v. Ryder Scott Company</u>, 378

Mass. 1, 8 (1979).

1.  <u>Defendants Have Transacted Business in the Commonwealth.</u>

By their numerous and purposeful activities within the Commonwealth, Defendants

have transacted business in Massachusetts pursuant to M.G.L. c. 223A, §3(a).  <u>See</u> <u>Reidy</u>

<u>Aff.</u>, ¶¶ 2-15, Exhs. A-I and Q. Both federal and state courts have regularly construed the

"transacting any business" language of the statute in a generous manner."[3] <u>See</u> <u>Hahn</u>, 698

F.2d at 50; <u>Buckeye Associates, Ltd v. Fila Sports, Inc.</u>, 616 F.Supp. 1484, 1491-92 (1st

Cir. 1985), <u>quoting</u> <u>Ross v. Ross</u>, 371 Mass. 439, 441 (1976); <u>Boudreau</u>, 1992 U.S. District

LEXIS at 5.  The remedial nature of the long arm statute argues for a liberal construction of

its provisions.  <u>See</u> <u>Nova Biomedical Corp. v. Moller</u>, 629 F.2d. 190 (1st Cir. 1980); <u>Kagan</u>

<u>v. United Vacuum Appliance Corp.</u>, 357 Mass. 680, 683-84 (1970).

---

[2] Courts routinely sidestep the statutory inquiry and proceed directly to the constitutional analysis because the Supreme Judicial Court of Massachusetts has interpreted the state's Long Arm Statute "as an assertion of jurisdiction over the person's limits allowed by the Constitution of the United States." <u>See</u> <u>Sawtelle v. Farrell</u>, 70 F.3d 1381 (1st. Cir. 1995) (holding that when a state's long arm statute is co-extensive with the limits of due process, the court's attention properly turns to the constitutional standards); <u>Daynard v. Ness, et al.</u>, 290 F.3d 42 (1st Cir. 2002); <u>Automatic Sprinkler Corp. of AM. v. Seneca Foods Corp.</u>, 361 Mass. 441 (1972).

The requirements of the statute may be satisfied where the only contact involved is an isolated transaction or one with little impact on the commerce of this Commonwealth. See Buckeye, 616 F.Supp. at 1492; Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 933 (1st Cir. 1985). Indeed, "a defendant with very slight contact with Massachusetts may be viewed literally as having 'transacted business' in Massachusetts even though such contact may be *constitutionally* insufficient to support jurisdiction." See Bond Leather Co., at 933; Good Hope Indus., Inc., 378 Mass. at 8, n.13.

Defendants satisfy the "transacting any business" provision of section 3(a) because they solicited the Agreement with Reidy in Massachusetts, traveled to Boston on two occasions to negotiate and carry out the Agreement, had almost daily telephone and email communications with Reidy in Massachusetts, sought Reidy's assent in Massachusetts to assign the Agreement, were required to provide insurance to Reidy in Massachusetts, were required to provide samples of products to Reidy in Massachusetts, were required to provide Reidy with regular documentation regarding the sale of products in Massachusetts, and made numerous payments and transfers of stock to Reidy in Massachusetts. See Reidy Aff., ¶¶ 2-15, Exhs. A-I and Q; Daynard, 290 F.3d at 52; Foster-Miller, 46 F.3d at 145; Boudreau v. Scitex, 1992 U.S. District LEXIS 9629, 4-5; Good Hope, 378 Mass. at 8 (1979).

The totality of these activities greatly exceeds the threshold for "transacting business" under the long arm statute. See id. For example, in Boudreau v. Scitex, the court found that the defendant had transacted business in the Commonwealth based solely on its negotiation of plaintiff's employment contract by way of electronic mail, fax

---

[3] The provision is not limited to commercial activity by the defendant, but rather "is general and applies to the purposeful acts by an individual, whether personal, private or commercial." Ross, 371 Mass. at 441.

