UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-40049-FDS

J.J. REIDY & CO., INC.,

Plaintiff,

v.

AIRWATER CORPORATION AND
AIRWATER PATENTS
CORPORATION,

Defendants.

### DEFENDANTS AIRWATER CORPORATION'S AND AIRWATER PATENTS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO MOTION OF PLAINTIFF J.J. REIDY & CO., INC. TO AMEND COMPLAINT

The Defendants AirWater Corporation and AirWater Patents, Inc. hereby submit the following Memorandum of Law in Support of their Opposition to Motion of Plaintiff J.J. Reidy & Co., Inc. to Amend Complaint.

### I. FACTUAL BACKGROUND

On December 16, 2004, the Plaintiff, J.J. Reidy & Co., Inc. ("J.J. Reidy") commenced this action by filing a Complaint asserting a sole count against AirWater Corporation for breach of contract. Complaint, at ¶¶ 8-11. In that regard, the Plaintiff alleged that AirWater Corporation breached the parties' Global Manufacturing and Marketing License Agreement by "fail[ing] to make its required monthly royalty payments" and "fail[ing] to commit the resources and put forth best efforts in accomplishing, completing, and fulfilling its promise to establish and maintain awareness

and exposure of products manufactured by AirWater based on the patents licensed by J.J. Reidy and to enhance sales and future growth." Id. at ¶ 7.

On February 16, 2005, J.J. Reidy filed, as of right, its First Amended Complaint, adding AirWater Patents Corporation as a party defendant as the alleged successor-in-interest to AirWater Corporation. Further, the Plaintiff alleged that on June 25, 2003, "AirWater Corp. assigned its rights and obligations under the License to AirWater Patents. . . ." Id. at ¶ 5. Significantly, J.J. Reidy's First Amended Complaint consisted of a solve count for breach of contract against both Defendants, and the sole basis upon which it alleged that AirWater Corporation had breached the parties' agreements was that it failed to "abide by [its contractual] obligations concerning [its] efforts to market products based on J.J. Reidy's licensed patents. . . ." Id. at ¶ 12.

On March 3, 2006, the Defendant AirWater Corporation timely filed a Motion for Summary Judgment, seeking dismissal of this action in its entirety as to AirWater Corporation on the grounds of the assignment, assented and agreed to by J.J. Reidy, by which AirWater Corporation transferred "all rights and liabilities of the Global Manufacturing and Marketing Licensing Agreement . . . to AirWater Patents Inc." Defendant's Memorandum of Law in Support of Summary Judgment, at 3-4.

In response to Defendant AirWater Corporation's Motion for Summary Judgment, Plaintiff J.J. Reidy filed a motion to amend its First Amended Complaint by adding a new claim against AirWater Corporation for intentional misrepresentation. See Motion of Plaintiff, J.J. Reidy & Co., Inc. to Amend Complaint, at 2-3; Opposition of J.J. Reidy & Co., Inc. to Defendant AirWater Corporation's Motion for Partial Summary Judgment, at

2

3-4.[1] Significantly, the Plaintiff does not offer any argument whatsoever against dismissing the breach of contract claim against AirWater Corporation. See Opposition of J.J. Reidy & Co., Inc. to Defendant AirWater Corporation's Motion for Partial Summary Judgment, at 1-6. On the contrary, the Plaintiff argues merely that it has "substantial and convincing evidence" to support its belatedly proposed misrepresentation claim that "defendant AirWater Corp. falsely represented to J.J. Reidy that it had $2 million in financing in order to market products based upon J.J. Reidy's patents" and "also falsely represented that it had the resources available to fulfill its promise to establish and maintain the awareness and exposure of products manufactured by it based on the patents licensed by J.J. Reidy and to enhance future sales and future growth." Motion of Plaintiff J.J. Reidy & Co., Inc. to Amend Complaint, at 2; Proposed Second Amended Complaint, at ¶ 19. The Plaintiff further alleges that it was "fraudulently induced" to enter into the contract as a result of AirWater Corporation's alleged misrepresentations. Opposition of J.J. Reidy & Co., Inc. to Defendant AirWater Corporation's Motion for Partial Summary Judgment, at 4.

