UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS.                                    CIVIL ACTION NO. 05-40049-FDS

(Consolidated with <u>Airwater Patents, Inc. v. J.J.
Reidy & Co., Inc., a Massachusetts Corporation;</u>
United States District Court Southern District of
Florida, Miami Division, Case No. 05-20650-
CIV-JORDAN)

| | |
|---|---|
| J.J. REIDY & CO., INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AIRWATER CORPORATION and | ) |
| AIRWATER PATENTS CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## <u>THIRD AFFIDAVIT OF JAMES J. REIDY</u>

I, James J. Reidy, hereby depose and state on personal knowledge as follows:

1.      This affidavit supplements my two previous affidavits dated July 19, 2005 and

June 14, 2006, respectively, in connection with this lawsuit.

2.      J.J. Reidy & Co., Inc. ("J.J. Reidy") is a Massachusetts corporation with a

principal place of business at 1260 Main Street, Holden, Massachusetts.

3.      I am president, director and an owner of J.J. Reidy.

4.      On March 21, 2003, J. J. Reidy and AirWater Corporation ("AirWater Corp."),

the predecessor-in-interest to AirWater Patents Corporation ("AirWater Patents"), entered into a

Global Manufacturing and Marketing Licensing Agreement (the "License") in which J. J. Reidy

granted to AirWater Corp. a license to use all of its United States Patents relating to a water

production/generation system (the "Licensed Patents"). A true and accurate copy of the License is attached as Exhibit A.

5.    On June 25, 2003, AirWater Corp. assigned its rights and obligations under the License to AirWater Patents. A true and accurate copy of the letter dated June 25, 2003 addressed to me is attached as Exhibit B.

6.    Under the License, AirWater Patents was required to pay J. J. Reidy a minimum monthly royalty payment of $10,000 per month for a minimum of ten years, or until its last patent expires, whichever period is longer. The Licensed Patents have not expired.

7.    AirWater Patents failed to make its required monthly royalty payment of $10,000 to J. J. Reidy under the License on November 1, 2004 and December 1, 2004.

8.    Additionally, the payments owed to J.J. Reidy on December 1, 2003, January 1, 2004, February 1, 2004, March 1, 2004, July 1, 2004 and September 1, 2004 were all paid more than fifteen days late. Considering the two percent late payment fee under the License, AirWater Patents owes a late payment fee totaling $1,600 (8 late payments of $10,000 per month at two (2) percent).

9.    On January 13, 2005, J. J. Reidy, through counsel, sent a Notice of Default addressed to Michael J. Zwebner at AirWater Patents requesting that it cure its failure to make payments. A true and accurate copy of the Notice of Default is attached as Exhibit C. However, AirWater Patents did not make good on the amounts owed.

10.    On January 31, 2005, J. J. Reidy, through counsel, sent a Notice of Termination addressed to Michael J. Zwebner at AirWater Patents, terminating the License. A true and accurate copy of the Notice of Termination is attached as Exhibit D.

{J:\CLIENTS\lit\304269\0002\PLD\F0332601.DOC;1}

11.    Despite the termination of the License, upon information and belief, AirWater

Patents continues to use the Licensed Patents.  As a result, J.J. Reidy is currently owed in excess

of $231,600 pursuant to the License.

Subscribed and sworn to under the pains and penalties of perjury on this 30th day of
October, 2006.

James J. Reidy, President
J.J. Reidy & Co., Inc.

## CERTIFICATE OF SERVICE

I, Thomas J. Conte, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 31, 2006.

/s/ Thomas J. Conte
Thomas J. Conte

{J:\CLIENTS\lit\304269\0002\PLD\F0332601.DOC;1}

# Exhibit A – Part 1

{}

# GLOBAL
# MANUFACTURING AND MARKETING LICENSING AGREEMENT

This Agreement is made and entered this _21ST day_ of March 2003 by and between;

**J.J. Reidy & Co., Inc.,** a Massachusetts Corporation whose principal address is 1260 Main Street, Holden Massachusetts 01520-1020, hereinafter referred to as "LICENSOR" and;

**AirWater Corporation**, a Florida Corporation, whose principal address is suite 6K, Lincoln Road, Miami Beach Florida 33139, hereinafter referred to as "LICENSEE".

