UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**J.J. REIDY & CO., INC.,**

   **Plaintiff,**

v.

**AIRWATER CORPORATION AND
AIRWATER PATENTS
CORPORATION,**

   **Defendants.**

CIVIL ACTION NO. 05-40049-FDS

**AIRWATER PATENTS, INC.**

   **Plaintiff,**

v.

**J.J. REIDY & CO., INC.**

   **Defendant.**

CIVIL ACTION NO. 06-10137-FDS

**MEMORANDUM OF LAW OF AIRWATER CORPORATION
AND AIRWATER PATENTS, INC. IN SUPPORT OF
THEIR OPPOSITION TO PLAINTIFF J.J. REIDY & CO., INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT
OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

AirWater Corporation and AirWater Patents, Inc. collectively, ("AirWater")

hereby submit this Memorandum of Law in support of their Opposition to Plaintiff J.J.

Reidy & Co., Inc.'s Motion for Partial Summary Judgment and in Support of Their

Cross-Motion for Partial Summary Judgment.

**I  PROCEDURAL HISTORY**

The parties commenced separate actions against each other which have ultimately been consolidated in the United States District Court for the District of Massachusetts, Central Division, in Civil Actions Nos. 05-40049-FDS and 06-10137-FDS. In its First Amended Complaint, J.J. Reidy asserts a sole count for breach of contract against AirWater Corporation and AirWater Patents, alleging that AirWater Corporation breached the Agreement by failing to make required Minimum Monthly Royalty Payments. Additionally, J.J. Reidy alleged that both AirWater Patents, Inc. and AirWater Corporation breached the Agreement by failing to commit resources and put forth best efforts to market the J.J. Reidy air to water system.

AirWater Corporation has moved for summary judgment on J.J. Reidy's breach of contract claims based on its assignment of all rights and obligations under the Agreement to AirWater Patents, Inc. and J.J. Reidy's assent thereto. AirWater Corporation's motion for summary judgment is still pending.

In response to AirWater Corporation's motion for summary judgment, J.J. Reidy filed a motion for leave to amend its complaint by adding a claim for intentional misrepresentation against AirWater Corporation. J.J. Reidy's motion to amend is still pending.

In AirWater's complaint against J.J. Reidy, AirWater seeks, in part, a declaratory judgment that its obligation regarding Minimum Monthly Royalty Payments was limited to a one-year period; that J.J. Reidy wrongfully sought to terminate the Agreement; that AirWater's exclusive rights under the Agreement continue in force; and that J.J. Reidy is barred from licensing the J.J. Reidy Patents to any third parties during the term of the

2

Agreement. Further, AirWater asserts claims against J.J. Reidy for breach of contract,

breach of the implied covenant of good faith and fair dealing and unjust enrichment.

## II. FACTS

### A.    The Global Manufacturing and Marketing Licensing Agreement

In or about February, 2003, AirWater commenced negotiations with J.J. Reidy &

Co., Inc. ("J.J. Reidy") for an exclusive world-wide license for AirWater to manufacture,

market and sell water production generation systems, which produce drinkable water

from the air and which were ostensibly based upon patents owned by J.J. Reidy.

Zwebner Affidavit, at ¶ 3. During the initial negotiations, J.J. Reidy represented to

AirWater that J.J. Reidy was the sole inventor of the water production generation system

in question, and that J.J. Reidy owned all right, title and interest to the relevant patents:

U.S. Patent Nos. 5,106,512; 5,149,446; 5,203,989; and 5,366,705 (the "J.J. Reidy

Patents"). Additionally, J.J. Reidy represented to AirWater that the design for J.J.

Reidy's water production generation system had been patented and/or otherwise

protected world-wide. Id. at ¶ 4.

Additionally, during the initial negotiations, the parties agreed upon certain basic

terms for a licensing agreement, which included J.J. Reidy's grant to AirWater of an

exclusive, world-wide license for J.J. Reidy's water production generation system for a

10-year term upon AirWater's payment to J.J. Reidy of $100,000 cash, 4 million shares

of stock issued and valued at approximately $300,000, and quarterly royalty payments

during the term of the license. Id. at ¶ 5.

Throughout the course of the negotiations, both parties reasonably anticipated and

expressly acknowledged that there would be substantial delay in the flow of AirWater's

3

royalty payments to J.J. Reidy because sales of J.J. Reidy's water production generation system would not be immediately generated for a number of reasons, including (a) the time needed to re-design J.J. Reidy's water production generation machines, (b) the time needed to develop and build a range of new air to water machines, (c) the time necessary to obtain national and international permits and licenses for the sale of the air to water machines, and, finally, (d) the need to allow reasonable time for AirWater's sales and marketing efforts to generate sales. In that regard, the parties expected that the start-up process for AirWater would take at least one to one and one-half years from the date of execution of a global licensing agreement before any revenue would be realized from sales. Id. at ¶ 6. Accordingly, since the stock J.J. Reidy would receive was legally restricted pursuant to SEC rules and could not be traded for one year, and because quarterly royalties were not anticipated during AirWater's start-up phase of designing, manufacturing, marketing and selling J.J. Reidy's water generation system, the parties agreed and intended that AirWater would pay J.J. Reidy a minimum monthly royalty of $10,000 for a limited period of one year, after which AirWater would commence to pay royalties on a quarterly basis. Id. at ¶ 7.

In or about late June of 2003, J.J. Reidy and AirWater Corporation executed a written Global Manufacturing and Marketing Licensing Agreement (the "Agreement"), back-dating it to March 21, 2003. Reidy Affidavit of April 14, 2006, at ¶ 10. Thereafter, on June 25, 2003, AirWater Corporation assigned all of its rights and obligations under the Agreement to AirWater Patents, Inc., which assignment was consented to in writing by J.J. Reidy. Third Reidy Affidavit, at ¶ 5 and Exh. B.

