## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,** | |
| **Plaintiff,** | CIVIL ACTION NO. 05-40049-FDS |
| **v.** | |
| **AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,** | |
| **Defendants.** | |
| **AIRWATER PATENTS, INC.** | |
| **Plaintiff,** | CIVIL ACTION NO. 06-10137-FDS |
| **v.** | |
| **J.J. REIDY & CO., INC.** | |
| **Defendant.** | |

## AFFIDAVIT OF MICHAEL J. ZWEBNER

I, Michael J. Zwebner, do hereby state and depose as follows:

1.    I am the President of AirWater Patents, Inc. and AirWater Corporation, both of which are Florida corporations, with principal places of business located in Miami Beach, Florida.

2.    I have personal knowledge of the facts set forth in this affidavit regarding the above-captioned consolidated matters.

3.    In or about February, 2003, AirWater commenced negotiations with J.J. Reidy & Co., Inc. ("J.J. Reidy") for an exclusive world-wide license for AirWater to

manufacture, market and sell water production generation systems, which produce drinkable water from the air and which were ostensibly based upon patents owned by J.J. Reidy.

4.      During the initial negotiations, J.J. Reidy represented to AirWater that J.J. Reidy was the sole inventor of the water production generation system known as the WaterStar system, and that J.J. Reidy owned all right, title and interest to the relevant patents: U.S. Patent Nos. 5,106,512; 5,149,446; 5,203,989; and 5,366,705 (the "J.J. Reidy Patents"). Additionally, J.J. Reidy represented to AirWater that the design for J.J. Reidy's water production generation system had been patented and/or otherwise protected on a world-wide basis.

5.      During the initial negotiations, J.J. Reidy and AirWater agreed upon certain basic terms for a licensing agreement. Specifically, J.J. Reidy and AirWater agreed that J.J. Reidy would grant AirWater an exclusive, world-wide license for a term of ten (10) years, (or to end on the expiration of the patents, whichever came first) in exchange for which AirWater would pay J.J. Reidy (a one time cash payment in the amount ) of $100,000 cash, and transfer to J.J. Reidy 4 million shares of stock valued at approximately $300,000, and pay quarterly royalty payments during the term of the license.

6.      Additionally, throughout the course of the negotiations, both AirWater and J.J. Reidy anticipated and expressly acknowledged that there would be substantial delay in the flow of AirWater's quarterly royalty payments to J.J. Reidy because sales of the water production generation system would not be immediately generated for a number of reasons, including (a) the time needed to re-design J.J. Reidy's water production

2

generation machines, (b) the time needed to develop and build a range of new air to water machines, (c) the time necessary to obtain national and international permits and licenses for the sale of the air to water machines, and, finally, (d) the need to allow reasonable time for AirWater's sales and marketing efforts to generate sales. In that regard, AirWater and J.J. Reidy anticipated that the start-up phase of the contract would take at least one to one and one-half years from the date of execution of a global licensing agreement before AirWater would realize any revenue from sales.

7.      Accordingly, since the stock that AirWater would be transferring to J.J. Reidy would be legally restricted pursuant to SEC rules and could not be traded for one year, and because quarterly royalties were not anticipated during AirWater's start-up phase of designing, manufacturing, marketing and selling J.J. Reidy's water generation system, (and because Mr. Reidy also claimed that he would not have any income for the first period of one year,) the parties agreed and intended that AirWater would pay J.J. Reidy a minimum monthly royalty of $10,000 for a limited period of one year, after which AirWater would commence to pay royalties on a quarterly basis.

8.      In or about late June of 2003, J.J. Reidy and AirWater Corporation executed a written Global Manufacturing and Marketing Licensing Agreement (the "Agreement"), back-dating it to March 21, 2003. A true and accurate copy of the Agreement is attached hereto as Exhibit A. Thereafter, on June 25, 2003, AirWater Corporation assigned all of its rights and obligations under the Agreement to AirWater Patents, Inc., which assignment was consented to in writing by J.J. Reidy.

9.      AirWater timely performed its obligations under the Agreement by paying J.J. Reidy $100,000 in a one time cash payment, and transferring 4 million shares of

3

stock to J.J. Reidy. Further, consistent with the parties' negotiations and intent, and because there would be no sales and therefore no royalties during the initial start-up phase of the air to water venture, AirWater paid J.J. Reidy the agreed upon minimum monthly royalties in the amount of $10,000 per month for a period of twelve months, commencing November 1, 2003, through October 31, 2004.

10.    Immediately upon the execution of the Agreement, AirWater commenced its recruitment of individuals and corporations on a world-wide basis to help develop, design, and build state-of-the-art water production generation machines. Through its parent corporation and sister company AirWater Corporation, AirWater spent in excess of $2 million in direct and indirect costs, wholly attributable to the J.J. Reidy air to water venture. The details of these substantial expenditures, including research and development costs, manufacture and shipping of sample machines, advertising, promotion, exhibitions, travel and marketing expenses, were fully disclosed in public filings with the SEC. As a result of AirWater's substantial efforts, the air-to-water concept, the Reidy's Patents and the reality of the technology, became well-publicized on a world-wide basis, whereas prior to the licensing agreement J.J. Reidy's Patents and the concept of air to water technology was relatively unknown and even less exploited.

11.    Unfortunately, throughout the first eighteen (18) months of the term of the Agreement, a significant amount of AirWater's time, money and effort were diverted away from the J.J. Reidy air-to-water venture as a result of a lawsuit in which AirWater was forced to defend the validity of the J.J. Reidy Patents. In particular, on or about August 8, 2003, AirWater and its parent company, Universal Communication Systems, Inc. ("UCSY"), were served with a complaint for patent infringement by a Texas

company, Electric Gas & Technologies, Inc. ("ELGT"). A true and accurate copy of the Complaint is attached hereto as Exhibit B. In essence, ELGT alleged that J.J. Reidy had himself fraudulently obtained and registered patents for the air-to-water technology from another inventor who was the rightful owner thereof.

12.     In response to this (ELGT) lawsuit, J.J. Reidy deliberately avoided service of process (ELGT claimed, under oath, that it attempted to serve J.J. Reidy's registered agent, Mr. James J. Reidy, on 12 separate occasions without success) and took no steps to defend the validity of the J.J. Reidy Patents, leaving the entire burden of the defense of ELGT's action upon AirWater. Rather, J.J. Reidy stood by silently, failed to cooperate in good faith with AirWater's defense of the validity of the J.J. Reidy Patents, and even refused to contribute funds to the costs of the defense of the patent litigation. Ultimately, on grounds other than the validity of the J.J. Reidy Patents, AirWater was able to negotiate a settlement with ELGT, and the action was settled in favor of AirWater. However, the questions raised by ELGT as to the validity of the J.J. Reidy Patents remained and remain unresolved.

13.     In defending the validity of the J.J. Reidy Patents, AirWater incurred attorney's fees and costs in excess of $180,000. Additionally, as a direct consequence of the ELGT action, AirWater suffered damage to its reputation, loss of international credibility, considerable business downturn; and loss of many business opportunities. Further, AirWater lost valuable time which further postponed and delayed the arrival of the J.J. Reidy air-to-water system and its deployment in the market.

