## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**AIRWATER CORPORATION AND**<br>**AIRWATER PATENTS**<br>**CORPORATION,**<br><br>      **Defendants.** | CIVIL ACTION NO. 05-40049-FDS |
| **AIRWATER PATENTS, INC.**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**J.J. REIDY & CO., INC.**<br><br>      **Defendant.** | CIVIL ACTION NO. 06-10137-FDS |

### AFFIDAVIT OF MATTHEW P. ZAYOTTI, ESQ. IN SUPPORT OF MOTION OF AIRWATER CORPORATION AND AIRWATER PATENTS, INC. TO AMEND SCHEDULING ORDER AND TO CONTINUE HEARING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT UNTIL COMPLETION OF DISCOVERY

I, Matthew P. Zayotti, Esquire, do hereby state and depose as follows:

1.     I am an associate with the law firm Keegan Werlin LLP, and I am an attorney in good standing of the bar of the Commonwealth of Massachusetts.

2.     Attorney Richard Kirby and I represent the Defendants AirWater Corporation and AirWater Patents, Inc. in connection with the above-captioned consolidated actions.

3.     Attached to this affidavit as Exhibit A is a true and accurate copy of correspondence from Maura A. Greene, counsel for J.J. Reidy & Co., Inc., dated

February 9, 2007, wherein she requested a 7-day extension of time for her client, J.J. Reidy, to comply with the Court's Order granting, in large part, AirWater's motion to Compel.

4.      Although I agreed to grant J.J. Reidy's request for a 7-day extension of time to comply with the Court's Order, J.J. Reidy failed to supplement its discovery responses as required by the Court Order on or before the expiration of the extension of time, and J.J. Reidy's counsel did not request any additional extension of time.

5.      Attached to this affidavit as Exhibit B are true and accurate copies of a cover letter from Maura A. Greene, Esq. dated March 7, 2007 and J.J. Reidy's supplemental responses to interrogatories and document requests.

6.      Attached to this affidavit as Exhibits C and D are true and accurate copies of letters from Maura A. Greene dated March 8 and 9, 2007 concerning J.J. Reidy's supplemental document production.  A good number of documents produced in J.J. Reidy's supplemental document production appear to have already been produced.

7.      Because I was in Saginaw, Michigan for depositions on March 12 and 13, 2007, I did not actually see and have an opportunity to review J.J. Reidy's supplemental document production until Thursday, March 15, 2007.

8.      J.J. Reidy has yet to provide a privilege log as ordered by the Court.

9.      Attached to this affidavit as Exhibit E is a true and accurate copy of a Patent and Asset Purchase Agreement dated October 4, 2005, by and between J.J. Reidy and Free Water Company.

10.     Attached to this affidavit as Exhibit F is a true and accurate copy of the parties' Global Marketing and Manufacturing Licensing Agreement.

10. Attached to this affidavit as Exhibit G are true and accurate copies of correspondence by and between J.J. Reidy and counsel for Mike Klein and/or World Wide Water, Inc., World Wide Water, LLC and/or Air2Water, LLC, which were obtained by AirWater's Florida counsel by means of subpoena to Mike Klein before the Florida litigation was transferred to and consolidated in Massachusetts.

11. To date, J.J. Reidy has failed to produce any documents relating to revenues that J.J. Reidy received on account of any agreements that J.J. Reidy has with any third party concerning the Patents from January 2003 to present.

12. To date, J.J. Reidy has produce only two documents relating to efforts to license the Patents to third parties from January 2003 to present.

13. To date, J.J. Reidy has failed to produce any documents concerning the disposition of the UCSY, AirWater and/or AirWater stock that was issued to J.J. Reidy pursuant to the parties' Agreement.

14. In light of J.J. Reidy's delays and continuing failure to comply with the Court's discovery, which have obstructed AirWater from timely discovering information to which the Court has determined AirWater is entitled, and given the courtesies I have granted J.J. Reidy by way of an extension of time to comply with the Court's Order and forebearance on a motion for contempt, I proposed during telephone conferences with J.J. Reidy's counsel on Thursday, March 15, 2007 and Thursday, March 22, 2007, that the parties jointly move to extend discovery so that AirWater would not be prejudiced by J.J. Reidy's conduct. Additionally, I drafted and sent to J.J. Reidy's counsel a proposed joint motion to extend discovery and to continue the hearing on the parties' cross-motions for summary judgment.

15.    Attached to this affidavit as <u>Exhibit H</u> is a true and accurate copy of

correspondence from Maura A. Greene, Esq. dated March 22, 2007, wherein she

indicates that J.J. Reidy will not agree to an extension of discovery.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

_____23rd_____ DAY OF MARCH, 2007.

Matthew P. Zayotti

---

**CERTIFICATE OF SERVICE**
I hereby certify that this document filed through the ECF
system will be sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non registered participants on
March 23, 2007.

---

4

**EXHIBIT A**

## Matt Zayotti

**From:** Greene, Maura [MGreene@bowditch.com]
**Sent:** Friday, February 09, 2007 3:27 PM
**To:** Matt Zayotti
**Subject:** supplementation

Hi Matt,
Do you mind if I have an additional seven days to supplement these ints and requests? I've been tied up in depositions this week and still have work to do on them. Please let me know.

Maura

Maura A. Greene, Esq.
Bowditch & Dewey, LLP
175 Crossing Boulevard
Framingham, MA 01702
Tel: 508.416.2421
Fax: 508.929.3021
Email: mgreene@bowditch.com
www.bowditch.com

Communications from our firm may contain or incorporate federal tax advice. Under recently promulgated US Internal Revenue Service standards (Circular 230), we are required to inform you that only formal, written tax opinions meeting the requirements of Circular 230 may be relied upon by taxpayers for the purpose of avoiding tax-related penalties. Accordingly, this communication is not intended or written to be used, and it cannot be used, for the purpose of avoiding tax-related penalties under the Internal Revenue Code.

This e-mail message is generated from the law firm of Bowditch & Dewey, LLP and contains information that is confidential and may be privileged as an attorney/client communication or as attorney work product. The information is intended to be disclosed solely to the addressee(s). If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this email information is prohibited. If you have received this email in error, please notify the sender by return email and delete it from your computer system. For more information about Bowditch & Dewey, please visit our web site at www.bowditch.com

**EXHIBIT B**



*Bowditch*
*&Dewey*
ATTORNEYS

Maura A. Greene
Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

March 22, 2007

## VIA FACSIMILE AND FIRST CLASS MAIL

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

> *Re:  J.J. Reidy Co., Inc. v. AirWater Patents Corporation, et al*
> *Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

We have received your draft motion and considered your request to continue the discovery deadline, which expires on Friday, March 23, 2007, for sixty days. We do not agree to extend the discovery deadline. As the depositions of the parties were previously scheduled, we anticipate that those depositions will go forward after we receive the documents we have requested from your client.

Very truly yours,

*Maura Greene*

Maura A. Greene

MAG/aec

cc:     Thomas J. Conte, Esquire

{Client Files\LIT\304269\0002\COR\F0397054.DOC:1}

BOWDITCH & DEWEY LLP  175 CROSSING BOULEVARD  SUITE 500  FRAMINGHAM MA 01702
T 508.879.5700  F 508.875.1141  www.bowditch.com

$\mathcal{B}$



*Bowditch*
*&Dewey*
ATTORNEYS

Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

## *FACSIMILE TRANSMITTAL SHEET*

| | | |
|---|---|---|
| **TO:** Matthew P. Zayotti, Esq. | **FAX NUMBER:** 617-951-1354 | **PHONE NUMBER:** 617-951-1400 |
| **DATE:** March 22, 2007 | | |
| **FROM:** Maura A. Greene | **TOTAL NO. OF PAGES INCLUDING COVER:** 2 | |
| **RE:** J.J. Reidy & Co., Inc. v. AirWater Corporation | **CLIENT/MATTER NUMBER:** 304269.0002 | |

URGENT      FOR REVIEW      PLEASE COMMENT      PLEASE REPLY      PLEASE RECYCLE

## CONFIDENTIALITY NOTE

The documents accompanying this facsimile transmission contain information from the law firm of Bowditch & Dewey, LLP, which is confidential and/or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this faxed information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.

If you do not receive all pages or receive this fax in error, please call Amy at (508) 416-2454.

{Client Files\LIT\304269\0002\FAX\F0397161.DOC;1}





*Bowditch*
*&Dewey*
ATTORNEYS

**Maura A. Greene**
Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

March 7, 2007

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

Re:     *J.J. Reidy Co., Inc. v. AirWater Patents Corporation, et al*
        *Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

        I enclose the following in the above-referenced matter:

1.      Plaintiff J.J. Reidy & Co., Inc.'s Supplemental Answers to Defendant Airwater
        Patents Corporation's First Set of Interrogatories to Plaintiff; and

2.      Plaintiff J.J. Reidy & Co., Inc.'s Supplemental Answers to Defendant Airwater
        Patents Corporation's First Request for Production of Documents;

        The responsive documents will be sent under separate cover.

                                        Very truly yours,

                                        Maura A. Greene

MAG/aec
Enclosures

cc:     Thomas J. Conte, Esquire

{Client Files\LIT\304269\0002\COR\F0394502.DOC;1}

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS                                    CIVIL ACTION NO.  05-40049-FDS

J.J. REIDY & CO., INC..                        )
                                               )
                    Plaintiff,                 )
                                               )
v.                                             )
                                               )
AIRWATER CORPORATION and                       )
AIRWATER PATENTS CORPORATION,                  )
                                               )
                    Defendants,                )

### PLAINTIFF J.J. REIDY & CO., INC.'S SUPPLEMENTAL ANSWERS TO DEFENDANT AIRWATER PATENTS CORPORATION'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Pursuant to Rule 33 of the Massachusetts Rules of Civil Procedure, Plaintiff, J.J. Reidy &

Co., Inc. ("J.J. Reidy") responds to Defendant AirWater Patents Corporation's First Set of

Interrogatories as follows:

### GENERAL OBJECTIONS

1.      The plaintiff objects to each and every interrogatory to the extent that it seeks

information protected by the attorney-client privilege and/or the work product doctrine.

2.      The plaintiff objects to each and every interrogatory to the extent that it purports

to establish a continuing duty to supplement, or seeks to impose a duty beyond those imposed by

the Massachusetts Rules of Civil Procedure.

3.      Each of the General Objections shall be deemed to apply to each of the

defendant's separate interrogatories.

{Client Files\LIT\304269\0002\PLD\00852935.DOC;1}

## INTERROGATORIES

Interrogatory No. 1

Please state your full name, date of birth, residential address, social security number,

educational background, and most recent occupation and employment, title, and business

address.

A nswer No. 1

Objection. The plaintiff objects to the request to the extent it seeks Mr. Reidy's social

security number as the request is not reasonably calculated to lead to the discovery of admissible

evidence and Mr. Reidy is not a named party to the lawsuit. Subject to and without waiving the

foregoing objection, the plaintiff answers as follows: James J. Reidy, February 22, 1941, 1260

Main Street, Holden, MA 01520, Associate of Science degree, Stockbridge School of

Agriculture, Bachelor of Science Degree, University of Massachusetts, Amherst, President of J.J.

Reidy & Co., Inc., 1260 Main St., Holden, MA 01520.

Interrogatory No. 2

Please describe any actions you have taken in connection with preparing your responses

to these interrogatories, including but not limited to identifying separately, with respect to each

of your responses, any documents reviewed, any persons you have consulted and the substance

of the information obtained from each such document or person in connection with each such

response.

Answer No. 2

The plaintiff objects to this interrogatory to the extent that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The

plaintiff further objects on the grounds of attorney-client privilege, work product doctrine and

or/trial strategy. Subject to and without waiving the foregoing objections, Mr. Reidy on behalf of

2

the plaintiff answers as follows: I have searched for, reviewed and collected all the documents pertinent to this litigation and have supplied them to our attorney and the defendant as requested in their First Request for Production of Documents.  Other than my attorneys, I have not consulted with anyone else in terms of responding to these interrogatories.

Interrogatory No. 3

Please identify all persons who have any knowledge of, or have expressed any opinion with respect to, any relevant facts relating to this litigation and as to each such person state fully and completely the knowledge and/or opinion such person has or has expressed.

Answer No. 3

The plaintiff objects to this interrogatory to the extent that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  The plaintiff further objects on the grounds of attorney-client privilege, work product doctrine and/or trial strategy.  Subject to and without waiving the foregoing objections, Mr. Reidy on behalf of the plaintiff answers as follows: Any discussions I had with my attorneys, including Brian Dingman, are protected by the attorney client privilege.  There are no other persons, outside of friends or family, who have expressed an opinion.

Interrogatory No. 4

Please identify each communication, whether oral or written, between Benoit on the one hand and Wynee and or Wynne Oil on the other hand, which constitutes, relates or refers to the basis of, or any event, act, omission, fact or circumstance relating to, any claim made by Benoit in this litigation.

Answer No. 4

This interrogatory does not relate to this litigation and no response is therefore required.

3

Interrogatory No. 5

Please state each and every material fact that supports your allegation in paragraph 9 of your First Amended Complaint that "Defendants failed to commit resources and put forth best efforts in accomplishing, completing, and fulfilling their promises to establish and maintain the awareness and exposure of products manufactured by Defendants based on the patents licensed by J.J. Reidy and to enhance sales and future growth."

Answer No. 5

Prior to signing, the defendant assured me that there was $2 million available to market these products. To the best of my knowledge, although the defendant promised to commit $2 million, those funds were never available or used for marketing.

Moreover, the defendants' continuous and intentional disregard for their obligation to build products that conformed to the technology of the Licensed Patents, was a failure to use best efforts. The initial samples the defendant intended to use to demonstrate the product to the Army did not include the critical safety features nor the specific water treatment sequences of the Licensed Patents. A proper and successful evaluation by the Army of the technology in the Licensed Patents was therefore impossible and the subsequent lack of sales to the Army supports this conclusion. Furthermore, the defendant prepared sales literature for a concept unit that described improper water flow and treatment, contrary to the technology specified in the Licensed Patents. The defendant was building the product without the specifications and had molds made without the product specifications.

On or before March 4, 2005 the defendants' President, Michael J. Zwebner, willingly formed a new company, Atmospheric Water Technologies, Inc., in direct competition to AirWater Patents. This is a major breach of the License Agreement.

4

On October 13, 2005 the defendants' President, Michael J. Zwebner, willingly formed another new company, Air Water Fridges and Freezers Corp., in direct competition to AirWater Patents. This is a major breach of the License Agreement.

The plaintiff reserves the right to supplement this response.

Interrogatory No. 6

Please state each and every material fact that supports the allegation in paragraphs 8 and 11 of your First Amended Complaint to the effect that AirWater Patents breached the parties Global Manufacturing and Marketing Licensing Agreement by failing to make its required minimum monthly royalty payments to J.J. Reidy, including in your response without limitation identification of the specific provisions of the Global Manufacturing and Marketing Licensing Agreement that you contend AirWater Patents breached.

Answer No. 6

Under the bold heading MINIMUM MONTHLY ROYALTY PAYMENTS in the Global Manufacturing and Marketing Licensing Agreement, the Licensing Agreement provides as follows: "LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above whichever is the more." The preceding provision in the Licensing Agreement, entitled ROYALTY PAYMENTS, sets forth the agreement as to the calculation of royalty payments which are over the $10,000 minimum. The provision entitled TERM OF LICENSE, is also applicable, because it sets forth the term of the license, during which the royalty payments were due.

Mr. Zwebner contended he needed some breathing room to prepare for this minimum monthly payment and we ultimately agreed that the beginning of these minimum payments could

5

be postponed until November 1, 2003. It was also discussed and agreed that the reason a minimum monthly payment was required was to protect the plaintiff because the plaintiff was granting an exclusive license.   The defendant breached the agreement when it stopped paying royalties.

Also, see my answer to Interrogatory No. 7 regarding other breaches of this Licensing Agreement.

Interrogatory No. 7

Please state each and every material fact that supports your breach of contract claim against AirWater Corporation.

Answer No. 7

Objection.  The plaintiff has moved to amend the Complaint to include a claim for intentional misrepresentation against AirWater Corporation.  The claim is based upon the intentional misrepresentation of AirWater Corporation that it had $2 million in financing available to market the products based upon J.J. Reidy's patents.

Supplemental Answer No. 7

The plaintiff's Second Amended Complaint does not contain a breach of contract claim against AirWater Corporation and therefore no response is required.

