UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-40049-FDS

(Consolidated with AirWater Patents, Inc. v. J.J.
Reidy & Co., Inc., a Massachusetts Corporation;
United States District Court Southern District of
Florida, Miami Division, Case No. 05-20650-
CIV-JORDAN)

| | |
|---|---|
| J.J. REIDY & CO., INC., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) **AFFIDAVIT OF** |
| AIRWATER CORPORATION and | ) **JAMES P. HOBAN, ESQUIRE** |
| AIRWATER PATENTS CORPORATION, | ) |
| | ) |
| Defendants. | ) |

I, James P. Hoban, on oath depose and state as follows:

1.      I am an attorney in good standing in the Commonwealth of Massachusetts and am

co-counsel to plaintiff, J. J. Reidy & Co., Inc. in the above-entitled action.

2.      Attached hereto as **Exhibit A** is a true and accurate copy of an Amendment to a

Form 10-KSB filed with the Securities and Exchange Commission on or about June 30, 2004.

This document was authenticated by Michael J. Zwebner, the Fed. R. Civ. P. 30(b)(6) designee

of the defendants and marked as Deposition Exhibit No. 5 on June 8, 2007.

3.      Attached hereto as **Exhibit B** is a true and accurate copy of a Form 10-KSB filed

with the Securities and Exchange Commission on or about January 15, 2005.  This document

was authenticated by Michael J. Zwebner, the Fed. R. Civ. P. 30(b)(6) designee of the defendants

and marked as Deposition Exhibit No. 7 on June 25, 2007.

4.      Attached hereto as **Exhibit C** are true and accurate copies of excerpts from the

Fed. R Civ. P. 30(b)(6) Deposition of defendants AirWater Corporation an AirWater Patents

Corporation dated June 8, 2007.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS** _12_ **DAY**

**OF JULY 2007.**

_____

James P. Hoban

**EXHIBIT A**

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
  !FgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 OmhkoxnoDfwDp4QwuEvJP2yjeVD2T36DSOLRH8Pr9LfmEZ90OznfEPsFtjuTnW8D
 t0B5wgqGwVKcF62Y/gOttg==

<SEC-DOCUMENT>0001116502-04-001687.txt : 20040630
<SEC-HEADER>0001116502-04-001687.hdr.sgml : 20040630
<ACCEPTANCE-DATETIME>20040630111223
ACCESSION NUMBER:          0001116502-04-001687
CONFORMED SUBMISSION TYPE: 10KSB/A
PUBLIC DOCUMENT COUNT:     9
CONFORMED PERIOD OF REPORT: 20030930
FILED AS OF DATE:          20040630

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:             UNIVERSAL COMMUNICATION SYSTEMS IN
                CENTRAL INDEX KEY:                  0001098207
                STANDARD INDUSTRIAL CLASSIFICATION: TELEPHONE COMMUNICATIONS (NO RADIO
                IRS NUMBER:                         860887822
                STATE OF INCORPORATION:             NV
                FISCAL YEAR END:                    0930

        FILING VALUES:
                FORM TYPE:          10KSB/A
                SEC ACT:            1934 Act
                SEC FILE NUMBER:    000-30405
                FILM NUMBER:        04890372

        BUSINESS ADDRESS:
                STREET 1:           407 LINCOLN ROAD
                STREET 2:           SUITE 6K
                CITY:               MIAMI
                STATE:              FL
                ZIP:                33139
                BUSINESS PHONE:     5108396100

        MAIL ADDRESS:
                STREET 1:           407 LINCOLN ROAD
                STREET 2:           SUITE 6K
                CITY:               MIAMI
                STATE:              FL
                ZIP:                33139

        FORMER COMPANY:
                FORMER CONFORMED NAME:  WORLD WIDE WIRELESS COMMUNICATIONS INC
                DATE OF NAME CHANGE:    20000124
</SEC-HEADER>
<DOCUMENT>
<TYPE>10KSB/A
<SEQUENCE>1
<FILENAME>univ10ksb-a.txt
<DESCRIPTION>ANNUAL REPORT ENDED 9-30-2003
<TEXT>
```



PT EXHIBIT
6/8/07
5
Zwebner

                    U.S. SECURITIES AND EXCHANGE COMMISSION
                           Washington, D.C. 20549

FORM 10-KSB/A
Amendment Number 1

x]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
      ACT OF 1934

      For the fiscal year ended September 30, 2003

[ ]   TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
      ACT OF 1934

      For the transition period from _____ to _____

Commission file number: 000-30405

                    Universal Communication Systems, Inc.
                    ---------------------------------------
                    (Name of small business issuer in its charter)

            Nevada                                  860887822
            ------                                  ---------
      (State or other jurisdiction of     (I.R.S. Employer Identification No.)
      incorporation or organization)

407 Lincoln Road, Ste 12F, Miami Beach, Florida              33139
- ---------------------------------------------              -----
      (Address of principal executive offices)           (Zip Code)

407 Lincoln Road, Ste 6K, Miami Beach, Florida               33139
- ---------------------------------------------              -----
      (Address of former principal executive offices)    (Zip Code)

Issuer's telephone number: (305) 672-6344

Name of each exchange on which registered:  OTC Bulletin Board under the trading
                                            symbol UCSY

Securities registered under Section 12(b) of the Act:  None

Securities registered under Section 12(g) of the Exchange Act:

                    Common Stock, $.001 par value per share
                              (Title of class)

         Check whether the issuer (1) filed all reports required to be filed by
Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such
shorter period that the registrant was required to file such reports), and (2)
has been subject to such filing requirements for the past 90 days.
Yes [X] No [ ].

         Check if disclosure of delinquent filers in response to Item 405 of
Regulation S-B is not contained in this form, and no disclosure will be
contained, to the best of registrant's knowledge, in definitive proxy or
information statements incorporated by reference in Part III of this Form 10-KSB
or any amendment to this Form 10-KSB. [ ]

Issuer's revenues for its most recent fiscal year:  $0

Aggregate market value of voting stock held by non-affiliates of the issuer as
of December 30, 2002: $5,670,640

State the number of shares outstanding of each of the issuer's classes of

common equity, as of the latest practicable date. 103,123,070 shares of common stock as of December 30, 2003.

Documents incorporated by reference:          None.

Transitional Small Business Disclosure Format:  Yes [ ]  No  [X]
<PAGE>

                    Universal Communication Systems, Inc.

                          Index to Annual
                        Report on Form 10-KSB
               For The Fiscal Year Ended September 30, 2003

                                                              Page

ITEM 1.     DESCRIPTION OF BUSINESS.............................................3

ITEM 2.     DESCRIPTION OF PROPERTY............................................6

ITEM 3.     LEGAL MATTERS......................................................7

ITEM 4.     SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS................7

ITEM 5.     MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS...........8

ITEM 6.     MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATIONS........11

ITEM 7.     FINANCIAL STATEMENTS..............................................16

ITEM 8.     CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING
               AND FINANCIAL DISCLOSURE.......................................16

ITEM 8A.    CONTROLS AND PROCEDURES...........................................16

ITEM 9.     DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS;
               COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT ............17

ITEM 10.    EXECUTIVE COMPENSATION............................................19

ITEM 11.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.....19

ITEM 12.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS....................20

ITEM 13.    EXHIBITS AND REPORTS ON FORM 8-K.................................21

ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES...........................22

SIGNATURES...................................................................23

                                   -2-

<PAGE>

                                  PART I

Introductory Statement
- ----------------------
  All statements contained herein that are not historical facts, including but
not limited to, statements regarding the Company's current business strategy,
the Company's projected sources and uses of cash, and the Company's plans for
future development and operations, are based upon current expectations. These
statements are forward-looking in nature and involve a number of risks and

uncertainties. Actual results may differ materially. Among the factors that could cause actual results to differ materially are the following: the availability of sufficient capital to finance our business plans on terms satisfactory to us; competitive factors; changes in labor, equipment and capital osts; changes in regulations affecting our business; future acquisitions or strategic partnerships; general business and economic conditions; and factors described from time to time in the reports filed by us with the Securities and Exchange Commission. Readers are cautioned not to place undue reliance on any such forward-looking statements, which statements are made pursuant to the Private Litigation Reform Act of 1995 and, as a result, are pertinent only as of the date made.

All of the share price information presented herein has been adjusted to reflect the 1 for 1,000 reverse split of our outstanding common stock effective August 23, 2002.

ITEM 1.  DESCRIPTION OF BUSINESS

Introduction

For the past two fiscal years we have had minimal revenues. We have a history of losses, and an accumulated shareholder deficit of $31,833,598. Because of our recurring losses, our independent auditors have expressed doubt as to our ability to continue as a going concern.

We will require short-term outside investment on a continuing basis to finance our current operations and capital expenditures. If we do not obtain short term financing we may not be able to continue as a viable concern. We do not have a bank line of credit, although our subsidiary has a checking account overdraft facility, and there can be no assurance that any required or desired financing ill be available through bank borrowings, debt, or equity offerings, or otherwise, on acceptable terms. If future financing requirements are satisfied through the issuance of equity securities, investors may experience significant dilution in the net book value per share of common stock.

We currently have three channels of activity, each conducted by a wholly owned subsidiary. Air Water Corporation, ("AirWater") a Florida corporation formed in March, 2003, has been established to design, manufacture (utilizing contract manufacturing organizations) and market systems that perform water extraction from air. Millennium Electric T.O.U. Ltd., ("Millenium") an Israeli company, acquired September, 2003, specializes in the development and installation of solar power systems worldwide, primarily to government and industrial users. Solar One, Inc., ("Solar One") a Florida corporation, formed in July, 2003, manufactures (subcontracted to third parties) and markets portable photovoltaic cells in leather cases for consumer electronic products. Solar One was formed to source the manufacturing and to market the product line of photovoltaic consumer energy panel products designed by Solar Style, Ltd., an Israeli company 50% owned by us. We have recently combined the technology of the photovoltaic system of Millenium and the water extraction systems of Air Water and developed a self powered air water machine.

We are focusing our sales efforts in the European, African, Middle Eastern and Asian government and industrial markets for Air Water and Millenium product and service offerings. Solar One is targeting the North American and European consumer markets. We have discontinued, effective January, 2003, our previous telecommunication and wireless broad band business activities to focus on the water extraction and photovoltaic technology.

-3-

<PAGE>

History

In February of 1997, Worldwide Wireless, Inc., a Nevada corporation, was formed
to coordinate the operations of TSI Technologies, Inc., a Nevada corporation,
and National Micro Vision Systems, Inc., a Nevada corporation. Its purpose was
to complete the development of its patented advanced distributed wireless
telephone and network designs and to finance, manufacture, and market these
units and systems. TSI Technologies, Inc. was the research and development
company formed for the purpose of creating and developing the distributed
wireless call processing system. National Micro Vision Systems, Inc. was formed
to operate a network of wireless Internet sites. In April of 1998, Worldwide
Wireless, Inc., TSI Technologies, Inc. and National Micro Vision Systems, Inc.
acquired Upland Properties, Inc., a Nevada corporation, for stock and
transferred their assets to Upland Properties, Inc. Upland Properties, Inc. then
changed its name to World Wide Wireless Communications, Inc. and began trading
on the OTC Bulletin Board (OTC:BB) under the symbol WLGS.


On February 10, 2000 we acquired all of the shares of Digital Way, S.A., a
Peruvian telecommunications company. In June of 2001, we received a notice of
default from the sellers of Digital Way, claiming a breach of the terms of our
purchase agreement. On May 10, 2002, we executed a settlement agreement with
those sellers. Under the terms of the agreement, we re-aligned the stock
ownership of Digital Way, by returning 73% of the common shares owned by us to
the former owners. In addition, we retained a 50% interest in the first $6.2
million of equity value of Digital Way, in the event of a sale or other
disposition. Any value beyond the first $6.2 million will be divided based on
shareholdings. Our chairman, Michael Zwebner, remains on the Board of Directors
of Digital Way, S. A. The settlement agreement fully cancels all debts, claims
and counter claims between us and the sellers, and allows for future co-
operation in the ongoing development or sale of Digital Way. Although we have
reached this settlement, management of Digital Way has not provided the
necessary financial information for Digital Way to be included in our financial
reporting, and the results of the Company's investment in Digital Way is unclear
at this time. The Company has fully impaired this investment. Management is now
actively seeking a third party buyer for our 27% interest in Digital Way SA.

On November 1, 2001, current management took control of the company. During the
fiscal year ended September 30, 2002, we moved our offices from Oakland,
California to Miami Beach, Florida and changed our name to Universal
Communication Systems, Inc. We then changed our symbol to UCSI. Following our
one for one thousand reverse stock split on August 23, 2002, our symbol was
changed to UCSY.

In January, 2003, we identified a new business venture, abandoned the
telecommunication and wireless business and adopted a new business plan. We
formed a wholly owned subsidiary, AirWater Corporation, whose purpose and
mission is to design, build and market machines that produce drinkable water
from the air. The first step in the endeavor was to obtain licensing rights to
the technology. To that end, we acquired the rights to four patents by an
agreement dated March 24, 2003, relating to this technology from J. J. Reidy
Company of Holden, Massachusetts. AirWater Patents Corporation was formed to
hold our acquired licensed patent rights. Under the terms of the agreement, we
paid $300,000, and we are obligated to pay a royalty payment of between 5 to
7.5% on all sales of equipment which uses the patented technology. Of the
$300,000 purchase price, the company paid $100,000 in cash, and the balance of
$200,000 was settled by issuing 4,000,000 restricted common shares.

Beginning in March 2003 we pursued various consulting, marketing and sales
agreements. The activities covered by these agreements include, product design,
electrical and mechanical engineering, systems integration, research and
development, conceptual designs, global contacts, mergers and acquisitions,
product and company publicity, marketing, sales and general business consulting.

Key agreements include the following:

- - We entered into a commission based agreement with Natra Advanced Technologies '1995) Ltd. an Israeli company, for the marketing of our Air Water Products.
 - We engaged the services of an Israeli business consulting company, Otzarot Tarshish Nechasim Limited for general business development, covering possible mergers and potential acquisitions. The terms of this agreement called for a cash payment of 10% of the value of any closed transaction, along with five year warrants at the closing price of the transaction, in total value equal to 10% of the transaction value.
- - We entered into a services agreement with Perfect Securities Limited, of Ramat Gan, Israel, for Investor Relations, and to actively promote the company and publicize its new products and services. - We signed a General Marketing Agreement with AirWater Afrique, a company established in Paris, France, who will market both our Air Water and PV Solar Energy products mainly in the continent of Africa and some countries in the middle east on a sales commission basis.

On April 30, 2003 we executed a letter of intent to acquire CinemaElectric, Inc., a Los Angeles based multimedia messaging service company for a purchase price of $10 million. On August 12th, 2003, and by mutual agreement, we withdrew from this Letter Of Intent. We withdrew our letter of intent so that Brenex Oil Corporation could issue their letter of intent to acquire CinemaElectric, Inc., which they did on August 12, 2003. Under the proposed transaction, we will receive 10% of the entity resulting from the acquisition of CinemaElectric by Brenex Oil Corporation. Our Board of Directors is evaluating distributing these shares to our shareholders.

We completed an agreement to purchase all of the stock of Millennium on September 29, 2003. As part of the Millenium acquisition, we acquired 50% of Solar Style, Ltd. ("Solar"). Solar is an inactive Israeli company that holds ertain rights to manufacture and market solar power products. In connection with the Millenium / Solar acquisitions, a new U. S. subsidiary, Solar One Corporation, was formed to market solar power products and systems.

Millenium and its president, Mr. Ami Elazari, operate in the forefront of the high technology field of solar energy, solar panels, and solar powered consumer products. The Company and Mr. Elazari are the holders of more than 21 international patents relating to both Photo Voltaic ("PV") and solar energy systems and products.


Our strategy


Under the auspices of new management, we have made considerable progress in restructuring prior obligations and removing debt. We have concentrated our activities, as previously mentioned, on the Air-Water product and the photo voltaic product lines. We have withdrawn from the wireless internet market, disposed of assets for cash and we continue our negotiations with creditors to compromise, extend, convert and/or forgive debt owed by the company prior to the new management.

-4-

<PAGE>


or the six months prior to year end, we have worked to design, research and develop as well as source the manufacture of our AirWater machines. The result of this search has lead to the final stage of negotiating manufacturing and licensing agreements with entities in Israel and Brazil, and more recently in Australia. Our next step is to embark on a worldwide sales and marketing

program, focusing on the markets listed above.


 ir-Water technology and competition


The applications for the Air-Water System technology are extensive. It is our
belief that the initial product should be the model that offers the easiest
entry into the marketplace, gains the quickest exposure, and generates a
substantial cash flow. To this end, we believe that a residential
5-gallon-per-day model would best fit this goal.
Our reasoning is as follows:

o        The bottled water market is approximately a $7.1+ billion marketplace
         with projected growth in excess of 10% per year. Its cost to the
         consumer, inconvenience and logistical aggravation and the fluctuation
         in the quality of the water make bottled water vulnerable to an
         alternative, Air-Water Products for example, which is cheaper per
         gallon on the order of 1-2 kW per gallon, has consistent quality and is
         convenient.
o        It is the easiest model to take to market thus maximizing its exposure.
o        It would be readily accepted by foreign customers, where size is often
         very important.
o        It would create a very lucrative aftermarket sector for serviceable
         parts such as water filters, containers and ultra-violet light bulbs.

We believe that the global market for Air Water machines is largely untapped and
undeveloped. The Air Water technology and system is very new, and much of the
initial sales efforts that we are currently engaged in are dedicated to
education, and the detailed explanation of the machines, the built in safety
 ystems and their general operation.

Operational safety and computer managed user maintenance is built into every
Air~Water System by the use of a patented, inexpensive, programmable chip. The
water filtration industry is reliant upon voluntary user discipline in the
important issue of safety, and the periodic changing of the machine filters.

The Air~Water System knows when an air filter needs cleaning, or is missing,
when the UV bulb becomes ineffective, when the water filter needs changing and
if the user accidentally tries to use an expired water filter. The Air~Water
System will not operate if any of those factors exist and displays to the user
the reason on a small electronic display panel.

Management further believes that there are a number of specific market segments
that the Air Water Products can be introduced to and marketed to.

First is the home consumer product market, to which the company is addressing a
Small Office / Home Office ("SOHO") styled product. Next is the commercial
market, for such users as small hospitals, local field clinics, small farms,
factories and so on. And then there is the larger customer such as International
Aid Agencies, Governments, The United Nations, The Red Cross, Local Towns and
Villages, and Military Forces worldwide all in areas and countries where water
is scarce, or difficult to transport.

At this time, the company is aware of very limited competition. The company has
identified a Dallas Texas based company, called Electric Gas & Technologies Inc,
and World Wide Water Inc., of Los Angeles California. In addition, the company
 as seen a similar product sold in the US Market, made or offered for sale by a
 ompany called Liquid Air Inc, also based in California. Almost in all cases,
these companies are in various stages of "start up" mode, having been in the
Water from Air business less than a year, and just starting to offer machines to
customers.

We believe that as the Air Water products and Systems become more engrained in the global marketplace, and are more publicized and accepted, that there will be additional companies entering this industry, thus creating increased competition. We further believe that our patents and intellectual property rights will place us at a competitive advantage.

In certain global areas where electricity and or gas power sources are either not available or in short supply, there is a need for a power alternative to conventional sources. Our subsidiary, Millennium, has designed the system to fulfill this technological need of providing Photo Voltaic (PV) Electric Energy to provide the necessary power to the air water units.

Following our acquisition, Millennium's management is currently primarily focused on re-organizing the company. This included moving to new offices, purchasing new computer systems, the addition of several new personnel for key positions including operations officer, marketing manager and regional marketing manager . Millennium is also conducting educational seminars for potential clients, by targeting architects, elected officials and military personnel.

Millennium's Strategic vision for sales is to create a group of international independent sales consultants to provide a more extensive marketing and networking program than that which could be achieved by an employee based sales force.

Solar Style Inc. USA, ("Solar") formed as part of Solar One, Inc. with offices in Baltimore as well as a new warehouse, will form the basis of the planned North American Distribution network of the Solar Style (Israel) product line.

We acquired 50% of Solar Style Limited (an Israeli Company) upon the completion of the acquisition of Millennium. We are currently in negotiations to acquire he remaining 50% equity of Solar Style Ltd. There can be no assurance that we ill be successful in our current negotiations to conclude this transaction.

Solar is offering PV Solar Chargers for a wide range of products, including Laptop computers, Palms, Walkmans and Discmans, as well as a wide range of cellular phones. The PV Solar Chargers negate the need for consumer electronic products to be connected to the electric grid, in order to charge or recharge the appliance. Solar Style (Israel) has a manufacturing agreement with a Hong Kong firm. The products are targeted at the portable consumer electronic market. Solar Style's technology converts solar energy into electricity in a packaged solution that recharges mobile electronic devices by a small portable photovoltaic solar panel, which is specially designed to fit in an elegant leather case.

Solar Style manufactures the panels and carrying-cases, which are then assembled and sold as a unit. The panels can easily be plugged in to solar cells and charged outdoors by sunlight and indoors by electric light. The photovoltaic cells act as battery chargers allowing a non-dependant use of the mobile device, making batteries / battery-chargers unnecessary.

Solar's value proposition spans two levels:

The practical and the environmental. On the practical level, Solar Style's products enable consumers to use their mobile devices without having to worry about plugs and connectors. On the Environmental level, in today's "green-aware" world, where environmental concerns have come to be very important to consumers, Solar Style offers mobile device users a reliable environmentally friendly power source.

We plan to establish distribution and sales channels for the existing products, and to continue research and development of improvements on existing and creation of new products, concurrent with ongoing sales. Solar is already in the process of various negotiations regarding its products, and is considering two

basic modes of operation:

A "traditional" manufacturer-distributor value chain, by which
will have control over manufacturing and distribution, and sell its products
through large distributors.

A licensing option, limited by time and dependant on results,
by which its involvement at the manufacturing stage will be minimal (just enough
to preserve unique knowledge and enable further product development), while
distribution, promotion, and sales management are left to a licensee /business
partner.

Solar will choose its preferred course of action according to
potential partnerships and customers. Its initial product line has already been
developed. Initial marketing activities are in process, so once negotiations are
finalized and funding is secured, it can start operations. Management favors the
distribution model over the licensing model, as under the distribution model the
company will have greater sales potential.

-5-

<PAGE>

Pending Acquisition

On September 17, 2003, we announced that we have entered into a letter of intent
to acquire a 51% interest in GiraSOLAR, BV, a Dutch company that operates and
specializes in the photo voltaic solar energy industry. This Dutch group is made
up of two separate operating subsidiaries. As of December 30, 2003, both parties
are conducting due diligence in connection with this acquisition.

We anticipate acquiring the stock of GiraSolar BV, with a combination of our
restricted common stock and cash. At this time, the amount of shares and the
amount of cash to be paid, are still under negotiation pending completion of the
due diligence process. We will have to obtain an equity investment to fund the
cash required for this acquisition. We may not be able to raise the required
equity investment and accordingly may not be able to consumate this transaction.

Patents/Intellectual Property

We currently hold a patent for our distributed wireless call processing system.
As we have exited this business, we are looking to license this technology to a
third party developer in order to potentially create a royalty stream of income.
However, we cannot guarantee that we will enter into such an agreement.

As previously mentioned, we hold the exclusive global patent and licensing
rights to four air to water patents under an agreement with J.J. Reidy Company,
relating to atmospheric extraction of water and its purification process. These
patents, numbered: 05106512-00, 05149446-00, 05203989-00, and 05366705-00, were
issued by the US Government Patent Office. Two of these licenses were issued in
1992 and the other two in 1993 respectively. These patents relate to the Air
Water Products not only in the USA, but in countries covered by the PCT global
agreements.

The Patent Cooperation Treaty (PCT) simplifies and reduces the cost of obtaining
international patent protection and facilitates public access to a wealth of
technical information relating to inventions. By filing one international patent
application under the PCT you can simultaneously seek protection for an
invention in over one hundred countries, including developing countries
throughout the world. The Patent Cooperation Treaty (PCT) has over the past
three decades emerged as a major international filing system for seeking patent
protection worldwide in a cost effective and efficient manner. In addition,

through the dissemination of latest technical information contained in published PCT applications, the PCT system has been actively contributing to the development of science and technology.

.e company fully intends to utilize the patents and intellectual property rights in its pursuit and ongoing development of the business.

Further, through our Millenium subsidiary, we own 21 international patents in the photo voltaic solar power and energy system area.

Employees

As of September 30, 2003, we had four employees, all located in our Millenium office in Israel. As of December 31, 2003, we had no full time employees in the United States. No employee is represented by a labor union and the company believes its employee relations to be good.

ITEM 2.  DESCRIPTION OF PROPERTY

We own no real estate. Effective February 1, 2002, we leased a 1400 square foot corporate and administrative office facility at 407 Lincoln Road, Suite 6K, Miami Beach, FL 33139. The lease provides for a three-year term. The lease provided for cancellation with ninety days notice after the first year. On November 1, 2002 we exercised this provision and rented on a month to month basis with the landlord at the same address. On October 1, 2003 we moved our office to suite 12F in the same building.

Millenium Electric T.O.U., Ltd., rents administration and manufacturing offices the Herzliah Industrial zone in Israel under a lease which ends in 2005. The minimum remaining payments under this lease are $60,180 for 2004 and $55,165 for 2005.

-6-

<PAGE>

ITEM 3.  LEGAL MATTERS

On August 26, 1999, we filed suit against Credit Bancorp, in U.S. District Court in San Francisco, regarding improprieties on the part of Credit Bancorp relating to a loan. The case was settled on October 11, 1999. As part of the settlement agreement, Credit Bancorp agreed to convert the original loans granted to us to a convertible debenture in the amount of $740,000. On October 11, 1999, we issued a convertible unsecured debenture for $740,000 to Credit Bancorp in settlement of this obligation. The terms of this convertible unsecured debenture are 7% interest per annum payable, semiannually on the last day of February and September, with the principal due September 30, 2002. All amounts of unpaid principal and accrued interest of this debenture are convertible at any time at the conversion price of $1,600 per share of unregistered, restricted shares of our common stock. Credit Bancorp has agreed to convert principal and accrued interest owing on the debenture into 483 shares of our common stock.

In November 1999, the SEC filed suit against Credit Bancorp alleging violations of various securities laws in connection with its actions in relation to us and others, and seeking various forms of relief including disgorgement of its illegal gains. A receiver has been appointed to administer the affairs of Credit ncorp. We have been informed that the appointed receiver denies that such a conversion request was made and that the principal amount and accrued interest of the debenture are due. We currently carry the 483 share obligation in our equity under escrowed shares.

On August 7, 2003, Electric Gas & Technology of Dallas, Texas ("ELGT"), published a press announcement claiming that a complaint and $60 million lawsuit ~d been filed (Federal District Court, Northern District of Texas, Dallas ~vision). Their press release stated that we had infringed on their patents. Counsel has advised us that the claims lack substance. On November 24, 2003, the court granted our motion for dismissal due to lack of Texas jurisdiction. ELGT has similar suits filed against other companies in the same industry. We have filed counter claims in the US District Court of Southern Florida, disputing ELGT's claims of patent infringement and as a result of statements made by ELGT, we have filed a claim for $118 million in damages for false, defamatory and libelous statements. Our counter claims and damage lawsuits are still ongoing.

Although we initiated negotiations with businesses in Puerto Rico and Portugal in 1999, no further negotiations or affiliations are currently pending in those areas. On July 20, 2001, WSI, Inc., a Puerto Rican corporation, and its principal officer and shareholder Howard Hager, filed suit against the Company in the U.S. District Court in Puerto Rico for breach of contract and damages in the amount of $4,675,000. The claims arise out of an alleged agreement on the part of the Company to acquire WSI and provide it with substantial financing. A default judgment was entered in WSI's favor. On November 26, 2002 a settlement agreement was reached with Mr. Hager and the trustee in bankruptcy for WSI. Under the agreement, we issued $200,000 in value of shares of common stock. In addition to the stock, $50,000 was paid to the trustee of WSI and a two year consulting contract, valued at $120,000, was executed with Mr. Hager. The settlement had a total cost of $370,000 and is included in our general and administrative expense for the fiscal year ended September 30, 2003.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted during the fourth quarter of the fiscal year covered by this report to a vote of the security holders through the solicitation of proxies or otherwise.

-7-

<PAGE>

PART II

ITEM 5.  MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

Prior to April 3, 2002, our common stock was traded on the over the counter Bulletin Board market under the symbol "WLGS". From April 4, 2002 through August 22, 2002 our common stock was traded on the over the counter Bulletin Board market under the symbol "UCSI". From August 23, 2002 to the present, our common stock is trading on the over the counter Bulletin Board market under the symbol "UCSY".

The following table sets forth the range of high and low closing bid prices for each period indicated as reported by the National Association of Securities Dealers composite feed or other qualified interdealer quotation medium. The quotations provided reflect inter-dealer prices, without retail mark-up, ~ark-down or commission and may not represent actual transactions. All of the hare price information presented below has been adjusted to reflect the 1 for 1,000 reverse split of our outstanding common stock effective August 23, 2002.

Price Range for Common Stock
- -----------------------------

| FISCAL YEAR SEPT 30, 2004 | High | Low |
|---|---|---|
| First Quarter | $ 0.115 | $0.060 |

| FISCAL YEAR SEPT 30, 2003 | High | Low |
|---|---|---|
| First Quarter | $ 0.170 | $0.100 |
| Second Quarter | 0.100 | 0.045 |
| Third Quarter | 0.230 | 0.030 |
| Fourth Quarter | 0.115 | 0.060 |

| FISCAL YEAR SEPT 30, 2002 | High | Low |
|---|---|---|
| First Quarter | $21.000 | $5.599 |
| Second Quarter | 14.000 | 2.000 |
| Third Quarter | 10.000 | 0.799 |
| Fourth Quarter | 2.700 | 0.100 |

-8-

<PAGE>

Since our shares began trading on the OTC Bulletin Board in 1997, the prices for our shares have fluctuated widely. There may be many factors which may explain these variations, but we believe that the following are some of these factors:

- o        the demand for our common stock;

- o        the number of market makers for our common stock;

- o        developments in the market for broadband Internet access and wireless transmission in particular; and

- o        changes in the performance of the stock market in general.

In recent years, the stock market has experienced extreme price and volume fluctuations that have had a substantial effect on the market prices for many telecommunications, Internet and emerging growth companies such as ours, which may be unrelated to the operating performances of the specific companies. Companies that have experienced volatility in the market price of their stock have been the object of securities class action litigation. If we become the object of securities class action litigation, it could result in substantial costs and a diversion of our management's attention and resources and have an adverse effect on our business, financial condition and results of operations. In addition, holders of shares of our common stock could suffer substantial losses as a result of fluctuations and declines in the stock price.

There are approximately 495 holders of record and an estimated 8,000 holders in street name of our common stock as of September 30, 2003.

The trading of our shares is subject to limitations set forth in Rule 15g-9 of the Securities Exchange Act. This rule imposes sales practice requirements on broker-dealers who sell so-called penny stocks to persons other than established customers, accredited investors or institutional investors. Accredited investors are generally defined to include individuals with a net worth in excess of $1,000,000 or annual income exceeding $200,000 or $300,000 together with their spouses during the previous two years and expected annual income of that amount during the current year. For sales of shares to other persons, broker-dealers must make special suitability determinations, and obtain the written consent of the purchaser to the sale prior to consummating the sale and are generally prohibited from making cold-calls or other unsolicited inquiries to purchasers without complying with these rules. These rules may adversely affect the ability

of broker-dealers and others to sell our shares or to sell shares in the
secondary market.

No cash dividends have been declared to date on our Company's common stock. We
expect that all earnings, if any, will be retained to finance the growth of our
Company and that no cash dividends will be paid for the foreseeable future.

On May 21, 2002, stockholders approved a measure to increase the number of
authorized common shares from 300 million to 800 million.

EQUITY COMPENSATION PLAN INFORMATION
- -----------------------------------

<TABLE>
<CAPTION>

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Num remai futu equ p secur |
|---|---|---|---|
| | (a) (b) (c) | | |
| <S> | <C> | <C> | |
| Equity compensation plans approved by security holders | 0 | n/a | |
| Equity compensation plans not approved by security holders | 257,250 | $0.095 | |
| Total | 257,250 | $0.095 | |

</TABLE>

(1) Pursuant to form S-8, dated 12/27/03. Submitted under plan, 11,000,000
shares, issued, 4,293,083.

Description of Equity Compensation

Options issued were issued pursuant to the 2001 Stock Option Plan and also
provided as motivation and incentives to individuals considered important to the
Company's success. The 2001 plan was approved by our board of directors, but not
submitted to a vote of stockholders.

The total number of options granted and outstanding at September 31, 2003, and
the average exercise price and expiration dates for each year are as follows:

| Year | Total Options | Exercise Price | Expiration Date |
|---|---|---|---|
| 2001 | 251,150 | $0.095 | December 31, 2006 |
| | 6,100 | $602.00 | December 31, 2006 |
| Total | 257,250 | | |

- 9 -

<PAGE>

Sales of Unregistered Securities
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

We have issued and sold unregistered securities that have not previously been
reported as set forth below. An underwriter was not utilized in any of these
transactions. The recipients of securities in each transaction represented their
intention to acquire the securities without a view to distribution. All the
issued securities were restricted securities under Rule 144, Reg. D or Reg. S
regulations, and appropriate restrictive legends were affixed to the securities
in each transaction. All sales of securities were to accredited investors in
private placements, and accordingly all of the sales complied with Section 4(2)
as well as 4(6) of the Securities Act of 1933.


On April 9 - 11, 2003, we issued 4,253,847 shares of common stock under private
placement subscriptions at $0.04 per share, based on the average closing price
for the three days prior to April 8, 2003, at a 25 percent discount. These
securities were issued in transactions exempt from registration under the
Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the Securities
Act of 1933.

On April 11, 2003, we issued 575,000 shares of common stock under private
placement subscriptions at $0.035 per share. These securities were issued in a
transaction exempt from registration under the Securities Act of 1933 in
reliance on Sections 4(2) and 4(6) of the Securities Act of 1933.

On July 3, 2003, we issued 2,350,043 shares of common stock under private
placement subscriptions at prices ranging from $0.028 per share to $0.055 per
share. These securities were issued in transactions exempt from registration
under the Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the
Securities Act of 1933. We paid a 10% commission in connection with this private
placement.

On July 7, 2003, we issued 1,905,625 shares of common stock under private
placement subscriptions at prices ranging from $0.042 per share to $0.05 per
share. These securities were issued in transactions exempt from registration
under the Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the
Securities Act of 1933. We paid a 10% commission in connection with this private
placement.

On July 9, 2003, we issued 1,410,647 shares of common stock under private
placement subscriptions at prices ranging from $0.042 per share to $0.055 per
share. These securities were issued in transactions exempt from registration
under the Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the
Securities Act of 1933. We paid a 10% commission in connection with this private
placement.

On July 10, 2003, we issued 525,577 shares of common stock under private
placement subscriptions at prices ranging from $0.026 per share to $0.05 per
share. These securities were issued in transactions exempt from registration
under the Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the
Securities Act of 1933. We paid a 10% commission in connection with this private
placement.

On July 15, 2003, we issued 714,096 shares of common stock under private
placement subscriptions at prices ranging from $0.042 per share to $0.05 per
share. These securities were issued in transactions exempt from registration

under the Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the
Securities Act of 1933. We paid a 10% commission in connection with this private
placement.

 า July 18, 2003, we issued 2,304,944 shares of common stock under private
placement subscriptions at prices ranging from $0.026 per share to $0.055 per
share. These securities were issued in transactions exempt from registration
under the Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the
Securities Act of 1933. We paid a 10% commission in connection with this private
placement.

On July 23, 2003, we issued 172,591 shares of common stock under private
placement subscriptions at prices ranging from $0.05 per share to $0.055 per
share. These securities were issued in transactions exempt from registration
under the Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the
Securities Act of 1933. We paid a 10% commission in connection with this private
placement.

-10-

<PAGE>

On August 13, 2003, we issued 155,000 shares of common stock under a private
placement subscription at a price of $0.045 per share. These securities were
issued in transactions exempt from registration under the Securities Act of 1933
in reliance on Sections 4(2) and 4(6) of the Securities Act of 1933. We paid a
10% commission in connection with this private placement.

 า August 14, 2003, we issued 1,600,000 shares of common stock under a private
placement subscription at a price of $0.10 per share. These securities were
issued in transactions exempt from registration under the Securities Act of 1933
in reliance on Sections 4(2) and 4(6) of the Securities Act of 1933.

On September 3, 2003, we issued 1,000,000 shares of common stock under a private
placement subscription at a price of $0.10 per share. These securities were
issued in transactions exempt from registration under the Securities Act of 1933
in reliance on Sections 4(2) and 4(6) of the Securities Act of 1933.

Other Securities Transactions
- -----------------------------

Pursuant to the April 14, 2000 Securities Purchase Agreement (the 4% convertible
debentures), the investors converted $769,094 of debentures into 23,486,734 of
the Company's common stock on various dates between March 3 and September 24,
2003, at various prices ranging from $0.0253 per common share to $0.1275 per
common share.

ITEM 6. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATIONS

        The following should be read in conjunction with the "Risk Factors,"
"Introductory Statement" contained in Part I and the "Financial Statements" and
the Notes thereto.

New Business Activities and Plan of Operations
- ----------------------------------------------

The business of AirWater Corporation is that of extracting (drinkable) water from the air, the manufacturing of the machines and systems that facilitate this, and the global marketing and distribution of the patented technology, ystems and products. We will pursue these activities with a focus on large scale government sales of the water from air technology and through Millenium, the sale of the technology and consulting on the implementation and utilization of Photovoltaic solar systems.

Since February, 2003 we have pursued the design, manufacture, sale, licensing and distribution of equipment that extracts and purifies water from the atmosphere. Although we have received letters and purchase orders for our equipment, we have not recorded any sales during this reporting period, as we have only manufactured and shipped demonstration units.

The availability and safety of drinking water has become a global problem, in the United States as well as countless other areas of the world. Current attempts to meet this need have created a $7.1+ billion bottled water market, a $60+ Billion point-of-use water treatment industry, and wherever practical, incredibly expensive desalination plants with huge infrastructures and severe geographical restrictions. All of these methods require traditional sources of water and each has inherent weaknesses and disadvantages. Even existing municipal water systems experience repeated shortages and contamination problems.

At any given moment the earth's atmosphere contains 4,000 cubic miles of water, which is just .000012% of the 344 million cubic miles of water on earth. Nature maintains this ratio by accelerating or retarding the rates of evaporation and condensation (the Hydrologic Cycle), irrespective of the activities of man. It is the sole source and means of regenerating wholesome water for all forms of ife on earth.

-11-

<PAGE>

Man has been extracting water vapor from the air for generations. Most often it is intentional and the water collected is treated as wastewater, such as with dehumidifiers and air conditioners. The common mechanics include traditional refrigerant systems, but other technologies are available such as thermo-electrics (Peltier) and thermo acoustics.

While all these technologies are used for extracting water vapor from the air and are common knowledge, the subsequent methods employed to produce potable water from tapping into nature's hydrologic cycle are unique and are patented in the USA and in other nations. The technology used in the AirWater Series of variously sized models is the result of 13 years of research and field-testing and involves many United States and a number of international patents.

The AirWater System, regardless of the model size, sterilizes each drop of water within 5-6 seconds of its formation by exposure to ultra-violet light. UV light waves fracture the DNA strands within bacteria, virus, and other microorganisms, which kills them instantly.

This sterilized water is then passed through a unique patented 1-micron activated carbon water filter. (The average size of bacteria is 5 microns). This filter removes any possible solid particles, toxic chemicals, volatile organics, nd other contaminates as well as any odors, taste, or discoloration. This iltration is followed by a 2nd UV exposure and sterilization.

The same bulb bathes the exit port, also patented, in UV light creating a sterile exit. The AirWater System maintains an enclosed sterile environment

throughout its water treatment, from the first drop in to the last drop out --
into a water tank or removable container. It is imperative to any marketing
success that this water be handled safely and aesthetically, which no other
method can do.

We have coupled this water extraction system with the photo voltaic systems
developed by our wholly owned subsidiary, Millenium Electric T.O.U., Ltd., to
create a self sustaining system. Our equipment, by combining these two
technologies, has been of great interest to governmental and humanitarian
organizations. Further, we have developed a unit specifically aimed at the
boating and recreational vehicle industry.

Millennium Electric TOU Inc., one of Israel's high technology companies, is an
enterprise focusing on practical applications of solar energy. Millennium is
well versed in designing, developing, installing and providing solar energy
related products and services. The sophisticated solar energy devices are
economical, clean and an environment friendly source of energy/power with a wide
variety of practical applications in many fields. Millennium's skills encompass
planning, design, construction and installation services and applications not
connected to the electric power grid. Millennium's fully computerized systems
serve remote housing, villages, street lighting installations, computerized
irrigation, communication and various military systems. The company's total
system capabilities have been proven in large-scale projects performed for
Israel's Ministries of Energy, Housing and Defense. The company's mission is to
continue to design and establish solar systems for communities on a worldwide
basis, based on the "MSS," a unique patented system that utilizes advanced
photovoltaic and storage technology combined with flat-plate solar water

-12-

PAGE>

collectors to provide electricity and hot air/water and air-conditioning for
residential and industrial buildings. Being modular, the average basic system
can provide from 1kw up to 100 Megawatt of useful power utilizing solar energy
products and services, for a more economical, cleaner, and safer environment.

Plan of Operation for the next 12 months
- ---------------------------------------

Our current cash position is only sufficient to carry us for about three months
based upon our current cash needs. However, our Chairman, in connection with
Port Universal Ltd., a company in which he owns a one third interest, has agreed
to provide funding as needed until our sales activities are sufficient to cover
our cash flow needs. This agreement by our Chairman and Port Universal is not a
binding obligation; we have no assurances that this funding will continue beyond
the short term.

With the acquisition of Millenium and the company's new business focus, we have
been able to obtain private placement funding to finance our activities in these
fields. We anticipate continuing to receive operating funds from these private
placements until such time as sales are sufficient to support the organization,
however no assurances can be made that we will be able to find willing
investors. We are also relying upon the same private placement funding to
provide the cash required to consumate the proposed GiroSolar acquisition
described earlier.

Except for the GiroSolar acquisition, we do not have any major expenditures
planned, nor do we anticipate the purchase or sale of plant and / or significant
equipment. Our plan calls for the use of third party contract manufacturers,

thus avoiding the allocation of our resources into manufacturing operations. We
anticipate funding any sizeable orders for either AirWater equipment or
Photovoltaic installations, through deposits and advances from customers. We do
not anticipate any significant changes in the number of employees in the near
erm for our existing operations.

On January 14, 2001, we entered into a settlement agreement with our systems
integrator, Andrew Corporation. At that time, we owed Andrew Corporation
$1,400,000 for their services and equipment. Under the agreement, we paid an
initial $100,000 and we were obligated to pay $100,000 per month until the
balance was paid. We did not make any of the scheduled payments. On September 3,
2002, we reached a settlement agreement for all amounts due, by issuing a note
in the amount of $300,000 which is due April 30, 2004. We secured this note with
300,000 shares of our common stock. If we are not able to pay the $300,000 on
April 30, 2004, the obligation will revert to the balance due of $1,300,000. We
do not have sufficient cash to meet this obligation at September 30, 2003. We
will rely upon additional sales of our common stock under private placement
transactions to satisfy this obligation. We have no assurances that we will be
able to obtain this funding.

Millenium has several potential sizeable contracts in the sales process. Should
these contracts be awarded, we will need to raise additional equity or arrange
for financing vehicles to fund those contracts. Any equity raised could result
in dilution of existing shareholders. Additionally, we are uncertain as to the
availability of sufficient financing on acceptable terms.

To date, we have not incurred any production costs as we have only produced
prototypes.

esults of Operations
- ---------------------

We did not generate any revenues during fiscal 2003 and 2002. However, our
Peruvian subsidiary had revenues which are not reported as a result of a lack of
cooperation from our subsidiary's management.

General and administrative expenses totaled $1,785,431 in the fiscal year ended
September 30, 2003 and $807,033 in the fiscal year ended September 30, 2002. The
increase in expenses resulted from activities associated with the entrance into
the air-water technology industry.

General and administrative expenses for the fiscal years ended September 30,
2003 and 2002 were comprised of the following items:

|  | 2003 | 2002 |
|---|---|---|
|  | ---------- | ---------- |
| Abandoned acquisitions and fees | $   171,397 | $        - |
| Consultants and outside services | 609,977 | 484,843 |
| Depreciation | 5,690 | 22,036 |
| FCC licensing and site expenses | - | 1,338 |
| Financing costs and fund raising expense | 120,804 | 5,501 |
| Legal expense | 228,661 | 85,059 |
| 'iscellaneous and other expenses | 42,478 | 33,568 |
| Professional fees | 136,154 | 91,570 |
| Rent | 27,650 | 37,462 |
| Salaries | - | 14,614 |
| Travel | 72,620 | 31,042 |

Settlement loss - WSI, Inc.                    370,000
                                            ----------      ----------
                                            $1,785,431      $  807,033
                                            ==========      ==========


Liquidity and Capital Resources
- -------------------------------

As of September 30, 2003 our total working capital was deficient in the amount
of $1,390,556. This represents a $760,729 decrease over our September 30, 2002
deficiency of $2,151,285. Until revenues commence from the sale of our AirWater
equipment, we will need to obtain funding from external sources to finance our
current operations. We anticipate revenues in the second quarter of fiscal year
September 30, 2004.

                                    -13-

Since we began operations, we have generated minor revenues and have incurred
substantial expenditures and operating losses. In view of this fact, our
auditors have stated in their report for the fiscal year ended September 30,
2003 and 2002 that there is substantial doubt about our ability to continue as a
going concern, dependent upon our ability to meet our future financing
requirements, and the success of our future operations, the outcome of which
cannot be determined at this time. In order to finance our working capital
requirements, we have and continue to negotiate equity investments with several
sophisticated investors, but there can be no assurance that we will obtain this
capital in the future, or that it will be obtained on terms favorable to us. If
we do not obtain short term financing we may not be able to continue as a viable
concern. We do not have a bank line of credit, although Millenium does have a
bank overdraft facility, and there can be no assurance that any required or
 esired financing will be available through bank borrowings, debt, or equity
offerings, or otherwise, on acceptable terms.


If future financing requirements are satisfied through the issuance of equity
securities, investors may experience significant dilution in the net book value
per share of common stock.

On June 6, 2003, we defaulted on the January 6, 2003 12% notes with a principal
value of $60,000, which came due on that date. The holders of the Notes, who
also hold a portion of our 4% convertible debentures, did not take action to
foreclose on the Notes. These notes have been included in a proposed negotiated
settlement whereby the notes and the debentures will be converted into shares of
common stock at a fixed conversion price.

We are entirely dependent on equity investments at this time and recognize that
without these investments we would not be able to continue as a going concern.
We have negative cash flows and do not anticipate any significant revenues in
the short term. We do not have sufficient resources to meet current obligations
without continuing equity investments. Prior financing arrangements, as
disclosed on our SB-2 filed March 15, 2001, are no longer in effect. We must
obtain approval from our current debenture holders to place additional debt
against our assets. There are no assurances that we would be able to secure that
approval, if we did have the opportunity to secure additional debt. We are
attempting to negotiate with trade creditors to convert existing obligations,
including any accrued interest, to common stock in satisfaction of those
obligations. We have received agreement from our current debenture holders to
 onvert their existing debt to equity, but there are no requirements for the
 ebt holders to adhere to that consent.


During the fiscal years ended September 30, 2003 and 2002, we received equity

investments and advances of $1,054,577 and $383,291 respectively. These
investments and advances were in the form of issuance of our common stock in
various private placements.

Our long term debt is composed of the following debt obligations:

4% subordinated convertible debentures, issued April 14, 2000,
maturing April 14, 2005. These debentures are convertible at 85%
of the average of the three lowest bid prices for the 22 trading
days prior to the date of conversion                                      $3,380,548

8% senior secured convertible debentures, issued March 29, 2001,
maturing March 29, 2005. These debentures are convertible at 85%
of the average of the three lowest bid prices for the 22 trading
days prior to the date of conversion                                      $1,066,449
                                                                          ----------
          Total                                                           $4,446,997

Commitments

We do not have any material commitments for capital expenditures, although we
recognize that should we receive substantial orders which are currently in our
sales process, we will need to establish material commitments in order to
complete these orders. We anticipate contracting our production requirements to
third parties, as we do not have any facilities of our own.

                                    -14-

PAGE>

Risk Factors
- ------------

- -We will require additional capital in the short term to remain a going concern
 We will require short term outside investment on a continuing basis to finance
our current operations and any expansion of activities. Since we began
operations, we have generated virtually no revenues and have incurred
substantial expenditures. We expect to continue to experience losses from
operations while we develop our new revenue source, consummate acquisitions and
develop other technologies. In view of this fact, our auditors have stated in
their report for the period ended September 30, 2003 that our ability to meet
our future financing requirements, and the success of our future operations,
cannot be determined at this time. In order to finance our working capital
requirements we are negotiating existing equity investments and new investments,
but there can be no assurance that we will obtain this capital or that it will
be obtained on terms favorable to us. If we do not obtain short term financing
we may not be able to continue as a viable concern. We do not have a bank line
of credit and there can be no assurance that any required or desired financing
will be available through bank borrowings, debt, or equity offerings, or
otherwise, on acceptable terms. If future financing requirements are satisfied
through the issuance of equity securities, investors may experience significant
dilution in the net book value per share of common stock.

- -We are dependent on the services of key individuals and the loss of any of
these individuals could significantly affect our ability to operate our business

- -We may be unable to protect our intellectual property rights
 Our success depends in part on our ability to protect our proprietary
technologies. We rely on a combination of patent, copyright and trademark laws,

trade secrets and confidentiality and other contractual provisions to establish and protect our proprietary rights. However, our patents may not be of sufficient scope or strength, others may independently develop similar technologies or products, duplicate any of our products or design around our patents, and the patents may not provide us competitive advantages. Litigation, which could result in substantial costs and diversion of effort by us, may also be necessary to enforce any patents issued or licensed to us or to determine the scope and validity of third-party proprietary rights. Any such litigation, regardless of outcome, could be expensive and time consuming, and adverse determinations in any such litigation could seriously harm our business.

- -We may not be able to successfully market and develop the air from water systems required by the market we are focusing our sales efforts on. Governments and humanitarian organizations are subject to political influences which can change without notice. Needs, as defined by these groups, may also change. If we cannot design, build and modify the systems to meet these changes, our marketing efforts may not be productive.

- -We may not be able to successfully defend against Credit Bancorp receiver's assertions.
As more fully described in Item 3. Legal Matters, the Receiver for Credit Bancorp denies that a conversion request was made with respect to a convertible, unsecured debenture we issued October 11, 1999, in the amount of $740,000. If we are unsuccessful in defending against the Receiver's position, we may have to pay the unpaid principal and accrued interest.

-15-

<PAGE>

-Other risk issues
We have pursued, are currently pursuing and, in the future may pursue, new technologies and businesses internally and through acquisitions and combinations which involve significant risks. Any such acquisition or combination may involve, among other things, the issuance of equity securities, the payment of cash, the incurrence of contingent liabilities and the amortization of expenses related to goodwill and other intangible assets, and transaction costs, which have adversely affected, or may adversely affect, our business' results of operations and financial condition. Our ability to integrate and organize any new businesses and/or products, whether internally developed or obtained by acquisition or combination, will likely require significant expansion of our operations. There is no assurance that we will have or be able to obtain the necessary resources to satisfactorily effect such expansion, and the failure to do so could have a material adverse effect on our business, financial condition and results of operations. In addition future acquisitions and or combinations by the Company involve risks of, among other things, entering markets or segments in which we have no or limited prior experience, the potential loss of key employees of the acquired company and/or difficulty, delay or failure in the integration of the operations, management, personnel and business of any such new business with our business and operating and financial difficulties of any new or newly combined operations, any of which could have a materially adverse effect on our business, financial condition and results of operations. Moreover, there can be no assurance that the anticipated benefits of any specific acquisition or of any internally developed new business segment or business combination will be realized.

Other Matters
- -------------
Subsequent to September 30, 2003, a majority of the debenture holders have tentatively agreed to convert their holdings into shares of common stock at various amounts and under various terms. It is our intention to reach agreements with the debenture holders in order to equitize the outstanding debentures and

associated interest on those debentures.

ITEM 7.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See Index to Financial Statements on page F-1.

ITEM 8.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS

There have been no changes in or disagreements with our independent auditors regarding accounting and financial disclosure required to be reported under this item.

ITEM 8A. CONTROLS AND PROCEDURES

Our management carried out an evaluation pursuant to Rule 13a-15 of the Securities Exchange Act of 1934, as amended, under the supervision and with the participation of our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Report. Based upon that evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in reports that we file or furnish under the Exchange Act are recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

During the period covered by this report on Form 10-KSB, there has been no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

-16-

<PAGE>

PART III

ITEM 9.    DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS;
           COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT

Our executive officers and directors and their ages as of December 30, 2003 are as follows:

| Name | Age | Position | Period of Service |
| --- | --- | --- | --- |
| Michael J. Zwebner...... | 51 | Chairman of the Board and CEO | November 2001-present |
| Curtis Orgil.......... | 51 | CFO and Director | November 2001-present |
| Ramsey Sweis........... | 37 | Director | May 1998-present |
| Alexander Walker, Jr. .. | 76 | Director | November 2001-present |
| Ami R. Elazari.......... | 51 | Director | October 2003-present |

Certain biographical information concerning the Directors and executive officers of the Company as of December 30, 2003 is set forth below. Such information was furnished by them to the Company.

Michael Zwebner has served as a Director since November, 2001 and is the

Chairman of the Board of Directors. He is the founder of Talk Visual Corporation
and has served as a Director and its Chairman of the Board of Directors since
September, 1998 until March, 2002. Mr. Zwebner is the President of Card
Universal Corporation, a privately held Florida corporation which we
  ad issued a letter of intent to acquire. Card Universal has ceased operations
and we have withdrawn and abandoned our letter of intent to acquire. From 1974
to 1986, Mr. Zwebner founded and ran a travel and tourism company and a charter
airline, specializing in the areas of air charter travel, wholesale ticketing
and general business and tourist travel. From 1986 to 1990, Mr. Zwebner owned
and operated several real estate companies as well as managed a chain of five
family restaurants and related catering services in England. From 1991 to 1997,
Mr. Zwebner founded and served as Vice-President of Cardcall International
Holdings Inc. (USA) and Operating Manager of Cardcall (UK) Ltd. for which he
designed and developed telecommunications and marketing concepts and organized
the prepaid phone card operations. Mr. Zwebner also coordinated corporate
finance activities for Cardcall.

Mr. Walker has served as a Director of the Company since November, 2001. Mr.
Walker has served as Chairman of the Board of the Nevada Agency and Trust
Company in Reno, Nevada, a licensed and registered trust company and transfer
agent in business since 1903. He received his B.A. from Waynesburg College in
1950 and his J.D. from the University of Pittsburgh School of Law in 1952. From
1956 to date, he has maintained a private practice as an attorney.

Curtis A. Orgil has served as a Director of the Company since November, 2001. He
received his Bachelor of Science degree in 1974 from Brigham Young University.
He worked for Deloitte Haskins & Sells in Salt Lake City, Utah. Later he
transferred to Reno, Nevada where he helped establish their new office. While in
Reno, Mr. Orgil was the Partner-in-Charge of the tax department there and was
the senior tax partner in the state of Nevada. While with Deloitte, Mr. Orgil
 as on its National Industry Teams for Qualified Retirement Plans and
Agribusiness. Since 1995, he has been a principal with Bartig, Basler & Ray,
CPA's, Inc., a regional accounting firm with headquarters in Sacramento,

-17-

<PAGE>

California. He is the treasurer of the Northern Nevada International Center and
of the BYU Management Society of Northern Nevada. He has chaired the Taxation
Committee for the Nevada Society of Certified Public Accountants. He is a former
treasurer and board member of the Nevada Museum of Art, the American Lung
Association of Reno, the Economic Development Authority of Western Nevada, and
the Northern Nevada Development Authority. He was a founding board member of the
Nevada World Trade Council and was a member of the Advisory Council for the
University of Nevada, Reno College of Business.

Ramsey Sweis has served as a Director since May, 1998. He has had extensive
experience in management and in the product design industry. He has been a
leader and developer of high performance teams by enabling, training and
motivating team members. In the recent past he has provided computer and
engineering services to General Motors and Chrysler Corporation. In connection
with those activities Mr. Sweis has developed designs between engineering,
prototype models, tooling and vendor sources. Mr. Sweis resides in Roseville,
Michigan. He currently operates a financial services company. From 1997 to 1999
Mr. Sweis served as a designer for Computer and Engineering Services of Auburn
Hills, Michigan. From 1991 to 1997, Mr. Sweis was a design leader for Megatech
ingineering of Warren, Michigan, contracted to General Motors of Warren,
Michigan.

Ami R. Elazari, is the founder, President and CEO of Millennium Electric T.O.U.

Ltd. He is a Lt. Col. (Res.) in the Israeli army and served in the IDF
Intelligence special unit. Mr. Elazari is an energy and computer engineer and
holds a BA in Psychology and an MBA with honors. He is the Vice Chairman of the
Israel Export Institute Environmental Technology Center and the Vice Chairman of
the Israel Export Institute Start-Up Company Center. Mr. Elazari represents
Israel in the IEA and holds a number of world patents in his name, mainly in
renewable energy. Between 1990-1995 Mr. Elazari managed Amitec Energy and
Computer Industries, from 1995-1999 he managed the PV division of Chromagen
Solar Systems. He is a member of the Israeli Financial forum, High tech forum
and has published numerous articles in his field of expertise.

Director Compensation

  Directors do not have a plan of compensation for serving as directors, except
that the following common stock grants were issued for the fiscal year ended
September 30, 2003:

| Name | Number of Shares Granted | |
| --- | --- | --- |
| Alex Walker, Jr. | 500,000 | - for legal services |
| Curtis Orgil | 200,000 | - for financial services |

Limitation of Liability and Indemnification Matters

Our Bylaws provide that we may indemnify any director, officer, agent or
employee against all expenses and liabilities, including counsel fees,
reasonably incurred by or imposed upon them in connection with any proceeding in
which they may become involved by reason of their being or having been a
director, officer, employee or agent of our Company. Moreover, our Bylaws
provide that we shall have the right to purchase and maintain insurance on
behalf of any such persons whether or not we would have the power to indemnify
such person against the liability insured against. Insofar as indemnification
may be afforded for liabilities arising under the Securities Act, we have been
informed that, in the opinion of the Securities and Exchange Commission, such
indemnification is against public policy as expressed in the Securities Act and
is therefore unenforceable.

-18-

<PAGE>

Compliance with Section 16(a) of the Securities Exchange Act of 1934

Section 16(a) of the Securities Exchange Act of 1934 requires our Company's
officers and directors, and persons who own more than 10% of a registered class
of our Company's equity securities, to file reports of ownership and changes in
ownership with respect to the securities of our Company with the SEC and to
furnish copies of these reports to our Company. We believe that during fiscal
year 2003, Alex Walker, Ramsey Sweis and Curtis Orgil have not filed the
required Form 4s.

ITEM 10. EXECUTIVE COMPENSATION

Employment Agreements

        There are no employment agreements in force at September 30, 2003.

The Company entered into a three year consulting agreement with Overseas Communications Limited on November 2, 2001, for the management and business advisory services provided by Mr. Michael Zwebner, Chairman and CEO of the Company. The Agreement calls for annual payments of $240,000, payable in cash or e Company's common stock. For the fiscal year ended September 30, 2003, the Company paid $80,000 in cash and issued 3,160,742 shares of common stock under this agreement.

ITEM 11.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

        The following table sets forth certain information regarding beneficial ownership of our common stock as of December 30, 2003, by:

        o        each person who is known by us to own beneficially more than
                 5% of the outstanding shares of our common stock;

        o        each of our directors; and

        o        all our directors and executive officers as a group.

 Applicable ownership is based on 106,123,070 shares of common stock outstanding as of December 30, 2003. Beneficial ownership is determined in accordance with the rules of the SEC. Shares of common stock subject to options or warrants that are presently exercisable or exercisable within 60 days of December 30, 2003 are deemed outstanding for the purpose of computing the percentage ownership of the person or entity holding options or warrants, but are not treated as outstanding for the purpose of computing the percentage ownership of any other person or entity.

        The persons listed below have sole voting and investment power with spect to all shares of common stock shown as being beneficially owned by them, subject to community property laws, where applicable. The number of shares column in the table includes shares issuable upon exercise of options and warrants exercisable within 60 days of December 30, 2003. The number of options

-19-

<PAGE>

and warrants exercisable within 60 days of December 30, 2003 are listed in the shares issuable upon exercise of options or warrants column.

<TABLE>
<CAPTION>

| Name of Named Executive Officer, Director, or Beneficial Owner | Number of Shares | Percentage Ownership | Shares Issuable Upon Exercise of Options or Warrant |
|---|---|---|---|
| <S>                       <C> | <C> | <C> | <C> |
| Michael J. Zwebner (3) | 4,977,910 (1) | 4.7% | 0 |
| Alexander Walker, Jr. (3) | 557,000 | * | 0 |
| Ramsey Sweis (3) | 1,723,970 | 1.6% | 500,000 |
| Curtis Orgil (3) | 251,000 | * | 0 |
| ...ni R. Elazari      (3) | 2,200,000 | 2.1% | |
| Executive Officers and Directors as a Group - 5 individuals | 9,709,880 | 9.1% | |

| | | | |
|---|---|---|---|
| Endeavour Capital<br>c/o Endeavour Advisors, Ltd.<br>` O.B. 57116<br>ʉerusalem 91570 | 10,506,184 | 9.9% | 7,992,654 ( |
| Amro International S. A.<br>Grossmuenster Platz 26<br>Zurich, Switzerland CH8022 | 10,506,184 | 9.9% | 8,200,276 ( |
| Esquire Trade & Finance Inc.<br>Trident Chambers, Road Town<br>Tortola, BVI | 5,635,114 | 5.3% | 4,500,114 ( |
| Celeste Trust Reg<br>Trevisa-Treuhand-Anstalt<br>Landstrasse 8, 9496 Furstentums<br>Balzers, Liechtenstein<br></TABLE> | 3,028,530 | 2.9% | 3,009,843 ( |

- ------------------------------------------
* Less than 1%

(1)   Includes 23 shares beneficially held by Overseas Communications Limited,
      534,014 shares beneficially held by Overseas Development Holdings Limited
      and 204,167 shares beneficially held by Port Universal.

'2)   Represents shares convertible under the 4%, due April 14, 2005, $3,380,548
      and 8%, due March 29, 2005, $1,066,449 convertible debentures held, but not
      more than 9.9% of total outstanding, as per the provision of the
      debentures.

(3)   The address of each such person is c/o the Company, 407 Lincoln Rd., Ste
      12F, Miami Beach, FL 33139


ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Commencing November 1, 2001, we engaged the services of the Chairman Michael
Zwebner under a consulting agreement through Overseas Development Holdings
Corporation, a foreign corporation. The annual payment is $240,000. Overseas
Development Holdings Corporation is 33% owned by our Chairman.

Alexander Walker, Jr., a Director and the Secretary of our company, is Chairman
of the Board and a shareholder of Nevada Agency and Trust Company, our transfer
agent since November 6, 2001. During the fiscal year ended September 30, 2003,
we incurred fees aggregating $6,963 to Nevada Agency and Trust Company. In
addition, 500,000 shares of common stock were issued to Mr. Walker as payment
for legal services.

                                  -20-

<PAGE>

         Curtis Orgil, a Director and the Chief Financial Officer of our
company, received 200,000 shares of common stock for his financial services.


ITEM 13. EXHIBITS AND REPORTS ON FORM 8-K

(a)  Exhibits