{I:\CLIENTS\lit\304269\0002\00563489.DOC;2}

communications and phone calls. See Boudreau, 1992 U.S. District LEXIS at 5. In Hahn v. Vermont Law School, the court held that a Vermont corporation's mailing of an application, information and acceptance letter to a Massachusetts resident also constituted transacting business. See Hahn, 698 F.2d at 51. Additionally, the court in Landmark Bank v. Machera ruled that defendants' telephone calls and correspondence to the plaintiff in Massachusetts amounted to transacting business. See Landmark Bank v. Machera, 736 F.Supp. 375, 383-84 (D. Mass. 1990). The sum and quality of Defendants' activities in Massachusetts, including traveling to Boston to meet with Reidy before and after the execution of the Agreement, far exceed those in the above cases. See Reidy Aff., ¶¶ 2-15, Exhs. A-I and Q; Daynard, 290 F.3d at 52; Foster-Miller, 46 F.3d at 145; Boudreau v. Scitex, 1992 U.S. District LEXIS 9629, 4-5; Good Hope, 378 Mass. at 8 (1979). Accordingly, Defendants have conducted business in Massachusetts. See id.

2.  The Present Cause of Action Arises from Defendants' Transaction of Business in Massachusetts.

Reidy's claim of breach of contract arises from Defendants' purposeful solicitation, negotiation, and performance of its obligations in Massachusetts. In general, if a cause of action stems from a contract, as in this case, the "arising from" requirement is met if (1) the cause of action is for a breach of the contract and (2) the business transacted in the Commonwealth was instrumental in the formation of the contract. See Hahn, 698 F.2d at 51; Boudreau, 1992 U.S. District LEXIS at 5.

In this case, Reidy is suing for breach of its contract with Defendants. See Amended Complaint. Defendants purposefully and deliberately solicited and negotiated the Agreement through traveling to Massachusetts, making phone calls to Reidy in Massachusetts, and sending mail and email to Reidy in Massachusetts. See Reidy Aff., ¶¶ 2-

8, Exhs. A-G and Q. Defendants further sought and obtained Reidy's assent in Massachusetts to assign the Agreement to AirWater Patents. See id., ¶ 7. Moreover, the terms of the Agreement required Defendants to provide insurance to Reidy in Massachusetts, make monthly payments to Reidy in Massachusetts, provide regular updates on commissions to Reidy in Massachusetts, and provide samples of products to Reidy in Massachusetts. See id., Exh. E. Therefore, Reidy's claims arise directly from Defendants' contacts with Massachusetts. See Reidy Aff., ¶¶ 2-15, Exhs. A-I and Q; Daynard, 290 F.3d at 52; Foster-Miller, 46 F.3d at 145; Boudreau v. Scitex, 1992 U.S. District LEXIS 9629, 4-5; Good Hope, 378 Mass. at 8 (1979). Accordingly, Defendants have conducted business in Massachusetts. See id.

**B.      The Court's Exercise of Personal Jurisdiction over the Defendants Satisfies the Due Process Requirements of the 14th Amendment.**

Due process requires only that in order to subject a defendant to personal jurisdiction, the defendant must have certain minimum contacts with the forum such that the maintenance of the lawsuit does not offend traditional notions of fair play and substantial justice. See Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Daynard, 290 F.3d at 52. In a contract case, the Court evaluates the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, to determine whether the defendants purposefully established minimum contacts. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985); Daynard, 290 F.3d at 52. The Court further determines whether the sum of these contacts permits it to exercise personal jurisdiction over Defendants consistent with the Constitution. See Burger King Corp., 471 U.S. at 479-81; Foster-Miller, 46 F.3d at 144.

{J:\CLIENTS\lit\304269\0002\00563489.DOC;2}

The level of contact required to satisfy these requirements varies with the type of personal jurisdiction sought: general or specific. See Foster-Miller, 46 F.3d at 145; Donnatelli v. National Hockey League, 893 F.2d 459, 462-63 (1st Cir. 1990); Boudreau, 1992 U.S. District LEXIS at 6. Specific personal jurisdiction may be asserted where the cause of action arises directly out of, or relates to, the defendant's forum based contacts. See Foster-Miller, 46 F.3d at 144; Boudreau, 1992 U.S. District LEXIS at 6.[4]

For specific personal jurisdiction, the First Circuit divides its due process analysis into three categories: relatedness, purposeful availment, and reasonableness. See Daynard, 290 F.3d at 60-61; Foster-Miller, 46 F.3d at 144. The exercise of specific personal jurisdiction over Defendants satisfies each of these three categories. See id.; Reidy Aff., ¶¶ 2-15, Exhs. A-I and Q.