The Plaintiff's fraudulent inducement claim is belied, however, by the very same materials that Plaintiff seeks to rely upon in asserting that it has "substantial and

---

[1] The Plaintiff's proposed Second Amended Complaint includes various additional amendments in support of which the Plaintiff sets forth no argument or rationale in its motion to amend. In that regard, Count I of the Second Amended Complaint for breach of contract would be asserted against AirWater Patents only. Proposed Second Amended Complaint, at 3. Additionally, the Proposed Second Amended Complaint includes an entirely new count for violation of Mass. Gen. L. ch. 93A, §§ 2 and 11 as to both Defendants. Id. at 4. Although the the 93A claim against Defendant AirWater Corporation is presumably premised upon its alleged misrepresentations, there are no factual allegations in the Proposed Second Amended Complaint that would support such a claim against AirWater Patents, Inc. Commercial Union Ins. Co. v. Seven Provinces Ins. Co. Ltd., 217 F.3d. 33, 40 (1st Cir. 2000) ("[a] mere breach of contract does not constitute an unfair or deceptive trade practice under 93A"). Finally, the Proposed Amended Complaint includes a claim for declaratory judgment as to AirWater Patents, seeking a declaration that the parties' license agreement has been terminated. Id. at 5.

3

convincing evidence" to support its newly proposed misrepresentation claim. In that regard, the Plaintiff relies upon the Affidavit of James J. Reidy and a series of emails exchanged between James Reidy and Michael Zwebner on May 8, 2003 that, when taken together, reflect an ongoing negotiation of the material terms of the parties' agreement and, more importantly, clearly show that Plaintiff was not induced by any purported misrepresentation to enter into the agreement with AirWater Corporation.

Indeed, the emails establish that as of May 8, 2003, the parties were far from agreement on numerous essential terms. In his initial email to Mr. Zwebner, sent Thursday, May 8, 2003 12:31 AM with the subject line: "Your new #&*+@ 5/7/03 Draft", Mr. Reidy expresses his obvious displeasure with the terms proposed by Mr. Zwebner:

> I cannot believe your changes. We are worse off then [sic] the day we started this whole thing.
>
> Aside from other, maybe lesser, issues, the following is non-negotiable:
>
> 1. $100,000 must be wired to my bank account on the day we sign.
>
> 2. There must be some significant minimum monthly Royalty.
>
> 3. The stock must clearly be registered within 90 days as you had previously promised.

Reidy Affidavit, Exh. C. Moreover, Mr. Reidy states that he "will not meet [Mr. Zwebner] in Israel without a fully consummated Agreement." Id.

Mr. Zwebner responds that if the parties are to proceed it cannot be "on terms that are not good for ALL parties. The agreement still has many issues that we need to go

4

over and discuss and agree upon." In response, Mr. Reidy replies: "I agree, and wonder how this could have been done by today." Id.

Further, with regard to Mr. Reidy's insistence on a minimum monthly royalty payment, Mr. Zwebner states "[t]here will be NO royalties payable until either we or a sublicense are in production and sales. There is no logic otherwise." (emphasis in original). Mr. Reidy replies" "Logic? That time frame is under your control, not mine. Desert Aire can start manufacturing tomorrow. Giving you a world-wide non-[sic] exclusive virtually destroys any other potential licensing opportunities for me.[2] I am essentially out of business while you take a year to decide what you want to do. Meanwhile, I'm getting inundated with legal fees and patent expenses. Is THIS fair? I should receive ongoing compensation for this sacrifice and you should pay something for this privilege." Id. (emphasis in original).

In addition, Mr. Zwebner states to Mr. Reidy that "you are totally FREE to sign any deal with any other potential manufacturer, and or Licensee, and if you have such people lined up, and are ready to sign and pay, then do not wait for us. . . . We need to be more secure and feel good about the new business we are getting into. If this takes us another few weeks, so be it." Indeed, Mr. Zwebner stated that "[t]odate, [sic] though we no have copies of your patents, and are having patent attorneys check them out, we have NOT seen a working model of your design, . . . there is NO manufacturing company that is licensed and can produce machines for us. . . etc etc[.]" Mr. Reidy responds that

---

[2] Obviously, Mr. Reidy meant to say that giving Mr. Zwebner an exclusive world-wide license would destroy all other possible licensing opportunities for Mr. Reidy. If Mr. Reidy granted non-exclusive rights to Mr. Zwebner, then Mr. Reidy would have been free to grant rights to third parties. Ultimately, the agreement the parties signed granted exclusive rights: "The License granted herein . . . shall remain exclusive unless terminated in accordance with the terms of this agreement." Reidy Affidavit, Exh. A at 13.

5

"[e]veryone, including you, need [sic] months and months to do this. I will continue to try." Id.