## WITNESSETH

**WHEREAS, LICENSOR** represent and warrants that it has the entire right, title, and interest in and to United States Patents numbered 5,106,512, 5,149,446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and any patents to issue, foreign or domestic on any continuation or division thereof and any new patents, foreign or domestic, granted to LICENSOR relating to the Water Production/Generations System (hereinafter collectively referred to as "LICENSED PATENTS"), and generally known as the WATERSTAR systems, and that LICENSOR has the absolute and undisputed rights to grant the licenses under the LICENSED PATENTS as specified hereinafter; and,

**WHEREAS LICENSEE** represents that it is a US Corporation formed and registered in the State of Florida, and so licensed to do business, and,

**WHEREAS LICENSEE** is a wholly owned subsidiary of Universal Communications Systems Inc, a publicly traded company trading on the NASD OTC BB under the symbol "UCSY", and,

**WHEREAS LICENSEE** has indicated to LICENSOR of its interest in both manufacturing and marketing the WATERSTAR systems and technologies, on a world wide basis, and,



**WHEREAS LICENSEE** is desirous of obtaining a global right and license to manufacture, assemble, use and sell Water Production/Generation System products, and component parts therefore, falling under the scope of any LICENSED PATENT (hereinafter referred to as "LICENSED PROPERTY"); and

**WHEREAS LICENSOR** is willing to grant such right and license to LICENSEE under the conditions hereinafter set forth;

**NOW THEREFORE**, in consideration of mutual covenants, promises and undertakings contained herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby reciprocally acknowledged, the undersigned parties agree as follows.

# TERMS OF AGREEMENT

## GRANT OF LICENSE:

LICENSOR hereby grants to LICENSEE, for the term of this AGREEMENT, as a right and license to use and sell LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS, according to the provisions set forth hereinafter with the full right and privilege to alter, change and / or modify the contents and peripheral materials associated with LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY

RIGHTS with the conditions set forth herein, and the right to sublicense sale and distributions of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS according to the provisions and the conditions set forth hereinafter.

## TERM OF LICENSE:

The term of this Agreement shall commence upon the date of execution of this agreement and shall remain binding and continue for a period of not less than 10 years, and / or for the life of the last expiring LICENSED PATENT, whichever comes last, unless terminated sooner as provided herein.



## OWNERSHIP OF LICENSED PROPERTY:

This license agreement is not a sale or lease of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS from LICENSOR and the full title, rights and interests shall remain in the name of LICENSOR unless otherwise expressed herein and upon written mutual consent of both parties.

## PURPOSE

The purpose of LICENSEE will be, but is not limited to, the manufacture, sale and distribution of Water Production Generation Systems, and being of the invention of the LICENSOR, or derived or evolved there from, which system(s) is/are designed to produced potable water from the air.

## THE TERRITTORY

LICENSEE agrees that this Global Marketing and License Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions.

## VALIDITY

LICENSOR grants to LICENSEE this LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS for a period not less than 10 years, and / or the life of the last expiring patent, whichever comes last, and in any event agrees that it will not sell, allocate, transfer or sublicense to any third party without the expressed written permission of the LICENSOR.

## PAYMENT AND CONSIDERATION

LICENSEE further agrees to deliver 2 payments to LICENSOR's designated individuals a Global Marketing and Licensing Fee in the amount totaling $100,000 on or before July 1st 2003, (one payment due July 1st 2003, the second payment payable on August 1st 2003) plus four (4) million shares of UCSY to be delivered to the LICENSOR, (or his designees) within 21 days from the date of the execution of this Agreement.



These 4 million UCSY shares shall be issued as 144 shares, which in line with SEC regulations are restricted from sale for a period of not less than one year, unless subjected to a registration with the SEC and such registration is approved. These shares will be included in any company filing / registration, which the company undertakes to effect in not more than 180 days from the date of execution of this agreement.