4

Pursuant to the terms of the Agreement, J.J. Reidy represented and warranted as follows:

> LICENSOR represents and warrants that it has the entire right, title, and interest in and to United States Patents numbered 5,106,512, 5,149.446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and any patents to issue, foreign or domestic on any continuation or division thereof and any new patents, foreign or domestic, granted to LICENSOR relating to the Water Production/Generations System (hereinafter collectively referred to as "Licensed PATENTS"), and generally known as the WATERSTAR systems, and that LICENSOR has the absolute and undisputed rights to grant the licenses under the LICENSED PATENTS as specified hereinafter;

Zwebner Affidavit, Exh. A, at 1.

The term of the license "commence[d] upon the date of execution of this agreement and shall remain binding and continue for a period of not less than 10 years, and / or for the life of the last expiring LICENSED PATENT, whichever comes last, unless terminated sooner as provided herein." Id.

The parties further agreed that "this Global Marketing and Licensing Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions." The parties further agreed that "this exclusive Agreement is not limited to any county, state or country worldwide. Further, pursuant to the provision of the Agreement entitled "Maintenance of Patent(s)," "LICENSOR hereby agrees and confirms that the above-referenced patents are all valid, in good standing and that he has disclosed all pertinent and relevant information relative to the patents, and further confirms that he will maintain the validity and good standing of the patents." Additionally, pursuant to the provision of the Agreement entitled "Duration/Term/Maintenance of Exclusivity" the "License granted

herein exclusive to a geographical territory as defined above and shall remain exclusive unless terminated in accordance with the terms of this agreement." Id., Exh. A, at 3, 9 and 13.

In exchange for the exclusive, world-wide rights granted by J.J. Reidy, AirWater agreed to pay J.J. Reidy $100,000, and transfer to J.J. Reidy 4 million shares of UCSY stock. Id., Exh. A, at 3-4. Additionally, as further consideration for the exclusive, world-wide rights granted to AirWater, AirWater agreed to pay J.J. Reidy royalties on sales. Specifically, the Agreement provides, in relevant part, as follows:

> ROYALTY PAYMENTS
>
> LICENSEE further agrees to pay a royalty fee on al sales of manufactured models in the amount of five per cent (5%) of all gross sales less any applicable taxes, for any machines and or components sold in the amounts not exceeding $10,000 each. For all other sales of units and or components, the Royalty Fee shall be seven per cent (7%).
>
> LICENSOR shall receive royalties on the quarterly gross sales of LICENSEE, and any of its sub LICENSEES. The royalties shall be computed based on the sales price, less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes, and other such amounts.
>
> This royalty levied on gross sales shall be paid for all sales made on a Quarterly basis.
>
> The payment will be remitted to the LICENSOR on or before the 30th day following the closing of the quarterly period.
>
> . . .
>
> The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:
>
> Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales during that fiscal quarter.

Id., Exh. A, at 4. Additionally, with regard to royalties the Agreement further provides,

in relevant part, as follows:

> ### MINIMUM MONTHLY ROYALTY PAYMENTS:
>
> LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st, 2003, or the Royalty payments due in accordance with [the quarterly royalty provisions of the Agreement] whichever is the more.
>
> LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

Id., Exh. A, at 5.

The "Termination or Revocation of License" section of the Agreement provides,

in relevant part, as follows:

> This Agreement and the rights and licenses granted herein shall wholly cease and terminate prior to the termination of the license as described hereinabove upon the occurrence of any of the following events.
>
> Any material breach by either party of the terms of this Agreement, *provided the non-breaching party in [sic] the one seeking the termination* and gives the other party written notice of intention to terminate, which shall state the fault or breach upon which the party relies. The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time. . . .
>
> If the LICENSOR does not receive the Licensing fee at the time of the joint approval and signing of this agreement or any other subsequent payment due LICENSOR that is not paid within 5 business days within its due date.
>
> . . .

7

> This agreement will terminate with notice, if LICENSEE
> does not make any required payments to LICENSOR as
> specified within the stated and agreed time period.
>
> The LICENSOR agrees to grant to the LICENSEE a 14 day
> period of notice / grace in which the LICENSEE can make
> good on any outstanding amount.

Id., Exh. A, at 11-12 (emphasis supplied).

Additionally, the Agreement provided a 14-day grace period for payment of
royalties. Id. at 5. In that regard, the Accordingly, AirWater had until February 15, 2005
to make its first quarterly royalty payment, after which time J.J. Reidy could elect to
accept late payment fees from AirWater in the amount of two percent (2%) of any gross
amount due to J.J. Reidy. Id.

AirWater timely performed its obligations under the Agreement by paying J.J.
Reidy $100,000, and transferring 4 million shares of stock to J.J. Reidy. Further,
consistent with the parties' negotiations and intent, and because there would be no sales
and therefore no royalties during the initial start-up phase of the air to water venture,
AirWater agreed to Minimum Monthly Royalty Payments to J.J. Reidy of $10,000 per
month for twelve months, commencing November 1, 2003, through October 31, 2004.
Zwebner Affidavit, at ¶ 9.

Immediately upon the execution of the Agreement, AirWater commenced its
recruitment of individuals and corporations on a world-wide basis to help develop,
design, and build state-of-the-art water production generation machines. Through its
parent corporation and sister company AirWater Corporation, AirWater spent in excess
of $2 million in direct and indirect costs, wholly attributable to the J.J. Reidy air to water
venture. Additionally, whereas J.J. Reidy's Patents and the concept of air to water
technology was relatively unknown and even less exploited prior to the execution of the

8

Agreement, as a result of AirWater's substantial efforts, the air to water concept, J.J.