14.     Notably, even during the time that AirWater was forced to defend the validity of the J.J. Reidy Patents, AirWater honored its obligations under the Agreement

and continued to pay J.J. Reidy the minimum monthly royalty of $10,000. A true and accurate copy of a letter dated November 10, 2004 concerning AirWater's defense of the validity of the Reidy Patents is attached to this affidavit as Exhibit C.

15.     Pursuant to the terms of the Agreement, J.J. Reidy represented that the J.J. Reidy Patents were "valid all over the world without restrictions." Indeed, the Agreement is entitled, "*Global* Manufacturing and Marketing Licensing Agreement. During all times relevant, J.J. Reidy also represented that the J.J. Reidy Patents were valid, registered and enforceable "world-wide". The exclusivity of the license and registration of the Reidy Patents on a world-wide basis were essential inducing features of the contract with J.J. Reidy because there is little market for the WaterStar system in the United States where clean water of good quality is plentiful and AirWater's business operations were anticipated to occur, and have occurred primarily overseas, including the design and manufacture of machines in Israel and in China, and the development of markets for the WaterStar system in Sri Lanka, India, and other countries where drinkable water is a scarce commodity. Contrary to J.J. Reidy's representation, however, AirWater subsequently learned that J.J. Reidy had only obtained patents in the United States and in three other overseas countries.

16.     Upon learning that J.J. Reidy's Patents were not protected in several foreign countries that were known targets of AirWater's marketing efforts, AirWater made demand upon J.J. Reidy to obtain appropriate patent protection for the same. Although the Agreement expressly provided that J.J. Reidy was required to make applications for foreign trademark and trade name registration and for filing any foreign patents, J.J. Reidy refused to cooperate and file the essential applications for foreign

6

patent and trademark protection for the J.J. Reidy Patents and the air-to-water system, despite AirWater's continuing demands. In that regard, J.J. Reidy subsequently sought to excuse J.J. Reidy's performance of its obligations under the Agreement, claiming that the time limits for filing such patent protections in the various overseas countries had lapsed and that the J.J. Reidy Patents could therefore no longer be registered in those overseas countries. As a result, AirWater was deprived of the benefit of its bargain with J.J. Reidy to license the J.J. Reidy Patents on an exclusive world-wide basis. This was particularly detrimental for AirWater, as almost all sales leads and sales efforts were to markets outside of the USA, and as such outside of the area of coverage of the patents.

17.     In addition to the quarterly royalty payments of either 5% or 7%, based on the size and number of the air to water machines sold, the Agreement also contained the following provision for AirWater's payment to J.J. Reidy of a Minimum Monthly Royalty for a period of twelve months:

> LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st, 2003, or the Royalty payments due in accordance with those stated above whichever is the more.

> LICENSEE agrees that for a period of 12 months commencing November 1st, 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

18.     In accordance with these terms, from November 1, 2003, through October 31, 2004, AirWater made monthly royalty payments to J.J. Reidy. Commencing November 1, 2004, in accordance with the Royalty Payments provisions of the Agreement, AirWater's quarterly royalty fee (of either 5% or 7%) on gross sales was due to be paid to J.J. Reidy for the last quarter of 2004, on February 15, 2005.

7

19.     Pursuant to the terms of the Royalty Payments provisions of the Agreement, AirWater's first quarterly royalty payment for the period ending December 31, 2004, was due January 31, 2005.

20.     Contrary to J.J. Reidy's negotiations inducing AirWater to enter into the Agreement, contrary to the express terms of the Agreement set forth above, and contrary to the clear intent of the parties as manifest in their course of prior performance under the Agreement, J.J. Reidy claimed that AirWater was obligated to continue to pay Minimum Monthly Royalty Payments beyond the limited one year term, in addition to AirWater's quarterly Royalty Payments of either 5% or 7% based on AirWater's actual sales.

21.     On January 13, 2005, J.J. Reidy sent written notice of default to AirWater Corporation, thereby triggering a thirty-day cure period. A true and accurate copy of J.J. Reidy's January 13, 2005 letter is attached hereto as Exhibit D.  In that regard, the Agreement expressly provided that "termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time."

22.     Rather than wait the mandatory 30 days required under the Agreement, however, J.J. Reidy sent AirWater a second letter dated January 31, 2005, whereby J.J. Reidy purported to terminate the parties' Agreement. A true and accurate copy of J.J. Reidy's January 31, 2005 letter is attached hereto as Exhibit E.

23.     In the meantime, J.J. Reidy engaged in a smear campaign against AirWater, going public with J.J. Reidy's allegation that AirWater breached the Agreement by way of non-payment of the disputed minimum monthly royalty. In

8

interviews with the press, J.J. Reidy announced its intention to reject AirWater's tender of the disputed minimum monthly royalty payment (under J.J. Reidy's interpretation, due thirty days from the date of his January 13, 2005 demand letter), because "its too late. I don't want to have anything to do with them."

24.    In the meantime, in furtherance of its strategy to prematurely terminate the Agreement, J.J. Reidy negotiated most, if not all, of the shares of UCSY stock received from AirWater in consideration for the exclusive, world-wide license for the Reidy Patents. Further, J.J. Reidy publicly announced that it was looking for a new group of investors and a new manufacturer to produce J.J. Reidy's air to water system and actively recruited licensees and sub-licensees. Indeed, prior to November, 2004, J.J. Reidy openly solicited licensees via J.J. Reidy's website: www.drinkwaterfromtheair.com, offered international patent license agreements, and offered to accept candidates for awarding new licenses and distributorships for J.J. Reidy's air to water system. Additionally, prior to seeking to terminate the Agreement, J.J. Reidy secretly negotiated with potential companies and licensees, including AirWater's direct competitors, offering opportunities to obtain the J.J. Reidy Patents directly from J.J. Reidy.

25.    Notwithstanding J.J. Reidy's numerous breaches and anticipatory breaches of the Agreement as aforesaid, AirWater stood ready, willing and able to pay quarterly royalty payments, and on February 11, 2005, filed its complaint for declaratory relief wherein AirWater tendered royalties for the quarter ending December 31, 2004 (due February 15, 2005) and the estimated quarterly royalties for the first quarter of 2005 (due May 15, 2005) upon order of the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida authorizing the clerk thereof to accept the same.

9

Thereafter, AirWater filed its lawsuit against J.J. Reidy making additional financial

claims relating to fraudulent dealings by J.J. Reidy and other claims as set out in the

complaint.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

_____ DAY OF NOVEMBER, 2006.

_____

CERTIFICATE OF SERVICE
I hereby certify that this document filed thought the ECF
system will be sent electronically to the registered
participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as
non-registered participants on _December 13, 2006_

*EXHIBIT A*

# GLOBAL
# MANUFACTURING AND MARKETING
# LICENSING AGREEMENT

This Agreement is made and entered this __21ˢᵀ day__ of March 2003 by and between;

**J.J. Reidy & Co., Inc.,** a Massachusetts Corporation whose principal address is 1260 Main Street, Holden Massachusetts 01520-1020, hereinafter referred to as "LICENSOR" and;

**AirWater Corporation**, a Florida Corporation, whose principal address is suite 6K, Lincoln Road, Miami Beach Florida 33139, hereinafter referred to as "LICENSEE".