Interrogatory No. 8

Please identify and describe the content of all communications by and between you and or James J. Reidy on the one hand, and Brian Dingman on the other hand, regarding the subject matter of this litigation, including without limitation the patents referred to in paragraph 4 of your First Amended Complaint.

6

Answer No. 8

The plaintiff objects to this interrogatory to the extent that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The

plaintiff further objects on the grounds of attorney-client privilege, work product doctrine and/or

trial strategy.

Supplemental Answer No. 8

The plaintiff states that Mr. Reidy asked Mr. Dingman if he could represent J.J. Reidy in

this lawsuit and Mr. Dingman said he could not because he had previously represented Mr.

Zwebner. Mr. Reidy asked Mr. Dingman's opinion on whether the license was properly

terminated and Mr. Dingman gave his opinion that the license was properly terminated and that

AirWater no longer had a license. There were conversations between Mr. Zwebner, Mr. Reidy

and Mr. Dingman in 2003 and 2004 regarding several patent application fees due, deadlines for

paying them and consequences for not paying them.

Interrogatory No. 9

Please identify and describe the content of all communications by and between you

and/or James J. Reidy on the one hand, and any third party regarding the subject matter of this

litigation.

Answer No. 9

The plaintiff objects to this interrogatory to the extent it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The

plaintiff further objects on the grounds of the attorney-client privilege, work product doctrine and

or trial strategy. Subject to and without waiving the foregoing objections, Mr. Reidy on behalf

of the plaintiff states as follows: Since the litigation between the parties has become publicly

7

known I have received a number of inquiries from the press and others regarding the lawsuit. I did not log these inquiries. However, in general, I recall informing them that the lawsuit was being decided in the Federal Court. In addition, I recall a conversation with Mike Klein in which he told me that Zwebner told him that he (Zwebner) knew that he was in breach of the Licensing Agreement between us, but that he was going to drag out the litigation as long as he could in the hopes that I would become financially exhausted and default on my lawsuit against him.

Supplemental Answer No. 9

Mr. Reidy obtained inquiries and emails from various people all over the world regarding the patents at a rate of 10 to 25 per month, with various levels of interest. In the summer of 2005, Arthur Neumann, the President of Free Water Company, called Mr. Reidy and wanted to know the status of Mr. Reidy's patents and expressed interest in them. Mr. Reidy informed Mr. Neumann that he had terminated the license with AirWater and he didn't want to license them, but he wanted to sell the patents. Mr. Reidy informed Mr. Neumann that there was litigation between AirWater Corporation, AirWater Patents and J. J. Reidy, but Mr. Neumann remained interested. Mr. Reidy and Mr. Neumann negotiated a patent and asset purchase agreement in October of 2005.

Interrogatory No. 10

Please identify each and every contract by and between you and any third party relating to the patents and or water production/generation system referred to in paragraph 4 of your First Amended Complaint, including but not limited to any licenses, sublicenses, marketing and or manufacturing agreements.

8

Answer No. 10

The plaintiff objects to the interrogatory to the extent that it seeks information following the proper termination of the Licensing Agreement on the grounds that such information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without the foregoing obligation, the plaintiff states as follows:

There are no contracts prior to the termination of the Licensing Agreement.

Supplemental Answer No. 10

J. J. Reidy does not have any licenses, sublicenses, marketing and or manufacturing agreements. As stated previously, there is a patent and asset purchase agreement dated October of 2005 between J. J. Reidy and Free Water Company.

Interrogatory No. 11

Please identify and describe the content of any and all communications by and between you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or Michael Zwebner on the other hand, regarding the anticipated lack of royalties during the Defendants' start-up phase in marketing the water production/generation system referred to in paragraph 4 of your First Amended Complaint.

Answer No. 11

During the six months of communications and negotiations between Mr. Zwebner and myself before signing the Licensing Agreement, we agreed that it would be in our best mutual interests to minimize the burden of cash outflow during the initial start-up phase to allow the best opportunity for success. We agreed, therefore, that the stated minimum monthly royalties would not begin until November 1, 2003 some 5 or 6 months away.

9

Interrogatory No. 12

Please identify and describe the content of any and all communications by and between you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or Michael Zwebner on the other hand, regarding quarterly royalty payments under the Global Manufacturing and Marketing Licensing Agreement.

Answer No. 12

I recall having communications with Michael Zwebner regarding quarterly royalty payments.

Supplemental Answer No. 12

Mr. Reidy and Mr. Zwebner first discussed having a non-exclusive license. Mr. Zwebner then changed the discussion to his company having an exclusive license. When the conversation shifted to Mr. Zwebner's desire to have an exclusive license, Mr. Reidy told Mr. Zwebner that he wanted minimum monthly royalties because his income from the patents would be limited to the amount he received from AirWater Corporation. Mr. Zwebner and Mr. Reidy discussed their understanding that AirWater Corporation would make quarterly payments to Mr. Reidy as to the other royalties due above and beyond the $10,000 per month.

Interrogatory No. 13

Please identify and describe the content of any and all communications by and between you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or Michael Zwebner on the other hand, regarding minimum monthly royalty payments under the Global Manufacturing and Marketing Licensing Agreement, including but not limited to the parties' intent to limit the minimum monthly royalty payment obligation to a period of one year.

10

Answer No. 13

I don't recall any communications with Michael Zwebner to limit the minimum monthly payment obligation under the License Agreement to a period of one year.

Interrogatory No. 14

Please identify and describe the content of any and all communications by and between you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or Michael Zwebner on the other hand, regarding the anticipated lack of royalties during the Defendants' start-up phase in marketing the water production/generation system referred to in paragraph 4 of your First Amended Complaint.

Answer No. 14

This interrogatory is worded exactly the same as Interrogatory No. 11.

Please refer to the response to Interrogatory No. 11.

Interrogatory No. 15

Please state each and every material fact that supports the allegation in paragraph 13 of your First Amended Complaint that "J.J. Reidy has fulfilled all of its obligations under the License."

Answer No. 15

Reidy provided AirWater with all technical data, photographs, drawings, and various texts in his possession, some of which is being used by AirWater to this day.

Reidy maintained the validity and good standing of the patents with timely payments of maintenance fees to the United States Patent Office. In terms of transfer of custody, know how and technical assistance, Reidy provided all information in his possession that AirWater would accept.

11

Reidy granted AirWater the required 14 day period of notice/grace in which AirWater could make good on any outstanding amount. In fact, Michael Zwebner, had an additional 14 days as Reidy supplied a second grace period to AirWater Patents.

Further, Reidy returned telephone calls and responded to emails in a timely fashion.

Reidy also traveled at AirWater's request, and to AirWater's schedule, in every instance, including trips to Boston, Miami, London, Tel Aviv, Jerusalem and numerous local business trips.

Reidy also repeatedly offered his services and know how at the discretion of AirWater.

The plaintiff granted a license to AirWater Corporation (which was then assigned to AirWater Patents Corporation) of the United States Patents described in the License Agreement. The defendants, however, failed to pay the royalty payments due and owing under the License Agreement.

Interrogatory No. 16

If you contend that you cooperated, assisted and or contributed financially to the defense of the action entitled Electric & Gas Technology, Inc. et al. v. Universal Communications, Inc., et al., United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 03-1798G, please state each and every material fact that supports your contention.

Answer No. 16

The plaintiff objects to this interrogatory to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence.

12

Supplemental Answer No. 16

Mr. Reidy repeatedly requested that Mr. Zwebner allow him to participate in the counterclaim, and Mr. Zwebner informed Mr. Reidy that he should file his own suit. Mr. Zwebner also questioned Mr. Reidy as to why he would want to get involved in the lawsuit.

Interrogatory No. 17

Please identify and describe the content of any and all communications by and between you and or James J. Reidy on the one hand, and Electric & Gas Technology, Inc., Atmospheric Water Technology, Inc. and or Richard Ehrlich on the other hand.

Answer No. 17

The plaintiff objects to the interrogatory to the extent it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objection, the plaintiff states as follows:

Reidy has never met or communicated with Richard Ehrlich in any manner.

Supplemental Answer No. 17

In 1994, Mr. Reidy spoke with Mort Zimmerman of Electric & Gas Technology, Inc. with regard to manufacturing Mr. Reidy's machines for a potential New Zealand licensee. They spoke about royalties that would be paid, but the deal fell through.

Interrogatory No. 18

Please identify and describe the content of any and all communications by and between you and or James J. Reidy on the one hand, and World Wide Water, Inc., World Wide Water, LLC and or Mike Klein on the other hand.

13

Answer No. 18

The plaintiff objects to the interrogatory to the extent it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The plaintiff further objects to this interrogatory on the ground that it is unlimited in time and scope rendering it unanswerable in its present form.

Supplemental Answer No. 18

With respect to any communications relating to patents and licensing arrangements from January 2003 to date and continuing, James Reidy states that he had discussions with Mike Klein and Mr. Zwebner because Mr. Klein and Mr. Zwebner were going to agree that Mr. Klein could manufacture a machine that converted water vapor from the air into drinking water. Mr. Zwebner agreed that Mr. Klein could make the machine, and Mr. Klein in return stated that he would not bring suit against Mr. Zwebner for patent infringement provided that Mr. Zwebner manufactured only Mr. Reidy's machine. Mr. Reidy warned Mr. Zwebner that he could not make Mr. Klein's machine.

Interrogatory No. 19

Please identify each person you expect to call as a fact witness at trial and for each person state:

a)      his/her name;

b)      address;

c)      telephone number; and

d)      fully and completely, the substance of the testimony to be given.

Answer No. 19

The plaintiff objects to this interrogatory on the grounds of attorney-client privilege, work product doctrine and/or trial strategy. Subject to and without waiving the foregoing objections, the plaintiff answers as follows: the plaintiff has not yet determined who will be called as a fact witness at the trial of this matter.

Supplemental Answer No. 19

To date, the plaintiff anticipates calling James J. Reidy, 1260 Main Street, Holden, MA 01520. Mr. Reidy is expected to testify as to the patents for the air to water technology, the registration of the patents, the licensing agreement entered into with AirWater Corporation, the assignment to Air Water Patents, royalty payments made and royalty payments Air Water Patents owes to J.J. Reidy. The plaintiff may call Michael Zwebner as a witness with regard to the licensing agreement, payment of royalties, and licensing and sublicensing agreements. The plaintiff has not determined what other witnesses it may call or on what other topics Mr. Reidy or Mr. Zwebner may be asked to testify at trial.

Interrogatory No. 20

Please identify each person you expect to call as an expert witness at trial and for each person state:

a)      his/her name;

b)      address;

c)      the subject matter upon which he/she is expected to testify;

d)      the substance of the facts and opinions to which he/she is expected to testify; and

e)      fully and completely the substance of the grounds for each opinion.

15

trial. The plaintiff will seasonably supplement its response to this interrogatory, as appropriate, in accordance with the rules for expert disclosures.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14th DAY OF FEBRUARY, 2007

James J. Reidy, President
J.J. Reidy & Co., Inc.

AS TO OBJECTIONS:

Thomas J. Conte (BBO#566092)
Maura A. Greene (BBO #547204)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615
(508) 926-3415
FAX: (508) 929-3006

Dated: March 7, 2007

16

## CERTIFICATE OF SERVICE

I, Maura Greene, hereby certify that on this 7th day of March, 2007, I served a copy of the foregoing via U.S. mail on Defendants' counsel, Matthew Zayotti, Esq., Keegan Werlin LLP, 265 Franklin Street, Boston, MA 02110-3113.

Maura A. Greene, Esq.

17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS                              CIVIL ACTION NO. 05-40049-FDS

J.J. REIDY & CO., INC.,.                          )
                Plaintiff,          )
                                                  )
v.                                                )
                                                  )
AIRWATER CORPORATION AND                          )
AIRWATER PATENTS CORPORATION,                     )
              Defendants.         )

## **PLAINTIFF J.J. REIDY & CO., INC.'S SUPPLEMENTAL RESPONSE TO DEFENDANT AIRWATER PATENTS CORPORATION'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rule 34 of the Massachusetts Rules of Civil Procedure, plaintiff, J.J. Reidy &

Co., Inc. responds to Defendant AirWater Patents Corporation's first request for production of

documents as follows:

### GENERAL OBJECTIONS

1.      The plaintiff, without admitting that any of the documents requested are relevant

to the subject matter of this action or that the production of said documents would be reasonably

calculated to lead to the discovery of admissible evidence or that said documents exist, will

produce documents responsive to the defendant's request at the office of Bowditch & Dewey,

LLP in Worcester, Massachusetts.

2.      The plaintiff objects to any requests for documents which fall beyond the scope of

permitted discovery as defined by Rule 26 of the Massachusetts Rules of Civil Procedure. More

particularly, the plaintiff will not produce documents which are privileged or which were

prepared in anticipation of litigation or for trial by or for plaintiff or by or for any of its

representatives. Additionally, the plaintiff objects to the defendant's specific requests to the extent that they are irrelevant, unduly burdensome, or purport to impose obligations beyond those imposed by the Massachusetts Rules of Civil Procedure.

The following responses to specific requests are made subject to and without waiving these general objections.

## DOCUMENT REQUESTS

### Request No. 1

All documents requested to be identified in AirWater Patent's first (or any subsequent) set of interrogatories to Plaintiff.

#### Response No. 1

The plaintiff objects to this request to the extent that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

#### Supplemental Response No. 1

The plaintiff has produced documents responsive to this request.

### Request No. 2

All documents upon which you rely in asserting this action against AirWater Patents Corporation and/or AirWater Corporation.

#### Response No. 2

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The plaintiff objects to this request to the extent it is ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and

2

without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 3

All documents identified in Plaintiff J.J. Reidy & Co., Inc.'s Automatic Discovery Disclosure.

Response No. 3

The plaintiff states that documents responsive to this request will be produced.

Request No. 4

All documents or communications that constitute, relate or refer to the Global Manufacturing and Marketing Licensing Agreement.

Response No. 4

The plaintiff objects to this request to the extent it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 5

All documents or communications that relate or refer to the transfer or assignment of all the rights and liabilities of the Global Manufacturing and Marketing Licensing Agreement from AirWater Corporation to AirWater Patents Inc. dated June 25, 2003.

Response No. 5

The plaintiff states that documents responsive to this request, if any, will be produced.

3

Request No. 6

All documents or communications that relate or refer to any alleged default by AirWater Corporation and or AirWater Patents under the Global Manufacturing and Marketing Licensing Agreement.

Response No. 6

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 7

All documents or communications that relate or refer to the action entitled Electric & Gas Technology, Inc. et al. v. Universal Communications, Inc., et al., United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 03-1798G.

Response No. 7

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The plaintiff further objects to this request to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 8

All documents that relate or refer to your efforts in defending the action entitled Electric & Gas Technology, Inc. et al. v. Universal Communications, Inc., et al., United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 03-1798G, and or your contribution of funds in connection therewith.

4

Response No. 8

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The plaintiff further objects to this request to the extent that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 9

All documents or communications that constitute, relate or refer to royalty payments from AirWater Corporation and or AirWater Patents to J.J. Reidy.

Response No. 9

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 10

All documents or communications that relate or refer to the patents referred to in paragraph 4 of your First Amended Complaint.

Response No. 10

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The plaintiff further objects to the request to the extent it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, the plaintiff states that the documents responsive to this request, if any, will be produced.

5

Supplemental Response No. 10

The plaintiff will produce documents with respect to any communication between the Plaintiff and any other entity concerning patents during the period from January 2003 to January 2006, in accordance with the order of the Court dated January 29, 2007.

Request No. 11

All documents or communications that relate or refer to Patent Nos. 5,106,512; 5,149,446; 5,203,989; and 5,366,705.

Response No. 11

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The plaintiff further objects to the interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Response No. 11

The plaintiff will produce documents with respect to any communication between the Plaintiff and any other entity concerning patents during the period from January 2003 to January 2006, in accordance with the order of the Court dated January 29, 2007.

Request No. 12

All documents or communications that reflect, relate or refer to the world-wide registration, enforceability and or validity of the patents for the water production/generation system referred to in paragraph 4 of your First Amended Complaint.

6

Response No. 12

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The plaintiff states that the documents responsive to this request, if any, will be produced.

Supplemental Response No. 12

The plaintiff will produce any non-privileged documents and to the extent that documents have been withheld due to privilege, the plaintiff will produce a privilege log.