```
ITEM (601)                         DOCUMENT
----------                         --------
(i)    3.1    Articles of Incorporation.

(i)    3.2    Amendment to Articles of Incorporation

(i)    3.3    Amendment to Articles of Incorporation.

(i)    3.4    By-laws.

(iv)   3.5    Amendment to Articles of Incorporation.

(i)    4.1    Form of Certificate Evidencing shares of Common Stock of
              Universal Communication Systems, Inc.

(i)    4.2    Convertible Unsecured Debenture for $740,000 issued by World
              Wide Wireless Communications, Inc. to Credit Bancorp.


(v)    10.1   Stock Purchase Agreement dated November 30, 1999 Between
              Infotel Argentina S.A. and Universal Communication Systems, Inc.

(v)    10.3   Security Purchase Agreement Among World Wide Wireless
              Communications, Inc. and the Purchasers Named Therein.

(v)    10.4   Registration Rights Agreements Among World Wide Wireless
              Communications, Inc. and the Purchasers Named Therein.

(v)    10.5   Escrow Agreement Among the Purchasers Named Therein, the
              Representative of the Purchasers and the Escrow Agent.

(v)    10.6   Form of Debenture of Universal Communication Systems, Inc.
              with Respect to the 4% Convertible Debenture Due 2005.

(v)    10.7   Form of Warrant to Purchase Shares of World Wide Communications,
              Inc. Issued in the Offering.

(vi)   10.8   Amendment to the Securities Purchase Agreement entered into
              between World Wide Wireless Communications and the selling
              shareholders named therein.

(ii)   10.9   Second Amendment to the Securities Purchase Agreement
              entered into between World Wide Wireless Communications and
              the selling shareholders name therein.


(ii)   10.11  World Wide Communications, Inc. Incentive Stock Option Plan

(iii)  10.12  Agreement between Overseas Communication Limited and World
              Wide Wireless Communications, Inc.


(vii)  10.13  Stock Purchase Agreement by Universal Communication Systems, Inc.
              and Ami R. Elazari and Caltan Development, Ltd., dated
              August 22, 2003.