    1.    Relatedness – the Claim Underlying this Action Directly Arises out of and Relates to Defendants' Massachusetts Activities.

This Court has personal jurisdiction over the Defendants because Reidy's breach of contract claim directly arises out of and relates to the Defendants' forum state activities. See id.; Amended Complaint. Specific jurisdiction exists when "there is a demonstrable nexus between a plaintiff's claims and a defendant's forum based activities, such as when the litigation itself is founded directly on those activities." See Mass. Sch. of Law, 142 F.3d at 34. Reidy's lawsuit is based on its claim that Defendants owe it money pursuant to an agreement initiated by Defendants' contacting Reidy in Massachusetts and traveling to the Commonwealth. See Reidy Aff., ¶¶ 2-7, Exhs. A-E and Q; Amended Complaint. Moreover, the Agreement was negotiated in and partially performed in Massachusetts and there was

---

[4] General jurisdiction, which Reidy does not rely on in this case, exists when the litigation is not directly founded in the defendant's foreign based contacts, but defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the foreign state.

regular, ongoing interaction between Reidy, in Massachusetts, and Defendants, in Florida, Israel, and elsewhere before and during the life of the Agreement.  See Reidy Aff., ¶¶ 2-7, Exhs. E-J and Q.  Therefore, Reidy's lawsuit arises out of Defendants' Massachusetts activities, which were essential to the formation and performance of the Agreement.  See McGee v. Int'l Life Ins. Co., 335 US 220, 223 (1957) (upholding jurisdiction over a suit "based on a contract which had substantial connection with the State"); Daynard, 290 F.3d at 61; Hahn 698 F2d at 51-52.

In Daynard v. Ness, Motley, Loadholt, Richardson & Poole, a Massachusetts law professor sued law firms in Mississippi and South Carolina for payment of fees for his legal services arising from litigation against tobacco companies.  See Daynard, 290 F.3d at 42-63.  The court found that the breach of contract arose from a course of dealings between the parties because the contract was in the form of a working relationship – started in Massachusetts – that called for interaction between the various states.  See id. at 61.  Similarly, Reidy and the Defendants began a relationship based on Defendants contacting Reidy in Massachusetts.  Defendants' purposeful and willing contact with Reidy led to a relationship in which Defendant twice traveled to visit Reidy in Massachusetts and in which the parties communicated via telephone and email on a constant basis.  The parties executed a written agreement that called for the regular provision of documents and products to Reidy in Massachusetts.  See Reidy Aff., Exh. E.  During the entire period, Reidy and Defendants were in regular communication.  See id., ¶¶ 5 and 10.  Because the court held that this constituted "relatedness" in Daynard, so too should this Court find that Reidy's claims arise out of Defendants' forum state activities.  See Boudreau, 1992 U.S. District LEXIS at 10 (holding that defendant's negotiation of plaintiff's employment contract through telephone calls, fax communications, and electronic mail between Israel and Massachusetts was

sufficiently related to plaintiff's breach of contract action based on the employment

contract.)

    2.    <u>Purposeful Availment – The Defendants' Instate Contacts Represent a Purposeful Availment of the Privilege of Conducting Activities in Massachusetts</u>.