In response, Mr. Reidy confirms that he is continuing to actively explore the possibility of licensing his patents to third parties. In particular, Mr. Reidy states that he is "willing to continue to try [to work together to achieve mutually acceptable terms]. But you should know one last thing. I'm offering you the best deal I ever offered anyone. The Indian I met with for the last 2 days has verbally agreed to pay me $300,000 up front plus a minimum of $15,000 per month for the [sic] just the USA. He's agreed to do the same, again, for just India! That's TWO countries. You have about 238 countries available to you for just a small fraction of what he's willing to pay for two." Id. (emphasis in original).

According to Mr. Reidy's own affidavit, negotiations continued until as late as June of 2003, when "Reidy and Zwebner executed the written Agreement, back-dating it to March 21, 2003." Id. at ¶ 10.

In addition to establishing that the parties had not agreed on all essential terms as of May 8, 2003, the emails further establish that Mr. Reidy was not fraudulently induced to enter into the agreement based on a representation by Mr. Zwebner that he already had $2 million in investment funding to devote to marketing and promoting the products. Indeed, Mr. Reidy states to Mr. Zwebner that "[y]ou have told me several times, as early as your very first telephone call to me on February 27th, that you had over $2 million available at that time." Regardless of whether Mr. Reidy's statement reflects a simple misunderstanding or self-serving mischaracterization of what the parties had previously discussed, Mr. Zwebner's response made it abundantly clear that AirWater Corporation

6

was still in the process of trying to secure the $2 million in new investment funds, and that the future availability of such funding was dependent upon various contingencies beyond AirWater Corporation's control: "And yes, I did tell you back in March that we have $2 million in new investment funds coming in for this deal. . . . However, like all investments, the funders want more information on this, then on that, then they want certain due diligence [sic] items covered etc etc etc. . . . [sic] We have now produced the investment memorandum, and this I am delivering to Israel next week to finalize the cash investment. I should just mention, that if $2 million was so easy to get for this project, YOU would have gotten it a long time ago." Reidy Affidavit, Exh. C. Further, with regard to the investors, Mr. Zwebner stated that "With regards to the Israel trip, if you do not wish to come, then that too is OK with me. I will meet the people I need to meet, and them come back and deal with your issues later. I guess that if they want to see later, we will organize it then." Mr. Reidy responded, "Okay. It's not fair at this time to ask me to give them everything they want, and will probably need." Id.

The Plaintiff's Motion to Amend Complaint relies upon materials that were already in its possession as distinguished from materials newly obtained through discovery, and the Plaintiff provides no rationale or explanation for its belated effort to add these new claims.

## II. ARGUMENT

### A.    STANDARD UNDER FED. R. CIV. P. 15

According to Fed. R. Civ. P. 15, leave to amend will be "freely given when justice so requires" unless the amendment "would be futile or reward, *inter alia*, undue or intended delay". Berwind Property Group Inc. v. Environmental Management Group, Inc., 233 F.R.D. 62, 66 (D.Mass. 2005), citing, Resolution Trust Corp. v. Gold, 30 F.3d

7

251, 253 (1st Cir. 1994). "A proposed amendment is futile if it cannot survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P." Tingley Systems, Inc. v. CSC Consulting, Inc., 152 F.Supp.2d 95, 117 (D.Mass. 2001), citing, Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir.1990). See also, MacNeil Engineering Company, Inc. v. Trisport, 59 F.Supp.2d 199, 201 (D.Mass. 1999) (quoting, Smith v. Mitre Corp., 949 F.Supp. 943, 945 (D.Mass. 1997) ("Despite this rather forgiving standard [under Fed. R. Civ. P. 15(a)], '[i]n considering a motion for leave to amend the trial court must first consider whether the proposed new claims are futile, that is, whether they would be subject to dismissal for failure to state a claim'."); Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir.1996) ("futility" standard mirrors standard for failure to state a claim).

Additionally, where, as here, a motion for summary judgment has been filed, a "motion for leave to amend will be allowed only if the plaintiff can provide 'substantial and convincing evidence' in support of the amendment." Tyler v. U.S., 397 F.Supp.2d 176, 180 (D.Mass. 2005), quoting, Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994). See also, Adorno v. Crowley Towing And Transp. Co., 443 F.3d 122, 126 (1st Cir. 2006) (bar for a plaintiff tendering an amended complaint is higher after a motion for summary judgment has been filed; plaintiff must demonstrate "that the proposed amendments were supported by substantial and convincing evidence"). In this context, a "plaintiff's motion to amend is an attempt to alter the shape of the case in order to defeat summary judgment." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996).