## ROYALTY PAYMENTS

LICENSEE further agrees to pay a royalty fee on all sales of manufactured models in the amount of five per cent (5%) of all gross sales less any applicable taxes, for any machines and or components sold in the amounts not exceeding $10,000 each. For all other sales of units and or components, the Royalty Fee shall be seven percent (7%).

LICENSOR shall receive royalties on the quarterly gross sales of LICENSEE, and any of its sub LICENSEES. The royalties shall be computed based on the sales price, less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes, and other such amounts.

This royalty levied on gross sales shall be paid for all sales made on a Quarterly basis.

The payment will be remitted to the LICENSOR on or before the 30th day following the closing of the quarterly period.

LICENSEE will provide LICENSOR on a quarterly basis a full accounting of units shipped, units billed, and a receivables aging, until that time both parties agree to waive this requirement.

The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:

Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales during that fiscal quarter.



## MINIMUM MONTHLY ROYALTY PAYMENTS;

LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above whichever is the more.

LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

## LATE PAYMENT OF ROYALTIES:

LICENSOR may elect, to accept late payment fees from LICENSEE of two percent (2.0%) of any gross amount due LICENSOR should any payment due not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

## MANUFACTURING BY LICENSEE & THIRD PARTIES

LICENSOR further acknowledges that LICENSEE intends to offer to manufacture the said units and models in other countries around the world, and LICENSOR hereby confirms that the LICENSEE is granted the absolute right to so offer 3rd parties the sub-rights at all times adhering to the terms and conditions of this agreement.

## SUBLICENSE CONTRACTS

LICENSEE shall have the right to sublicense the LICENSED PROPERTY to any and all third parties it deems creditable and trustworthy to distribute and or market and or sell the LICENSED PROPERTY within the geographical limits as shall be agreed.

Both parties agree that the definition of Sublicense shall mean, "The right granted by the Licensee to any third party to manufacture, market and or distribute the LICENSED PROPERTY pursuant to the provisions and conditions provided herein, and as shall be amended to accommodate the particular situation.



LICENSEE retains the rights to charge and retain, and or waive, finance and or to accept partial payments (down payments) for any and all sublicense fees, as shall be the case on a case-by-case basis.

LICENSEE shall provide and deliver sublicense contracts to LICENSOR as a matter of record.

LICENSEE agrees that all sublicenses and related contracts are to encompass and embrace the parameters of this Agreement, and shall be created so as not to be in violation of any of the provisions contained herein, in part or in whole.

## SUBLICENSE PROPERTY

All sublicenses shall be considered proprietary and confidential and shall remain the property of the LICENSEE and/or the introducing party.

## PRODUCT ENDORSEMENT

LICENSEE may seek endorsements, including celebrity endorsements that LICENSEE deems qualified to represent LICENSED PROPERTY, and such endorsements obtained by LICENSEE shall remain the property of LICENSEE. LICENSOR agrees to acknowledge by letter the right of LICENSEE to use the prior or future endorsements at the discretion of LICENSEE in an appropriate manner of marketing with the consent of the endorser.

## LICENSEE OBJECTIVE AND GLOBAL MARKETING

LICENSEE's overall objective is to establish and maintain the awareness and the exposure of LICENSED PROPERTY to enhance sales and future growth.

LICENSEE will maintain the image and integrity of LICENSED PROPERTY for duration of this License Agreement. No marketing campaign shall be undertaken which fails to project good moral and ethical values. This specifically includes companies, which fail to reflect the highest of moral standards.

LICENSEE hereby commits the resources and puts forth best efforts in accomplishing, completing, and fulfillment of the promises contained herein.

LICENSEE shall have the right to create commercial production (radio, television, print) and other means in which to fulfill License Agreement.

LICENSE may create a long-term public relations strategy in which to achieve awareness \ sales, and growth.

## PRODUCT NAME AND LOGO's

LICENSEE retains the right to change the LICENSED PRODUCTS's name without the expressed written consent of LICENSOR.

## DESIGN PACKAGING.

LICENSEE shall hereby have the right to alter, change, add and or remove any item, color, format or material in any existing design packaging with the expressed written consent hereby granted by LICENSOR.