Reidy's Patents and the reality of the technology, had become well-publicized on a

world-wide basis to the substantial benefit of J.J. Reidy. Id. at ¶ 10.

### The ELGT Patent Infringement Litigation Challenging the Reidy Patents

Unfortunately, throughout the first eighteen (18) months of the term of the

Agreement, a significant amount of AirWater's time, money and effort were diverted

away from the J.J. Reidy air to water venture as a result of a lawsuit in which AirWater

was forced to defend the validity of the J.J. Reidy Patents. In particular, on or about

August 8, 2003, AirWater and its parent company, Universal Communication Systems,

Inc. ("UCSY"), were served with a complaint for patent infringement by a Texas

company, Electric Gas & Technologies, Inc. ("ELGT"). In essence, ELGT alleged that

J.J. Reidy had fraudulently obtained and registered patents for the air to water technology

from another inventor who was the rightful owner thereof. Id. at ¶ 11 and Exh. B.

In response to this lawsuit, J.J. Reidy deliberately avoided service of process

(ELGT claimed, under oath, that it attempted to serve J.J. Reidy's registered agent, Mr.

James J. Reidy, on 12 separate occasions without success) and took no steps to defend the

validity of the J.J. Reidy Patents, leaving the entire burden of the defense of ELGT's

action upon AirWater. Rather, J.J. Reidy stood by silently, failed to cooperate in good

faith with AirWater's defense of the validity of the J.J. Reidy Patents, and even refused to

contribute funds to the costs of the defense of the patent litigation. Ultimately, on

grounds other than the validity of the J.J. Reidy Patents, AirWater was able to negotiate a

settlement with ELGT, and the action was settled in favor of AirWater. However, the

questions raised by ELGT as to the validity of the J.J. Reidy Patents remained and remain

unresolved. <u>Id.</u> at ¶ 12. In defending the validity of the J.J. Reidy Patents, AirWater incurred attorney's fees and costs in excess of $180,000. <u>Id.</u> at ¶ 13. Notably, even during the time that AirWater was forced to defend the validity of the J.J. Reidy Patents, AirWater honored its obligations under the Agreement and continued to pay J.J. Reidy the Minimum Monthly Royalty of $10,000. <u>Id.</u> at ¶ 14.

**Reidy's Failure to Provide Global Patents**

Contrary to the terms of the parties Agreement and J.J. Reidy's representation regarding the world-wide registration of the Reidy Patents, J.J. Reidy had only obtained patents in the United States and in three other overseas countries. Upon learning that J.J. Reidy's Patents were not protected in several foreign countries that were known targets of AirWater's marketing efforts, AirWater made demand upon J.J. Reidy to obtain appropriate patent protection for the same. Although the Agreement expressly provided that J.J. Reidy is required to make applications for foreign trademark and trade name registration and for filing any foreign patents, J.J. Reidy refused to cooperate and file the essential applications for foreign patent and trademark protection for the J.J. Reidy Patents and the air to water system, despite AirWater's continuing demands. In that regard, J.J. Reidy subsequently sought to excuse J.J. Reidy's performance of its obligations under the Agreement, claiming that the time limits for filing such patent protections in the various overseas countries had lapsed and that the J.J. Reidy Patents could therefore no longer be registered in those overseas countries. As a result, AirWater was deprived of the benefit of its bargain with J.J. Reidy to license the J.J. Reidy Patents. <u>Id.</u> at ¶¶ 14-16 and Exh. C.

**J.J. Reidy's Unjustified and Wrongful Anticipatory Breach
and Termination of the Agreement**

In accordance with the terms of the Agreement, from November 1, 2003, through October 31, 2004, AirWater made monthly royalty payments to J.J. Reidy. Commencing November 1, 2004, in accordance with the Royalty Payments provisions of the Agreement, AirWater's quarterly royalty fee (of either 5% or 7%) on gross sales was due to be paid to J.J. Reidy for the last quarter of 2004, on February 15, 2005. Pursuant to the terms of the Royalty Payments provisions of the Agreement, AirWater's first quarterly royalty payment for the period ending December 31, 2004, was due January 31, 2005. Id., Exh. A, at 4.

Contrary to J.J. Reidy's negotiations inducing AirWater to enter into the Agreement, contrary to the express terms of the Agreement set forth above, and contrary to the clear intent of the parties as manifest in their course of prior performance under the Agreement, J.J. Reidy claimed that AirWater was obligated to continue to pay Minimum Monthly Royalty Payments beyond the limited one year term, in addition to AirWater's quarterly Royalty Payments of either 5% or 7% based on AirWater's actual sales. Id. at ¶ 20 and Exh. D.

On January 13, 2005, J.J. Reidy sent written notice of default to AirWater Corporation, thereby triggering a thirty-day cure period. Id. at ¶ 21 Rather than wait the mandatory 30 days required under the Agreement, however, J.J. Reidy sent AirWater a second letter dated January 31, 2005, whereby J.J. Reidy purported to terminate the parties' Agreement. Id. at ¶ 22 and Exh. E.

Notwithstanding J.J. Reidy's numerous breaches and anticipatory breaches of the Agreement as aforesaid, AirWater stood ready, willing and able to pay quarterly royalties, and tendered payment of such amounts into the Registry of the Circuit Court of

11

the 11th Judicial Circuit in and for Miami-Dade County, Florida by requesting a Court Order authorizing the clerk thereof to accept the same.