## WITNESSETH

**WHEREAS, LICENSOR** represent and warrants that it has the entire right, title, and interest in and to United States Patents numbered 5,106,512, 5,149,446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and any patents to issue, foreign or domestic on any continuation or division thereof and any new patents, foreign or domestic, granted to LICENSOR relating to the Water Production/Generations System (hereinafter collectively referred to as "LICENSED PATENTS"), and generally known as the WATERSTAR systems, and that LICENSOR has the absolute and undisputed rights to grant the licenses under the LICENSED PATENTS as specified hereinafter; and,

**WHEREAS LICENSEE** represents that it is a US Corporation formed and registered in the State of Florida, and so licensed to do business, and,

**WHEREAS LICENSEE** is a wholly owned subsidiary of Universal Communications Systems Inc, a publicly traded company trading on the NASD OTC BB under the symbol "UCSY", and,

**WHEREAS LICENSEE** has indicated to LICENSOR of its interest in both manufacturing and marketing the WATERSTAR systems and technologies, on a world wide basis, and,



1   JR

**WHEREAS LICENSEE** is desirous of obtaining a global right and license to manufacture, assemble, use and sell Water Production/Generation System products, and component parts therefore, falling under the scope of any LICENSED PATENT (hereinafter referred to as "LICENSED PROPERTY"); and

**WHEREAS LICENSOR** is willing to grant such right and license to LICENSEE under the conditions hereinafter set forth;

**NOW THEREFORE,** in consideration of mutual covenants, promises and undertakings contained herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby reciprocally acknowledged, the undersigned parties agree as follows.

# TERMS OF AGREEMENT

## GRANT OF LICENSE:

LICENSOR hereby grants to LICENSEE, for the term of this AGREEMENT, as a right and license to use and sell LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS, according to the provisions set forth hereinafter with the full right and privilege to alter, change and / or modify the contents and peripheral materials associated with LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY

RIGHTS with the conditions set forth herein, and the right to sublicense sale and distributions of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS according to the provisions and the conditions set forth hereinafter.

## TERM OF LICENSE:

The term of this Agreement shall commence upon the date of execution of this agreement and shall remain binding and continue for a period of not less than 10 years, and / or for the life of the last expiring LICENSED PATENT, whichever comes last, unless terminated sooner as provided herein.

2  JR

## OWNERSHIP OF LICENSED PROPERTY:

This license agreement is not a sale or lease of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS from LICENSOR and the full title, rights and interests shall remain in the name of LICENSOR unless otherwise expressed herein and upon written mutual consent of both parties.

## PURPOSE

The purpose of LICENSEE will be, but is not limited to, the manufacture, sale and distribution of Water Production Generation Systems, and being of the invention of the LICENSOR, or derived or evolved there from, which system(s) is/are designed to produced potable water from the air.

## THE TERRITTORY

LICENSEE agrees that this Global Marketing and License Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions.

## VALIDITY

LICENSOR grants to LICENSEE this LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS for a period not less than 10 years, and / or the life of the last expiring patent, whichever comes last, and in any event agrees that it will not sell, allocate, transfer or sublicense to any third party without the expressed written permission of the LICENSOR.

## PAYMENT AND CONSIDERATION

LICENSEE further agrees to deliver 2 payments to LICENSOR's designated individuals a Global Marketing and Licensing Fee in the amount totaling $100,000 on or before July 1st 2003, (one payment due July 1st 2003, the second payment payable on August 1st 2003) plus four (4) million shares of UCSY to be delivered to the LICENSOR, (or his designees) within 21 days from the date of the execution of this Agreement.



3   JR

These 4 million UCSY shares shall be issued as 144 shares, which in line with SEC regulations are restricted from sale for a period of not less than one year, unless subjected to a registration with the SEC and such registration is approved. These shares will be included in any company filing / registration, which the company undertakes to effect in not more than 180 days from the date of execution of this agreement.

## ROYALTY PAYMENTS

LICENSEE further agrees to pay a royalty fee on all sales of manufactured models in the amount of five per cent (5%) of all gross sales less any applicable taxes, for any machines and or components sold in the amounts not exceeding $10,000 each. For all other sales of units and or components, the Royalty Fee shall be seven percent (7%).

LICENSOR shall receive royalties on the quarterly gross sales of LICENSEE, and any of its sub LICENSEES. The royalties shall be computed based on the sales price, less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes, and other such amounts.

This royalty levied on gross sales shall be paid for all sales made on a Quarterly basis.

The payment will be remitted to the LICENSOR on or before the 30th day following the closing of the quarterly period.

LICENSEE will provide LICENSOR on a quarterly basis a full accounting of units shipped, units billed, and a receivables aging, until that time both parties agree to waive this requirement.

The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:

Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales during that fiscal quarter.



4  JR

## MINIMUM MONTHLY ROYALTY PAYMENTS:

LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above whichever is the more.

LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

## LATE PAYMENT OF ROYALTIES:

LICENSOR may elect, to accept late payment fees from LICENSEE of two percent (2.0%) of any gross amount due LICENSOR should any payment due not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

## MANUFACTURING BY LICENSEE & THIRD PARTIES

LICENSOR further acknowledges that LICENSEE intends to offer to manufacture the said units and models in other countries around the world, and LICENSOR hereby confirms that the LICENSEE is granted the absolute right to so offer 3rd parties the sub-rights at all times adhering to the terms and conditions of this agreement.

## SUBLICENSE CONTRACTS

LICENSEE shall have the right to sublicense the LICENSED PROPERTY to any and all third parties it deems creditable and trustworthy to distribute and or market and or sell the LICENSED PROPERTY within the geographical limits as shall be agreed.

Both parties agree that the definition of Sublicense shall mean, "The right granted by the Licensee to any third party to manufacture, market and or distribute the LICENSED PROPERTY pursuant to the provisions and conditions provided herein, and as shall be amended to accommodate the particular situation.



LICENSEE retains the rights to charge and retain, and or waive, finance and or to accept partial payments (down payments) for any and all sublicense fees, as shall be the case on a case-by-case basis.

LICENSEE shall provide and deliver sublicense contracts to LICENSOR as a matter of record.

LICENSEE agrees that all sublicenses and related contracts are to encompass and embrace the parameters of this Agreement, and shall be created so as not to be in violation of any of the provisions contained herein, in part or in whole.

## SUBLICENSE PROPERTY

All sublicenses shall be considered proprietary and confidential and shall remain the property of the LICENSEE and/or the introducing party.

## PRODUCT ENDORSEMENT

LICENSEE may seek endorsements, including celebrity endorsements that LICENSEE deems qualified to represent LICENSED PROPERTY, and such endorsements obtained by LICENSEE shall remain the property of LICENSEE. LICENSOR agrees to acknowledge by letter the right of LICENSEE to use the prior or future endorsements at the discretion of LICENSEE in an appropriate manner of marketing with the consent of the endorser.

## LICENSEE OBJECTIVE AND GLOBAL MARKETING

LICENSEE's overall objective is to establish and maintain the awareness and the exposure of LICENSED PROPERTY to enhance sales and future growth.