Request No. 13

All documents or communications that relate or refer to the water production/generation system referred to in paragraph 4 of your First Amended Complaint.

Response No. 13

The plaintiff states that the documents responsive to this request, if any, will be produced.

Request No. 14

All documents or communications that constitute, relate or refer to negotiations regarding any and all provisions of the Global Manufacturing and Marketing Licensing Agreement.

Response No. 14

The plaintiff states that the documents responsive to this request, if any, will be produced.

Request No. 15

All documents or communications that constitute, relate or refer to Defendants' efforts to establish and maintain the awareness and exposure of products manufactured by Defendants based on the patents by J.J. Reidy and to enhance sales and future growth of such products as referred to in paragraphs 7 and 9 of your First Amended Complaint.

7

Response No. 15

The plaintiff states that the documents responsive to this request, if any, will be produced.

Request No. 16

All documents that support your computation of damages.

Response No. 16

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Supplemental Response No. 16

The plaintiff will produce any non-privileged documents and to the extent that documents have been withheld due to privilege, the plaintiff will produce a privilege log.

Request No. 17

All documents which you intend to offer into evidence at the trial of this matter.

Response No. 17

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine and/or trial strategy. Subject to and without waiving the foregoing objections, the plaintiff answers as follows: the plaintiff has not yet determined what documents it intends to offer into evidence at the trial of this matter.

Supplemental Response No. 17

The plaintiff will produce any non-privileged documents and to the extent that documents have been withheld due to privilege, the plaintiff will produce a privilege log.

8

Request No. 18

All documents relating to the subject matter of this litigation.

Response No. 18

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The plaintiff objects to this request to the extent it is ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 19

All documents that constitute, relate or refer to communications between you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or Michael J. Zwebner on the other hand.

Response No. 19

The plaintiff objects to this request to the extent that it is ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Response No. 19

The plaintiff previously produced documents responsive to this request and will produce additional documents responsive to this request.

Request No. 20

All documents or communications that constitute, relate or refer to any and all payments other than royalty payments made by AirWater Corporation and or AirWater Patents to J.J. Reidy.

9

Response No. 20

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 21

All documents that constitute, relate or refer to communications regarding minimum monthly royalty payments under the Global Manufacturing and Marketing Licensing Agreement.

Response No. 21

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 22

All documents that constitute, relate or refer to communications regarding quarterly royalty payments under the Global Manufacturing and Marketing Licensing Agreement.

Response No. 22

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 23

All documents or communications that constitute, relate or refer to tender of the disputed minimum monthly royalty payments by AirWater Corporation and or AirWater Patents, including but not limited to the parties' intent to limit the minimum monthly royalty payment obligation to a period of one year.

Response No. 23

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 24

All documents that constitute, relate or refer to communications regarding the anticipated lack of royalties during the Defendants' start-up phase in marketing the water production/generation system referred to in paragraph 4 of your First Amended Complaint.

<u>Response No. 24</u>

The plaintiff states that documents responsive to this request, if any, will be produced.

<u>Request No. 25</u>

All documents or communications that constitute, relate or refer to the issuance of stock by AirWater Corporation, AirWater Patents and or UCSY to you.

<u>Response No. 25</u>

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

<u>Supplemental Response No. 25</u>

The plaintiff will produce documents responsive to this request in accordance with the order of the Court dated January 29, 2007.

<u>Request No. 26</u>

All documents that constitute, relate or refer to newspaper articles, press articles and or any other publications regarding the subject matter of this action.

<u>Response No. 26</u>

The plaintiff objects to this request to the extent it is ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

<u>Supplemental Response No. 26</u>

The plaintiff will supplement its response in accordance with the order of the Court dated January 29, 2007.

11

Request No. 27

All documents that constitute, relate or refer to the disposition of the UCSY, AirWater Corporation and or AirWater Patents stock issued to you.

Response No. 27

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Response No. 27

The plaintiff will supplement its response in accordance with the order of the Court dated January 29, 2007.

Request No. 28

All documents that constitute, relate or refer to any and all agreements by and between you and or any third party to license, sublicense, market and or manufacture the patents and or water production/generation system referred to in paragraph 4 of your Amended Complaint.

Response No. 28

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Response No. 28

The plaintiff will supplement its response as to documents relating to agreements from January 2003, in accordance with the order of the Court dated January 29, 2007.

Request No. 29

All documents that constitute, relate or refer to any and all gross revenues and profits you have received as a result of any and all agreements by and between you and or any third party to

12

license, sublicense, market and or manufacture the patents and or water production/generation

system referred to in paragraph 4 of your Amended Complaint.

#### Response No. 29

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to

the discovery of admissible evidence.

#### Supplemental Response No. 29

The plaintiff will supplement its response as to documents relating to agreements from

January 2003, in accordance with the order of the Court dated January 29, 2007.

#### Request No. 30

All documents that constitute, relate or refer to any and all efforts on your part to solicit

licensing, sublicensing, marketing and or manufacturing agreements by and between you and any

third party regarding the patents and or water production/generation system referred to in

paragraph 4 of your Amended Complaint.

#### Response No. 30

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to

the discovery of admissible evidence.

#### Supplemental Response No. 30

The plaintiff will supplement its response as to documents relating to agreements from

January 2003, in accordance with the order of the Court dated January 29, 2007.

#### Request No. 31

All documents or communications that constitute, relate or refer to termination of the

Global Manufacturing and Marketing Licensing Agreement.

Response No. 31

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 32

All documents that constitute relate or refer to communications by and between you and or James J. Reidy on the one hand, and Brian Dingman on the other hand regarding the subject matter of this litigation, including without limitation the patents referred to in paragraph 4 of your First Amended Complaint.

Response No. 32

The plaintiff objects to this request to the extent it seeks documents which are protected by disclosure by the attorney-client privilege and the work product doctrine. The plaintiff further states that an attorney-client relationship exists between James J. Reidy and Brian Dingman and any documents the defendant seeks in request no. 32 are protected by the attorney-client privilege and the work product doctrine.

Supplemental Response No. 32

The plaintiff will supplement its response in accordance with the order of the Court dated January 29, 2007.

Request No. 33

All documents that constitute, relate or refer to communications by and between you and or James J. Reidy on the one hand, and any third party regarding the subject matter of this litigation.

Response No. 33

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege and work product doctrine. The plaintiff objects

14

to this request to the extent it is ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Supplemental Response No. 33

The plaintiff will supplement its response in accordance with the order of the Court dated January 29, 2007.

Request No. 34

All documents or communications that relate or refer to the financial condition of J.J. Reidy, including but not limited to any and all tax returns, financial statements, income statements and balance sheets from 2000 through the present.

Response No. 34

The plaintiff objects to this request as it is overly burdensome, not relevant and not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 35

All documents or communications that relate or refer to the parties' rights and obligations under the Global Manufacturing and Marketing Licensing Agreement.

Response No. 35

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 36

All documents or communications with respect to J.J. Reidy that constitute, relate or refer to any and all:

a.    minutes and consent actions of the directors and shareholders;

15

b.    meetings of the directors and shareholders;

c.    corporate filings including but not limited to articles of organization, changes of

officers and directors, and annual reports;

d.    shareholder agreements and any amendments thereto;

e.    by-laws and any amendments thereto.

Response No. 36

The plaintiff objects to this request to the extent that it is ambiguous, overly broad,

unduly burdensome and not reasonably calculated to lead to the discovery of admissible

evidence.

Supplemental Response No. 36

The plaintiff will supplement its response in accordance with the order of the Court dated

January 29, 2007.

J.J. REIDY & COMPANY, INC.
By its attorneys,

Thomas J. Conte (BBO #566092)
Maura A. Greene (BBO #547204)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated:  March 8, 2007

16

## CERTIFICATE OF SERVICE

I, Maura Greene, hereby certify that on this 14th day of March, 2007, I served a copy of the foregoing via U.S. mail on Defendants' counsel, Matthew Zayotti, Esq., Keegan Werlin LLP, 265 Franklin Street, Boston, MA 02110-3113.

_Maura A. Greene_

Maura A. Greene, Esq.

17

# EXHIBIT C



**Bowditch**
**&Dewey**
ATTORNEYS

Maura A. Greene
Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

March 8, 2007

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

Re:    *J.J. Reidy Co., Inc. v. AirWater Patents Corporation, et al*
       *Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

    I enclose documents bate stamp numbered JJR 643 through JJR 739. These supplemental documents are responsive to Defendant Airwater Patents Corporation's First Request for Production of Documents.

                            Very truly yours,

                            Maura A. Greene

MAG/aec
Enclosures

cc:    Thomas J. Conte, Esquire

{Client Files\LIT\304269\0002\COR\F0394874.DOC;1}

BOWDITCH & DEWEY, LLP  175 CROSSING BOULEVARD  SUITE 500  FRAMINGHAM, MA 01702
T 508 879 5700  F 508 872 1492  www.bowditch.com                *Boston  Framingham  Worcester*

**EXHIBIT D**



*Bowditch*
*&Dewey*
ATTORNEYS

Maura A. Greene
Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

March 9, 2007

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

**Re:** ***J.J. Reidy Co., Inc. v. AirWater Patents Corporation, et al***
***Civil Action No. 05-40049-FDS***

Dear Mr. Zayotti:

I enclose additional documents bate stamp numbered JJR 740 through JJR 775. These supplemental documents are responsive to Defendant Airwater Patents Corporation's First Request for Production of Documents.

Very truly yours,

Maura A. Greene

MAG/kbm
Enclosures

cc:    Thomas J. Conte, Esquire

[Client Files\LIT\304269\0002\COR\F0395104.DOC:1]

BOWDITCH & DEWEY, LLP  175 CROSSING BOULEVARD  SUITE 500  FRAMINGHAM, MA 01702
T 508 879 5700  F 508 872 1492  www.bowditch.com        *Boston  Framingham  Worcester*

**EXHIBIT E**

# PATENT and ASSET

# PURCHASE AGREEMENT

DATED AS OF October 4, 2005

BETWEEN

J.J. REIDY & CO., INC.

AS SELLER

AND

FREE WATER COMPANY

AS BUYER

JJR 702

# TABLE OF CONTENTS

01.0 DEFINITIONS    3
02.0 PURCHASE AND SALE OF THE PURCHASED ASSETS    8
02.1. ASSETS BEING ASSIGNED TO BUYER    8
02.2. EXCLUDED ASSETS    9
02.3. ASSUMED OBLIGATIONS    9
02.4. PURCHASE PRICE    9
02.5. FURTHER ASSURANCES    9
03.0 CLOSING    10
04.0 NO OTHER LICENSES    10
05.0 FUTURE PAYMENTS AND SHARE OF MILESTONE AND OTHER PAYMENTS.    10
05.1. FUTURE PAYMENTS.    10
05.2. RECORDS    11
05.3. REPORTS AND PAYMENTS.    12
05.4. FORM OF PAYMENT    12
05.5. TAXES    12
05.6. INTEREST    12
06.0 PROTECTION OF INTELLECTUAL PROPERTY RIGHTS    13
06.1. PATENT PROSECUTION/PATENT COSTS    13
06.2. CONFIDENTIAL INFORMATION    13
06.3. ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS    13
07.0 COVENANTS OF BUYER    14
07.1. DUE DILIGENCE    14
07.1.2. GENERAL OBLIGATION    14
07.1.3. SPECIFIC DUE DILIGENCE OBLIGATIONS    15
07.1.4. FAILURE TO MEET DUE DILIGENCE OBLIGATIONS    15
07.1.5. REPORTS    15
07.1.6. FORCE MAJEURE    15
07.2. COMPLIANCE WITH LAW    16
07.3. MARKING    16
07.4. PUBLICITY    16
08.0 COVENANTS OF SELLER    16
09.0 REPRESENTATIONS AND WARRANTIES OF SELLER    16
09.1. DUE ORGANIZATION, AUTHORIZATION AND GOOD STANDING    16
09.10 DISCLAIMER OF WARRANTIES; FEDERAL PATENT POLICY    19

09.11. FULL DISCLOSURE    19
09.2. NO CONFLICT    17
09.3. TITLE TO DR EQUIPMENT    17
09.4. DR TECHNOLOGY    17
09.6. CONSENTS    18
09.7. PROPRIETARY INFORMATION OF THIRD PARTIES    18
09.8. LITIGATION    18
09.9. TAXES    19
10.0 REPRESENTATIONS AND WARRANTIES OF BUYER    19
10.1. DUE ORGANIZATION, AUTHORIZATION AND GOOD STANDING    19
10.2. NO CONFLICT    20
10.3. DISCLAIMER OF WARRANTIES    20
11.0 TERM    21
12.0 INDEMNIFICATION    21
12.1. SURVIVAL OF REPRESENTATIONS AND WARRANTIES    21
12.2. INDEMNIFICATION BY SELLER    21
12.3. INDEMNIFICATION BY BUYER    22
13.0 INSURANCE    23
13.1. INSURANCE OBLIGATIONS OF BUYER    23
14.0 LIMITATION OF LIABILITY    24
15.0 EXPENSES OF TRANSACTION    24
16.0 CONDUCT OF PARTIES    24
17.0 NOTICES    24
18.0 ENTIRE AGREEMENT; MODIFICATIONS AND AMENDMENTS    25
19.0 ASSIGNMENT    25
20.0 GOVERNING LAW, VENUE    25
21.0 DISPUTE RESOLUTION    26
22.0 INDEPENDENT CONTRACTORS    26
23.0 SEVERABILITY    26
24.0 NO WAIVER    26
25.0 COUNTERPARTS    27
26.0 HEADINGS    27
27.0 EXHIBIT (A) Assigned Patents    29
28.0 EXHIBIT (B) Bill of Sale and Disclosure Schedule    65

Initial _____   Initial JSR

2

## PATENT AND ASSET PURCHASE AGREEMENT

This Patent and Asset Purchase Agreement ("AGREEMENT") is entered into between the J.J. Reidy & Co., Inc., a Massachusetts Corporation, hereinafter referred to as (Seller), having its headquarters at , 1260 Main Street, Holden, Massachusetts 01520-1020 and, Free Water Company a corporation of the State of Nevada , having its principal place of business at, 525 Reactor Way, Reno, Nevada, 89502 hereinafter referred to as (Buyer).

WHEREAS, Buyer desires to purchase Seller's Potable Air-Water Generator technology Patents from Seller, and Seller wishes to sell Seller's Potable Air-Water Generator technology Patents to Buyer, on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of these premises, the respective covenants of Buyer and Seller set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.0 DEFINITIONS. The following capitalized terms shall have the meanings given below:

1.1. "Affiliate" shall mean, with respect to a party ("First Person") any other Person, which is controlled by or controls the First Person or, together with the First Person, is under the common control of a third Person, but only for so long as such control relationship continues to exist. Control shall mean:

(i)     in the case of stock-issuing, for-profit corporate entities, direct or indirect ownership of at least 50% of the stock or shares having the right to vote for the election of directors;

(ii)    in the case of other for-profit entities, ownership of at least 50% of the equity interest in such entity with the power to elect the governing body of such entity or the power to elect at least 50% of the members of the governing body of such entity; and

(iii)   in the case of any not-for-profit entity, the direct or indirect power to manage, direct or cause the direction of the management and policies of the entity or the power to elect at least 50% of the members of the governing body of such entity.

1.2. "Assumed Obligations" shall have the meaning set forth in Section 2.3.

1.3. "Buyer Indemnities" shall have the meaning set forth in Section 12.2.1.

1.4. "Closing" shall have the meaning set forth in Section 2.1.

1.5. "Closing Date" shall have the meaning set forth in Section 3.1.

Initial ____   Initial _JJR___          3

1.6. "Confidential Information" shall mean any and all information furnished by one party (the "Disclosing Party") to the other party (the "Receiving Party") that is (a) marked "confidential" or bears a similar legend, if such information is disclosed in a document or other tangible medium, or (b) accompanied by a contemporaneous oral notification to the effect that such information is considered confidential and followed within 30 days by a written notification that the information is confidential, if such information is disclosed orally or visually. Information that may be identified as confidential may include information relating to any technology, product, process or intellectual property of the Disclosing Party (including, but not limited to, owned or licensed intellectual property rights, data, know-how, samples, technical and non-technical materials and specifications) as well as any business plan, financial or other confidential commercial information of or about the Disclosing Party.