       10.14  Consulting Agreement - Dorit Elazari

       10.15  Consulting Agreement - Joseph Moore
```

10.16  Consulting Agreement - Otzarot Nechasim Vehashkaot, Ltd.


21.1   Subsidiaries

31.1   Certification Pursuant to 18 USC Section 302
       for Michael Zwebner.

31.2   Certification Pursuant to 18 USC Section 302
       for Curtis Orgil.

32.1   Certification Pursuant to 18 USC Section 1350 as adopted pursuant
       to Section 906 of Sarbanes- Oxley Act of 2002 for Michael Zwebner.

32.2   Certification Pursuant to 18 USC Section 1350 as adopted pursuant
       to Section 906 of Sarbanes- Oxley Act of 2002 for Curtis Orgil.

- ------------------

       (i) Filed with the registration statement on Form SB-2 with the
           Securities and Exchange Commission on May 31, 2000.

                                -21-

<PAGE>

       (ii) Filed with the registration statement on Form SB-2 with the
            Securities and Exchange Commission on December 15, 2000.

      (iii) Filed with Form 10-KSB for the period September 30, 2002.

       (iv) Filed with Form DEF14A on April 25, 2002.

        (v) Filed with the registration statement on Form SB-2 with the
            Securities and Exchange Commission on May 31, 2000.

       (vi) Filed with Form 10-KSB for the period September 30, 2000.

      (vii) Filed with Form 8-K on October 14, 2003.


   (b) The following Form 8-K was filed during the fourth quarter.

       September 29, 2003, Item 2. Acquisition or Disposition of Assets.
       Reporting the completion of the acquisition of Millenium Electric
       T.O.U., Ltd, pursuant to a stock purchase agreement dated August 22,
       2003.


ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

       Pursuant to SEC Release No. 33-8183 (as corrected by Release No.
33-8183A), the disclosure requirements of this Item are not effective until our
Annual Report on Form 10-KSB for our first fiscal year ending after December 15,
2003.

                                -22-

<PAGE>

SIGNATURES

In accordance with Section 13 or 15(d) of the Securities Exchange Act of 1934,
the Registrant caused this amendment to the report to be signed on its behalf by
the undersigned, thereunto duly authorized, on June 29, 2004.

                        Universal Communication Systems, Inc.


                    By:   /s/ MICHAEL ZWEBNER
                          --------------------
                          Michael J. Zwebner
                          Chief Executive Officer


In accordance with the requirements of the Securities Exchange Act of 1934,
this amendment to the report has been signed below by the following persons on
behalf of the Registrant in the capacities indicated on June 29, 2004:


| Signature | Title | Date |
| --------- | ----- | ---- |
| /s/ MICHAEL J. ZWEBNER<br>----------------------<br>Michael J. Zwebner | Director, Chief Executive Officer,<br>and Chairman of the Board | June 29, 2004 |
| /s/ ALEXANDER WALKER JR<br>----------------------<br>Alexander Walker, Jr. | Director and Secretary | June 29, 2004 |
| /s/ RAMSEY SWEIS<br>----------------------<br>Ramsey Sweis | Director | June 29, 2004 |
| /s/ CURTIS ORGIL<br>----------------------<br>Curtis Orgil | Director and Chief Financial Officer<br>(Principal Financial and Accounting<br>Officer) | June 29, 2004 |
| /s/ AMI R. ELAZARI<br>----------------------<br>Ami R. Elazari | Director | June 29, 2004 |


                            -23-


<PAGE>


                  INDEX TO FINANCIAL STATEMENTS

|  | Page |
| --- | ---- |
| Report of Independent Auditor | F-2 |
| Consolidated Balance Sheet | F-3 |
| Consolidated Statements of Operations | F-4 |

Statements of Stockholders' Deficit                                    F-5

Consolidated Statements of Cash Flows                          F-6-F-7

Notes to the Consolidated Financial Statements          F-8-F-24

F-1

<PAGE>
<TABLE>
<S>                                        <C>                                              <C>

                                    REUBEN E. PRICE & CO.
REUBEN E. PRICE, C.P.A. (1904-1986)   PUBLIC ACCOUNTANCY CORPORATION               MEMBERS
      -------                                 FOUNDED 1942                        AMERICAN INSTITU
RICHARD A. PRICE, C.P.A.                                                    CERTIFIED PUBLIC AC
                                                                                   ------
                                       703 MARKET STREET
                                    SAN FRANCISCO, CA 94103                  SECURITIES AND E
                                       -------------                        COMMISSION PRACTICE
                                       (415) 982-3556                       OF THE AMERICAN INS
                                     FAX (415) 957-1178                     CERTIFIED PUBLIC AC
                                                                                   ------
                                                                            CALIFORNIA SOCI
                                                                           CERTIFIED PUBLIC AC

</TABLE>

INDEPENDENT AUDITOR'S REPORT

Board of Directors
Universal Communication Systems, Inc.

We have audited the accompanying consolidated balance sheet of Universal
Communication Systems, Inc. and subsidiaries (the Company), as of September 30,
2003, and the related consolidated statements of operations, stockholders'
deficit and cash flows, for the years ended September 30, 2003 and 2002. The
consolidated financial statements of Universal Communication Systems, Inc. and
subsidiaries are the responsibility of the Companys management. Our
responsibility is to express an opinion on these financial statements based on
our audits.

We conducted our audits in accordance with The Standards of the Public Company
Accounting Oversight Board (United States). Those standards require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. An audit includes examining, on a
test basis, evidence supporting the amounts and disclosures in the financial
statements. An audit also includes assessing the accounting principles used and
significant estimates made by management, as well as evaluating the overall
financial statement presentation. We believe that our audits provide a
reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above, present
fairly, in all material respects, the financial position of Universal
Communication Systems, Inc. and subsidiaries, as of September 30, 2003 and the
results of their operations and their cash flows for the years ended September
30, 2003 and 2002, in conformity with accounting principles generally accepted
in the United States.

The accompanying consolidated financial statements have been prepared assuming
that the Company will continue as a going concern. As discussed in Note 3, the
Companys current liabilities exceed current assets by nearly $1.4 million, and
it has suffered recurring losses that raise substantial doubt about its ability
to continue as a going concern. Realization of a major portion of the assets is

dependent upon the Company's ability to meet its future financing requirements, and the success of future operations, the outcome of which cannot be determined at this time. Management's plans in regard to these matters are also described in Note 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Reuben E. Price & Co.
June 2, 2004

F-2

<PAGE>
Part I.   FINANCIAL INFORMATION
Item 1.   FINANCIAL STATEMENTS

UNIVERSAL COMMUNICATION SYSTEMS, INC. & SUBSIDIARIES
Consolidated Balance Sheet

|  | September 30, 2003 |
|---|---|
| **ASSETS** | |
| Current Assets: | |
| Cash & cash equivalents | $    144,682 |
| Accounts receivable, net | 105,859 |
| Note receivable | 116,782 |
| Inventory, finished goods | 4,900 |
| Prepaid expenses | 35,185 |
| Total Current Assets | 407,408 |
| Property, Plant and Equipment: | |
| Furniture and equipment | 64,838 |
| Less: Accumulated depreciation | 21,579 |
| Total Fixed Assets, Net | 43,259 |
| Other Assets: | |
| Patents, net | 606,714 |
| Deposits | 4,600 |
| Total Other Assets | 611,314 |
| Total Assets | $  1,061,981 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | |
| Current Liabilities: | |
| Bank overdraft advances | $     25,721 |
| Accounts payable, trade | 195,538 |
| Accrued expenses | 360,805 |
| Notes payable | 344,746 |
| Liabilities of discontinued operations | 946,794 |
| Due to related parties | 93,308 |
| Due to officer | 11,368 |
| Total Current Liabilities | 1,978,280 |
| Long-term Liabilities: | |
| Convertible debentures | 4,446,996 |
| Total Liabilities | 6,425,276 |

Commitments and Contingencies                                                    --
Stockholders' Deficit:
   Preferred stock, par value $.001 per share , 10,000,000 shares
     authorized, no shares Issued and outstanding                          --
   Common stock, par value $.001 per share,
     800,000,000 shares authorized, 81,223,246 shares
     issued and outstanding                                              81,223
Additional paid-in capital                                              26,482,580
Accumulated deficit                                                    (31,833,598)
Account receivable, stockholder                                            (93,500)
                                                  ------------

    Total Stockholders' Deficit                                       (5,363,295)
                                                  ------------

       Total Liabilities and Stockholders' Deficit             $  1,061,981
                                                  ============


The accompanying notes are an integral part of these financial statements.

<center>F-3</center>

&lt;PAGE&gt;


<center>UNIVERSAL COMMUNICATION SYSTEMS, INC. & SUBSIDIARIES
Consolidated Statements of Operations</center>

&lt;TABLE&gt;
&lt;CAPTION&gt;

| | For the Year Ended September 30, | |
|---|---|---|
| | 2003 | 2002 |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; |
| Operating Expenses: | | |
|   Sales and marketing | $    151,804 | $        -- |
|   Research and developmen | 62,333 | -- |
|   General and administrative | 1,785,431 | 807,033 |
|   Impairment losses | -- | 128,706 |
|     Total Operating Expenses | 1,999,568 | 935,739 |
| Other Expense: | | |
|   Interest expense | 285,572 | 334,953 |
| Net Loss | $ 2,285,140 | $ 1,270,692 |
| Basic and Diluted Net Loss per Common Share | $      0.09 | $      5.54 |
| Basic and Diluted Weighted Average Shares Outstanding | 26,758,511 | 229,239 |

&lt;/TABLE&gt;


The accompanying notes are an integral part of these financial statements.

<center>F-4</center>

&lt;PAGE&gt;

<center>UNIVERSAL COMMUNICATIONS SYSTEMS, INC. & SUBSIDIARIES
Statements of Stockholders' Deficit
For the Years Ended September 30, 2003 and 2002</center>

&lt;TABLE&gt;

<CAPTION>

|  | Common Stock | | Additional Paid-in Capital | Accumula Defici |
|---|---|---|---|---|
|  | Shares | Amount |  |  |
| <S> | <C> | <C> | <C> | <C> |
| Balance, September 30, 2001 | 137,993 | $      137 | $ 19,713,954 | $(28,158, |
| Eliminate foreign currency adjustment | -- | -- | -- | (119, |
| Capital Stock Subscriptions - -------------------------- |  |  |  |  |
| Common stock issued in private Placement between $3.00 and $5.00 per share | 45,254 | 45 | 173,455 |  |
| Conversion of debentures for common stock between $0.50 and $4.00 per share | 4,898,636 | 4,899 | 2,611,537 |  |
| Common stock issued for services at $0.20 and $15.00 per share | 584,011 | 584 | 572,903 |  |
| One for one thousand reverse Split, Fractional shares Adjustment | 2,096 | 3 | (3) |  |
| Common stock issued in escrow to secure debt | 300,000 | 300 | (300) |  |
| Net loss for the fiscal year Ended, September 30, 2002 | -- | -- | -- | (1,270, |
| Balance, September 30, 2002 | 5,967,990 | 5,968 | 23,071,546 | (29,548, |
| ommon stock issued in private placements between $0. 026 and $1.00 per share | 22,742,301 | 22,742 | 1,192,087 |  |
| Conversions of debentures for common stock between $0.0253 and $0.1275 per share | 23,486,734 | 23,487 | 693,578 |  |
| Common stock issued for services between $0.04 and $ 0.12 per share | 18,008,770 | 18,009 | 1,086,386 |  |
| Common stock issued for purchase of subsidiary at $.05 per share | 5,000,000 | 5,000 | 245,000 |  |
| Common stock issued for non-cash Investments in patent rights at of $0.05 per share | 4,000,000 | 4,000 | 196,000 |  |
| Common stock issued between $0.033 and $1.00 per share in escrow, not paid | 2,017,451 | 2,017 | (2,017) |  |
| Account receivable, stockholder | -- | -- | -- |  |
| Net loss for the fiscal year ended, September 30, 2003 | -- | -- | -- | (2,285, |
| Balance, September 30, 2003 | 81,223,246 | $   81,223 | $ 26,482,580 | $(31,833, |

</TABLE>

The accompanying notes are an integral part of these financial statements.

F-5

&lt;PAGE&gt;

UNIVERSAL COMMUNICATION SYSTEMS, INC. & SUBSIDIARIES
Consolidated Statements of Cash Flows

'ABLE&gt;
&lt;CAPTION&gt;

|  | For the Year Ended September 30, | |
|---|---|---|
|  | 2003 | 2002 |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net Loss | $(2,285,140) | $(1,270,6 |
| Adjustments to reconcile net loss from operations to net cash used by operating activities: | | |
| Common stock issued for services | 1,104,395 | 573,4 |
| Impairment loss | -- | 128,7 |
| Depreciation expense | 5,690 | 22,0 |
| Interest payable added to principal of debentures | 239,513 | 246,3 |
| Loss on write down of assets | -- | 190,0 |
| Interest payable added to principal of note payable | 30,509 | |
| Changes in operating assets and liabilities: | | |
| (Increase) in inventory | (4,900) | 48,9 |
| (Increase) in accounts receivable | (105,859) | |
| (Increase) in prepaid and other | (85,249) | (4,6 |
| Increase (Decrease) in accrued expenses and accounts payable | 181,902 | (343,4 |
| Net Cash (Used) by Operating Activities | (919,139) | (409,1 |
| _ASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchase of patent rights | (100,000) | |
| Purchase of property, plant and equipment | (37,662) | (1,9 |
| Note receivable | (116,782) | |
| (Increase) Decrease in advances to related parties | (46,676) | (35,4 |
| Net Cash (Used) by Investing Activities | (301,120) | (37,3 |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds of short term notes | 60,000 | |
| Proceeds of line of credit | 25,721 | |
| Proceeds from the issuance of senior secured convertible debentures, net | -- | 240,0 |
| Proceeds from issuance of common stock | 1,214,829 | 173,5 |
| Increase (Decrease) in advances from related parties | 63,517 | 29,7 |
| Net Cash Provided by Financing Activities | 1,364,067 | 443,2 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 143,808 | (3,2 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | 874 | 4,0 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $   144,682 | $    8 |

</TABLE>


    The accompanying notes are an integral part of these financial statements.

                                        F-6
<PAGE>

            UNIVERSAL COMMUNICATION SYSTEMS, INC. & SUBSIDIARIES
                    Consolidated Statements of Cash Flows
<TABLE>
<CAPTION>

|  | For the Year Ended September 30, | |
|  | 2003 | 2002 |
|  | ----------- | --------- |
| CONTINUED: | | |
| <S> | <C> | <C> |
| SUPPLEMENTAL DISCLOSURES OF CASH: | | |
|     Interest paid | $        -- | $ |
|     Income taxes paid | $        -- | $ |
| SUPPLEMENTAL DISCLOSURES OF NONCASH INVESTING AND FINANCING ACTIVITIES: | | |
|     Interest accrued on debentures, added to the principal of the debentures | $   239,852 | $   246,3 |
|     Interest accrued on note payable added to the principal of the note | $    30,509 | $ |
|     Debentures converted to capital stock | $   717,065 | $ 2,616,4 |
|     Capital stock issued in acquisition of subsidiary | $   250,000 | $ |
|     Capital stock issued in acquisition of patent rights | $   200,000 | $ |

</TABLE>


    The accompanying notes are an integral part of these financial statements.


                                        F-7
<PAGE>
            Universal Communication Systems, Inc. and Subsidiaries
                    Notes to the Consolidated Financial Statements
                            September 30, 2003


NOTE 1 - BACKGROUND, ACQUISITIONS AND SUBSIDIARIES


        Background
        ----------

        The Company and its subsidiaries are actively engaged in developing and
        marketing solar energy systems, as well as systems for the extraction
        of drinkable water from the air. Consolidated subsidiaries include
        wholly-owned subsidiaries AirWater Corp, AirWater Patents Corp,
        Millennium Electric T.O.U. Ltd, Solar Style Inc (USA), and Solar One
        Inc, and majority-owned subsidiaries Millennium USA and Solar Style
        Ltd.

        Digital Way, Peru
        -----------------

        The Company owns 27% of Digital Way, S.A., a Peruvian
        telecommunications company. The Company treats Digital Way as an
        unconsolidated investment. Pursuant to APB 18, par 17, absent evidence

to the contrary, and investor is presumed to have the ability to significantly influence an investee if it owns 20% or more of the investee's voting stock and the equity method of accounting is required. Because the majority ownership is concentrated among a small group of shareholders who operate Digital Way without regard to the views of Universal and the financial information necessary to apply the equity method of accounting is not being made available, Universal is unable to apply the equity method. Because significant doubt exists as to the recovery from this investment, the investment is fully impaired.

Hard Disc Cafe, Inc.
--------------------

During fiscal 2002, the Company advanced $147,794 and signed a non-binding letter of intent to acquire Hard Disc Cafe, Inc. (HDC), a Florida corporation, majority-owned by an officer of the Company. HDC intended to develop and license themed internet cafes. During 2002, HDC ceased all operations and returned $10,699 to the Company. As a result, the Company recognized a loss of $110,698 in fiscal 2002, and $26,397 in fiscal 2003.

Card Universal Corporation, Inc.
--------------------------------

During fiscal 2003, the Company entered into a non-binding letter of intent to acquire Card Universal Corporation, Inc.(CUC), a privately held development stage Florida corporation of which an officer of the Company was CEO and a major shareholder. CUC intended to provide and market prepaid "Stored Money Cards". CUC has ceased its development activities, is currently inactive, and the acquisition has been abandoned.

CinemaElectric
--------------

During fiscal 2003, the Company agreed to acquire CinemaElectric, a Los Angeles based multimedia messaging service company. On August 12, 2003, the Company released CinemaElectric from the agreement in exchange for 10% of CinemaElectric's stock, which was not received as of September 30, 2003.

F-8

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 1 - BACKGROUND, ACQUISITIONS AND SUBSIDIARIES (continued)

AirWater Systems
----------------

On March 21, 2003, the Company licensed worldwide rights to patents held by J.J. Reidy & Co, relating to a water production/generation system, for a period of not less than 10 years. In connection with the licensing, the Company created two wholly-owned subsidiaries: AirWater Corp, to produce and market the systems, and AirWater Patents Corp, to hold the Company's licensed patent rights. The Company paid $100,000 cash and 4 million shares of Company stock valued at $200,000. Additionally, the license agreement requires royalty payments of 5-7% of gross water system sales, with minimum royalty payments of $10,000 monthly beginning November 2003.

The $300,000 acquisition cost is included in Patents. As discussed in Note 12, no amortization or impairment has been recognized.

Millennium Solar Systems
------------------------

On September 29, 2003, the Company completed an agreement to purchase 100% of the stock of Millennium Electric T.O.U. Ltd (Millennium), an Israeli company specializing in the development and installation of solar power systems worldwide. Terms included an initial transfer of 5 million shares of Company stock, valued at $250,000, with options for the sellers to purchase an additional 22 million shares at various exercise prices, ranging from $0.05 to $0.39 per share, to be granted under various conditions related to certain future events and future Company performance standards.

The Company's purchase cost plus net liabilities assumed, resulted in $300,064 of intangibles in the form of patent costs, which is included in Patents. As discussed in Note 12, no amortization or impairment has been recognized.

Two new wholly-owned US subsidiaries, Solar One Inc and Solar Style Inc (USA), were created by the Company to market the solar systems. As of September 30, 2003, they were inactive, with no assets or liabilities.

Millennium has two subsidiaries: 65%-owned Millennium USA, and 50%-owned Solar Style Ltd. Both are inactive, with no assets or liabilities.

Millennium's assets and liabilities are included in the Company's consolidated balance sheet at September 30, 2003. However, Millennium's results are not included in the Company's consolidated statements of operations, stockholders' deficit, or cash flows.

F-9

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 1 - BACKGROUND, ACQUISITIONS AND SUBSIDIARIES (continued)

Millennium Solar Systems (continued)
------------------------------------

The following pro forma data is presented on a combined basis, as if Millennium had been acquired as of October 1, 2001:

| For the years ended September 30: | 2003 | 2002 |
|---|---|---|
| Revenues | $    162,066 | $    136,814 |
| Expenses | 2,477,052 | 1,364,838 |
| Net (Loss) | ($2,314,986) | ($1,228,024) |
| Basic & Diluted Loss per Share | ($      0.09) | ($      0.26) |

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Reverse Stock Split
-------------------

The Company completed a one-for-one-thousand reverse stock split on
August 23, 2002. All share and per share information reflects this
reverse stock split.

Principles of Consolidation
---------------------------

The consolidated financial statements include the accounts of all
majority-owned subsidiaries. Investments in which the Company has the
ability to exercise significant influence, but not control, are
accounted for by the equity method. All other investments are carried
at the lower of cost or fair value. Intercompany transactions are
eliminated.

Basic and Diluted Net Loss Per Share
------------------------------------

The calculation of basic and diluted net loss per share is in
accordance with Statement of Financial Accounting Standards No. 128,
"Earnings Per Share". Net loss per common share, basic and diluted, has
been computed using weighted average common shares outstanding. The
effect of outstanding stock options and warrants totaling 28,071 in
fiscal 2002 and 27,521 in 2003 has been excluded from the dilutive
computation, as their inclusion would be anti-dilutive.

                                    F-10

<PAGE>

            Universal Communication Systems, Inc. and Subsidiaries
                Notes to the Consolidated Financial Statements
                           September 30, 2003

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

|  | Fiscal Year Ended September 30, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Net loss | $(2,285,140) | $(1,270,692) |
| Weighted average number of common shares | 26,758,511 | 229,239 |
| Basic and diluted loss per share | $ (0.09) | $ (5.54) |

Cash Equivalents
----------------

The Company considers all highly liquid investments with an original
maturity of three months or less to be cash equivalents. Balances in
bank accounts may, from time to time, exceed federal insured limits.

Inventory
---------

Inventory is stated at the lower of cost (determined using the "first-
in, first-out" method) or market. Inventory write-offs are provided to
cover risks arising from slow-moving items or obsolescence.

Property, Plant and Equipment
-----------------------------

Furniture, fixtures and equipment are depreciated over their estimated useful lives of 3 to 15 years, using the straight-line method of depreciation.

Long-Lived Assets
-----------------

The Company reviews its long-lived assets on a quarterly basis to determine any impairment in accordance with Statement of Financial Accounting Standards (SFAS) No. 144. This statement provides a single accounting model for long-lived assets to be disposed of and significantly changes the criteria that would have to be met to classify an asset as held-for-sale. Classification as held-for-sale is an important distinction since such assets are not depreciated and are stated at the lower of fair value and carrying amount. This statement also requires expected future operating losses from discontinued operations to be displayed in the period(s) in which the losses are incurred, rather than as of the measurement date as previously required.

F-11

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Estimates
---------

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Fair Value of Financial Instruments
-----------------------------------

For cash, cash equivalents, other assets, accounts payable, and accrued expenses, the carrying amounts represent their fair market value. The carrying amount of the debentures payable approximates fair value because of similar current rates at which the Company could borrow funds with consistent remaining maturities.

Investments
-----------

The Company has adopted SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities". Under this standard, management determines the appropriate classifications of debt securities at the time of acquisition, and reevaluates such designation as of each balance sheet date.

Revenue Recognition
-------------------

Revenues from the sales of products are recognized in accordance with Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial

Statements", when persuasive evidence of an arrangement exists and delivery of the product has occurred, provided that the collection of the resulting receivable is probable, the price is fixed or determinable, and no significant obligation exists. The Company does not grant any right of return.

Because the Company's acquisition of Millennium occurred only one day before its fiscal year-end, no Millennium revenue has been recognized in the Company's consolidated statement of operation for the year ended 9/30/03.

Segment Information
-------------------

The Company adopted Statement of Financial Accounting Standards No. 131, "Disclosures about Segments of an Enterprise and Related Information" (SFAS No. 131) in 1999. This statement establishes standards for the reporting of information about operating segments in annual and interim financial statements and requires restatement of prior year information. The Company has no reportable operating segments for the years ended September 30, 2003 and 2002.

Comprehensive Income and Foreign Currency Translation
-----------------------------------------------------

The Company has adopted FASB Statement No. 130, Reporting Comprehensive Income. The financial statements of the Company's foreign subsidiaries are measured using the U.S. dollar as the functional currency. Where there are foreign currency transactions, assets and liabilities are translated at exchange rates as of the balance sheet date and revenues and expenses were translated at average rates of exchange in effect during the year. Any cumulative translation adjustments are recorded as a separate component of stockholders' equity.

Recent Accounting Pronouncements
--------------------------------

In October 2001, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 143, "Accounting for Asset Retirement Obligations" ("SFAS No. 143"). SFAS No. 143 establishes guidelines related to the retirement of tangible

                                F-12

<PAGE>

          Universal Communication Systems, Inc. and Subsidiaries
                 Notes to the Consolidated Financial Statements
                           September 30, 2003

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

        Recent Accounting Pronouncements (continued)
        --------------------------------------------

        long-lived assets of the Company and the associated retirement costs.
        This statement requires that the fair value of a liability for an asset
        retirement obligation be recognized in the period in which it is
        incurred if a reasonable estimate of fair value can be made. The
        associated asset retirement costs are capitalized as part of the
        carrying amount of the long-lived assets. This statement is effective
        for financial statements issued for the fiscal years beginning after
        June 15, 2002 and with earlier application encouraged. The Company
        adopted SFAS No. 143 and the adoption did not have a material impact on
        the financial statements of the Company at September 30, 2003.

In October 2001, the Financial Accounting Standards Board issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No. 144"). SFAS No. 144 replaces SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed of." This standard establishes a single accounting model for long-lived assets to be disposed of by sale, including discontinued operations. SFAS No. 144 requires that these long-lived assets be measured at the lower of carrying amount or fair value less cost to sell, whether reported in continuing operations or discontinued operations. This statement is effective beginning for fiscal years after December 15, 2001, with earlier application encouraged. The Company adopted SFAS No. 144 and the adoption did not have a material impact on the financial statements of the Company at September 30, 2003.

In April 2002, the Financial Accounting Standards Board issued SFAS No. 145, "Rescission of FASB Statements No. 44, 4 and 64, Amendment of FASB Statement No. 13, and Technical Corrections" ("SFAS No. 145"), which updates, clarifies and simplifies existing accounting pronouncements. FASB No. 4, which required all gains and losses from the extinguishment of debt to be aggregated and, if material, classified as an extraordinary item, net of related tax effect was rescinded. As a result, FASB No. 64, which amended FASB No. 4, was rescinded as it was no longer necessary. SFAS No. 44, "Accounting for Intangible Assets of Motor Carriers", established the accounting requirements for the effects of transition to the provisions of the Motor Carrier Act of 1980. Since the transition has been completed, SFAS No. 44 is no longer necessary and has been rescinded. SFAS No. 145 amended SFAS No. 13 to eliminate an inconsistency between the required accounting for sale-leaseback transactions and the required accounting for certain lease modifications that have economic effects that are similar to sale-leaseback transactions. The Company adopted SFAS No. 145, which has not had a material effect on the Company's financial statements.

F-13

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Recent Accounting Pronouncements (continued)
-------------------------------------------

In June 2002, the Financial Accounting Standards Board issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" ("SFAS No. 146"). SFAS No. 146 addresses significant issues regarding the recognition, measurement, and reporting of costs associated with exit and disposal activities, including restructuring activities. SFAS No. 146 also addresses recognition of certain costs related to terminating a contract that is not a capital lease, costs to consolidate facilities or relocate employees, and termination benefits provided to employees that are involuntarily terminated under the terms of a one-time benefit arrangement that is not an ongoing benefit arrangement or an individual deferred-compensation contract. SFAS No. 146 was issued in June 2002, effective December 31, 2002 with early adoption encouraged. There has been no impact on the Company's financial position or results of operations from adopting SFAS No. 146.

In April 2003, the Financial Accounting Standards Board issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging

Activities" (hereinafter "SFAS No. 149"). SFAS No. 149 amends and clarifies the accounting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities". This statement is effective for contracts entered into or modified after June 30, 2003 and for hedging relationships designated after June 30, 2003. The adoption of SFAS No. 149 did not have a material impact on the financial position or results of operations of the Company.

In May 2003, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity" (hereinafter "SFAS No. 150"). SFAS No. 150 establishes standards for classifying and measuring certain financial instruments with characteristics of both liabilities and equity and requires that those instruments be classified as liabilities in statements of financial position. Previously, many of those instruments were classified as equity. SFAS No. 150 is effective for financial instruments entered into or modified after May 31, 2003 and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Company has determined that there was no impact on the Company's financial statements from the adoption of this statement.

In January 2003, the Financial Accounting Standards Board issued FASB Interpretation No. (FIN) 46 "Consolidation of Variable Interest Entities, an Interpretation of ARB No. 51" (hereinafter "FIN 46"). FIN 46 requires certain variable interest entities to be consolidated by the primary beneficiary of the entity if the equity investors in the entity do not have the characteristics of a controlling financial

F-14

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Recent Accounting Pronouncements (continued)
-------------------------------------------

interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. FIN 46 is effective for all new variable interest entities created or acquired after January 31, 2003. The provisions of FIN 46 must be applied for the first interim or annual period beginning after June 15, 2003. The Company does not have any entities that require disclosure or new consolidation as a result of adopting the provisions of FIN 46.

In November 2002, the Financial Accounting Standards Board issued FIN 45 "Guarantor's Accounting and Disclosure Requirements for Guarantees, including Indirect Guarantees of Indebtedness of Others." FIN 45 requires a company, at the time it issues a guarantee, to recognize an initial liability for the fair value of obligations assumed under the guarantee and elaborates on existing disclosure requirements related to guarantees and warranties. The initial recognition requirements of FIN 45 are effective for guarantees issued or modified after December 31, 2002 and do not have an impact on the financial statements of the Company. The Company does not anticipate issuing any guarantees which would be required to be recognized as a liability under the provisions

of FIN 45 and thus does not expect the adoption of this interpretation
to have an impact on its results of operations or financial position.

NOTE 3 - GOING CONCERN AND SIGNIFICANT RISKS AND UNCERTAINTIES

The Company's financial statements are prepared using generally
accepted accounting principles applicable to a going concern which
contemplates the realization of assets and liquidation of liabilities
in the normal course of business. The Company's current liabilities
exceed current assets by over $1.5 million, has experienced losses
since inception, and had an accumulated deficit of $31,833,598 at
September 30, 2003. Net losses are expected for the foreseeable future.
As such, there is substantial doubt as to the Company's ability to
continue as a going concern. Management has modified its business plan
and is currently focusing its operations on the design, manufacture and
sale of water production and generation systems along with solar power
systems. The Company needs to secure additional capital through sales
of common stock. There is no assurance that management will be
successful in its efforts to raise additional capital.

NOTE 4 - COMMITMENTS AND CONTINGENCIES

Litigation
----------

In November 1998, the Company and its predecessor affiliates filed an
action against the lessor of its leases for the Concord and San Marcos,

F-15

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 4 - COMMITMENTS AND CONTINGENCIES (continued)

Litigation (continued)
----------------------

California multipoint distribution service channels. Thereafter, the
lessor cross-complained against the Company and its predecessors,
alleging breach of contract. On December 9, 1999, a settlement
agreement was signed. Under terms of the settlement agreement, the
Company had an option to purchase the Concord and San Marcos leases for
a price of $250,000 each, less lease payments already made. The Company
elected to exercise the option to purchase the Concord lease, and the
appropriate transfer procedure has been initiated with the U.S. Federal
Communications Commission (FCC) which is still pending. The Company
believes that under current FCC regulations it is not required to pay
the $250,000 purchase price until such time as the FCC has approved the
transfer of the license, and has made no payment. Management has
abandoned the pursuit of these leases and licenses.

During 1999, the Company borrowed $740,000 from Credit Bancorp. Also in
1999, the Company filed suit against Credit Bancorp in US District
Court in San Francisco, regarding improprieties. The case was settled
in 1999, with the $740,000 loan converting to a $740,000 convertible
debenture. In 2000, Credit Bancorp's receiver agreed to convert the
debenture into 462 shares of the Company's stock. A new receiver has
been appointed to administer the affairs of Credit Bancorp. The Company
has been informed that the appointed receiver denies that such a
conversion request was made, and the Company may be liable for the

principal plus accrued interest. As of September 30, 2003, no shares had been issued. Management believes that the receiver's claim lacks an authoritative basis, and that the resolution of these matters will not have a material effect on the Company's financial statements.

On April 19, 2001, the Company was served with a complaint alleging unjust enrichment and a violation of California Business and Professions Code by Broad Horizons, Inc., a Florida corporation. The complaint stems from allegations that the Company improperly received monetary benefits from the Company's intended acquisition of Comunicacoes 100Fio, Ltda, a Brazilian corporation, and the Company's subsequent relations with Luis Cuza, a former vice-president and director of Broad Horizons, Inc., and a former member of the Company's board of directors. The Company denies the allegations and believes that the resolution of this matter will not have a material effect on the Company's financial statements.

In fiscal 2003, Electric & Gas Technology Inc (ELGT) filed suit against the Company in Federal District Court in Texas, alleging patent infringement and other claims regarding the Company's AirWater products. This suit was dismissed without prejudice, for venue/jurisdictional reasons. It is not yet clear whether ELGT will re-file in another jurisdiction. The Company has counter-sued ELGT in Federal District Court in Florida for defamation and patent infringement, which case is still pending. Management believes that the resolution of these matters will not have a material effect on the Company's financial statements.

F-16

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 4 - COMMITMENTS AND CONTINGENCIES (continued)

Operating Leases
----------------

During 2003, the Company converted the lease of its Miami executive and administrative offices to a month-to-month basis. The Company's Millennium subsidiary in Israel rents facilities under non-cancelable operating leases for periods ending in 2005, and also leases a car under a 36-month lease commencing October 2003.

Future minimum lease payments required under these leases are as follows at September 30, 2003:

Fiscal year
Ending September 30,
--------------------

| | |
|---|---|
| 2004 | $ 73,692 |
| 2005 | 68,677 |
| 2006 | 13,512 |
| | -------- |
| | $155,881 |
| | ======== |

Management Agreement
--------------------

The Company entered into a three year consulting agreement with

Overseas Communications Limited ("Overseas") on November 2, 2001, for
Mr. Michael Zwebner to act as Chairman and CEO of the Company. The
Agreement calls for a monthly payment of $20,000, payable in cash or
the Company's common stock. For the fiscal years ended September 30,
2003 and 2002, the Company paid $80,000 and $20,000 in cash,
respectively, and issued 3,160,742 and 365,966 shares of common stock,
respectively, under this agreement. Mr. Zwebner is a shareholder of
Overseas.

Settlement Agreement
--------------------

As described more fully in Note 9, below, the Company has entered into
a settlement agreement with the Andrew Corporation, formerly a major
supplier to the Company. The related note payable for $300,000 was
timely paid in April 2004.

F-17

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 4 - COMMITMENTS AND CONTINGENCIES (continued)

Consultant Agreements
--------------------

In September 2003, the Company entered into two consulting agreements
with two Millennium executives. The remaining contingent obligations on
these agreements at September 30, 2003 totals $114,000.

AirWater Minimum Royalty Payments
---------------------------------

As discussed more fully in Note 1, the Company's license agreement,
through its AirWater subsidiary, requires monthly royalty payments of
$10,000 per month through October 2013.

NOTE 5 - STOCKHOLDERS' EQUITY

On May 21, 2002, stockholders approved a measure to increase the number
of authorized common shares from 300 million to 800 million, and to
authorize 10 million preferred shares.

The Company's Board of Directors approved a one-for-one-thousand
reverse stock split, effective August 23, 2002. Fractional shares were
rounded up to the next share. All share and per share information
reflects this reverse stock split.

During the fiscal year ended September 30, 2003, the Company sold
22,742,301 shares of its common stock for net cash proceeds of
$1,214,829. The Company issued 23,486,734 shares of common stock in
conversion of outstanding debentures for an aggregate value of
$717,065. The Company also issued 18,008,770 shares of its common stock
for services at an aggregate value of $1,104,395. Stock issued for
services was at the reported market price for the shares at the time of
issuance.

During the fiscal year ended September 30, 2002, the Company sold
45,254 shares of its common stock for net cash proceeds of $173,500.
The Company issued 4,898,636 shares of common stock in conversion of
outstanding debentures for an aggregate value of $2,616,436. The

Company also issued 584,011 shares of its common stock for services at
an aggregate value of $573,485. Stock issued for services was at the
reported market price for the shares at the time of issuance.

F-18

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 6 - INCOME TAXES

A reconciliation between the actual income tax benefit and the federal
statutory rate follows:

| | Fiscal years ended September 30, | | | |
| | 2002 | | 2003 | |
| | Amoun | % | Amount | % |
| Computed income tax benefit at statutory rate | $ 447,000 | 34 % | $ 656,000 | 34 % |
| Tax benefit reserved for doubtful valuation | (447,000) | (34)% | (656,000) | (34)% |
| Income tax benefit | None | | None | |

At September 30, 2003 the Company had a net operating loss carry
forward for federal tax purposes of approximately $29,300,000 which, if
unused to offset future taxable income, will expire between the years
2011 to 2023. A valuation allowance has been recognized to offset the
related deferred tax assets due to the uncertainty of realizing any
benefit therefrom.

Under section 382 of the Internal Revenue Code, the utilization of net
operating loss carryforwards is limited after an ownership change, as
defined, to an annual amount equal to the market value of the loss
corporation's outstanding stock immediately before the date of the
ownership change multiplied by the highest Federal long-term tax exempt
rate in effect for any month in the 3 calendar month period ending in
the calendar month in which the ownership change occurred. Due to the
ownership changes as a result of the May 1998 reorganization and
subsequent stock issuances, any future realization of the Company's net
operating losses will be severely limited.

Significant components of the Company's deferred tax assets are as
follows:

| | 2002 | 2003 |
| Net operating loss carryforwards | $ 28,000,000 | $ 29,300,000 |
| Valuation allowance | (28,000,000) | (29,300,000) |
| Net deferred tax assets | None | None |

F-19

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements

September 30, 2003

NOTE 7 - STOCK OPTION PLANS

Nonstatutory Stock Options
--------------------------

The Company has issued stock options under nonstatutory stock option
agreements. The options are granted at the fair market value of the
shares at the date the option is granted. The options are granted for a
period of 5 years, and are fully exercisable during the term of the
option period or within thirty (30) days of the participant's
resignation or termination.

Combined transactions in non-employee options for the fiscal years
ended September 30, 2003 and 2002 are as follows:

<TABLE>
<CAPTION>

|  | 2003 | | 2002 | |
| --- | --- | --- | --- | --- |
|  | Number of Shares | Average Exercise Price | Number of Shares | Av Ex Pr |
| <S> | <C> | <C> | <C> | <C> |
| Options outstanding October 1 | 251,300 | $0.624 | 251,300 | $0 |
| Granted | -- | -- | -- | |
| Cancelled/Expired | 250 | 95.00 | -- | |
| Exercised | -- | -- | -- | -- |
| Options outstanding, September 30 | 251,050 | $0.095 | 251,300 | $0 |

./TABLE>

Incentive Stock Plan
--------------------

The Company adopted an incentive stock plan on August 5, 1998, which
was approved by the shareholders on March 1, 2001. The options are
granted at the fair market value of the shares at the date that the
option is granted. The options are granted for a period of 10 years,
and are exercisable after one year from the date of grant, at a vested
rate of 20% per year during the term of the option period or within
thirty (30) days of the participant's resignation or termination. The
number of shares of stock covered by each outstanding option, and the
exercise price per share thereof set forth in each such option, shall
be proportionately adjusted for any stock split, and or stock dividend.
All such options were being treated as non-statutory stock options
until the incentive stock plan was approved by the shareholders.

F-20

<PAGE>
Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 7 - STOCK OPTION PLANS (continued)

Combined transactions in employee options for the fiscal years ended
September 30, 2003 and 2002 are as follows:
<TABLE>
<CAPTION>

| | 2003 | | 2002 | |
| | --- | --- | --- | --- |
| <S> | Number of Shares | Average Exercise Price | Number of Shares | Av Ex Pr |
| | <C> | <C> | <C> | <C> |
| Options outstanding October 1 | 6,300 | $602.00 | 6,300 | |
| Granted | 0 | 0 | 0 | |
| Cancelled/Expired | (200) | 602.00 | 0 | |
| Exercised | 0 | 0 | 0 | |
| Options outstanding, September 30 | 6,100 | $602.00 | 6,300 | |

</TABLE>

The Company applies APB Opinion 25 in accounting for its stock compensation plans discussed above. Accordingly, no compensation costs have been recognized for these plans in 2003 or 2002. Had compensation costs been determined on the basis of fair value pursuant to FASB Statement No. 123, no compensation costs would have been recognized inasmuch as no options were granted under these plans.

NOTE 8 - SECURITIES PURCHASE AGREEMENTS AND DEBENTURES

On April 14, 2000, the Company entered into a Securities Purchase Agreement with six investors, for the purchase of investment units, consisting of common stock, common stock purchase warrants, 4% subordinated debentures maturing April 14, 2005, and preferred stock. On August 10, 2000 and again on October 18, 2000, the Company agreed with the investors to modify certain terms of the earlier funding agreement including elimination of the warrants and the preferred stock. The investors acquired $6,720,000 of 4% subordinated debentures. Interest is compounded semi-annually on the aggregate principal amount and is payable upon conversion, redemption or maturity of the debentures. Accumulated accrued interest is payable by increasing the aggregate principal amount of the debentures semi- annually and convertible into common stock of the Company. The debentures are not callable and can be converted into common stock at the option of the Holder at any time. The debentures are convertible generally at 85% of the average per share market value for the 5 consecutive trading days immediately prior to the conversion date.

On March 29, 2001, the Company entered into a Senior Secured Convertible Debentures and Warrants Purchase Agreement with several investors. On June 7, 2001 the Company and several investors agreed to amend the March 29, 2001 Senior Secured Convertible Debentures and Warrants Purchase Agreement. The investors agreed to purchase $200,000 principal amount of 8% senior convertible debentures, maturing in February and March 2005. The Company also agreed to issue letter warrants to purchase up to $125,000 divided by 85% of the average of the three lowest bid prices during the 22 trading days prior to June 7, 2001. Interest is computed at 8% per annum on the principal amount, compounded quarterly and is payable upon conversion, redemption or maturity of the debentures. The debentures are convertible generally at 70% of the average of the 3 lowest bid prices during the 22 trading days immediately prior to the conversion date.

In July 2003, an individual purchased a 4% Convertible Debenture with a principal amount of $100,000, maturing in 2005, from an existing bondholder. The debenture, as amended, allows its conversion at any time into 2,300,000 freely transferable shares of the Company's stock.

F-21

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 8 - SECURITIES PURCHASE AGREEMENTS AND DEBENTURES (continued)

Commencing on February 5, 2002 through September 30, 2002, debenture
holders exercised their option to convert $2,492,885 of 4% debentures
and $123,551 of 8% debentures into 4,898,636 shares of common stock.

During the fiscal year ended September 30, 2003, debenture holders
exercised their option to convert $717,065 of 4% debentures into
23,486,734 shares of common stock.

The balance of long-term debentures are shown in the following table.
All of the debentures are due in the year 2005.

|  | Balance Outstanding September 30, 2003 |
| --- | --- |
| 4% Debenture | $3,380,547 |
| 8% Debentures | 1,066,449 |
| Total long term | $4,446,996 |

NOTE 9 - NOTE PAYABLE

The Notes Payable of $344,746 is composed of $284,746, related to the
Andrew Corporation settlement agreement (discussed below), and a
$60,000 note, bearing an interest rate of 12%, which matured on January
6, 2003. The Company is in negotiations with the holder to convert the
note into stock of the Company, which has not yet occurred.

On January 14, 2001, the Company entered into a Settlement Agreement
with its systems integrator, Andrew Corporation, to repay costs
incurred in purchasing their services and equipment in an approximate
amount of $1,400,000. Under the Agreement, Andrew received an initial
payment of $100,000 and was scheduled to receive an additional $100,000
each month until the loan was repaid. No payments were made. In
addition, the Company issued a warrant to purchase no less than 200 and
no more than 500 shares of the Company's common stock. The warrants are
exercisable until January 24, 2005 at an exercise price of $230 per
share. The warrants were issued in lieu of interest, and the Company is
required to register the shares underlying the warrants. Further, on
July 23, 2001, the Company entered into an agreement with Andrew to
resolve all remaining indebtedness. This agreement required the return
of all equipment previously shipped to Argentina, most of which has
been held in the duty free zone in La Plata, Argentina, as well as some
inventory held in the U.S. The equipment in Argentina has not yet been
returned to Andrew. The Company has not been able to locate the
equipment in Argentina. On September 3, 2002, the Company reached a
settlement agreement with Andrew Corporation for all amounts due. The
Company issued a note in the amount of $300,000 due in April 2004. The
note bears no interest and is secured by 300,000 shares of the
Company's common stock. The amount due was paid in April 2004.

F-22

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 9 - NOTE PAYABLE (continued)

Because there was no stated interest, $45,763 was calculated as imputed interest, resulting in a stated value of the note payable of $254,237 recorded as part of Notes Payable. Interest expense of $30,509 was computed for the year ended September 30, 2003 and added to the stated value of the note, increasing the stated value of the note payable to $284,746 as of September 30, 2003.

NOTE 10 - RELATED PARTY TRANSACTIONS

Company CEO Michael Zwebner is the majority shareholder of Hard Disc Cafe, Inc (HDC), with which the Company entered into a letter of intent to acquire HDC, as discussed in Note 3 above.

Mr. Zwebner is also the majority shareholder of Card Universal Corporation, Inc., with which the Company entered into a letter of intent to acquire Card Universal, as discussed in Note 1 above.

Mr. Zwebner advanced certain funds to the Company, of which $11,368 was outstanding and payable to him at September 30, 2003. Furthermore, Mr. Zwebner assumed a liability owing to the Company from a third party, resulting in an account receivable, stockholder of $93,500.

As discussed in Note 4, the Company entered into a three year consulting agreement with Overseas Communications Limited ("Overseas") on November 2, 2001, for Mr. Michael Zwebner to act as Chairman and CEO of the Company. The Agreement calls for a monthly payment of $20,000, payable in cash or the Company's common stock. For the fiscal years ended September 30, 2003 and 2002, the Company paid $80,000 and $20,000 in cash, respectively, and issued 3,160,742 and 365,966 shares of common stock, respectively, under this agreement. Mr. Zwebner is a shareholder of Overseas.

During fiscal 2003, the Company paid $6,963 to its stock registrar, The Nevada Agency and Trust Company (NATCO). Alexander Walker Jr, the Company's Corporate Secretary and a Director, is the Chairman and a shareholder of NATCO. Mr. Walker also received 500,000 shares of the Company's stock as compensation for legal services.

Mr. Curt Orgil, the Company's Treasurer and a Director, received 200,000 shares of the Company's stock as compensation for financial services.

NOTE 11 - RESEARCH AND DEVELOPMENT COSTS

The Company does not capitalize costs for improvement or refinement of existing products. Product development expenses charged against earnings were $62,333 in the fiscal year ended September 30 2003.

F-23

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2003

NOTE 12 - PATENTS

Intangibles consist of $300,064 of goodwill allocated to patents, related to the Millennium acquisition (see Note 1), and $306,650 of patent and related license costs, $300,000 of which relates to the acquisition of the AirWater patent licenses from J.J. Reidy (also see

Note 3), and $6,650 of which relates to the Company's distributed wireless call processing (DWCP) system. The Company has chosen to amortize the cost of the patents and patent licenses using the units-of-production method. No amortization is recognized during fiscal 2003 on the Millennium patents, because they were acquired at the end of the year. No amortization is recognized during fiscal 2003 on the AirWater and DWCP patents, because no units were sold. No reasonable estimate of future amortization costs can be made at this time.

With the Company's adoption of SFAS No. 142, intangible assets will be tested for impairment annually, and will be tested for impairment between annual tests if an event occurs that would indicate that the carrying amount may be impaired. The amount of the impairment loss is calculated by the excess of the asset's carrying value over its fair value. Management has analyzed the patents and licenses, and has determined that there is no impairment at this time.

NOTE 13 - NOTES RECEIVABLE

The Company's investment in notes receivable consists solely of demand notes maturing in less than one year, in the amount of $116,782. Investments with maturities of less than one year are classified as short-term investments. These investments are carried at cost (which approximates fair value), with an interest rate of 10% per annum.

NOTE 14 - LIABILITIES FROM DISCONTINUED OPERATIONS

This amount of $946,794 represents expenses incurred before 9/30/01, in the normal course of business, at the time when the Company was engaged in developing and providing of wireless broadband internet services. While the Company is currently in the process of renegotiating or settling these liabilities, it is not possible to determine at this time if, and to what degree, it will be successful in doing so. Therefore, it is not practicable or cost effective to develop any estimates of fair value (SFAS No. 107).

NOTE 15 - SUBSEQUENT EVENTS

On December 15, 2003, the Company tentatively agreed to acquire GiraSOLAR BV, a Dutch holding company with 2 subsidiaries, Stroomwerk Energy and Solar Service Buro, both involved in the photo-voltaic solar industry. The Company is in the process of conducting its due diligence in connection with this proposed acquisition.

F-24

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.14
<SEQUENCE>2
<FILENAME>dorit_ex1014.txt
<DESCRIPTION>CONSULTING AGREEMENT
<TEXT>
EXHIBIT 10.14
```

CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (the "Agreement") dated as of September 29, 2003 (the "Execution Date"), is entered into by and between TOU Millennium Electric Limited, an Israeli limited company (the "Company"), and Dorit Elazari (the "Consultant").