Defendants, by their extensive and deliberate Massachusetts contacts with Reidy in

person and through telephone and email, have purposefully availed themselves of the

privilege of conducting activities in Massachusetts, thereby invoking the benefits and

protections of the Commonwealth's laws and making their involuntary presence before this

Court foreseeable. <u>See</u> <u>Reidy Aff.</u>, ¶¶ 2-15, Exhs. A-I and Q; <u>Daynard</u>, 290 F.3d at 61;

<u>Foster-Miller</u>, 46 F.3d at 144; <u>Boudreau</u>, 1992 U.S. District LEXIS at 10.   The transmission

of facts or information into Massachusetts via telephone or mail constitutes evidence of a

jurisdictional contact directed into the forum state." <u>See</u> <u>Burger King Corp.</u>, 471 U.S. at 476

(stating that "it is an inescapable fact of modern commercial life that a substantial amount of

business is transacted solely by mail and wire communications across state lines" and that

defendants may not defeat jurisdiction merely by showing that they never physically entered

the forum); <u>Daynard</u>, 290 F.3d at 62 ("Even in cases where the defendant was not physically

present in the forum, where defendant initiated the transaction by mailing or calling the

plaintiff in the forum and when the defendant contemplated that the plaintiff would render

services in the forum…many courts have found jurisdiction"); <u>Mass Sch. of Law</u>, 142 F3d.

at 36.

      This case closely resembles <u>Boudreau</u>, where plaintiff and defendant negotiated the

Massachusetts plaintiff's employment contract through telephone calls, fax communications,

and electronic mail between Israel and Massachusetts. <u>See</u> <u>Boudreau</u>, 1992 U.S. District

LEXIS at 10.   The court in <u>Boudreau</u> found that these communications were sufficient to

satisfy the minimum contacts requirements for due process. See id. Likewise, Reidy and

Defendants negotiated the Agreement in Massachusetts and through email, mail and

telephone communications between Defendants and Reidy in Massachusetts. Accordingly,

this Court should find that Defendants' contacts with Massachusetts satisfy due process. See

Boudreau, 1992 U.S. District LEXIS at 10.

The record before this Court is also similar to that in Daynard. See Daynard, 290

F.3d at 42-63. In Daynard, the defendants engaged in telephone and fax communications

with the plaintiff in Massachusetts. See id. At 62. Defendants had conversations with

plaintiff in which they agreed to pay him a share of fees as compensation for work

performed in Massachusetts. See id. Defendants also came to Boston to receive plaintiff's

advice. See id. The Court reasoned that based on defendant's physical presence in

Massachusetts to negotiate the agreement which ultimately gave rise to this litigation and the

ongoing relationship between defendants and plaintiff, defendants engaged in purposeful

activity related to the forum. See id., citing Burger King Corp., 471 U.S. at 476.

Similar to the defendants in Daynard, AirWater and AirWater Patents engaged in

email and telephone solicitations of the Agreement with Reidy in Massachusetts and traveled

to Boston to meet with Reidy. Defendants also repeatedly and purposefully sought technical

assistance from Reidy in Massachusetts. Just as in Daynard, where the court held that these

activities constituted purposeful availment, so too should this Court exercise specific

personal jurisdiction over AirWater and AirWater Patents. See id. At 62; Nova Biomedical

Corp., 629 F.2d. at 193 (holding that by entering into the licensing agreement with plaintiff

and visiting Massachusetts twice on related business, defendant had purposefully availed

himself of the privilege of conducting activities within the forum state).

3.    Reasonableness – The Exercise of Jurisdiction is Reasonable in light of the "Gestalt Factors."

The application of the "Gestalt factors" shows that this Court's exercise of jurisdiction over Defendants is reasonable, especially given the traditional deference afforded to a plaintiff's choice of forum and in light of Massachusetts' stake in being able "to provide a convenient forum for its residents to redress injuries inflicted by out of forum actors." See Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 107 (1987); Worldwide Volkswagon Corp. v. Woodson, 444 U.S. 286, 292 (1980); Sawtelle v. Farrell, 70 F.3d 1381, 1395 (1st Cir. 1995). The Gestalt factors considered by this Court are: (1) the burden on the defendant caused by appearing locally; (2) the forum state's interest in adjudicating the dispute; (3) the shared interest of all states involved in furthering substantive, social policies; (4) the plaintiff's interest in obtaining convenient and effective relief; and (5) the interstate judicial system's interest in resolving the controversy efficiently. Burger King, 471 U.S. at 476-77.