8

B.  THE PLAINTIFF'S MOTION TO AMEND COMPLAINT MUST BE DENIED BECAUSE THE PLAINTIFF HAS FAILED TO SHOW THAT IT HAS "SUBSTANTIAL AND CONVINCING EVIDENCE" TO SUPPORT ITS NEWLY PROPOSED MISREPRESENTATION CLAIM AGAINST AIRWATER CORPORATION AND THE PROPOSED AMENDMENT WOULD BE FUTILE

The Plaintiff's Motion to Amend Complaint must be denied because the Plaintiff has failed to show that it has "substantial and convincing evidence" to support its newly proposed misrepresentation claim against AirWater Corporation and the proposed amendment would be futile.

To state a cause of action for fraud under Massachusetts law, defendants must allege: "(1) a misrepresentation of a material fact; (2) the misrepresentation was made with knowledge of its falsity; (3) the [plaintiff] intended the [defendant] rely upon the misrepresentation; and (4) the [defendant] relied upon it to his damage." Enterprise Finance Leasing Co. v. Westford Regency Inn, Inc., 1990 WL 279512, *1 (D.Mass. 1990), citing, Herring v. Vadala, 670 F.Supp. 1082, 1086 (D.Mass. 1987). In addition, the plaintiff "must show that his reliance on the alleged misrepresentations was reasonable." Armstrong v. Rohm and Haas Co., Inc., 349 F.Supp.2d 71, 81 (D.Mass. 2004), citing, Saxon Theatre Corp. of Boston v. Sage, 347 Mass. 662, 666-7 (1964); Elias Bros. Rest., Inc. v. Acorn, 831 F.Supp. 920, 922 (D.Mass. 1993). "Reliance is not reasonable where the alleged representations are vague or indefinite." Armstrong, 349 F.Supp.2d at 81, citing, Saxon, 347 Mass. at 666-7 (no reasonable reliance for purposes of plaintiff's claim of deceit where defendant's agreement to construct a theater and lease it to plaintiff "left [so many details] for future negotiations"); Warren H. Bennett, Inc. v. Charlestown Savings Bank, 3 Mass.App.Ct. 753, 753 (1975) ("no actionable deceit is

9

alleged . . . as the representation allegedly relied upon was so indefinite and imprecise as to render such reliance unreasonable as a matter of law").

In the present case, the Plaintiff's allegation that "defendant AirWater Corp. falsely represented to J.J. Reidy that it had $2 million in financing in order to market products based upon J.J. Reidy's patents" is patently unsupported and, in fact, is contradicted, by "substantial and convincing" evidence set forth in Mr. Reidy's affidavit and the emails attached thereto. Taken together, Mr. Reidy's Affidavit and the emails establish that as of May 8, 2003, the Plaintiff knew that AirWater Corporation was still in the process of trying to obtain the $2 million in investment funding; that such financing was still subject to various contingencies beyond AirWater Corporation's ultimate control; that Mr. Reidy would not be joining Mr. Zwebner on a trip to Israel to meet with the prospective investors and that the prospective investors would likely "want, and . . . probably need" additional information from the Plaintiff; that the parties' prospective agreement still had "many issues" that the parties needed to "discuss and agree upon," including but not limited to royalties; that the Plaintiff was actively pursuing other potential licensees; and that there was no consummated agreement between Plaintiff and AirWater Corporation. Even if AirWater Corporation made such representation in February, March or April, 2003 as alleged by Plaintiff, the Plaintiff's proposed amendment fails to state a claim upon which relief can be granted for fraud and should be denied as futile because the Plaintiff undisputedly knew the facts before the agreement was finalized, and the parties had yet to agree on all of the essential terms of the contract at the time the alleged misrepresentations were made. Accordingly, the Plaintiff's Motion to Amend Complaint must be denied. See, e.g., Saxon, 347 Mass. at 667 ("[w]e