## COPYRIGHT USAGE

LICENSOR hereby grants the right to LICENSEE the use of any and all, in part or in whole, copyright materials as they currently relate to the LICENSED PROPERTY.

## TRADEMARK REGISTRATION – US. / FOREIGN

LICENSEE shall make application and pay filing fees in registering changes to trademark and or trade names, registrations, and service marks when and where applicable.

## GRANT OF TRADEMARK USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trademarks as they currently relate to the LICENSED PROPERTY under the conditions contained herein.



## GRANT OF TRADE NAME USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trade names, symbols, or logo's associated with LICENSED PROPERTY as they currently relate, under the conditions contained herein.

## TRADEMARK QUALITY CONTROL

LICENSOR has the right to approve LICENSED PROPERTY sold bearing the trademark licensed herein for conformance with LICENSOR's quality standard.

Before implementing changes in the goods sold under the trademark, LICENSEE shall provide LICENSOR a specimen of the proposed changes.

LICENSOR shall have 2 weeks in which to pass comment, denying or approving the said changes within reason. If LICENSOR does not object within the said 2 weeks, the said changes are deemed approved.

## PRODUCT AND MATERIAL ADDITIONS

LICENSEE shall have the right to make any additions to the LICENSED PROPERTY without the expressed written consent of the LICENSOR for market appeal and or added value. Any such added materials shall remain the property of the LICENSEE at all times, subject to continuing payment of royalties.

## ASSEMBLY

LICENSEE has the right to assemble and or have assembled LICENSED PROPERTY where and whenever applicable.

## UNIVERSAL PRODUCT CODE

LICENSOR shall provide LICENSEE any existing UPC codes for the LICENSED PROPERTY.



## LICENSE PARAMETER

LICENSOR agrees and confirms that this exclusive Agreement is not limited to any county, state or country worldwide.

## MAINTENANCE OF PATENT(s)

LICENSOR hereby agrees and confirms that the above referenced patents are all valid, in good standing and that he has disclosed all pertinent and relevant information relative to the patents, and further confirms that he will maintain the validity and good standing of the patents.

## PRODUCT LIABILITY INSURANCE

LICENSEE shall during the entire term of this agreement, maintain an adequate Insurance Policy, to commence upon the first commercial production and sales of product, such product liability insurance to cover LICENSED PROPERTY sold by LICENSEE or any of its sub licensees, and J.J. Reidy & Co Inc., shall be named "additional insured" thereon with respect to any claims made against LICENSOR as a result of LICENSEE's or any of its sub licensee's sales of LICENSED PROPERTY.

LICENSEE agrees to provide a copy of such insurance policy within 30 days of execution of its marketing opening dates of sales. LICENSEE shall also indemnify and hold harmless J.J. Reidy & Co Inc, its employees, directors, officers, shareholders as to any claims, lawsuits, threatened litigation or judgments rendered, relating to the LICENSED PROPERTY sold by the LICENSEE and /or any of its sub licensees.

## TRADE SECRETS

Both parties acknowledge and agree that the other party possesses trade secrets that are proprietary property, and constitute a valuable trade secret. Both parties agree not to disclose and or make available to third parties the information that shall include, but be limited to, this Agreement and any other Agreement that may be entered into between the parties, without the expressed written consent of the other party.



# Exhibit A – Part 2

# FOREIGN PATENT AND TRADEMARK AND REGISTRATIONS

If at the LICENSEES request the LICENSOR shall make application for foreign trademark and or trade name registration, then the LICENSEE shall pay all fees necessary.

LICENSEE, when applicable shall retain the full rights, title, and interest in any and all trademark(s) and trade name(s) registration in foreign countries as long as this license Agreement is in force.

LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSOR, at his own expense.

# RECORDS AND INSPECTION

LICENSEE shall reduce all sublicenses granted herein written Agreements and copies will be provided to LICENSOR.