## III. ARGUMENT

### A.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Grub v. KMS Patriots, L.P., 88 F.3d 1, 3 (1st Cir. 1996), citing, Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991); Fed. R. Civ. P. 56(c).  Under this standard, "a party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists.  Once the moving party has made this showing, the nonmoving party must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." Blackie v. State of Maine, 75 F.3d 716, 721 (1st Cir. 1996).  To avoid summary judgment, the nonmoving party "must offer the court more than posturing and conclusory rhetoric.  This principle is brought into bold relief when the motion targets an issue on which the nonmoving party bears the ultimate burden of proof." McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995).  Finally, in ruling upon a motion for summary judgment, "[m]atters of law . . . are for the court to resolve." Blackie, 75 F.3d at 721.

### B.     J.J. REIDY'S MOTION FOR PARTIAL SUMMARY JUDGMENT MUST BE DENIED BECAUSE THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING THE INTERPRETATION OF AMBIGUOUS CONTRACT LANGUAGE REGARDING PAYMENT OF MINIMUM MONTHLY ROYALTIES

J.J. Reidy's Motion for Partial Summary Judgment must be denied because there is a genuine issue of material fact regarding the interpretation of the ambiguous contract language regarding the payment of minimum monthly royalties.

Notwithstanding J.J. Reidy's argument to the contrary, the terms of the Agreement regarding the payment of royalties are highly ambiguous and, therefore, interpretation of the language of the Agreement concerning AirWater's alleged obligation to pay minimum monthly royalties beyond a period of twelve (12) months is a question of fact for the jury that precludes summary judgment in favor of J.J. Reidy. "The principle guide to contract interpretation is the language of the contract itself. Where there is no ambiguity in the contract language, it must be enforced according to its terms." <u>Lisciotti v. Lattanzio</u>, 2006 WL 2848141, *5 (Mass.Super. 2006), <u>citing</u>, <u>Freelander v. G.K. Realty Corp.</u>, 357 Mass. 512, 516 (1970). "An ambiguous contract, however, may raise a question of fact for a jury." <u>Lisciotti</u>, 2006 WL 2848141, *5, <u>citing</u>, <u>Trafton v. Custeau</u>, 338 Mass. 305, 307-08 (1959). "Contract language is ambiguous 'if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" <u>Lisciotti</u>, 2006 WL 2848141, *5, <u>quoting</u>, <u>Citation Ins. Co. v. Gomez</u>, 426 Mass. 379, 381 (1998). In that regard, "[a] contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties." <u>Lisciotti</u>, 2006 WL 2848141, *5, <u>citing</u>, <u>Starr v. Fordham</u>, 420 Mass. 178, 192 (1995); <u>Shane v. Winter Hill Fed. Sav. & Loan Ass'n.</u>, 397 Mass. 479, 483 (1986); <u>McMahon v. Monarch Life Ins. Co.</u>, 345 Mass. 261, 264 (1962). "The proper interpretation of a contract is one which accords with justice, common sense and the probable intention of the parties."

Northborough Youth Hockey Program, Inc. v. Knox, 2000 WL 1473504, *10 (Mass.Super. 2000), citing, Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 701 (1964); Bowser v. Chalifour, 334 Mass. 348, 352 (1956); USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass.App.Ct. 108, 116 (1989), review denied, 406 Mass. 1104 (1989) (contract to be interpreted "as a whole, in a reasonable and practical way, consistent with its language, background, and purpose").

To ascertain the intent of the parties, a court must consider the "words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances." Lisciotti, 2006 WL 2848141, *5, citing, Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers, 411 Mass. 39, 45-46 (1992). In that regard, the court considers "the particular language used against the background of other indicia of the parties' intention, and construes the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished." Lisciotti, 2006 WL 2848141, *5, citing, Starr v. Fordham, 420 Mass. 178, 190 (1995). "Not only must due weight be accorded to the immediate context but no part of the contract is to be disregarded." Id. Where, as here, the language of a contract is ambiguous, "the interpretation of that language creates a question of fact to be resolved at an evidentiary hearing." Lisciotti, 2006 WL 2848141, *5, citing, Commercial Union Ins. Co. v. Boston Edison Co., 412 Mass. 545, 557 (1992).

As previously stated above, the royalty provisions at issue in the present case are highly ambiguous. For example, while the Royalty Payments section of the Agreement purports to require in the first paragraph thereof payment on a quarterly basis of fees at the rate of either five per cent (5%) or seven per cent (7%) of all gross sales depending on the size and number of machines sold, less any applicable taxes, the second paragraph of

14

the Royalty Payments section of the Agreement is contradictory in that it provides that "[t]he royalties shall be computed based on the sales price, less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes and other such amounts." Zwebner Affidavit, Exh. A at 4. Indeed, the foregoing provisions purport to require payment of quarterly royalties based on "all gross sales," yet simultaneously appear to provide for the royalty calculation to be based upon some form of net sales, i.e., "less any applicable taxes" or "less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes and other such amounts." Id. Similarly, contrary to the provision in first paragraph of the Royalty Payments section of the Agreement that sets forth applicable royalty rates of five per cent (5%) and seven per cent (7%), the sixth and seventh paragraphs of the same section provide that:

> The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:
>
> Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales during that fiscal quarter.