LICENSEE will maintain the image and integrity of LICENSED PROPERTY for duration of this License Agreement. No marketing campaign shall be undertaken which fails to project good moral and ethical values. This specifically includes companies, which fail to reflect the highest of moral standards.

6   JR

LICENSEE hereby commits the resources and puts forth best efforts in accomplishing, completing, and fulfillment of the promises contained herein.

LICENSEE shall have the right to create commercial production (radio, television, print) and other means in which to fulfill License Agreement.

LICENSE may create a long-term public relations strategy in which to achieve awareness \ sales, and growth.

## PRODUCT NAME AND LOGO's

LICENSEE retains the right to change the LICENSED PRODUCTS's name without the expressed written consent of LICENSOR.

## DESIGN PACKAGING.

LICENSEE shall hereby have the right to alter, change, add and or remove any item, color, format or material in any existing design packaging with the expressed written consent hereby granted by LICENSOR.

## COPYRIGHT USAGE

LICENSOR hereby grants the right to LICENSEE the use of any and all, in part or in whole, copyright materials as they currently relate to the LICENSED PROPERTY.

## TRADEMARK REGISTRATION – US. / FOREIGN

LICENSEE shall make application and pay filing fees in registering changes to trademark and or trade names, registrations, and service marks when and where applicable.

## GRANT OF TRADEMARK USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trademarks as they currently relate to the LICENSED PROPERTY under the conditions contained herein.



7  JR

## GRANT OF TRADE NAME USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trade names, symbols, or logo's associated with LICENSED PROPERTY as they currently relate, under the conditions contained herein.

## TRADEMARK QUALITY CONTROL

LICENSOR has the right to approve LICENSED PROPERTY sold bearing the trademark licensed herein for conformance with LICENSOR's quality standard.

Before implementing changes in the goods sold under the trademark, LICENSEE shall provide LICENSOR a specimen of the proposed changes.

LICENSOR shall have 2 weeks in which to pass comment, denying or approving the said changes within reason. If LICENSOR does not object within the said 2 weeks, the said changes are deemed approved.

## PRODUCT AND MATERIAL ADDITIONS

LICENSEE shall have the right to make any additions to the LICENSED PROPERTY without the expressed written consent of the LICENSOR for market appeal and or added value. Any such added materials shall remain the property of the LICENSEE at all times, subject to continuing payment of royalties.

## ASSEMBLY

LICENSEE has the right to assemble and or have assembled LICENSED PROPERTY where and whenever applicable.

## UNIVERSAL PRODUCT CODE

LICENSOR shall provide LICENSEE any existing UPC codes for the LICENSED PROPERTY.



8   JR

## LICENSE PARAMETER

LICENSOR agrees and confirms that this exclusive Agreement is not limited to any county, state or country worldwide.

## MAINTENANCE OF PATENT(s)

LICENSOR hereby agrees and confirms that the above referenced patents are all valid, in good standing and that he has disclosed all pertinent and relevant information relative to the patents, and further confirms that he will maintain the validity and good standing of the patents.

## PRODUCT LIABILITY INSURANCE

LICENSEE shall during the entire term of this agreement, maintain an adequate Insurance Policy, to commence upon the first commercial production and sales of product, such product liability insurance to cover LICENSED PROPERTY sold by LICENSEE or any of its sub licensees, and J.J. Reidy & Co Inc., shall be named "additional insured" thereon with respect to any claims made against LICENSOR as a result of LICENSEE's or any of its sub licensee's sales of LICENSED PROPERTY.

LICENSEE agrees to provide a copy of such insurance policy within 30 days of execution of its marketing opening dates of sales. LICENSEE shall also indemnify and hold harmless J.J. Reidy & Co Inc, its employees, directors, officers, shareholders as to any claims, lawsuits, threatened litigation or judgments rendered, relating to the LICENSED PROPERTY sold by the LICENSEE and /or any of its sub licensees.

## TRADE SECRETS

Both parties acknowledge and agree that the other party possesses trade secrets that are proprietary property, and constitute a valuable trade secret. Both parties agree not to disclose and or make available to third parties the information that shall include, but be limited to, this Agreement and any other Agreement that may be entered into between the parties, without the expressed written consent of the other party.



9   JR

## FOREIGN PATENT AND TRADEMARK AND REGISTRATIONS

If at the LICENSEES request the LICENSOR shall make application for foreign trademark and or trade name registration, then the LICENSEE shall pay all fees necessary.

LICENSEE, when applicable shall retain the full rights, title, and interest in any and all trademark(s) and trade name(s) registration in foreign countries as long as this license Agreement is in force.

LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSOR, at his own expense.

## RECORDS AND INSPECTION

LICENSEE shall reduce all sublicenses granted herein written Agreements and copies will be provided to LICENSOR.

## TRANSFER OF CUSTODY, KNOW HOW AND TECHNICAL ASSISTANCE

LICENSOR agrees to provide all information in its possession to assist LICENSEE to distribute and sell LICENSED PROPERTY. LICENSOR shall transfer to the care and custody of LICENSEE within 30 days from the execution of this Agreement, all information requested by LICENSEE in its possession pertaining to the LICENSED PROPERTY, and all information material and pertaining to the sales thereof, and consisting of, for example, but not limited to:

All design Data, films, disks, camera work, negatives, layouts, registration mark copy for production and reprint, logos, type fonts, etc.

Process Specifications-All details, processes, steps and procedures concerning, but not limited to care of product, storage, the do's and don'ts, print specifications, packaging specifications, etc.



10   JR

Commercial Operation Data-volume discounts, minimum order levels, maximum order levels, turn-around production time, shipping costs and requirements, etc.

Endorsement Grant-granting the permission to LICENSEE the use of any and all previous or future endorsements with the permission of the endorser.

LICENSOR shall also make available in timely fashion, all future improvements relating to the LICENSED PROPERTY, including change, and modifications and specifications, methods and materials, during the term of this Agreement.

## TERMINATION OR REVOCATION OF LICENSE

This Agreement and the rights and licenses granted herein shall wholly cease and terminate prior to the termination of the license as described hereinabove upon the occurrence of any of the following events.

Any material breach by either party of the terms of this Agreement, provided the non-breaching party in the one seeking the termination and gives the other party written notice on intention to terminate, which shall state the fault or breach upon which the party relies.  The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time; or

If the LICENSOR does not receive the Licensing fee at the time of the joint approval and signing of this agreement or any other subsequent payment due LICENSOR that is not paid within 5 business days within its due date.

This agreement shall terminate upon the insolvency and/or criminal conviction of either party unless other agreed to in writing.

Upon termination, LICENSOR shall have the first right of refusal to purchase Licensee's inventory for cost payable within 30 days of written offer.

The written offer must be accepted within 30 days of being made. In no event shall LICENSEE sell existing inventory after a period of 12 months following the termination notice.



11    JR

The mutual consent of the parties expressed in writing.

This agreement will terminate with notice, if LICENSEE does not make any required payments to LICENSOR as specified within the stated and agreed time periods.

The LICENSOR agrees to grant to the LICENSEE a 14 day period of notice / grace in which the LICENSEE can make good on any outstanding amount.