Notwithstanding the foregoing, information of or about the Disclosing Party shall not be considered Confidential Information with respect to the Disclosing Party to the extent that the Receiving Party can demonstrate by written records or other suitable physical evidence that:

(i)     such information was lawfully in the Receiving Party's possession or control prior to the time such information was disclosed to the Receiving Party by the Disclosing Party,

(ii)    such information was developed by the Receiving Party or on its behalf independently of and without reference to the Confidential Information;

(iii)   such information was lawfully obtained by the Receiving Party from a Third Party under no apparent obligation of confidentiality to the Disclosing Party; or

(iv)    such information was, at the time it was disclosed or obtained by the Receiving Party, or thereafter became, publicly known otherwise than through a breach by the Receiving Party of such party's obligation to the Disclosing Party.

1.7. "Current JJR Technology" shall have the meaning set forth in Section 2.0.

1.8. "Development Period" shall have the meaning set forth in Section 7.1.2.

4.9. "JJR Arrangement" shall mean an agreement between Buyer or an Affiliate of Buyer and a Third Party which is executed on or before Closing of this agreement and which includes a grant of rights under the JJR Technology or any portion thereof.

1.10. "JJR Equipment" shall have the meaning set forth in Section 2.1.3.

Initial _____    Initial JJR    4

1.11. "JJR Know-how" shall mean all technology, inventions, technical information, materials and the like related to the technology used in Seller's programs, the use of Potable Air-Water Generators, devices for methods of making such devices, in which Seller has an interest on the Effective Date, whether patentable or not, and which: (i) (a) is related to any patent application or patent included in the JJR Patents or (b) is necessary or useful in connection with the manufacture, use or sale of any product described in any such patent application or patent, or the practice of any invention or technology described in any such patent application or patent, and (ii) until the Effective Date constitutes the confidential information of Seller.

1.12. "JJR Patents" shall mean those patents and patent applications listed in (Exhibit A), and any divisional, continuation, continuation-in-part, reissue, renewal or extension thereof or substitute, therefore, or any patent issuing there from and any foreign patent applications and patents corresponding thereto.

1.13. "JJR Product" shall mean:

(i)     any product, the manufacture, use, sale or importation of which would, absent the rights transferred (or sublicensed, in the case where Section 2.5 applies) by Seller to Buyer hereunder, infringe any Valid Claim; or

(ii)    any product developed in whole or in part through use of a process which is covered by a Valid Claim.

1.14. "JJR Revenues" shall mean amounts payable to Buyer or an Affiliate of Buyer from a Third Party pursuant to an JJR Arrangement, including without limitation up-front license fees, milestone payments, payments in consideration for the issuance of equity or debt securities of Buyer, and other non-royalty cash payments: PROVIDED, HOWEVER, that JJR Revenues shall not include (i) bona fide research and development support payments, (ii) payments and revenues realized from the sale of JJR Products prior to the execution of this arrangement and (iii) payments received to reimburse Buyer for patent expenses incurred by Buyer or an Affiliate of Buyer after execution of the JJR Arrangement.

1.15. "JJR Technology" shall mean the Owned JJR Technology products and the Licensed JJR Technology patents.

1.16. "Federal Patent Policy" shall mean Policies as outline by federal and state law pertaining to patents, and all regulations promulgated there under, as amended, and any similar or successor statutes or regulations.

1.17. "Indemnification Floor" shall have the meaning set forth in Section 12.2.5.

1.18. "Infringement" shall have the meaning set forth in Section 6.3.2.

1.19. "Infringer" shall have the meaning set forth in Section 6.3.1.

Initial _____    Initial JJR    5

1.20. "Licensed JJR Know-how" shall mean Seller's interest in all JJR Know-how which is obtained pursuant to the Assigned Agreements.

1.21. "Licensed JJR Patents" shall mean Seller's interest in all JJR Patents which is obtained pursuant to the Assigned Agreements.

1.22. "Licensed JJR Technology" shall mean the In-Licensed JJR Know-How and the In-Licensed JJR Patents.

1.23. "Knowledge" and like phrases shall mean and include (i) actual knowledge and (ii) that knowledge, data and other information which a party (including the directors, officers and key employees of Seller) should have known by virtue of being an officer, director or key employee of the Seller.

1.24. "Lien" shall mean any mortgage, pledge, security interest, attachment, license, right to use, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing).

1.25. "Net Payments" with respect to a JJR Product shall mean payments on the Net Sales (or per unit sales or other similar basis for the payment of payments) of an JJR Product payable to Buyer by a Sub-licensee with respect to such JJR Product, less payments on the Net Sales (or per unit sales or other similar basis for the payment of payments) of the same JJR Product payable by Buyer to any Third Party.

1.26. "Net Sales" shall mean

(i)     in any case where any JJR Product or technology is sold or commercially disposed of for value in an arm's length sale to an independent Third Party, the gross invoice price for such JJR Product, less the following permitted deductions to the extent that such items are reflected in the price charged and do not exceed reasonable and customary amounts in the country in which the transaction occurs: (a) trade and quantity discounts or rebates actually taken or allowed, (b) credits or allowances given or made for rejections or return of any previously sold JJR Product actually taken or allowed, (c) any tax or government charge (including any tax such as a value added or similar tax or government charge, but not including any tax levied with respect to income) levied on the sale, transportation or delivery of the JJR Product and borne by the seller thereof, and (d) any charges for freight or insurance billed to the final customer.

(ii)     in any case, other than for a use in research or development or for use in marketing, where any JJR Product is not sold or commercially disposed of for value in an arm's length sale to an independent Third Party (including, without limitation, disposition in connection with the delivery of other products or services), the greatest of: (a) the Net Sales amount for such transaction determined as provided in (i) above or (b) if there has been any arm's length sale of a similar JJR Product to an independent Third Party, the Net Sales amount, determined as provided in (i) above, for the most

Initial [signature]     Initial JJR     6

contemporaneous such sale or (c). if there has been no such arm's length sale, the gross sales asking price for the JJR Product.

1.27. "Owned JJR Know-how" shall mean all JJR Patent Know-how.

1.28. "Owned JJR Patents" shall mean all JJR Patents.

1.29. "Owned JJR Technology" shall mean the Owned JJR Patents and the Owned JJR Know-how.

1.30. "Person" shall mean any natural person or legal entity.

1.31. "Purchased Assets" shall have the meaning set forth in Section 2.1.

1.32. "Reversion Event" shall have the meaning set forth in Section 7.1.3(i).

1.33. "Seller Indemnities" shall have the meaning set forth in Section 12.3.1.

1.34. "Combination Product" means a product comprising a combination of the JJR Technology with other Technology (i) where Seller's proprietary technology is used through use of the JJR Technology, and (ii) where the primary use of such combination product, as reasonably shown is provided by the product itself

1.35. "JJR Technology" shall mean the current and future proprietary technology of Seller and its Affiliates based on the use of Seller's proprietary patents or proprietary products and the technology derived from such patents

1.36. "Sub-licensee" shall mean any Third Party which is a direct or indirect licensee, sub-licensee or assignee of the JJR Technology from Buyer.

1.37. "Third Party" shall mean any Person other than Buyer and its Affiliates or Seller and its Affiliates.

1.38. "Transaction Documents" shall have the meaning set forth in Section 9.1.

1.39. "JJR Product" shall mean an JJR Product that is a product using the Patents.

1.40. "Valid Claim" shall mean (i) any pending claim of a patent application included in the JJR Patents that has not been abandoned or finally rejected without the possibility of appeal or re-filing or (ii) any claim of an issued or granted and unexpired patent included in the JJR Patents which has not been held permanently revoked, unenforceable, un-patentable or invalid by a decision of a court or other governmental body of competent jurisdiction that is un-appealable or un-appealed within the time allowed for appeal, which has not been rendered unenforceable through disclaimer or otherwise, which has neither been abandoned nor lost through an interference proceeding.

Initial     Initial 𝒥𝒥𝑅

7

## 2.0 PURCHASE AND SALE OF THE PURCHASED ASSETS

2.1. ASSETS BEING ASSIGNED (Sold) TO BUYER. At the closing of the transaction as described in Section 3 (the "Closing"), Seller shall sell and assign to Buyer, and Buyer shall purchase and assume, the assets identified in Sections 2.1.1 through 2.1.6 below (collectively, the "Purchased Assets") as the same exist on the Closing Date (as hereinafter defined):

2.1.1. Seller's entire right, title and interest in the Owned JJR Technology.

U.S. Patent No(s). (#5,149,446), for an invention entitled "Potable Air-Water Generator," which issued on 9/2/92; and,

U.S. Patent No(s). (#5,106,512), for an invention entitled "Potable Air-Water Generator," which issued on 4/21/92; and,

U.S. Patent No(s). (#5,203,989), for an invention entitled "Potable Air- Water Generator," which issued on 4/20/92; and,

U.S. Patent No(s). (#5,366,705)for an invention entitled "Potable Air- Water Generator," which issued on 11/22/94;

2.1.2. Seller's entire right, title and interest in the equipment (the "JJR Equipment") identified on Schedule 2.1.3 attached hereto.

2.1.3. With respect to the JJR Patents, all of Seller's right, title and interest in the prosecution files for all patent applications and patents comprising the JJR Patents (including, without limitation, all drafts, notes, drawings or figures, official correspondence with patent offices, other correspondence and copies of cited references, copies of which Seller may retain), and in all intellectual property rights in such patents and applications, including without limitation the right to claim the priority benefit thereof and to prosecute and to enforce any patents arising there from.

2.1.4. With respect to the JJR Technology, all of Seller's right, title and interest in originals or copies of all laboratory notebooks and other primary data, research results, records and documentation, research plans, proposals, conclusions, know-how, specifications and information, to the extent any of the foregoing are recorded in any tangible form (including, without limitation, photographs, print-outs, electronic files and paper documents), which are owned by or licensed to and in the possession of Seller and which relate to the discovery of or are necessary or materially useful for the practice of the JJR Technology; and all intellectual and tangible property rights in the foregoing, including the right to file additional patent applications based thereon.

2.1.5. With respect to the JJR Technology, all of Seller's right, title and interest in all patent related prototypes, sub assemblies, components, samples or products of, or in connection with the JJR Technology.

Initial _____ Initial ʃʃR                    8

Seller shall transfer the Purchased Assets to Buyer pursuant to a Bill of Sale in substantially the form of EXHIBIT B attached hereto (the "Bill of Sale"); an Assignment of Patents substantially in the form of EXHIBIT A attached hereto (the "Patent Assignment").

2.2. EXCLUDED ASSETS. Buyer shall not acquire any assets other than those assets specifically included in the Purchased Assets. Without limiting the foregoing, Buyer shall not acquire any of Seller's other technology, other intellectual property, cash or cash equivalents, accounts receivable, deposits or open purchase orders or back orders.

2.3. ASSUMED OBLIGATIONS. Buyer shall assume and perform all obligations of the Seller under the Assigned Agreements arising after the Closing and based on events or circumstances arising after the Closing (the "Assumed Obligations"), including, without limitation, any and all payments, product development milestones, diligence, patent prosecution or other obligations arising there under after the Closing. Except as otherwise explicitly set forth herein, Buyer shall not assume any obligations of Seller other than the Assumed Obligations, and Buyer shall not assume any liabilities of the Seller.

2.4. PURCHASE PRICE. In addition to the payments provided for in Section 5 and assumption of the Assumed Obligations, Buyer shall pay to Seller a total of $6,000,000.00 pursuant to Section 3.1.3 hereof. Each of Buyer and Seller, respectively, shall pay any sales, use and other transfer taxes imposed on such party by operation of law in connection with the purchase and/or transfer of the Purchased Assets hereunder.

2.5. FURTHER ASSURANCES. Each of the parties hereto, before, at and after the Closing, promptly upon the request from time to time of any other party hereto and without further consideration, will do each and every reasonable act and thing as may be necessary or reasonably desirable to consummate the transactions contemplated hereby and to effect an orderly transfer to Buyer of the Purchased Assets, and to put the Buyer in actual possession and operating control thereof, and to confirm the Buyer's title to all of the Owned JJR Technology and Buyer's rights under the Assigned Agreements, and to carry out the purpose and intent of this Agreement, including without limitation:

(i) granting Buyer a license or other interest in such Purchased Assets to the extent that the Seller is unable to assign such asset without the consent or approval of one or more Third Parties;

(ii) assigning to Buyer additional agreements between the Seller and Third Parties, such as, for example, material transfer agreements;

(iii) executing, acknowledging and delivering assurances, assignments, powers of attorney and other documents and instruments;

(iv) furnishing information and copies of documents, scientific notebooks, books and records;

(v) filing reports, returns, applications, filings and other documents and instruments with governmental authorities; and

Initial _____    Initial JJR    9

(vi) cooperating with the other party hereto in exercising any right or pursuing any claim, whether by litigation or otherwise, other than rights and claims running against the party from which such cooperation is requested.

3. CLOSING.

3.1. The Closing shall be held at the respective offices of **J.J. Reidy & Co., Inc. and Free Water Company** no later than 5:00 p.m. Eastern Standard Time on October 13th 2005 or at such other location and on such other date as Buyer and Seller may agree upon in writing (the "Closing Date"). At the Closing:

3.1.1 Seller shall deliver or cause to be delivered to Buyer the following:

(i) The Bill of Sale;

(ii) The Patent Assignment; and

3.1.2. Buyer shall deliver or cause to be delivered to Seller the Assignment Agreement.

3.1.3. Buyer shall pay to Seller, by wire transfer of immediately available funds, in accordance with written instructions furnished by Seller a fee in the amount of one million one hundred eighty thousand dollars $1,180,000.00 within one hundred twenty days after the execution of this agreement by seller and term may be extended by written authorization by seller.

3.1.4 Seller shall deliver at the Closing or shall make available within thirty (30) days after the Closing all of the books, data, documents, instruments and other records and materials to the extent required by Section 2.1, and any other documents or materials containing or embodying JJR Know-how. For the purpose of effecting the transfer of all JJR Technology to Buyer, and to facilitate Buyer's understanding of the JJR Technology, Seller will, from time to time upon reasonable notice during the term of this Agreement, make Seller personnel reasonably available to Buyer to answer Buyer's questions related to the JJR Technology, including any past agreements between Buyer and Third-Parties related thereto, provided that Buyer shall reimburse Seller for any out-of-pocket expenses incurred by Seller in connection therewith.

4.0 NO OTHER LICENSES. No other rights or licenses under the JJR Technology are granted to Seller hereunder. Without limiting the generality of the foregoing sentence, no provision of this Agreement shall be construed to grant Seller rights under the JJR Technology to make, have made, use have used, sell, have sold, or import products .

5.0. FUTURE PAYMENTS AND SHARE OF MILESTONE AND OTHER PAYMENTS.

5.1. FUTURE PAYMENTS.

Initial _____ Initial ʾƷƷℭ     10

JJR 711

5.1.1. Starting twelve (12) months from signing of this agreement Buyer shall pay or cause to be paid to Seller an amount equal to a minimum of $45,000.00 or [five] percent [5%] per quarter which ever is greater of the Net Sales of JJR Products or sublicenses sold by Buyer or its Affiliates to the maximum sum of six million dollars ($6,000,000.00) total.

5.1.2 Buyer shall pay Seller the total outstanding balance as the buyer acquires funding. Buyer will pay a minimum of 25% of investment capital invested with company to a maximum of six million dollars ($6,000,000.00). Payments will be calculated against the total quarterly investment beginning one year from date of signed agreement.

5.1.3 No multiple amounts shall be payable by Buyer under this Article 5 because the manufacture, use, sale or import of any JJR Product is covered by more than one Valid Claim of an JJR Patent or uses or incorporates more than one aspect of the JJR Technology.

5.1.4 With respect to each of the four JJR Patents, the obligations of Buyer under this Article 5 shall expire, upon completion of all forms of payments equaling six million dollars ($6,000,000.00)

5.2 RECORDS. Buyer shall keep, and shall require its Sub-licensees and Affiliates to keep and make available to Buyer for review by accountants selected by Seller as provided herein, complete and accurate records of the latest three (3) years relating to the Net Sales of JJR Products on which amounts are payable hereunder. For the sole purpose of verifying the amounts payable to Seller under Section 5.1, Seller shall have the right, no more often than once each calendar year, at Seller's expense to retain an independent, certified public accountant selected by Seller and reasonably acceptable to Buyer, to review such records of Buyer in the location where such records are maintained by Buyer upon reasonable notice and during regular business hours and under obligations of strict confidence. The independent certified public accountant shall disclose to Seller only whether the reports required under Section 5.0 are correct or incorrect, and the specific details concerning any discrepancies. No other information shall be provided to Seller. If such independent certified public accountant concludes that additional amounts were owed during such period, then Buyer shall pay such additional amounts to Seller within thirty (30) days after the date Seller delivers to Buyer such accounting firm's written report so concluding. If such independent certified public accountant concludes that Buyer overpaid amounts due during such period, Buyer shall receive a credit against payment of future amounts due for such overpayment. Should the results of such review result in an increase of more than 5% in any payment due Seller hereunder, Buyer shall be obligated to pay any out-of-pocket expenses incurred by Seller with respect to such review. Seller shall treat all financial information subject to review under this Section 5.0 as the Confidential Information of Buyer in accordance with the provisions of Section 6.2, and shall cause its independent public accountant or accounting firm to enter into confidentiality agreements having provisions at least as strict as the provisions in Section 6.2 hereof.