WHEREAS, the parties desire to set forth in this Agreement the terms and conditions under which Consultant will provide consulting services for the Company regarding general consulting work in Israel and worldwide relating to solar power and related business. (the "Project").

NOW THEREFORE, in consideration of the mutual covenants contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree that the foregoing preliminary statement is true and further agree as follows:

AGREEMENT

1. Consultant's Duties. The Company hereby retains Consultant to perform, and Consultant shall perform all advisory and consultative services that the Company's Board of Directors shall from time to time reasonably request relating to the Project. The Consultant agrees that he will provide such services for the Company on an exclusive basis and shall not perform the same or similar services for any other person or entity during the Term of this Agreement (as defined below).

2. Remuneration and Expenses.

(a) As compensation for the Consultant's services, the Company shall pay the Consultant a total aggregate amount of US $118,000 in 5 monthly installments of $22,000 each (the "Monthly Fee") and one final installment of US $8,000 (the "Final Fee") (collectively the "Consulting Fee"). The first Monthly Fee payment shall be made on the Execution Date, and thereafter on the first business day of each consecutive month for five months after the execution hereof. The Final Fee shall be paid on the final day of the Term, as defined below.

(b) The Company shall pay for or reimburse Consultant for all reasonable, necessary and ordinary expenses incurred in the performance of the Consultant's services. Such reimbursement is subject to the prior written approval by the Company.

3. Control by Company. Consultant agrees that the Company shall have the unlimited right to supervise and control Consultant and direct Consultant during the provision of the consulting services.

4. Term of Agreement. Unless terminated earlier under the provisions of this Agreement, the term of this Agreement shall be for a period of 6 months (the "Term") commencing on the Execution Date.

1

<PAGE>

5. Termination. The Company may terminate the Consultant for willful violation of the terms and conditions of this Agreement.

6. Confidential Information. Consultant acknowledges that as a result of his engagement with the Company, Consultant will acquire knowledge of and may make use of certain information which is of a special and unique nature which includes, but is not limited to, such matters as the Company's trade secrets, systems, procedures, manuals, confidential reports, and lists of customers or clients, which are deemed for all purposes confidential and proprietary, as well as the nature and type of services the Company renders, the equipment and methods used by the Company or the customers or clients of the Company, and the fees that customers or clients pay to the Company (collectively, the "Confidential Information"). Consultant acknowledges that the Confidential Information is a valuable, special and unique asset of the Company which is essential to the continuation of the Business. As used herein, the "Business" of

the Company includes the research, development, sale and marketing of products and services relating to solar power and related technologies or any other business engaged in by the Company during the term of Consultant's engagement with the Company.

A presumption shall exist that all information relating to the Business is Confidential Information and such presumption may be rebutted only by a demonstration that such information is common knowledge in the industry or business community in which the Company is engaged. The parties acknowledge that the normal business affairs of the Company will be seriously disrupted if the Company were required during the course of business to identify any specific information or document as Confidential Information, and accordingly, the Company is under no duty to Consultant during the course of business to identify any information or document as Confidential Information.

7. Confidentiality. Consultant agrees to keep in strict secrecy and confidence any and all Confidential Information of which Consultant knows of or to which Consultant has access that has not been publicly disclosed and is not a matter of common knowledge with respect to the Business. Consultant will not, without the Company's prior written consent, disclose any such Confidential Information to any third person or entity.

8. Restrictive Covenants. The following covenants against solicitation and competition shall be effective for a period of 12 months following the last day of the later of: (i) the expiration of the Term of this Agreement; or (ii) any period for which Consultant is receiving compensation from the Company (the "Restriction Period"). The Restriction Period shall be extended by the length of any period during which Consultant is in breach of the terms of this Section 8.

In consideration of this Agreement, and in light of the understandings of the parties set forth herein, Consultant agrees that during the Restriction Period, Consultant will not do any of the following (the "Restrictive Covenants"):

(a) during the term of Consultant's engagement with the Company, engage, directly or indirectly, in any business which is the same or similar to the Business or is competitive with the Business of the Company (a "Competitive Business") within Israel (the "Restrictive Territory"), or in any market in which the Company is then currently or has during the term of this Agreement been engaged in the Business;

2

<PAGE>

(b) without the prior written consent of the Company, directly or indirectly own an interest in, manage, operate, join, control, lend money or render financial or other assistance to or participate in or be connected with, as a partner, member, stockholder, consultant or otherwise, any person that engages in any Competitive Business within the Restrictive Territory; provided, however, that, for the purposes of this Agreement, ownership of securities having no more than five percent of the outstanding voting power of any person engaged in a Competitive Business or Businesses which are listed on any national securities exchange or traded actively in the national over-the-counter market shall not be deemed to be in violation of this Agreement so long as the person owning such securities has no other connection or relationship with such competitor;

(c) solicit or attempt to solicit any present, past or pending customer of the Company; or

(d) hire or attempt to hire or entice any employee, broker, vendor or other agent or business affiliate of the Company.

9. Reasonableness of Restrictions.

(a) Each party to this Agreement has independently consulted with his counsel and after such consultation agrees that the covenants set forth ι this Agreement are reasonable and proper. Accordingly, Consultant agrees that ιhe Restrictive Covenants above are no greater than are reasonably necessary to protect the Company in its legitimate interests. In light of these understandings, Consultant and the Company agree that the covenants set forth hereinabove are reasonable and will not unduly restrict Consultant in securing other employment in the event of such termination.

(b) The Company and Consultant further agree that if any Restrictive Covenants are held in a final judgment or determination of any court of law or administrative agency of competent jurisdiction to be over-broad or otherwise unenforceable in any respect, such provision shall be deemed to be amended and shall be binding upon Consultant to the maximum extent deemed reasonable and enforceable by such court or administrative agency. Without limitation of the foregoing, the parties agree that in the event that any of the Restrictive Covenants are deemed to be unreasonable, the remaining Restrictive Covenants shall be enforced.

10. Specific Performance. The parties agree that damages at law will be an insufficient remedy to the Company in the event Consultant violates the Restrictive Covenants, therefore it is agreed that the Company, in addition to the other remedies available, shall be entitled, as a matter of right, to injunctive relief in any court of competent jurisdiction, plus reasonable attorneys' fees for securing such relief.

3

<PAGE>

11. Independent Contractor Status. The relationship between Company and ᴄonsultant shall be solely as independent contractor and neither party shall be deemed a joint venturer, partner agent, representative or employee of the other. Consultant is solely responsible for securing, at his sole cost, Workers' Compensation insurance, disability benefits insurance and any other insurance as may be required by law. The Company will not provide, nor will it be responsible for, benefits for Consultant. Any such benefits, if provided by Consultant himself, including, but not limited to, health insurance, office space, paid vacations, paid holidays, sick leave or disability insurance coverage of whatever nature, shall be secured and paid for by Consultant.

12. Tax Duties & Responsibilities. Consultant is responsible for the payment of all required taxes and any other fees, charges, licenses or other payments required by law.

13. Binding Effect; Assignment. The terms and provisions of this Agreement shall be binding upon the parties and their heirs, legal representatives, successors, and assigns. Consultant shall not assign its rights hereunder without the prior written consent of Company, which such consent, due to the specialized nature of the work being performed, may be withheld in Company's sole discretion.

14. Entire Agreement. This Agreement, together with that certain Stock Purchase Agreement between Universal Communication Systems, Inc., Ami R. Elazari and Catlan Development Limited executed on August 22, 2003, contains the entire understanding of the parties and merges and supersedes any prior or contemporaneous agreements between the parties relating to this Agreement's ᴜbject matter. This Agreement may not be modified or terminated orally, and no ᴍodification, termination or attempted waiver of any of the provisions shall be binding unless in writing and signed by the party against whom it is sought to be enforced.

15. Notices. Whenever any notice, demand or request is required or permitted under this Agreement, that notice, demand or request shall be either hand-delivered in person or sent by registered or certified mail, postage prepaid, delivered via overnight courier, to the addresses below or to any other address that either party may specify by notice to the other party. Neither party shall be obligated to send more than one notice to the other party and no notice of a change of address shall be effective until received by the other party. A notice shall be deemed received upon hand delivery, or one business day after dispatch by overnight courier.

To Consultant:

```
----------------------------------
----------------------------------
----------------------------------
----------------------------------
----------------------------------
```

To Company:                TOU Millennium Electric, Inc.
                           Hasadna 7
                           P.O. Box 3014
                           Rannana Industrial Zone
                           Israel 43650
                           Facsimile: 972-9-7407511
                           Attention: Ami Elazari

                                    4

<PAGE>

With copy to:              Universal Communication Systems, Inc.
                           407 Lincoln Road, Suite 6K
                           Miami Beach, FL 33139
                           Facsimile: (305) 672-1965
                           Attention: Michael J. Zwebner

16. Headings. The headings of the paragraphs of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise affect the construction of the terms or provisions of this Agreement. References in this Agreement to Sections are to the sections of this Agreement.

17. Severability. The invalidity or unenforceability of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the validity or enforceability of the remaining provisions of this Agreement or any part of any provision, all of which are inserted conditionally on their being valid in law, and in the event that any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall be declared invalid or unenforceable, this Agreement shall be construed as if such invalid or unenforceable word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted or shall be enforced as nearly as possible according to their original terms and intent to eliminate any invalidity or unenforceability.

18. Governing Law. This Agreement is made and executed and shall be governed by the laws of Israel, without regard to its conflicts of laws principles.

19. Arbitration. Any controversy or claim arising out of or related to this Agreement shall be settled by arbitration in accordance with the rules and under the the commercial arbitration rules then pertaining of the London Center or International Arbitration ("LCIA"); and any arbitration shall be conducted in Tel Aviv, Israel. The arbitrator(s) shall make written findings of fact and conclusions of law. The prevailing party (as determined by the arbitrator(s)) shall be entitled to all legal fees and associated costs

20. Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

21. Additional Acts. Employee and the Company each agrees to execute, acknowledge and deliver all further instruments, agreements or documents and do all further acts that are necessary or expedient to carry out this Agreement's intended purposes.

22. Construction. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted, including any presumption of superior knowledge or

5

<PAGE>

responsibility based upon a party's business or profession or any professional training, experience, education or degrees of any member, agent, officer or employee of any party. If any words in this Agreement have been stricken out or otherwise eliminated (whether or not any other words or phrases have been added) and the stricken words initialed by the party against whom the words are construed, this Agreement shall be construed as if the words so stricken out or otherwise eliminated were never included in this Agreement and no implication or inference shall be drawn from the fact that those words were stricken out or otherwise eliminated.

[SIGNATURES BEGIN ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the ιte first written above.

COMPANY:

By: /s/ Michael J. Zwebner
    -----------------------
Name:  Michael J. Zwebner
Title: Chairman


CONSULTANT:

/s/ Dorit Elazari
-----------------
Dorit Elazari


6

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.15
<SEQUENCE>3
<FILENAME>moore_ex1015.txt
<DESCRIPTION>CONSULTING AGREEMENT
<TEXT>
 ΧHIBIT 10.15


                        CONSULTING AGREEMENT

     THIS CONSULTING AGREEMENT (the "Agreement") dated as of September 29,

2003 (the "Execution Date"), is entered into by and between TOU Millennium Electric Limited, an Israeli limited company (the "Company"), and Joseph Moore (the "Consultant").

WHEREAS, the parties desire to set forth in this Agreement the terms and conditions under which Consultant will provide consulting services for the Company regarding general consulting work in Israel and worldwide relating to solar power and related business. (the "Project").

NOW THEREFORE, in consideration of the mutual covenants contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree that the foregoing preliminary statement is true and further agree as follows:

AGREEMENT

1. Consultant's Duties. The Company hereby retains Consultant to perform, and Consultant shall perform all advisory and consultative services that the Company's Board of Directors shall from time to time reasonably request relating to the Project. The Consultant agrees that he will provide such services for the Company on an exclusive basis and shall not perform the same or similar services for any other person or entity during the Term of this Agreement (as defined below).

2. Remuneration and Expenses.

(a) As compensation for the Consultant's services, the Company shall pay the Consultant a total aggregate amount of US $37,000 payable in two installments of $18,500 each (the "Consulting Fee"). The first installment payment shall be made on December , 2003, and the final installment payment shall be paid on the final day of the Term, as defined below.

(b) The Company shall pay for or reimburse Consultant for all reasonable, necessary and ordinary expenses incurred in the performance of the Consultant's services. Such reimbursement is subject to the prior written approval by the Company.

3. Control by Company. Consultant agrees that the Company shall have the unlimited right to supervise and control Consultant and direct Consultant during the provision of the consulting services.

4. Term of Agreement. Unless terminated earlier under the provisions of this Agreement, the term of this Agreement shall be for a period of 6 months (the "Term") commencing on the Execution Date.

5. Termination. The Company may terminate the Consultant for willful violation of the terms and conditions of this Agreement.

1

<PAGE>

6. Confidential Information. Consultant acknowledges that as a result of his engagement with the Company, Consultant will acquire knowledge of and may make use of certain information which is of a special and unique nature which includes, but is not limited to, such matters as the Company's trade secrets, systems, procedures, manuals, confidential reports, and lists of customers or clients, which are deemed for all purposes confidential and proprietary, as well as the nature and type of services the Company renders, the equipment and methods used by the Company or the customers or clients of the Company, and the fees that customers or clients pay to the Company (collectively, the "Confidential Information"). Consultant acknowledges that the Confidential Information is a valuable, special and unique asset of the Company which is essential to the continuation of the Business. As used herein, the "Business" of

the Company includes the research, development, sale and marketing of products and services relating to solar power and related technologies or any other business engaged in by the Company during the term of Consultant's engagement with the Company.

A presumption shall exist that all information relating to the Business is Confidential Information and such presumption may be rebutted only by a demonstration that such information is common knowledge in the industry or business community in which the Company is engaged. The parties acknowledge that the normal business affairs of the Company will be seriously disrupted if the Company were required during the course of business to identify any specific information or document as Confidential Information, and accordingly, the Company is under no duty to Consultant during the course of business to identify any information or document as Confidential Information.

7. Confidentiality. Consultant agrees to keep in strict secrecy and confidence any and all Confidential Information of which Consultant knows of or to which Consultant has access that has not been publicly disclosed and is not a matter of common knowledge with respect to the Business. Consultant will not, without the Company's prior written consent, disclose any such Confidential Information to any third person or entity.

8. Restrictive Covenants. The following covenants against solicitation and competition shall be effective for a period of 12 months following the last day of the later of: (i) the expiration of the Term of this Agreement; or (ii) any period for which Consultant is receiving compensation from the Company (the "Restriction Period"). The Restriction Period shall be extended by the length of any period during which Consultant is in breach of the terms of this Section 8.

In consideration of this Agreement, and in light of the understandings of the parties set forth herein, Consultant agrees that during the Restriction Period, Consultant will not do any of the following (the "Restrictive Covenants"):

(a) during the term of Consultant's engagement with the Company, engage, directly or indirectly, in any business which is the same or similar to the Business or is competitive with the Business of the Company (a "Competitive Business") within Israel (the "Restrictive Territory"), or in any market in which the Company is then currently or has during the term of this Agreement been engaged in the Business;

(b) without the prior written consent of the Company, directly or indirectly own an interest in, manage, operate, join, control, lend money or render financial or other assistance to or participate in or be connected with,

2

<PAGE>

as a partner, member, stockholder, consultant or otherwise, any person that engages in any Competitive Business within the Restrictive Territory; provided, however, that, for the purposes of this Agreement, ownership of securities having no more than five percent of the outstanding voting power of any person engaged in a Competitive Business or Businesses which are listed on any national securities exchange or traded actively in the national over-the-counter market shall not be deemed to be in violation of this Agreement so long as the person owning such securities has no other connection or relationship with such competitor;

(c) solicit or attempt to solicit any present, past or pending customer of the Company; or

(d) hire or attempt to hire or entice any employee, broker,

vendor or other agent or business affiliate of the Company.

9. Reasonableness of Restrictions.

(a) Each party to this Agreement has independently consulted with his counsel and after such consultation agrees that the covenants set forth in this Agreement are reasonable and proper. Accordingly, Consultant agrees that the Restrictive Covenants above are no greater than are reasonably necessary to protect the Company in its legitimate interests. In light of these understandings, Consultant and the Company agree that the covenants set forth hereinabove are reasonable and will not unduly restrict Consultant in securing other employment in the event of such termination.

(b) The Company and Consultant further agree that if any Restrictive Covenants are held in a final judgment or determination of any court of law or administrative agency of competent jurisdiction to be over-broad or otherwise unenforceable in any respect, such provision shall be deemed to be amended and shall be binding upon Consultant to the maximum extent deemed reasonable and enforceable by such court or administrative agency. Without limitation of the foregoing, the parties agree that in the event that any of the Restrictive Covenants are deemed to be unreasonable, the remaining Restrictive Covenants shall be enforced.

10. Specific Performance. The parties agree that damages at law will be an insufficient remedy to the Company in the event Consultant violates the Restrictive Covenants, therefore it is agreed that the Company, in addition to the other remedies available, shall be entitled, as a matter of right, to injunctive relief in any court of competent jurisdiction, plus reasonable attorneys' fees for securing such relief.

11. Independent Contractor Status. The relationship between Company and Consultant shall be solely as independent contractor and neither party shall be deemed a joint venturer, partner agent, representative or employee of the other. Consultant is solely responsible for securing, at his sole cost, Workers' Compensation insurance, disability benefits insurance and any other insurance as may be required by law. The Company will not provide, nor will it be responsible for, benefits for Consultant. Any such benefits, if provided by Consultant himself, including, but not limited to, health insurance, office space, paid vacations, paid holidays, sick leave or disability insurance coverage of whatever nature, shall be secured and paid for by Consultant.

3

<PAGE>

12. Tax Duties & Responsibilities. Consultant is responsible for the payment of all required taxes and any other fees, charges, licenses or other payments required by law.

13. Binding Effect; Assignment. The terms and provisions of this Agreement shall be binding upon the parties and their heirs, legal representatives, successors, and assigns. Consultant shall not assign its rights hereunder without the prior written consent of Company, which such consent, due to the specialized nature of the work being performed, may be withheld in Company's sole discretion.

14. Entire Agreement. This Agreement, together with that certain Stock Purchase Agreement between Universal Communication Systems, Inc., Ami R. Elazari and Catlan Development Limited executed on August 22, 2003, contains the entire understanding of the parties and merges and supersedes any prior or contemporaneous agreements between the parties relating to this Agreement's subject matter. This Agreement may not be modified or terminated orally, and no modification, termination or attempted waiver of any of the provisions shall be binding unless in writing and signed by the party against whom it is sought to

be enforced.

15. Notices. Whenever any notice, demand or request is required or permitted under this Agreement, that notice, demand or request shall be either hand-delivered in person or sent by registered or certified mail, postage prepaid, delivered via overnight courier, to the addresses below or to any other address that either party may specify by notice to the other party. Neither party shall be obligated to send more than one notice to the other party and no notice of a change of address shall be effective until received by the other party. A notice shall be deemed received upon hand delivery, or one business day after dispatch by overnight courier.

```
To Consultant:          -----------------------------------
                        -----------------------------------
                        -----------------------------------
                        -----------------------------------
                        -----------------------------------

To Company:             TOU Millennium Electric, Inc.
                        Hasadna 7
                        P.O. Box 3014
                        Rannana Industrial Zone
                        Israel 43650
                        Facsimile: 972-9-7407511
                        Attention: Ami Elazari
                        ---------

With copy to:           Universal Communication Systems, Inc.
                        407 Lincoln Road, Suite 6K
                        Miami Beach, FL 33139
                        Facsimile: (305) 672-1965
                        Attention: Michael J. Zwebner
```

4

<PAGE>

16. Headings. The headings of the paragraphs of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise affect the construction of the terms or provisions of this Agreement. References in this Agreement to Sections are to the sections of this Agreement.

17. Severability. The invalidity or unenforceability of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the validity or enforceability of the remaining provisions of this Agreement or any part of any provision, all of which are inserted conditionally on their being valid in law, and in the event that any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall be declared invalid or unenforceable, this Agreement shall be construed as if such invalid or unenforceable word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted or shall be enforced as nearly as possible according to their original terms and intent to eliminate any invalidity or unenforceability.

18. Governing Law. This Agreement is made and executed and shall be governed by the laws of Israel, without regard to its conflicts of laws principles.

19. Arbitration. Any controversy or claim arising out of or related to this Agreement shall be settled by arbitration in accordance with the rules and under the the commercial arbitration rules then pertaining of the London Center for International Arbitration ("LCIA"); and any arbitration shall be conducted

in Tel Aviv, Israel. The arbitrator(s) shall make written findings of fact and conclusions of law. The prevailing party (as determined by the arbitrator(s)) shall be entitled to all legal fees and associated costs

20. Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

21. Additional Acts. Employee and the Company each agrees to execute, acknowledge and deliver all further instruments, agreements or documents and do all further acts that are necessary or expedient to carry out this Agreement's intended purposes.

22. Construction. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted, including any presumption of superior knowledge or responsibility based upon a party's business or profession or any professional training, experience, education or degrees of any member, agent, officer or employee of any party. If any words in this Agreement have been stricken out or otherwise eliminated (whether or not any other words or phrases have been added) and the stricken words initialed by the party against whom the words are construed, this Agreement shall be construed as if the words so stricken out or otherwise eliminated were never included in this Agreement and no implication or inference shall be drawn from the fact that those words were stricken out or otherwise eliminated.

[SIGNATURES BEGIN ON FOLLOWING PAGE]

5

<PAGE>

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

COMPANY:

By: /s/ Michael J. Zwebner
    -----------------------
Name:  Michael J. Zwebner
Title: Chairman

CONSULTANT:

/s/ Joseph Moore
----------------
Joseph Moore

6

</TEXT>
</DOCUMENT>
DOCUMENT>
TYPE>EX-10.16
<SEQUENCE>4
<FILENAME>otzarot_ex1016.txt
<DESCRIPTION>BUSINESS ADVISORY AGREEMENT

<TEXT>
EXHIBIT 10.16

## BUSINESS ADVISORY AND CONSULTING SERVICES AGREEMENT

This Agreement made as of the 18 day of August, 2003, by and between Otzarot Otzarot Nechasim Vehashkaot LTD an Israeli Corporation (hereinafter referred to as "Otzarot") whose principal office is located at 35 Jabotinsky st, Ramat Gan Israel 52511, and Universal Communication Systems, Inc. a publicly traded Company (symbol: UCSY) (hereinafter referred to as "UCSY "), whose principal offices are located at 407 Lincoln Road, Suite 6K. Miami Beach, FL 33139 and whose Chief Executive Officer is michael Zwebner.

### WITNESSETH:

WHEREAS, Otzarot is a private venture capital Consulting firm that has expertise in Completing mergers and acquisitions and rendering strategic business advice including leveraged based buyouts.

WHEREAS, UCSY wishes to retain Otzarot on the terms and Conditions hereinafter set forth;

NOW, THEREFORE, in Consideration of the aforesaid, it is hereby agreed by and between the parties as follows:

### ARTICLE I - SCOPE OF SERVICES

USCY has indicated and instructs Otzarot to originate, develop, structure, negotiate and advise upon appropriate joint venture or partnership deals or merger and acquisition deals or other forms of business combinations involving UCSY's business activities, and the expansion thereof, into other countries and ew and other activities.

### ARTICLE II - PERIOD OF PERFORMANCE

The term of this Agreement shall initially be for twelve months Commencing on the date of this agreement. At the Conclusion of the twelve month, this Agreement may be extended by the parties in writing.

### ARTICLE III - INITIAL FEE BASED COMPENSATION

There will be no initial Compensation for the performance of the services described above.

### ARTICLE IV - CONTINGENCY BASED COMPENSATION

For successfully closing of appropriate joint venture or partnership deal or merger and acquisition deal or other forms of business combinations, through Otzarot's efforts, with its direct or indirect sources, Otzarot shall receive a success fee equal to 10% of UCSY's free trading stocks of all stocks issued as part of the subject deal and 10% of all other forms of payment as part of the subject deal. Otzarot will also be entitled to the success fee described above if, within three years of the date of this letter (or the date of any extension hereof), (i) a Proposed Transaction is Completed, or (ii) UCSY enters into a definitive agreement which subsequently results in a Proposed Transaction, and in either case such Transaction is (a) with a party or parties introduced by Otzarot to the Company or (b) a transaction in respect to which Otzarot has

1

<PAGE>

provided assistance in structuring, Coordinating and/or negotiating the specific

transaction.

## ARTICLE V - EXPENSES

ᵀXPENSE REIMBURSEMENT: Otzarot shall be reimbursed for expenses as provided
.erein. UCSY shall prepay extraordinary Travel Expenses it approves. In the
event any item on the Expense Reimbursement bill causes UCSY a problem, then the
parties shall promptly negotiate a resolution of the matter in good faith.

Any expenditure over one thousand dollars must be approved in writing in advance
by an officer of UCSY . Expenses eligible for reimbursement hereunder include,
but are not limited to, production, road show Costs, Copying and travel and
entertainment expenses. Outside legal, accounting and other professional service
expenses that Otzarot incurs must be approved in advance in writing and are
subject to reimbursement as set forth in this Agreement. Outside Consultants,
legal or accounting services retained by UCSY shall be paid by UCSY .

## ARTICLE VI - COMPANY INFORMATION

a. Since Otzarot must at all times rely upon the accuracy and the Completeness
of information supplied to it by officers, directors, agents and employees of
UCSY , in any proceeding or suit which may arise out of the relationship to
Otzarot, UCSY agrees to indemnify and hold Otzarot harmless for any false or
misleading information which was provided to Otzarot by UCSY .

b. No party to this agreement shall be liable for any damages for failure to
perform its obligations hereunder due to any cause beyond their Control.

## ARTICLE VIL - CONFIDENTIALITY

Each party agrees that during the course of this Agreement, information that is
ᵒonfidential or of a proprietary nature may be disclosed to the other party,
ᵢncluding, but not limited to, product and business plans, software, technical
processes and formulas, source codes, product designs, sales, costs and other
unpublished financial information, advertising revenues, usage rates,
advertising relationships, projections, and marketing data ("Confidential
Information"). Each party shall use confidential Information only for the
purposes contemplated by this Agreement, and shall not disclose it to any third
party except with the prior written consent of the disclosing party.
Confidential Information shall not include information that the receiving party
can demonstrate (a) is, as of the time of its disclosure, in the public domain,
or thereafter becomes part of the public domain through a source other than the
receiving party, (b) was known to the receiving party as of the time of its
disclosure, (c) is independently developed by the receiving party.

## ARTICLE VII - INDEMNIFICATION

(A) UCSY agrees that it will indemnify and hold harmless Otzarot, its directors,
employees, agents and Controlling persons (each being an "Indemnified Party')
from and against any and all losses, claims, damages, liabilities and expenses,
joint or several (including all reasonable fees of counsel and other expenses
incurred by any Indemnified Party in connection with the preparation for, or
defense of, any claim, action or proceeding, whether or not resulting in any
liability), to which such Indemnified Party may become subject under any
applicable federal or state law, or otherwise, caused by or arising out of
Otzarot's acting for UCSY pursuant to this agreement, except that UCSY will not
be liable hereunder to the extent that any loss, claim, damage, liability or

<div align="center">2</div>

<PAGE>

expense is found to have resulted primarily from Otzarot's. negligence or bad

faith.

(B) OTZAROT. Otzarot agrees to indemnify, defend, and shall hold harmless UCSY , its directors, employees and agents, and defend any action brought against same ith respect to any claim, demand, cause of action, debt or liability, including _easonable attorneys' fees, to the extent that such an action arises out of the conduct of Otzarot or any unauthorized oral or written representation made by Otzarot or its agents, employees or affiliates in connection with the offer or sale of securities of UCSY or any actions by Otzarot or any such person in violation of a Act or any Blue Sky law.

(C) NOTICE. In claiming an indemnification hereunder, the indemnified party shall promptly provide the indemnifying party with written notice of any claim, which the indemnified party believes falls within the scope of the foregoing paragraphs. The indemnified party may, at its expense, assist in the defense if it so chooses, provided that the indemnifying party shall control such defense, and all negotiations relative to the settlement of any such claim. Any settlement intended to bind the indemnified party shall not be final without the indemnified party's written consent, which shall not be unreasonably withheld.

ARTICLE IX - ASSIGNMENT

Otzarot shall not delegate or subcontract its obligations hereunder without the prior written consent of UCSY .

ARTICLE XI - ARBITRATION/JURISDICTION OF ARBITRATION PANEL

Any controversy or claim, including matters seeking an injunction, arising out of or relating to this Agreement or the breach thereof which is not settled between the signatories themselves, shall be settled by an independent arbitrator, mutually acceptable to both parties or if agreement cannot be eached through an arbitrator selected by the American Arbitration Association "AAA"). Notwithstanding any rules of the AAA the matter may be heard upon application of a party telephonically upon two days notice for an injunction and ten days notice otherwise with both parties required to waive their personal appearances and appear ear via telephone. It is the intention of this provision not to cause a party and its it witnesses to be disadvantaged by having to travel great distances to have its cause heard. This Agreement shall in all respects be interpreted and construed under the laws of the District of Columbia. Jurisdiction for any arbitration shall lie in the District of Columbia.

ARTICLE X - NOTICES.

Any notice which is required or desired under this Agreement shall be given in writing and may be sent by personal delivery, fax or by mail (either United States mail, postage prepaid, or Federal Express or similar generally recognized overnight carrier),' addressed as follows (subject to the right to designate a different address by notice similarly given):

3

<PAGE>

To Universal Communication Systems, Inc:

To: Otzarot Tarshish Nechasim Vehashkaot LTD
35 Jabotinsky  St.
Ramat Gan, Israel 52511,
Tel 972-3-501574.
ᴉax 972 3 6195240
ᴉail qsecure@netvision.net.il


                    ARTICLE XIII - MISCELLANEOUS

This Agreement establishes an "independent contractor" relationship between
Otzarot and UCSY . Otzarot understands that UCSY is a publicly traded company
and that it may occur that Otzarot will come into confidential information.
Otzarot shall ensure that its employees, agents or delegates will maintain the
confidentiality of UCSY and not violate any insider trading rules or any other
rules of the SEC, NASD, or individual states in their conduct under this
agreement. Otzarot shall not release any press releases alluding to UCSY without
the express written permission of UCSY . Only an instrument in writing executed
by all the parties hereto may amend this Agreement. This Agreement contains the
entire agreement between the parties with respect to the subject matter hereof.
There are no promises, agreements, conditions, undertakings, understandings,
warranties, covenants or representations, oral or written, express or implied,
between them with respect to this Agreement or the matters described in this
Agreement, except as set forth in this Agreement. Any such negotiations,
promises, or understandings shall not be used to interpret or constitute this
Agreement. This Agreement may be executed in counterparts and a facsimile copy
bearing the signature of a party shall be the same for all purposes as an
original. It supersedes all prior or contemporaneous communications,
representations and agreements, whether oral or written, with respect to the
subject matter hereof. No oral agreements hereinafter made between the parties
shall be binding on either party unless reduced to writing and signed by an
ᴉthorized officer of the party so bound.

                                4

<PAGE>

IN WITNESS THEREOF, the parties have executed this Agreement on the dates set
forth above their respective signatures.


Date:                                Date:
    ------------------------------       ------------------------------



I accept the terms of this Agreement.    I accept the terms of this Agreement.




- --------------------------------        ----------------------------------
By: /s/ Michael J. Zwebner               By: /s/ Lavi Krasney
Universal Communication Systems, Inc.    Otzarot Tarshish Nechasim
President & CEO                          Vehashkaot LTD, President & CEO

                                5

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-21.1
<SEQUENCE>5
<FILENAME>sub-exh211.txt
<DESCRIPTION>SUBSIDIARIES OF THE REGISTRANT
<TEXT>
```

EXHIBIT 21

SUBSIDIARIES OF REGISTRANT

| Name | State | Ownership |
|------|-------|-----------|
| Airwater Corporation | Florida | 100% |
| Airwater Patents Corp | Florida | 100% |
| Digital Way S. A. | Peru | 27% |
| Millennium Electric TOU, Ltd. | Israel | 100% |
| Solar Style, Inc. (USA) | Florida | 100% |
| Millennium Electric (USA) | Florida | 50% |
| Solar One, Inc. | Florida | 100% |
| Solar Style Ltd. | Israel | 50% |

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.1
<SEQUENCE>6
<FILENAME>certzwebner-311.txt
<DESCRIPTION>CERTZWEBNER
<TEXT>
```

Exhibit 31.1
------------

CERTIFICATION

I, Michael J. Zwebner, certify that:

     1. I have reviewed this amendment to the annual report on Form 10-KSB of
Universal Communication Systems, Inc.;

     2. Based on my knowledge, this report does not contain any untrue
statement of a material fact or omit to state a material fact necessary to make
the statements made, in light of the circumstances under which such statements
were made, not misleading with respect to the period covered by this report;
     3. Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as
of, and for, the periods presented in this report;

4.  The small business issuer's other certifying officer(s) and I are
responsible for establishing and maintaining disclosure controls and procedures
(as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small
business issuer and have:

        (a) Designed such disclosure controls and procedures, or caused such
    disclosure controls and procedures to be designed under our supervision,
    to ensure that material information relating to the registrant, including
    its consolidated subsidiaries, is made known to us by others within those
    entities, particularly during the period in which this report is being
    prepared;

        (b) Evaluated the effectiveness of the small business issuer's
    disclosure controls and procedures and presented in this report our
    conclusions about the effectiveness of the disclosure controls and
    procedures, as of the end of the period covered by this report based on
    such evaluation; and

        (c) Disclosed in this report any change in the small business issuer's
    internal control over financial reporting that occurred during the small
    business issuer's most recent fiscal quarter (the small business issuer's
    fourth fiscal quarter in the case of an annual report) that has materially
    affected, or is reasonably likely to materially affect, the small business
    issuer's internal control over financial reporting; and

5.  The small business issuer's other certifying officer(s) and I have
disclosed, based on our most recent evaluation of internal control over
financial reporting, to the small business issuer's auditors and the audit
committee of the small business issuer's board of directors (or persons
performing the equivalent functions):

        (a) All significant deficiencies and material weaknesses in the design
    or operation of internal control over financial reporting which are
    reasonably likely to adversely affect the small business issuer's ability
    to record, process, summarize and report financial information; and

        (b) Any fraud, whether or not material, that involves management or
    other employees who have a significant role in the small business issuer's
    internal control over financial reporting.

Date:  June 29, 2004                    /s/ Michael J. Zwebner
                                        -----------------------------------
                                        Michael J. Zwebner
                                        Chairman and Chief Executive Officer


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.2
<SEQUENCE>7
<FILENAME>certorgil-312.txt
<DESCRIPTION>CERTORGIL
<TEXT>


                                                        Exhibit 31.2
                                                        ------------



                                CERTIFICATION

I, Curtis Orgil, certify that:

1. I have reviewed this amendment to the annual report on Form 10-KSB of Universal Communication Systems, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date:  June 29, 2004                    /s/ Curtis Orgil
                                        ------------------------------------
                                        Curtis Orgil
                                        Chief Financial Officer
                                        (Principal Financial and
                                        Accounting Officer)

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32.1
 SEQUENCE>8
 FILENAME>certzwebner-321.txt
<DESCRIPTION>CERTZWEBNER
<TEXT>
```

Exhibit 32.1
------------


Certification pursuant to 18 U.S.C. Section 1350,
As adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002
The undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350, as
adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my
knowledge, the Amended Annual Report on Form 10-KSB/A for the year ended
September 30, 2003 of Universal Communication Systems, Inc. (the "Company")
fully complies with the requirements of Section 13(a) or 15(d) of the Securities
Exchange Act of 1934, as amended, and that the information contained in such
periodic report fairly presents, in all material respects, the financial
condition and results of operations of the Company as of, and for, the periods
presented in such report.

Date:   June 29, 2004                        /s/ Michael J. Zwebner
                                             --------------------------------
                                             Michael J. Zwebner
                                             Chairman and
                                             Chief Executive Officer


```
</TEXT>
</DOCUMENT>   ·
<DOCUMENT>
<TYPE>EX-32.2
<SEQUENCE>9
<FILENAME>certorgil-322.txt
<DESCRIPTION>CERTORGIL
<TEXT>
```

Exhibit 32.2
------------


Certification pursuant to 18 U.S.C. Section 1350,
As adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002
The undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350, as
adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my
knowledge, the Amended Annual Report on Form 10-KSB/A for the year ended
September 30, 2003 of Universal Communication Systems, Inc. (the "Company")
fully complies with the requirements of Section 13(a) or 15(d) of the Securities
Exchange Act of 1934, as amended, and that the information contained in such
periodic report fairly presents, in all material respects, the financial
condition and results of operations of the Company as of, and for, the periods
 esented in such report.

Date:   June 29, 2004                        /s/ Curtis Orgil
                                             --------------------------------

Curtis Orgil
Chief Financial Officer,
(Principal Financial and
Accounting Officer)


```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# EXHIBIT B

```
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 JQurWz34JeIwJ1tyfca+UxK1dNRfz7eKtC6Hx8S9P0/toXnMKrNMyvVzYXt6dRoN
 Zfn/QFfzkoUvZjPC544coA==
```

```
<SEC-DOCUMENT>0001116502-05-000071.txt : 20050113
<SEC-HEADER>0001116502-05-000071.hdr.sgml : 20050113
<ACCEPTANCE-DATETIME>20050113172428
ACCESSION NUMBER:		0001116502-05-000071
CONFORMED SUBMISSION TYPE:	10KSB
PUBLIC DOCUMENT COUNT:		7
CONFORMED PERIOD OF REPORT:	20040930
FILED AS OF DATE:		20050113
DATE AS OF CHANGE:		20050113

FILER:

	COMPANY DATA:	
		COMPANY CONFORMED NAME:			UNIVERSAL COMMUNICATION SYSTEMS IN
		CENTRAL INDEX KEY:			0001098207
		STANDARD INDUSTRIAL CLASSIFICATION:	TELEPHONE COMMUNICATIONS (NO RADIO
		IRS NUMBER:				860887822
		STATE OF INCORPORATION:			NV
		FISCAL YEAR END:			0930

	FILING VALUES:
		FORM TYPE:		10KSB
		SEC ACT:		1934 Act
		SEC FILE NUMBER:	000-30405
		FILM NUMBER:		05528885

	BUSINESS ADDRESS:	
		STREET 1:		407 LINCOLN ROAD
		STREET 2:		SUITE 6K
		CITY:			MIAMI
		STATE:			FL
		ZIP:			33139
		BUSINESS PHONE:		5108396100

	MAIL ADDRESS:	
		STREET 1:		407 LINCOLN ROAD
		STREET 2:		SUITE 6K
		CITY:			MIAMI
		STATE:			FL
		ZIP:			33139

	FORMER COMPANY:	
		FORMER CONFORMED NAME:	WORLD WIDE WIRELESS COMMUNICATIONS INC
		DATE OF NAME CHANGE:	20000124
</SEC-HEADER>
<DOCUMENT>
<TYPE>10KSB
<SEQUENCE>1
<FILENAME>universal-10ksb.txt
<DESCRIPTION>ANNUAL REPORT
<TEXT>
```

                    U.S. SECURITIES AND EXCHANGE COMMISSION
                          Washington, D.C. 20549



FORM 10-KSB

[x]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
       ACT OF 1934

       For the fiscal year ended September 30, 2004

[ ]    TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
       ACT OF 1934

       For the transition period from _____ to _____

Commission file number: 000-30405

                    Universal Communication Systems, Inc.
                    ---------------------------------------
                    (Name of small business issuer in its charter)


            Nevada                              860887822
            ------                              ---------
    (State or other jurisdiction of      (I.R.S. Employer Identification No.)
    incorporation or organization)


407 Lincoln Road, Ste 12F, Miami Beach, Florida                    33139
- ------------------------------------------                        -----
    (Address of principal executive offices)                    (Zip Code)

Issuer's telephone number: (305) 672-6344

Name of each exchange on which registered:  OTC Bulletin Board under the trading
                                            symbol UCSY

Securities registered under Section 12(b) of the Act:  None

Securities registered under Section 12(g) of the Exchange Act:

                    Common Stock, $.001 par value per share
                             (Title of class)

        Check whether the issuer (1) filed all reports required to be filed by
Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such
shorter period that the registrant was required to file such reports), and (2)
has been subject to such filing requirements for the past 90 days.
Yes [ ] No [X].