Defendants cannot show that that the burden of appearing in Massachusetts is so great as to violate due process. See Reidy Aff., ¶¶ 21 and 22; Daynard, 290 F.3d at 62; Boudreau, 1992 U.S. District LEXIS at 11; Good Hope Indus., Inc., 378 Mass. at 12. To the extent that Defendants contend that litigating in Massachusetts would be unfair due to Zwebner's physical limitations, their argument must fail in light of his extensive participation in litigation throughout the country. Notably, Zwebner is currently involved in two cases in United States District Court for the District of Massachusetts which were transferred from the United States District Court for the Southern District of Florida in 2005. See infra at p. 8. All but one of these lawsuits were filed after 1999, the year in

18

{J:\CLIENTS\lit\304269\0002\00563489.DOC;2}

which Zwebner states he was confined to a wheelchair.  Zwebner, therefore, is able to litigate in courts outside of southern Florida.

Additionally, Zwebner's email communications to Reidy reveal that he traveled to New York, Los Angeles, Mississippi, Peru, Brazil, Canada, Israel, India, and the United Kingdom.  See infra., at 2-3.  Zwebner clearly has the resources and ability to travel throughout the world, including Massachusetts.  Accordingly, travel to Massachusetts would not be burdensome or oppressive to Zwebner.

Defendants' burden in litigating in Massachusetts is significantly alleviated by Zwebner's ability to retain local counsel in this matter.  See Marine Charter & Storage Ltd., Inc. v. Denison Marine, Inc., 701 F.Supp. 930, 936 (Dist. Mass. 1988).  Zwebner's years of experience litigating in Massachusetts, including his two cases currently pending in the District Court for Massachusetts, have no doubt have left him with the knowledge and ability to obtain competent representation in the Commonwealth.

Moreover, Massachusetts has a compelling interest in adjudicating this matter because Massachusetts law governs this dispute.  See infra at p. 5.  As Reidy, a Massachusetts corporation, is the Plaintiff in this action, Massachusetts law governs.  Massachusetts also has a stake in being able to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors.  See Daynard, 290 F.3d at 62; Sawtelle, 70 F.3d at 1395; Marine Charter & Storage Ltd., Inc., 701 F.Supp. at 936.

The shared interest of all states involved in furthering substantive, social policies is co-extensive with Massachusetts' substantive interest in ensuring that valid contracts and their warranties are not breached.  Marine Charter & Storage Ltd., Inc., 701 F.Supp. at 936.  Because Reidy has been damaged by Defendants' breach through the loss of its

royalty payments, Massachusetts has the greatest interest in enforcing the contract in issue.
See id.

Regarding the final two factors, Reidy's interest in bringing its action in this forum, given the traditional deference afforded to a plaintiff's choice of forum, weighs in favor of personal jurisdiction. See Daynard, 290 F.3d at 62. Additionally, the efficiency of the interstate judicial system will be aided by litigating in Massachusetts, as this action is already proceeding against the Defendants. See id. at 62-63.

## CONCLUSION

For the foregoing reasons, Plaintiff J.J. Reidy & Company, Inc. respectfully requests that this Court deny Defendants AirWater Corporation and AirWater Patents Corporation's Motion to Dismiss for Lack of Personal Jurisdiction.

Respectfully submitted,

J.J. REIDY & COMPANY, INC.,

By Its Attorneys,

Thomas J. Conte (BBO #566092)
Daniel P. Flynn (BBO #655180)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 926-3415
FAX: (508) 929-3006

July 19, 2005

## CERTIFICATE OF SERVICE

I, Daniel P. Flynn, hereby certify that I have on this 19th day of July 2005 I served the foregoing by mailing copy thereof, postage prepaid, to:

Richard Kirby, Esquire
Matthew P. Zayotti, Esquire
Keegan, Werlin & Pabian, LLP
265 Franklin Street
Boston, MA 02110-3113

_____
Daniel P. Flynn

{J:\CLIENTS\lit\304269\0002\00563489.DOC;2}