10

are of the opinion that the plaintiff could not reasonably rely on a representation of an intention to draw up and execute a mutually acceptable lease when essential terms of it had not yet been stated or settled"); Schwanbeck v. Federal Mogul Corp., 31 Mass.App.Ct. 390, 399 n. 7 (1991) (plaintiff, "a sophisticated businessman, could not reasonably rely" on vague statement of hope by defendant that the parties would work out any future financing difficulties where terms of letter of intent required defendant "receive a 100% security interest in the real and personal assets of plaintiffs' to be formed corporation," but the defendant would finance only half the purchase price), modified on other grounds, 412 Mass. 703 (1992); Mahaney v. John Hancock Mut. Life Ins. Co., 6 Mass.App.Ct. 919, 920 (1978) (plaintiff did not reasonably rely on defendant's representations as to estimate of retirement benefits available to plaintiff under insurance policy where it should "have been obvious to him that there was something radically wrong with the figures given to him"); Export Lobster Co. v. Bay State Lobster Co., 1994 WL 902930, *4-5 (Mass.Super.Ct. 1994) (plaintiff did not reasonably rely on oral statements made during negotiations allegedly misrepresenting financial condition of defendants' company given that plaintiff's financial advisor upon reviewing defendants' financial statement, which showed that the company had suffered recurring losses and had a net working capital deficiency, informed plaintiff that he had "great reservations' " and "could not lend money on that type of statement"); Kennedy v. Josephthal & Co., 814 F.2d 798, 805 (1st Cir. 1987) (upholding summary judgment for defendants on common law fraud in sale of securities where oral misrepresentations of agent were completely at odds with offering memorandum and therefore reliance could not be reasonable as a matter of law).

Moreover, the Plaintiff's allegation that AirWater Corporation "also falsely represented that it had the resources available to fulfill its promise to establish and maintain the awareness and exposure of products manufactured by it based on the patents licensed by J.J. Reidy and to enhance future sales and future growth," even if made, is not actionable as a misrepresentations because such statement is not one of fact but rather is promissory in nature, relates to conditions to exist in the future and is too vague and indefinite to engender liability. Stolzoff v. Waste Systems International, Inc., 58 Mass.App.Ct. 747, 759 (2003) ("[a] statement on which liability for fraud may be based must be one of fact; it may not be one of opinion, or conditions to exist in the future, or matters promissory in nature"); Warren H. Bennett, Inc. v. Charlestown Sav. Bank, 3 Mass. App. Ct. 753, 753 (1975) (citing, Saxon, 347 Mass. at 666-667; Stroscio v. Jacobs, 2 Mass. App. Ct. 827 (1974) (no actionable deceit as representation allegedly relied upon was so indefinite and imprecise as to render such reliance unreasonable as a matter of law)).

## C. THE PLAINTIFF'S MOTION TO AMEND COMPLAINT MUST BE DENIED BECAUSE THE PLAINTIFF HAS FAILED TO PLEAD THE ALLEGED FRAUD WITH PARTICULARITY

The Plaintiff's Motion to Amend Complaint must be denied for the additional reason that the Plaintiff has failed to plead the alleged fraud with particularity as required by Fed. R. Civ. P. 9(b).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In order to comply with Rule 9(b), the claim must allege "'the time, place, and content of an alleged false representation. . . .'" Tingley Systems, Inc. v. CSC Consulting, Inc., 152 F.Supp.2d 95, 117 (D.Mass. 2001); citing, Boyle v. Merrimack Bancorp, Inc., 756

12

F.Supp. 55, 58 (D.Mass. 1991), citing, McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir. 1980). "The general purposes for this special pleading requirement are: (1) to provide the defendants with notice of the grounds on which the plaintiff's fraud claim rests; (2) to prevent the use of a groundless fraud claim as a pretext for discovering a wrong; and (3) to protect the defendants from frivolous claims that may harm their reputations." Tingley, 152 F.Supp.2d at 117, citing, New England Data Services, Inc. v. Becher, 829 F.2d 286, 289 (1st Cir.1987); Wayne Investment, Inc. v. Gulf Oil Corporation, 739 F.2d 11, 13-14 (1st Cir.1984).

In the present case, the Plaintiff's Proposed Second Amended Complaint falls far short of meeting the special pleading requirements of Rule 9(b), alleging merely that "defendant AirWater Corp. falsely represented to J.J. Reidy that it had $2 million in financing in order to market products based upon J.J. Reidy's patents" and "also falsely represented that it had the resources available to fulfill its promise to establish and maintain the awareness and exposure of products manufactured by it based on the patents licensed by J.J. Reidy and to enhance future sales and future growth." Proposed Second Amended Complaint, at ¶ 19. Accordingly, Plaintiff's Motion to Amend Complaint must be denied.

### III. CONCLUSION

WHEREFORE, based upon the foregoing points and authorities, the Defendants AirWater Corporation and AirWater Patents, Inc. respectfully request that this Honorable Court deny the Motion of J.J. Reidy & Co., Inc. to Amend Complaint.

DEFENDANTS AIRWATER
CORPORATION AND AIRWATER
PATENTS, INC.

Respectfully submitted,

*/s/ Matthew P. Zayotti*

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts 02110-3113
(617) 951-1400

Dated: May 5, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 5, 2006.

*/s/ Matthew P. Zayotti*