# TRANSFER OF CUSTODY, KNOW HOW AND TECHNICAL ASSISTANCE

LICENSOR agrees to provide all information in its possession to assist LICENSEE to distribute and sell LICENSED PROPERTY. LICENSOR shall transfer to the care and custody of LICENSEE within 30 days from the execution of this Agreement, all information requested by LICENSEE in its possession pertaining to the LICENSED PROPERTY, and all information material and pertaining to the sales thereof, and consisting of, for example, but not limited to:

All design Data, films, disks, camera work, negatives, layouts, registration mark copy for production and reprint, logos, type fonts, etc.

Process Specifications-All details, processes, steps and procedures concerning, but not limited to care of product, storage, the do's and don'ts, print specifications, packaging specifications, etc.



Commercial Operation Data-volume discounts, minimum order levels, maximum order levels, turn-around production time, shipping costs and requirements, etc.

Endorsement Grant-granting the permission to LICENSEE the use of any and all previous or future endorsements with the permission of the endorser.

LICENSOR shall also make available in timely fashion, all future improvements relating to the LICENSED PROPERTY, including change, and modifications and specifications, methods and materials, during the term of this Agreement.

## TERMINATION OR REVOCATION OF LICENSE

This Agreement and the rights and licenses granted herein shall wholly cease and terminate prior to the termination of the license as described hereinabove upon the occurrence of any of the following events.

Any material breach by either party of the terms of this Agreement, provided the non-breaching party in the one seeking the termination and gives the other party written notice on intention to terminate, which shall state the fault or breach upon which the party relies. The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time; or

If the LICENSOR does not receive the Licensing fee at the time of the joint approval and signing of this agreement or any other subsequent payment due LICENSOR that is not paid within 5 business days within its due date.

This agreement shall terminate upon the insolvency and/or criminal conviction of either party unless other agreed to in writing.

Upon termination, LICENSOR shall have the first right of refusal to purchase Licensee's inventory for cost payable within 30 days of written offer.

The written offer must be accepted within 30 days of being made. In no event shall LICENSEE sell existing inventory after a period of 12 months following the termination notice.

The mutual consent of the parties expressed in writing.

This agreement will terminate with notice, if LICENSEE does not make any required payments to LICENSOR as specified within the stated and agreed time periods.

The LICENSOR agrees to grant to the LICENSEE a 14 day period of notice / grace in which the LICENSEE can make good on any outstanding amount.

## EFFECT OF TERMINATION OR REVOCATION

The termination of this agreement shall not release LICENSEE from the obligation to pay LICENSOR any accrued sums owed to LICENSOR or from fulfilling any other accrued obligation. Additionally such termination shall be without prejudice to any right or remedy, which either party may have or believes it has against the other party.

The termination of this agreement as a result of the provisions and conditions provided herein, and/or the breach thereof, or an uncontrolled act of G-d, government, laws, etc., which prohibit the fulfillment of this Agreement shall not bind the LICENSEE to fulfill any projected sales figures.

In no case shall LICENSEE have any claims for repayment or offset of any sum or sums, which shall have been paid, as required under the terms of this agreement

Upon termination, each party will retain proprietary property(s) and the complete rights title, and interest of any and all proprietary property, information and material introduced.

Upon termination and revocation of License Agreement, each party will properly return, in a timely fashion and all proprietary property to the owner, in the same manner and condition received in relation to paragraph above.

Upon termination and revocation of License Agreement. LICENSOR has the right to purchase from LICENSEE any items not considered LICENSED PROPERTY, such as, but not limited to, changes in the LICENSED PROPERTY name, trade mark or trade name, universal product codes,



marketing materials changes, alterations, and/or modifications duly registered etc., at a fair market price.

## DURATION/TERM/MAINTANENCE OF EXCLUSIVITY

The License granted herein exclusive to a geographical territory as defined above and shall remain exclusive unless terminated in accordance with the terms of this agreement.

LICENSEE agrees to put forth its best efforts to sell LICENSED PROPERTY during the period of exclusivity of the Licenses granted herein.

### INFRINGEMENT:

In the event any infringement of LICENSOR's patents is discovered in any country recognizing such patents and/or litigation commences with respect to any claim of infringement of LICENSOR's patents, LICENSEE has the option to pursue any and all litigation to protect the marketing effort.