Id. While the language in these latter provisions regarding the ROYALTY RATE might appear to be mere surplusage and/or meaningless in light of the royalty rates sets for in the first paragraph of the Royalty Payments section of the Agreement, such an interpretation would violate the "well-established rule of contract construction requiring a court, wherever possible, to give meaning to every word and phrase of a contract and treat none as surplusage if any other construction is rationally possible." Northborough Youth Hockey, 2000 WL 1473504, *9, citing, Computer Systems of America, 19 Mass.App.Ct. 430, 437 (1985); ER Holdings Inc., v. Norton Company, 735 F.Sup. at 1098 ("Under Massachusetts contract law, the by-laws must be read as a whole so that, if possible, provisions are harmonized with one another").

More significantly, the Minimum Monthly Royalty Payments section of the Agreement is extremely ambiguous, especially when read together with the quarterly royalty payment provisions above. Specifically, the first paragraph of the Minimum Monthly Royalty Payments section of the Agreement states that "LICENSEE is to pay LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, *or* the Royalty Payments due in accordance with those stated above *whichever is the more*." Zwebner Affidavit, Exh. A, at 5 (emphasis supplied). A logical reading of this first paragraph of would dictate that AirWater was to pay for a period of time commencing on November 1, 2003, *either* a minimum monthly royalty fee of $10,000, *or* quarterly royalties calculated at the relevant rates, *whichever is greater*, but clearly not both. Such a reading would be consistent with, among other things, the traditional concept of a minimum monthly royalty. However, the second paragraph of the Minimum Monthly Royalty Payments section of the Agreement provides that "LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period." Id. Although a literal reading of the language in this second paragraph might arguably suggest that AirWater would be entitled to credit any unearned minimum monthly royalty payments against earned quarterly royalties for a period of only twelve (12) months commencing on November 1, 2003 and, thereafter, AirWater would be obligated to pay both a minimum monthly royalty fee of $10,000 plus applicable quarterly royalties, an interpretation that AirWater obviously rejects, any such interpretation would be entirely inconsistent with (a) the language in the preceding first paragraph of this section, (b) the

16

purpose and concept of a minimum monthly royalty fee, and (c) the conduct of the parties themselves. This is the only interpretation by which the language in the first and second paragraphs of the Minimum Monthly Royalty Payments section of the Agreement may reasonably be reconciled and by which all of the language therein may be given effect.

Moreover, the interpretation that the minimum monthly royalty payment obligation was to cease after twelve months is also consistent with the parties' course of conduct. Indeed, it is undisputed that AirWater made the twelve (12) minimum monthly royalty payments for the period of time from November 1, 2003 through October 31, 2004, and ceased making minimum monthly royalty payments thereafter. In that regard, AirWater communicated the foregoing interpretation to J.J. Reidy in writing by letter dated November 10, 2004, wherein AirWater stated, in relevant part, that despite having to defend the validity of the patents, "[n]evertheless, the Company has been consistent in making the $10,000 advance royalty payments to you that were agreed to for the year, beginning November 1, 2003." Zwebner Affidavit, Exh. C. Moreover, J.J. Reidy has not claimed in this litigation, nor did it claim in either its Notice of Default dated January 13, 2005 or its Notice of Termination dated January 31, 2005, that AirWater is obligated to pay minimum monthly royalties in the amount of $10,000, plus quarterly royalties. Id., Exhs. D and E.

A far more reasonable alternative interpretation of the second paragraph of the Minimum Monthly Royalty Payments section of the Agreement is that the $10,000 minimum monthly royalty payments were intended to be made over the twelve-month period commencing on November 1, 2003 and, thereafter, the minimum monthly royalty payments would cease altogether. This interpretation is consistent with the parties'

17

negotiations, intent, situation and course of conduct. Indeed, throughout the course of the

negotiations, AirWater and J.J. Reidy reasonably anticipated and acknowledged that there

would be substantial delay in the flow of AirWater's royalty payments to J.J. Reidy

because sales of J.J. Reidy's water production generation system would not be

immediately generated for a number of reasons, including (a) the time needed to re-

design J.J. Reidy's water production generation machines, (b) the time needed to develop

and build a range of new air to water machines, (c) the time necessary to obtain national

and international permits and licenses for the sale of the air to water machines, and,

finally, (d) the need to allow reasonable time for AirWater's sales and marketing efforts

to generate sales. In that regard, the parties expected that the start-up process for

AirWater would take at least one to one and one-half years from the date of execution of

a global licensing agreement before any revenue would be realized from sales. Zwebner

Affidavit, at ¶ 6. Accordingly, since the stock J.J. Reidy would receive was legally

restricted pursuant to SEC rules and could not be traded for one year, and because

quarterly royalties were not anticipated during AirWater's start-up phase of designing,

manufacturing, marketing and selling J.J. Reidy's water generation system, the parties

agreed and intended that AirWater would pay J.J. Reidy a minimum monthly royalty of

$10,000 for a limited period of one year, after which AirWater would commence to pay

royalties on a quarterly basis. Id. at ¶ 7.

    Under circumstances similar to the present case, the Court in Crane Co. v.

Aeroquip Corp., 356 F.Supp. 733 (N.D.Ill. 1973), denied a motion for partial summary

judgment seeking termination of a license on behalf of a patent licensor due to

nonpayment of royalties, finding that "[a]ll royalties that were *undisputedly* due were

tendered within sixty days of Crane's notice of its intention to terminate. . . ." 356

F.Supp. 733, 737. There, the plaintiff licensor claimed that it was entitled to terminate

the defendant licensee's license due to the licensee's failure to pay royalties in connection

with certain modified couplings developed by the defendant licensee. In response, the

defendant licensee asserted that the patent it had licensed from the plaintiff did not cover

the modified couplings and, alternatively, that the relevant patent was invalid. In light of

the licensee's assertions regarding the invalidity of the patent, the court denied the

plaintiff licensor's motion for summary judgment requesting an adjudication that the

exclusive license agreement was terminated, ruling that "a full hearing on the merits of

the patent validity and infringement issues is necessary before any final determination as

to the continuing validity of the agreement can be made." Id. at 739-40.