## EFFECT OF TERMINATION OR REVOCATION

The termination of this agreement shall not release LICENSEE from the obligation to pay LICENSOR any accrued sums owed to LICENSOR or from fulfilling any other accrued obligation. Additionally such termination shall be without prejudice to any right or remedy, which either party may have or believes it has against the other party.

The termination of this agreement as a result of the provisions and conditions provided herein, and/or the breach thereof, or an uncontrolled act of G-d, government, laws, etc., which prohibit the fulfillment of this Agreement shall not bind the LICENSEE to fulfill any projected sales figures.

In no case shall LICENSEE have any claims for repayment or offset of any sum or sums, which shall have been paid, as required under the terms of this agreement

Upon termination, each party will retain proprietary property(s) and the complete rights title, and interest of any and all proprietary property, information and material introduced.

Upon termination and revocation of License Agreement, each party will properly return, in a timely fashion and all proprietary property to the owner, in the same manner and condition received in relation to paragraph above.

Upon termination and revocation of License Agreement. LICENSOR has the right to purchase from LICENSEE any items not considered LICENSED PROPERTY, such as, but not limited to, changes in the LICENSED PROPERTY name, trade mark or trade name, universal product codes,



marketing materials changes, alterations, and/or modifications duly registered etc., at a fair market price.

## DURATION/TERM/MAINTANENCE OF EXCLUSIVITY

The License granted herein exclusive to a geographical territory as defined above and shall remain exclusive unless terminated in accordance with the terms of this agreement.

LICENSEE agrees to put forth its best efforts to sell LICENSED PROPERTY during the period of exclusivity of the Licenses granted herein.

## INFRINGEMENT:

In the event any infringement of LICENSOR's patents is discovered in any country recognizing such patents and/or litigation commences with respect to any claim of infringement of LICENSOR's patents, LICENSEE has the option to pursue any and all litigation to protect the marketing effort.

LICENSEE has the sole discretion to determine how much to incur in legal expenses in pursuing any infringement claim or litigation based upon what is reasonable and in the best interest of LICENSEE.

LICENSOR shall have the option to participate in such claim in proportion to the expense LICENSEE bears, i.e. 50% of litigation expenses = 50% of the claim/settlement. In the event LICENSOR exercises this option to participate, LICENSOR shall be entitled to retain an equal percentage amount, in relation to the percentage amount of expenses incurred, of the receipts from such settlement, judgment, compromise or arbitration.

In the event infringement is discovered and LICENSEE does not act upon settlement of infringement or litigation in a reasonable amount of time as not to effect the marketing campaign, sales, and/or growth, LICENSOR shall have the right to pursue the infringing party for damages, and retain the proceeds.

13   JR

## USE RESTRICTIONS:

LICENSEE agrees not to use LICENSED PROPERTY in any illegal fraudulent, or deceptive manner to damage the good name and / or standing of the LICENSED property

## TRANSFER RESTRICTIONS/ASSIGNABILITY/SUB-LICENSE/SALE

Any party may assign and/or sell this Agreement to any third party, subject to first offering the other party a first right of refusal. Any such assignment and/or sale shall be made in accordance with the provisions herein.

LICENSEE has the right to have other parties manufacture for it, provided the manufacturer enters into a Non-Compete and Non-Disclosure Agreement with LICENSOR. If LICENSEE sells or assigns this License, LICENSOR will receive from LICENSEE fifteen percent (15%) of the assignment/sale price.

## ASSIGNMENT/SALE

LICENSOR agrees to notify LICENSEE of any contemplated assignment /sale of LICENSOR's patents during the term of this Agreement with thirty (30) days notice.

LICENSEE agrees to notify LICENSOR of any contemplated assignment /sale of this License during the term of this Agreement with thirty (30) days notice.

In either of the above cases, each party shall offer the other party the right of first refusal.



## WAIVERS:

No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.

The waiver by any party of any of the conditions precedent to its respective obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement.

## BENEFITS:

Except as expressly provided in this Agreement, nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligation, or liability under or by reason of this Agreement

## CONSTRUCTION/JURISDICTION:

Inasmuch as the transactions, which may arise or occur between the parties and/or their principals may cross boundaries of national and or international jurisdiction, this Agreement shall be construed and interpreted in Accordance with the laws of the United States of America and the resident state of the Plaintiff.

## SEVERABILITY:

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

15    JR

## ARBITRATION

The parties may elect to settle and differences by submitting to Arbitration in the resident state of the plaintiff. The Arbitrators decision shall be and remain binding to either and both parties.

## NOTIFICATION

Any notice hereunder must be in writing and by courier service with signed receipt and shall be deemed to have been given when such notification, properly addressed to the addressee indicated above, is sent by courier and receipt acknowledged. Either party hereto may at any time by thirty (30) days notice to the other, designate any other address in place of those given above.

## FURTHER DOCUMENTS:

Each of the parties hereto agrees to execute and deliver all such documents and to do any and all acts, matters and things as may be necessary or proper in order to carry out the intended purposes of this Agreement.

## PRIOR AGREEMENTS:

This Agreement shall supersede and replace any and all prior Agreements entered into between the parties hereto related to the subject matter hereof and any such prior Agreements shall be, and they are hereby, canceled.

## EMPLOYEE STATUS:

It is understood and agreed by both parties that neither party is an employee of the other.

## EFFECTIVE DATE:

The effective date of this Agreement shall be upon the acceptance and execution thereof by both parties.



16    JR

## ENTIRE AGREEMENT:

This instrument of 18 pages contains the entire Agreement between LICENSOR and LICENSEE, and no modification hereof shall be binding on the parties unless it is in writing and signed by a duly authorized officer of the parties to be bound.

## AUTHORITY:

All parties warrant that they have the requisite authority and capacity to execute this Agreement and that its terms and provisions constitute valid and legally enforceable rights and obligations against the parties, their successors, administrators, etc.

## DOCUMENT ORIGINALS:

This document is considered as an original, binding and enforceable Agreement, whether executed in original, binding counterparts or Facsimile.

## INTENTIONALLY LEFT BLANK.



17

IN WITNESS WHEREOF, the parties have affixed their names, signatures, and seals, by their executive officers thereto duly authorized, on the day and year first above written.

**ON BEHALF OF LICENSEE:**

M J Zwebner - Chairman
AirWater Corporation

**ON BEHALF OF LICENSOR**:

James J. Reidy, President
J.J. Reidy & Co., Inc.

Subscribed and sworn to before me

This _21st_ day of _March_ 2003

Notary Public Notary Public
My commission expires: _1/9/03_

OFFICIAL NOTARY SEAL
ROLANDO S SABLON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD083309
MY COMMISSION EXP. JAN. 9,2006

18

## *EXHIBIT B*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 1 2 2003

CLERK, U.S. DISTRICT COURT
By_____
               Deputy

ELECTRIC & GAS TECHNOLOGY, INC.          &
ATMOSPHERIC WATER TECHNOLOGY, INC.       &
and                                      &
RICHARD EHRLICH                          &
        Plaintiffs                       &
                                         &
                                         &    CIVIL ACTION NO.
                                         &
vs.                                      &
                                         &
UNIVERSAL COMMUNICATIONS SYSTEMS, INC.   &    03CV1798 G
and IT'S SUBSIDIARY AIRWATER CORP.       &
     and J. J. REIDY, INC.               &
        Defendants                       &
                                         &

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff's, Electric & Gas Technology, Inc., Atmospheric Water Technology, Inc.,
and Richard Ehrlich, by counsel, hereby complains of Defendants, Universal
Communications Systems, Inc. and it's subsidiary Airwater Corp. and J. J. Reidy, Inc.
and alleges as follows:

### PARITIES

1.    Electric & Gas Technoloyg, Inc. ("ELGT") is a corporation organized and
existing under the laws of Texas and has its principal place of business at 13636 Neutron
Road, Dallas, Texas 75244-4410.