Initial ~~W~~    Initial ~~JJR~~    11

5.3. REPORTS AND PAYMENTS. Within ninety (90) days after the end of each calendar quarter, Buyer shall (i) deliver or cause to be delivered to Seller a true and accurate report, giving such particulars of the business conducted by Buyer, Buyer's Affiliates and any Sub-licensees during such quarter under this Agreement as are pertinent to an accounting for any payments hereunder, and (ii) pay or cause to be paid any payment amounts determined on the basis of such accounting. If no payments are due, it shall be so reported. For the purposes of determining when the sale of an JJR Product occurs for the purposes of calculating Net Sales, such sale shall be deemed to occur on the date of invoice to the purchaser of the JJR Product. To the extent appropriate for the calculation of any amounts payable under this Agreement, any such report shall include a statement showing the calculation of the amount owed on the total Net Sales for the period covered, the exchange rate used to convert any amounts payable into United States Dollars and the total Net Sales for the period covered.

5.4. FORM OF PAYMENT. All amounts payable to Seller hereunder shall be payable in United States dollars to the address specified in Section 17, or at such other place as Seller may reasonably designate; PROVIDED, HOWEVER, that if the law of any foreign country prevents any payment payable to Seller hereunder to be made as so provided, or prevents any such payment to be made in United States dollars, Seller agrees to accept such payment in such form and place as is permitted, including deposits by Buyer in the applicable foreign currency in a local bank or banks in such country designated by Seller. If any currency conversion is required in connection with any payment to Seller hereunder, such conversion shall be made at the buying rate for the transfer of such other currency as quoted by The Wall Street Journal on the last business day of the applicable accounting period, in the case of any payment payable with respect to a specified accounting period, or, in the case of any other payment, the last business day prior to the date of such payment.

5.5. TAXES. Seller and Buyer shall use all reasonable and legal efforts to reduce tax withholding on payments made to Seller hereunder. If Buyer concludes that, notwithstanding such efforts, tax withholding under the laws of any country is required with respect to any payment to be made to Seller under this agreement, Buyer shall withhold or cause its Affiliate or Sub-licensee to withhold the required amount and to pay such amount to the appropriate governmental authority. In such a case, Buyer will promptly provide Seller with, or promptly cause Seller to be provided with, original receipts or other evidence sufficient to allow Seller to obtain the benefits of any such tax withholding.

5.6. INTEREST. In the event that any payment due hereunder is not made when due, the payment shall accrue interest beginning on the first day following the calendar quarter to which such payment relates calculated at the annual rate of the sum of (a) [one] percent [1%] plus (b) [LIBOR]; PROVIDED, THAT, in no event shall said annual rate exceed the maximum interest rate permitted by law in regard to such payments. Such payment when made shall be accompanied by all interest so accrued. Said interest and the payment and acceptance thereof shall not negate or waive the right of Seller to any other remedy, legal or equitable, to which it may be entitled because of the delinquency of the payment.


Initial _____ Initial JJR

12

## 6.0 PROTECTION OF INTELLECTUAL PROPERTY RIGHTS.

6.1. PATENT PROSECUTION/PATENT COSTS. Buyer shall be responsible for prosecuting and maintaining all JJR Patents. Seller shall cooperate with Buyer in regard to such maintenance and prosecution which cooperation shall include: (i) provision of written or other information reasonably requested by the Buyer, (ii) allowing the Buyer reasonable access to employees of the Seller and (iii) commercially reasonable efforts to have the officers, employees, consultants, agents, accountants and attorneys of the Seller cooperate fully with the Buyer, including, without limitation, by providing written or oral testimony pertaining to the JJR Technology and/or the discovery thereof as reasonably requested by the Buyer, signing all lawful documents reasonably requested by the Buyer, and executing all divisional, continuing, reissue and patents applications reasonably requested by the Buyer.

6.2. CONFIDENTIAL INFORMATION. Each party shall maintain the Confidential Information of the other party in strict confidence, and shall not disclose, divulge or otherwise communicate such Confidential Information to others, or use it for any purpose, except pursuant to, and in order to carry out, the terms and objectives of this Agreement or with the express written consent of the Disclosing Party. Each party also hereby agrees to take reasonable steps to prevent and restrain the unauthorized disclosure of such Confidential Information by any of its directors, officers, employees, consultants, sub-contractors, sub-licensees or agents. For purposes of this agreement, the JJR Technology and the Assigned Agreements shall become the Confidential Information of Buyer upon the Closing; PROVIDED, HOWEVER, that upon the occurrence of a Reversion Event, the Current JJR Technology and the Assigned Agreements shall become the Confidential Information of Seller. The provisions of this paragraph shall not apply to any Confidential Information of the Disclosing Party which is required to be disclosed by the Receiving Party to comply with any applicable laws or regulations, but only to the extent required by such law or regulation; and FURTHER, PROVIDED, that the Receiving Party making a disclosure pursuant to the provisions of this sentence shall provide prior notice of such disclosure to the Disclosing Party sufficiently in advance of such disclosure to allow the Disclosing Party to respond and to take reasonable and lawful action to avoid and/or minimize the degree of such disclosure.

## 6.3. ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS.

6.3.1. If Buyer becomes aware of any infringement of any JJR Patent or any violation of any other intellectual property right contained (i) in the JJR Technology by a Third Party (an "Infringer") during the Development Period, or (ii) in the atmospheric water generator technology or related to a atmospheric water generator Combination Product by an Infringer during term of this Agreement, Buyer shall so notify Seller. Similarly, if Seller becomes aware of the infringement of any JJR Patent during the term of this Agreement or any other intellectual property right contained in the JJR Technology during the term of this Agreement, Seller shall so notify Buyer.



Initial _____  Initial JJR          13

6.3.2. Buyer shall have the right to protect against any infringement of any JJR Patent or any violation of any other intellectual property right contained in the JJR Technology (any such infringement or violation being referred to herein as an "Infringement") by any Infringer during the term of this Agreement when, in Buyer's sole judgment, such action may be reasonably necessary, proper and justified. If (i) at any time during the Development Period with respect to the JJR Technology, or (ii) at any time during the term of this Agreement with respect to the atmospheric water generator Combination Product, Seller shall have provided Buyer with written evidence demonstrating prima facie evidence of an Infringement and Seller shall have requested Buyer in writing to take steps to protect against such Infringement, and Buyer has not, within 90 days of the receipt of such evidence and request, either (i) caused such Infringement to terminate, (ii) initiated legal proceedings against the Infringer, or (iii) entered into discussions with such alleged Infringer regarding a license under the applicable JJR Patent, then Seller may, upon notice to Buyer, initiate legal proceedings against the Infringer at Seller's expense and in Buyer's name if so required by law.

6.3.3. In the event that either party shall initiate or carry on legal proceedings against any Infringer as contemplated by Section 6.3.2 above, the other party shall fully cooperate with and supply all assistance reasonably required by the party initiating or carrying on such proceedings. The party which initiates any such proceedings shall have sole control of such proceedings and shall bear the reasonable expenses. The party initiating or carrying out such proceedings shall keep the other party informed of the progress of such proceedings and such other party shall be entitled to counsel in such proceedings but at its own expense.

6.3.4. Any award paid by any Third Party as a result of such proceedings (whether by way of settlement or otherwise) shall be first applied to reimbursement of the un-reimbursed legal fees and expenses incurred by the party initiating the proceedings, then to the reimbursement of the un-reimbursed legal fees and expenses incurred by the other party, and then the remainder shall be divided by the parties as follows:

6.3.4.1. If the remaining amount awarded is with respect to lost profits, the applicable party shall receive an amount equal to the damages the court determines such party has suffered as a result of the Infringement, less any amounts (if any) that would have been due to the other party under this Agreement had such party made the sale of products or realized payments from Affiliates or sub-licensees that would have resulted in such profits; and the other party shall receive an amount equal to such deducted amounts.

6.3.4.2. Any remaining amounts shall be retained by the party initiating such proceedings.

7.0 COVENANTS OF BUYER.

7.1. DUE DILIGENCE.

7.1.2. GENERAL OBLIGATION. Buyer

Initial _____ Initial JJR        14

shall use commercially reasonable efforts to diligently commercialize the JJR Technology.

7.1.3. SPECIFIC DUE DILIGENCE OBLIGATIONS. Buyer, itself or through its Affiliates or Sub-licensees, agrees to accomplish one of the following commercialization objectives with respect to the JJR Technology during the five (5) year period commencing on the first day of Buyer's first fiscal quarter following the Closing Date (the "Development Period"):

(i) Create a investment program for three million dollars ($3,000,000.00) for initial bridge capital. Followed by a seventeen million dollar ($17,000,000.00) investment program.

(ii) Develop a practical application embodying the JJR technology and patents.

(iii) Develop a production program of a product using the JJR technology and patents

7.1.4. FAILURE TO MEET DUE DILIGENCE OBLIGATIONS. If Buyer, itself or through its Affiliates or Sub-licensees, fails to accomplish the first one of the commercialization objectives set forth in Section 7.1.2 above (a "Reversion Event"), then the JJR Technology as it exists on the Effective Date (the "Current JJR Technology"), and the JJR Equipment owned by Buyer at the end of the Development Period shall automatically be reassigned to Seller; provided, that, if, Buyer granted licenses or sublicenses (as the case may be) under the JJR Technology prior to the occurrence of a Reversion Event, such licenses or sublicenses (as the case may be) shall be assigned to the Seller and otherwise shall remain in full force and effect under the same terms and conditions.

7.1.5. REPORTS. During the Development Period, Buyer shall provide to Seller a quarterly report of its activities and efforts toward commercialization of the JJR Technology in sufficient detail to allow Seller to monitor Buyer's compliance with the due diligence obligations set forth in Section 7.1.2 above. Any such reports shall be the Confidential information of Buyer and shall be held in strict confidence by Seller in accordance with the provisions of Section 6.2 hereof.

7.1.6. FORCE MAJEURE. Buyer shall not be deemed to be in breach of its obligations under this Agreement, including without limitation its obligations under Section 7.1.5 above, if such failure or delay is due to natural disasters or any causes beyond its reasonable control, including without limitation delays caused by the seller, regulatory agencies or other third parties; provided however, that in such event, Buyer shall promptly notify Seller in writing of such occurrence, use commercially reasonable best efforts to meet its obligations under this Agreement, notify Seller in writing of the expected duration of such inability to perform and of any developments (or changes therein) that appear likely to affect Buyer's ability to perform any of its obligations hereunder in whole or in part; and provided, further, any time for performance by Buyer hereunder shall be extended by the actual time of delay caused by such occurrence or event.



Initial _____ Initial JJR _____          15

7.2. COMPLIANCE WITH LAW. Buyer shall comply with, and shall insure that Buyer's Affiliates and Sub-licensees comply with, all government statutes and regulations that relate to JJR Products, including, but not limited to, FDA statutes and regulations and the Export Administration Act of 1979 (50 App.U.S.C. ss.2401 et. seq.), as amended, and the regulations promulgated there under, and any applicable similar laws and regulations of any other country. Without limiting the generality of the foregoing, Buyer agrees that all JJR Products used or sold in the United States shall be manufactured substantially in the United States.

7.3. MARKING. Buyer shall cause all JJR Products sold in the United States to be marked with all applicable U.S. Patent Numbers, to the full extent required by United States law. Buyer shall similarly cause all JJR Products shipped to or sold in any other country to be marked in such a manner as to conform with the patent laws and practice of such country.

7.4. PUBLICITY. Except as required by law, neither party shall use the name of the other party or the other party's Affiliates, nor that of any staff member or employee of the other party or the other party's Affiliates, or any adaptation thereof, in any advertising, promotional or sales literature, offering materials, business plans or any other form of publicity without prior written consent obtained from such other party and from the individual staff member or employee if such individual's name is so used.

8.0 COVENANTS OF SELLER.

Seller shall satisfy its obligations under the Agreement referenced in Section 7.0 above.

9.0 REPRESENTATIONS AND WARRANTIES OF SELLER.

Except as set forth in the schedule of exceptions, Seller represents and warrants to Buyer as follows:

9.1. DUE ORGANIZATION, AUTHORIZATION AND GOOD STANDING. Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Massachusetts and is authorized to transact business as a corporation in each jurisdiction in which the failure to so qualify would have a material adverse impact on Seller's ability to sell the Purchased Assets, including the States of Nevada and internationally. Seller has the requisite corporate power and authority to enter into, execute, deliver and perform this Agreement and any other instruments of transfer and conveyance executed in connection herewith (collectively, with this Agreement, the "Transaction Documents"), and to consummate all transactions contemplated hereby and thereby and has or will have taken all corporate action required by law and its articles of incorporation and by-laws to authorize such execution, delivery and performance. This Agreement is, and each of the other Transaction Documents will, upon execution by duly authorized officers of Seller at the Closing, be the valid and legally binding obligation of Seller, enforceable against it in accordance with its terms, except to the extent such enforcement may be limited by bankruptcy, insolvency, moratorium, reorganization and

Initial _____    Initial J J R    16

similar laws of general applicability affecting the rights and remedies of creditors and by general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.

9.2. NO CONFLICT. The execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated hereby and thereby will not (i) result in a breach or violation of or be in conflict with Seller's articles of incorporation or by-laws, (ii) violate or result in a breach of any mortgage, indenture, note, license, agreement or any other instrument or obligation related to Seller or to Seller's ability to execute this Agreement or the Transaction Documents or to consummate the transactions contemplated hereby or thereby, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained in writing, (iii) violate any judgment, order, writ, injunction, decree, statute, rule or regulation applicable to Seller, or (iv) result in the creation of any Lien upon the Purchased Assets. Seller is in good standing and is not in breach or default of any obligation under any of the Assigned Agreements.

9.3. TITLE TO JJR EQUIPMENT. Seller has good and defensible title to all the JJR Equipment, free and clear of all Liens.

9.4. JJR TECHNOLOGY. Seller owns all of the patents and patent applications comprising the Owned JJR Technology and Seller owns all of the Owned JJR Know-how, in each case free and clear of all Liens and free and clear of all claims or actions arising out of or resulting from any action or failure to act of the Seller, or arising out of or resulting from any action or failure to act of any inventors of such Owned JJR Technology or any other agent, employee or consultant of Seller. Seller has the right to assign to Buyer all of its rights under the Assigned Agreements and any JJR Technology subject to such Agreements, and to the Knowledge of Seller, all JJR Technology within the Assigned Agreements is free and clear of all Liens and free and clear of all claims or actions arising out of or resulting from any action or failure to act of the Seller, or arising out of or resulting from any action or failure to act of any inventors of such JJR Technology or any other agent, employee or consultant of Seller. Seller is not in default of any of the Assigned Agreements, nor has Seller received notice of any default under any agreement under which Seller has in-licensed any portion of the JJR Technology. To Seller's Knowledge, no party from which Seller has in-licensed the In-Licensed JJR Technology is in default or breach of any of the Assigned Agreements, and Seller has not asserted any claims of default against any party to the Assigned Agreements. The parties expressly acknowledge and agree that Seller's technology known as "Potable Air-Water Generator," as embodied in United States U.S. Patent No(s). (#5,149,446), (#5,106,512), (#5,203,989), (#5,336,705) part of the JJR Technology and is included in the technology purchased by Buyer hereunder. The patents and patent applications identified on Schedule 1.13 constitute all of the patents and patent applications related to the JJR Technology in which Seller has an interest. All of the JJR Patents have been filed and prosecuted in good faith as required by law and are in good standing. The inventors of such patent applications and patents are as set forth in the respective patent documents and all such inventors have assigned their rights in the JJR Technology to Seller or to the party that licensed any In-Licensed JJR Technology to Seller. To the Knowledge of

Initial _____    Initial "JJR"         17

Seller, no Third Party has any claim of infringement against Seller of any patents or other intellectual property rights of others in connection with the JJR Technology or the use thereof. No interference or opposition proceeding is pending or, to the Knowledge of the Seller threatened, relating to the JJR Technology. Except as reflected in this Agreement and the disclosure schedules, Seller has not granted any Third Party any right to use the JJR Technology for any purpose, prior to the Closing Date and which included a grant of the right to such Third Party to access or use the JJR Technology, or the grant of rights under Seller's intellectual property rights in the JJR Technology (collectively "Third Party JJR Rights") have expired or have been terminated under conditions where: (i) all of such Third Party JJR Rights have been terminated so that as of the Closing Date and thereafter, such Third Party does not have and will not have any rights in or any rights of access to or use of the JJR Technology and any intellectual property rights therein, any inventions or discoveries (including any intellectual property rights therein) made through such party's use of the JJR Technology, or any products developed or made through the use of the JJR Technology; and (ii) such Third Party has returned to Seller or destroyed all confidential information relating to the JJR Technology and any tangible embodiments of the JJR Technology. No right or license under intellectual property (other than the JJR Technology) owned or controlled by, or licensed to, the Seller is needed by Buyer in order to practice the JJR Technology.