        Check if disclosure of delinquent filers in response to Item 405 of
Regulation S-B is not contained in this form, and no disclosure will be
contained, to the best of registrant's knowledge, in definitive proxy or
information statements incorporated by reference in Part III of this Form 10-KSB
or any amendment to this Form 10KSB. [ ]

Issuer's revenues for its most recent fiscal year:  $375,007

Aggregate market value of voting stock held by non-affiliates of the issuer as
of December 30, 2004: $9,308,315

State the number of shares outstanding of each of the issuer's classes of common
equity, as of the latest practicable date. 236,426,863 shares of common stock as
of December 30, 2004.

Documents incorporated by reference:        None.

<PAGE>

Universal Communication Systems, Inc.

Index to Annual
Report on Form 10-KSB
For The Fiscal Year Ended September 30, 2004

Page

ITEM 1.    DESCRIPTION OF BUSINESS.............................................3

ITEM 2.    DESCRIPTION OF PROPERTY.............................................9

ITEM 3.    LEGAL MATTERS....................................................... 9

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS...............10

ITEM 5.    MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS..........11

ITEM 6.    MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATIONS........15

ITEM 7.    FINANCIAL STATEMENTS...............................................19

ITEM 8.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING
             AND FINANCIAL DISCLOSURE..........................................19

ITEM 8A.    CONTROLS AND PROCEDURES...........................................19

ITEM 9.    DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS;
             COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT ...............20

ITEM 10.   EXECUTIVE COMPENSATION.............................................22

ITEM 11.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.....23

ITEM 12.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.....................24

ITEM 13.   EXHIBITS AND REPORTS ON FORM 8-K...................................24

ITEM 14.   PRINCIPAL ACCOUNTANT FEES AND SERVICES.............................26

SIGNATURES.....................................................................27

-2-

<PAGE>

PART I

Introductory Statement
- ----------------------

     All statements contained herein that are not historical facts,
including but not limited to, statements regarding the Company's current
business strategy, the Company's projected sources and uses of cash, and the
Company's plans for future development and operations, are based upon current
expectations. These statements are forward-looking in nature and involve a
number of risks and uncertainties. Actual results may differ materially. Among
the factors that could cause actual results to differ materially are the
following: the availability of sufficient capital to finance our business plans
on terms satisfactory to us; competitive factors; changes in labor, equipment
and capital costs; changes in regulations affecting our business; future
acquisitions or strategic partnerships; general business and economic

conditions; and factors described from time to time in our reports filed with the Securities and Exchange Commission. Readers are cautioned not to place undue reliance on any such forward-looking statements, which statements are made pursuant to the Private Litigation Reform Act of 1995 and, as a result, are pertinent only as of the date made.

All of the share price information presented herein has been adjusted to reflect the 1 for 1,000 reverse split of our outstanding common stock effective August 23, 2002.

ITEM 1.  DESCRIPTION OF BUSINESS

Introduction

For the past two fiscal years we have had minimal revenues. We have a history of losses, and an accumulated shareholder deficit of $35,376,531. Because of our recurring losses, our independent auditors have expressed doubt as to our ability to continue as a going concern.

We will require short-term outside investment on a continuing basis to finance our current operations and capital expenditures. If we do not obtain short term financing we may not be able to continue as a viable concern. We do not have a bank line of credit, although our subsidiary has a checking account overdraft facility, and there can be no assurance that any required or desired financing will be available through bank borrowings, debt, or equity offerings, or otherwise, on acceptable terms. If future financing requirements are satisfied through the issuance of equity securities, investors may experience significant dilution in the net book value per share of common stock.

We currently have three channels of activity, each conducted by a wholly owned subsidiary. AirWater Corporation, ("AirWater") a Florida corporation formed in March, 2003, has been established to design, manufacture (utilizing contract manufacturing organizations) and market systems that perform water extraction from air. Millennium Electric T.O.U. Ltd., ("Millenium") an Israeli company, acquired September, 2003, specializes in the development and installation of solar power systems worldwide, primarily to government and industrial users.

-3-

<PAGE>

Solar One, Inc., ("Solar One") a Florida corporation, formed in July, 2003, manufactures (subcontracted to third parties) and markets portable photovoltaic cells in leather cases for consumer electronic products. Solar One was formed to source the manufacturing and to market the product line of photovoltaic consumer energy panel products designed by Solar Style, Ltd., ("Solar Style") a wholly owned Israeli subsidiary. We have recently combined the technology of the photovoltaic system of Millenium and the water extraction systems of AirWater and developed a self powered air water machine.

We are focusing our sales efforts in the European, African, Middle Eastern and Asian government and industrial markets for AirWater and Millenium product and service offerings. Solar One is targeting the North American and European consumer markets. We have discontinued, effective January, 2003, our previous telecommunication and wireless broad band business activities to focus on the water extraction and photovoltaic technology.

History

In February of 1997, Worldwide Wireless, Inc., a Nevada corporation, was formed to coordinate the operations of TSI Technologies, Inc., a Nevada corporation, and National Micro Vision Systems, Inc., a Nevada corporation. Its purpose was to complete the development of its patented advanced distributed wireless telephone and network designs and to finance, manufacture, and market these

units and systems. TSI Technologies, Inc. was the research and development company formed for the purpose of creating and developing the distributed wireless call processing system. National Micro Vision Systems, Inc. was formed to operate a network of wireless Internet sites. In April of 1998, Worldwide Wireless, Inc., TSI Technologies, Inc. and National Micro Vision Systems, Inc. acquired Upland Properties, Inc., a Nevada corporation, for stock and transferred their assets to Upland Properties, Inc. Upland Properties, Inc. then changed its name to World Wide Wireless Communications, Inc. and began trading on the OTC Bulletin Board (OTC:BB) under the symbol WLGS.

On February 10, 2000 we acquired all of the shares of Digital Way, S.A., a Peruvian telecommunications company. In June of 2001, we received a notice of default from the sellers of Digital Way, claiming a breach of the terms of our purchase agreement. On May 10, 2002, we executed a settlement agreement with those sellers. Under the terms of the agreement, we re-aligned the stock ownership of Digital Way, by returning 73% of the common shares owned by us to the former owners. In addition, we retained a 50% interest in the first $6.2 million of equity value of Digital Way, in the event of a sale or other disposition. Any value beyond the first $6.2 million will be divided based on shareholdings. Our chairman, Michael Zwebner, remains on the Board of Directors of Digital Way, S. A., however he has not actively participated in the affairs of the company. The settlement agreement fully cancels all debts, claims and counter claims between us and the sellers, and allows for future co-operation in the ongoing development or sale of Digital Way. Although we have reached this settlement, management of Digital Way has not provided the necessary financial information for Digital Way to be included in our financial reporting, and the results of the Company's investment in Digital Way is unclear at this time. The Company has fully impaired this investment. Management continues to seek a third party buyer for our 27% interest in Digital Way SA.

On November 1, 2001, current management took control of the company. During the fiscal year ended September 30, 2002, we moved our offices from Oakland,

-4-

<PAGE>

California to Miami Beach, Florida and changed our name to Universal Communication Systems, Inc. We then changed our symbol to UCSI. Following our one for one thousand reverse stock split on August 23, 2002, our symbol was changed to UCSY.

In January, 2003, we identified a new business venture, abandoned the telecommunication and wireless business and adopted a new business plan. We formed a wholly owned subsidiary, AirWater Corporation, whose purpose and mission is to design, build and market machines that produce drinkable water from the air. The first step in the endeavor was to obtain licensing rights to the technology. To that end, we acquired the rights to four patents by an agreement dated March 24, 2003, relating to this technology from J. J. Reidy Company of Holden, Massachusetts. AirWater Patents Corporation was formed to hold our acquired licensed patent rights. Under the terms of the agreement, we paid $300,000, and we are obligated to pay, for a one year period, a royalty payment of between 5 to 7.5% on all sales of equipment which uses the patented technology. Of the $300,000 purchase price, the company paid $100,000 in cash, and the balance of $200,000 was settled by issuing 4,000,000 restricted common shares.

Beginning in March 2003 we pursued various consulting, marketing and sales agreements. The activities covered by these agreements include, product design, electrical and mechanical engineering, systems integration, research and development, conceptual designs, global contacts, mergers and acquisitions, product and company publicity, marketing, sales and general business consulting.

On April 30, 2003, we entered into a letter of intent to acquire MessageOne, Inc., a Los Angeles based multimedia messaging service company for a purchase price of $10 million. On August 12th, 2003, and by mutual agreement, we withdrew from this Letter Of Intent. We withdrew our letter of intent so that Brenex Oil Corporation could issue their letter of intent to acquire CinemaElectric, Inc., which they did on August 12, 2003. We received 10% of the entity resulting from the acquisition of CinemaElectric by Brenex Oil Corporation.

We completed an agreement to purchase all of the stock of Millennium on September 29, 2003. As part of the Millenium acquisition, we acquired 50% of Solar Style, Ltd. On April 30, 2004, we acquired the remaining 50% of Solar Style for 500,000 shares of common stock and warrants exercisable for two years, for 1 million shares at a price of $0.10 per share. Solar Style is an inactive Israeli company that holds certain rights to manufacture and market solar power products. In connection with the Millenium / Solar Style acquisitions, a new U. S. subsidiary, Solar One Corporation, was formed to market solar power products and systems.

Millenium and its president, Mr. Ami Elazari, operate in the forefront of the high technology field of solar energy, solar panels, and solar powered consumer products. The Company and Mr. Elazari are the holders of more than 21 international patents relating to both Photo Voltaic ("PV") and solar energy systems and products.

Our strategy

Under the auspices of new management, we have made considerable progress in restructuring prior obligations and removing debt. We have concentrated our activities, as previously mentioned, on the AirWater product and the photo voltaic product lines. We have withdrawn from the wireless internet market,

-5-

<PAGE>

disposed of assets for cash and we continue our negotiations with creditors to compromise, extend, convert and/or forgive debt owed by the company prior to the new management.

Since March of 2003, we have worked to design, research and develop as well as source the manufacture of our AirWater machines. We have successfully sourced the manufacturing of our machines. In 2004, we have embarked on a worldwide sales and marketing program, focusing on the markets listed above.

AirWater technology and competition

The applications for the AirWater system technology are extensive. It is our belief that the initial product should be the model that offers the easiest entry into the marketplace, gains the quickest exposure, and generates a substantial cash flow. To this end, we believe that a residential 5-gallon-per-day model would best fit this goal.

Our reasoning is as follows:

o       The bottled water market is approximately a $7.1+ billion marketplace with projected growth in excess of 10% per year. Its cost to the consumer, inconvenience and logistical aggravation and the fluctuation in the quality of the water make bottled water vulnerable to an alternative, AirWater products for example, which is cheaper per gallon on the order of 1-2 kW per gallon, has consistent quality and is convenient.
o       It is the easiest model to take to market thus maximizing its exposure.
o       It would be readily accepted by foreign customers, where size is often

o        It would create a very lucrative aftermarket sector for serviceable
         parts such as water filters, containers and ultra-violet light bulbs.

We believe that the global market for AirWater machines is largely untapped and
undeveloped. The AirWater technology and system is very new, and much of the
initial sales efforts that we are currently engaged in are dedicated to
education, and the detailed explanation of the machines, the built in safety
systems and their general operation.

Operational safety and computer managed user maintenance is built into every
AirWater system by the use of a patented, inexpensive, programmable chip. The
water filtration industry is reliant upon voluntary user discipline in the
important issue of safety, and the periodic changing of the machine filters.

The AirWater system knows when an air filter needs cleaning, or is missing,
when the UV bulb becomes ineffective, when the water filter needs changing and
if the user accidentally tries to use an expired water filter. The AirWater
system will not operate if any of those factors exist and displays to the user
the reason on a small electronic display panel.

Management further believes that there are a number of specific market segments
that the AirWater products can be introduced to and marketed to.

First is the home consumer product market, to which the company is addressing a
Small Office / Home Office ("SOHO") styled product. Next is the commercial

                                      -6-

<PAGE>

market, for such users as small hospitals, local field clinics, small farms,
factories and so on. And then there is the larger customer such as International
Aid Agencies, Governments, The United Nations, The Red Cross, Local Towns and
Villages, and Military Forces worldwide all in areas and countries where water
is scarce, or difficult to transport.

At this time, the company is aware of very limited competition. The company has
identified Electric Gas & Technologies Inc, a Dallas Texas based company,
and World Wide Water Inc., of Los Angeles California as competitors. In
addition, the company has seen a similar product sold in the US Market, made or
offered for sale by Liquid Air Inc, based in California. Almost in all cases,
these companies are in various stages of "start up" mode, having been in the
Water from Air business less than a few years, and are just starting to offer
machines to customers. As a result of a settlement from litigation instituted by
Electric Gas & Technologies, Inc., we have acquired the assets and rights to
their technology with respect to water from air processes. See Item 3 - Legal
Matters for additional information.

We believe that as the AirWater products and Systems become more engrained in
the global marketplace, and are more publicized and accepted, there will be
additional companies entering this industry, thus creating increased
competition. We further believe that our patents and intellectual property
rights will place us at a competitive advantage.

In certain global areas where electricity and or gas power sources are either
not available or in short supply, there is a need for a power alternative to
conventional sources. Our subsidiary, Millennium, has designed the system to
fulfill this technological need of providing Photo Voltaic (PV) Electric Energy
to provide the necessary power to the air water units.

Following our acquisition in 2003, Millennium's management focused on re-
organizing the company. This included moving to new offices, purchasing new

computer systems . . . officer, marketing manager and regional marketing manager. Millennium is also conducting educational seminars for potential clients, by targeting architects, elected officials and military personnel.

Millennium's strategic vision for sales is to create a group of international independent sales consultants to provide a more extensive marketing and networking program than that which could be achieved by an employee based sales force.

Solar Style Inc. USA, ("Solar") formed as part of Solar One, Inc. with offices in Baltimore, is the basis of the planned North American Distribution network of the Solar Style (Israel) product line.

Solar is offering PV Solar Chargers for a wide range of products, including Laptop computers, Palms, Walkmans and Discmans, as well as a wide range of cellular phones. The PV Solar Chargers negate the need for consumer electronic products to be connected to the electric grid, in order to charge or recharge the appliance. Solar Style (Israel) has a manufacturing agreement with a Hong Kong firm. The products are targeted at the portable consumer electronic market. Solar Style's technology converts solar energy into electricity in a packaged solution that recharges mobile electronic devices by a small portable photovoltaic solar panel, which is specially designed to fit in an elegant leather case.

-7-

<PAGE>

Solar manufactures the panels and carrying-cases separately, which are then assembled and sold as a unit. The panels can easily be plugged in to solar cells and charged outdoors by sunlight and indoors by electric light. The photo voltaic cells act as battery chargers allowing a non-dependant use of the mobile device, making batteries / battery-chargers unnecessary.

Solar's value proposition spans two levels:

The practical and the environmental. On the practical level, Solar's products enable consumers to use their mobile devices without having to worry about plugs and connectors. On the Environmental level, in today's "green-aware" world, where environmental concerns have come to be very important to consumers, Solar offers mobile device users a reliable environmentally friendly power source.

We are in the process of establishing distribution and sales channels for the existing products. We continue research and development of improvements on existing and creation of new products, concurrent with ongoing sales. There are two methods of distribution for Solar's products and technology, both of which are being pursued at various levels:

A "traditional" manufacturer-distributor value chain, by which it will have control over manufacturing and distribution, and sell its products through large distributors.

A licensing option, limited by time and dependant on results, by which its involvement at the manufacturing stage will be minimal (just enough to preserve unique knowledge and enable further product development), while distribution, promotion, and sales management are left to a licensee/business partner.

Patents/Intellectual Property

We currently hold a patent for our distributed wireless call processing system. As we have exited this business, we are looking to license this technology to a

third party developer to develop a potentially state of the art steam harness or ice.
However, we cannot guarantee that we will enter into such an agreement.

We also hold the exclusive global patent and licensing rights to four air to
water patents under an agreement with J.J. Reidy Company, relating to
atmospheric extraction of water and its purification process. These patents,
numbered: 05106512-00, 05149446-00, 05203989-00, and 05366705-00, were
issued by the US Government Patent Office. Two of these licenses were issued in
1992 and the other two in 1993 respectively. These patents relate to the Air
Water Products not only in the USA, but in countries covered by the PCT global
agreements.

The Patent Cooperation Treaty (PCT) simplifies and reduces the cost of obtaining
international patent protection and facilitates public access to a wealth of
technical information relating to inventions. By filing one international patent
application under the PCT you can simultaneously seek protection for an
invention in over one hundred countries, including developing countries
throughout the world. The Patent Cooperation Treaty (PCT) has over the past
three decades emerged as a major international filing system for seeking patent
protection worldwide in a cost effective and efficient manner. In addition,

-8-

<PAGE>

through the dissemination of latest technical information contained in published
PCT applications, the PCT system has been actively contributing to the
development of science and technology.

The company fully intends to utilize the patents and intellectual property
rights in its pursuit and ongoing development of the business.

Further, through our Millenium subsidiary, we own 21 international patents in
the photo voltaic solar power and energy system area.

Employees

As of September 30, 2004, we had four employees, located in our Millenium
office in Israel and one employee in our Maryland office of Solar. Our Miami
office is serviced by outside consultants. No employee is represented by a labor
union and the company believes its employee relations to be good.

ITEM 2.   DESCRIPTION OF PROPERTY

        We own no real estate. Effective June 1, 2004, we leased an 1,800
square foot corporate and administrative office facility at 407 Lincoln Road,
Suite 12F, Miami Beach, FL 33139. The lease provides for a three-year term at a
monthly rate of $4,375.

        Solar One, Inc. leases a 1,147 square foot administrative office in
Baltimore, Maryland under a lease which commenced December 1, 2003. This lease
is for an eighteen month period and expires May 30, 2005. The lease is at a
monthly rate of $2,198.42.

        Millenium Electric T.O.U., Ltd., leases 2,500 square foot
administration and manufacturing offices in the Rannana Industrial zone in
Israel under a lease which ends in 2005. The minimum remaining payments under
this lease are $60,180 for 2004 and $55,165 for 2005.

ITEM 3.   LEGAL MATTERS

On August 26, 1999, we filed suit against Credit Bancorp, in U.S. District Court
in San Francisco, regarding improprieties on the part of Credit Bancorp relating

agreement, Credit Bancorp agreed to convert the original loans granted to us to a convertible debenture in the amount of $740,000. On October 11, 1999, we issued a convertible unsecured debenture for $740,000 to Credit Bancorp in settlement of this obligation. The terms of this convertible unsecured debenture are 7% interest per annum payable, semiannually on the last day of February and September, with the principal due September 30, 2002. All amounts of unpaid principal and accrued interest of this debenture are convertible at any time at the conversion price of $1,600 per share of unregistered, restricted shares of

-9-

<PAGE>

our common stock. Credit Bancorp has agreed to convert principal and accrued interest owing on the debenture into 483 shares of our common stock.

In November 1999, the SEC filed suit against Credit Bancorp alleging violations of various securities laws in connection with its actions in relation to us and others, and seeking various forms of relief including disgorgement of its illegal gains. A receiver has been appointed to administer the affairs of Credit Bancorp. We have been informed that the appointed receiver denies that such a conversion request was made and that the principal amount and accrued interest of the debenture are due. We currently carry the 483 share obligation in our equity under escrowed shares. No provision for debenture principal and accrued interest have been made in our financial statements, as we believe the receiver's claim is unfounded and the company will prevail. The matter remains unresolved at September 30, 2004.

On August 7, 2003, Electric Gas & Technology of Dallas, Texas ("ELGT"), published a press announcement claiming that a complaint and $60 million lawsuit had been filed in Federal court in Texas (identified in the court records as Federal District Court, Northern District of Texas -- Dallas Division Cause No. 3-03CV-1798-G). Their press release stated that we had infringed on their patents. We filed a counter claim in the United States District Court, Southern District of Florida, case number 03-22196-Civ-Seitz, disputing ELGT's claims of patent infringement and as a result of statements published in their press releases, we included in our complaint $118 million in damages against both ELGT and its president, Mr. Dan Zimmerman, for their false, defamatory and libelous statements. On November 24, 2004 a settlement agreement was reached calling for:

1.  a stipulation for the entry of a "Consent Judgment" in favor of our subsidiary, Airwater Corporation and the Company, jointly, and against Atmospheric Water Technology, Inc. ("AWT") in the amount of $5 million,

2.  the payment of the amount of $25,000 in cash, and

3.  the issuance of 150,000 shares of ELGT's restricted common stock ("Shares").

Further agreed, was that after the stipulation for the entry of the "Consent Judgment" has been executed by the parties, ELGT is to assign to us all of ELGT's equity ownership interest (i.e. shares of stock or otherwise) in AWT. This includes all ELGT and AWT's right, title and interest in U.S. Patent No. 4,255,937 and all enhancements thereto, and all ELGT and AWT's right, title and interest to the copyright and trademarks describing the technology in the U.S. Patent, and the Trademark known as "Watermaker", and all ELGT and AWT's right, title and interest in U.S. Patent No. 5,553,459. This transfer to the Company and AirWater Corporation is equal to 92% of the outstanding stock (controlling interest) of AWT and includes all of the US and Global business, as well as all the appertaining Patents, Trademarks and Licenses. Finally, all parties agreed that each side shall bear its own costs and attorney's fees.

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

        No matters were submitted during the fourth quarter of the fiscal year covered by this report to a vote of the security holders through the solicitation of proxies or otherwise.

-10-

<PAGE>

PART II

ITEM 5.    MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

        Prior to April 3, 2002, our common stock was traded on the over the counter Bulletin Board market under the symbol "WLGS". From April 4, 2002 through August 22, 2002 our common stock was traded on the over the counter Bulletin Board market under the symbol "UCSI". From August 23, 2002 to the present, our common stock is trading on the over the counter Bulletin Board market under the symbol "UCSY".

The following table sets forth the range of high and low closing bid prices for each period indicated as reported by the National Association of Securities Dealers composite feed or other qualified interdealer quotation medium. The quotations provided reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not represent actual transactions. All of the share price information presented below has been adjusted to reflect the 1 for 1,000 reverse split of our outstanding common stock effective August 23, 2002.

Price Range for Common Stock
- ----------------------------

| FISCAL YEAR SEPT 30, 2005 | High | Low |
|---|---|---|
| First Quarter | $ 0.050 | $0.015 |

| FISCAL YEAR SEPT 30, 2004 | High | Low |
|---|---|---|
| First Quarter | $ 0.115 | $0.060 |
| Second Quarter | 0.081 | $0.045 |
| Third Quarter | 0.160 | $0.043 |
| Fourth Quarter | 0.058 | $0.043 |

| FISCAL YEAR SEPT 30, 2003 | High | Low |
|---|---|---|
| First Quarter | $ 0.170 | $0.100 |
| Second Quarter | 0.100 | 0.045 |
| Third Quarter | 0.230 | 0.030 |
| Fourth Quarter | 0.115 | 0.060 |

        Since our shares began trading on the OTC Bulletin Board in 1997, the prices for our shares have fluctuated widely. There may be many factors which may explain these variations, but we believe that the following are some of these factors:

        o        the demand for our common stock;

-11-

<PAGE>

        o        the number of market makers for our common stock;

        o        developments in the market for broadband Internet access and

o        changes in the performance of the stock market in general.

In recent years, the stock market has experienced extreme price and
volume fluctuations that have had a substantial effect on the market prices for
many emerging growth companies such as ours, which may be unrelated to the
operating performances of the specific companies.
Companies that have experienced volatility in the market price of their stock
have been the object of securities class action litigation. If we become the
object of securities class action litigation, it could result in substantial
costs and a diversion of our management's attention and resources and have an
adverse effect on our business, financial condition and results of operations.
In addition, holders of shares of our common stock could suffer substantial
losses as a result of fluctuations and declines in the stock price.

There are approximately 600 holders of record and an estimated 7,800
holders in street name of our common stock as of September 30, 2004.

The trading of our shares is subject to limitations set forth in Rule
15g-9 of the Securities Exchange Act. This rule imposes sales practice
requirements on broker-dealers who sell so-called penny stocks to persons other
than established customers, accredited investors or institutional investors.
Accredited investors are generally defined to include individuals with a net
worth in excess of $1,000,000 or annual income exceeding $200,000 or $300,000
together with their spouses during the previous two years and expected annual
income of that amount during the current year. For sales of shares to other
persons, broker-dealers must make special suitability determinations, and obtain
the written consent of the purchaser to the sale prior to consummating the sale
and are generally prohibited from making cold-calls or other unsolicited
inquiries to purchasers without complying with these rules. These rules may
adversely affect the ability of broker-dealers and others to sell our shares or
to sell shares in the secondary market.

No cash dividends have been declared to date on our Company's common stock. We
expect that all earnings, if any, will be retained to finance the growth of our
Company and that no cash dividends will be paid for the foreseeable future.

-12-

<PAGE>

On May 21, 2002, stockholders approved a measure to increase the number of
authorized common shares from 300 million to 800 million.

EQUITY COMPENSATION PLAN INFORMATION
- -----------------------------------
<TABLE>
<CAPTION>

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Num remai futu equ p secur |
| --- | --- | --- | --- |
| | (a)  (b)  (c) | | |
| <S> | <C> | <C> | |
| Equity compensation plans approved by security holders | 0 | n/a | |

Equity compensation plans not approved by
security holders

- ------------------------------------------------------------------------
Total                                           257,250          $0.095
- ------------------------------------------------------------------------

</TABLE>
(1) Pursuant to form S-8, dated 12/23/03. Submitted under plan, 11,000,000
    shares, issued, 9,428,825.

                                -13-

<PAGE>

Description of Equity Compensation

Options issued were issued pursuant to the 2001 Stock Option Plan and also
provided as motivation and incentives to individuals considered important to the
Company's success. The 2001 plan was approved by our board of directors, but not
submitted to a vote of stockholders.

The total number of options granted and outstanding at September 30, 2004, and
the average exercise price and expiration dates for each year are as follows:

|       | Total Options | Exercise Price | Expiration Date   |
| ----- | ------------- | -------------- | ----------------- |
| 2001  | 251,150       | $0.095         | December 31, 2006 |
|       | 6,100         | $602.00        | December 31, 2006 |
| Total | 257,250       |                |                   |

Sales of Unregistered Securities
- --------------------------------

        We have issued and sold unregistered securities that have
not previously been reported as set forth below. An underwriter was not utilized
in any of these transactions. The recipients of securities in each transaction
represented their intention to acquire the securities without a view to
distribution. All the issued securities were restricted securities under Rule
144, Reg. D or Reg. S regulations, and appropriate restrictive legends were
affixed to the securities in each transaction.

On July 14, 2004, we issued 164,340 shares of common stock under private
placement subscriptions at $0.05 per share. These securities were issued in
transactions exempt from registration under the Securities Act of 1933 in
reliance on Sections 4(2) and 4(6) of the Securities Act of 1933. In connection
with these transactions, we paid a commission of 10% to a third party.

On July 27, 2004, we issued 12,375,000 shares of common stock under private
placement subscriptions to our Chairman, at prices ranging from $0.025 to $0.05
per share. These securities were issued in transactions exempt from registration
under the Securities Act of 1933 in reliance on Sections 4(2) and 4(6) of the
Securities Act of 1933.

On September 13, 2004, we issued 1,998,000 shares of common stock under private
placement subscriptions at $0.05 per share. These securities were issued in
transactions exempt from registration under the Securities Act of 1933 in
reliance on Sections 4(2) and 4(6) of the Securities Act of 1933. In connection
with these transactions, we paid a commission of 10% to a third party.

On December 6, 2004, the Company sold 25,000 shares of Series B 8% Convertible
Preferred Stock and Warrants to purchase 16,666,667 shares of common stock for
which it received net proceeds of $250,000. The Series B Convertible Preferred
Stock, with a face value of $250,000, is convertible into common stock at $0.015

On January 5, 2005, the Company sold 30,000 shares of Series C 8% Convertible
Preferred Stock and A, B and C Warrants to purchase 20,000,000 shares of common
stock for which it received net proceeds of $300,000. The Series C Convertible
Preferred Stock, with a face value of $300,000, is convertible into common stock
at $0.03 per share. The A Warrants are exercisable for 10,000,000 shares of
common stock at $0.04 per share until January 5, 2010. The B Warrants are
exercisable for 5,000,000 shares of common stock at $0.06 per share until
January 5, 2010. and the C Warrants are exercisable for 5,000,000 shares of
common stock at $0.08 per share until January 5, 2010.

Other Securities Transactions
- ----------------------------

Pursuant to the April 14, 2000 Securities Purchase Agreement (the 4% convertible
debentures) and the March 29, 2001 Securities Purchase Agreement (the 8% Senior

-14-

<PAGE>

Secured Convertible Debentures), the investors converted $337,050 of debentures
into 10,000,000 shares of the Company's common stock on various dates between
July 29 and September 13, 2004, at various prices ranging from $0.03867 per
common share to $0.044 per common share.

ITEM 6. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATIONS

        The following should be read in conjunction with the "Risk Factors" and
the "Financial Statements" and the Notes thereto.

Plan of Operations
- -----------------

For the past three fiscal years we have had minimal revenues. We have a history
of losses, and an accumulated shareholder deficit of $35,376,531. Because of our
recurring losses, our independent auditors have expressed doubt as to our
ability to continue as a going concern.

    We will require additional capital in the short term to remain a going
concern.

    We will require substantial short term outside investment on a continuing
basis to finance our current operations and any limited capital expenditures
identified to protect existing investments. Our revenues for the foreseeable
future may not be sufficient to attain profitability. Since inception, we have
generated little revenue and have incurred substantial expenditures. We expect
to continue to experience losses from operations while we develop the Air -
Water and photo voltaic businesses. In view of this fact, our auditors have
stated in their report for the period ended September 30, 2004 that our ability
to meet our future financing requirements, and the success of our future
operations, cannot be determined at this time. In order to finance our working
capital requirements we are negotiating equity investments, but there can be no
assurance that we will obtain the required capital or that it will be obtained
on terms favorable to us. If we do not obtain short term financing we may not be
able to continue as a viable concern. Although one of our subsidiaries has a
bank account overdraft facility, we do not have a bank line of credit and there
can be no assurance that any required or desired financing will be available
through bank borrowings, debt, or equity offerings, or otherwise, on acceptable
terms, if at all. If future financing requirements are satisfied through the
issuance of equity securities, investors may experience significant dilution in

We are currently focusing our operations on the design, manufacture and sale of water production and generation systems along with solar power systems. There are no assurances that this business activity will be successful, that we will be able to identify and sell to the market and that the market will respond to our product line.

-15-

<PAGE>

PLAN OF OPERATION FOR THE NEXT 12 MONTHS
- ----------------------------------------

Our cash position at September 30, 2004 is $453,134. This is only sufficient to provide coverage for three and a half months of operating cash needs, based on the current reporting period's negative cash flow from operations. However, our Chairman, in connection with Port Universal Ltd., a company in which he owns a one third interest, has agreed to provide funding as needed until our sales activities are sufficient to cover our cash flow needs. This agreement by our Chairman and Port Universal is not a binding obligation; we have no assurances that this funding will continue beyond the short term. Further, we anticipate that by December 31, 2005, our subsidiaries will have sufficient revenues that we will not require funding from equity sales.

With our focus on the airwater and photo voltaic businesses, we have been able to obtain private placement funding to finance our activities in these fields. We anticipate continuing to receive operating funds from private placement sales of our common stock, until such time as product sales are sufficient to support the organization, however no assurances can be made that we will be able to find willing investors.

We do not have any major expenditures planned, nor do we anticipate the purchase or sale of plant and / or significant equipment. Our plan calls for the use of third party contract manufacturers, thus avoiding the allocation of our resources into manufacturing operations. We anticipate funding any sizeable orders for either AirWater equipment or Photovoltaic installations, through deposits and advances from customers.

We do not anticipate any substantial change in the number of employees in the near term for our existing operations.

We have several potential sizeable contracts in the sales process. Should these contracts be awarded, we will need to raise additional equity or arrange for financing vehicles to fund those contracts. Any equity raised could result in dilution of existing shareholders. Additionally, we are uncertain as to the availability of sufficient financing on acceptable terms.

Results of Operations
- ---------------------

Revenues and cost of sales for the fiscal year ended September 30, 2004 were earned primarily by our subsidiary, Millenium. Our Peruvian subsidiary had revenues which are not reported as a result of a lack of cooperation from our subsidiary's management.

General and administrative expenses totaled $2,832,670 in the fiscal year ended September 30, 2003 and $1,785,431 in the fiscal year ended September 30, 2003. The increase in expenses resulted from activities associated with the entrance into the air-water technology industry.

-16-

<PAGE>

General and administrative expenses for the fiscal years ended
September 30, 2004 and 2003 were comprised of the following items:

|  | 2004 | 2003 |
| --- | --- | --- |
| Abandoned acquisitions and fees | $ - | $ 171,397 |
| Consultants and outside services | 1,114,528 | 609,977 |
| Depreciation | 13,079 | 5,690 |
| Financing costs and fund raising expense | 187,597 | 120,804 |
| Legal expense | 322,482 | 228,661 |
| Miscellaneous and other expenses | 238,456 | 42,478 |
| Professional fees | 245,893 | 136,154 |
| Rent | 78,432 | 27,650 |
| Salaries | 313,458 | - |
| Travel | 318,745 | 72,620 |
| Settlement loss - WSI, Inc. | - | 370,000 |
|  | $2,832,670 | $1,785,431 |

Liquidity and Capital Resources
- ------------------------------

         As of September 30, 2004 our total working capital was deficient in the
amount of $1,610,181. This represents a $219,625 increase over our September 30,
2003 deficiency of $1,390,556. Until substantial revenues commence from the sale
of our AirWater equipment, we will need to obtain funding from external sources
to finance our current operations.

         Since we began operations, we have generated minor revenues and have
incurred substantial expenditures and operating losses. In view of this fact,
our auditors have stated in their report for the fiscal years ended September
30, 2004 and 2003 that there is substantial doubt about our ability to continue
as a going concern, dependent upon our ability to meet our future financing
requirements, and the success of our future operations, the outcome of which
cannot be determined at this time. In order to finance our working capital
requirements, we have and continue to negotiate equity investments with several
sophisticated investors, but there can be no assurance that we will obtain this
capital in the future, or that it will be obtained on terms favorable to us. If
we do not obtain short term financing we may not be able to continue as a viable
concern. We do not have a bank line of credit and there can be no assurance that
any required or desired financing will be available through bank borrowings,
debt, or equity offerings, or otherwise, on acceptable terms. If future
financing requirements are satisfied through the issuance of equity securities,
investors may experience significant dilution in the net book value per share of
common stock.

         On June 6, 2003, we defaulted on the January 6, 2003 12% notes in the
amount of $60,000, which came due on that date. The holders of the Notes, who
also hold a portion of the convertible debentures, did not  take  action  to
foreclose on the Notes.  These notes have been included in a proposed negotiated
settlement whereby the notes and the debentures will be converted into shares of
common stock at a fixed conversion price.

         During the fiscal years ended September 30, 2004 and 2003, we received
equity investments and advances of $2,593,452 and $1,214,829 respectively. These
investments and advances were in the form of issuance of our common stock in
various private placements and the issuance of preferred convertible Series A
stock.

-17-

<PAGE>

Risk Factors
- -----------

- -We will require additional capital in the short term to remain a going concern

        We will require short term outside investment on a continuing basis to
finance our current operations and any expansion of activities. Since we began
operations, we have generated virtually no revenues and have incurred
substantial expenditures. We expect to continue to experience losses from
operations while we develop our new revenue source, consummate acquisitions and
develop other technologies. In view of this fact, our auditors have stated in
their report for the period ended September 30, 2004 that our ability to meet
our future financing requirements, and the success of our future operations,
cannot be determined at this time. In order to finance our working capital
requirements we are negotiating existing equity investments and new investments,
but there can be no assurance that we will obtain this capital or that it will
be obtained on terms favorable to us. If we do not obtain short term financing
we may not be able to continue as a viable concern. We do not have a bank line
of credit and there can be no assurance that any required or desired financing
will be available through bank borrowings, debt, or equity offerings, or
otherwise, on acceptable terms. If future financing requirements are satisfied
through the issuance of equity securities, investors may experience significant
dilution in the net book value per share of common stock.