LICENSEE has the sole discretion to determine how much to incur in legal expenses in pursuing any infringement claim or litigation based upon what is reasonable and in the best interest of LICENSEE.

LICENSOR shall have the option to participate in such claim in proportion to the expense LICENSEE bears, i.e. 50% of litigation expenses = 50% of the claim/settlement. In the event LICENSOR exercises this option to participate, LICENSOR shall be entitled to retain an equal percentage amount, in relation to the percentage amount of expenses incurred, of the receipts from such settlement, judgment, compromise or arbitration.

In the event infringement is discovered and LICENSEE does not act upon settlement of infringement or litigation in a reasonable amount of time as not to effect the marketing campaign, sales, and/or growth, LICENSOR shall have the right to pursue the infringing party for damages, and retain the proceeds.

## USE RESTRICTIONS:

LICENSEE agrees not to use LICENSED PROPERTY in any illegal fraudulent, or deceptive manner to damage the good name and / or standing of the LICENSED property

## TRANSFER RESTRICTIONS/ASSIGNABILITY/SUB-LICENSE/SALE

Any party may assign and/or sell this Agreement to any third party, subject to first offering the other party a first right of refusal. Any such assignment and/or sale shall be made in accordance with the provisions herein.

LICENSEE has the right to have other parties manufacture for it, provided the manufacturer enters into a Non-Compete and Non-Disclosure Agreement with LICENSOR. If LICENSEE sells or assigns this License, LICENSOR will receive from LICENSEE fifteen percent (15%) of the assignment/sale price.

## ASSIGNMENT/SALE

LICENSOR agrees to notify LICENSEE of any contemplated assignment /sale of LICENSOR's patents during the term of this Agreement with thirty (30) days notice.

LICENSEE agrees to notify LICENSOR of any contemplated assignment /sale of this License during the term of this Agreement with thirty (30) days notice.

In either of the above cases, each party shall offer the other party the right of first refusal.



## WAIVERS:

No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.

The waiver by any party of any of the conditions precedent to its respective obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement.

## BENEFITS:

Except as expressly provided in this Agreement, nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligation, or liability under or by reason of this Agreement

## CONSTRUCTION/JURISDICTION:

Inasmuch as the transactions, which may arise or occur between the parties and/or their principals may cross boundaries of national and or international jurisdiction, this Agreement shall be construed and interpreted in Accordance with the laws of the United States of America and the resident state of the Plaintiff.

## SEVERABILITY:

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

## ARBITRATION

The parties may elect to settle and differences by submitting to Arbitration in the resident state of the plaintiff. The Arbitrators decision shall be and remain binding to either and both parties.

## NOTIFICATION

Any notice hereunder must be in writing and by courier service with signed receipt and shall be deemed to have been given when such notification, properly addressed to the addressee indicated above, is sent by courier and receipt acknowledged. Either party hereto may at any time by thirty (30) days notice to the other; designate any other address in place of those given above.

## FURTHER DOCUMENTS:

Each of the parties hereto agrees to execute and deliver all such documents and to do any and all acts, matters and things as may be necessary or proper in order to carry out the intended purposes of this Agreement.

## PRIOR AGREEMENTS:

This Agreement shall supersede and replace any and all prior Agreements entered into between the parties hereto related to the subject matter hereof and any such prior Agreements shall be, and they are hereby, canceled.

## EMPLOYEE STATUS:

It is understood and agreed by both parties that neither party is an employee of the other.

## EFFECTIVE DATE:

The effective date of this Agreement shall be upon the acceptance and execution thereof by both parties.



## ENTIRE AGREEMENT:

This instrument of 18 pages contains the entire Agreement between LICENSOR and LICENSEE, and no modification hereof shall be binding on the parties unless it is in writing and signed by a duly authorized officer of the parties to be bound.

## AUTHORITY:

All parties warrant that they have the requisite authority and capacity to execute this Agreement and that its terms and provisions constitute valid and legally enforceable rights and obligations against the parties, their successors, administrators, etc.