Similar to the Crane Co. case, because AirWater tendered payment in the present

case of all the royalty payments that were undisputedly due, i.e, the quarterly royalty

payments, in accordance with Mass. Gen. L. ch. 232A, § 1 and other applicable

precedent, and since there is a genuine issue of material fact for the jury as to whether

AirWater was obligated to pay a minimum monthly royalty fee in the amount of $10,000

beyond the relevant twelve month period over which AirWater in fact paid J.J. Reidy

minimum monthly royalties totaling $120,000, this Court must deny J.J. Reidy's Motion

for Partial Summary Judgment.

**C.   J.J. REIDY'S MOTION FOR PARTIAL SUMMARY JUDGMENT MUST
      BE DENIED BECAUSE J.J. REIDY'S PRIOR MATERIAL BREACHES OF
      CONTRACT EXCUSED AIRWATER'S PERFORMANCE OF ANY
      ALLEGED OBLIGATION TO PAY MINIMUM MONTHLY ROYALTIES
      AFTER TWELVE MONTHS**

J.J. Reidy's Motion for Partial Summary Judgment must be denied because J.J.

Reidy's prior material breaches of contract excused AirWater's performance of any

alleged obligation on the part of AirWater to continue paying minimum monthly royalties after the relevant twelve-month period.

"It is well established that a material breach by one party excuses the other party from further performance under the contract." Ward v. American Mut. Liability Ins. Co., 15 Mass.App.Ct. 98, 100-101 (1983), citing, Quintin Vespa Co. v. Construction Serv. Co., 343 Mass. 547, 554 (1962); Petrangelo v. Pollard, 356 Mass. 696, 701-702 (1970); Center Garment Co. v. United Refrigerator Co., 369 Mass. 633, 638 (1976). "A material breach is one that goes to an essential and inducing feature of the contract: i.e., the 'root' of the contract." Astra USA, Inc. v. Bildman, 2005 WL 1477747, *3 (Mass.Super. 2005), citing, Bucholz v. Green Bros. Co., 272 Mass. 49, 52 (1930); Lease-It v. Massachusetts Port Auth., 33 Mass.App.Ct. 391, 396 (1992). "The existence of a material breach must be determined from the circumstances of each case." Astra USA, Inc., 2005 WL 1477747, *3, citing, Boston Housing Auth. v. Hemingway, 363 Mass. 184, 200 (1973). Additionally, "[w]hether a breach is material is normally a question of fact for the fact finder." DiBella v. Fiumara, 63 Mass. App. Ct. 640 (2005), citing, Boston Housing Auth., supra, 363 Mass. at 200; Lease-It, supra, 33 Mass.App.Ct. at 396.

Applying these principles under circumstances similar to the present case, the Massachusetts Appeals Court held in Ward that the defendant employer's wrongful discharges of the plaintiffs constituted breaches of the employment agreements so material as to discharge the plaintiff salesmen from any further obligations under the contracts, including but not limited to covenants not to compete, and to allow the plaintiff salesmen to recover contract damages for total breach. 15 Mass. App. Ct. at 101. See also, RESTATEMENT (SECOND) OF CONTRACTS §§ 241-243 (1981).

Similarly, although J.J. Reidy claims in the present case that AirWater was "required to pay minimum royalty payments of $10,000 per month for a minimum of ten (10) years, or until the last patent expires, whichever is longer," and further argues that AirWater breached the Agreement by "fail[ing] to make its required monthly royalty payment of $10,000 to J.J. Reidy on November 1, 2004 and December 1, 2004," J.J. Reidy's Memorandum of Law, at 6, because J.J. Reidy materially breached the parties' Agreement in the first instance by failing to provide AirWater with world-wide registrations for the Reidy Patents, AirWater was excused from performing any alleged continuing obligation to pay minimum monthly royalties to J.J. Reidy.

With regard to providing patent protection on a world-wide basis, the parties' specifically agreed that the "Global Marketing and Licensing Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions." Zwebner Affidavit, Exh. A, at 3 (emphasis in original). Unfortunately, however, J.J. Reidy only registered the Reidy Patents in the United States and three other overseas countries, and failed to register the patents on a world-wide basis, including but not limited to several foreign countries that were known by J.J. Reidy to be targets of AirWater's marketing efforts. Id. at ¶¶ 15-16. In that regard, J.J. Reidy was material because registration of the patents on a world-wide basis was an essential inducing feature of the contract from AirWater's perspective as "business operations under the Licensing Agreement were anticipated to occur . . . primarily overseas. . . ." Id. at ¶ 15. Accordingly, as a result of J.J. Reidy's prior material breach of the Agreement in failing to register the Reidy Patents on a world-wide basis, AirWater was excused from any alleged continuing obligation to pay minimum monthly

royalties to J.J. Reidy and, therefore, J.J. Reidy's motion for partial summary judgment must be denied. By the same token, AirWater is entitled to partial summary judgment that J.J. Reidy breached the Agreement by failing to provide world-wide registration of the Reidy Patents.