2.    Atmospheric Water Technology, Inc. ("AWT") is a corporation and
subsidiary of ELGT and organized and existing under the laws of the State of Texas.

       Both ELGT and AWT shall hereinafter be referred to as "ELGT".

3.    Richard Ehrlich is an individual scientific inventor residing at 175 N.W. 21st,
North Miami, Florida   33138.



A.    Universal Communications Systems, Inc. and its wholly owned

subsidiary Airwater, Inc. are Florida based corporation located at

Miami Beach, Florida 33139 herein after referred to as "UCSY".

B.    J. J. Reidy, Inc. is located at 1260 Main St. Holden, Mass.  01520.

## JURISDICTION AND VENUE

4.    The court has subject matter jurisdiction pursuant to 28 U.S.C. & 1338,

granting the United States District courts exclusive original jurisdiction of any civil action

arising under the Act of Congress relating to patents.

5.    Venue is proper in this Court pursuant to 28 U.S.C. & 1391(b)(1) because the

Defendants are corporations subject to the personal jurisdiction of the U.S. district Courts

and thus deemed to reside in this judicial district pursuant to 28 U.S.C. & 1391(c).

## FACTS GIVING RISE TO THE CAUSE OF ACTION

6.    ELGT, a publicly traded corporation employing including its subsidiaries

approximately 250 people.  Richard Ehrlich is an individual scientific inventor who

received a U.S. Patent No. 4,255,937 on March 17, 1981 and received a U.s. copyright on

May 28, 1981 on both the information in the U.S. Patent but  also additional enhancement

of intellectual property which information was public information even prior to the March

17, 1981 receipt of Ehrlich U.S. Patent.  Such U.S. Patent is now owned by ELGT, a copy of

which is attached as Exhibit "A".

In addition ELGT owns copyright and trademarks describing such technology

indicated in the Ehrlich U.S. Patent and the Trademark known as "WATERMAKER"

as indicated in (attached Exhibit "A-1") the Ehrlich U.S. Patent prior to expiration in 2001

was augmented and enhanced using the fundamental claims of the Ehrlich patent by the

filing in 1994 and receipt of U.S. Patent No., 5,553,459 on September 10, 1996 by Larry G. Harrison, Garland, Texas (copy attached hereto as Exhibit ("A-2") which is owned by the Watermaker Corp. which was acquired and now owned by ELGT.

7.    On June 24, 2003 ELGT sent a certified letter (attached as Exhibit "B") to UCSY in care of its CEO Mr. Michael J. Zwebner demanding that UCSY, its affiliates, subsidiaries and employees cease and desist in selling, manufacturing, either directly or indirectly, its Airwater products in violation of ELGT's U.S. Patents and enhanced intellectual property.

8.    Upon information and belief, Defendant, either directly, or by and through its parents, subsidiaries and/or affiliates, manufacturers, offered for sale, and sells such Watermaker products.  Defendant has advised by Press announcements the sale of such products in several locations including the U.S. Defense Dept. and to the military in the State of Israel (copies attached as Exhibit "C").  Such products are covered by one or more claims of the Ehrlich U.S. Patents and enhanced intellectual property owned by ELGT. Upon information and belief, Defendant continues to offer for sale such Watermaker products throughout the U.S. and world wide customers.

9.    On December 4, 1996 Richard Ehrlich was awarded a final judgement against Russell B. Adler, Melvin Adler and Air & Watermaker, Inc. rendering Ehrlich 's U.S. Patent No. 4,255,936 (Exhibit "A" attached) back to Ehrlich (See copy of judgement attached as Exhibit "D").

10.    On March 24, 2003 UCSY documented the formation of Airwater Corporation as a wholly owned subsidiary of UCSY and had acquired international manufacturing and marketing licenses as well as patent and copyright from J. J. Reidy &

Co., Inc. of Holden, Mass.

11.    Under the terms of said UCSY/Reidy agreement UCSY issued four (4) million shares of UCSY common stock to J. J. Reidy pursuant to rule 144 of the SEC plus a one time payment of $100,000.00. In addition UCSY agreed to pay J. J. Reidy & Co., Inc. royalties.

12.    All of said above information in items 9, 10, 11 above are disclosed in public filings of UCSY to the Securities & Exchange Corp. as evidenced in Exhibit "E" attached hereto.

13.    During the late 1980's and early 1990's James J. Reidy, owner of J. J. Reidy, Inc. visited the offices of Daveco, Inc. in Garland, Texas owner of the Watermaker Corp. and he obtained full disclosures on the Ehrlich Patent based on an actual WATERMAKER (tm) product 5 gallon per day production models which included improvements and enhancements of the Ehrlich patent technology including addition of fans and ultra violet enhanced filtering and components. (See Exhibit "E-1").

14.    Also in said period of time and even thereafter James  J. Reidy met with Russell b. Adler in Miami, Florida who had by virtue of the Circuit Court judgement NO RIGHTS TO said Ehrlich patent or intellectual property including Reidy's contact with Richard Ehrlich to observe and view typical pre production Watermaker prototypes.

15.    On the basis of such full disclosure from Daveco, Inc. and the Watermaker Corp, Richard Adler, and Richard Ehrlich, J. J. Reidy filed a U.S. Patent application on August 16, 1991 and received U.S. Patent No. 5, 106, 512 on April 21, 1992 (Exhibit "F" attached hereto).

16.    By virtue of having copies of the Ehrlich Patent and having observed and made notes of the actual WATERMAKER (tm) product by J. J. Reidy and then copying said patent claims coupled with the improvements already made in the actual Ehrlich production model, J. J. Reidy not only infringed on such patent and enchanted technology but also violated the must important requirement of a sworn statement to the United States Department of Commerce and U.S. Patent and Trademark office regarding his absolute previous knowledge of such known technology (Exhibit "F-1") attached hereto.

17.    Notwithstanding the reference in Reidy's wrongfully obtained patent regarding the 1981 Ehrlich patent Reidy's stated comment was that said Ehrlich patent did not contain certain controls and a fan. Reidy was well aware of the Daveco production model which he knew was already incorporated with controls and fan blowers which he observed prior to his improper patent filing in 1991. Yet such statement made by Reidy was untrue and a mispresentation to the U.S. Patent office since the Ehrlich patent contained a <u>control</u> foat as seen in componet 38, a valve and pump switch for <u>control</u> of activation of water flow. A check valve component 44 for further pump water flow <u>control</u> which therefore totally falsifies such statement by Reidy and in addition the Ehrlich patent clearly indicates a dehumidifer which Reidy was fully aware that such convential dehumidifiers all by necessity contain a fan or blower required to disspate or remove condensation which is the source of water thus again mistating to the U.S. Patent examiner as to Reidy stating "no fan". Even in addition to amplify his "prior art" notice by the actual inspection and observation of the prototype and production model Watermaker. Reidy filed his improper U.S. Patent application with such mistatements by

being fully knowledgeable of such "prior art" which should nullify and cancel his U.S. Patent.