9.6. CONSENTS. No filing with or notice to and no permit, authorization, consent or approval of any Person or regulatory or governmental authority is necessary for the execution, delivery and performance of this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby.

9.7. PROPRIETARY INFORMATION OF THIRD PARTIES. To the Knowledge of Seller, no Third Party has claimed or has reason to claim that any person employed by or affiliated with Seller has, in any way related to the JJR Technology, (i) violated or may be violating any of the terms or conditions of such person's employment, non-competition or non-disclosure agreement with such third Party, or (ii) disclosed or may be disclosing, or utilized or may be utilizing any trade secret or proprietary information or documentation of such Third Party. No Third Party has requested information from Seller which suggests that such a claim might be contemplated. To the Knowledge of Seller, no person employed by or affiliated with Seller has employed or proposes to employ in connection with the JJR Technology any trade secret or any information or documentation proprietary to any former employer or other Third Party and no person employed by or affiliated with Seller has violated any confidential relationship which such person may have had with any Third Party in connection with the JJR Technology.

9.8. LITIGATION. There is no action, suit, claim, proceeding or investigation pending, or, to the Knowledge of Seller, threatened against Seller, affecting the Purchased Assets, (i) at law or in equity, or before any federal, state, municipal or other governmental commission, board, bureau, agency or instrumentality, domestic or foreign, or (ii) before any arbitration panel. To the Knowledge of Seller, there are no outstanding writs, judgments, injunctions or decrees of any court, governmental agency or arbitration tribunal against, involving or affecting the Purchased Assets other than what is listed and

Initial [signature] Initial JJR          18

disclosed on the (Disclosure Schedule Exhibit B). There is no action or suit by Seller pending or threatened against others involving the Purchased Assets.

9.9. TAXES. Seller has not taken or, to the Knowledge of Seller, failed to take any action which could create any tax lien on the Purchased Assets.

9.10 DISCLAIMER OF WARRANTIES; FEDERAL PATENT POLICY.

9.10.1. EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY OF THE PURCHASED ASSETS INCLUDING WITHOUT LIMITATION THE JJR TECHNOLOGY OR ANY JJR PRODUCT AND HEREBY DISCLAIMS THE SAME.

9.10.2. SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY THAT THE MANUFACTURE, USE, SALE OR DISPOSAL OF ANY JJR PRODUCT WILL NOT INFRINGE ANY PATENT OR OTHER RIGHT OF ANY THIRD PARTY AND HEREBY DISCLAIMS THE SAME.

9.10.3. Nothing in this Agreement shall be construed as:

(i)     a warranty or representation by Seller as to the validity or scope of the JJR Patents;

(ii)    an obligation on Seller to bring or prosecute actions or suits against Third Parties for patent infringement;

(iii)   conferring by implication, estoppel or otherwise any license or rights under any patents of Seller other than the JJR Patents as defined in this Agreement, regardless of whether those patents are dominant or subordinate to the JJR Patents;

(iv)    an obligation on Seller to improve, modify or update the JJR Technology.

9.11. FULL DISCLOSURE. No representation or warranty of the Seller contained in this Agreement, the schedules and exhibits attached hereto or in the Transaction Documents contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements made, in the context in which made, not false or misleading.

10.0 REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer represents and warrants to Seller as follows:

10.1. DUE ORGANIZATION, AUTHORIZATION AND GOOD STANDING. Buyer is a duly incorporated, validly existing and duly registered with all requisite power and

Initial [signature]    Initial JJR                    19

authority to execute, deliver and perform this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby and has taken all action required by law and its Statutes to authorize such execution, delivery and performance. This Agreement is, and each of the other Transaction Documents will, upon execution thereof by a duly authorized officer of Buyer at the Closing, be the valid and legally binding obligation of Buyer, enforceable in accordance with its terms, except to the extent such enforcement may be limited by bankruptcy, insolvency, moratorium, reorganization and similar laws of general applicability affecting the rights and remedies of creditors and to general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.

10.2. NO CONFLICT. The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby will not (i) result in a breach or violation of Buyer's Statutes, (ii) violate or result in a breach of any mortgage, indenture, note, license, agreement or other instrument or obligation related to Buyer or to Buyer's ability to consummate the transactions contemplated hereby or thereby, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained in writing, or (iii) violate any judgment, order, writ, injunction, decree, statute, rule or regulation application to Buyer.

10.3. DISCLAIMER OF WARRANTIES.

10.3.1. BUYER MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE JJR TECHNOLOGY OR ANY PRODUCT AND HEREBY DISCLAIMS THE SAME.

10.3.2. BUYER MAKES NO EXPRESS OR IMPLIED WARRANTY THAT THE MANUFACTURE, USE OR SALE OF ANY PRODUCT OR COMBINATION PRODUCT WILL NOT INFRINGE ANY PATENT OR OTHER RIGHT OF ANY PARTY AND HEREBY DISCLAIMS THE SAME.

10.3.3. Nothing in this Agreement shall be construed as:

(i)     a warranty or representation by Buyer as to the validity or scope of the JJR Patents;

(ii)    an obligation on Buyer to bring or prosecute actions or suits against Third Parties for patent infringement;

(iii)   conferring by implication, estoppel or otherwise any license or rights under any patents of Buyer other than the JJR Patents as defined in this Agreement, regardless of whether those patents are dominant or subordinate to the JJR Patents; or

Initial _____    Initial _JJR_                    20

JJR 721

(iv)   an obligation on Buyer to improve, modify or update the JJR Technology.

## 11.0 TERM.

11.1. This Agreement shall commence on the Effective Date, and unless terminated earlier by mutual written agreement of the parties, this Agreement will expire upon the expiration of the last of the JJR Patents to expire in any country.

11.2. Upon the termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of termination.

11.3. The provisions of the following Articles and Sections shall survive the expiration or termination of this Agreement: 6.2, 9, 10, 11.2, 11.3,12, 13, 14, 20, 21.

11.4. This Agreement may be terminated by Seller, upon written notice to Buyer. Such notice shall be deliverable by Seller within 15 days of material breach of this Agreement

## 12.0 INDEMNIFICATION.

12.1.   SURVIVAL   OF   REPRESENTATIONS   AND   WARRANTIES.   The representations and warranties of Seller and Buyer shall survive the Closing and shall continue in full force and effect for twelve (12) months following the Closing, except that the Seller's representations contained in Section 9.5 shall survive the Closing and shall continue in full force and effect forever.                    no 9.5 ?

## 12.2. INDEMNIFICATION BY SELLER.

12.2.1. Seller agrees to defend and indemnify Buyer, its Affiliates, their respective officers, directors, employees and agents and their respective successors, heirs and assigns (the "Buyer Indemnities") from all sums, including, without limitation, reasonable attorneys' fees, with respect to:

(i)   any and all liabilities, losses, damages and expenses due and owing and arising prior to the Closing or arising from an act, omission or conduct of Seller prior to the Closing, and relating to the Purchased Assets, of any nature, whether accrued, absolute, contingent or otherwise existing;

(ii)   any breach of the representations, warranties or covenants by Seller contained herein or in the Transaction Documents; and

(iii)   any and all liabilities, losses, damages and expenses incurred by or imposed upon the Buyer Indemnities in connection with any

Initial _____    Initial JJR                    21

JJR 722

claims, suits, actions, demands or judgments arising out of or resulting from the making or distribution of, the use by or administration to any Person of any JJR Product or JJR Combination Product made, used or sold pursuant to any right or license granted to Seller under this Agreement (including, but not limited to, actions in the form of tort, warranty or strict liability).

12.2.2. Seller's indemnification under Section 12.2.1 shall not apply to any liability, damage, loss or expense to the extent that it is directly attributable to the reckless misconduct or intentional misconduct of the Buyer Indemnities.

12.2.3. Seller agrees, at its own expense, to provide attorneys reasonably acceptable to Buyer to defend against any actions brought or filed against any party indemnified hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

12.2.4. Any Buyer Indemnity seeking indemnification hereunder shall promptly notify Seller of any claim for which indemnification is sought (PROVIDED, HOWEVER, that no delay on the part of any Buyer Indemnity in so notifying Seller shall relieve Seller of any liability hereunder unless, and solely to the extent that, Seller is prejudiced thereby), shall cooperate with Seller in the defense of any such claim, and shall not settle or compromise, or consent to the entry of a judgment with respect to any such claim, without the prior written consent of Seller, which shall not be unreasonably withheld.

12.2.5. Seller shall have no liability under Sections 12.2.1(i), 12.2.1(ii) or 12.2.1(iii) above until the aggregate of all sums due hereunder exceeds $50,000 (the "Indemnification Floor"), in which case Seller shall be liable for the amount of such sums in excess of $50,000.

12.3. INDEMNIFICATION BY BUYER.

12.3.1. Buyer agrees to defend and indemnify Seller, its Affiliates, their respective officers, directors, employees and agents and their respective successors, heirs and assigns (the "Seller Indemnities") from all sums, including, without limitation, reasonable attorneys' fees, with respect to:

(i)     except as provided in Section 12.2.1(i), any and all liabilities, losses, damages and expenses due and owing and arising subsequent to the Closing, or arising from an act, omission or conduct of Buyer after the Closing and relating to the Purchased Assets of any nature, whether accrued, absolute, contingent or otherwise existing, including, without limitation, any federal, state or local tax liability;

(ii)    any breach of the representations, warranties or covenants by Buyer contained herein or in the Transaction Documents, including, without limitation, under the Assumed Obligations; and

Initial _____ Initial ‾JJR‾          22

JJR 723

(iii)    any and all liabilities, losses, damages and expenses incurred by or imposed upon the Seller Indemnities in connection with any claims, suits, actions, demands or judgments arising out of or resulting from the making or distribution of, the use by or administration to any Person of any JJR Product made, used or sold pursuant to any right or license granted to Buyer under this Agreement (including, but not limited to, actions in the form of tort, warranty or strict liability).

12.3.2. Buyer's indemnification under Section 12.3.1 shall not apply to any liability, damage, loss or expense to the extent that it is directly attributable to the reckless misconduct or intentional misconduct of the Seller Indemnities.

12.3.3. Buyer agrees, at its own expense, to provide attorneys reasonably acceptable to Seller to defend against any actions brought or filed against any party indemnified hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

12.3.4. Any Seller Indemnities seeking indemnification hereunder shall promptly notify Buyer of any claim for which indemnification is sought (PROVIDED, HOWEVER, that no delay on the part of any Seller Indemnity in so notifying Buyer shall relieve Buyer of any liability hereunder unless, and solely to the extent that, Buyer is prejudiced thereby), shall cooperate with Buyer in the defense of any such claim, and shall not settle or compromise, or consent to the entry of a judgment with respect to any such claim, without the prior written consent of Buyer, which shall not be unreasonably withheld.

12.3.5. Buyer shall have no liability under Sections 12.3.1(i), 12.3.1(ii) or 12.3.1(iii) above until the aggregate of all sums due hereunder exceeds the Indemnification Floor, in which case Buyer shall be liable for the amount of such sums in excess of $50,000.

13.0 INSURANCE.

13.1. INSURANCE OBLIGATIONS OF BUYER.

13.1.1 Beginning at the time as any JJR Product is being commercially distributed or sold (other than for the purpose of obtaining regulatory approvals) by Buyer, an Affiliate of Buyer or by a sub-licensee of Buyer, Buyer shall, at its sole cost and expense, procure and maintain commercial general liability insurance in amounts not less than $1,000,000 per incident and $1,000,000 annual aggregate and naming the Seller Indemnitees as additional insureds. Such commercial general liability insurance shall provide (a) product liability coverage and (b) contractual liability coverage for Buyer's indemnification under Section 12 of this Agreement. If Buyer elects to self-insure all or part of the limits described above (including deductibles or retentions which are in excess of $250,000 annual aggregate) such self-insurance program must be acceptable to Seller. The minimum amount of insurance coverage required under this Section 13.1 shall not be construed to create a limit of Buyer liability with respect to its indemnification under Section 12 of this Agreement.



JJR 724

13.1.2. Buyer shall provide Seller with written evidence of such insurance upon request of Seller. Buyer shall provide Seller with written notice at least fifteen (15) days prior to the cancellation, non-renewal or material change in such insurance; if Buyer does not obtain replacement insurance providing comparable coverage within such fifteen (15) day period, Seller shall have the right to terminate this Agreement effective at the end of such fifteen (15) day period without notice of any additional waiting periods.

13.1.3. Buyer shall maintain such commercial general liability insurance during (a) the period that any such product, process or service is being commercially distributed or sold (other than for the purpose of obtaining regulatory approvals) by Buyer or by a Sub-licensee and (b) a reasonable period after the period referred to in (iii)(a) above which in no event shall be less than three (3) years.

14.0 LIMITATION OF LIABILITY. Neither party shall be liable to the other party for indirect, incidental or consequential damages arising out of the terms or conditions of this Agreement, the JJR Technology or any JJR Product or with respect to its performance or lack thereof.

15.0 EXPENSES OF TRANSACTION. Except as otherwise provided in Section 7.1.7, whether or not the transactions provided for herein are consummated, each of the parties hereto will assume and bear all expenses, costs and fees incurred by such party in connection with the preparation, negotiation and execution of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

16.0 CONDUCT OF PARTIES. Each party agrees to conduct itself in good faith in all relations with the other party contemplated by this Agreement. Each party agrees not to intentionally take, delay or omit to take any action to avoid compliance with this Agreement; provided, that, this provision shall not be interpreted in any way to require either party to alter its customary method of reaching business decisions or to make business decisions other than (i) in a commercially reasonable manner using prudent business judgment, (ii) in compliance with all applicable laws and regulations and (iii) in accordance with such party's fiduciary and other obligations to its employees and stockholders

17.0 NOTICES.
All notices and other communications required or permitted hereunder shall be in writing and shall be sent by facsimile (with hard copy to follow), courier service or certified mail, return receipt requested, postage prepaid, addressed as follows or to such other address or addresses of which the respective party shall have notified the other party.

If to Seller, to it at

J.J. Reidy & Co., Inc.
1260 Main Street, Holden,

Initial ____    Initial JJR    24

JJR 725

Massachusetts 01520-1020
Attn: President


If to Buyer, to it at

**Free Water Company**
525 Reactor Way,
Reno, Nevada, 89502
Attn: President


18.0  ENTIRE AGREEMENT; MODIFICATIONS AND AMENDMENTS. The agreement of the parties that is comprised of this Agreement and the Schedules hereto, the other Transaction Documents and the other documents referred to herein sets forth the entire agreement and understanding between the parties and supersedes any prior written agreement or understanding and any prior or contemporaneous oral agreement or understanding relating to the subject matter of this Agreement. The terms and provisions of this Agreement may be modified only by a written agreement executed by both parties hereto.


19.0 ASSIGNMENT.

This Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permissible assigns of Seller and Buyer. This Agreement and any rights hereunder shall not be assigned, hypothecated or otherwise transferred by any party hereto without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld, except that either party may assign its rights hereunder to a purchaser or successor in connection with a sale of such party's business (whether by merger, sale of stock or sale of all or substantially all of such party's assets); PROVIDED, HOWEVER, that no assignment by either party shall relieve such party of its obligations hereunder, including without limitation its obligations under Section 12 above.