- -We are dependent on the services of key individuals and the loss of any of
these individuals could significantly affect our ability to operate our business

- -We may be unable to protect our intellectual property rights

        Our success depends in part on our ability to protect our proprietary
technologies. We rely on a combination of patent, copyright and trademark laws,
trade secrets and confidentiality and other contractual provisions to establish
and protect our proprietary rights. We have received one patent from the United
States Patent and Trademark Office pertaining to the distributed wireless call
processing system and may file for additional patents in the future. However,
our patents may not be of sufficient scope or strength, others may independently
develop similar technologies or products, duplicate any of our products or
design around our patents, and the patents may not provide us competitive
advantages. Litigation, which could result in substantial costs and diversion of
effort by us, may also be necessary to enforce any patents issued or licensed to
us or to determine the scope and validity of third-party proprietary rights. Any
such litigation, regardless of outcome, could be expensive and time consuming,
and adverse determinations in any such litigation could seriously harm our
business.

                                    -18-

<PAGE>

- -We may not be able to successfully market and develop the air from water
systems required by the market we are focusing our sales efforts on. Governments
and humanitarian organizations are subject to political influences which can
change without notice. Needs, as defined by these groups, may also change. If we
cannot design, build and modify the systems to meet with these changes, our
marketing efforts may not be productive.

- -Other risk issues

        We have pursued, are currently pursuing and, in the future may pursue,
new technologies and businesses internally and through acquisitions and
combinations which involve significant risks. Any such acquisition or
combination may involve, among other things, the issuance of equity securities,
the payment of cash, the incurrence of contingent liabilities and the

amortization of expenses related to goodwill and other intangible assets and transaction costs, which have adversely affected, or may adversely affect, our business' results of operations and financial condition. Our ability to integrate and organize any new businesses and/or products, whether internally developed or obtained by acquisition or combination, will likely require significant expansion of our operations. There is no assurance that we will have or be able to obtain the necessary resources to satisfactorily effect such expansion, and the failure to do so could have a material adverse effect on our business, financial condition and results of operations. In addition future acquisitions and or combinations by the Company involve risks of, among other things, entering markets or segments in which we have no or limited prior experience, the potential loss of key employees of the acquired company and/or difficulty, delay or failure in the integration of the operations, management, personnel and business of any such new business with our business and operating and financial difficulties of any new or newly combined operations, any of which could have a materially adverse effect on our business, financial condition and results of operations. Moreover, there can be no assurance that the anticipated benefits of any specific acquisition or of any internally developed new business segment or business combination will be realized.

ITEM 7.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

         See Index to Financial Statements on page F-1.

ITEM 8.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS

         There have been no changes in or disagreements with our independent auditors regarding accounting and financial disclosure required to be reported under this item.

ITEM 8A.  CONTROLS AND PROCEDURES

  Our management carried out an evaluation pursuant to Rule 13a-15 of the Securities Exchange Act of 1934, as amended, under the supervision and with the participation of our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Report. Based upon that evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in reports that we file or furnish under the Exchange Act are recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

         During the period covered by this report on Form 10-KSB, there has been no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

                                   -19-
<PAGE>
                                 PART III

ITEM 9.   DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS;
          COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT

         Our executive officers and directors and their ages as of December 30, 2004 are as follows:
<TABLE>
<CAPTION>
Name                      Age   Position                  Period of Service
- -----                    ---   --------                  -----------------
<S>                       <C>                             <C>

| Curtis Orgil.......... | 52 | CFO and Director | November 2001-present |
| Ramsey Sweis.......... | 38 | Director | May 1998-present |
| Alexander Walker, Jr. .. | 77 | Director | November 2001-present |
| Ami R. Elazari......... | 52 | Director | October 2003-present |

</TABLE>

MICHAEL ZWEBNER has served as a Director since November, 2001 and is the Chairman of the Board of Directors. He is the founder of TVC Telecom, Inc. (formerly Talk Visual Corporation) and has served as a Director and its Chairman of the Board of Directors from September, 1998 until March, 2003. From 1974 to 1986, Mr. Zwebner founded and ran a travel and tourism company and a charter airline, specializing in the areas of air charter travel, wholesale ticketing and general business and tourist travel. From 1986 to 1990, Mr. Zwebner owned and operated several real estate companies as well as managed a chain of five family restaurants and related catering services in England. From 1991 to 1997, Mr. Zwebner founded and served as Vice-President of Cardcall International Holdings Inc. (USA) and Operating Manager of Cardcall (UK) Ltd. for which he designed and developed telecommunications and marketing concepts and organized the prepaid phone card operations. Mr. Zwebner also coordinated corporate finance activities for Cardcall. In February of 1997, Mr. Zwebner negotiated and secured the sale/merger of the Cardcall Group to a publicly-held entity based in Connecticut. In addition, in February of 1988, Mr. Zwebner negotiated the creation of a multi-million dollar joint venture between Cardcaller Canada Inc. and Datawave Systems Inc. of Vancouver, Canada.

ALEX WALKER, JR. has served as a Director of the Company since November, 2001. Mr. Walker has served as Chairman of the Board of the Nevada Agency and Trust Company in Reno, Nevada, a licensed and registered trust company and transfer agent in business since 1903. He received his B.A. from Waynesburg College in 1950 and his J.D. from the University of Pittsburgh School of Law in 1952. From 1956 to date, he has maintained a private practice as an attorney.

CURTIS A. ORGILL has served as a Director of the Company since November, 2001. He received his Bachelor of Science degree in 1974 from Brigham Young University. He worked for Deloitte Haskins & Sells in Salt Lake City, Utah. Later he transferred to Reno, Nevada where he helped establish their new office. While in Reno, Mr. Orgill was the Partner-in-Charge of the tax department there and was the senior tax partner in the state of Nevada. While with Deloitte, Mr. Orgill was on its National Industry Teams for Qualified Retirement Plans and Agribusiness. Since 1995, he has been a principal with

-20-

<PAGE>

Bartig, Basler & Ray, CPA's, Inc., a regional accounting firm with headquarters in Sacramento, California. He is the treasurer of the Northern Nevada International Center and of the BYU Management Society of Northern Nevada. He has chaired the Taxation Committee for the Nevada Society of Certified Public Accountants. He is a former treasurer and board member of the Nevada Museum of Art, the American Lung Association of Reno, the Economic Development Authority of Western Nevada, and the Northern Nevada Development Authority. He was a founding board member of the Nevada World Trade Council and was a member of the Advisory Council for the University of Nevada, Reno College of Business.

RAMSEY SWEIS has served as a Director since May, 1998. He has had extensive experience in management and in the product design industry. He has been a leader and developer of high performance teams by enabling, training and motivating team members. In the recent past he has provided computer and engineering services to General Motors and Chrysler Corporation. In connection

with those activities. Mr. Sweis has developed designs between engineering prototype models, tooling and vendor sources. Mr. Sweis resides in Roseville, Michigan. He currently serves as a Program Manager for Hanke Training & Design of Clawson, Michigan. From 1997 to 1999 Mr. Sweis served as a designer for Computer and Engineering Services of Auburn Hills, Michigan. From 1991 to 1997, Mr. Sweis was a design leader for Megatech Engineering of Warren, Michigan, contracted to General Motors of Warren, Michigan.

AMI R. ELAZARI has served as a Director since August 26, 2003. He is the founder, President and CEO of Millennium Electric T.O.U. Ltd. He is a Lt. Col. (Res.) in the Israeli army and served in the IDF Intelligence special unit. Mr. Elazari is an energy and computer engineer and holds a BA in Psychology and an MBA with honors. He is the Vice Chairman of the Israel Export Institute Environmental Technology Center and the Vice Chairman of the Israel Export Institute Start-Up Company Center. Mr. Elazari is an internationally renowned energy expert on solar energy. He represents Israel in the IEA and holds a number of world patents in his name, mainly in renewable energy. Between 1990-1995 Mr. Elazari managed Amitec Energy and Computer Industries, from 1995-1999 he managed the PV division of Chromagen Solar Systems. He is a member of the Israeli Financial forum, High tech forum and has published numerous articles in his field of expertise.

During the fiscal year ended September 30, 2004 the Board of Directors of the Company met one time. The Board members, during their term in fiscal year 2004, attended all of the meetings of the Board of Directors and meetings of any committees of the Board of Directors on which such person served which were held during the time that such person served.

Director Compensation

The Company has no standard arrangements pursuant to which directors of the Company are compensated for any services provided as a director.

Limitation of Liability and Indemnification Matters

Our Bylaws provide that we may indemnify any director, officer, agent or employee against all expenses and liabilities, including counsel fees,

-21-

<PAGE>

reasonably incurred by or imposed upon them in connection with any proceeding in which they may become involved by reason of their being or having been a director, officer, employee or agent of our Company. Moreover, our Bylaws provide that we shall have the right to purchase and maintain insurance on behalf of any such persons whether or not we would have the power to indemnify such person against the liability insured against. Insofar as indemnification may be afforded for liabilities arising under the Securities Act, we have been informed that, in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

Compliance with Section 16(a) of the Securities Exchange Act of 1934
- ----------------------------------------------------------------

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), requires the Company's directors and executive officers, and persons who own more than ten percent of the Company's Common Stock, to file with the Securities and Exchange Commission initial reports of ownership and reports of changes in ownership of Common Stock. Officers, directors and greater than ten percent stockholders are required by Securities and Exchange Commission regulations to furnish the Company with copies of all Section 16(a) forms they

To the Company's knowledge, based solely on a review of the copies of such reports furnished to the Company and representations that no other reports were required, during the fiscal year ended September 30, 2004, we believe that Ami Elazari has not filed the required Form 4.

ITEM 10. EXECUTIVE COMPENSATION

The following table sets forth certain summary information concerning compensation paid or accrued by the Company on behalf of the Chief Executive Officer. No other executive officers of the Company have total annual salary and bonus for fiscal year 2004 which exceeded $100,000, with respect to services rendered by such persons to the Company and its subsidiaries for each of the fiscal years ended September 30, 2004, 2003 and 2002.

<TABLE>
<CAPTION>

| Name and Principal Position(6) | Year | Salary ($) | Other Annual Compensation ($) | Long-Term Compensation Awards ---Securities--- Underlying Options(#) |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> |
| Michael J. Zwebner (1) | 2004 | $240,000(2) | -0- | -0- |
| Chairman of the Board | 2003 | $240,000(3) | -0- | -0- |
| of Directors, CEO | 2002 | $240,000(4) | -0- | -0- |

</TABLE>

(1) Mr. Zwebner works under a contract with Overseas Communications, Ltd.
(2) For the fiscal year ended September 30, 2004, this amount was paid $135,000 in cash and the Company issued 1,316,666 shares of common stock.
(3) For the fiscal year ended September 30, 2003, this amount was paid $80,000 in cash and the Company issued 3,160,742 shares of common stock.
(4) For the fiscal year ended September 30, 2002, this amount was paid with common stock in the amount of 378,578 shares.

-22-

<PAGE>

AGGREGATED OPTION EXERCISES IN FISCAL 2004
AND VALUE OF OPTIONS AT SEPTEMBER 30, 2004

The following tables set forth certain information with respect to the Company's Chief Executive Officer concerning unexercised stock options held as of September 30, 2004.

<TABLE>
<CAPTION>

Individual Grants

| Number of Securities Underlying Options Granted | Percent of Total options granted to employees in Fiscal 2004 | Exercise Price ($/Share) | Expiration Date |
| --- | --- | --- | --- |
| <S> | | | |
| <C> | <C> | <C> | <C> |
| - - NONE | | | |

</TABLE>

<TABLE>
<CAPTION>

Aggregated Options/ SAR Exercises at September 30, 2004

| | Shares Acquired or Exercised | | Number of Securities Underlying Unexercised Options/SARS at September 30, 2004 Exercisable/Unexercisable | Value of Unexercise the-Money Options/ S September 30, 200 Exercisable/Unexerc |
| | (#) | ($) | | |
| <S> | <C> | <C> | <C> | <C> |

- - NONE
</TABLE>

ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

        The following table sets forth, as of December 30, 2004, the number
and percentage of shares of Common Stock beneficially owned (as defined in Rule
13d-3 adopted under the Exchange Act) by (a) all persons known to the Company to
own beneficially more than 5% of any class of voting security of the Company,
(b) each of the Company's directors, (c) the Company's Chief Executive Officer
and (d) all directors and executive officers of the Company as a group.

<TABLE>
<CAPTION>

| Name of Named Executive Officer, Director, or Beneficial Owner | Number of Shares | Percentage Ownership | Upon Exercise of Options or Warrants |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Michael J. Zwebner (3) | 28,777,609 (1) | 12.2% | 0 |
| Alexander Walker, Jr. (3) | 557,000 | * | 0 |
| Ramsey Sweis (3) | 1,723,970 | * | 500,000 |
| Curtis Orgil (3) | 251,000 | * | 0 |
| Ami R. Elazari   (3) | 4,980,159 | 2.1% | |
| Executive Officers and Directors as a Group - 5 individuals | 36,289,738 | 15.3% | |
| Endeavour Capital c/o Endeavour Advisors, Ltd. P.O.B. 57116 Jerusalem 91570 | 23,406,259 | 9.9% | 22,474,453 ( |
| Alpha Capital Aktiengesellschaft Pradafant 7, Furstentums 9490, Vaduz, Liechtenstein | 16,886,713(4) | 7.1% | 10,470,236 ( |
| Port Universal Ltd. c/o Mizrahi Bank 78 Hayarkon Street Tel Aviv Israel | 13,970,832 | 5.9% | |
| Esquire Trade & Finance, Inc. Trident Chambers, Road Town Tortola, British Virgin Islands | 13,513,093 | 5.7% | |

</TABLE>

                                      -23-

<PAGE>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
  *  Less than 1%

(1) Includes 3,358,823 shares beneficially held by Overseas Communications

Limited and 4,656,200 shares beneficially held by Port Universal.

(2) Represents shares convertible under the 4%, due April 14, 2005, $1,299,210
    and 8%, due March 29, 2005, $386,374 convertible debentures held, but not
    more than 9.9% of total outstanding, as per the provision of the debentures.

(3) The address of each such person is c/o the Company, 407 Lincoln Rd., Ste
    12F, Miami Beach, FL 33139

(4) Includes 9,424,242 shares convertible at $0.033 per share under the Series A
    8% Cumulative Convertible Preferred Stock, dated April 19, 2004.

ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

        Commencing November 1, 2001, we engaged the services of the Chairman
Michael Zwebner under a consulting agreement through Overseas Development
Holdings Corporation, a foreign corporation. The annual payment is $240,000.
Overseas Development Holdings Corporation is 33% owned by our Chairman.

        Alexander Walker, Jr., a Director and the Secretary of our company, is
Chairman of the Board and a shareholder of Nevada Agency and Trust Company, our
transfer agent since November 6, 2001. During the fiscal year ended September
30, 2004, we incurred fees aggregating $8,352 to Nevada Agency and Trust
Company.

ITEM 13. EXHIBITS AND REPORTS ON FORM 8-K

        (a)  Exhibits

   ITEM (601)                    DOCUMENT
   ----------                    --------
(i)    3.1   Articles of Incorporation.

(i)    3.2   Amendment to Articles of Incorporation

(i)    3.3   Amendment to Articles of Incorporation.

(i)    3.4   By-laws.

(iv)   3.5   Amendment to Articles of Incorporation.

(i)    4.1   Form of Certificate Evidencing shares of Common Stock of
             Universal Communication Systems, Inc.

(i)    4.2   Convertible Unsecured Debenture for $740,000 issued by World
             Wide Wireless Communications, Inc. to Credit Bancorp.

                              -24-
<PAGE>

(v)    10.1  Stock Purchase Agreement dated November 30, 1999 Between
             Infotel Argentina S.A. and Universal Communication Systems, Inc.

(v)    10.3  Security Purchase Agreement Among World Wide Wireless
             Communications, Inc. and the Purchasers Named Therein.

(v)    10.4  Registration Rights Agreements Among World Wide Wireless
             Communications, Inc. and the Purchasers Named Therein.

(v)    10.5  Escrow Agreement Among the Purchasers Named Therein, the
             Representative of the Purchasers and the Escrow Agent.

(v)   10.6   Forms of Inter-company Communications Systems, Inc.
with Respect to the 4% Convertible Debenture Due 2005.

(v)   10.7   Form of Warrant to Purchase Shares of World Wide Communications,
Inc. Issued in the Offering.

(vi)  10.8   Amendment to the Securities Purchase Agreement entered into
between World Wide Wireless Communications and the selling
shareholders named therein.

(ii)  10.9   Second Amendment to the Securities Purchase Agreement
entered into between World Wide Wireless Communications and
the selling shareholders name therein.

(ii)  10.11  World Wide Communications, Inc. Incentive Stock Option Plan

(iii) 10.12  Agreement between Overseas Communication Limited and World
Wide Wireless Communications, Inc.

(vii) 10.13  Stock Purchase Agreement by Universal Communication Systems, Inc.
and Ami R. Elazari and Caltan Development, Ltd., dated
August 22, 2003.

(viii) 10.14  Consulting Agreement - Dorit Elazari

(viii) 10.15  Consulting Agreement - Joseph Moore

(viii) 10.16  Consulting Agreement - Otzarot Nechasim Vehashkaot, Ltd.

       10.17  Certificate of Designation for Series A 8% Cumulative Convertible
Preferred Stock

       21.1   Subsidiaries

       31.1   Certification Pursuant to 18 USC Section 302
for Michael Zwebner.

       31.2   Certification Pursuant to 18 USC Section 302
for Curtis Orgil.

       32.1   Certification Pursuant to 18 USC Section 1350 as adopted pursuant
to Section 906 of Sarbanes- Oxley Act of 2002 for Michael Zwebner.

       32.2   Certification Pursuant to 18 USC Section 1350 as adopted pursuant
to Section 906 of Sarbanes- Oxley Act of 2002 for Curtis Orgil.

-25-

<PAGE>
- ------------------

   (i)   Filed with the registration statement on Form SB-2 with the
Securities and Exchange Commission on May 31, 2000.
  (ii)   Filed with the registration statement on Form SB-2 with the
Securities and Exchange Commission on December 15, 2000.

 (iii)  Filed with Form 10-KSB for the period September 30, 2002.

  (iv)  Filed with Form DEF14A on April 25, 2002.

   (v)   Filed with the registration statement on Form SB-2 with the
Securities and Exchange Commission on May 31, 2000.

  (vi)  Filed with Form 10-KSB for the period September 30, 2000.

(vii) Filed with Form 10-K for the period December 31, 2003.

    (viii) Filed with Form 10-KSB for the period September 30, 2003.

  (b)  The following Form 8-K was filed during the fourth quarter.

            None

ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

The following table presents fees for the audits of the Company's annual
consolidated financial statements for the fiscal year ended September 30, 2004
and for other services provided by Reuben E. Price, P.A.

```
Audit Fees............................................ $180,000
Audit-Related Fees...................................     -0-
Tax Fees.............................................     -0-
All Other Fees.......................................     -0-
```

                              -26-

<PAGE>
                          SIGNATURES

        In accordance with Section 13 or 15(d) of the Securities Exchange Act
of 1934, the Registrant caused this report to be signed on its behalf by the
undersigned, thereunto duly authorized, on January 13, 2005.

                        Universal Communication Systems, Inc.


                        By:   /s/ MICHAEL ZWEBNER
                              ------------------
                              Michael J. Zwebner
                              Chief Executive Officer

        In accordance with the requirements of the Securities Exchange Act of
1934, this report has been signed below by the following persons on behalf of
the Registrant in the capacities indicated on January 13, 2005:

<TABLE>
<CAPTION>

| Signature | Title | Date |
| --------- | ----- | ---- |
| <S> | <C> | <C> |
| /s/ MICHAEL J. ZWEBNER<br>-----------------------<br>Michael J. Zwebner | Director, Chief Executive Officer,<br>  and Chairman of the Board (Principal<br>Financial and Accounting Officer) | January 13, 2005 |
| /s/ ALEXANDER WALKER, JR<br>------------------------<br>Alexander Walker, Jr. | Director and Secretary | January 13, 2005 |
| /s/ RAMSEY SWEIS<br>- - --------------------<br>Ramsey Sweis | Director | January 13, 2005 |
| /s/ CURTIS ORGILL<br>- ----------------------<br>Curtis Orgil | Director and Chief Financial Officer | January 13, 2005 |
| /s/ AMI R. ELAZARI<br>- - --------------------<br>Ami R. Elazari | Director | January 13, 2005 |

-27-

<PAGE>

--------------------------------------------------

UNIVERSAL COMMUNICATION SYSTEMS, INC.
--------------------------------------------------


REPORT ON AUDIT OF FINANCIAL STATEMENTS

AS OF SEPTEMBER 30, 2004

---------------------------------------


REUBEN E. PRICE & COMPANY
PUBLIC ACCOUNTANCY CORPORATION


<PAGE>

UNIVERSAL COMMUNICATION SYSTEMS, INC.
----------------------------


CONTENTS


                                                           PAGE
                                                           ----

FINANCIAL STATEMENTS:

    Report of Independent Auditor                          F-1

    Consolidated Balance Sheet as of
       September 30, 2004                                  F-2

    Consolidated Statements of Operations for the
       Years Ended September 30, 2004 and 2003             F-3

    Consolidated Statements of Shareholders' Deficit
       for the Years Ended September 30, 2004 and 2003     F-4

    Consolidated Statements of Cash Flows for the
       Years Ended September 30, 2004 and 2003          F-5 - F-6

Page 27 of 82

Case 4:05-cv-40049-FDS    Document 100-11    Filed 07/13/2007    Page 7 of 10
Notes to Consolidated Financial Statements        F-7 - F-21

ii

<PAGE>

INDEPENDENT AUDITOR'S REPORT

Board of Directors and Shareholders of
Universal Communication Systems, Inc.

We have audited the accompanying consolidated balance sheet of Universal
Communication Systems, Inc. and subsidiaries, as of September 30, 2004, and the
related consolidated statements of operations, shareholders' deficit and cash
flows, for the years then ended. The consolidated financial statements of
Universal Communication Systems, Inc. and subsidiaries are the responsibility of
the Company's management. Our responsibility is to express an opinion on these
financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company
Accounting Oversight Board (United States). Those standards require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. An audit includes examining, on a
test basis, evidence supporting the amounts and disclosures in the financial
statements. An audit also includes assessing the accounting principles used and
significant estimates made by management, as well as evaluating the overall
financial statement presentation. We believe that our audits provide a
reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above, present
fairly, in all material respects, the financial position of Universal
Communication Systems, Inc. and subsidiaries, as of September 30, 2004 and 2003
and the results of their operations and their cash flows for the years then
ended, in conformity with accounting principles generally accepted in the United
States of America.

The accompanying consolidated financial statements have been prepared assuming
that the Company will continue as a going concern. As discussed in Note 3, the
Company's current liabilities exceed current assets by $1,797,720, nd it has
suffered recurring losses that raise substantial doubt about its ability to
continue as going concern. Realization of a major portion of the assets is
dependent upon the Company's ability to meet its future financing requirements,
and the success of future operations, the outcome of which cannot be determined
at this time. Management's plans in regard to these matters are also described
in Note 3. The financial statements do not include any adjustments that might
result from the outcome of this uncertainty.

Reuben E. Price & Co.

San Francisco, California
January 13, 2005

                                      F-1

<PAGE>

Part I.   FINANCIAL INFORMATION
Item 1.   FINANCIAL STATEMENTS

            UNIVERSAL COMMUNICATION SYSTEMS, INC. & SUBSIDIARIES

```
<TABLE>
<CAPTION>
```

|  | September 30, 2004 |
|---|---|
| ASSETS | |
| `<S>` | `<C>` |
| **Current Assets:** | |
| Cash & cash equivalents | $     453,134 |
| Accounts receivable, net of allowances of 0 | 102,009 |
| Notes receivable | 128,357 |
| Inventory, finished goods | 41,994 |
| Prepaid expenses | 65,362 |
| Total Current Assets | 790,856 |
| Fixed Assets, Net | 411,817 |
| **Other Assets:** | |
| Patents, net | 540,914 |
| Goodwill | 30,000 |
| Deposits | 24,133 |
| Total Other Assets | 595,047 |
| Total Assets | $   1,797,720 |

### LIABILITIES AND SHAREHOLDERS' DEFICIT

|  |  |
|---|---|
| **Current Liabilities:** | |
| Accounts payable, trade | $     254,012 |
| Accrued expenses | 1,201,987 |
| Due to related party | 31,744 |
| Notes payable | 60,000 |
| Liabilities of discontinued operations | 946,794 |
| Total Current Liabilities | 2,494,537 |
| **Long-term Liabilities:** | |
| Convertible debentures | 2,060,374 |
| Total Liabilities | 4,554,911 |
| Commitments and Contingencies | -- |
| **Shareholders' Deficit:** | |
| Preferred stock, par value $.001 per share , 10,000,000 shares authorized, 30,000 shares issued and outstanding | 30 |
| Common stock, par value $.001 per share, 800,000,000 shares authorized, 202,900,000 shares issued and outstanding | 202,900 |
| Additional paid-in capital | 32,509,910 |
| Accumulated deficit | (35,376,531) |
| Accounts receivable, shareholder | (93,500) |
| Total Shareholders' Deficit | (2,757,191) |
| Total Liabilities and Shareholders' Deficit | $   1,797,720 |

```
</TABLE>
```

The accompanying notes are an integral part of these financial statements.

UNIVERSAL COMMUNICATION SYSTEMS, INC. & SUBSIDIARIES
Consolidated Statements of Operations

|  | For the Year Ended September 30, | |
|  | 2004 | 2003 |
| --- | --- | --- |
| Revenues | $ 375,007 | $ -- |
| Cost of Revenues | 292,841 | -- |
| Gross Margin | 82,166 | -- |
| Operating Expenses: | | |
| Sales and marketing | 403,787 | 151,804 |
| Product development | -- | 62,333 |
| Amortization of patent rights | 75,000 | -- |
| General and administrative | 2,832,670 | 1,785,431 |
| Total Operating Expenses | 3,311,457 | 1,999,568 |
| Other Income & Expense: | | |
| Interest income | 11,575 | -- |
| Less: Interest expense | 314,217 | 285,572 |
| Total Other Expense | 302,642 | 285,572 |
| Net Loss | $ 3,531,933 | $ 2,285,140 |
| Basic and Diluted Net Loss per Common Share | $ 0.03 | $ 0.09 |
| Basic and Diluted Weighted Average Shares Outstanding | 132,537,737 | 26,758,511 |

The accompanying notes are an integral part of these financial statements.

F-3

UNIVERSAL COMMUNICATIONS SYSTEMS, INC. & SUBSIDIARIES
Consolidated Statements of Shareholders' Deficit
For the Years Ended September 30, 2004 and 2003

|  | Common Stock | | Preferred Stock Amount | Additional Paid-in Capital | Accumulated Deficit |
|  | Shares | Amount |  |  |  |
| --- | --- | --- | --- | --- | --- |
| Balance, September 30, 2002 | 5,967,990 | $ 5,968 | $-- | $23,071,546 | $(29,548,45 |
| Common stock issued in private placements between $0.026 and $1.00 per share | 22,742,301 | 22,742 | -- | 1,192,087 | -- |
| Conversions of debentures for common stock between $0.0253 and $0.1275 per share | 23,486,734 | 23,487 | -- | 693,578 | -- |

| | | | | |
|---|---|---|---|---|
| Common stock issued for services between $0.04 and $ 0.12 per share | 18,008,770 | 18,009 | -- | 1,086,386 | -- |
| Common stock issued for purchase of subsidiary at $.05 per share | 5,000,000 | 5,000 | -- | 245,000 | -- |
| Common stock issued for non-cash investments in patent rights at of $0.05 per share | 4,000,000 | 4,000 | -- | 196,000 | -- |
| Common stock issued between $0.033 and $1.00 per share in escrow, not paid | 2,017,451 | 2,017 | -- | (2,017) | -- |
| Receivable from shareholder Net loss for the fiscal year ended, September 30, 2003 | -- | -- | -- | -- | (2,285,14 |
| Balance, September 30, 2003 | 81,223,246 | 81,223 | -- | $26,482,580 | $(31,833,59 |
| Preferred stock issued in private placement at $10. per share for 30,000 shares | -- | -- | 30 | 299,970 | - |
| Common stock issued in private placements between $0.02 and $.06 per share | 60,593,464 | 60,595 | -- | 2,232,859 | - |
| Common stock issued in payment of note payable | 300,000 | 300 | -- | 25,634 | |
| Conversions of debentures for common stock between $0.0287 and $0.15 per share | 43,506,234 | 43,506 | -- | 2,432,430 | - |
| Common stock issued for services between $0.040 and $0.11 per share | 16,776,309 | 16,776 | -- | 1,006,938 | |
| Common stock issued for purchase of subsidiary at $.06 per share | 500,000 | 500 | -- | 29,500 | - |
| Dividends on preferred stock | | | -- | -- | (11,00 |
| Net loss for the fiscal year ended, September 30, 2004 | -- | -- | -- | -- | (3,531,93 |
| Balance, September 30, 2004 | 202,899,253 | $202,900 | $30 | $32,509,911 | $(35,376,531 |

  </TABLE>

    The accompanying notes are an integral part of these financial statements.

                                    F-4
  <PAGE>
              UNIVERSAL COMMUNICATION SYSTEMS, INC. & SUBSIDIARIES
                    Consolidated Statements of Cash Flows
  <TABLE>
  <CAPTION>

| | For the Year End September 30, | |
|---|---|---|
| | 2004 | 2 |
| | ----------- | ----- |
| <S> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net Loss | $(3,531,933) | $(2,2 |
| Adjustments to reconcile net loss from operations to net cash used by operating activities: | | |

Common Stock Service Costs

| | | |
|---|---|---|
| Depreciation and amortization expense | 88,079 | |
| Interest payable added to principal of debentures | 79,330 | 2 |
| Interest payable added to principal of note payable | 15,254 | |
| Accrued interest on notes receivable | (11,575) | |
| Changes in operating assets and liabilities: | | |
| (Increase) Decrease in accounts receivable | 3,850 | (1 |
| (Increase) in inventory | (37,094) | |
| (Increase) Decrease in prepaid and other | (39,727) | ( |
| Increase (Decrease) in accrued expenses and | | |
| accounts payable | 888,658 | 1 |
| | ---------- | ----- |
| Net Cash (Used) by Operating Activities | (1,521,444) | (9 |
| | ---------- | ----- |

CASH FLOWS FROM INVESTING ACTIVITIES:

| | | |
|---|---|---|
| Purchase of patent rights | (9,200) | (1 |
| Purchase of fixed assets | (381,637) | ( |
| Note receivable | -- | (1 |
| (Increase) in advances to related parties | (11,368) | ( |
| | ---------- | ----- |
| Net Cash (Used) by Investing Activities | (402,205) | (3 |
| | ---------- | ----- |

CASH FLOWS FROM FINANCING ACTIVITIES:

| | | |
|---|---|---|
| Proceeds of short term notes | -- | |
| Proceeds (repayment) of overdraft facility | (25,721) | |
| Repayment of note payable | (274,066) | |
| Proceeds from issuance of common stock | 2,293,452 | 1,2 |
| Proceeds from issuance of preferred stock | 300,000 | |
| Increase (Decrease) in advances from related parties | (61,364) | |
| | ---------- | ----- |
| Net Cash Provided by Financing Activities | 2,232,101 | 1,3 |
| | ---------- | ----- |

| | | |
|---|---|---|
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 308,452 | 1 |
| | | |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | 144,682 | |
| | ---------- | ----- |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $   453,134 | $   1 |
| | ========== | ===== |

</TABLE>

    The accompanying notes are an integral part of these financial statements.

                                    F-5
<PAGE>
            UNIVERSAL COMMUNICATION SYSTEMS, INC. & SUBSIDIARIES
                    Consolidated Statements of Cash Flows
<TABLE>
<CAPTION>

| | For the Year Ended September 30, | |
|---|---|---|
| | 2004 | 2003 |
| | ---------- | -------- |
| <S> | <C> | <C> |

| | | |
|---|---|---|
| SUPPLEMENTAL DISCLOSURES OF CASH: | | |
| Interest paid | $ -- | $ -- |
| Income taxes paid | $ -- | $ -- |
| SUPPLEMENTAL DISCLOSURES OF NONCASH | | |
| INVESTING AND FINANCING ACTIVITIES: | | |
| Interest accrued on debentures, added to | | |
| the principal of the debentures | $ 79,333 | $239,852 |
| Interest accrued on note payable added | | |
| to the principal of the note | $ 15,254 | $ 30,509 |
| Dividends accrued on preferred stock | $ 11,000 | |
| Debentures converted to capital stock | $2,475,936 | $717,065 |
| Capital stock issued in acquisition of subsidiary | $ 30,000 | $250,000 |
| Capital stock issued in acquisition of patent rights | $ -- | $200,000 |
| Capital stock issued in payoff of note payable | $ 25,934 | $ -- |

</TABLE>

The accompanying notes are an integral part of these financial statements.

F-6

<PAGE>
Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 1 - BACKGROUND, ACQUISITIONS AND SUBSIDIARIES

Background
- ----------

Universal Communications Systems, Inc. (the Company) and its
subsidiaries are actively engaged worldwide in developing and marketing
solar energy systems, as well as systems for the extraction of
drinkable water from the air.  Consolidated subsidiaries include
wholly-owned subsidiaries AirWater Corp, AirWater Patents Corp,
Millennium Electric T.O.U. Ltd, Solar Style Inc (USA), and Solar One
Inc, and Solar Style Ltd., and majority-owned subsidiary Millennium
USA.

AirWater Systems
- ----------------

On March 21, 2003, the Company licensed worldwide rights to patents
held by J.J. Reidy & Co, relating to a water production/generation
system, for a period of not less than 10 years.  In connection with the
licensing, the Company created two wholly-owned subsidiaries: AirWater
Corp, to produce and market the systems, and AirWater Patents Corp, to
hold the Company's licensed patent rights.  The Company paid $100,000
cash and 4 million shares of Company stock valued at $200,000.
Additionally, the license agreement requires royalty payments of 5-7%
of gross water system sales, with minimum royalty payments of $10,000
monthly beginning November 2003.  The $300,000 acquisition cost is
included in Patents.

Millennium Solar Systems
- ------------------------

On September 29, 2003, the Company completed an agreement to purchase
100% of the stock of Millennium Electric T.O.U. Ltd (Millennium), an
Israeli company specializing in the development and installation of
solar power systems worldwide.  Terms included an initial transfer of 5
million shares of Company stock, valued at $250,000, with options for

exercise prices, ranging from $0.05 to $0.39 per share, to be granted under various conditions related to certain future events and future Company performance standards.

The Company's purchase cost plus net liabilities assumed, resulted in $300,064 of intangibles in the form of patent costs, which is included in Patents. As discussed in Note 12, no amortization or impairment has been recognized.

Two new wholly-owned US subsidiaries, Solar One Inc and Solar Style Inc (USA), were created by the Company to market the solar systems. As of September 30, 2003, they were inactive, with no assets or liabilities. For the fiscal year ended September 30, 2004 Solar One Inc. remains inactive. Solar Style Inc. (USA) has leased office space in Baltimore Maryland, and contracted with manufactures to bring to marked solar powered products for the portable consumer market. At this time no units have been sold.

Millennium has two subsidiaries: 65%-owned Millennium USA, and 50%-owned Solar Style Ltd. Both are inactive, with no assets or liabilities. The Company purchased the remaining 50% of Solar Style Ltd. from an outside investor for 500,000 shares valued at $30,000. Solar Style LTD was purchase to create a controlling interest, and to obtain sole use of the name Solar Style. The Company, and its wholly owned subsidiary Millennium, now own 100% of Solar Style Ltd.

Millennium's assets and liabilities are included in the Company's consolidated balance sheet at September 30, 2003. However, Millennium's results are not included in the Company's consolidated statements of operations, shareholders' deficit, or cash flows for the year ended September 30, 2003. Millennium's results are included in the Company's statements of operations, sharekholders' deficit, and statement of cash flows for the year ended September 30, 2004.

F-7

<PAGE>
            Universal Communication Systems, Inc. and Subsidiaries
                  Notes to the Consolidated Financial Statements
                          September 30, 2004

NOTE 1 - BACKGROUND, ACQUISITIONS AND SUBSIDIARIES (continued)

Millennium Solar Systems (continued)
- ------------------------------------

The following pro forma data is presented on a combined basis, as if Millennium had been acquired as of October 1, 2001:

|                                | 2003          |
| ------------------------------ | ------------- |
| Revenues                       | $    162,066  |
| Expenses                       |     2,477,052 |
| Net (Loss)                     | ($2,314,986)  |
| Basic & Diluted Loss per Share | ($0.09)       |

Hard Disc Cafe, Inc.
- --------------------

During fiscal 2003, the Company developed a non-binding letter of intent to acquire Hard Disc Cafe, Inc. (HDC), a Florida corporation, majority-owned by an officer of the Company. HDC intended to develop and license themed internet cafes. During 2002, HDC ceased all operations and returned $10,699 to the Company. As a result, the Company recognized a loss of $26,397 in fiscal 2003.

Card Universal Corporation, Inc.
- -------------------------------

During fiscal 2003, the Company entered into a non-binding letter of intent to acquire Card Universal Corporation, Inc. (CUC), a privately held development stage Florida corporation of which an officer of the Company was CEO and a major shareholder. CUC intended to provide and market prepaid "Stored Money Cards". CUC has ceased its development activities, is currently inactive, and the acquisition has been abandoned.

Digital Way, Peru
- ----------------

The Company owns 27% of Digital Way, S.A., a Peruvian telecommunications company. The Company treats Digital Way as an unconsolidated investment. Pursuant to APB 18, par 17, absent evidence to the contrary, and investor is presumed to have the ability to significantly influence an investee if it owns 20% or more of the investee's voting stock and the equity method of accounting is required. Because the majority ownership is concentrated among a small group of shareholders who operate Digital Way without regard to the views of Universal and the financial information necessary to apply the equity method of accounting is not being made available, Universal is unable to apply the equity method. Because significant doubt exists as to the recovery from this investment, the investment is fully impaired.