## DOCUMENT ORIGINALS:

This document is considered as an original, binding and enforceable Agreement, whether executed in original, binding counterparts or Facsimile.

## INTENTIONALLY LEFT BLANK.



IN WITNESS WHEREOF, the parties have affixed their names, signatures, and seals, by their executive officers thereto duly authorized, on the day and year first above written.

<u>**ON BEHALF OF LICENSEE**</u>:

_____
M J Zwebner - Chairman
AirWater Corporation

<u>**ON BEHALF OF LICENSOR**</u>:

_____ Pres.
James J. Reidy, President
J.J. Reidy & Co., Inc.

Subscribed and sworn to before me

This _21st_ day of _March_ 2003

_____
Notary Public Notary Public
My commission expires: 1/9/03

OFFICIAL NOTARY SEAL
ROLANDO S SABLON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD083309
MY COMMISSION EXP. JAN. 9,2006

# Exhibit B

{}

**AirWater Corporation**
Suite 6K, 407 Lincoln Road
Miami Beach FL 33139
Tel 305 672 6344
Fax 305 672 1965

J&J Reidy & Co Inc
1260 Main Street,
Holden 01520
Mass

June 25, 2003

Dear Jim,

Please be advised that in accordance with our discussion and agreement, we have transferred all the rights and liabilities of the Global Manufacturing and Marketing Licensing Agreement entered into between us on March 21st 2003, to **AirWater Patents Inc**, a Florida Corporation.

This company recently formed, is also to be a wholly owned subsidiary of Universal Communication Systems Inc.

Please signify your agreement to this transfer by signing below on the space designated.

Thank you for your co-operation.

Yours sincerely,

Michael Zwebner - President
AirWater Corporation.

I have read this letter, and pursuant to the terms of the agreement relevant, I/we hereby give my/our consent to this request for approval for the transfer of the Agreement to **AirWater Patents Inc.**, as stated above.

Date June 25, 2003

James Reidy – President
J&J Reidy & Co Inc.



# Exhibit C

{}

*Bowditch*
*&Dewey*
ATTORNEYS

EX.B

Direct telephone: (508) 926-3431
Direct facsimile: (508) 929-3046
Email: dflynn@bowditch.com

<u>VIA FEDERAL EXPRESS</u>                    January 13, 2005

Mr. Michael Zwebner
AirWater Patents Corporation
Suite 12F
407 Lincoln Road
Miami Beach, FL 33139

Re:    **NOTICE OF DEFAULT**

Dear Mr. Zwebner:

This firm represents J.J. Reidy & Company, Inc. ("J.J. Reidy"). This letter is to inform you that AirWater Patents Corporation ("AirWater Patents") is in default of the Global Manufacturing and Marketing Licensing Agreement (the "License") executed on March 21, 2003 between AirWater Corporation and J.J. Reidy and assigned to AirWater Patents on June 25, 2003. AirWater Patents has failed to make its required monthly royalty payments to J.J. Reidy on November 1, 2004 and December 1, 2004 and has thus breached the terms of the License. Additionally, AirWater Patents has made eight (8) payments of monthly royalties to J.J. Reidy more than fifteen (15) days past the due date. This letter is notice to AirWater Patents that J.J. Reidy has elected to accept late payment fees from AirWater Patents of 2% of the gross amount of these late royalty payments.

The "Minimum Monthly Royalty Payments" section of the License, page 5, states: "LICENSEE is to pay LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1, 2003." Moreover, the "TERM OF LICENSE" section of the License, page 2-3, states that "...this agreement shall remain binding and continue for a period of not less than 10 years...." AirWater Patents has failed to make its $10,000 monthly royalty payments to J.J. Reidy on November 1, 2004 and December 1, 2004 and is in default of its obligations under the License. According to the "TERMINATION OR REVOCATION OF LICENSE" section of the License, page 11-12, AirWater Patents has a 14-day period of notice / grace in which it can make good on its outstanding amount of $20,000 owed to J.J. Reidy. If said payment is not received by J.J. Reidy within this time, J.J. Reidy reserves the right to Terminate and Revoke the License.