Additionally, there is a genuine triable issue of material fact as to whether J.J. Reidy breached its express warranty that "it has the entire right, tile, and interest in and to United States Patents numbered 5,106,512, 5,149,446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and any patents to issue, foreign or domestic on any continuation or division thereof and any new patents, foreign or domestic . . . ," Zwebner Affidavit, Exh. A, at 1, as well as its contractual obligation to defend and indemnify AirWater in connection with the ELGT patent infringement litigation, such that AirWater's performance of any alleged continuing obligation to pay minimum monthly royalties was excused. In that regard, it is well-settled that "[a]n express warranty serves in substance as an agreement on the part of the warrantor to indemnify the other party if the fact or condition guaranteed to be true turns out not to be so." Wechsler v. Long Island Rehabilitation Center of Nassau, Inc., 1996 WL 590679, *22 (Mass. Super. 1996), citing, Carolet v. Garfield, 339 Mass. 75, 78 (1959) ("In more recent times the general course of decision has been to treat express warranties as contracts of indemnity rather than as representations, unless a recovery in tort for deceit is specifically sought. Usually a warranty is thought of and often is a contract or an express promise."); Metropolitan Coal Co. v. Howard, 155 F.2d 780, 784 (2d Cir.1946) (stating that warranty "amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue"). Notwithstanding J.J. Reidy's express representation and

warranty concerning its right, title and interest to the Reidy Patents, almost immediately

after AirWater and J.J. Reidy entered into their Agreement ELGT sued AirWater for

patent infringement, alleging that J.J. Reidy had fraudulently obtained and registered

patents for the air-to-water technology from another inventor who was the rightful owner

thereof. Zwebner Affidavit, at ¶ 11 and Exh. B. Moreover, when ELGT sued AirWater,

J.J. Reidy failed to assist AirWater in its defense of the validity of the Reidy Patents, and

J.J. Reidy refused to contribute to the substantial cost thereof. Id. at ¶¶ 12-13. Although

AirWater was ultimately able to negotiate a settlement with ELGT, the questions raised

by ELGT regarding the validity of the J.J. Reidy Patents remained and remain unresolved

to date. Id. at ¶ 12.

Accordingly, J.J. Reidy's motion for partial summary judgment must be denied

for the additional reason that there is a genuine disputed issue of material fact as to

whether J.J. Reidy breached its express warranty concerning the validity of its patents as

well as its obligation to defend and indemnify AirWater in connection with the ELGT

litigation.

**D.    J.J. REIDY'S MOTION FOR PARTIAL SUMMARY JUDGMENT MUST
       BE DENIED BECAUSE THE TERMS OF THE AGREEMENT BARRED
       J.J. REIDY FROM TERMINATING WHERE J.J. REIDY WAS ITSELF IN
       BREACH AND J.J. REIDY FAILED TO COMPLY WITH THE
       APPLICABLE TERMINATION PROVISIONS OF THE AGREEMENT**

J.J. Reidy's Motion for Partial Summary Judgment must be denied because the

terms of the Agreement barred J.J. Reidy from terminating where J.J. Reidy itself was in

breach and J.J. Reidy failed to comply with the termination provisions of the Agreement.

It is well-settled that in the mere failure to pay royalties is not, absent a specific

provision in the license, sufficient to allow the licensor to unilaterally terminate the

license. Crane Co. v. Aeroquip Corp., 356 F.Supp. 733, 738 (N.D.Ill. 1973). Cf.

Automatic Radio Mfg. Co. v. Hazeltine Research, 176 F.2d 799, 809 (1st Cir. 1949) (in absence of cancellation option in agreement licensee could not by unilateral notice of repudiation terminate contract obligation under license agreement having several years yet to run). In the present case, the terms of the parties' Agreement that governed termination specifically provided, in relevant part, that the license could be terminated upon the occurrence of certain specific events, including "[a]ny material breach by either party of the terms of this Agreement, *provided the non-breaching party in [sic] the one seeking termination. . . .* Zwebner Affidavit, Exh. A, at 11. Thus, under the terms of the Agreement J.J. Reidy could not terminate the Agreement if J.J. Reidy was itself in breach thereof. Accordingly, because J.J. Reidy had committed a prior material breach of the Agreement by failing to provide AirWater world-wide patent registrations as promised as more fully stated above, J.J. Reidy was barred by the terms of the Agreement from terminating AirWater's license. Alternatively, as more fully stated above, there is a genuine issue of material fact as to whether J.J. Reidy breached its warranty as well as its obligation to defend and indemnify in connection with the ELGT patent infringement action, such that J.J. Reidy was barred by the termination provisions of the Agreement from terminating AirWater's license.

Moreover, J.J. Reidy's Motion for Partial Summary Judgment seeking termination of the license must be denied because J.J. Reidy failed to comply with the terms of the Agreement that govern termination. Specifically, by letter dated January 13, 2005, J.J. Reidy gave the assignee of the license, AirWater Patents, notice of the alleged default, thereby triggering a 30-day cure period. Zwebner Affidavit, Exh. A at 11. However, J.J. Reidy failed to observe the 30-day cure period, sending AirWater Patents notice of

termination by letter dated January 31, 2005. Accordingly, having failed to comply with the termination provisions of the Agreement, J.J. Reidy's Motion for Partial Summary Judgment as to termination must be denied.

**D.    J.J. REIDY'S MOTION FOR PARTIAL SUMMARY JUDGMENT MUST BE DENIED BECAUSE REFORMATION OF THE TERMS OF THE AGREEMENT REGARDING THE PAYMENT OF ROYALTIES IS NECESSARY TO PREVENT UNJUST ENRICHMENT**

J.J. Reidy's Motion for Partial Summary Judgment must be denied because reformation of the terms of the Agreement regarding the payment of royalties is necessary to prevent unjust enrichment.