    A.    ELGT also emphasizes and claim that even in addition to the direct infringement by UCSY the infringement is also based on section 217a of the U.S. Patent Code concerning the "DOCTRINE OF EQUIVALENTS" if a device performs substantially the same function in substantially the same way to obtain the same result. The U.S. Patent improperly filed by Reidy is a perfect example of the violation of the "Doctrine of Equivalents" which gives cause for proof of infringement by USCY.

    In addition, the Ehrlich U.S. Patent filed on March 17, 1981 in accordance with Section 154 of the U.S. Patent Code warrants protection through March 17, 2001 which covers the period of time that the 1992 patent owned by UCSY and the previous Adler judgement and Reidy violation prior to 1991 took place that created such infringement.

    Such infringement herein can be passed on and applied to Defendants distribution chain including a manufacturer, importer, exporter, distributor, retailers and or ultimate customers.

18.    ELGT made payment of $575,000.00 in the form of cash and stock to Daveco based on $250,000 cash and a $325,000 second promissory note through its ownership of the Watermaker Corp. and thereby received assignment and ownership of said Ehrlich U.S. Patent to ELGT and its subsidiary Atmospheric Water Technology, Inc. (which name was changed from Atmospheric & Magnetics Technology, Inc.) and ELGT has since invested many millions of dollars using the basic technology to design and modify

Watermaker units larger than the basic 5 gallon production models to 50, 150, 500, 1000, 7500 and 10,000 and more gallons per day of purified healthy drinking water derived from the "air we breathe" which ELGT calls the "infinite fountain of water" (see Exhibit "F-2") attached hereto.

19.    UCSY in accordance with its 10Q SEC filings as a public corporation disclosure on Note 2 on page 6 has been confirmed by its auditors of the present risks and concerns and uncertainties of the continuation of UCSY as a going concern due to UCSY's losses and an accumulated deficit of $30,089,856 as of March 31, 2003 (See exhibit "G") attached hereto. Such almost bankrupt financial condition, in spite of UCSY's patent infringment could jeopardize any alleged warranties on the Airwater Products that could be damaging to Plaintiffs manufacturing program to innocent distributors and customers.

20    Michael J. Zwebner, CEO of UCSY has issued almost daily Press Releases regarding UCSY's promotion and sales of the Watermaker products all in violation of ELGT's U.S. Patent and intellectual property position such copies of Press Releases attached hereto as Exhibit "H"). It is unknown by Plaintiff at this time whether or not Zwebner was aware of Reidy's infringement when UCSY acquired said improper Reidy patent but if not there was no EXCUSE by UCSY to acquire such Reidy patent and thus participate in the infringement.

21.    The Court is advised that the 2003 market as confirmed by industry reports is presently a $60 billion market for all types of Water products due to the growing contamination of drinking water containing arsenic and other contaminants.

22.    Attached hereto is an Exhibit "I" (attached hereto) is a copy of an affidavit

and supporting document by Richard Ehrlich regarding the U.S. Patents owned by Electric & Gas Technology, Inc. and it's subsidiary Atmospheric Water Technology, Inc.

The Court is advised that several additional affidavits by individuals who are knowledgeable of this infringement will be filed by an amendment by ELGT as soon as completed.

## COUNT ONE

## CLAIM FOR PATENT INFRINGEMENT

ELGT herein incorporates each averment contained in Paragraphs 1 though 22.

Defendant has maliciously infringed the Ehrlich U.S. Patent and accompanying intellectual property in violation of 35 U.S.C. & 271(a) by making, using, offering to sell and/or selling products that infringe one or more of the claims and disclosed enhancements of the Ehrlich patent.

Defendant, specifically, has infringed the Ehrlich U.S. Patent and accompanying intellectual property in violation of 35 U.S.C. & 271(a) by making, using, offering to sell and/or selling Watermaker products.

Defendant has infringed the Ehrlich patent in violation of 35 U.S.C. & 271(b) by actively inducing others to infringe one or more claims on said Ehrlich patent and enhancement and intellectual property.

Defendant has made, and continues to be, willful and harmful to Plaintiffs under 35 U.S.C. & 283 because Defendant has had written certified notice of said patents since June 24, 2003.

Plaintiff ELGT is being irreparably harmed by substantial damages of such infringement.

Defendant will continue its infringement if not enjoined by this Court.

Plaintiff ELGT had no adequate remedy of law.

Defendant is aware by its own admissions that the total market for said Water Maker products is in excess of $60 billion annually.

### JURY DEMAND

Plaintiff, ELGT demands trial by jury for all claims so triable.

WHEREFORE, Plaintiff respectfully prays that this Court grant judgement against Defendant as follows:

A.    Declaring that Defendant has infringed said U.S. Patent prior to 1991 and Enhancement of the actual production models known by Defendant in violation of 35 U.S.C. & 271(a), and has actively induced others to infringe the said patent in violation of 35 U.S.C. & 271(b);

B.    Declaring that Defendant has willfully infringed on the Ehrlich patent and enhancement technology under 35 U.S.C. & 284 and trebling the damages found or assessed as a result of such infringement.

C.    Granting a permanent injunction under 35 U.S.C. & 283 enjoining the Defendant and its parents, subsidiaries, affiliates, agents, employees and/or servants and all those acting in concert therewith, from further acts of infringement of said Ehrlich Patent enhancement technology.

D.    Ordering an accounting and an award of actual and punitive damages under 35 U.S.C. & 284, together with prejudgment interest and costs as fixed by the Court and to amount to at least  one tenth (1/10) of one percent (1%) on the $60 billion annual market or damages of at lease $60 million.

E.    Awarding to Plaintiff its costs and counsel fees incurred herein pursuant to

35 U.S.C. & 285, or reasonably attorney's fees and costs as otherwise

permitted by law;

F.    Awarding post-judgement interest at the maximum legal rate; and

G.    Any other or further relief that this Court deems proper.


Dated: July 16, 2003


                              Respectfully submitted.

                              Joe B. Abbey

                              State Bar No. 00789000
                              13636 Neutron Road   suite "B"
                              Dallas, Texas 75244-4410
                              Phone: (972) 661 5870
                              Fax:    (972) 991 3265

                              Attorney for Plaintiffs

## *EXHIBIT C*



**AIR WATER CORPORATION**

J.J. Reidy & Co. Inc
1260 Main Street
Holden MA. 01520

November 10, 2004

Dear Mr. Reidy,

As you are aware, for almost the entire life of our licensing agreement regarding the Patents of the Waterstar systems, we have been required to defend the very validity of the patents for which our company has paid a very substantial sum. This expense of the litigation has been a continuing severe drain on the company's resources.