20.0 GOVERNING LAW, VENUE. This Agreement shall be governed by and construed in accordance with the laws of the State in which the plaintiff resides. Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Plaintiff and of the United States of America located in the State of Plaintiff for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby, and each of the parties hereto agrees not to commence any action, suit or proceeding relating hereto or thereto except in such courts. Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby or thereby, in the courts of the State of Plaintiff or the United States of America located in

Initial          Initial JJR          25

the State of Plaintiff, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

21.0 DISPUTE RESOLUTION. Any controversy, dispute or claim arising out of or in connection with this Agreement, or the breach, termination or validity hereof, shall be settled by final and binding arbitration to be conducted by an arbitration tribunal in the state of Plaintiff pursuant to the Commercial Arbitration Rules of the American Arbitration Association then in effect. The arbitration tribunal shall consist of three arbitrators. The party initiating arbitration shall nominate one arbitrator in the request for arbitration and the other party shall nominate a second in the answer thereto within thirty (30) days of receipt of the request. The two arbitrators so named will then jointly appoint the third arbitrator.

If the answering party fails to nominate its arbitrator within the thirty (30) day period, or if the arbitrators named by the parties fail to agree on the third arbitrator within sixty (60) days, the office of the American Arbitration Association and shall make the necessary appointments of such arbitrator(s). Each party shall pay the costs of its respective arbitrator, and the parties shall share equally the costs of the third arbitrator. The decision or award of the arbitration tribunal (by a majority determination, or if there is no majority, then by the determination of the third arbitrator, if any) shall be final, and judgment upon such decision or award may be entered in any competent court or application may be made to any competent court for judicial acceptance of such decision or award and an order of enforcement. In the event of any procedural matter not covered by the aforesaid rules, the procedural law of The State of plaintiff shall govern.

22.0 INDEPENDENT CONTRACTORS. For the purposes of this Agreement and all services to be provided hereunder, each shall be, and shall be deemed to be, an independent contractor and not an agent, partner, joint venture or employee of the other party. Neither party shall have authority to make any statements, representations or commitments of any kind, or to take any action which shall be binding on the other party, except as may be explicitly provided for herein or authorized in writing.

23.0 SEVERABILITY. If any provision of this Agreement shall be found by a court of competent jurisdiction to be void, invalid or unenforceable in any respect in the jurisdiction or jurisdictions in which it is to be performed, the same shall either be reformed to comply with applicable law or stricken if not so conformable, so as not to affect the validity or enforceability of this Agreement; and no party shall be deemed to be in breach of this Agreement for its failure to perform any obligation which is unenforceable, void or invalid.

24.0 NO WAIVER. No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party. No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or

Initial [signature]    Initial JJR    26

remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies. The terms and provisions of this Agreement may be waived, or consent for the departure there from granted, only by a written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

25.0 COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes and all of which together shall constitute one and the same instrument.

26.0 HEADINGS. The headings and captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope or intent of this Agreement. The parties hereto acknowledge and agree that:

(i)    each party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision; the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and

(ii)   the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in a favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

Initial _____   Initial _JJR_         27

JJR 728

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed under seal by their respective duly authorized officers as of the day and year first written above.

Free Water Company

By: _____

Name: Arthur Neumann

Title: President/COO

J.J. Reidy & Co., Inc.,

By: _____

Name: James J. Reidy

Title: President

*✗ Pages 29 – 64 are copies of the patents*

## 27.0 EXHIBIT A

### ASSIGNED PATENTS

### INVENTION PATENTS AND APPLICATIONS

James Reidy



USPTO PATENT FULL-TEXT AND IMAGE DATABASE

(1 of 1)

| | |
|---|---|
| United States Patent | 5,106,512 |
| Reidy | April 21, 1992 |

Portable air-water generator

### Abstract

A water generating device for obtaining potable water from ambient air inside or outside a structure or dwelling, having ducts for bringing this supply of ambient air to the device and for releasing the air back outside the device after it has been processed. There is an air filter for filtering the air prior to processing of the air. The air filter includes a one-time sensing element which renders it unusable when removed from the generator. A condenser is provided for extracting water vapor in the air brought thereto by the ducts. Within the ducts there is a fan or blower to move air from outside the device through the condenser and for returning the air back outside the device after it has traversed the condenser. Between the condenser and the collection point, there is an immediate temporary holding reservoir, or plumbing to this reservoir, which contains an ultraviolet light to kill existing microorganisms, as well as a pump to transport the water through a subsequent water filter, a second exposure to ultraviolet light, and into the ultimate internal or external water storage unit. The water filter also includes a one-time sensing element which renders it unusable when removed. An internal container is positioned to receive

Initial ✗    Initial JJR    29

## 28.0 EXHIBIT B

### BILL OF SALE AND DISCLOSURE SCHEDULE

JJR 731

## BILL OF SALE

Pursuant to the Patent Sales Agreement of even date herewith, by and among J.J. Reidy & Co., Inc., (The Corporation) a Massachusetts Corporation organized and existing under the laws of Massachusetts having a place of business at 1260 Main Street, Holden, Massachusetts 01520-1020 and Free Water Company a corporation of the State of Nevada, having its principal place of business at, 525 Reactor Way, Reno, Nevada, 89502, a corporation organized and existing under the laws of the State of Nevada, (The Buyer"), and in consideration of the payments amounting to six million dollars ($6,000,000.00) USD to J.J Reidy & Co., Inc., J.J Reidy & Co., Inc, does hereby assign, sell, transfer and convey to the Buyer all of the Corporation's right, title and interest as of the date hereof in and to the property and assets of which are listed on Exhibit A hereto (the "Assets").

TO HAVE AND TO HOLD, the Assets hereby conveyed, all and singular, unto the Buyer, to and for its use and benefit.

Corporation represents and warrants to the Buyer that he has good and valid title to and is the lawful owner of the assets, and that Corporation has the right to sell the Assets free and clear of all liens, claims and encumbrances.

Buyer will, at any time and from time to time after the date hereof, upon the reasonable request of the Corporation, do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged or delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney or assurances as may be required for the better transferring, assigning, conveying and confirming to the Buyer, or for aiding and assisting in reducing to possession by the Buyer, any of the Assets or rights being purchased hereunder, or to vest in the Buyer good, valid and marketable title to such Assets and rights.

This Assignment and Bill of Sale shall inure to the benefit of the Buyer and shall be binding upon Corporation and his successors and assigns.

IN WITNESS WHEREOF, Corporation has caused this Assignment and Bill of Sale to be duly executed this _____ day of _____, 2005.

By (Print):  James J Reidy

Signature: _____

Initial _____  Initial JJR            66

## Legal Proceedings

In January 2005, we received a termination notice from J.J. Reidy & Company, the AirWater patent holders allegedly terminating the Global License Agreement that was entered into in March 2003, alleging Breach of Contract. The company has filed an action in the U.S. District Court for the Southern District of Florida (case no. 05-20650-CIV-Jordan/Klein), seeking Declamatory relief from the court, determining its rights, status and legal relations as well as Money Judgment against J.J. Reidy & Company. Meanwhile, J.J. Reidy & Company had already made a court filing in Boston Massachusetts, in December 2004.

— End —

Initial     Initial  JJR          67

JJR 733

**EXHIBIT F**

# GLOBAL
# MANUFACTURING AND MARKETING
# LICENSING AGREEMENT

This Agreement is made and entered this __21ˢᵀ day__ of March 2003 by and between;

**J.J. Reidy & Co., Inc.,** a Massachusetts Corporation whose principal address is 1260 Main Street, Holden Massachusetts 01520-1020, hereinafter referred to as "LICENSOR" and;

**AirWater Corporation,** a Florida Corporation, whose principal address is suite 6K, Lincoln Road, Miami Beach Florida 33139, hereinafter referred to as "LICENSEE".

## WITNESSETH

**WHEREAS, LICENSOR** represent and warrants that it has the entire right, title, and interest in and to United States Patents numbered 5,106,512, 5,149,446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and any patents to issue, foreign or domestic on any continuation or division thereof and any new patents, foreign or domestic, granted to LICENSOR relating to the Water Production/Generations System (hereinafter collectively referred to as "LICENSED PATENTS"), and generally known as the WATERSTAR systems, and that LICENSOR has the absolute and undisputed rights to grant the licenses under the LICENSED PATENTS as specified hereinafter; and

**WHEREAS LICENSEE** represents that it is a US Corporation formed and registered in the State of Florida, and so licensed to do business, and,

**WHEREAS LICENSEE** is a wholly owned subsidiary of Universal Communications Systems Inc, a publicly traded company trading on the NASD OTC BB under the symbol "UCSY", and,

**WHEREAS LICENSEE** has indicated to LICENSOR of its interest in both manufacturing and marketing the WATERSTAR systems and technologies, on a world wide basis, and,





1    JR

**WHEREAS LICENSEE** is desirous of obtaining a global right and license to manufacture, assemble, use and sell Water Production/Generation System products, and component parts therefore, falling under the scope of any LICENSED PATENT (hereinafter referred to as "LICENSED PROPERTY"); and

**WHEREAS LICENSOR** is willing to grant such right and license to LICENSEE under the conditions hereinafter set forth;

**NOW THEREFORE**, in consideration of mutual covenants, promises and undertakings contained herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby reciprocally acknowledged, the undersigned parties agree as follows.

# TERMS OF AGREEMENT

### GRANT OF LICENSE:

LICENSOR hereby grants to LICENSEE, for the term of this AGREEMENT, as a right and license to use and sell LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS, according to the provisions set forth hereinafter with the full right and privilege to alter, change and / or modify the contents and peripheral materials associated with LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY

RIGHTS with the conditions set forth herein, and the right to sublicense sale and distributions of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS according to the provisions and the conditions set forth hereinafter.

### TERM OF LICENSE:

The term of this Agreement shall commence upon the date of execution of this agreement and shall remain binding and continue for a period of not less than 10 years, and / or for the life of the last expiring LICENSED PATENT, whichever comes last, unless terminated sooner as provided herein.

2   JR

## OWNERSHIP OF LICENSED PROPERTY:

This license agreement is not a sale or lease of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS from LICENSOR and the full title, rights and interests shall remain in the name of LICENSOR unless otherwise expressed herein and upon written mutual consent of both parties.

## PURPOSE

The purpose of LICENSEE will be, but is not limited to, the manufacture, sale and distribution of Water Production Generation Systems, and being of the invention of the LICENSOR, or derived or evolved there from, which system(s) is/are designed to produced potable water from the air.

## THE TERRITTORY

LICENSEE agrees that this Global Marketing and License Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions.

## VALIDITY

LICENSOR grants to LICENSEE this LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS for a period not less than 10 years, and / or the life of the last expiring patent, whichever comes last, and in any event agrees that it will not sell, allocate, transfer or sublicense to any third party without the expressed written permission of the LICENSOR.

## PAYMENT AND CONSIDERATION

LICENSEE further agrees to deliver 2 payments to LICENSOR's designated individuals a Global Marketing and Licensing Fee in the amount totaling $100,000 on or before July 1st 2003, (one payment due July 1st 2003, the second payment payable on August 1st 2003) plus four (4) million shares of UCSY to be delivered to the LICENSOR, (or his designees) within 21 days from the date of the execution of this Agreement.



3    JR

These 4 million UCSY shares shall be issued as 144 shares, which in line with SEC regulations are restricted from sale for a period of not less than one year, unless subjected to a registration with the SEC and such registration is approved. These shares will be included in any company filing / registration, which the company undertakes to effect in not more than 180 days from the date of execution of this agreement.

## ROYALTY PAYMENTS

LICENSEE further agrees to pay a royalty fee on all sales of manufactured models in the amount of five per cent (5%) of all gross sales less any applicable taxes, for any machines and or components sold in the amounts not exceeding $10,000 each. For all other sales of units and or components, the Royalty Fee shall be seven percent (7%).

LICENSOR shall receive royalties on the quarterly gross sales of LICENSEE, and any of its sub LICENSEES. The royalties shall be computed based on the sales price, less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes, and other such amounts.

This royalty levied on gross sales shall be paid for all sales made on a Quarterly basis.

The payment will be remitted to the LICENSOR on or before the 30th day following the closing of the quarterly period.

LICENSEE will provide LICENSOR on a quarterly basis a full accounting of units shipped, units billed, and a receivables aging, until that time both parties agree to waive this requirement.

The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:

Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales during that fiscal quarter.



4   JR

## MINIMUM MONTHLY ROYALTY PAYMENTS:

LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above whichever is the more.

LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

## LATE PAYMENT OF ROYALTIES:

LICENSOR may elect, to accept late payment fees from LICENSEE of two percent (2.0%) of any gross amount due LICENSOR should any payment due not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

## MANUFACTURING BY LICENSEE & THIRD PARTIES

LICENSOR further acknowledges that LICENSEE intends to offer to manufacture the said units and models in other countries around the world, and LICENSOR hereby confirms that the LICENSEE is granted the absolute right to so offer 3rd parties the sub-rights at all times adhering to the terms and conditions of this agreement.

## SUBLICENSE CONTRACTS

LICENSEE shall have the right to sublicense the LICENSED PROPERTY to any and all third parties it deems creditable and trustworthy to distribute and or market and or sell the LICENSED PROPERTY within the geographical limits as shall be agreed.

Both parties agree that the definition of Sublicense shall mean, "The right granted by the Licensee to any third party to manufacture, market and or distribute the LICENSED PROPERTY pursuant to the provisions and conditions provided herein, and as shall be amended to accommodate the particular situation.



5   JR

LICENSEE retains the rights to charge and retain, and or waive, finance and or to accept partial payments (down payments) for any and all sublicense fees, as shall be the case on a case-by-case basis.

LICENSEE shall provide and deliver sublicense contracts to LICENSOR as a matter of record.

LICENSEE agrees that all sublicenses and related contracts are to encompass and embrace the parameters of this Agreement, and shall be created so as not to be in violation of any of the provisions contained herein, in part or in whole.

## SUBLICENSE PROPERTY

All sublicenses shall be considered proprietary and confidential and shall remain the property of the LICENSEE and/or the introducing party.

## PRODUCT ENDORSEMENT

LICENSEE may seek endorsements, including celebrity endorsements that LICENSEE deems qualified to represent LICENSED PROPERTY, and such endorsements obtained by LICENSEE shall remain the property of LICENSEE. LICENSOR agrees to acknowledge by letter the right of LICENSEE to use the prior or future endorsements at the discretion of LICENSEE in an appropriate manner of marketing with the consent of the endorser.

## LICENSEE OBJECTIVE AND GLOBAL MARKETING

LICENSEE's overall objective is to establish and maintain the awareness and the exposure of LICENSED PROPERTY to enhance sales and future growth.

LICENSEE will maintain the image and integrity of LICENSED PROPERTY for duration of this License Agreement. No marketing campaign shall be undertaken which fails to project good moral and ethical values. This specifically includes companies, which fail to reflect the highest of moral standards.



6   JR

LICENSEE hereby commits the resources and puts forth best efforts in accomplishing, completing, and fulfillment of the promises contained herein.

LICENSEE shall have the right to create commercial production (radio, television, print) and other means in which to fulfill License Agreement.

LICENSE may create a long-term public relations strategy in which to achieve awareness \ sales, and growth.

## PRODUCT NAME AND LOGO's

LICENSEE retains the right to change the LICENSED PRODUCTS's name without the expressed written consent of LICENSOR.

## DESIGN PACKAGING.

LICENSEE shall hereby have the right to alter, change, add and or remove any item, color, format or material in any existing design packaging with the expressed written consent hereby granted by LICENSOR.

## COPYRIGHT USAGE

LICENSOR hereby grants the right to LICENSEE the use of any and all, in part or in whole, copyright materials as they currently relate to the LICENSED PROPERTY.

## TRADEMARK REGISTRATION – US. / FOREIGN

LICENSEE shall make application and pay filing fees in registering changes to trademark and or trade names, registrations, and service marks when and where applicable.

## GRANT OF TRADEMARK USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trademarks as they currently relate to the LICENSED PROPERTY under the conditions contained herein.



7  JR

## GRANT OF TRADE NAME USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trade names, symbols, or logo's associated with LICENSED PROPERTY as they currently relate, under the conditions contained herein.