CinemaElectric
- --------------

During fiscal 2003, the Company agreed to acquire CinemaElectric, a Los Angeles based multimedia messaging service company. On August 12, 2003, the Company released CinemaElectric from the agreement in exchange for 10% of CinemaElectric's stock, which was received in the fiscal year ended September 30, 2004. As of the date of publishing these financial statements, no value could be calculated on the shares of this non-publicly traded company. At such time as a value can be determined, the Company will record the 10% investment in CinemaElectric.

F-8

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Principles of Consolidation
- --------------------------

The consolidated financial statements include the accounts of all majority-owned subsidiaries. Investments in which the Company has the ability to exercise significant influence, but not control, are accounted for by the equity method. All other investments are carried at the lower of cost or fair value. Intercompany transactions are eliminated.

Basic and Diluted Net Loss Per Share
- ------------------------------------

The calculation of basic and diluted net loss per share is in
accordance with Statement of Financial Accounting Standards No. 128,
"Earnings Per Share". Net loss per common share, basic and diluted, has
been computed using weighted average common shares outstanding. The
effect of outstanding stock options and warrants totaling 27,521 in
fiscal 2003 and 18,083,131 in 2004 has been excluded from the dilutive
computation, as their inclusion would be anti-dilutive.

<div align="center">F-9</div>

<PAGE>

<div align="center">Universal Communication Systems, Inc. and Subsidiaries<br>Notes to the Consolidated Financial Statements<br>September 30, 2004</div>

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

|  | Fiscal Year Ended September 30, | |
|  | 2004 | 2003 |
| --- | --- | --- |
| Net loss | $ (3,531,933) | $ (2,285,140) |
| Weighted average number of common shares | 132,537,737 | 26,758,511 |
| Basic and diluted loss per share | $ (0.03) | $ (0.09) |

Cash Equivalents
- ----------------

The Company considers all highly liquid investments with an original
maturity of three months or less to be cash equivalents. Balances in
bank accounts may, from time to time, exceed federal insured limits.

Inventory
- ---------

Inventory is stated at the lower of cost (determined using the "first-
in, first-out" method) or market. Inventory write-offs are provided to
cover risks arising from slow-moving items or obsolescence.

Fixed Assets
- ------------

Furniture, fixtures and equipment are depreciated over their estimated
useful lives of 3 to 15 years, using the straight-line method of
depreciation.

Long-Lived Assets
- -----------------

The Company reviews its long-lived assets on a quarterly basis to
determine any impairment in accordance with Statement of Financial
Accounting Standards (SFAS) No. 144. This statement provides a single
accounting model for long-lived assets to be disposed of and
significantly changes the criteria that would have to be met to
classify an asset as held-for-sale. Classification as held-for-sale is

an important modification to such accounting as these assets are
stated at the lower of fair value and carrying amount. This statement
also requires expected future operating losses from discontinued
operations to be displayed in the period(s) in which the losses are
incurred, rather than as of the measurement date as previously
required.

                                F-10
<PAGE>

                Universal Communication Systems, Inc. and Subsidiaries
                    Notes to the Consolidated Financial Statements
                            September 30, 2004

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Estimates
- ---------

The preparation of financial statements in conformity with generally
accepted accounting principles requires management to make estimates
and assumptions that affect the reported amounts of assets and
liabilities and disclosure of contingent assets and liabilities at the
date of the financial statements and the reported amounts of revenues
and expenses during the reporting period. Actual results could differ
from those estimates.

Fair Value of Financial Instruments
- -----------------------------------

For cash, cash equivalents, other assets, accounts payable, and accrued
expenses, the carrying amounts represent their fair market value. The
carrying amount of the debentures payable approximates fair value
because of similar current rates at which the Company could borrow
funds with consistent remaining maturities.

Segment Information
- -------------------

The Company adopted Statement of Financial Accounting Standards No.
131, "Disclosures about Segments of an Enterprise and Related
Information" (SFAS No. 131) in 1999. This statement establishes
standards for the reporting of information about operating segments in
annual and interim financial statements and requires restatement of
prior year information. The Company has no reportable operating
segments for the years ended September 30, 2004 and 2003.  All products
and services in the current fiscal year, are related to one operating
segment, the installation of solar energy products worldwide.

Comprehensive Income and Foreign Currency Translation
- -----------------------------------------------------

The Company has adopted FASB Statement No. 130, Reporting Comprehensive
Income. The Company's foreign subsidiaries transactions are recorded in
New Israeli Shekels ("NIS"); however, most of the company's revenues
are received in U.S. dollars or linked to the U.S. dollar, and a
substantial portion of its costs is incurred in U.S. dollars
Accordingly, the Company has determined the U.S. dollar as the currency
of its primary economic environment and thus its functional and
reporting currency.

The financial statements of the Company's foreign subsidiaries are
measured using the U.S. dollar as the functional currency. Where there

are foreign subsidiaries, assets and liabilities were
translated at exchange rates as of the balance sheet date and revenues
and expenses were translated at average rates of exchange in effect
during the year. Any cumulative translation adjustments are recorded as
a separate component of shareholders' equity.

Revenue Recognition and Trade Accounts Receivable
- -------------------------------------------------

The Company's revenues are recognized when contracted services are
provided for or products are shipped to unaffiliated customers. The
Securities and Exchange Commission's Staff Accounting Bulletin (SAB)
No. 101, "Revenue Recognition" provides guidance on the application of
generally accepted accounting principles to selected revenue
recognition issues. The Company has concluded that its revenue
recognition policy is appropriate and in accordance with generally
accepted accounting principles and SAB No. 101.  Trade accounts
receivable older than 90 days are considered past due and are subject
to write down.

Fixed Assets
- ------------

Fixed assets are recorded at cost. Additions and improvements are
capitalized; these include all material, labor, and engineering costs
to design, install or improve the asset. Interest costs on construction
projects are also capitalized. These costs are carried as construction
in progress until the asset is ready for its intended use, at which
time the costs are transferred to land, buildings, or machinery and
equipment. Routine repairs and maintenance are expensed as incurred.
The cost of plant and equipment is depreciated using the straight-line
method over the estimated useful life of the asset. In compliance with
SFAS 144, long-lived assets are reviewed for impairment whenever
management's judgment conditions indicate a possible loss. Such
impairment tests compare estimated undiscounted cash flows to the
recorded value of the asset. If an impairment is indicated, the asset
is written down to its fair market value or, if fair market value is
not readily determinable, to an estimated fair value based on
discounted cash flows.

Goodwill
- --------

Under SFAS No. 142, Goodwill and Other Intangible Assets, goodwill is
now subject only to impairment reviews. A fair-value-based test is
applied at the reporting unit level, which is generally one level below
the segment level. This test requires various judgments and estimates.
A goodwill impairment loss will be recorded for any goodwill that is
determined to be impaired. Goodwill is tested for impairment at least
annually.

Patents
- --------------------------

Patents are amortized for their patents life of 15 years.  In
accordance with SFAS No. 144, Accounting for the Impairment or Disposal
of Long-Lived Assets, all intangible assets are assessed for impairment
whenever events indicate a possible loss. Such an assessment involves
estimating undiscounted cash flows over the remaining useful life of
the intangible. If the review indicates that undiscounted cash flows
are less than the recorded value of the intangible asset, the carrying
amount of the intangible is reduced by the estimated cash-flow

shortfall on accounts payable and present outstanding invoices to the Statement of Consolidated Operations.

Stock Based Compensation
- ------------------------
From time to time the company has compensated key employees with shares of common stock in lieu of salary (see note 12 on related party transactions).

Shipping Costs
- --------------
The company incurred no significant shipping costs in the current year.

Advertising Costs
- -----------------
Advertising costs are expensed as incurred.

Recent Accounting Pronouncements
- --------------------------------

In October 2001, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 143, "Accounting for Asset Retirement Obligations" ("SFAS No. 143"). SFAS No. 143 establishes guidelines related to the retirement of tangible

<center>F-11</center>

<PAGE>

<center>
Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004
</center>

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Recent Accounting Pronouncements (continued)
- --------------------------------------------

long-lived assets of the Company and the associated retirement costs. This statement requires that the fair value of a liability for an asset retirement obligation be recognized in the period in which it is incurred if a reasonable estimate of fair value can be made.  The associated asset retirement costs are capitalized as part of the carrying amount of the long-lived assets. This statement is effective for financial statements issued for the fiscal years beginning after June 15, 2002 and with earlier application encouraged.  The Company adopted SFAS No. 143 and the adoption did not have a material impact on the financial statements of the Company at September 30, 2003.

In October 2001, the Financial Accounting Standards Board issued SFAS No. 144,  "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No. 144"). SFAS No. 144 replaces SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed of." This standard establishes a single accounting model for long-lived assets to be disposed of by sale, including discontinued operations. SFAS No. 144 requires that these long-lived assets be measured at the lower of carrying amount or fair value less cost to sell, whether reported in continuing operations or discontinued operations. This statement is effective beginning for fiscal years after December 15, 2001, with earlier application encouraged.  The Company adopted SFAS No. 144 and the adoption did not have a material impact on the financial statements of the Company at September 30, 2003.

In April 2002, the Financial Accounting Standards Board issued SFAS No.

updates, clarifies and simplifies existing accounting pronouncements.
FASB No. 4, which required all gains and losses from the extinguishment
of debt to be aggregated and, if material, classified as an
extraordinary item, net of related tax effect was rescinded.  As a
result, FASB No. 64, which amended FASB No. 4, was rescinded as it was
no longer necessary. SFAS No. 44, "Accounting for Intangible Assets of
Motor Carriers", established the accounting requirements for the
effects of transition to the provisions of the Motor Carrier Act of
1980. Since the transition has been completed, SFAS No. 44 is no longer
necessary and has been rescinded.  SFAS No. 145 amended SFAS No. 13 to
eliminate an inconsistency between the required accounting for sale-
leaseback transactions and the required accounting for certain leases
modifications that have economic effects that are similar to sale-
leaseback transactions.  The Company adopted SFAS No. 145, which has
not had a material effect on the Company's financial statements.

<center>F-12</center>

<PAGE>

<center>
Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004
</center>

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Recent Accounting Pronouncements (continued)
- --------------------------------------------

In June 2002, the Financial Accounting Standards Board issued SFAS No.
146, "Accounting for Costs Associated with Exit or Disposal Activities"
("SFAS No. 146"). SFAS No. 146 addresses significant issues regarding
the recognition, measurement, and reporting of costs associated with
exit and disposal activities, including restructuring activities.  SFAS
No. 146 also addresses recognition of certain costs related to
terminating a contract that is not a capital lease, costs to
consolidate facilities or relocate employees, and termination benefits
provided to employees that are involuntarily terminated under the terms
of a one-time benefit arrangement that is not an ongoing benefit
arrangement or an individual deferred-compensation contract. SFAS No.
146 was issued in June 2002, effective December 31, 2002 with early
adoption encouraged.  There has been no impact on the Company's
financial position or results of operations from adopting SFAS No. 146.

In April 2003, the Financial Accounting Standards Board issued SFAS No.
149,  "Amendment of Statement 133 on Derivative Instruments and Hedging
Activities" (hereinafter  "SFAS No. 149"). SFAS No. 149 amends and
clarifies the accounting for derivative instruments, including certain
derivative instruments embedded in other contracts, and for hedging
activities under SFAS No. 133,  "Accounting for Derivative Instruments
and Hedging Activities".  This statement is effective for contracts
entered into or modified after June 30, 2003 and for hedging
relationships designated after June 30, 2003.  The adoption of SFAS No.
149 did not have a material impact on the financial position or results
of operations of the Company.

In May 2003, the Financial Accounting Standards Board issued Statement
of Financial Accounting Standards No. 150, "Accounting for Certain
Financial Instruments with Characteristics of Both Liabilities and
Equity" (hereinafter "SFAS No. 150"). SFAS No. 150 establishes
standards for classifying and measuring certain financial instruments
with characteristics of both liabilities and equity and requires that
those instruments be classified as liabilities in statements of

instruments entered into or modified after May 31, 2003 and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Company has determined that there was no impact on the Company's financial statements from the adoption of this statement.

In January 2003, the Financial Accounting Standards Board issued FASB Interpretation No. (FIN)46 "Consolidation of Variable Interest Entities, an Interpretation of ARB No. 51" (hereinafter "FIN 46"). FIN 46 requires certain variable interest entities to be consolidated by the primary beneficiary of the entity if the equity investors in the entity do not have the characteristics of a controlling financial

F-13

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Recent Accounting Pronouncements (continued)
- -------------------------------------------

interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties.  FIN 46 is effective for all new variable interest entities created or acquired after January 31, 2003.  The provisions of FIN 46 must be applied for the first interim or annual period beginning after June 15, 2003.  The Company does not have any entities that require disclosure or new consolidation as a result of adopting the provisions of FIN 46.

In November 2002, the Financial Accounting Standards Board issued FIN 45 "Guarantor's Accounting and Disclosure Requirements for Guarantees, including Indirect Guarantees of Indebtedness of Others."  FIN 45 requires a company, at the time it issues a guarantee, to recognize an initial liability for the fair value of obligations assumed under the guarantee and elaborates on existing disclosure requirements related to guarantees and warranties.  The initial recognition requirements of FIN 45 are effective for guarantees issued or modified after December 31, 2002 and do not have an impact on the financial statements of the Company. The Company does not anticipate issuing any guarantees which would be required to be recognized as a liability under the provisions of FIN 45 and thus does not expect the adoption of this interpretation to have an impact on its results of operations or financial position.

Revenues form the sales of products are recognized in accordance with Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements when persuasive evidence of an arrangement exists, delivery of the product has occurred, provided the collection of resulting receivable is probable, the price is fixed or determinable and no significant obligation exists.  The Company does not grant right of return.

NOTE 3 - GOING CONCERN AND SIGNIFICANT RISKS AND UNCERTAINTIES

The Company's financial statements are prepared using generally accepted accounting principles applicable to a going concern which contemplates the realization of assets and liquidation of liabilities in the normal course of business. The Company's current liabilities

exceed current assets by nearly $1.7 million, has experienced losses since inception, and had an accumulated deficit of $35,377,000 at September 30, 2004. Net losses are expected for the foreseeable future. As such, there is substantial doubt as to the Company's ability to continue as a going concern. Management has modified its business plan and is currently focusing its operations on the design, manufacture and sale of water production and generation systems along with solar power systems. The Company needs to secure additional capital through sales of common stock. There is no assurance that management will be successful in its efforts to raise additional capital.

NOTE 4   FIXED ASSETS

|  |  | September 30 | |
|  |  | 2004 | 2003 |
| --- | --- | --- | --- |
| Cost: |  |  |  |
| | Furniture, fixtures and equipment | $ 49,123 | $29,686 |
| | Office leasehold improvements | 4,780 | -- |
| | Equipment molds | 21,000 | -- |
| | Demonstration equipment  Air Water | 362,234 | 25,814 |
| | Demonstration equipment  Solar One | 9,338 | 9,338 |
| | Total | 446,475 | 64,838 |
| Accumulated depreciation and amortization: |  |  |  |
| | Furniture, fixtures and equipment | 29,979 | 21,579 |
| | Office leasehold improvements | 1,304 | -- |
| | Equipment molds | 3,375 | -- |
| | Demonstration equipment  Air Water | -- | -- |
| | Demonstration equipment  Solar One | -- | -- |
| | Total accumulated depreciation and amortization | 34,658 | 21,579 |
| Depreciated cost |  | $411,817 | $43,259 |
| Depreciation and amortization expense for the fiscal year |  | $ 13,079 | $ 5,690 |

Depreciation of furniture, fixtures and office equipment is computed on the straight-line basis over periods of 3 to 10 years.  Leasehold improvements are amortized on the straight-line basis for the period of the space lease.  Equipment molds are being depreciated on the straight-line basis for 3 to 5 years.

NOTE 5 - COMMITMENTS AND CONTINGENCIES

Litigation
- ----------

In November 1998, the Company and its predecessor affiliates filed an action against the lessor of its leases for the Concord and San Marcos,

California multipoint distribution service channels. Thereafter, the lessor cross-complained against the Company and its predecessors, alleging breach of contract. On December 9, 1999, a settlement agreement was signed. Under terms of the settlement agreement, the

Company had a right to purchase the Concord licenses and Madison licenses for a price of $250,000 each, less lease payments already made. The Company elected to exercise the option to purchase the Concord lease, and the appropriate transfer procedure has been initiated with the U.S. Federal Communications Commission (FCC) which is still pending. The Company believes that under current FCC regulations it is not required to pay the $250,000 purchase price until such time as the FCC has approved the transfer of the license, and has made no payment. Management has abandoned the pursuit of these leases and licenses.

During 1999, the Company borrowed $740,000 from Credit Bancorp.  Also in 1999, the Company filed suit against Credit Bancorp in US District Court in San Francisco, regarding improprieties. The case was settled in 1999, with the $740,000 loan converting to a $740,000 convertible debenture. In 2000, Credit Bancorp's receiver agreed to convert the debenture into 462 shares of the Company's stock. A new receiver has been appointed to administer the affairs of Credit Bancorp. The Company has been informed that the appointed receiver denies that such a conversion request was made, and the Company may be liable for the principal plus accrued interest. As of September 30, 2003, no shares had been issued. Management believes that the receiver's claim lacks an authoritative basis, and that the resolution of these matters will not have a material effect on the Company's financial statements.

On April 19, 2001, the Company was served with a complaint alleging unjust enrichment and a violation of California Business and Professions Code by Broad Horizons, Inc., a Florida corporation. The complaint stems from allegations that the Company improperly received monetary benefits from the Company's intended acquisition of Comunicacoes 100Fio, Ltda, a Brazilian corporation, and the Company's subsequent relations with Luis Cuza, a former vice-president and director of Broad Horizons, Inc., and a former member of the Company's board of directors. The Company denies the allegations and believes that the resolution of this matter will not have a material effect on the Company's financial statements.

In fiscal 2003, Electric & Gas Technology Inc (ELGT) filed suit against the Company in Federal District Court in Texas, alleging patent infringement and other claims regarding the Company's AirWater products.  This suit was dismissed without prejudice, for venue/jurisdictional reasons.  It is not yet clear whether ELGT will re-file in another jurisdiction.  The Company has counter-sued ELGT in Federal District Court in Florida for defamation and patent infringement, which case is still pending.  Management believes that the resolution of these matters will not have a material effect on the Company's financial statements.

F-14

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 5 - COMMITMENTS AND CONTINGENCIES (continued)

Operating Leases
- ----------------

During 2003, the Company converted the lease of its Miami executive and administrative offices to a month-to-month basis. The Company's Millennium subsidiary in Israel rents facilities under non-cancelable operating leases for periods ending in 2005, and also leases a car under a 36-month lease commencing October 2003.

Future minimum lease payments required under these leases are as follows at September 30, 2003:

```
         Fiscal year
         Ending September 30,
         --------------------

              2005              $13,512
              2006               13,512
                                -------
                                $27,024
                                =======
```

## Management Agreement

The Company entered into a three year consulting agreement with Overseas Communications Limited ("Overseas") on November 2, 2001, for Mr. Michael Zwebner to act as Chairman and CEO of the Company. This agreement was extended by one year on November 1, 2004.  The Agreement calls for a monthly payment of $20,000, payable in cash or the Company's common stock. For the fiscal years ended September 30, 2004 and 2003, the Company paid $157,000 and $83,000 in cash, respectively, and issued 85,000 and 3,160,742 shares of common stock, respectively, under this agreement. Mr. Zwebner is a shareholder of Overseas.

## Settlement Agreement

      As described more fully in Note 9, below, the Company has entered into a settlement agreement with the Andrew Corporation, formerly a major supplier to the Company. The related note payable for $300,000 was fully satisfied with the issuance of 300,000 shares valued at $25,934.

## Concentrations

The Company's wholly owned subsidiary Millennium depends on many third-party suppliers and manufacturers for key products and components, contained in our products. For some of these products and components, Millennium may only use a single source supplier, in part due to the lack of alternative sources of supply. If the supply of a key product or component is delayed or curtailed, Millennium's ability to ship the related product or solution in desired quantities and in a timely manner could be adversely affected, possibly resulting in reductions in net sales

## Consultant Agreements

In September 2003, the Company entered into two consulting agreements with two Millennium executives. The remaining contingent obligations on these agreements at September 30, 2003 totals $114,000.  The consulting agreements expired in the fiscal year ended September 30, 2004 with no remaining contingent obligations.

## AirWater Minimum Royalty Payments

As discussed more fully in Note 1, the Company's license agreement, through its AirWater subsidiary, requires monthly royalty payments of $10,000 per month through October 2013.

NOTE 6    NOTES PAYABLE

Notes payable consist of a non-interest bearing debt instruments.
Interest on these notes has been imputed and accrued at 8%.    These
notes are past due, but are expected to be paid in full in the coming
fiscal year.


NOTE 7 - SHAREHOLDERS' EQUITY

During the fiscal year ended September 30, 2004, the Company sold
60,593,464 shares of its common stock for net cash proceeds of
$2,293,454. The Company issued 43,506,234 shares of common stock in
conversion of outstanding debentures for an aggregate value of
$2,475,936. The Company also issued 16,776,309 shares of its common
stock for services at an aggregate value of $1,023,714. Stock issued
for services was at the reported market price for the shares at the
time of issuance.  The Company issued 500,000 shares valued at $30,000
for the purchase of a 50% equity interest in Solar Style Ltd. (see Note
1).

The Company has 100,000,000 of authorized preferred shares.  On April
20, 2004 the Company received $300,000 for the issuance 30,000 shares
of Series A cumulative, non-participating convertible preferred stock.
Holders of the preferred shares are entitled to receive cumulative cash
dividends at the annual rate of 8%.  Each Preferred shares is
convertible at the option of the holder, into shares of common stock.
Interest accrued, but not paid on the preferred stock was $11,000 for
the year ended September 30, 2004.

During the fiscal year ended September 30, 2003, the Company sold
22,742,301 shares of its common stock for net cash proceeds of
$1,214,829. The Company issued 23,486,734 shares of common stock in
conversion of outstanding debentures for an aggregate value of
$717,065. The Company also issued 18,008,770 shares of its common stock
for services at an aggregate value of $1,104,395. Stock issued for
services was at the reported market price for the shares at the time of
issuance.

<div align="center">F-15</div>

<PAGE>

<div align="center">
Universal Communication Systems, Inc. and Subsidiaries<br>
Notes to the Consolidated Financial Statements<br>
September 30, 2004
</div>

NOTE 8 - INCOME TAXES

A reconciliation between the actual income tax benefit and the federal
statutory rate follows:

<TABLE>
<CAPTION>

|  | Fiscal years ended Septembe 2004 | | |
| --- | --- | --- | --- |
|  | Amount | % | Amount |
| <S> | <C> | <C> | <C> |
| Computed income tax benefit at statutory rate | $ 1,205,000 | 34 % | $656,000 |
| Tax benefit reserved for doubtful valuation | (1,205,000) | (34)% | (656,000) |
| Income tax benefit | None | | None |

</TABLE>

At September 30, 2004 the Company had a net operating loss carry
forward for federal tax purposes of approximately $32,832,000 which, if
unused to offset future taxable income, will expire between the years
2011 to 2023. A valuation allowance has been recognized to
offset the related deferred tax assets due to the uncertainty of
realizing any benefit therefrom.

Under section 382 of the Internal Revenue Code, the utilization of net
operating loss carryforwards is limited after an ownership change, as
defined, to an annual amount equal to the market value of the loss
corporation's outstanding stock immediately before the date of the
ownership change multiplied by the highest Federal long-term tax exempt
rate in effect for any month in the 3 calendar month period ending in
the calendar month in which the ownership change occurred. Due to the
ownership changes as a result of the May 1998 reorganization and
subsequent stock issuances, any future realization of the Company's net
operating losses will be severely limited.

Significant components of the Company's deferred tax assets are as
follows:

|                                    | 2004          | 2003          |
|------------------------------------|---------------|---------------|
| Net operating loss carryforwards   | $32,832,000   | $29,300,000   |
| Valuation allowance                | (32,832,000)  | (29,300,000)  |
| Net deferred tax assets            | None          | None          |

It is the intention of the Company to file a consolidated tax return.

F-16

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 9 - STOCK OPTION PLANS

Nonstatutory Stock Options
- -------------------------

The Company has issued stock options under nonstatutory stock option agreements.
The options are granted at the fair market value of the shares at the date the
option is granted. The options are granted for a period of 5 years, and are
fully exercisable during the term of the option period or within thirty (30)
days of the participant's resignation or termination. The range of exercise
price is from $1.63 to $0.95. All shares have vested and are exercisable.

Combined transactions in non-employee options for the fiscal years
ended September 30, 2004 and 2003 are as follows:
<TABLE>
<CAPTION>

|                     | 2004                |                     | 2         |
|---------------------|---------------------|---------------------|-----------|
|                     | Number of Shares    | Average Exercise Price | Number of Shares |

| <S> | | <C> | <C> | <C> |
| Options outstanding October 1 | | 1,300 | $0.095 | 251,400 |
| Granted | | -- | -- | -- |
| Expired | | (250) | -- | -- |
| Exercised | | -- | -- | (250,000) |
| | | ----- | ------ | -------- |
| Options outstanding, September 30 | | 1,050 | $0.095 | 1,300 |
| | | ===== | ====== | ======== |

</TABLE>

Incentive Stock Plan
- --------------------

The Company adopted an incentive stock plan on August 5, 1998, which
was approved by the shareholders on March 1, 2001. The options are
granted at the fair market value of the shares at the date that the
option is granted. The options are granted for a period of 10 years,
and are exercisable after one year from the date of grant, at a vested
rate of 20% per year during the term of the option period or within
thirty (30) days of the participant's resignation or termination. The
number of shares of stock covered by each outstanding option, and the
exercise price per share thereof set forth in each such option, shall
be proportionately adjusted for any stock split, and or stock dividend.
All such options were being treated as non-statutory stock options
until the incentive stock plan was approved by the shareholders.  There
is no range of exercise price, all shares have an exercise price of
$0.593.  All shares have vested and are exercisable.

F-17

<PAGE>
Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 9 - STOCK OPTION PLANS (continued)

Combined transactions in employee options for the fiscal years ended
September 30, 2004 and 2003 are as follows:
<TABLE>
<CAPTION>

| | 2004 | | 2 |
| | -------------------- | | ---------- |
| | Number of Shares | Average Exercise Price | Number of Shares |
| | --------- | ------- | --------- |
| <S> | <C> | <C> | <C> |
| Options outstanding October 1 | 6,100 | $0.593 | 6,300 |
| Granted | 0 | 0 | 0 |
| Expired | (1,650) | 0 | (200) |
| Exercised | 0 | 0 | 0 |
| | ------ | ------ | ----- |
| Options outstanding, September 30 | 4,450 | $0.593 | 6,100 |
| | ====== | ====== | ===== |

</TABLE>

The Company applies APB Opinion 25 in accounting for its stock
compensation plans discussed above. Accordingly, no compensation costs
have been recognized for these plans in 2004 or 2003. Had compensation
costs been determined on the basis of fair value pursuant to FASB
Statement No. 123, no compensation costs would have been recognized
inasmuch as no options were granted under these plans.

NOTE 10- SECURITIES PURCHASE AGREEMENTS AND DEBENTURES

On April 14, 2000, the Company entered into a Securities Purchase Agreement with six investors, for the purchase of investment units, consisting of common stock, common stock purchase warrants, 4% subordinated debentures maturing April 14, 2005, and preferred stock. On August 10, 2000 and again on October 18, 2000, the Company agreed with the investors to modify certain terms of the earlier funding agreement including elimination of the warrants and the preferred stock.  The investors acquired $6,720,000 of 4% subordinated debentures.  Interest is compounded semi-annually on the aggregate principal amount and is payable upon conversion, redemption or maturity of the debentures.  Accumulated accrued interest is payable by increasing the aggregate principal amount of the debentures semi-annually and convertible into common stock of the Company.  The debentures are not callable and can be converted into common stock at the option of the Holder at any time. The debentures are convertible generally at 85% of the average per share market value for the 5 consecutive trading days immediately prior to the conversion date.

On March 29, 2001, the Company entered into a Senior Secured Convertible Debentures and Warrants Purchase Agreement with several investors. On June 7, 2001 the Company and several investors agreed to amend the March 29, 2001 Senior Secured Convertible Debentures and Warrants Purchase Agreement. The investors agreed to purchase $200,000 principal amount of 8% senior convertible debentures, maturing in February and March 2005. The Company also agreed to issue letter warrants to purchase up to $125,000 divided by 85% of the average of the three lowest bid prices during the 22 trading days prior to June 7, 2001.  Interest is computed at 8% per annum on the principal amount, compounded quarterly and is payable upon conversion, redemption or maturity of the debentures.  The debentures are convertible generally at 70% of the average of the 3 lowest bid prices during the 22 trading days immediately prior to the conversion date.

In July 2003, an individual purchased a 4% Convertible Debenture with a principal amount of $100,000, maturing in 2005, from an existing bondholder.  The debenture, as amended, allows its conversion at any time into 2,300,000 freely transferable shares of the Company's stock.

F-18

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 10- SECURITIES PURCHASE AGREEMENTS AND DEBENTURES (continued)

Commencing on February 5, 2002 through September 30, 2002, debenture holders exercised their option to convert $2,492,885 of 4% debentures and $123,551 of 8% debentures into 4,898,636 shares of common stock.

During the fiscal year ended September 30, 2003, debenture holders exercised their option to convert $717,065 of 4% debentures into 23,486,734 shares of common stock.

During the fiscal year ended September 30, 2004, debenture holders exercised their option to convert $1,921,902 of 4% debentures into 28,019,978 shares of common stock and $554,034 of 8% debenture into 15,486,256 shares of common stock.

The balance of long term debentures is shown in the following table:
All of the debentures are due in the year 2005.

|  | Balance Outstanding<br>September 30, 2004 |
|---|---|
| 4% Debenture | $1,537,975 |
| 8% Debentures | 522,399 |
|  | ---------- |
| Total long term | $2,060,374 |
|  | ========== |

NOTE 11- SETTLEMENT AGREEMENT AND NOTE PAYABLE

On January 14, 2001, the Company entered into a Settlement Agreement with its
systems integrator, Andrew Corporation, to repay costs incurred in purchasing
their services and equipment in an approximate amount of $1,400,000. Under the
Agreement, Andrew received an initial payment of $100,000 and was scheduled to
receive and additional $100,000 each month until the loan was repaid. No
payments were made. On September 3, 2002, the Company reached a settlement
agreement with Andrew Corporation for all amounts due. The Company issued a note
in the amount of $300,000 due in April 2004. The note bore no interest and was
secured by 300,000 shares of the Company's common stock. The amount due was paid
in April 2004, of which, $274,066 was in cash, and the balance with the issuance
of 300,000 shares of common stock valued at $25,634.

F-19

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 11 - SETTLEMENT AGREEMENT AND NOTE PAYABLE (continued)

Because there was no stated interest, $45,763 was calculated as imputed
interest, resulting in a stated value of the note payable of $254,237
recorded as part of Notes Payable. Interest expense of $15,254 and
$30,509 was computed for the years ended September 30, 2003 and 2004
and was added to the stated value of the note, increasing the stated
value at the time of finale payment of the note payable in April 2004
to $300,000.

NOTE 12 - RELATED PARTY TRANSACTIONS

The Company has a payable to officers of its subsidiary, Millennium, of
$31,744. The Company expects to pay in full, all amounts owed to
related parties in the next fiscal year.

Mr. Zwebner advanced certain funds to the Company, of which $11,368 was
outstanding and payable to him at September 30, 2003. Furthermore, Mr.
Zwebner assumed a liability owing to the Company from a third party,
resulting in an Account Receivable, Shareholder of $93,500.

As discussed in Note 12, the Company entered into a three year consulting
agreement with Overseas Communications Limited ("Overseas") on November 2, 2001,
for Mr. Michael Zwebner to act as Chairman and CEO of the Company. The Agreement
calls for a monthly payment of $20,000, payable in cash or the Company's common
stock. For the fiscal years ended September 30, 2004 and 2003, the Company paid
$135,000 and $80,000 in cash, respectively, and issued 1,316,666 and 3,160,742
shares of common stock, respectively, under this agreement. Mr. Zwebner is a
controlling shareholder of Overseas. Additionally, Mr. Zwebner was issued
4,505,000 shares of stock valued at $150,125 for the year ended September 30,
2004 for expenses incurred on behalf of the Company.

During the 2004 fiscal year, the Company issued 1,980,167 shares valued at $118,810 to Millennium President Mr. Ami Alizari, as compensation for services.

During the 2004 fiscal year, the Company issued 1,165,909 shares valued at $128,250 to the Company's board member, Mr. Ramsey Sweis, as compensation for his services.

During the 2004 fiscal year, the Company paid $8,352 to its stock registrar, The Nevada Agency and Trust Company (NATCO). Alexander Walker Jr, the Company's Corporate Secretary and a Director, is the Chairman and a shareholder of NATCO.  Mr. Walker also received 500,000 shares of the Company's stock as compensation for legal services in the year ended September 30, 2003.

Mr. Curt Orgil, the Company's Treasurer and a Director, received 200,000 shares of the Company's stock as compensation for financial services in the year ended September 30, 2003.

NOTE 13- PRODUCT DEVELOPMENT COSTS

The Company does not capitalize costs for improvement or refinement of existing products.  Product development expenses charged against earnings were $62,333 and $0 in the fiscal years ended September 30, 2003 and September 30, 2004, respectively.  The Company has changed its focus from product development to instillation and consulting.

F-20

<PAGE>

Universal Communication Systems, Inc. and Subsidiaries
Notes to the Consolidated Financial Statements
September 30, 2004

NOTE 14- PATENTS

Intangibles consist of $300,064 of goodwill allocated to patents, related to the Millennium acquisition (see Note 1), and $306,650 of patent and related license costs, $300,000 of which relates to the acquisition of the AirWater patent licenses from J.J. Reidy (also see Note 3), and $6,650 of which relates to the Company's distributed wireless call processing (DWCP) system.

No amortization is recognized during fiscal 2003 on the Millennium patents, because they were acquired at the end of the year. For the year ended September 30, 2004 $30,000 in amortization expense was recognized.

No amortization is recognized during fiscal 2003 on the AirWater and DWCP patents, because production was limited to retypes and demonstration units.  For the year ended September 30, 2004 $45,000 in amortization was recognized.

It was determined after as a subsequent event that the DWCP patents were deemed to be fully impaired (see footnote 16 on subsequent events).

 It is estimated that amortization expense over the next five years will total $375,000.  However, with the Company's adoption of SFAS No. 142, intangible assets will be tested for impairment annually, and will be tested for impairment between annual tests if an event occurs that would indicate that the carrying amount may be impaired.  The amount of the impairment loss is calculated by the excess of the asset's carrying

value over its fair value. Management has analyzed the patent's and
licenses, and has determined that there is no impairment at this time.
Patents are being amortized on a straight-line bases over their 10 year
life.

NOTE 15 - NOTES RECEIVABLE

The Companies investment in notes receivable consists solely of demand
notes maturing in less than one year, in the amount of $128,357 and
$116,782 for the years ended September 30, 2003 and 2004, respectively.
Investments with maturities of less than one year are classified as
short-term investments.  These investments are carried at cost (which
approximates fair value), with an interest rate of 10% per annum.

NOTE 16 - SUBSEQUENT EVENTS

On December 15, 2003, the Company tentatively agreed to acquire 51% of
GiraSOLAR BV, a Dutch holding company with 2 subsidiaries, Stroomwerk
Energy and Solar Service Buro, both involved in the photo-voltaic solar
industry. The Company is in the process of conducting its due diligence
in connection with this proposed acquisition.  As part of the agreement
to acquire GiraSOLAR, 36,000,000 shares are being held in escrow.  If
the sale of GiraSOLAR is finalized, the Company shares will become the
property of GiraSOLAR shareholders.  As of the date of this report, the
Company is continuing doing its due diligence and legal preparatory
work, in anticipation of closing the acquisition.

It was determined after the conclusion of audit field work that patents
associated with Companies distributed wireless call processing (DWCP)
valued at $6,650 was totally impaired.  This intangible asset will be
expensed in the first quarter of 2005.

                                F-21

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.17
<SEQUENCE>2
<FILENAME>ex1017.txt
<DESCRIPTION>CERTIFICATE TO SET FORTH DESIGNATIONS
<TEXT>

                                                      EXHIBIT 10.17


            CERTIFICATE TO SET FORTH DESIGNATIONS, VOTING POWERS,
             PREFERENCES, LIMITATIONS, RESTRICTIONS, AND RELATIVE
                RIGHTS OF SERIES A 8% CUMULATIVE CONVERTIBLE
                  PREFERRED STOCK, $.001 PAR VALUE PER SHARE

        It is hereby certified that:

        I. The name of the corporation is Universal Communication Systems, Inc.
(the "Corporation"), a Nevada corporation.

        II. Set forth hereinafter is a statement of the voting powers,
preferences, limitations, restrictions, and relative rights of shares of Series
A 8% Cumulative Convertible Preferred Stock hereinafter designated as contained
in a resolution of the Board of Directors of the Corporation pursuant to a
provision of the Articles of Incorporation of the Corporation permitting the
issuance of said Series A 8% Cumulative Convertible Preferred Stock by
resolution of the Board of Directors:

        Series A 8% Cumulative Convertible Preferred Stock, $.001 par value.

1. Designation: Number of Shares. The designation of said series of Preferred Stock shall be Series A 8% Cumulative Convertible Preferred Stock (the "Series A Preferred Stock"). The number of shares of Series A Preferred Stock shall be 36,000. Each share of Series A Preferred Stock shall have a stated value equal to $10 (as adjusted for any stock dividends, combinations or splits with respect to such shares) (the "Stated Value"), and $.001 par value.

2. Dividends.

(a) The Holders of outstanding shares of Series A Preferred Stock shall be entitled to receive preferential dividends in cash out of any funds of the Corporation legally available at the time for declaration of dividends before any dividend or other distribution will be paid or declared and set apart for payment on any shares of any Common Stock, or other class of stock presently authorized or to be authorized (the Common Stock, and such other stock being hereinafter collectively the "Junior Stock") at the rate of 8% simple interest per annum on the Stated Value per share payable commencing with the period ending December 31, 2004 and semi-annually thereafter. At the Holder's option, however, that dividend payments may be made in additional fully paid and non assessable shares of Series A Preferred Stock at a rate of one share of Series A Preferred Stock for each $10 of such dividend not paid in cash. The issuance of such additional shares shall constitute full payment of such dividends.