H:\CLIENT\lit\303126\0001\00501583.DOC:1;

BOWDITCH & DEWEY, LLP   311 MAIN STREET   PO BOX 15156   WORCESTER, MA 01615-0156
T 508 791 3511   F 508 756 7636   www.bowditch.com

*Boston   Framingham   Worcester*



Page 2

This letter further notifies AirWater Patents that J.J. Reidy has elected to accept late payment fees from AirWater Patents of 2% of the gross amount of royalty payments either unpaid as of this date or paid more than fifteen days past their due date, pursuant to the "LATE PAYMENT OF ROYALTIES" section of the License, page 5, which states:

> LICENSOR may elect to accept late payment fees from LICENSEE of two percent of any gross amount due LICENSOR should any payments not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

As payments due to J.J. Reidy on December 1, 2003, January 1, 2004, February 1, 2004, March 1, 2004, July 1, 2004, September 1, 2004, November 1, 2004, and December 1, 2004 were all paid or have not yet been paid more than fifteen days from their due dates, AirWater Patents owes to J.J. Reidy a 2% late payment fee totaling $1,600 (8 late payments of $10,000 per month at 2%). Failure to make this payment within fourteen (14) days of receipt of this letter will constitute a further breach of the License and grant J.J. Reidy the option to Terminate and Revoke the License without waiving its right to any monies owed it by AirWater Patents pursuant to the "TERMINATION OR REVOCATION OF LICENSE" section of the License, page 11.

Please remit payment directly to J.J. Reidy and copy the undersigned on your correspondence.

J.J. Reidy reserves all of its rights to pursue any and all legal remedies available to it to enforce its rights under the License.

Sincerely,

Daniel P. Flynn

Cc: Thomas J. Conte, Esquire

# Exhibit D

{}



*Bowditch*
*&Dewey*
ATTORNEYS

Direct telephone: (508) 926-3431
Direct facsimile: (508) 929-3046
Email: dflynn@bowditch.com

January 31, 2005

<u>VIA FEDERAL EXPRESS</u>

Mr. Michael Zwebner
AirWater Patents Corporation
Suite 12F
407 Lincoln Road
Miami Beach, FL 33139

Re:    NOTICE OF TERMINATION

Dear Mr. Zwebner:

I am writing as a follow up to my letter to AirWater Patents Corporation ("AirWater Patents") dated January 13, 2005, (the "Notice of Default"). As AirWater Patents has failed to make any payments to cure its material breach of the Global Manufacturing and Marketing Licensing Agreement (the "License") within fourteen days, the License is hereby terminated.

As such, J.J. Reidy demands that AirWater Patents cease and desist using and selling water production/generation system products, and component parts thereof, falling under the scope of United States Patents numbered 5,106,512, 5,149,446, 5,203,989, and 5,366,705, any patents issued, foreign or domestic, on any continuation or division thereof, or any new patents, foreign or domestic, granted to J.J. Reidy relating to water production generation systems. These and all other rights granted to AirWater Patents under the License have been wholly terminated pursuant to the "Termination or Revocation of License" section of the License (pp. 11 - 12 of the License). Also pursuant to pages 11 and 12 of the License, "in no case shall licensee [AirWater Patents] have any claims for repayment or offset of any sum or sums, which shall have been paid, as required under the terms of this agreement" upon this termination.

Also according to pages 11 and 12 of the License, "upon termination each party will retain proprietary property(s) and the complete rights, title and interest of any and all proprietary property, information and material introduced." Further, "upon termination and revocation of

Page 2

License Agreement each party will promptly return, in a timely fashion and [*sic*] all proprietary property to the owner. . . " Accordingly, J.J. Reidy demands return of all of its proprietary property within ten days of AirWater Patents' receipt of this letter.

J.J. Reidy reserves all of its rights to pursue any and all legal remedies to recover damages it has suffered or will suffer from the breach of the License by AirWater Patents.

Sincerely,

Daniel P. Flynn

DPF/rl