"A claim of unjust enrichment provides for an equitable remedy, which is meant to fill in remedial gaps when no adequate remedy at law is present." Sweeney v. DeLuca, 2006 WL 936688, *8 (Mass.Super. 2006), citing, Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381, 112 S.Ct. 2031, 119 Led.2d 157 (1992). "Equitable remedies are flexible tools to be applied with a focus on fairness and justice." O'Connor v. U.S. Art Co., Inc., 2005 WL 1812512, *10 (Mass.Super. 2005), citing, Demoulas v. Demoulas, 428 Mass. 555, 580 (1998). "For the doctrine of unjust enrichment to apply, "[t]he benefit must be *unjust,* a quality that turns on the reasonable expectations of the parties." Sobolewski v. Kaltsas, 2005 WL 1618225, *2 (Mass.App.Ct. 2005) (emphasis in original), citing, The Community Builders, Inc. v. Indian Motocycle Assocs., Inc., 44 Mass.App.Ct. 537, 560 (1998). Under appropriate circumstances, courts have generally held that the equitable remedy of reformation is available to prevent unjust enrichment. Food Service Marketing, Inc. v. National Foods, Inc., 225 A.D.2d 477, 639 N.Y.S.2d 378, 379 (1996), citing, Rosenblum v. Manufacturers Trust Co., 270 N.Y. 79, 84-85 (1936). See also, State Dept. of Human Services ex rel. Palmer v. Unisys Corp., 637

N.W.2d 142, 151(Iowa,2001) (reformation is needed to give effect to the intention of the parties and to prevent unjust enrichment); Lea v. Balboa Life & Cas. Ins. Co., 1992 WL 74591, *5 (E.D.La. 1992) (under appropriate factual situation, court has authority to grant reformation of loss payable clause of insurance contract to prevent unjust enrichment). "A court has the power to grant equitable relief when there has been a violation of fiduciary duty and fraud, and rescission may be ordered to avoid unjust enrichment of the fiduciary at the expense of a beneficiary." Demoulas, 428 Mass. at 580-81, citing, Broomfield v. Kosow, 349 Mass. 749, 758 (1965); Jose v. Lyman, 316 Mass. 271, 278 (1944). Similarly, "[a] court may also reform an agreement to correct wrongdoing." Demoulas, 428 Mass. 581, citing, Elias Bros. Restaurants v. Acorn Enters., Inc., 831 F.Supp. 920, 927 (D.Mass.1993); Beaton v. Land Court, 367 Mass. 385, 392 appeal dismissed, 423 U.S. 806, 96 S.Ct. 16, 46 L.Ed.2d 27 (1975); Century Plastic Corp. v. Tupper Corp., 333 Mass. 531, 533 (1956); Brodie v. Evirs, 313 Mass. 741, 744 (1943); Barrell v. Britton, 252 Mass. 504, 508 (1925); Torrao v. Cox, 26 Mass.App.Ct. 247, 525 (1988).

In order to establish a claim for unjust enrichment, a plaintiff must show the following: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." Ravanis v. Bliss, 2004 WL 2341496, *8 (Mass.Super. 2004).

In the present case, reformation of the terms of the Agreement regarding the payment of royalties is necessary to prevent unjust enrichment. In that regard, AirWater

26

conferred substantial benefits to J.J. Reidy, including but not limited to a one-time cash payment of $100,000; 4 million shares of UCSY stock valued at approximately $300,000; Minimum Monthly Royalty Payments from November 1, 2003 through October 1, 2004 in the total amount of $120,000; defense of the litigation challenging the validity of the J.J. Reidy Patents at an approximate cost of $180,000; and marketing, development and manufacture of products based on the Reidy Patents at a cost in excess of $2 million. Zwebner Affidavit, at ¶¶ 5, 9-11, 13-14. J.J. Reidy accepted the foregoing benefits in consideration of granting to AirWater the exclusive rights to the Reidy Patents and the world-wide registration thereof, and AirWater conferred such benefits on J.J. Reidy with the expectation of receiving the same. Id. ¶¶ 4-5 and Exh. A at 3, 9 and 13. Reformation is necessary to prevent unjust enrichment because J.J. Reidy failed to deliver the world-wide patents and instead provided patent registration sin the United States and only three overseas countries, and AirWater's primary markets for products based on the Reidy Patents were overseas. Id. at ¶¶ 15-16. In other words, AirWater paid J.J. Reidy approximately $520,000 and conferred substantial additional benefits to J.J. Reidy with the expectation and express agreement that AirWater would receive in return and exclusive world-wide license to the global Reidy Patents, but in reality AirWater received only a license to patents registered in the United States and three overseas countries, which J.J. Reidy has wrongfully attempted to terminate. As a result, there has been a substantial failure of the consideration provided by J.J. Reidy, and the Agreement must be reformed in order to prevent the unjust enrichment of J.J. Reidy so as to allow AirWater to retain the benefit of the limited rights which AirWater did receive and require J.J. Reidy to pay restitution of an appropriate amount on account of J.J. Reidy's

failure to provide the global patents. <u>AirWater's Complaint for Declaratory Judgment</u>, at 17-18.

## IV. CONCLUSION

WHEREFORE, based upon the foregoing points and authorities AirWater Corporation and AirWater Patents, Inc. hereby request that this Honorable Court issue and order:

1.  Denying Plaintiff J.J. Reidy & Co., Inc.'s Motion for Partial Summary Judgment; and

2.  Granting Defendant AirWater Patents, Inc.'s Motion for Partial Summary Judgment that J.J. Reidy breached the Agreement by failing to provide the world-wide registration of the Reidy Patents.

AIRWATER CORPORATION AND
AIRWATER PATENTS, INC.

Respectfully submitted,

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts  02110-3113
(617) 951-1400

Dated: December 13, 2006

---

**CERTIFICATE OF SERVICE**
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on

December 13, 2006                              .

_____ .

---