Of course, there is the immediate cash losses involved in paying counsel together with the burdensome expenses associated with modern litigation. Above that, moreover, is the loss of business caused by the uncertainty in the marketplace over UCSY's rights to sell these machines. We have found it to be most difficult to create the markets we all anticipated, in the face of these challenges.

Nevertheless, the Company has been consistent in making the $10,000 advance royalty payments to you that were agreed to for the year, beginning November 1, 2003. While the Company had received advice that these payments could have been halted because of the disputes over the patents, we determined to keep faith with you for that year.

We continue in litigation. It is difficult to explain to the Board and interested shareholders how it is possible that we should have to finance litigation over the validity of a patent for which we have already spent significant money. It appears that it would be in your interest to finance, to a major extent, our defense.

We continue our efforts to market, even in this hostile environment. We will give you a report of sales as agreed, and remit any future royalties owing at that time.

Please let me know if you are willing to contribute to the patent's defense costs.

Yours truly,

Michael J. Webner – President
Air Water Corp.

Suite 12F, 407 Lincoln Road, Miami Beach Florida 33139
Phone: (305) 672 6344 // Fax: (305) 672 1965
Email: MJZ@sprynet.com // Web address: www.AirWaterCorp.com

KW00765

## *EXHIBIT D*

**Bowditch**
**&Dewey**
ATTORNEYS

*EX.B*

Direct telephone: (508) 926-3431
Direct facsimile: (508) 929-3046
Email: dflynn@bowditch.com

<u>VIA FEDERAL EXPRESS</u>                    January 13, 2005

Mr. Michael Zwebner
AirWater Patents Corporation
Suite 12F
407 Lincoln Road
Miami Beach, FL 33139

Re:    NOTICE OF DEFAULT

Dear Mr. Zwebner:

This firm represents J.J. Reidy & Company, Inc. ("J.J. Reidy"). This letter is to inform you that AirWater Patents Corporation ("AirWater Patents") is in default of the Global Manufacturing and Marketing Licensing Agreement (the "License") executed on March 21, 2003 between AirWater Corporation and J.J. Reidy and assigned to AirWater Patents on June 25, 2003. AirWater Patents has failed to make its required monthly royalty payments to J.J. Reidy on November 1, 2004 and December 1, 2004 and has thus breached the terms of the License. Additionally, AirWater Patents has made eight (8) payments of monthly royalties to J.J. Reidy more than fifteen (15) days past the due date. This letter is notice to AirWater Patents that J.J. Reidy has elected to accept late payment fees from AirWater Patents of 2% of the gross amount of these late royalty payments.

The "Minimum Monthly Royalty Payments" section of the License, page 5, states: "LICENSEE is to pay LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1, 2003." Moreover, the "TERM OF LICENSE" section of the License, page 2-3, states that "...this agreement shall remain binding and continue for a period of not less than 10 years...." AirWater Patents has failed to make its $10,000 monthly royalty payments to J.J. Reidy on November 1, 2004 and December 1, 2004 and is in default of its obligations under the License. According to the "TERMINATION OR REVOCATION OF LICENSE" section of the License, page 11-12, AirWater Patents has a 14-day period of notice / grace in which it can make good on its outstanding amount of $20,000 owed to J.J. Reidy. If said payment is not received by J.J. Reidy within this time, J.J. Reidy reserves the right to Terminate and Revoke the License.

\*\CLIENT\R\00126\0007\00501553.DOC:1;

BOWDITCH & DEWEY, LLP  311 MAIN STREET  PO BOX 15156  WORCESTER, MA 01615-0156
508 791 3511  F 508 756 7636  www.bowditch.com

Boston  Framingham  Worcester

Page 2

This letter further notifies AirWater Patents that J.J. Reidy has elected to accept late payment fees from AirWater Patents of 2% of the gross amount of royalty payments either unpaid as of this date or paid more than fifteen days past their due date, pursuant to the "LATE PAYMENT OF ROYALTIES" section of the License, page 5, which states:

> LICENSOR may elect to accept late payment fees from LICENSEE of two percent of any gross amount due LICENSOR should any payments not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

As payments due to J.J. Reidy on December 1, 2003, January 1, 2004, February 1, 2004, March 1, 2004, July 1, 2004, September 1, 2004, November 1, 2004, and December 1, 2004 were all paid or have not yet been paid more than fifteen days from their due dates, AirWater Patents owes to J.J. Reidy a 2% late payment fee totaling $1,600 (8 late payments of $10,000 per month at 2%). Failure to make this payment within fourteen (14) days of receipt of this letter will constitute a further breach of the License and grant J.J. Reidy the option to Terminate and Revoke the License without waiving its right to any monies owed it by AirWater Patents pursuant to the "TERMINATION OR REVOCATION OF LICENSE" section of the License, page 11.

Please remit payment directly to J.J. Reidy and copy the undersigned on your correspondence.

J.J. Reidy reserves all of its rights to pursue any and all legal remedies available to it to enforce its rights under the License.

Sincerely,

Daniel P. Flynn

Cc: Thomas J. Conte, Esquire

## *EXHIBIT E*



*Bowditch*
*&Dewey*
ATTORNEYS

Direct telephone: (508) 926-3431
Direct facsimile: (508) 929-3045
Email: dflynn@bowditch.com

January 31, 2005

<u>VIA FEDERAL EXPRESS</u>

Mr. Michael Zwebner
AirWater Patents Corporation
Suite 12F
407 Lincoln Road
Miami Beach, FL 33139

Re:    NOTICE OF TERMINATION

Dear Mr. Zwebner:

I am writing as a follow up to my letter to AirWater Patents Corporation ("AirWater Patents") dated January 13, 2005, (the "Notice of Default"). As AirWater Patents has failed to make any payments to cure its material breach of the Global Manufacturing and Marketing Licensing Agreement (the "License") within fourteen days, the License is hereby terminated.

As such, J.J. Reidy demands that AirWater Patents cease and desist using and selling water production/generation system products, and component parts thereof, falling under the scope of United States Patents numbered 5,106,512, 5,149,446, 5,203,989, and 5,366,705, any patents issued, foreign or domestic, on any continuation or division thereof, or any new patents, foreign or domestic, granted to J.J. Reidy relating to water production generation systems. These and all other rights granted to AirWater Patents under the License have been wholly terminated pursuant to the "Termination or Revocation of License" section of the License (pp. 11 - 12 of the License). Also pursuant to pages 11 and 12 of the License, "in no case shall licensee [AirWater Patents] have any claims for repayment or offset of any sum or sums, which shall have been paid, as required under the terms of this agreement" upon this termination.

Also according to pages 11 and 12 of the License, "upon termination each party will retain proprietary property(s) and the complete rights, title and interest of any and all proprietary property, information and material introduced." Further, "upon termination and revocation of

Page 2

License Agreement each party will promptly return, in a timely fashion and [*sic*] all proprietary property to the owner. . . " Accordingly, J.J. Reidy demands return of all of its proprietary property within ten days of AirWater Patents' receipt of this letter.

   J.J. Reidy reserves all of its rights to pursue any and all legal remedies to recover damages it has suffered or will suffer from the breach of the License by AirWater Patents.

   Sincerely,

   Daniel P. Flynn

DPF/rl