## TRADEMARK QUALITY CONTROL

LICENSOR has the right to approve LICENSED PROPERTY sold bearing the trademark licensed herein for conformance with LICENSOR's quality standard.

Before implementing changes in the goods sold under the trademark, LICENSEE shall provide LICENSOR a specimen of the proposed changes.

LICENSOR shall have 2 weeks in which to pass comment, denying or approving the said changes within reason. If LICENSOR does not object within the said 2 weeks, the said changes are deemed approved.

## PRODUCT AND MATERIAL ADDITIONS

LICENSEE shall have the right to make any additions to the LICENSED PROPERTY without the expressed written consent of the LICENSOR for market appeal and or added value. Any such added materials shall remain the property of the LICENSEE at all times, subject to continuing payment of royalties.

## ASSEMBLY

LICENSEE has the right to assemble and or have assembled LICENSED PROPERTY where and whenever applicable.

## UNIVERSAL PRODUCT CODE

LICENSOR shall provide LICENSEE any existing UPC codes for the LICENSED PROPERTY.



8  JR

## LICENSE PARAMETER

LICENSOR agrees and confirms that this exclusive Agreement is not limited to any county, state or country worldwide.

## MAINTENANCE OF PATENT(s)

LICENSOR hereby agrees and confirms that the above referenced patents are all valid, in good standing and that he has disclosed all pertinent and relevant information relative to the patents, and further confirms that he will maintain the validity and good standing of the patents.

## PRODUCT LIABILITY INSURANCE

LICENSEE shall during the entire term of this agreement, maintain an adequate Insurance Policy, to commence upon the first commercial production and sales of product, such product liability insurance to cover LICENSED PROPERTY sold by LICENSEE or any of its sub licensees, and J.J. Reidy & Co Inc., shall be named "additional insured" thereon with respect to any claims made against LICENSOR as a result of LICENSEE's or any of its sub licensee's sales of LICENSED PROPERTY.

LICENSEE agrees to provide a copy of such insurance policy within 30 days of execution of its marketing opening dates of sales. LICENSEE shall also indemnify and hold harmless J.J. Reidy & Co Inc, its employees, directors, officers, shareholders as to any claims, lawsuits, threatened litigation or judgments rendered, relating to the LICENSED PROPERTY sold by the LICENSEE and /or any of its sub licensees.

## TRADE SECRETS

Both parties acknowledge and agree that the other party possesses trade secrets that are proprietary property, and constitute a valuable trade secret. Both parties agree not to disclose and or make available to third parties the information that shall include, but be limited to, this Agreement and any other Agreement that may be entered into between the parties, without the expressed written consent of the other party.



9   JR

## FOREIGN PATENT AND TRADEMARK AND REGISTRATIONS

If at the LICENSEES request the LICENSOR shall make application for foreign trademark and or trade name registration, then the LICENSEE shall pay all fees necessary.

LICENSEE, when applicable shall retain the full rights, title, and interest in any and all trademark(s) and trade name(s) registration in foreign countries as long as this license Agreement is in force.

LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSOR, at his own expense.

## RECORDS AND INSPECTION

LICENSEE shall reduce all sublicenses granted herein written Agreements and copies will be provided to LICENSOR.

## TRANSFER OF CUSTODY, KNOW HOW AND TECHNICAL ASSISTANCE

LICENSOR agrees to provide all information in its possession to assist LICENSEE to distribute and sell LICENSED PROPERTY. LICENSOR shall transfer to the care and custody of LICENSEE within 30 days from the execution of this Agreement, all information requested by LICENSEE in its possession pertaining to the LICENSED PROPERTY, and all information material and pertaining to the sales thereof, and consisting of, for example, but not limited to:

All design Data, films, disks, camera work, negatives, layouts, registration mark copy for production and reprint, logos, type fonts, etc.

Process Specifications-All details, processes, steps and procedures concerning, but not limited to care of product, storage, the do's and don'ts, print specifications, packaging specifications, etc.



10    JR

Commercial Operation Data-volume discounts, minimum order levels, maximum order levels, turn-around production time, shipping costs and requirements, etc.

Endorsement Grant-granting the permission to LICENSEE the use of any and all previous or future endorsements with the permission of the endorser.

LICENSOR shall also make available in timely fashion, all future improvements relating to the LICENSED PROPERTY, including change, and modifications and specifications, methods and materials, during the term of this Agreement.

## TERMINATION OR REVOCATION OF LICENSE

This Agreement and the rights and licenses granted herein shall wholly cease and terminate prior to the termination of the license as described hereinabove upon the occurrence of any of the following events.

Any material breach by either party of the terms of this Agreement, provided the non-breaching party in the one seeking the termination and gives the other party written notice on intention to terminate, which shall state the fault or breach upon which the party relies.  The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time; or

If the LICENSOR does not receive the Licensing fee at the time of the joint approval and signing of this agreement or any other subsequent payment due LICENSOR that is not paid within 5 business days within its due date.

This agreement shall terminate upon the insolvency and/or criminal conviction of either party unless other agreed to in writing.

Upon termination, LICENSOR shall have the first right of refusal to purchase Licensee's inventory for cost payable within 30 days of written offer.

The written offer must be accepted within 30 days of being made. In no event shall LICENSEE sell existing inventory after a period of 12 months following the termination notice.



11   -SR

The mutual consent of the parties expressed in writing.

This agreement will terminate with notice, if LICENSEE does not make any required payments to LICENSOR as specified within the stated and agreed time periods.

The LICENSOR agrees to grant to the LICENSEE a 14 day period of notice / grace in which the LICENSEE can make good on any outstanding amount.

## EFFECT OF TERMINATION OR REVOCATION

The termination of this agreement shall not release LICENSEE from the obligation to pay LICENSOR any accrued sums owed to LICENSOR or from fulfilling any other accrued obligation. Additionally such termination shall be without prejudice to any right or remedy, which either party may have or believes it has against the other party.

The termination of this agreement as a result of the provisions and conditions provided herein, and/or the breach thereof, or an uncontrolled act of G-d, government, laws, etc., which prohibit the fulfillment of this Agreement shall not bind the LICENSEE to fulfill any projected sales figures.

In no case shall LICENSEE have any claims for repayment or offset of any sum or sums, which shall have been paid, as required under the terms of this agreement

Upon termination, each party will retain proprietary property(s) and the complete rights title, and interest of any and all proprietary property, information and material introduced.

Upon termination and revocation of License Agreement, each party will properly return, in a timely fashion and all proprietary property to the owner, in the same manner and condition received in relation to paragraph above.

Upon termination and revocation of License Agreement. LICENSOR has the right to purchase from LICENSEE any items not considered LICENSED PROPERTY, such as, but not limited to, changes in the LICENSED PROPERTY name, trade mark or trade name, universal product codes,



12    JR

marketing materials changes, alterations, and/or modifications duly registered etc., at a fair market price.

## DURATION/TERM/MAINTANENCE OF EXCLUSIVITY

The License granted herein exclusive to a geographical territory as defined above and shall remain exclusive unless terminated in accordance with the terms of this agreement.

LICENSEE agrees to put forth its best efforts to sell LICENSED PROPERTY during the period of exclusivity of the Licenses granted herein.

## INFRINGEMENT:

In the event any infringement of LICENSOR's patents is discovered in any country recognizing such patents and/or litigation commences with respect to any claim of infringement of LICENSOR's patents, LICENSEE has the option to pursue any and all litigation to protect the marketing effort.

LICENSEE has the sole discretion to determine how much to incur in legal expenses in pursuing any infringement claim or litigation based upon what is reasonable and in the best interest of LICENSEE.

LICENSOR shall have the option to participate in such claim in proportion to the expense LICENSEE bears, i.e. 50% of litigation expenses = 50% of the claim/settlement. In the event LICENSOR exercises this option to participate, LICENSOR shall be entitled to retain an equal percentage amount, in relation to the percentage amount of expenses incurred, of the receipts from such settlement, judgment, compromise or arbitration.

In the event infringement is discovered and LICENSEE does not act upon settlement of infringement or litigation in a reasonable amount of time as not to effect the marketing campaign, sales, and/or growth, LICENSOR shall have the right to pursue the infringing party for damages, and retain the proceeds.

13   JR

## USE RESTRICTIONS:

LICENSEE agrees not to use LICENSED PROPERTY in any illegal fraudulent, or deceptive manner to damage the good name and / or standing of the LICENSED property

## TRANSFER RESTRICTIONS/ASSIGNABILITY/SUB-LICENSE/SALE

Any party may assign and/or sell this Agreement to any third party, subject to first offering the other party a first right of refusal. Any such assignment and/or sale shall be made in accordance with the provisions herein.

LICENSEE has the right to have other parties manufacture for it, provided the manufacturer enters into a Non-Compete and Non-Disclosure Agreement with LICENSOR. If LICENSEE sells or assigns this License, LICENSOR will receive from LICENSEE fifteen percent (15%) of the assignment/sale price.

## ASSIGNMENT/SALE

LICENSOR agrees to notify LICENSEE of any contemplated assignment /sale of LICENSOR's patents during the term of this Agreement with thirty (30) days notice.

LICENSEE agrees to notify LICENSOR of any contemplated assignment /sale of this License during the term of this Agreement with thirty (30) days notice.

In either of the above cases, each party shall offer the other party the right of first refusal.

14   JR

## WAIVERS:

No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.

The waiver by any party of any of the conditions precedent to its respective obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement.

## BENEFITS:

Except as expressly provided in this Agreement, nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligation, or liability under or by reason of this Agreement

## CONSTRUCTION/JURISDICTION:

Inasmuch as the transactions, which may arise or occur between the parties and/or their principals may cross boundaries of national and or international jurisdiction, this Agreement shall be construed and interpreted in Accordance with the laws of the United States of America and the resident state of the Plaintiff.

## SEVERABILITY:

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

15   -sℓ

## ARBITRATION

The parties may elect to settle and differences by submitting to Arbitration in the resident state of the plaintiff. The Arbitrators decision shall be and remain binding to either and both parties.

## NOTIFICATION

Any notice hereunder must be in writing and by courier service with signed receipt and shall be deemed to have been given when such notification, properly addressed to the addressee indicated above, is sent by courier and receipt acknowledged. Either party hereto may at any time by thirty (30) days notice to the other; designate any other address in place of those given above.

## FURTHER DOCUMENTS:

Each of the parties hereto agrees to execute and deliver all such documents and to do any and all acts, matters and things as may be necessary or proper in order to carry out the intended purposes of this Agreement.

## PRIOR AGREEMENTS:

This Agreement shall supersede and replace any and all prior Agreements entered into between the parties hereto related to the subject matter hereof and any such prior Agreements shall be, and they are hereby, canceled.

## EMPLOYEE STATUS:

It is understood and agreed by both parties that neither party is an employee of the other.

## EFFECTIVE DATE:

The effective date of this Agreement shall be upon the acceptance and execution thereof by both parties.



16    JR

## ENTIRE AGREEMENT:

This instrument of 18 pages contains the entire Agreement between LICENSOR and LICENSEE, and no modification hereof shall be binding on the parties unless it is in writing and signed by a duly authorized officer of the parties to be bound.

## AUTHORITY:

All parties warrant that they have the requisite authority and capacity to execute this Agreement and that its terms and provisions constitute valid and legally enforceable rights and obligations against the parties, their successors, administrators, etc.

## DOCUMENT ORIGINALS:

This document is considered as an original, binding and enforceable Agreement, whether executed in original, binding counterparts or Facsimile.

## INTENTIONALLY LEFT BLANK.



JR

17

IN WITNESS WHEREOF, the parties have affixed their names, signatures, and seals, by their executive officers thereto duly authorized, on the day and year first above written.

**ON BEHALF OF LICENSEE:**

M J Zwebner - Chairman
AirWater Corporation

**ON BEHALF OF LICENSOR:**

James J. Reidy, President
J.J. Reidy & Co., Inc.

Subscribed and sworn to before me

This _21st_ day of _March_ 2003

Notary Public Notary Public
My commission expires: _1/9/03_

OFFICIAL NOTARY SEAL
ROLANDO S SABLON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD083309
MY COMMISSION EXP. JAN. 9 2006

18

# EXHIBIT G

# LONGO & LONGO, LLP
### 280 SOUTH BEVERLY DRIVE
### SUITE 210
### BEVERLY HILLS, CA 90212
### (310) 271-9388
### Fax: (310) 271-9194
### E-mail: longollp@pacbell.net

Via Mail

April 18, 2005

Elizabeth M. Schwabedissen
Adorno & Yoss
2525 Ponce De Leon Blvd., Suite 400
Miami, Florida 33134-6012

Dear Elizabeth M. Schwabedissen,

Please find enclosed, documents responsive to your subpoena in Case No. 05-20650.

Very Truly Yours,
LONGO & LONGO LLP

FRANK J. LONGO

FJL/gl

Enclosure:

**LONGO & LONGO, LLP**
280 SOUTH BEVERLY DRIVE
SUITE 210
BEVERLY HILLS, CA 90212
(310) 271-9388
Fax: (310) 271-9194
E-mail: frankjlongo@yahoo.com

Via Facsimile

March 23, 2005

Mr. Jim Reidy
1260 Main St.
Holden, MA 01520

Dear Mr. Reidy,

Air2Water, LLC has received your recent March 4, 2005 offer to license your patents. Even though we are extremely interested and have negotiated for these rights over the past 3 to 4 years, for $3 to $4 million, given your pending litigation with Michael Zwebner and his company, we cannot at this time negotiate a deal.

Very truly yours,

LONGO & LONGO, LLP

FRANK J. LONGO

Cc:    Michael Klein

# J.J. Reidy & Co., Inc.
## 1260 Main Street, Holden, MA  01520-1020

**Telephone:**  (508) 829-6550
**Fax:**  (508) 829-6492
**Email:**  jjreidy@earthlink.net
**URL:**  http://www.drinkingwaterfromtheair.com



March 4, 2005

Mr. Mike Klein
World Wide Water
105 Buckskin Road
Bell Canyon, CA  91307

Dear Mike:

You should know that we have terminated our world-wide Exclusive License with AirWater Corp. and AirWater Patents, Inc., both of Miami Beach.

For the last 3 to 4 years you have expressed a continuous interest in obtaining the rights to both our existing and pending patents.

We have decided to sell our intellectual property outright and would look forward to your offer now that these patents are back into our possession.

Please contact me at your convenience. We look forward to working with you.

Respectfully yours,

James J. Reidy
President

# EXHIBIT H



*Bowditch*
*&Dewey*
ATTORNEYS

Maura A. Greene
Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

March 22, 2007

## VIA FACSIMILE AND FIRST CLASS MAIL

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

Re:    *J.J. Reidy Co., Inc. v. AirWater Patents Corporation, et al*
      *Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

We have received your draft motion and considered your request to continue the discovery deadline, which expires on Friday, March 23, 2007, for sixty days. We do not agree to extend the discovery deadline. As the depositions of the parties were previously scheduled, we anticipate that those depositions will go forward after we receive the documents we have requested from your client.

Very truly yours,

Maura Greene

Maura A. Greene

MAG/aec

cc:    Thomas J. Conte, Esquire

{Client Files\LIT\304269\0002\COR\F0397054.DOC:1}

BOWDITCH & DEWEY, LLP   175 CROSSING BOULEVARD   SUITE 500   FRAMINGHAM, MA 01702
T 508.879.5700   F 508.879.1194   www.bowditch.com

# *Bowditch &Dewey*
### ATTORNEYS

Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

## *FACSIMILE TRANSMITTAL SHEET*

| TO: Matthew P. Zayotti, Esq. | FAX NUMBER: 617-951-1354 | PHONE NUMBER: 617-951-1400 |
|---|---|---|
| DATE: March 22, 2007 | | |
| FROM: Maura A. Greene | TOTAL NO. OF PAGES INCLUDING COVER: 2 | |
| RE: J.J. Reidy & Co., Inc. v. AirWater Corporation | CLIENT/MATTER NUMBER: 304269.0002 | |

URGENT     FOR REVIEW     PLEASE COMMENT     PLEASE REPLY     PLEASE RECYCLE

## CONFIDENTIALITY NOTE

The documents accompanying this facsimile transmission contain information from the law firm of Bowditch & Dewey, LLP, which is confidential and/or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this faxed information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.

If you do not receive all pages or receive this fax in error, please call Amy at (508) 416-2454.

{Client Files\LIT304269\0002\FAX\F0397161.DOC;1}