(b) The dividends on the Series A Preferred Stock at the rates provided above shall be cumulative whether or not earned so that, if at any time full cumulative dividends at the rate aforesaid on all shares of the Series A Preferred Stock then outstanding from the date from and after which dividends thereon are cumulative to the end of the quarterly dividend period next preceding such time shall not have been paid or declared and set apart for payment, or if the full dividend on all such outstanding Series A Preferred Stock for the then current dividend period shall not have been paid or declared and set apart for payment, the amount of the deficiency shall be paid or declared and set apart for payment (but without interest thereon) before any sum shall be set apart for or applied by the Corporation or a subsidiary of the Corporation to the purchase, redemption or other acquisition of the Series A Preferred Stock or any shares of any other class of stock ranking on a parity with the Series A Preferred Stock ("Parity Stock") and before any dividend or

1

<PAGE>

other distribution shall be paid or declared and set apart for payment on any Junior Stock and before any sum shall be set aside for or applied to the purchase, redemption or other acquisition of Junior Stock.

(c) Dividends on all shares of the Series A Preferred Stock shall begin to accrue and be cumulative from and after the date of issuance thereof. A dividend period shall be deemed to commence on the day following a dividend payment date herein specified and to end on the next succeeding dividend payment date herein specified.

3. Liquidation Rights.

(a) Upon the dissolution, liquidation or winding-up of the Corporation, whether voluntary or involuntary, the Holders of the Series A Preferred Stock shall be entitled to receive before any payment or distribution shall be made on the Junior Stock, out of the assets of the Corporation available for distribution to stockholders, the Stated Value per share of Series A Preferred Stock and all accrued and unpaid dividends to and including the date of payment thereof. Upon the payment in full of all amounts due to Holders of

the Series A Preferred Stock, Holders of Common Stock and any other class of Junior Stock shall receive all remaining assets of the Corporation legally available for distribution. If the assets of the Corporation available for distribution to the Holders of the Series A Preferred Stock shall be insufficient to permit payment in full of the amounts payable as aforesaid to the Holders of Series A Preferred Stock upon such liquidation, dissolution or winding-up, whether voluntary or involuntary, then all such assets of the Corporation shall be distributed to the exclusion of the Holders of shares of Junior Stock ratably among the Holders of the Series A Preferred Stock.

(b) The purchase or the redemption by the Corporation of all or substantially all the shares of any class of stock, the merger or consolidation of the Corporation with or into any other corporation or corporations or the sale or transfer by the Corporation of all or substantially all of its assets shall be deemed to be a liquidation, dissolution or winding-up of the Corporation for the purposes of this paragraph 3.

4. Conversion into Common Stock. Shares of Series A Preferred Stock shall have the following conversion rights and obligations:

(a) Subject to the further provisions of this paragraph 4 each Holder of shares of Series A Preferred Stock shall have the right at any time commencing after the issuance to the Holder of Series A Preferred Stock, to convert such shares into fully paid and non-assessable shares of Common Stock of the Corporation (as defined in paragraph 4(i) below) determined in accordance with the Conversion Price provided in paragraph 4(b) below (the "Conversion Price"). All issued or accrued but unpaid dividends may be converted at the election of the Holder simultaneously with the conversion of principal amount of Stated Value of Series A Preferred Stock being converted.

(b) The number of shares of Common Stock issuable upon conversion of each share of Series A Preferred Stock shall equal (i) the sum of (A) the Stated Value per share and (B) at the Holder's election accrued and unpaid dividends on such share, divided by (ii) the Conversion Price. The Conversion Price shall be $0.033.

(c) Holder will give notice of its decision to exercise its right to convert the Preferred Stock or part thereof by telecopying an executed and completed Notice of Conversion (a form of which is annexed as EXHIBIT A to the Certificate of Designation) to the Corporation via confirmed telecopier

2

<PAGE>

transmission or otherwise pursuant to Section 13(a) of the subscription agreement entered into between Holder and the Corporation ("Subscription Agreement"). The Holder will not be required to surrender the Preferred Stock certificate until the Preferred Stock has been fully converted. Each date on which a Notice of Conversion is telecopied to the Corporation in accordance with the provisions hereof shall be deemed a Conversion Date. The Corporation will itself or cause the Corporation's transfer agent to transmit the Corporation's Common Stock certificates representing the Common Stock issuable upon conversion of the Preferred Stock to the Holder via express courier for receipt by such Holder within five (5) business days after receipt by the Corporation of the Notice of Conversion (the "Delivery Date"). In the event the Common Stock is electronically transferable, then delivery of the Common Stock must be made by electronic transfer provided request for such electronic transfer has been made by the Holder. A Preferred Stock certificate representing the balance of the Preferred Stock not so converted will be provided by the Corporation to the Holder if requested by Holder, provided the Holder has delivered an original Preferred Stock certificate to the Corporation. To the extent that a Holder elects not to surrender Preferred Stock for reissuance upon partial payment or

loss or damage attributable to a third-party claim in an amount in excess of the
actual amount of the Stated Value of the Preferred Stock then owned by the
Holder.

In the case of the exercise of the conversion rights set forth
in paragraph 4(a) the conversion privilege shall be deemed to have been
exercised and the shares of Common Stock issuable upon such conversion shall be
deemed to have been issued upon the date of receipt by the Corporation of the
Notice of Conversion. The person or entity entitled to receive Common Stock
issuable upon such conversion shall, on the date such conversion privilege is
deemed to have been exercised and thereafter, be treated for all purposes as the
recordholder of such Common Stock and shall on the same date cease to be treated
for any purpose as the record Holder of such shares of Series A Preferred Stock
so converted.

Upon the conversion of any shares of Series A Preferred Stock
no adjustment or payment shall be made with respect to such converted shares on
account of any dividend on the Common Stock, except that the Holder of such
converted shares shall be entitled to be paid any dividends declared on shares
of Common Stock after conversion thereof.

The Corporation shall not be required, in connection with any
conversion of Series A Preferred Stock, and payment of dividends on Series A
Preferred Stock to issue a fraction of a share of its Series A Preferred Stock
and shall instead deliver a stock certificate representing the next whole
number.

The Corporation and Holder may not convert that amount of the
Series A Preferred Stock on a Conversion Date in amounts inconsistent with the
limitations set forth in the subscription agreement entered into by the
Corporation and Holder (or Holder's predecessor) relating to the issuance of the
Series A Preferred Stock ("Subscription Agreement") or that would result in the
Holder having a beneficial ownership of Common Stock which would be in excess of
the sum of (i) the number of shares of Common Stock beneficially owned by the
Holder and its affiliates on such Conversion Date, and (ii) the number of shares
of Common Stock issuable upon the conversion of the Series A Preferred Stock
with respect to which the determination of this proviso is being made on such
Conversion Date, which would result in beneficial ownership by the Holder and
its affiliates of more than 9.99% of the outstanding shares of Common Stock of
the Corporation. For the purposes of the proviso to the immediately preceding
sentence, beneficial ownership shall be determined in accordance with Section
13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13d-3
thereunder. Subject to the foregoing, the Holder shall not be limited to
successive exercises which would result in the aggregate issuance of more than
9.99%. The Holder may revoke the conversion limitation described in this
Paragraph upon 61 days prior notice to the Corporation. The Holder may allocate
which of the equity of the Corporation deemed beneficially owned by the Holder
shall be included in the 9.99% amount described above and which shall be
allocated to the excess above 9.99%.

3

<PAGE>

(d) The Conversion Price determined pursuant to Paragraph 4(b)
shall be subject to adjustment from time to time as follows:

(i) In case the Corporation shall at any time (A)
declare any dividend or distribution on its Common Stock or other securities of
the Corporation other than the Series A Preferred Stock, (B) split or subdivide
the outstanding Common Stock, (C) combine the outstanding Common Stock into a
smaller number of shares, or (D) issue by reclassification of its Common Stock
any shares or other securities of the Corporation, then in each such event the

A Preferred Stock shall be entitled to receive the kind and number of shares or other securities of the Corporation which such Holders would have owned or have been entitled to receive after the happening of any of the events described above had such shares of Series A Preferred Stock been converted immediately prior to the happening of such event (or any record date with respect thereto). Such adjustment shall be made whenever any of the events listed above shall occur. An adjustment made to the Conversion Price pursuant to this paragraph 4(d)(i) shall become effective immediately after the effective date of the event retroactive to the record date, if any, for the event.

(ii) For so long as Series A Preferred Stock is outstanding, if the Corporation shall issue any Common Stock except for (i) employee stock options or compensation plans, (ii) as full or partial consideration in connection with any merger, consolidation or purchase of substantially all of the securities or assets of any corporation or other entity, (iii) as has been described in the reports publicly available at the EDGAR website of the Securities and Exchange Commission prior to the first date of issuance of any Series A Preferred Stock, or (iv) conversion of the Series A Preferred Stock or exercise of Common Stock Purchase Warrants issued to the Holder contemporaneously with the Series A Preferred Stock for consideration less than the Conversion Price that would be in effect at the time of such issuance, then, and thereafter successively upon each such issuance, the Conversion Price shall be reduced to such other lower issuance price. For purposes of this adjustment, the issuance of any security or debt instrument of the Corporation carrying the right to convert such security or debt instrument into Common Stock or of any warrant, right or option to purchase Common Stock shall result in an adjustment to the Conversion Price upon the issuance of the above-described security, debt instrument, warrant, right, or option. The reduction of the Conversion Price described in this Section 4(d)(ii) is in addition to any other rights granted or available to the Holder pursuant to agreement with the Corporation, at law, equity or otherwise.

(e) (i) In case of any merger of the Corporation with or into any other corporation (other than a merger in which the Corporation is the surviving or continuing corporation and which does not result in any reclassification, conversion, or change of the outstanding shares of Common Stock) then unless the right to convert shares of Series A Preferred Stock shall have terminated, as part of such merger lawful provision shall be made so that Holders of Series A Preferred Stock shall thereafter have the right to convert each share of Series A Preferred Stock into the kind and amount of shares of stock and/or other securities or property receivable upon such merger by a Holder of the number of shares of Common Stock into which such shares of Series A Preferred Stock might have been converted immediately prior to such consolidation or merger. Such provision shall also provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in paragraph (d) of this paragraph 4. The foregoing provisions of this paragraph 4(e) shall similarly apply to successive mergers.

(ii) In case of any sale or conveyance to another person or entity of the property of the Corporation as an entirety, or substantially as an entirety, in connection with which shares or other securities or cash or other property shall be issuable, distributable, payable, or deliverable for outstanding shares of Common Stock, then, unless the right to

4

<PAGE>

convert such shares shall have terminated, lawful provision shall be made so that the Holders of Series A Preferred Stock shall thereafter have the right to convert each share of the Series A Preferred Stock into the kind and amount of shares of stock or other securities or property that shall be issuable,

distributable, payable or deliverable upon such sale or conveyance with respect to each share of Common Stock immediately prior to such conveyance.

Case 4:05-cv-40049-FDS   Document 100-15   Filed 07/13/2007   Page 5 of 5

(f) Whenever the number of shares to be issued upon conversion of the Series A Preferred Stock is required to be adjusted as provided in this paragraph 4, the Corporation shall forthwith compute the adjusted number of shares to be so issued and prepare a certificate setting forth such adjusted conversion amount and the facts upon which such adjustment is based, and such certificate shall forthwith be filed with the Transfer Agent for the Series A Preferred Stock and the Common Stock; and the Corporation shall mail to each Holder of record of Series A Preferred Stock notice of such adjusted conversion price.

(g) In case at any time the Corporation shall propose:

(i) to pay any dividend or distribution payable in shares upon its Common Stock or make any distribution (other than cash dividends) to the Holders of its Common Stock; or

(ii) to offer for subscription to the Holders of its Common Stock any additional shares of any class or any other rights; or

(iii) any capital reorganization or reclassification of its shares or the merger of the Corporation with another corporation (other than a merger in which the Corporation is the surviving or continuing corporation and which does not result in any reclassification, conversion, or change of the outstanding shares of Common Stock); or

(iv) the voluntary dissolution, liquidation or winding-up of the Corporation;

then, and in any one or more of said cases, the Corporation shall cause at least fifteen (15) days prior notice of the date on which (A) the books of the Corporation shall close or a record be taken for such stock dividend, distribution, or subscription rights, or (B) such capital reorganization, reclassification, merger, dissolution, liquidation or winding-up shall take place, as the case may be, to be mailed to the Transfer Agent for the Series A Preferred Stock and for the Common Stock and to the Holders of record of the Series A Preferred Stock.

(h) So long as any shares of Series A Preferred Stock shall remain outstanding and the Holders thereof shall have the right to convert the same in accordance with provisions of this paragraph 4 the Corporation shall at all times reserve from the authorized and unissued shares of its Common Stock a sufficient number of shares to provide for such conversions.

(i) The term Common Stock as used in this paragraph 4 shall mean the $.001 par value Common Stock of the Corporation as such stock is constituted at the date of issuance thereof or as it may from time to time be changed or shares of stock of any class or other securities and/or property into which the shares of Series A Preferred Stock shall at any time become convertible pursuant to the provisions of this paragraph 4.

(j) The Corporation shall pay the amount of any and all issue taxes (but not income taxes) which may be imposed in respect of any issue or delivery of stock upon the conversion of any shares of Series A Preferred Stock, but all transfer taxes and income taxes that may be payable in respect of any change of ownership of Series A Preferred Stock or any rights represented thereby or of stock receivable upon conversion thereof shall be paid by the person or persons surrendering such stock for conversion.

5

<PAGE>

(k) In the event a Holder shall elect to convert any shares of Series A Preferred Stock as provided herein, the Corporation may not refuse conversion based on any claim that such Holder or any one associated or affiliated with such Holder has been engaged in any violation of law, or for any other reason unless, an injunction from a court, on notice, restraining and or enjoining conversion of all or part of said shares of Series A Preferred Stock shall have been issued and the Corporation posts a surety bond for the benefit of such Holder in the amount of 150% of the Stated Value of the Series A Preferred Stock and dividends sought to be converted, which is subject to the injunction, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such Holder in the event it obtains judgment.

(l) In addition to any other rights available to the Holder, if the Corporation fails to deliver to the Holder such certificate or certificates pursuant to Section 4(c) by the Delivery Date and if after the Delivery Date the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by such Holder of the Common Stock which the Holder anticipated receiving upon such conversion (a "Buy-In"), then the Corporation shall pay in cash to the Holder (in addition to any remedies available to or elected by the Holder) within five (5) business days of written notice from the Holder, the amount by which (A) the Holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (B) the aggregate Stated Value of the shares of Series A Preferred Stock for which such conversion was not timely honored, together with interest thereon at a rate of 15% per annum, accruing until such amount and any accrued interest thereon is paid in full (which amount shall be paid as liquidated damages and not as a penalty). For example, if the Holder purchases shares of Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of $10,000 of Stated Value of Series A Preferred Stock, the Corporation shall be required to pay the Holder $1,000, plus interest. The Holder shall provide the Corporation written notice indicating the amounts payable to the Holder in respect of the Buy-In.

5. Voting Rights. The shares of Series A Preferred Stock shall not have voting rights except as described in Section 6 hereof.

6. Restrictions and Limitations.

(a) Amendments to Charter. The Corporation shall not amend its certificate of incorporation without the approval by the holders of at least a majority of the then outstanding shares of Series A Preferred Stock if such amendment would:

(i) change the relative seniority rights of the holders of Series A Preferred Stock as to the payment of dividends in relation to the holders of any other capital stock of the Corporation, or create any other class or series of capital stock entitled to seniority as to the payment of dividends in relation to the holders of Series A Preferred Stock;

(ii) reduce the amount payable to the holders of Series A Preferred Stock upon the voluntary or involuntary liquidation, dissolution or winding up of the Corporation, or change the relative seniority of the liquidation preferences of the holders of Series A Preferred Stock to the rights upon liquidation of the holders of other capital stock of the Corporation, or change the dividend rights of the holders of Series A Preferred Stock;

(iii) cancel or modify the conversion rights of the holders of Series A Preferred Stock provided for in Section 4 herein; or

(iv) cancel or modify the rights of the holders of

6

<PAGE>

7. Event of Default. The occurrence of any of the following events of default ("Event of Default") shall, after the applicable period to cure the Event of Default, cause the dividend rate of 8% described in paragraph 2 hereof to become 15% from and after the occurrence of such event (except in connection with Section 7(i) below) and the Holder shall have the option to require the Corporation to redeem the Series A Preferred Stock held by such Holder by the immediate payment to the Holder by the Corporation of a sum of money equal to the number of shares that would be issuable upon conversion of an amount of Stated Value and accrued dividends designated by the Holder multiplied by the average of the closing ask prices and closing bid prices of the Corporation's Common Stock as reported by Bloomberg L.P. for the principal trading market for the Common Stock for the five trading days preceding the date notice is given by the Holder to the Corporation:

(a) The Corporation fails to pay any dividend payment required to be paid pursuant to the terms of paragraph 2 hereof or the failure to timely pay any other sum of money due to the Holder from the Corporation and such failure continues for a period of ten (10) days after written notice to the Corporation from the Holder.

(b) The Corporation breaches any material covenant, term or condition of the Subscription Agreement or in this Certificate of Designation, and such breach continues for a period of seven (7) days after written notice to the Corporation from the Holder.

(c) Any material representation or warranty of the Corporation made in the Subscription Agreement pursuant to which the Series A Preferred Stock is issued, or in any agreement, statement or certificate given in writing pursuant thereto shall be false or misleading.

(d) The Corporation or any of its subsidiaries shall make an assignment of a substantial part of its property or business for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

(e) Any money judgment, confession of judgment, writ or similar process shall be entered against the Corporation, a subsidiary of the Corporation, or their property or other assets for more than $50,000, and is not vacated, satisfied, bonded or stayed within 45 days.

(f) Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Corporation or any of its subsidiaries, and is not dismissed within 45 days.

(g) An order entered by a court of competent jurisdiction, or by the Securities and Exchange Commission, or by the National Association of Securities Dealers, preventing purchase and sale transactions in the Corporation's Common Stock.

(h) The Corporation's failure to timely deliver Common Stock or a replacement Preferred Stock certificate, if required, to the Holder pursuant to paragraph 4 hereof or the Subscription Agreement.

(i) The occurrence of a Non-Registration Event as described in Section 11.4 of the Subscription Agreement.

<PAGE>

(j) Delisting of the Common Stock from the OTC Bulletin Board ("OTCBB") or such other principal exchange on which the Common Stock is listed for trading; failure to comply with the requirements for continued listing on the OTCBB for a period of three consecutive trading days; or notification from the OTC Bulletin Board or any principal market that the Corporation is not in compliance with the conditions for such continued listing on the OTCBB or other principal market.

(k) The Corporation effectuates a reverse split of its common stock without the prior written consent of the Holder.

(l) A default by the Corporation of a material term, covenant, warranty or undertaking of any other agreement to which the Corporation and Holder are parties, or the occurrence of a material event of default under any such other agreement, in each case, which is not cured after any required notice and/or cure period.

8. Status of Converted or Redeemed Stock. In case any shares of Series A Preferred Stock shall be redeemed or otherwise repurchased or reacquired, the shares so redeemed, converted, or reacquired shall resume the status of authorized but unissued shares of Preferred Stock and shall no longer be designated as Series A Preferred Stock.

Dated: April __, 2004

UNIVERSAL COMMUNICATION SYSTEMS, INC.

By:_____

8

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-21
<SEQUENCE>3
<FILENAME>ex21.txt
<DESCRIPTION>SUBSIDIARIES OF REGISTRANT
<TEXT>

EXHIBIT 21

SUBSIDIARIES OF REGISTRANT

| Name | State | Ownership |
| --- | --- | --- |
| Airwater Corporation | Florida | 100% |
| Airwater Patents Corp | Florida | 100% |
| Digital Way S. A. | Peru | 27% |
| Millenium Electric TOU, Ltd. | Israel | 100% |
| Solar One, Inc. | Florida | 100% |
| Solar Style, Ltd. | Israel | 100% |
| Solar Style (USA), Inc. | Florida | 100% |

</TEXT>

<DOCUMENT>
<TYPE>EX-31.1
<SEQUENCE>4
<FILENAME>ex311.txt
<DESCRIPTION>CERTIFICATION
<TEXT>

                                                              Exhibit 31.1
                                                              ------------


                                CERTIFICATION

I, Michael J. Zwebner, certify that:

     1. I have reviewed  this annual report on Form 10-KSB of Universal
Communication Systems, Inc.;

     2. Based on my knowledge, this report does not contain any untrue
statement of a material fact or omit to state a material fact  necessary to make
the statements made, in light of the  circumstances  under which such statements
were made, not misleading with respect to the period covered by this report;

     3. Based on my knowledge,  the financial  statements,  and other financial
information included in this report, fairly present in all material respects the
financial  condition,  results of operations and cash flows of the registrant as
of, and for, the periods presented in this report;

     4. The small  business  issuer's other  certifying  officer(s) and I are
responsible for establishing and maintaining  disclosure controls and procedures
(as  defined  in  Exchange  Act Rules  13a-15(e)  and  15d-15(e))  for the small
business issuer and have:

        (a) Designed such disclosure  controls and procedures,  or caused such
     disclosure  controls and procedures to be designed under our  supervision,
     to ensure that material information relating to the registrant,  including
     its consolidated subsidiaries,  is made known to us by others within those
     entities,  particularly  during the  period in which this  report is being
     prepared;

        (b) Evaluated  the  effectiveness  of  the  small  business  issuer's
     disclosure  controls  and procedures and  presented  in this  report our
     conclusions  about  the  effectiveness  of  the  disclosure  controls  and
     procedures,  as of the end of the period  covered by this report  based on
     such evaluation; and

        (c) Disclosed in this report any change in the small business issuer's
     internal  control over financial  reporting that occurred during the small
     business  issuer's most recent fiscal quarter (the small business issuer's
     fourth fiscal quarter in the case of an annual report) that has materially
     affected, or is reasonably likely to materially affect, the small business
     issuer's internal control over financial reporting; and

     5. The small  business  issuer's other  certifying  officer(s) and I have
disclosed,  based on our most  recent  evaluation  of  internal  control  over
financial  reporting,  to the small  business  issuer's  auditors  and the audit
committee  of the  small  business  issuer's  board of  directors  (or  persons
performing the equivalent functions):

        (a) All significant deficiencies and material weaknesses in the design
     or  operation of internal  control over  financial  reporting  which are
     reasonably  likely to adversely affect the small business issuer's ability
     to record, process, summarize and report financial information; and

&lt;PAGE&gt;

        (b) Any fraud, whether or not material, that involves management or
other employees who have a significant role in the small business issuer's
internal control over financial reporting.

Date:  January 13, 2005                    /s/ Michael J. Zwebner
                                           ------------------------------------
                                           Michael J. Zwebner
                                           Chairman and Chief Executive Officer


&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;
&lt;DOCUMENT&gt;
&lt;TYPE&gt;EX-31.2
&lt;SEQUENCE&gt;5
&lt;FILENAME&gt;ex312.txt
&lt;DESCRIPTION&gt;CERTIFICATION
&lt;TEXT&gt;

                                                        Exhibit 31.2
                                                        ------------


                                CERTIFICATION

I, Curtis Orgil, certify that:

        1. I have reviewed this annual report on Form 10-KSB of Universal
Communication Systems, Inc.;

        2. Based on my knowledge, this report does not contain any untrue
statement of a material fact or omit to state a material fact necessary to make
the statements made, in light of the circumstances under which such statements
were made, not misleading with respect to the period covered by this report;

        3. Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as
of, and for, the periods presented in this report;

        4. The small business issuer's other certifying officer(s) and I are
responsible for establishing and maintaining disclosure controls and procedures
(as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small
business issuer and have:

        (a) Designed such disclosure controls and procedures, or caused such
        disclosure controls and procedures to be designed under our supervision,
        to ensure that material information relating to the registrant, including
        its consolidated subsidiaries, is made known to us by others within those
        entities, particularly during the period in which this report is being
        prepared;

        (b) Evaluated the effectiveness of the small business issuer's
        disclosure controls and procedures and presented in this report our
        conclusions about the effectiveness of the disclosure controls and
        procedures, as of the end of the period covered by this report based on
        such evaluation; and

        (c) Disclosed in this report any change in the small business issuer's
        internal control over financial reporting that occurred during the small
        business issuer's most recent fiscal quarter (the small business issuer's
        fourth fiscal quarter in the case of an annual report) that has materially

issuer's internal control over financial reporting; and

<PAGE>

    5. The small business issuer's other certifying officer(s) and I have
disclosed, based on our most recent evaluation of internal control over
financial reporting, to the small business issuer's auditors and the audit
committee of the small business issuer's board of directors (or persons
performing the equivalent functions):

        (a) All significant deficiencies and material weaknesses in the design
    or operation of internal control over financial reporting which are
    reasonably likely to adversely affect the small business issuer's ability
    to record, process, summarize and report financial information; and

        (b) Any fraud, whether or not material, that involves management or
    other employees who have a significant role in the small business issuer's
    internal control over financial reporting.

Date: January 13, 2005                    /s/ Curtis Orgil
                                          ----------------------------------
                                          Curtis Orgil
                                          Chief Financial Officer
                                          (Principal Financial and
                                           Accounting Officer)


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32.1
<SEQUENCE>6
<FILENAME>ex321.txt
<DESCRIPTION>CERTIFICATION
<TEXT>

                                                        Exhibit 32.1
                                                        ------------


              Certification pursuant to 18 U.S.C. Section 1350,
       As adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

        The undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350, as
adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to
my knowledge, the Annual Report on Form 10-KSB for the year ended September
30, 2004 of Universal Communication Systems, Inc. (the "Company") fully
complies with the requirements of Section 13(a) or 15(d) of the Securities
Exchange Act of 1934, as amended, and that the information contained in such
periodic report fairly presents, in all material respects, the financial
condition and results of operations of the Company as of, and for, the
periods presented in such report.

Date: January 13, 2005                    /s/ Michael J. Zwebner
                                          ---------------------------------
                                          Michael J. Zwebner
                                          Chairman and
                                              Chief Executive Officer

</TEXT>
</DOCUMENT>
<DOCUMENT>

```
<TYPE>EX-32.2
<SEQUENCE>7
<FILENAME>ex322.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
```

Exhibit 32.2
------------


                    Certification pursuant to 18 U.S.C. Section 1350,
         As adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

       The  undersigned  hereby certifies, pursuant to 18 U.S.C. Section 1350, as
adopted  pursuant to Section 906 of the  Sarbanes-Oxley  Act of 2002,  that,  to
my  knowledge,  the Annual Report on Form 10-KSB for the year ended September
30, 2004 of Universal Communication Systems,  Inc. (the "Company")  fully
complies with the  requirements of Section 13(a) or 15(d) of the Securities
Exchange Act of 1934, as amended, and that the information  contained in such
periodic report fairly presents,  in all material respects,  the financial
condition and results of  operations  of the  Company as of, and for,  the
periods  presented  in such report.


 Date:  January 13, 2005                    /s/ Curtis Orgil
                                            -------------------------------
                                            Curtis Orgil
                                            Chief Financial Officer,
                                             (Principal Financial and
                                              Accounting Officer)



```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# EXHIBIT C

1

```
                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
                        CIVIL ACTION NO. 05-40049-FDS

 3   J.J. REIDY & CO., INC.,        )
             Plaintiff,             )
 4                                  )
 5   v.                             )
                                    )
 6   AIRWATER CORPORATION and AIRWATER )
     PATENTS CORPORATION,           )
             Defendants.            )
 7           DEPOSITION of MICHAEL JOEL ZWEBNER, a

 8   Rule 30(b)(6) designated witness of AIRWATER

 9   CORPORATION and AIRWATER PATENTS CORPORATION,

10   taken at the request of the plaintiff, pursuant to

11   the Federal Rules of Civil Procedure, before

12   Patricia J. Taylor, RPR, Notary Public for the

13   Commonwealth of Massachusetts, on June 8, 2007,

14   commencing at 10 a.m. at the offices of Bowditch &

15   Dewey, 311 Main Street, Worcester, Massachusetts.

16   A P P E A R A N C E S :

17   FOR THE PLAINTIFF:
     BOWDITCH & DEWEY, LLP
18   311 Main Street
     Post Office Box 15156
19   Worcester, MA  01615-0156
          BY:  THOMAS J. CONTE, ESQ.
20
     FOR THE DEFENDANT:
21   KEEGAN & WERLIN, LLP
     265 Franklin Street
22   Boston, MA  02110-3113
          BY:  MATTHEW P. ZAYOTTI, ESQ.
23   ALSO PRESENT:  JAMES J. REIDY
                    BAY STATE REPORTING AGENCY
24       76 MILL STREET, WORCESTER, MASSACHUSETTS 01603
                        (508) 753-4121
```

2

```
                    I N D E X

     DEPONENT:  MICHAEL JOEL ZWEBNER

                                                    PAGE

     EXAMINATION BY MR. CONTE


                    EXHIBITS

     NUMBER                                         PAGE

     1     Renotice of deposition of
           AirWater Corporation                      3

     2     Renotice of deposition of
           AirWater Patents Corporation              3

     3     Global Manufacturing and Marketing        3
           Licensing Agreement

     4     Letter dated 6/25/01                       3

     5     SEC filings                              102
```

COPY

3

```
 1           (Exhibit Numbers 1 through 4
 2   marked for identification.)
 3           MR. CONTE:  Reserve all objections,
 4   except as to the form of the question, until time
 5   of trial as well as motions to strike.  30 days to
 6   read and sign, and waiving notary.
 7           MICHAEL JOEL ZWEBNER, having been
 8   satisfactorily identified by the production of his
 9   passport and duly sworn, was examined and
10   testified as follows:
11   EXAMINATION BY MR. CONTE:
12   Q.      Good morning, sir.  My name is Thomas
13   Conte, and I represent the James Reidy Company in
14   this matter, with which I'm sure you're very well
15   familiar.
16           A few ground rules before we start
17   here today, couple of instructions.  One is, if at
18   any time you don't understand my question, please
19   tell me and I'll attempt to rephrase.  Otherwise I
20   will assume you understand the question.  Okay,
21   sir?
22   A.      Yes.
23   Q.      In addition, I would ask that you
24   allow me to finish the question.  And I will
```

4

```
 1   certainly allow you to answer.  The court reporter
 2   can only take one of us at the same time.  Okay on
 3   that?
 4   A.      Understood.
 5   Q.      In addition to that, if at any time
 6   you need a break, please let me know, and we'll
 7   stop and let you take a break.  The only thing I
 8   would ask is that you respond to a question if
 9   there is one pending.
10   A.      No problem.
11   Q.      Okay.  Sir, for the record could you
12   state your full name, please.
13   A.      Michael Joel Zwebner, Z-W-E-B-N-E-R.
14   Q.      And where do you live, sir?
15   A.      I live in the United Kingdom.
16   England, UK.
17   Q.      Can you give the address, please?
18   A.      I'll give the address of my attorney.
19   Q.      Please give your residential address.
20           MR. ZAYOTTI:  Off the record for a
21   second.
22           MR. CONTE:  I prefer to stay on, but
23   I'll go off in this instance.  But I typically
24   prefer to stay on.
```

73

1  Q.   What were the trademarks -- do you
2  need a moment to confer with your counsel?
3  A.   No.
4  Q.   What were the trademarks you sought?
5  A.   Just the logo and the name AirWater.
6  Q.   And where did you have those filed?
7  A.   I don't recall exactly. But they're
8  now registered in about, probably about 12 to 15
9  different countries.
10  Q.   Any others, any other marks?
11  A.   Misa, Misa Water.
12  Q.   How do you spell that?
13  A.   M-I-S-A. That just relates to the
14  water, not the machine. So that's not within the
15  scope of Mr. Reidy's patents. And, no, I don't
16  think any others.
17  Q.   So I just want to make sure I
18  understand this. Those are the only trademark or
19  trade name registrations that you've engaged in
20  with respect to foreign countries?
21  A.   Correct.
22  Q.   And none of them concerns or concern
23  the Reidy patents; is that fair to say?
24  A.   Not quite sure what the question is.

74

1  We registered trademarks for our own company. If
2  you're asking me if I registered anything in
3  relation to Mr. Reidy's trademark or his name, the
4  answer is no.
5  Q.   Or with respect to Reidy's patents?
6  A.   The answer is no.
7  Q.   Okay. And at any time did you ask
8  Mr. Reidy to make applications for foreign
9  trademark or trade name registration?
10  A.   Certainly.
11  Q.   When?
12  A.   Not foreign trademark. I'm sorry.
13  The answer to that question is no. Not to
14  trademark, we didn't ask Mr. Reidy that at all.
15  We talked and discussed a lot about
16  the validity of the patents in other countries,
17  but not the trademark. We never used, for the
18  record, we never used the Water Star treatment.
19  Q.   Which was what?
20  A.   Mr. Reidy's registered trademark.
21  Q.   Now, what about with respect to
22  patents, did you ever ask Mr. Reidy to file
23  additional patents overseas?
24  A.   Not additional patents, but to file

75

1  the current patents, yes.
2  Q.   So the four patents under Exhibit 3,
3  you asked him to --
4  A.   More than once.
5  Q.   -- file those?
6  Where, sir?
7  A.   Where? Wherever he was, in his home.
8  Q.   And concerning what, which countries?
9  A.   I don't recall.
10  MR. ZAYOTTI: Objection.
11  A.   I don't recall asking.
12  Q.   You don't recall what, sir?
13  A.   I think I mentioned Australia, that I
14  do recall. And I think his response was all our
15  patents are valid in Australia. That was his
16  comment and you can use our -- something like
17  that, like you can use or notify people that our
18  patents are in Australia.
19  Q.   Why didn't you file in those foreign
20  countries, you being --
21  A.   It wasn't my obligation to file. It
22  was his obligation to file.
23  Q.   And you're basing that on Exhibit 3?
24  A.   I'm basing that on the fact that when

76

1  we buy something, paid him a lot of money, he was
2  going to file it.
3  Q.   Do you have a provision in Exhibit 3
4  that you can refer me to which obligated Mr. Reidy
5  to file applications for foreign patents?
6  A.   "Licensor, when applicable, shall make
7  application for any foreign patents desired by
8  Licensor, at his own expense."
9  And I think probably, looking at this
10  now, the second licensor is supposed to be
11  licensee. That would be the people desiring it.
12  Why would he desire to do anything?
13  Q.   So your contention is that's a typo
14  now?
15  A.   Yes.
16  Q.   Because if it's not a typo, he's not
17  obligated to file?
18  A.   Why would he desire to do anything?
19  It's our request, desired by the licensee.
20  Q.   I understand your position, sir. But
21  hear my question.
22  If that is not a typographical error,
23  Mr. Reidy had no obligation to file for foreign
24  patents; isn't that true sir?

137

1　Q.　And you invested into AirWater

2　Corporation or UCSY?

3　A.　I invested in UCSY, which funneled the

4　cash to AirWater as needed.

5　Q.　What are AirWater's assets right now?

6　MR. ZAYOTTI: Objection.

7　You can answer.

8　A.　He says AirWater. It's not clear.

9　Q.　AirWater Corporation. I'm asking,

10　what are the assets of AirWater Corporation?

11　A.　The assets are mainly the business

12　customers and the trading and, obviously,

13　inventory, whatever we have.

14　Q.　What's the dollar figure, sir?

15　A.　I don't know offhand.

16　Q.　Give me an estimate.

17　A.　Inventory, maybe 200,000 maybe. That

18　changes all the time as we sell goods and order

19　more. Contracts in hand. We value the contracts

20　by the annual earnings. Maybe 2 or $300,000 worth

21　of profits for the next twelve months. No

22　buildings or no tangible assets.

23　And of course the Reidy patents. I

24　guess they're worth $420,000 or a bit less.

138

1　MR. CONTE: Why don't we break here.

2　Why don't we suspend and we will

3　resume later this month at a time to be determined

4　and worked out by counsel.

5　(Whereupon the deposition was

6　suspended.)

---

139

1　Excerpt from Rule 30 (e)

2　Submission to Witness; Changes; Signing.
　When the testimony is fully transcribed, the

3　deposition shall be submitted to the witness for
　examination and shall be read to or by him/her,

4　unless such examination and reading are waived by
　the witness and by the parties. Any changes in

5　form or substance which the witness desires to
　make shall be entered upon the deposition by the

6　officer with a statement of the reasons given by
　the witness for making them. This procedure must

7　be accomplished within 30 days of receipt of the
　transcript.

8

9　..............................................

10

11　I have read the foregoing, and it is a true

12　transcript of the testimony given by me at the

13　taking of the subject deposition.

14

15

16

17　_____
　DATE　　　　　　　　MICHAEL JOEL ZWEBNER

18

19　CASE NAME: Reidy v. AirWater
　DATE TAKEN:　June 8, 2007

20

21

22

23

24

---

140

1　ERRATA SHEET

2　In accordance with the rules of procedure
　governing depositions, you are entitled to read

3　and correct your deposition. Accordingly, please
　carefully read your deposition and, on this errata

4　sheet, make any changes or corrections in form or
　substance to your deposition that you feel should

5　be made. PLEASE DO NOT MARK THE TRANSCRIPT.
　After completing this procedure, sign at the

6　conclusion of such changes/corrections (if any)
　and return it in accordance with your

7　instructions.

8

9　PAGE　　LINE　　CHANGE　　　　　　　　　REASON

10

11

12

13

14

15

16

17

18

19

20　_____
　DATE　　　　　　　　MICHAEL JOEL ZWEBNER

21

22

23

24

141

1    COMMONWEALTH OF MASSACHUSETTS
     MIDDLESEX, SS.
2

3         I, Patricia J. Taylor, Notary Public in and
     for the Commonwealth of Massachusetts, do certify
4    that pursuant to appropriate notice of taking
     deposition, there came before me the
5    following-named person, to wit: MICHAEL JOEL
     ZWEBNER, who was by me duly sworn; that he was
6    thereupon examined upon his oath and his
     examination reduced to writing by me; and that the
7    deposition is a true record of the testimony given
     by the witness.

8         I further certify that I am not a relative or
     employee or counsel or attorney for any of the
9    parties, or a relative or employee of such counsel
     or attorney, nor am I financially or otherwise
10   interested in the outcome of the action.

11        Witness my hand this 23rd day of June 2007.

12

13   My Commission Expires             _____
     March 6, 2009                     Notary Public
14

15        The foregoing certification of this
     transcript does not apply to any reproduction of
16   the same in any respect unless under the direct
     control and/or direction of the certifying
17   reporter.

18

19

20

21

22

23

24