## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,**<br><br>　　　　**Plaintiff,**<br><br>**v.**<br><br>**AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,**<br><br>　　　　**Defendants.** | CIVIL ACTION NO. 05-40049-FDS |
| **AIRWATER PATENTS, INC.**<br><br>　　　　**Plaintiff,**<br><br>**v.**<br><br>**J.J. REIDY & CO., INC.**<br><br>　　　　**Defendant.** | CIVIL ACTION NO. 06-10137-FDS |

### AFFIDAVIT OF MATTHEW P. ZAYOTTI, ESQ. IN SUPPORT OF MOTION OF AIRWATER CORPORATION AND AIRWATER PATENTS, INC. TO CONTINUE DISCOVERY AND SUMMARY JUDGMENT PENDING DISPOSITION OF MOTION TO ENFORCE ORAL SETTLEMENT AGREEMENT

I, Matthew P. Zayotti, Esquire, do hereby state and depose as follows:

1.　　　I am an associate with the law firm Keegan Werlin LLP, and I am an attorney in good standing of the bar of the Commonwealth of Massachusetts.

2.　　　Attorney Richard Kirby and I represent the Defendants AirWater Corporation and AirWater Patents, Inc. in connection with the above-captioned consolidated actions.

3.　　　Attached to this affidavit as <u>Exhibit A</u> is a true and accurate copy of J.J. Reidy & Co., Inc.'s Supplemental Response to AirWater's First Request for Documents.

4.      Attached to this affidavit as <u>Exhibit B</u> is true and accurate copy of J.J. Reidy's Supplemental Responses to Interrogatories.

5.      Attached to this affidavit as <u>Exhibit C</u> is true and accurate copy of a letter from Maura Greene dated March 7, 2007 regarding service of J.J. Reidy's Supplemental Responses to Interrogatories and Document Requests.

6.      Attached to this affidavit as <u>Exhibit D</u> is true and accurate copy of a letter from Maura Greene dated March 8, 2007 regarding a supplemental document production by J.J. Reidy.

7.      Attached to this affidavit as <u>Exhibit E</u> is true and accurate copy of a letter from Maura Greene dated March 9, 2007 regarding a supplemental document production by J.J. Reidy.

8.      Attached to this affidavit as <u>Exhibit F</u> is true and accurate copy of a letter from Maura Greene dated April 24, 2007 regarding a supplemental document production by J.J. Reidy.

9.      Attached to this affidavit as <u>Exhibit G</u> is true and accurate copy of a letter from Maura Greene dated April 30, 2007 regarding a supplemental document production by J.J. Reidy.

10.     Attached to this affidavit as <u>Exhibit H</u> is true and accurate copy of the incomplete copy of the Patent and Asset Purchase Agreement by and between J.J. Reidy and Free Water as produced by J.J. Reidy on March 8, 2007.

11.     Attached to this affidavit as <u>Exhibit I</u> is a true and accurate copy of a letter from J.J. Reidy to Free Water Company dated June 18, 2007, produced by J.J. Reidy to AirWater during the deposition of J.J. Riedy on June 26, 2007.  J.J. Reidy has not

produced any of the following documents referred to in the June 18th letter: (i) the "Patent and Asset Purchase Agreement "and its latest, and current, Addendum to Patent and Asset Purchase Agreement Dated October 4, 2005 signed by both parties on March 21, 2007, (ii) Free Water's "May 29, 2007 email to me that you 'don't have the money . . . to take care of . . . your payments", (iii) "the NOTE AND AGREEMENT which accompanied the aforementioned Addendum", and (iv) a "PATENT ASSIGNMENT AGREEMENT [which] was also signed by Joseph Dutra".

12.     Attached to this affidavit as <u>Exhibit J</u> is true and accurate copy of the parties' Global Manufacturing and marketing Licensing Agreement.

13.     Attached to this affidavit as <u>Exhibit K</u> is a true and accurate copy of the Patent Assignment Abstract of Title for Reidy Patent No. 5,106,512 from the United States Patent and Trademark Office website.

14.     Attached to this affidavit as <u>Exhibit L</u> is a true and accurate copy of the Patent Assignment Abstract of Title for Reidy Patent No. 5,149,446 from the United States Patent and Trademark Office website.

15.     Attached to this affidavit as <u>Exhibit M</u> is a true and accurate copy of the Patent Assignment Abstract of Title for Reidy Patent No. 5,203,989 from the United States Patent and Trademark Office website.

16.     Attached to this affidavit as <u>Exhibit N</u> is a true and accurate copy of the Patent Assignment Abstract of Title for Reidy Patent No. 5,366,705 from the United States Patent and Trademark Office website.

17.     Attached to this affidavit as <u>Exhibit O</u> is a true and accurate copy of AirWater's Fourth Request for Production of Documents.

18.     Attached to this affidavit as <u>Exhibit P</u> are true and accurate copies of excerpts (pp. 1, 28-32, 84-85, 100-106) of the deposition of Mr. James Reidy.AirWater's Fourth Request for Production of Documents.

19.     To date, J.J. Reidy has produced no documents that constitute, relate or refer any assignments of the Reidy Patents or communications by and between J.J. Reidy and Mike Klein pursuant to the Court's January 29, 2007 discovery Order.  By the same token, J

20.     Attached to this affidavit as <u>Exhibit Q</u> are true and accurate copies of correspondence dated March 4, 2005 from J.J. Reidy to Mike Klein, correspondence dated March 23, 2005 from Mike Klien to J.J. Reidy, and correspondence dated April 18, 2005 from Frank J. Long to Elizabeth Schwabedissen

21.     Attached to this affidavit as <u>Exhibit R</u> is a true and accurate copy of AirWater's Third Request for Production of Documents, served on March 22, 2007, to which J.J. Reidy has not responded.

22.     Attached to this affidavit as <u>Exhibit S</u> is a true and accurate copy of AirWater's Second Request for Production of Documents served on March 9, 2007.

23.     Attached to this affidavit as <u>Exhibit T</u> is a true and accurate copy of J.J. Reidy's Response to AirWater's Second Request for Production of Documents.

24.     Attached to this affidavit as <u>Exhibit U</u> is a true and accurate copy of the Strategic Alliance Agreement by and between Free Water Company and Mike Klein's company Air2Water, Inc., which was produced to AirWater in connection with litigation pending in California.

25.    Attached to this affidavit as <u>Exhibit V</u> is a true and accurate copy of the return of no service on Mike Klein dated June 21, 2007 byAmstar Express.

26.    Attached to this affidavit as <u>Exhibit W</u> is a true and accurate copy of the Mercury Business Services' shipping confirmation of the subpoena to Mike Klein, signed for on June 13, 2007.

27.    To date, J.J. Reidy has not produced a privilege log of documents withheld as ordered by the Court on January 29, 2007.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

_____ DAY OF JULY, 2007.

Matthew P. Zayotti

---

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on _____.

5

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS                    CIVIL ACTION NO.  05-40049-FDS

J.J. REIDY & CO., INC.,.                )
                        Plaintiff,       )
                                         )
v.                                       )
                                         )
AIRWATER CORPORATION AND                 )
AIRWATER PATENTS CORPORATION,            )
                        Defendants.      )

### PLAINTIFF J.J. REIDY & CO., INC.'S SUPPLEMENTAL RESPONSE TO DEFENDANT AIRWATER PATENTS CORPORATION'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Massachusetts Rules of Civil Procedure, plaintiff, J.J. Reidy & Co., Inc. responds to Defendant AirWater Patents Corporation's first request for production of documents as follows:

### GENERAL OBJECTIONS

1.      The plaintiff, without admitting that any of the documents requested are relevant to the subject matter of this action or that the production of said documents would be reasonably calculated to lead to the discovery of admissible evidence or that said documents exist, will produce documents responsive to the defendant's request at the office of Bowditch & Dewey, LLP in Worcester, Massachusetts.

2.      The plaintiff objects to any requests for documents which fall beyond the scope of permitted discovery as defined by Rule 26 of the Massachusetts Rules of Civil Procedure.  More particularly, the plaintiff will not produce documents which are privileged or which were prepared in anticipation of litigation or for trial by or for plaintiff or by or for any of its

representatives.  Additionally, the plaintiff objects to the defendant's specific requests to the extent that they are irrelevant, unduly burdensome, or purport to impose obligations beyond those imposed by the Massachusetts Rules of Civil Procedure.

The following responses to specific requests are made subject to and without waiving these general objections.

<u>DOCUMENT REQUESTS</u>

<u>Request No. 1</u>

All documents requested to be identified in AirWater Patent's first (or any subsequent) set of interrogatories to Plaintiff.

<u>Response No. 1</u>

The plaintiff objects to this request to the extent that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

<u>Supplemental Response No. 1</u>

The plaintiff has produced documents responsive to this request.

<u>Request No. 2</u>

All documents upon which you rely in asserting this action against AirWater Patents Corporation and/or AirWater Corporation.

<u>Response No. 2</u>

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy.  The plaintiff objects to this request to the extent it is ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and

2

without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 3

All documents identified in Plaintiff J.J. Reidy & Co., Inc.'s Automatic Discovery Disclosure.

Response No. 3

The plaintiff states that documents responsive to this request will be produced.

Request No. 4

All documents or communications that constitute, relate or refer to the Global Manufacturing and Marketing Licensing Agreement.

Response No. 4

The plaintiff objects to this request to the extent it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 5

All documents or communications that relate or refer to the transfer or assignment of all the rights and liabilities of the Global Manufacturing and Marketing Licensing Agreement from AirWater Corporation to AirWater Patents Inc. dated June 25, 2003.

Response No. 5

The plaintiff states that documents responsive to this request, if any, will be produced.

{Client Files\LIT\304269\0002\PLD\00852936.DOC;1}

Request No. 6

All documents or communications that relate or refer to any alleged default by AirWater
Corporation and or AirWater Patents under the Global Manufacturing and Marketing Licensing
Agreement.

Response No. 6

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 7

All documents or communications that relate or refer to the action entitled Electric & Gas
Technology, Inc. et al. v. Universal Communications, Inc., et al., United States District Court for
the Northern District of Texas, Dallas Division, Civil Action No. 03-1798G.

Response No. 7

The plaintiff objects to this request to the extent it seeks documents which are protected
from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy.  The
plaintiff further objects to this request to the extent that it is not reasonably calculated to lead to
the discovery of admissible evidence.  Subject to and without waiving the foregoing objections,
the plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 8

All documents that relate or refer to your efforts in defending the action entitled Electric
& Gas Technology, Inc. et al. v. Universal Communications, Inc., et al., United States District
Court for the Northern District of Texas, Dallas Division, Civil Action No. 03-1798G, and or
your contribution of funds in connection therewith.

4

Response No. 8

The plaintiff objects to this request to the extent it seeks documents which are protected

from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The

plaintiff further objects to this request to the extent that it is overly broad, unduly burdensome

and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and

without waiving the foregoing objections, the plaintiff states that documents responsive to this

request, if any, will be produced.

Request No. 9

All documents or communications that constitute, relate or refer to royalty payments

from AirWater Corporation and or AirWater Patents to J.J. Reidy.

Response No. 9

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 10

All documents or communications that relate or refer to the patents referred to in

paragraph 4 of your First Amended Complaint.

Response No. 10

The plaintiff objects to this request to the extent it seeks documents which are protected

from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The

plaintiff further objects to the request to the extent it is overly broad, unduly burdensome and not

reasonably calculated to lead to the discovery of admissible evidence. Subject to and without

waiving the foregoing objections, the plaintiff states that the documents responsive to this

request, if any, will be produced.

5

Supplemental Response No. 10

The plaintiff will produce documents with respect to any communication between the

Plaintiff and any other entity concerning patents during the period from January 2003 to January

2006, in accordance with the order of the Court dated January 29, 2007.

Request No. 11

All documents or communications that relate or refer to Patent Nos. 5,106,512;

5,149,446; 5,203,989; and 5,366,705.

Response No. 11

The plaintiff objects to this request to the extent it seeks documents which are protected

from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy.  The

plaintiff further objects to the interrogatory as overly broad, unduly burdensome and not

reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Response No. 11

The plaintiff will produce documents with respect to any communication between the

Plaintiff and any other entity concerning patents during the period from January 2003 to January

2006, in accordance with the order of the Court dated January 29, 2007.

Request No. 12

All documents or communications that reflect, relate or refer to the world-wide

registration, enforceability and or validity of the patents for the water production/generation

system referred to in paragraph 4 of your First Amended Complaint.

{Client Files\LIT\304269\0002\PLD\00852936.DOC;1}

<u>Response No. 12</u>

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The plaintiff states that the documents responsive to this request, if any, will be produced.

<u>Supplemental Response No. 12</u>

The plaintiff will produce any non-privileged documents and to the extent that documents have been withheld due to privilege, the plaintiff will produce a privilege log.

<u>Request No. 13</u>

All documents or communications that relate or refer to the water production/generation system referred to in paragraph 4 of your First Amended Complaint.

<u>Response No. 13</u>

The plaintiff states that the documents responsive to this request, if any, will be produced.

<u>Request No. 14</u>

All documents or communications that constitute, relate or refer to negotiations regarding any and all provisions of the Global Manufacturing and Marketing Licensing Agreement.

<u>Response No. 14</u>

The plaintiff states that the documents responsive to this request, if any, will be produced.

<u>Request No. 15</u>

All documents or communications that constitute, relate or refer to Defendants' efforts to establish and maintain the awareness and exposure of products manufactured by Defendants based on the patents by J.J. Reidy and to enhance sales and future growth of such products as referred to in paragraphs 7 and 9 of your First Amended Complaint.

{Client Files\LIT\304269\0002\PLD\00852936.DOC;1}

Response No. 15

The plaintiff states that the documents responsive to this request, if any, will be produced.

Request No. 16

All documents that support your computation of damages.

Response No. 16

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Supplemental Response No. 16

The plaintiff will produce any non-privileged documents and to the extent that documents have been withheld due to privilege, the plaintiff will produce a privilege log.

Request No. 17

All documents which you intend to offer into evidence at the trial of this matter.

Response No. 17

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege, work product doctrine and/or trial strategy. Subject to and without waiving the foregoing objections, the plaintiff answers as follows: the plaintiff has not yet determined what documents it intends to offer into evidence at the trial of this matter.

Supplemental Response No. 17

The plaintiff will produce any non-privileged documents and to the extent that documents have been withheld due to privilege, the plaintiff will produce a privilege log.

{Client Files\LIT\304269\0002\PLD\00852936.DOC;1}

Request No. 18

All documents relating to the subject matter of this litigation.

Response No. 18

The plaintiff objects to this request to the extent it seeks documents which are protected

from disclosure by the attorney-client privilege, work product doctrine, and/or trial strategy. The

plaintiff objects to this request to the extent it is ambiguous, overly broad, unduly burdensome

and not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 19

All documents that constitute, relate or refer to communications between you and or

James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or Michael J.

Zwebner on the other hand.

Response No. 19

The plaintiff objects to this request to the extent that it is ambiguous, overly broad,

unduly burdensome and not reasonably calculated to lead to the discovery of admissible

evidence.

Supplemental Response No. 19

The plaintiff previously produced documents responsive to this request and will produce

additional documents responsive to this request.

Request No. 20

All documents or communications that constitute, relate or refer to any and all payments

other than royalty payments made by AirWater Corporation and or AirWater Patents to J.J.

Reidy.

9

Response No. 20

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 21

All documents that constitute, relate or refer to communications regarding minimum monthly royalty payments under the Global Manufacturing and Marketing Licensing Agreement.

Response No. 21

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 22

All documents that constitute, relate or refer to communications regarding quarterly royalty payments under the Global Manufacturing and Marketing Licensing Agreement.

Response No. 22

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 23

All documents or communications that constitute, relate or refer to tender of the disputed minimum monthly royalty payments by AirWater Corporation and or AirWater Patents, including but not limited to the parties' intent to limit the minimum monthly royalty payment obligation to a period of one year.

Response No. 23

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 24

All documents that constitute, relate or refer to communications regarding the anticipated lack of royalties during the Defendants' start-up phase in marketing the water production/generation system referred to in paragraph 4 of your First Amended Complaint.

10

Response No. 24

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 25

All documents or communications that constitute, relate or refer to the issuance of stock by AirWater Corporation, AirWater Patents and or UCSY to you.

Response No. 25

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Supplemental Response No. 25

The plaintiff will produce documents responsive to this request in accordance with the order of the Court dated January 29, 2007.

Request No. 26

All documents that constitute, relate or refer to newspaper articles, press articles and or any other publications regarding the subject matter of this action.

Response No. 26

The plaintiff objects to this request to the extent it is ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Supplemental Response No. 26

The plaintiff will supplement its response in accordance with the order of the Court dated January 29, 2007.

11

<u>Request No. 27</u>

All documents that constitute, relate or refer to the disposition of the UCSY, AirWater Corporation and or AirWater Patents stock issued to you.

<u>Response No. 27</u>

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to the discovery of admissible evidence.

<u>Supplemental Response No. 27</u>

The plaintiff will supplement its response in accordance with the order of the Court dated January 29, 2007.

<u>Request No. 28</u>

All documents that constitute, relate or refer to any and all agreements by and between you and or any third party to license, sublicense, market and or manufacture the patents and or water production/generation system referred to in paragraph 4 of your Amended Complaint.

<u>Response No. 28</u>

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to the discovery of admissible evidence.

<u>Supplemental Response No. 28</u>

The plaintiff will supplement its response as to documents relating to agreements from January 2003, in accordance with the order of the Court dated January 29, 2007.

<u>Request No. 29</u>

All documents that constitute, relate or refer to any and all gross revenues and profits you have received as a result of any and all agreements by and between you and or any third party to

license, sublicense, market and or manufacture the patents and or water production/generation

system referred to in paragraph 4 of your Amended Complaint.

Response No. 29

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to

the discovery of admissible evidence.

Supplemental Response No. 29

The plaintiff will supplement its response as to documents relating to agreements from

January 2003, in accordance with the order of the Court dated January 29, 2007.

Request No. 30

All documents that constitute, relate or refer to any and all efforts on your part to solicit

licensing, sublicensing, marketing and or manufacturing agreements by and between you and any

third party regarding the patents and or water production/generation system referred to in

paragraph 4 of your Amended Complaint.

Response No. 30

The plaintiff objects to this request to the extent it is not reasonably calculated to lead to

the discovery of admissible evidence.

Supplemental Response No. 30

The plaintiff will supplement its response as to documents relating to agreements from

January 2003, in accordance with the order of the Court dated January 29, 2007.

Request No. 31

All documents or communications that constitute, relate or refer to termination of the

Global Manufacturing and Marketing Licensing Agreement.

Response No. 31

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 32

All documents that constitute relate or refer to communications by and between you and or James J. Reidy on the one hand, and Brian Dingman on the other hand regarding the subject matter of this litigation, including without limitation the patents referred to in paragraph 4 of your First Amended Complaint.

Response No. 32

The plaintiff objects to this request to the extent it seeks documents which are protected by disclosure by the attorney-client privilege and the work product doctrine. The plaintiff further states that an attorney-client relationship exists between James J. Reidy and Brian Dingman and any documents the defendant seeks in request no. 32 are protected by the attorney-client privilege and the work product doctrine.

Supplemental Response No. 32

The plaintiff will supplement its response in accordance with the order of the Court dated January 29, 2007.

Request No. 33

All documents that constitute, relate or refer to communications by and between you and or James J. Reidy on the one hand, and any third party regarding the subject matter of this litigation.

Response No. 33

The plaintiff objects to this request to the extent it seeks documents which are protected from disclosure by the attorney-client privilege and work product doctrine. The plaintiff objects

14

to this request to the extent it is ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving the foregoing objections, the plaintiff states that documents responsive to this request, if any, will be produced.

Supplemental Response No. 33

The plaintiff will supplement its response in accordance with the order of the Court dated January 29, 2007.

Request No. 34

All documents or communications that relate or refer to the financial condition of J.J. Reidy, including but not limited to any and all tax returns, financial statements, income statements and balance sheets from 2000 through the present.

Response No. 34

The plaintiff objects to this request as it is overly burdensome, not relevant and not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 35

All documents or communications that relate or refer to the parties' rights and obligations under the Global Manufacturing and Marketing Licensing Agreement.

Response No. 35

The plaintiff states that documents responsive to this request, if any, will be produced.

Request No. 36

All documents or communications with respect to J.J. Reidy that constitute, relate or refer to any and all:

a.    minutes and consent actions of the directors and shareholders;

15

b.      meetings of the directors and shareholders;

c.      corporate filings including but not limited to articles of organization, changes of

officers and directors, and annual reports;

d.      shareholder agreements and any amendments thereto;

e.      by-laws and any amendments thereto.

Response No. 36

The plaintiff objects to this request to the extent that it is ambiguous, overly broad,

unduly burdensome and not reasonably calculated to lead to the discovery of admissible

evidence.

Supplemental Response No. 36

The plaintiff will supplement its response in accordance with the order of the Court dated

January 29, 2007.

J.J. REIDY & COMPANY, INC.
By its attorneys,


Thomas J. Conte (BBO #566092)
Maura A. Greene (BBO #547204)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated:  March 8, 2007

16

CERTIFICATE OF SERVICE

I, Maura Greene, hereby certify that on this 7th day of March, 2007, I served a copy of the foregoing via U.S. mail on Defendants' counsel, Matthew Zayotti, Esq., Keegan Werlin LLP, 265 Franklin Street, Boston, MA 02110-3113.

Maura A. Greene, Esq.

17

**EXHIBIT B**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS                                    CIVIL ACTION NO.  05-40049-FDS


J.J. REIDY & CO., INC..                          )
                                                 )
                        Plaintiff,               )
                                                 )
v.                                               )
                                                 )
AIRWATER CORPORATION and                         )
AIRWATER PATENTS CORPORATION,                    )
                                                 )
                        Defendants,              )


## PLAINTIFF J.J. REIDY & CO., INC.'S SUPPLEMENTAL ANSWERS TO DEFENDANT AIRWATER PATENTS CORPORATION'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Pursuant to Rule 33 of the Massachusetts Rules of Civil Procedure, Plaintiff, J.J. Reidy &

Co., Inc. ("J.J. Reidy") responds to Defendant AirWater Patents Corporation's First Set of

Interrogatories as follows:

## GENERAL OBJECTIONS

1.      The plaintiff objects to each and every interrogatory to the extent that it seeks

information protected by the attorney-client privilege and/or the work product doctrine.

2.      The plaintiff objects to each and every interrogatory to the extent that it purports

to establish a continuing duty to supplement, or seeks to impose a duty beyond those imposed by

the Massachusetts Rules of Civil Procedure.

3.      Each of the General Objections shall be deemed to apply to each of the

defendant's separate interrogatories.

## INTERROGATORIES

Interrogatory No. 1

Please state your full name, date of birth, residential address, social security number, educational background, and most recent occupation and employment, title, and business address.

Answer No. 1

Objection. The plaintiff objects to the request to the extent it seeks Mr. Reidy's social security number as the request is not reasonably calculated to lead to the discovery of admissible evidence and Mr. Reidy is not a named party to the lawsuit. Subject to and without waiving the foregoing objection, the plaintiff answers as follows: James J. Reidy, February 22, 1941, 1260 Main Street, Holden, MA 01520, Associate of Science degree, Stockbridge School of Agriculture, Bachelor of Science Degree, University of Massachusetts, Amherst, President of J.J. Reidy & Co., Inc., 1260 Main St., Holden, MA 01520.

Interrogatory No. 2

Please describe any actions you have taken in connection with preparing your responses to these interrogatories, including but not limited to identifying separately, with respect to each of your responses, any documents reviewed, any persons you have consulted and the substance of the information obtained from each such document or person in connection with each such response.

Answer No. 2

The plaintiff objects to this interrogatory to the extent that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The plaintiff further objects on the grounds of attorney-client privilege, work product doctrine and or/trial strategy. Subject to and without waiving the foregoing objections, Mr. Reidy on behalf of

{Client Files\LIT\304269\0002\PLD\00852935.DOC;1}

the plaintiff answers as follows: I have searched for, reviewed and collected all the documents pertinent to this litigation and have supplied them to our attorney and the defendant as requested in their First Request for Production of Documents.   Other than my attorneys, I have not consulted with anyone else in terms of responding to these interrogatories.

Interrogatory No. 3

Please identify all persons who have any knowledge of, or have expressed any opinion with respect to, any relevant facts relating to this litigation and as to each such person state fully and completely the knowledge and/or opinion such person has or has expressed.

Answer No. 3

The plaintiff objects to this interrogatory to the extent that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.   The plaintiff further objects on the grounds of attorney-client privilege, work product doctrine and/or trial strategy.   Subject to and without waiving the foregoing objections, Mr. Reidy on behalf of the plaintiff answers as follows: Any discussions I had with my attorneys, including Brian Dingman, are protected by the attorney client privilege.   There are no other persons, outside of friends or family, who have expressed an opinion.

Interrogatory No. 4

Please identify each communication, whether oral or written, between Benoit on the one hand and Wynee and or Wynne Oil on the other hand, which constitutes, relates or refers to the basis of, or any event, act, omission, fact or circumstance relating to, any claim made by Benoit in this litigation.

Answer No. 4

This interrogatory does not relate to this litigation and no response is therefore required.

3

Interrogatory No. 5

Please state each and every material fact that supports your allegation in paragraph 9 of your First Amended Complaint that "Defendants failed to commit resources and put forth best efforts in accomplishing, completing, and fulfilling their promises to establish and maintain the awareness and exposure of products manufactured by Defendants based on the patents licensed by J.J. Reidy and to enhance sales and future growth."

Answer No. 5

Prior to signing, the defendant assured me that there was $2 million available to market these products. To the best of my knowledge, although the defendant promised to commit $2 million, those funds were never available or used for marketing.

Moreover, the defendants' continuous and intentional disregard for their obligation to build products that conformed to the technology of the Licensed Patents, was a failure to use best efforts. The initial samples the defendant intended to use to demonstrate the product to the Army did not include the critical safety features nor the specific water treatment sequences of the Licensed Patents. A proper and successful evaluation by the Army of the technology in the Licensed Patents was therefore impossible and the subsequent lack of sales to the Army supports this conclusion. Furthermore, the defendant prepared sales literature for a concept unit that described improper water flow and treatment, contrary to the technology specified in the Licensed Patents. The defendant was building the product without the specifications and had molds made without the product specifications.

On or before March 4, 2005 the defendants' President, Michael J. Zwebner, willingly formed a new company, Atmospheric Water Technologies, Inc., in direct competition to AirWater Patents. This is a major breach of the License Agreement.

4

On October 13, 2005 the defendants' President, Michael J. Zwebner, willingly formed another new company, Air Water Fridges and Freezers Corp., in direct competition to AirWater Patents. This is a major breach of the License Agreement.

The plaintiff reserves the right to supplement this response.

Interrogatory No. 6

Please state each and every material fact that supports the allegation in paragraphs 8 and 11 of your First Amended Complaint to the effect that AirWater Patents breached the parties Global Manufacturing and Marketing Licensing Agreement by failing to make its required minimum monthly royalty payments to J.J. Reidy, including in your response without limitation identification of the specific provisions of the Global Manufacturing and Marketing Licensing Agreement that you contend AirWater Patents breached.

Answer No. 6

Under the bold heading MINIMUM MONTHLY ROYALTY PAYMENTS in the Global Manufacturing and Marketing Licensing Agreement, the Licensing Agreement provides as follows: "LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above whichever is the more." The preceding provision in the Licensing Agreement, entitled ROYALTY PAYMENTS, sets forth the agreement as to the calculation of royalty payments which are over the $10,000 minimum. The provision entitled TERM OF LICENSE, is also applicable, because it sets forth the term of the license, during which the royalty payments were due.

Mr. Zwebner contended he needed some breathing room to prepare for this minimum monthly payment and we ultimately agreed that the beginning of these minimum payments could

5

be postponed until November 1, 2003. It was also discussed and agreed that the reason a minimum monthly payment was required was to protect the plaintiff because the plaintiff was granting an exclusive license.   The defendant breached the agreement when it stopped paying royalties.

Also, see my answer to Interrogatory No. 7 regarding other breaches of this Licensing Agreement.

Interrogatory No. 7

Please state each and every material fact that supports your breach of contract claim against AirWater Corporation.

Answer No. 7

Objection.  The plaintiff has moved to amend the Complaint to include a claim for intentional misrepresentation against AirWater Corporation.  The claim is based upon the intentional misrepresentation of AirWater Corporation that it had $2 million in financing available to market the products based upon J.J. Reidy's patents.

Supplemental Answer No. 7

The plaintiff's Second Amended Complaint does not contain a breach of contract claim against AirWater Corporation and therefore no response is required.

Interrogatory No. 8

Please identify and describe the content of all communications by and between you and or James J. Reidy on the one hand, and Brian Dingman on the other hand, regarding the subject matter of this litigation, including without limitation the patents referred to in paragraph 4 of your First Amended Complaint.

Answer No. 8

The plaintiff objects to this interrogatory to the extent that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  The

plaintiff further objects on the grounds of attorney-client privilege, work product doctrine and/or

trial strategy.

Supplemental Answer No. 8

The plaintiff states that Mr. Reidy asked Mr. Dingman if he could represent J.J. Reidy in

this lawsuit and Mr. Dingman said he could not because he had previously represented Mr.

Zwebner.  Mr. Reidy asked Mr. Dingman's opinion on whether the license was properly

terminated and Mr. Dingman gave his opinion that the license was properly terminated and that

AirWater no longer had a license.  There were conversations between Mr. Zwebner, Mr. Reidy

and Mr. Dingman in 2003 and 2004 regarding several patent application fees due, deadlines for

paying them and consequences for not paying them.

Interrogatory No. 9

Please identify and describe the content of all communications by and between you

and/or James J. Reidy on the one hand, and any third party regarding the subject matter of this

litigation.

Answer No. 9

The plaintiff objects to this interrogatory to the extent it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  The

plaintiff further objects on the grounds of the attorney-client privilege, work product doctrine and

or trial strategy.  Subject to and without waiving the foregoing objections, Mr. Reidy on behalf

of the plaintiff states as follows: Since the litigation between the parties has become publicly

7

known I have received a number of inquiries from the press and others regarding the lawsuit. I did not log these inquiries. However, in general, I recall informing them that the lawsuit was being decided in the Federal Court. In addition, I recall a conversation with Mike Klein in which he told me that Zwebner told him that he (Zwebner) knew that he was in breach of the Licensing Agreement between us, but that he was going to drag out the litigation as long as he could in the hopes that I would become financially exhausted and default on my lawsuit against him.

Supplemental Answer No. 9

Mr. Reidy obtained inquiries and emails from various people all over the world regarding the patents at a rate of 10 to 25 per month, with various levels of interest. In the summer of 2005, Arthur Neumann, the President of Free Water Company, called Mr. Reidy and wanted to know the status of Mr. Reidy's patents and expressed interest in them. Mr. Reidy informed Mr. Neumann that he had terminated the license with AirWater and he didn't want to license them, but he wanted to sell the patents. Mr. Reidy informed Mr. Neumann that there was litigation between AirWater Corporation, AirWater Patents and J. J. Reidy, but Mr. Neumann remained interested. Mr. Reidy and Mr. Neumann negotiated a patent and asset purchase agreement in October of 2005.

Interrogatory No. 10

Please identify each and every contract by and between you and any third party relating to the patents and or water production/generation system referred to in paragraph 4 of your First Amended Complaint, including but not limited to any licenses, sublicenses, marketing and or manufacturing agreements.

8

Answer No. 10

The plaintiff objects to the interrogatory to the extent that it seeks information following

the proper termination of the Licensing Agreement on the grounds that such information is not

reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without the

foregoing obligation, the plaintiff states as follows:

There are no contracts prior to the termination of the Licensing Agreement.

Supplemental Answer No. 10

J. J. Reidy does not have any licenses, sublicenses, marketing and or manufacturing

agreements.  As stated previously, there is a patent and asset purchase agreement dated October

of 2005 between J. J. Reidy and Free Water Company.

Interrogatory No. 11

Please identify and describe the content of any and all communications by and between

you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or

Michael Zwebner on the other hand, regarding the anticipated lack of royalties during the

Defendants' start-up phase in marketing the water production/generation system referred to in

paragraph 4 of your First Amended Complaint.

Answer No. 11

During the six months of communications and negotiations between Mr. Zwebner and

myself before signing the Licensing Agreement, we agreed that it would be in our best mutual

interests to minimize the burden of cash outflow during the initial start-up phase to allow the best

opportunity for success.  We agreed, therefore, that the stated minimum monthly royalties would

not begin until November 1, 2003 some 5 or 6 months away.

9

Interrogatory No. 12

Please identify and describe the content of any and all communications by and between

you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or

Michael Zwebner on the other hand, regarding quarterly royalty payments under the Global

Manufacturing and Marketing Licensing Agreement.

Answer No. 12

I recall having communications with Michael Zwebner regarding quarterly royalty

payments.

Supplemental Answer No. 12

Mr. Reidy and Mr. Zwebner first discussed having a non-exclusive license.  Mr. Zwebner

then changed the discussion to his company having an exclusive license.  When the conversation

shifted to Mr. Zwebner's desire to have an exclusive license, Mr. Reidy told Mr. Zwebner that he

wanted minimum monthly royalties because his income from the patents would be limited to the

amount he received from AirWater Corporation.  Mr. Zwebner and Mr. Reidy discussed their

understanding that  AirWater Corporation would make quarterly payments to Mr. Reidy as to the

other royalties due above and beyond the $10,000 per month.

Interrogatory No. 13

Please identify and describe the content of any and all communications by and between

you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or

Michael Zwebner on the other hand, regarding minimum monthly royalty payments under the

Global Manufacturing and Marketing Licensing Agreement, including but not limited to the

parties' intent to limit the minimum monthly royalty payment obligation to a period of one year.

Answer No. 13

I don't recall any communications with Michael Zwebner to limit the minimum monthly payment obligation under the License Agreement to a period of one year.

Interrogatory No. 14

Please identify and describe the content of any and all communications by and between you and or James J. Reidy on the one hand and AirWater Corporation, AirWater Patents and or Michael Zwebner on the other hand, regarding the anticipated lack of royalties during the Defendants' start-up phase in marketing the water production/generation system referred to in paragraph 4 of your First Amended Complaint.

Answer No. 14

This interrogatory is worded exactly the same as Interrogatory No. 11.

Please refer to the response to Interrogatory No. 11.

Interrogatory No. 15

Please state each and every material fact that supports the allegation in paragraph 13 of your First Amended Complaint that "J.J. Reidy has fulfilled all of its obligations under the License."

Answer No. 15

Reidy provided AirWater with all technical data, photographs, drawings, and various texts in his possession, some of which is being used by AirWater to this day.

Reidy maintained the validity and good standing of the patents with timely payments of maintenance fees to the United States Patent Office. In terms of transfer of custody, know how and technical assistance, Reidy provided all information in his possession that AirWater would accept.

11

Reidy granted AirWater the required 14 day period of notice/grace in which AirWater could make good on any outstanding amount. In fact, Michael Zwebner, had an additional 14 days as Reidy supplied a second grace period to AirWater Patents.

Further, Reidy returned telephone calls and responded to emails in a timely fashion.

Reidy also traveled at AirWater's request, and to AirWater's schedule, in every instance, including trips to Boston, Miami, London, Tel Aviv, Jerusalem and numerous local business trips.

Reidy also repeatedly offered his services and know how at the discretion of AirWater.

The plaintiff granted a license to AirWater Corporation (which was then assigned to AirWater Patents Corporation) of the United States Patents described in the License Agreement. The defendants, however, failed to pay the royalty payments due and owing under the License Agreement.

<u>Interrogatory No. 16</u>

If you contend that you cooperated, assisted and or contributed financially to the defense of the action entitled <u>Electric & Gas Technology, Inc. et al. v. Universal Communications, Inc., et al.</u>, United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 03-1798G, please state each and every material fact that supports your contention.

<u>Answer No. 16</u>

The plaintiff objects to this interrogatory to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence.

12

Supplemental Answer No. 16

Mr. Reidy repeatedly requested that Mr. Zwebner allow him to participate in the

counterclaim, and Mr. Zwebner informed Mr. Reidy that he should file his own suit. Mr.

Zwebner also questioned Mr. Reidy as to why he would want to get involved in the lawsuit.

Interrogatory No. 17

Please identify and describe the content of any and all communications by and between

you and or James J. Reidy on the one hand, and Electric & Gas Technology, Inc., Atmospheric

Water Technology, Inc. and or Richard Ehrlich on the other hand.

Answer No. 17

The plaintiff objects to the interrogatory to the extent it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objection, the plaintiff states as follows:

Reidy has never met or communicated with Richard Ehrlich in any manner.

Supplemental Answer No. 17

In 1994, Mr. Reidy spoke with Mort Zimmerman of Electric & Gas Technology, Inc.

with regard to manufacturing Mr. Reidy's machines for a potential New Zealand licensee. They

spoke about royalties that would be paid, but the deal fell through.

Interrogatory No. 18

Please identify and describe the content of any and all communications by and between

you and or James J. Reidy on the one hand, and World Wide Water, Inc., World Wide Water,

LLC and or Mike Klein on the other hand.

13

Answer No. 18

The plaintiff objects to the interrogatory to the extent it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  The

plaintiff further objects to this interrogatory on the ground that it is unlimited in time and scope

rendering it unanswerable in its present form.

Supplemental Answer No. 18

With respect to any communications relating to patents and licensing arrangements from

January 2003 to date and continuing, James Reidy states that he had discussions with Mike Klein

and Mr. Zwebner because Mr. Klein and Mr. Zwebner were going to agree that Mr. Klein could

manufacture a machine that converted water vapor from the air into drinking water.  Mr.

Zwebner agreed that Mr. Klein could make the machine, and Mr. Klein in return stated that he

would not bring suit against Mr. Zwebner for patent infringement provided that Mr. Zwebner

manufactured only Mr. Reidy's machine.  Mr. Reidy warned Mr. Zwebner that he could not

make Mr. Klein's machine.

Interrogatory No. 19

Please identify each person you expect to call as a fact witness at trial and for each person

state:

a)    his/her name;

b)    address;

c)    telephone number; and

d)    fully and completely, the substance of the testimony to be given.

14

Answer No. 19

The plaintiff objects to this interrogatory on the grounds of attorney-client privilege, work product doctrine and/or trial strategy. Subject to and without waiving the foregoing objections, the plaintiff answers as follows: the plaintiff has not yet determined who will be called as a fact witness at the trial of this matter.

Supplemental Answer No. 19

To date, the plaintiff anticipates calling James J. Reidy, 1260 Main Street, Holden, MA 01520. Mr. Reidy is expected to testify as to the patents for the air to water technology, the registration of the patents, the licensing agreement entered into with AirWater Corporation, the assignment to Air Water Patents, royalty payments made and royalty payments Air Water Patents owes to J.J. Reidy. The plaintiff may call Michael Zwebner as a witness with regard to the licensing agreement, payment of royalties, and licensing and sublicensing agreements. The plaintiff has not determined what other witnesses it may call or on what other topics Mr. Reidy or Mr. Zwebner may be asked to testify at trial.

Interrogatory No. 20

Please identify each person you expect to call as an expert witness at trial and for each person state:

     a)      his/her name;

     b)      address;

     c)      the subject matter upon which he/she is expected to testify;

     d)      the substance of the facts and opinions to which he/she is expected to testify; and

     e)      fully and completely the substance of the grounds for each opinion.

{Client Files\LIT\304269\0002\PLD\00852935.DOC;1}

trial. The plaintiff will seasonably supplement its response to this interrogatory, as appropriate,

in accordance with the rules for expert disclosures.

     SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14Th DAY OF FEBRUARY, 2007

                                         James J. Reidy, President
                                         J.J. Reidy & Co., Inc.

AS TO OBJECTIONS:

Thomas J. Conte (BBO#566092)
Maura A. Greene (BBO #547204)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615
(508) 926-3415
FAX: (508) 929-3006

Dated: March 7, 2007

16

## CERTIFICATE OF SERVICE

I, Maura Greene, hereby certify that on this 7th day of March, 2007, I served a copy of the foregoing via U.S. mail on Defendants' counsel, Matthew Zayotti, Esq., Keegan Werlin LLP, 265 Franklin Street, Boston, MA 02110-3113.

Maura A. Greene, Esq.

**EXHIBIT C**



### Bowditch
### &Dewey
ATTORNEYS

Maura A. Greene
Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

March 7, 2007

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

Re:    *J.J. Reidy Co., Inc. v. AirWater Patents Corporation, et al*
       *Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

I enclose the following in the above-referenced matter:

1.    Plaintiff J.J. Reidy & Co., Inc.'s Supplemental Answers to Defendant Airwater
      Patents Corporation's First Set of Interrogatories to Plaintiff; and

2.    Plaintiff J.J. Reidy & Co., Inc.'s Supplemental Answers to Defendant Airwater
      Patents Corporation's First Request for Production of Documents;

The responsive documents will be sent under separate cover.

Very truly yours,

Maura A. Greene

MAG/aec
Enclosures

cc:    Thomas J. Conte, Esquire

{Client Files\LIT\304269\0002\COR\F0394502.DOC;1}

# EXHIBIT D



*Bowditch*
*&Dewey*
ATTORNEYS

**Maura A. Greene**
Direct telephone:  (508) 416-2421
Direct facsimile:  (508) 929-3021
Email:  mgreene@bowditch.com

March 8, 2007

Matthew P.  Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

*Re:*    *J.J. Reidy Co., Inc. v. AirWater Patents Corporation, et al*
         *Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

I enclose documents bate stamp numbered JJR 643 through JJR 739.  These supplemental
documents are responsive to Defendant Airwater Patents Corporation's First Request for
Production of Documents.

Very truly yours,

Maura A. Greene

MAG/aec
Enclosures

cc:    Thomas J. Conte, Esquire

{Client Files\LIT\304269\0002\COR\F0394874.DOC;1}

BOWDITCH & DEWEY, LLP  175 CROSSING BOULEVARD  SUITE 500  FRAMINGHAM, MA 01702
T 508 879 5700  F 508 872 1492  www.bowditch.com          *Boston  Framingham  Worcester*

**EXHIBIT E**



**Bowditch**
**&Dewey**
ATTORNEYS

**Maura A. Greene**
Direct telephone:  (508) 416-2421
Direct facsimile:  (508) 929-3021
Email:  mgreene@bowditch.com

March 9, 2007

Matthew P.  Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

**Re:**    *J.J. Reidy Co., Inc. v. AirWater Patents Corporation, et al*
         *Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

I enclose additional documents bate stamp numbered JJR 740 through JJR 775.  These supplemental documents are responsive to Defendant Airwater Patents Corporation's First Request for Production of Documents.

Very truly yours,

Maura A. Greene

MAG/kbm
Enclosures

cc:    Thomas J. Conte, Esquire

[Client Files\LIT\304269\0092\COR\F0395104.DOC;1]

BOWDITCH & DEWEY, LLP  175 CROSSING BOULEVARD  SUITE 500  FRAMINGHAM, MA 01702
T 508 879 5700  F 508 872 1492  www.bowditch.com        *Boston  Framingham  Worcester*



**EXHIBIT F**



*Bowditch*
*&Dewey*
ATTORNEYS

**Maura A. Greene**
Direct telephone:  (508) 416-2421
Direct facsimile:  (508) 929-3021
Email:  mgreene@bowditch.com

April 24, 2007

Matthew P.  Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

*Re:*    *J.J. Reidy Co., Inc. v. AirWater Corporation*
         *and AirWater Patents Corporation*
         *Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

   I have attached additional documents, bate-stamped numbers 0776 through 0935 which are responsive to Defendant AirWater's First Request for Production of Documents.

   Please contact me if you have any questions.

                                Very truly yours,

                                Maura A. Greene

MAG/aec

cc:    Thomas J. Conte, Esq.

{Client Files\LIT\304269\0002\COR\F0400896.DOC;1}

BOWDITCH & DEWEY, LLP  175 CROSSING BOULEVARD  SUITE 500  FRAMINGHAM, MA 01702
T 508 879 5700  F 508 872 1492  www.bowditch.com                    *Boston  Framingham  Worcester*

**EXHIBIT G**



**Bowditch
&Dewey**
ATTORNEYS

Maura A. Greene
Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

April 30, 2007

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

Re:    *J.J. Reidy Co., Inc. v. AirWater Corporation
       and AirWater Patents Corporation
       Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

I have attached additional documents, bate-stamped numbers 00914 through 00927 which are responsive to Defendant AirWater's First Request for Production of Documents which were inadvertently omitted from the package I sent you on April 24, 2007.

Please contact me if you have any questions.

Very truly yours,

Maura A. Greene

MAG/aec
Enclosures

{Client Files\LIT\304269\0002\COR\F0404315.DOC:1}

**EXHIBIT H**

# PATENT and ASSET

# PURCHASE AGREEMENT

DATED AS OF October 4, 2005

BETWEEN

J.J. REIDY & CO., INC.

AS SELLER

AND

FREE WATER COMPANY

AS BUYER

JJR 702

# PATENT and ASSET

# PURCHASE AGREEMENT

DATED AS OF October 4, 2005

BETWEEN

J.J. REIDY & CO., INC.

AS SELLER

AND

FREE WATER COMPANY

AS BUYER

JJR 702

# TABLE OF CONTENTS

01.0 DEFINITIONS ........................................................ 3
02.0 PURCHASE AND SALE OF THE PURCHASED ASSETS
02.1. ASSETS BEING ASSIGNED TO BUYER ........... 8
02.2. EXCLUDED ASSETS ...................................... 9
02.3. ASSUMED OBLIGATIONS .............................. 9
02.4. PURCHASE PRICE ........................................ 9
02.5. FURTHER ASSURANCES ............................... 9
03.0 CLOSING ............................................................ 10
04.0 NO OTHER LICENSES ....................................... 10
05.0 FUTURE PAYMENTS AND SHARE OF MILESTONE AND OTHER PAYMENTS ......... 10
05.1. FUTURE PAYMENTS ..................................... 10
05.2. RECORDS .................................................... 11
05.3. REPORTS AND PAYMENTS ........................... 12
05.4. FORM OF PAYMENT ..................................... 12
05.5. TAXES ......................................................... 12
05.6. INTEREST .................................................... 12
06.0 PROTECTION OF INTELLECTUAL PROPERTY RIGHTS ...... 13
06.1. PATENT PROSECUTION/PATENT COSTS ....... 13
06.2. CONFIDENTIAL INFORMATION ...................... 13
06.3. ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS .... 13
07.0 COVENANTS OF BUYER .................................... 14
07.1  DUE DILIGENCE ........................................... 14
07.1.2. GENERAL OBLIGATION .............................. 14
07.1.3. SPECIFIC DUE DILIGENCE OBLIGATIONS .... 15
07.1.4. FAILURE TO MEET DUE DILIGENCE OBLIGATIONS .... 15
07.1.5. REPORTS .................................................. 15
07.1.6. FORCE MAJEURE ...................................... 15
07.2. COMPLIANCE WITH LAW ............................... 16
07.3. MARKING .................................................... 16
07.4. PUBLICITY ................................................... 16
08.0 COVENANTS OF SELLER ................................... 16
09.0 REPRESENTATIONS AND WARRANTIES OF SELLER ...... 16
09.1. DUE ORGANIZATION, AUTHORIZATION AND GOOD STANDING .... 16
09.10 DISCLAIMER OF WARRANTIES; FEDERAL PATENT POLICY .... 19

09.11. FULL DISCLOSURE ..................................... 19
09.2. NO CONFLICT .............................................. 17
09.3. TITLE TO THE EQUIPMENT ........................... 17
09.4. JJR TECHNOLOGY ........................................ 17
09.6. CONSENTS .................................................. 18
09.7. PROPRIETARY INFORMATION OF THIRD PARTIES ...... 18
09.8. LITIGATION ................................................. 18
09.9. TAXES ........................................................ 19
10.0 REPRESENTATIONS AND WARRANTIES OF BUYER ...... 19
10.1. DUE ORGANIZATION, AUTHORIZATION AND GOOD STANDING .... 19
10.2. NO CONFLICT .............................................. 20
10.3. DISCLAIMER OF WARRANTIES ...................... 20
11.0 TERM ................................................................ 21
12.0 INDEMNIFICATION ............................................ 21
12.1. SURVIVAL OF REPRESENTATIONS AND WARRANTIES .... 21
12.2. INDEMNIFICATION BY SELLER ..................... 21
12.3  INDEMNIFICATION BY BUYER ...................... 22
13.0 INSURANCE ...................................................... 23
13.1. INSURANCE OBLIGATIONS OF BUYER ........... 23
14.0 LIMITATION OF LIABILITY .................................. 24
15.0 EXPENSES OF TRANSACTION ............................ 24
16.0 CONDUCT OF PARTIES ...................................... 24
17.0 NOTICES ........................................................... 24
18.0 ENTIRE AGREEMENT; MODIFICATIONS AND AMENDMENTS .... 25
19.0 ASSIGNMENT ................................................... 25
20.0 GOVERNING LAW; VENUE ................................. 25
21.0 DISPUTE RESOLUTION ...................................... 26
22.0 INDEPENDENT CONTRACTORS .......................... 26
23.0 SEVERABILITY .................................................. 26
24.0 NO WAIVER ...................................................... 26
25.0 COUNTERPARTS ............................................... 27
26.0 HEADINGS ....................................................... 27
27.0 EXHIBIT (A) Assigned Patents ............................ 29
28.0 EXHIBIT (B) Bill of Sale and Disclosure Schedule .... 65

Initial [signature]    Initial JJR    2

JJR 703

## PATENT AND ASSET PURCHASE AGREEMENT

This Patent and Asset Purchase Agreement ("AGREEMENT") is entered into between the J.J. Reidy & Co., Inc., a Massachusetts Corporation, hereinafter referred to as (Seller), having its headquarters at , 1360 Main Street, Holden, Massachusetts 01520-1020 and, Free Water Company a corporation of the State of Nevada , having its principal place of business at, 525 Reactor Way, Reno, Nevada, 89502 hereinafter referred to as (Buyer).

WHEREAS, Buyer desires to purchase Seller's Potable Air-Water Generator technology Patents from Seller, and Seller wishes to sell Seller's Potable Air-Water Generator technology Patents to Buyer, on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of these premises, the respective covenants of Buyer and Seller set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.0 DEFINITIONS. The following capitalized terms shall have the meanings given below:

1.1. "Affiliate" shall mean, with respect to a party ("First Person") any other Person, which is controlled by or controls the First Person or, together with the First Person, is under the common control of a third Person, but only for so long as such control relationship continues to exist. Control shall mean:

(i)     in the case of stock-issuing, for-profit corporate entities, direct or indirect ownership of at least 50% of the stock or shares having the right to vote for the election of directors;

(ii)    in the case of other for-profit entities, ownership of at least 50% of the equity interest in such entity with the power to elect the governing body of such entity or the power to elect at least 50% of the members of the governing body of such entity; and

(iii)   in the case of any not-for-profit entity, the direct or indirect power to manage, direct or cause the direction of the management and policies of the entity or the power to elect at least 50% of the members of the governing body of such entity.

1.2. "Assumed Obligations" shall have the meaning set forth in Section 2.3.

1.3. "Buyer Indemnities" shall have the meaning set forth in Section 12.2.1.

1.4. "Closing" shall have the meaning set forth in Section 2.1.

1.5. "Closing Date" shall have the meaning set forth in Section 3.1.

Initial    Initial  JJR                    3

1.6. "Confidential Information" shall mean any and all information furnished by one party (the "Disclosing Party") to the other party (the "Receiving Party") that is (a) marked "confidential" or bears a similar legend, if such information is disclosed in a document or other tangible medium, or (b) accompanied by a contemporaneous oral notification to the effect that such information is considered confidential and followed within 30 days by a written notification that the information is confidential, if such information is disclosed orally or visually. Information that may be identified as confidential may include information relating to any technology, product, process or intellectual property of the Disclosing Party (including, but not limited to, owned or licensed intellectual property rights, data, know-how, samples, technical and non-technical materials and specifications) as well as any business plan, financial or other confidential commercial information of or about the Disclosing Party.

Notwithstanding the foregoing, information of or about the Disclosing Party shall not be considered Confidential Information with respect to the Disclosing Party to the extent that the Receiving Party can demonstrate by written records or other suitable physical evidence that:

(i)     such information was lawfully in the Receiving Party's possession or control prior to the time such information was disclosed to the Receiving Party by the Disclosing Party.

(ii)    such information was developed by the Receiving Party or on its behalf independently of and without reference to the Confidential Information;

(iii)   such information was lawfully obtained by the Receiving Party from a Third Party under no apparent obligation of confidentiality to the Disclosing Party; or

(iv)    such information was, at the time it was disclosed or obtained by the Receiving Party, or thereafter became, publicly known otherwise than through a breach by the Receiving Party of such party's obligation to the Disclosing Party.

1.7. "Current JJR Technology" shall have the meaning set forth in Section 2.0

1.8. "Development Period" shall have the meaning set forth in Section 7.1.2.

1.9. "JJR Arrangement" shall mean an agreement between Buyer or an Affiliate of Buyer and a Third Party which is executed on or before Closing of this agreement and which includes a grant of rights under the JJR Technology or any portion thereof.

1.10. "JJR Equipment" shall have the meaning set forth in Section 2.1.3.



Initial _____     Initial _JJR_     4

1.11. "JJR Know-how" shall mean all technology, inventions, technical information, materials and the like related to the technology used in Seller's programs, the use of Potable Air-Water Generators, devices for methods of making such devices, in which Seller has an interest on the Effective Date, whether patentable or not, and which: (i) (a) is related to any patent application or patent included in the JJR Patents or (b) is necessary or useful in connection with the manufacture, use or sale of any product described in any such patent application or patent, or the practice of any invention or technology described in any such patent application or patent, and (ii) until the Effective Date constitutes the confidential information of Seller.

1.12. "JJR Patents" shall mean those patents and patent applications listed in (Exhibit A), and any divisional, continuation, continuation-in-part, reissue, renewal or extension thereof or substitute therefore, or any patent issuing there from and any foreign patent applications and patents corresponding thereto.

1.13. "JJR Product" shall mean:

(i)     any product, the manufacture, use, sale or importation of which would, absent the rights transferred (or sublicensed, in the case where Section 2.5 applies) by Seller to Buyer hereunder, infringe any Valid Claim; or

(ii)    any product developed in whole or in part through use of a process which is covered by a Valid Claim.

1.14. "JJR Revenues" shall mean amounts payable to Buyer or an Affiliate of Buyer from a Third Party pursuant to an JJR Arrangement, including without limitation up-front license fees, milestone payments, payments in consideration for the issuance of equity or debt securities of Buyer, and other non-royalty cash payments: PROVIDED, HOWEVER, that JJR Revenues shall not include (i) bona fide research and development support payments, (ii) payments and revenues realized from the sale of JJR Products prior to the execution of this arrangement and (iii) payments received to reimburse Buyer for patent expenses incurred by Buyer or an Affiliate of Buyer after execution of the JJR Arrangement.

1.15. "JJR Technology" shall mean the Owned JJR Technology products and the Licensed JJR Technology patents.

1.16. "Federal Patent Policy" shall mean Policies as outline by federal and state law pertaining to patents, and all regulations promulgated there under, as amended, and any similar or successor statutes or regulations.

1.17. "Indemnification Floor" shall have the meaning set forth in Section 12.2.5.

1.18. "Infringement" shall have the meaning set forth in Section 6.3.2.

1.19. "Infringer" shall have the meaning set forth in Section 6.3.1.

Initial ___    Initial JJR            5

1.20. "Licensed JJR Know-how" shall mean Seller's interest in all JJR Know-how which is obtained pursuant to the Assigned Agreements.

1.21. "Licensed JJR Patents" shall mean Seller's interest in all JJR Patents which is obtained pursuant to the Assigned Agreements.

1.22. "Licensed JJR Technology" shall mean the In-Licensed JJR Know-How and the In-Licensed JJR Patents.

1.23. "Knowledge" and like phrases shall mean and include (i) actual knowledge and (ii) that knowledge, data and other information which a party (including the directors, officers and key employees of Seller) should have known by virtue of being an officer, director or key employee of the Seller.

1.24. "Lien" shall mean any mortgage, pledge, security interest, attachment, license, right to use, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing).

1.25. "Net Payments" with respect to a JJR Product shall mean payments on the Net Sales (or per unit sales or other similar basis for the payment of payments) of an JJR Product payable to Buyer by a Sub-licensee with respect to such JJR Product, less payments on the Net Sales (or per unit sales or other similar basis for the payment of payments) of the same JJR Product payable by Buyer to any Third Party.

1.26. "Net Sales" shall mean

(i)       in any case where any JJR Product or technology is sold or commercially disposed of for value in an arm's length sale to an independent Third Party, the gross invoice price for such JJR Product, less the following permitted deductions to the extent that such items are reflected in the price charged and do not exceed reasonable and customary amounts in the country in which the transaction occurs: (a) trade and quantity discounts or rebates actually taken or allowed, (b) credits or allowances given or made for rejections or return of any previously sold JJR Product actually taken or allowed, (c) any tax or government charge (including any tax such as a value added or similar tax or government charge, but not including any tax levied with respect to income) levied on the sale, transportation or delivery of the JJR Product and borne by the seller thereof, and (d) any charges for freight or insurance billed to the final customer.

(ii)      in any case, other than for a use in research or development or for use in marketing, where any JJR Product is not sold or commercially disposed of for value in an arm's length sale to an independent Third Party (including, without limitation, disposition in connection with the delivery of other products or services), the greatest of: (a) the Net Sales amount for such transaction determined as provided in (i) above or (b) if there has been any arm's length sale of a similar JJR Product to an independent Third Party, the Net Sales amount, determined as provided in (i) above, for the most


Initial _____   Initial JJR

6

contemporaneous such sale or (c), if there has been no such arm's length sale, the gross sales asking price for the JJR Product.

1.27. "Owned JJR Know-how" shall mean all JJR Patent Know-how.

1.28. "Owned JJR Patents" shall mean all JJR Patents.

1.29. "Owned JJR Technology" shall mean the Owned JJR Patents and the Owned JJR Know-how.

1.30. "Person" shall mean any natural person or legal entity.

1.31. "Purchased Assets" shall have the meaning set forth in Section 2.1.

1.32. "Reversion Event" shall have the meaning set forth in Section 7.1.3(i).

1.33. "Seller Indemnities" shall have the meaning set forth in Section 12.3.1.

1.34. "Combination Product" means a product comprising a combination of the JJR Technology with other Technology (i) where Seller's proprietary technology is used through use of the JJR Technology, and (ii) where the primary use of such combination product, as reasonably shown is provided by the product itself.

1.35. "JJR Technology" shall mean the current and future proprietary technology of Seller and its Affiliates based on the use of Seller's proprietary patents or proprietary products and the technology derived from such patents.

1.36. "Sub-licensee" shall mean any Third Party which is a direct or indirect licensee, sub-licensee or assignee of the JJR Technology from Buyer.

1.37. "Third Party" shall mean any Person other than Buyer and its Affiliates or Seller and its Affiliates.

1.38. "Transaction Documents" shall have the meaning set forth in Section 9.1.

1.39. "JJR Product" shall mean an JJR Product that is a product using the Patents.

1.40. "Valid Claim" shall mean (i) any pending claim of a patent application included in the JJR Patents that has not been abandoned or finally rejected without the possibility of appeal or re-filing or (ii) any claim of an issued or granted and unexpired patent included in the JJR Patents which has not been held permanently revoked, unenforceable, un-patentable or invalid by a decision of a court or other governmental body of competent jurisdiction that is un-appealable or un-appealed within the time allowed for appeal, which has not been rendered unenforceable through disclaimer or otherwise, which has neither been abandoned nor lost through an interference proceeding.



JJR 708

2.0 PURCHASE AND SALE OF THE PURCHASED ASSETS

2.1. ASSETS BEING ASSIGNED (Sold) TO BUYER. At the closing of the transaction as described in Section 3 (the "Closing"), Seller shall sell and assign to Buyer, and Buyer shall purchase and assume, the assets identified in Sections 2.1.1 through 2.1.6 below (collectively, the "Purchased Assets") as the same exist on the Closing Date (as hereinafter defined):

2.1.1. Seller's entire right, title and interest in the Owned JJR Technology.

U.S. Patent No(s). (#5,149,446), for an invention entitled "Potable Air-Water Generator," which issued on 9/2/92; and,

U.S. Patent No(s). (#5,106,512), for an invention entitled "Potable Air-Water Generator," which issued on 4/21/92; and,

U.S. Patent No(s). (#5,203,989), for an invention entitled "Potable Air-Water Generator," which issued on 4/20/92; and,

U.S. Patent No(s). (#5,366,705) for an invention entitled "Potable Air-Water Generator," which issued on 11/22/94;

2.1.2. Seller's entire right, title and interest in the equipment (the "JJR Equipment") identified on Schedule 2.1.3 attached hereto.

2.1.3. With respect to the JJR Patents, all of Seller's right, title and interest in the prosecution files for all patent applications and patents comprising the JJR Patents (including, without limitation, all drafts, notes, drawings or figures, official correspondence with patent offices, other correspondence and copies of cited references, copies of which Seller may retain), and in all intellectual property rights in such patents and applications, including without limitation the right to claim the priority benefit thereof and to prosecute and to enforce any patents arising there from.

2.1.4. With respect to the JJR Technology, all of Seller's right, title and interest in originals or copies of all laboratory notebooks and other primary data, research results, records and documentation, research plans, proposals, conclusions, know-how, specifications and information, to the extent any of the foregoing are recorded in any tangible form (including, without limitation, photographs, print-outs, electronic files and paper documents), which are owned by or licensed to and in the possession of Seller and which relate to the discovery of or are necessary or materially useful for the practice of the JJR Technology; and all intellectual and tangible property rights in the foregoing, including the right to file additional patent applications based thereon.

2.1.5. With respect to the JJR Technology, all of Seller's right, title and interest in all patent related prototypes, sub-assemblies, components, samples or products of, or in connection with the JJR Technology.

Initial ___    Initial _JJR_    8

Seller shall transfer the Purchased Assets to Buyer pursuant to a Bill of Sale in substantially the form of EXHIBIT B attached hereto (the "Bill of Sale"); an Assignment of Patents substantially in the form of EXHIBIT A attached hereto (the "Patent Assignment").

2.2. EXCLUDED ASSETS. Buyer shall not acquire any assets other than those assets specifically included in the Purchased Assets. Without limiting the foregoing, Buyer shall not acquire any of Seller's other technology, other intellectual property, cash or cash equivalents, accounts receivable, deposits or open purchase orders or back orders.

2.3. ASSUMED OBLIGATIONS. Buyer shall assume and perform all obligations of the Seller under the Assigned Agreements arising after the Closing and based on events or circumstances arising after the Closing (the "Assumed Obligations"), including, without limitation, any and all payments, product development milestones, diligence, patent prosecution or other obligations arising there under after the Closing. Except as otherwise explicitly set forth herein, Buyer shall not assume any obligations of Seller other than the Assumed Obligations, and Buyer shall not assume any liabilities of the Seller.

2.4. PURCHASE PRICE. In addition to the payments provided for in Section 5 and assumption of the Assumed Obligations, Buyer shall pay to Seller a total of $6,000,000.00 pursuant to Section 3.1.3 hereof. Each of Buyer and Seller, respectively, shall pay any sales, use and other transfer taxes imposed on such party by operation of law in connection with the purchase and/or transfer of the Purchased Assets hereunder.

2.5. FURTHER ASSURANCES. Each of the parties hereto, before, at and after the Closing, promptly upon the request from time to time of any other party hereto and without further consideration, will do each and every reasonable act and thing as may be necessary or reasonably desirable to consummate the transactions contemplated hereby and to effect an orderly transfer to Buyer of the Purchased Assets, and to put the Buyer in actual possession and operating control thereof, and to confirm the Buyer's title to all of the Owned JJR Technology and Buyer's rights under the Assigned Agreements, and to carry out the purpose and intent of this Agreement, including without limitation:

    (i) granting Buyer a license or other interest in such Purchased Assets to the extent that the Seller is unable to assign such asset without the consent or approval of one or more Third Parties;

    (ii) assigning to Buyer additional agreements between the Seller and Third Parties, such as, for example, material transfer agreements;

    (iii) executing, acknowledging and delivering assurances, assignments, powers of attorney and other documents and instruments;

    (iv) furnishing information and copies of documents, scientific notebooks, books and records;

    (v) filing reports, returns, applications, filings and other documents and instruments with governmental authorities; and

Initial ____    Initial JJR    9

(vi) cooperating with the other party hereto in exercising any right or pursuing any claim, whether by litigation or otherwise, other than rights and claims running against the party from which such cooperation is requested.

## 3. CLOSING.

3.1. The Closing shall be held at the respective offices of J.J. Reidy & Co., Inc. and Free Water Company no later than 5:00 p.m. Eastern Standard Time on October 13th 2005 or at such other location and on such other date as Buyer and Seller may agree upon in writing (the "Closing Date"). At the Closing:

3.1.1 Seller shall deliver or cause to be delivered to Buyer the following:

(i) The Bill of Sale;

(ii) The Patent Assignment; and

3.1.2. Buyer shall deliver or cause to be delivered to Seller the Assignment Agreement.

3.1.3. Buyer shall pay to Seller, by wire transfer of immediately available funds, in accordance with written instructions furnished by Seller a fee in the amount of one million one hundred eighty thousand dollars $1,180,000.00 within one hundred twenty days after the execution of this agreement by seller and term may be extended by written authorization by seller.

3.1.4 Seller shall deliver at the Closing or shall make available within thirty (30) days after the Closing all of the books, data, documents, instruments and other records and materials to the extent required by Section 2.1, and any other documents or materials containing or embodying JJR Know-how. For the purpose of effecting the transfer of all JJR Technology to Buyer, and to facilitate Buyer's understanding of the JJR Technology, Seller will, from time to time upon reasonable notice during the term of this Agreement, make Seller personnel reasonably available to Buyer to answer Buyer's questions related to the JJR Technology, including any past agreements between Buyer and Third-Parties related thereto, provided that Buyer shall reimburse Seller for any out-of-pocket expenses incurred by Seller in connection therewith.

4.0 NO OTHER LICENSES. No other rights or licenses under the JJR Technology are granted to Seller hereunder. Without limiting the generality of the foregoing sentence, no provision of this Agreement shall be construed to grant Seller rights under the JJR Technology to make, have made, use have used, sell, have sold, or import products .

## 5.0. FUTURE PAYMENTS AND SHARE OF MILESTONE AND OTHER PAYMENTS.

5.1. FUTURE PAYMENTS.

Initial [signature]     Initial JJR

10

5.1.1. Starting twelve (12) months from signing of this agreement Buyer shall pay or cause to be paid to Seller an amount equal to a minimum of $45,000.00 or [five] percent [5%] per quarter which ever is greater of the Net Sales of JJR Products or sublicenses sold by Buyer or its Affiliates to the maximum sum of six million dollars ($6,000,000.00) total.

5.1.2 Buyer shall pay Seller the total outstanding balance as the buyer acquires funding . Buyer will pay a minimum of 25% of investment capital invested with company to a maximum of six million dollars ($6,000,000.00). Payments will be calculated against the total quarterly investment beginning one year from date of signed agreement.

5.1.3 No multiple amounts shall be payable by Buyer under this Article 5 because the manufacture, use, sale or import of any JJR Product is covered by more than one Valid Claim of an JJR Patent or uses or incorporates more than one aspect of the JJR Technology.

5.1.4 With respect to each of the four JJR Patents, the obligations of Buyer under this Article 5 shall expire, upon completion of all forms of payments equaling six million dollars ($6,000,000.00)

5.2. RECORDS. Buyer shall keep, and shall require its Sub-licensees and Affiliates to keep and make available to Buyer for review by accountants selected by Seller as provided herein, complete and accurate records of the latest three (3) years relating to the Net Sales of JJR Products on which amounts are payable hereunder. For the sole purpose of verifying the amounts payable to Seller under Section 5.1, Seller shall have the right, no more often than once each calendar year, at Seller's expense to retain an independent, certified public accountant selected by Seller and reasonably acceptable to Buyer, to review such records of Buyer in the location where such records are maintained by Buyer upon reasonable notice and during regular business hours and under obligations of strict confidence. The independent certified public accountant shall disclose to Seller only whether the reports required under Section 5.0 are correct or incorrect, and the specific details concerning any discrepancies. No other information shall be provided to Seller. If such independent certified public accountant concludes that additional amounts were owed during such period, then Buyer shall pay such additional amounts to Seller within thirty (30) days after the date Seller delivers to Buyer such accounting firm's written report so concluding. If such independent certified public accountant concludes that Buyer overpaid amounts due during such period, Buyer shall receive a credit against payment of future amounts due for such overpayment. Should the results of such review result in an increase of more than 5% in any payment due Seller hereunder; Buyer shall be obligated to pay any out-of-pocket expenses incurred by Seller with respect to such review. Seller shall treat all financial information subject to review under this Section 5.0 as the Confidential Information of Buyer in accordance with the provisions of Section 6.2, and shall cause its independent public accountant or accounting firm to enter into confidentiality agreements having provisions at least as strict as the provisions in Section 6.2 hereof.

Initial _____    Initial JJR    11

5.3. REPORTS AND PAYMENTS. Within ninety (90) days after the end of each calendar quarter, Buyer shall (i) deliver or cause to be delivered to Seller a true and accurate report, giving such particulars of the business conducted by Buyer, Buyer's Affiliates and any Sub-licensees during such quarter under this Agreement as are pertinent to an accounting for any payments hereunder, and (ii) pay or cause to be paid any payment amounts determined on the basis of such accounting. If no payments are due, it shall be so reported. For the purposes of determining when the sale of an JJR Product occurs for the purposes of calculating Net Sales, such sale shall be deemed to occur on the date of invoice to the purchaser of the JJR Product. To the extent appropriate for the calculation of any amounts payable under this Agreement, any such report shall include a statement showing the calculation of the amount owed on the total Net Sales for the period covered, the exchange rate used to convert any amounts payable into United States Dollars and the total Net Sales for the period covered.

5.4. FORM OF PAYMENT. All amounts payable to Seller hereunder shall be payable in United States dollars to the address specified in Section 17, or at such other place as Seller may reasonably designate; PROVIDED, HOWEVER, that if the law of any foreign country prevents any payment payable to Seller hereunder to be made as so provided, or prevents any such payment to be made in United States dollars, Seller agrees to accept such payment in such form and place as is permitted, including deposits by Buyer in the applicable foreign currency in a local bank or banks in such country designated by Seller. If any currency conversion is required in connection with any payment to Seller hereunder, such conversion shall be made at the buying rate for the transfer of such other currency as quoted by The Wall Street Journal on the last business day of the applicable accounting period, in the case of any payment payable with respect to a specified accounting period, or, in the case of any other payment, the last business day prior to the date of such payment.

5.5. TAXES. Seller and Buyer shall use all reasonable and legal efforts to reduce tax withholding on payments made to Seller hereunder. If Buyer concludes that, notwithstanding such efforts, tax withholding under the laws of any country is required with respect to any payment to be made to Seller under this agreement, Buyer shall withhold or cause its Affiliate or Sub-licensee to withhold the required amount and to pay such amount to the appropriate governmental authority. In such a case, Buyer will promptly provide Seller with, or promptly cause Seller to be provided with, original receipts or other evidence sufficient to allow Seller to obtain the benefits of any such tax withholding.

5.6. INTEREST. In the event that any payment due hereunder is not made when due, the payment shall accrue interest beginning on the first day following the calendar quarter to which such payment relates calculated at the annual rate of the sum of (a) [one] percent [1%] plus (b) [LIBOR]; PROVIDED, THAT, in no event shall said annual rate exceed the maximum interest rate permitted by law in regard to such payments. Such payment when made shall be accompanied by all interest so accrued. Said interest and the payment, and acceptance thereof, shall not negate or waive the right of Seller to any other remedy, legal or equitable, to which it may be entitled because of the delinquency of the payment.

Initial     Initial JJR    12

JJR 713

6.9 PROTECTION OF INTELLECTUAL PROPERTY RIGHTS.

6.1. PATENT PROSECUTION/PATENT COSTS. Buyer shall be responsible for prosecuting and maintaining all JJR Patents. Seller shall cooperate with Buyer in regard to such maintenance and prosecution which cooperation shall include: (i) provision of written or other information reasonably requested by the Buyer, (ii) allowing the Buyer reasonable access to employees of the Seller and (iii) commercially reasonable efforts to have the officers, employees, consultants, agents, accountants and attorneys of the Seller cooperate fully with the Buyer, including, without limitation, by providing written or oral testimony pertaining to the JJR Technology and/or the discovery thereof as reasonably requested by the Buyer, signing all lawful documents reasonably requested by the Buyer, and executing all divisional, continuing, reissue and patent applications reasonably requested by the Buyer.

6.2. CONFIDENTIAL INFORMATION. Each party shall maintain the Confidential Information of the other party in strict confidence, and shall not disclose, divulge or otherwise communicate such Confidential Information to others, or use it for any purpose, except pursuant to, and in order to carry out, the terms and objectives of this Agreement or with the express written consent of the Disclosing Party. Each party also hereby agrees to take reasonable steps to prevent and restrain the unauthorized disclosure of such Confidential Information by any of its directors, officers, employees, consultants, sub-contractors, sub-licensees or agents. For purposes of this agreement, the JJR Technology and the Assigned Agreements shall become the Confidential Information of Buyer upon the Closing; PROVIDED, HOWEVER, that upon the occurrence of a Reversion Event, the Current JJR Technology and the Assigned Agreements shall become the Confidential Information of Seller. The provisions of this paragraph shall not apply to any Confidential Information of the Disclosing Party which is required to be disclosed by the Receiving Party to comply with any applicable laws or regulations, but only to the extent required by such law or regulation; and FURTHER PROVIDED, that the Receiving Party making a disclosure pursuant to the provisions of this sentence shall provide prior notice of such disclosure to the Disclosing Party sufficiently in advance of such disclosure to allow the Disclosing Party to respond and to take reasonable and lawful action to avoid and/or minimize the degree of such disclosure.

6.3. ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS.

6.3.1. If Buyer becomes aware of any infringement of any JJR Patent or any violation of any other intellectual property right contained (i) in the JJR Technology by a Third Party (an "Infringer") during the Development Period, or (ii) in the atmospheric water generator technology or related to a atmospheric water generator Combination Product by an Infringer during term of this Agreement, Buyer shall so notify Seller. Similarly, if Seller becomes aware of the infringement of any JJR Patent during the term of this Agreement or any other intellectual property right contained in the JJR Technology during the term of this Agreement, Seller shall so notify Buyer.



Initial _____   Initial JJR          13

JJR 714

6.3.2. Buyer shall have the right to protect against any infringement of any JJR Patent or any violation of any other intellectual property right contained in the JJR Technology (any such infringement or violation being referred to herein as an "Infringement") by any Infringer during the term of this Agreement when, in Buyer's sole judgment, such action may be reasonably necessary, proper and justified. If (i) at any time during the Development Period with respect to the JJR Technology, or (ii) at any time during the term of this Agreement with respect to the atmospheric water generator Combination Product, Seller shall have provided Buyer with written evidence demonstrating prima facie evidence of an Infringement and Seller shall have requested Buyer in writing to take steps to protect against such Infringement, and Buyer has not, within 90 days of the receipt of such evidence and request, either (i) caused such Infringement to terminate, (ii) initiated legal proceedings against the Infringer, or (iii) entered into discussions with such alleged Infringer regarding a license under the applicable JJR Patent, then Seller may, upon notice to Buyer, initiate legal proceedings against the Infringer at Seller's expense and in Buyer's name if so required by law.

6.3.3. In the event that either party shall initiate or carry on legal proceedings against any Infringer as contemplated by Section 6.3.2 above, the other party shall fully cooperate with and supply all assistance reasonably required by the party initiating or carrying on such proceedings. The party which initiates any such proceedings shall have sole control of such proceedings and shall bear the reasonable expenses. The party initiating or carrying out such proceedings shall keep the other party informed of the progress of such proceedings and such other party shall be entitled to counsel in such proceedings but at its own expense.

6.3.4. Any award paid by any Third Party as a result of such proceedings (whether by way of settlement or otherwise) shall be first applied to reimbursement of the un-reimbursed legal fees and expenses incurred by the party initiating the proceedings, then to the reimbursement of the un-reimbursed legal fees and expenses incurred by the other party, and then the remainder shall be divided by the parties as follows:

6.3.4.1. If the remaining amount awarded is with respect to lost profits, the applicable party shall receive an amount equal to the damages the court determines such party has suffered as a result of the Infringement, less any amounts (if any) that would have been due to the other party under this Agreement had such party made the sale of products or realized payments from Affiliates or sub-licensees that would have resulted in such profits; and the other party shall receive an amount equal to such deducted amounts.

6.3.4.2. Any remaining amounts shall be retained by the party initiating such proceedings.

7.0 COVENANTS OF BUYER.

7.1. DUE DILIGENCE.

7.1.2. GENERAL OBLIGATION. Buyer

Initial ____   Initial JJR          14

shall use commercially reasonable efforts to diligently commercialize the JJR Technology.

7.1.3. SPECIFIC DUE DILIGENCE OBLIGATIONS. Buyer, itself or through its Affiliates or Sub-licensees, agrees to accomplish one of the following commercialization objectives with respect to the JJR Technology during the five (5) year period commencing on the first day of Buyer's first fiscal quarter following the Closing Date (the "Development Period"):

(i)     Create a investment program for three million dollars ($3,000,000.00) for initial bridge capital. Followed by a seventeen million dollar ($17,000,000.00) investment program.

(ii)    Develop a practical application embodying the JJR technology and patents.

(iii)   Develop a production program of a product using the JJR technology and patents

7.1.4. FAILURE TO MEET DUE DILIGENCE OBLIGATIONS. If Buyer, itself or through its Affiliates or Sub-licensees, fails to accomplish the first one of the commercialization objectives set forth in Section 7.1.2 above (a "Reversion Event"), then the JJR Technology as it exists on the Effective Date (the "Current JJR Technology"), and the JJR Equipment owned by Buyer at the end of the Development Period shall automatically be reassigned to Seller; provided, that, if, Buyer granted licenses or sublicenses (as the case may be) under the JJR Technology prior to the occurrence of a Reversion Event, such licenses or sublicenses (as the case may be) shall be assigned to the Seller and otherwise shall remain in full force and effect under the same terms and conditions.

7.1.5. REPORTS. During the Development Period, Buyer shall provide to Seller a quarterly report of its activities and efforts toward commercialization of the JJR Technology in sufficient detail to allow Seller to monitor Buyer's compliance with the due diligence obligations set forth in Section 7.1.2 above. Any such reports shall be the Confidential Information of Buyer and shall be held in strict confidence by Seller in accordance with the provisions of Section 6.2 hereof.

7.1.6. FORCE MAJEURE. Buyer shall not be deemed to be in breach of its obligations under this Agreement, including without limitation its obligations under Section 7.1.5 above, if such failure or delay is due to natural disasters or any causes beyond its reasonable control, including without limitation delays caused by the Seller, regulatory agencies or other third parties; provided however, that in such event, Buyer shall promptly notify Seller in writing of such occurrence, use commercially reasonable best efforts to meet its obligations under this Agreement, notify Seller in writing of the expected duration of such inability to perform and of any developments (or changes therein) that appear likely to affect Buyer's ability to perform any of its obligations hereunder in whole or in part; and provided, further, any time for performance by Buyer hereunder shall be extended by the actual time of delay caused by such occurrence or event.



Initial _____    Initial JJR    15

7.2. COMPLIANCE WITH LAW. Buyer shall comply with, and shall insure that Buyer's Affiliates and Sub-licensees comply with, all government statutes and regulations that relate to JJR Products, including, but not limited to, FDA statutes and regulations and the Export Administration Act of 1979 (50 App.U.S.C. ss.2401 et. seq.), as amended, and the regulations promulgated there under, and any applicable similar laws and regulations of any other country. Without limiting the generality of the foregoing, Buyer agrees that all JJR Products used or sold in the United States shall be manufactured substantially in the United States.

7.3. MARKING. Buyer shall cause all JJR Products sold in the United States to be marked with all applicable U.S. Patent Numbers, to the full extent required by United States law. Buyer shall similarly cause all JJR Products shipped to or sold in any other country to be marked in such a manner as to conform with the patent laws and practice of such country.

7.4. PUBLICITY. Except as required by law, neither party shall use the name of the other party or the other party's Affiliates, nor that of any staff member or employee of the other party or the other party's Affiliates, or any adaptation thereof, in any advertising, promotional or sales literature, offering materials, business plans or any other form of publicity without prior written consent obtained from such other party and from the individual staff member or employee if such individual's name is so used.

8.0 COVENANTS OF SELLER.

Seller shall satisfy its obligations under the Agreement referenced in Section 7.0 above.

9.0 REPRESENTATIONS AND WARRANTIES OF SELLER.

Except as set forth in the schedule of exceptions, Seller represents and warrants to Buyer as follows:

9.1. DUE ORGANIZATION, AUTHORIZATION AND GOOD STANDING. Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Massachusetts and is authorized to transact business as a corporation in each jurisdiction in which the failure to so qualify would have a material adverse impact on Seller's ability to sell the Purchased Assets, including the States of Nevada and internationally. Seller has the requisite corporate power and authority to enter into, execute, deliver and perform this Agreement and any other instruments of transfer and conveyance executed in connection herewith (collectively, with this Agreement, the "Transaction Documents"), and to consummate all transactions contemplated hereby and thereby and has or will have taken all corporate action required by law and its articles of incorporation and by-laws to authorize such execution, delivery and performance. This Agreement is, and each of the other Transaction Documents will, upon execution by duly authorized officers of Seller at the Closing, be the valid and legally binding obligation of Seller, enforceable against it in accordance with its terms, except to the extent such enforcement may be limited by bankruptcy, insolvency, moratorium, reorganization and

Initial W    Initial JJR    16

JJR 717

similar laws of general applicability affecting the rights and remedies of creditors and by general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.

9.2. NO CONFLICT. The execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated hereby and thereby will not (i) result in a breach or violation of or be in conflict with Seller's articles of incorporation or by-laws, (ii) violate or result in a breach of any mortgage, indenture, note, license, agreement or any other instrument or obligation related to Seller or to Seller's ability to execute this Agreement or the Transaction Documents or to consummate the transactions contemplated hereby or thereby, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained in writing, (iii) violate any judgment, order, writ, injunction, decree, statute, rule or regulation applicable to Seller, or (iv) result in the creation of any Lien upon the Purchased Assets. Seller is in good standing and is not in breach or default of any obligation under any of the Assigned Agreements.

9.3. TITLE TO JJR EQUIPMENT. Seller has good and defensible title to all the JJR Equipment, free and clear of all Liens.

9.4. JJR TECHNOLOGY. Seller owns all of the patents and patent applications comprising the Owned JJR Technology and Seller owns all of the Owned JJR Know-how, in each case free and clear of all Liens and free and clear of all claims or actions arising out of or resulting from any action or failure to act of the Seller, or arising out of or resulting from any action or failure to act of any inventors of such Owned JJR Technology or any other agent, employee or consultant of Seller. Seller has the right to assign to Buyer all of its rights under the Assigned Agreements and any JJR Technology subject to such Agreements, and to the Knowledge of Seller, all JJR Technology within the Assigned Agreements is free and clear of all Liens and free and clear of all claims or actions arising out of or resulting from any action or failure to act of the Seller, or arising out of or resulting from any action or failure to act of any inventors of such JJR Technology or any other agent, employee or consultant of Seller. Seller is not in default of any of the Assigned Agreements, nor has Seller received notice of any default under any agreement under which Seller has in-licensed any portion of the JJR Technology. To Seller's Knowledge, no party from which Seller has in-licensed the In-Licensed JJR Technology is in default or breach of any of the Assigned Agreements, and Seller has not asserted any claims of default against any party to the Assigned Agreements. The parties expressly acknowledge and agree that Seller's technology known as "Potable Air-Water Generator," as embodied in United States U.S. Patent No(s). (#5,149,446), (#5,106,512), (#5,203,989), (#5,336,705) part of the JJR Technology and is included in the technology purchased by Buyer hereunder. The patents and patent applications identified on Schedule 1.13 constitute all of the patents and patent applications related to the JJR Technology in which Seller has an interest. All of the JJR Patents have been filed and prosecuted in good faith as required by law and are in good standing. The inventors of such patent applications and patents are as set forth in the respective patent documents and all such inventors have assigned their rights in the JJR Technology to Seller or to the party that licensed any In-Licensed JJR Technology to Seller. To the Knowledge of

Initial W        Initial JJR                    17

Seller, no Third Party has any claim of infringement against Seller of any patents or other intellectual property rights of others in connection with the JJR Technology or the use thereof. No interference or opposition proceeding is pending or, to the Knowledge of the Seller threatened, relating to the JJR Technology. Except as reflected in this Agreement and the disclosure schedules. Seller has not granted any Third Party any right to use the JJR Technology for any purpose, prior to the Closing Date and which included a grant of the right to such Third Party to access or use the JJR Technology, or the grant of rights under Seller's intellectual property rights in the JJR Technology (collectively "Third Party JJR Rights") have expired or have been terminated under conditions where: (i) all of such Third Party JJR Rights have been terminated so that as of the Closing Date and thereafter, such Third Party does not have and will not have any rights in or any rights of access to or use of: the JJR Technology and any intellectual property rights therein, any inventions or discoveries (including any intellectual property rights therein) made through such party's use of the JJR Technology, or any products developed or made through the use of the JJR Technology; and (ii) such Third Party has returned to Seller or destroyed all confidential information relating to the JJR Technology and any tangible embodiments of the JJR Technology. No right or license under intellectual property (other than the JJR Technology) owned or controlled by, or licensed to, the Seller is needed by Buyer in order to practice the JJR Technology.

9.6. CONSENTS. No filing with or notice to and no permit, authorization, consent or approval of any Person or regulatory or governmental authority is necessary for the execution, delivery and performance of this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby.

9.7. PROPRIETARY INFORMATION OF THIRD PARTIES. To the Knowledge of Seller, no Third Party has claimed or has reason to claim that any person employed by or affiliated with Seller has, in any way related to the JJR Technology, (i) violated or may be violating any of the terms or conditions of such person's employment, non-competition or non-disclosure agreement with such third Party, or (ii) disclosed or may be disclosing, or utilized or may be utilizing any trade secret or proprietary information or documentation of such Third Party. No Third Party has requested information from Seller which suggests that such a claim might be contemplated. To the Knowledge of Seller, no person employed by or affiliated with Seller has employed or proposes to employ in connection with the JJR Technology any trade secret or any information or documentation proprietary to any former employer or other Third Party and no person employed by or affiliated with Seller has violated any confidential relationship which such person may have had with any Third Party in connection with the JJR Technology.

9.8. LITIGATION. There is no action, suit, claim, proceeding or investigation pending, or, to the Knowledge of Seller, threatened against Seller, affecting the Purchased Assets, (i) at law or in equity, or before any federal, state, municipal or other governmental commission, board, bureau, agency or instrumentality, domestic or foreign, or (ii) before any arbitration panel. To the Knowledge of Seller, there are no outstanding writs, judgments, injunctions or decrees of any court, governmental agency or arbitration tribunal against, involving or affecting the Purchased Assets other than what is listed and

Initial     Initial JJR          18

disclosed on the (Disclosure Schedule Exhibit B). There is no action or suit by Seller pending or threatened against others involving the Purchased Assets.

9.9. TAXES. Seller has not taken or, to the Knowledge of Seller, failed to take any action which could create any tax lien on the Purchased Assets.

9.10 DISCLAIMER OF WARRANTIES; FEDERAL PATENT POLICY.

9.10.1. EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY OF THE PURCHASED ASSETS INCLUDING WITHOUT LIMITATION THE JJR TECHNOLOGY OR ANY JJR PRODUCT AND HEREBY DISCLAIMS THE SAME.

9.10.2. SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY THAT THE MANUFACTURE, USE, SALE OR DISPOSAL OF ANY JJR PRODUCT WILL NOT INFRINGE ANY PATENT OR OTHER RIGHT OF ANY THIRD PARTY AND HEREBY DISCLAIMS THE SAME.

9.10.3. Nothing in this Agreement shall be construed as:

(i)     a warranty or representation by Seller as to the validity or scope of the JJR Patents;

(ii)    an obligation on Seller to bring or prosecute actions or suits against Third Parties for patent infringement;

(iii)   conferring by implication, estoppel or otherwise any license or rights under any patents of Seller other than the JJR Patents as defined in this Agreement, regardless of whether those patents are dominant or subordinate to the JJR Patents;

(iv)    an obligation on Seller to improve, modify or update the JJR Technology.

9.11. FULL DISCLOSURE. No representation or warranty of the Seller contained in this Agreement, the schedules and exhibits attached hereto or in the Transaction Documents contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements made, in the context in which made, not false or misleading.

10.0 REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer represents and warrants to Seller as follows:

10.1. DUE ORGANIZATION, AUTHORIZATION AND GOOD STANDING. Buyer is a duly incorporated, validly existing and duly registered with all requisite power and

Initial  W   Initial  JJR          19

authority to execute, deliver and perform this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby and has taken all action required by law and its Statutes to authorize such execution, delivery and performance. This Agreement is, and each of the other Transaction Documents will, upon execution thereof by a duly authorized officer of Buyer at the Closing, be the valid and legally binding obligation of Buyer, enforceable in accordance with its terms, except to the extent such enforcement may be limited by bankruptcy, insolvency, moratorium, reorganization and similar laws of general applicability affecting the rights and remedies of creditors and to general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.

10.2. NO CONFLICT. The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby will not (i) result in a breach or violation of Buyer's Statutes, (ii) violate or result in a breach of any mortgage, indenture, note, license, agreement or other instrument or obligation related to Buyer or to Buyer's ability to consummate the transactions contemplated hereby or thereby, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained in writing, or (iii) violate any judgment, order, writ, injunction, decree, statute, rule or regulation application to Buyer.

10.3. DISCLAIMER OF WARRANTIES.

10.3.1. BUYER MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE JJR TECHNOLOGY OR ANY PRODUCT AND HEREBY DISCLAIMS THE SAME.

10.3.2. BUYER MAKES NO EXPRESS OR IMPLIED WARRANTY THAT THE MANUFACTURE, USE OR SALE OF ANY PRODUCT OR COMBINATION PRODUCT WILL NOT INFRINGE ANY PATENT OR OTHER RIGHT OF ANY PARTY AND HEREBY DISCLAIMS THE SAME.

10.3.3. Nothing in this Agreement shall be construed as:

(i)     a warranty or representation by Buyer as to the validity or scope of the JJR Patents;

(ii)    an obligation on Buyer to bring or prosecute actions or suits against Third Parties for patent infringement;

(iii)   conferring by implication, estoppel or otherwise any license or rights under any patents of Buyer other than the JJR Patents as defined in this Agreement, regardless of whether those patents are dominant or subordinate to the JJR Patents; or

Initial ___    Initial JJR

20

(iv)   an obligation on Buyer to improve, modify or update the JJR Technology.

**11.0 TERM.**

11.1. This Agreement shall commence on the Effective Date, and unless terminated earlier by mutual written agreement of the parties, this Agreement will expire upon the expiration of the last of the JJR Patents to expire in any country.

11.2. Upon the termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of termination.

11.3. The provisions of the following Articles and Sections shall survive the expiration or termination of this Agreement: 6.2, 9, 10, 11.2, 11.3, 12, 13, 14, 20, 21.

11.4. This Agreement may be terminated by Seller, upon written notice to Buyer. Such notice shall be deliverable by Seller within 15 days of material breach of this Agreement.

**12.0 INDEMNIFICATION.**

12.1.   SURVIVAL   OF   REPRESENTATIONS   AND   WARRANTIES.   The representations and warranties of Seller and Buyer shall survive the Closing and shall continue in full force and effect for twelve (12) months following the Closing, except that the Seller's representations contained in Section 9.5 shall survive the Closing and shall continue in full force and effect forever.                         *no 9.5 ?*

**12.2. INDEMNIFICATION BY SELLER.**

12.2.1.  Seller agrees to defend and indemnify Buyer, its Affiliates, their respective officers, directors, employees and agents and their respective successors, heirs and assigns (the "Buyer Indemnities") from all sums, including, without limitation, reasonable attorneys' fees, with respect to:

(i)   any and all liabilities, losses, damages and expenses due and owing and arising prior to the Closing or arising from an act, omission or conduct of Seller prior to the Closing, and relating to the Purchased Assets, of any nature, whether accrued, absolute, contingent or otherwise existing;

(ii)   any breach of the representations, warranties or covenants by Seller contained herein or in the Transaction Documents; and

(iii)  any and all liabilities, losses, damages and expenses incurred by or imposed upon the Buyer Indemnities in connection with any

Initial _____    Initial JJR    24

JJR 722

claims, suits, actions, demands or judgments arising out of or resulting from the making or distribution of, the use by or administration to any Person of any JJR Product or JJR Combination Product made, used or sold pursuant to any right or license granted to Seller under this Agreement (including, but not limited to, actions in the form of tort, warranty or strict liability).

12.2.2. Seller's indemnification under Section 12.2.1 shall not apply to any liability, damage, loss or expense to the extent that it is directly attributable to the reckless misconduct or intentional misconduct of the Buyer Indemnities.

12.2.3. Seller agrees, at its own expense, to provide attorneys reasonably acceptable to Buyer to defend against any actions brought or filed against any party indemnified hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

12.2.4. Any Buyer Indemnity seeking indemnification hereunder shall promptly notify Seller of any claim for which indemnification is sought (PROVIDED, HOWEVER, that no delay on the part of any Buyer Indemnity in so notifying Seller shall relieve Seller of any liability hereunder unless, and solely to the extent that, Seller is prejudiced thereby), shall cooperate with Seller in the defense of any such claim, and shall not settle or compromise, or consent to the entry of a judgment with respect to any such claim, without the prior written consent of Seller, which shall not be unreasonably withheld.

12.2.5. Seller shall have no liability under Sections 12.2.1(i), 12.2.1(ii) or 12.2.1(iii) above until the aggregate of all sums due hereunder exceeds $50,000 (the "Indemnification Floor"), in which case Seller shall be liable for the amount of such sums in excess of $50,000.

12.3. INDEMNIFICATION BY BUYER.

12.3.1. Buyer agrees to defend and indemnify Seller, its Affiliates, their respective officers, directors, employees and agents and their respective successors, heirs and assigns (the "Seller Indemnities") from all sums, including, without limitation, reasonable attorneys' fees, with respect to:

(i)     except as provided in Section 12.2.1(i), any and all liabilities, losses, damages and expenses due and owing and arising subsequent to the Closing, or arising from an act, omission or conduct of Buyer after the Closing and relating to the Purchased Assets of any nature, whether accrued, absolute, contingent or otherwise existing, including, without limitation, any federal, state or local tax liability;

(ii)    any breach of the representations, warranties or covenants by Buyer contained herein or in the Transaction Documents, including, without limitation, under the Assumed Obligations; and

Initial _____    Initial JJR_____          22

(iii)    any and all liabilities, losses, damages and expenses incurred by or imposed upon the Seller Indemnities in connection with any claims, suits, actions, demands or judgments arising out of or resulting from the making or distribution of, the use by or administration to any Person of any JJR Product made, used or sold pursuant to any right or license granted to Buyer under this Agreement (including, but not limited to, actions in the form of tort, warranty or strict liability).

12.3.2. Buyer's indemnification under Section 12.3.1 shall not apply to any liability, damage, loss or expense to the extent that it is directly attributable to the reckless misconduct or intentional misconduct of the Seller Indemnities.

12.3.3. Buyer agrees, at its own expense, to provide attorneys reasonably acceptable to Seller to defend against any actions brought or filed against any party indemnified hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

12.3.4. Any Seller Indemnities seeking indemnification hereunder shall promptly notify Buyer of any claim for which indemnification is sought (PROVIDED, HOWEVER, that no delay on the part of any Seller Indemnity in so notifying Buyer shall relieve Buyer of any liability hereunder unless, and solely to the extent that, Buyer is prejudiced thereby), shall cooperate with Buyer in the defense of any such claim, and shall not settle or compromise, or consent to the entry of a judgment with respect to any such claim, without the prior written consent of Buyer, which shall not be unreasonably withheld.

12.3.5. Buyer shall have no liability under Sections 12.3.1(i), 12.3.1(ii) or 12.3.1(iii) above until the aggregate of all sums due hereunder exceeds the Indemnification Floor, in which case Buyer shall be liable for the amount of such sums in excess of $50,000.

13.0 INSURANCE.

13.1. INSURANCE OBLIGATIONS OF BUYER.

13.1.1 Beginning at the time as any JJR Product is being commercially distributed or sold (other than for the purpose of obtaining regulatory approvals) by Buyer, an Affiliate of Buyer or by a sub-licensee of Buyer, Buyer shall, at its sole cost and expense, procure and maintain commercial general liability insurance in amounts not less than $1,000,000 per incident and $1,000,000 annual aggregate and naming the Seller Indemnitees as additional insureds. Such commercial general liability insurance shall provide (a) product liability coverage and (b) contractual liability coverage for Buyer's indemnification under Section 12 of this Agreement. If Buyer elects to self-insure all or part of the limits described above (including deductibles or retentions which are in excess of $250,000 annual aggregate) such self-insurance program must be acceptable to Seller. The minimum amount of insurance coverage required under this Section 13.1 shall not be construed to create a limit of Buyer liability with respect to its indemnification under Section 12 of this Agreement.



Initial _____   Initial JJR     23

JJR 724

13.1.2. Buyer shall provide Seller with written evidence of such insurance upon request of Seller. Buyer shall provide Seller with written notice at least fifteen (15) days prior to the cancellation, non-renewal or material change in such insurance; if Buyer does not obtain replacement insurance providing comparable coverage within such fifteen (15) day period, Seller shall have the right to terminate this Agreement effective at the end of such fifteen (15) day period without notice of any additional waiting periods.

13.1.3. Buyer shall maintain such commercial general liability insurance during (a) the period that any such product, process or service is being commercially distributed or sold (other than for the purpose of obtaining regulatory approvals) by Buyer or by a Sub-licensee and (b) a reasonable period after the period referred to in (iii)(a) above which in no event shall be less than three (3) years.

14.0 LIMITATION OF LIABILITY. Neither party shall be liable to the other party for indirect, incidental or consequential damages arising out of the terms or conditions of this Agreement, the JJR Technology or any JJR Product or with respect to its performance or lack thereof.

15.0 EXPENSES OF TRANSACTION. Except as otherwise provided in Section 7.1.7, whether or not the transactions provided for herein are consummated, each of the parties hereto will assume and bear all expenses, costs and fees incurred by such party in connection with the preparation, negotiation and execution of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

16.0 CONDUCT OF PARTIES. Each party agrees to conduct itself in good faith in all relations with the other party contemplated by this Agreement. Each party agrees not to intentionally take, delay or omit to take any action to avoid compliance with this Agreement; provided, that, this provision shall not be interpreted in any way to require either party to alter its customary method of reaching business decisions or to make business decisions other than (i) in a commercially reasonable manner using prudent business judgment, (ii) in compliance with all applicable laws and regulations and (iii) in accordance with such party's fiduciary and other obligations to its employees and stockholders

17.0 NOTICES.
All notices and other communications required or permitted hereunder shall be in writing and shall be sent by facsimile (with hard copy to follow), courier service or certified mail, return receipt requested, postage prepaid, addressed as follows or to such other address or addresses of which the respective party shall have notified the other party.

If to Seller, to it at

J.J. Reidy & Co., Inc.
1260 Main Street, Holden,

Initial X      Initial JJR      24

Massachusetts 01520-1020
Attn: President


If to Buyer, to it at

**Free Water Company**
525 Reactor Way,
Reno, Nevada, 89502
Attn: President


18.0  ENTIRE AGREEMENT; MODIFICATIONS AND AMENDMENTS.  The agreement of the parties that is comprised of this Agreement and the Schedules hereto, the other Transaction Documents and the other documents referred to herein sets forth the entire agreement and understanding between the parties and supersedes any prior written agreement or understanding and any prior or contemporaneous oral agreement or understanding relating to the subject matter of this Agreement. The terms and provisions of this Agreement may be modified only by a written agreement executed by both parties hereto.


19.0  ASSIGNMENT.

This Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permissible assigns of Seller and Buyer. This Agreement and any rights hereunder shall not be assigned, hypothecated or otherwise transferred by any party hereto without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld, except that either party may assign its rights hereunder to a purchaser or successor in connection with a sale of such party's business (whether by merger, sale of stock or sale of all or substantially all of such party's assets); PROVIDED, HOWEVER, that no assignment by either party shall relieve such party of its obligations hereunder, including without limitation its obligations under Section 12 above.


20.0  GOVERNING LAW, VENUE. This Agreement shall be governed by and construed in accordance with the laws of the State in which the plaintiff resides. Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Plaintiff and of the United States of America located in the State of Plaintiff for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby, and each of the parties hereto agrees not to commence any action, suit or proceeding relating hereto or thereto except in such courts. Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby or thereby, in the courts of the State of Plaintiff or the United States of America located in

Initial ____    Initial 'J.J.R.    25

JJR 726

the State of Plaintiff, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

21.0 DISPUTE RESOLUTION. Any controversy, dispute or claim arising out of or in connection with this Agreement, or the breach, termination or validity hereof, shall be settled by final and binding arbitration to be conducted by an arbitration tribunal in the state of Plaintiff pursuant to the Commercial Arbitration Rules of the American Arbitration Association then in effect. The arbitration tribunal shall consist of three arbitrators. The party initiating arbitration shall nominate one arbitrator in the request for arbitration and the other party shall nominate a second in the answer thereto within thirty (30) days of receipt of the request. The two arbitrators so named will then jointly appoint the third arbitrator.

If the answering party fails to nominate its arbitrator within the thirty (30) day period, or if the arbitrators named by the parties fail to agree on the third arbitrator within sixty (60) days, the office of the American Arbitration Association and shall make the necessary appointments of such arbitrator(s). Each party shall pay the costs of its respective arbitrator, and the parties shall share equally the costs of the third arbitrator. The decision or award of the arbitration tribunal (by a majority determination, or if there is no majority, then by the determination of the third arbitrator, if any) shall be final, and judgment upon such decision or award may be entered in any competent court or application may be made to any competent court for judicial acceptance of such decision or award and an order of enforcement. In the event of any procedural matter not covered by the aforesaid rules, the procedural law of The State of plaintiff shall govern.

22.0 INDEPENDENT CONTRACTORS. For the purposes of this Agreement and all services to be provided hereunder, each shall be, and shall be deemed to be, an independent contractor and not an agent, partner, joint venture or employee of the other party. Neither party shall have authority to make any statements, representations or commitments of any kind, or to take any action which shall be binding on the other party, except as may be explicitly provided for herein or authorized in writing.

23.0 SEVERABILITY. If any provision of this Agreement shall be found by a court of competent jurisdiction to be void, invalid or unenforceable in any respect in the jurisdiction or jurisdictions in which it is to be performed, the same shall either be reformed to comply with applicable law or stricken if not so conformable, so as not to affect the validity or enforceability of this Agreement; and no party shall be deemed to be in breach of this Agreement for its failure to perform any obligation which is unenforceable, void or invalid.

24.0 NO WAIVER No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party. No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or

Initial ____    Initial JJR    26

JJR 727

remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies. The terms and provisions of this Agreement may be waived, or consent for the departure there from granted, only by a written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

25.0 COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes and all of which together shall constitute one and the same instrument.

26.0 HEADINGS. The headings and captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope or intent of this Agreement. The parties hereto acknowledge and agree that:

(i)     each party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision; the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and

(ii)    the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in a favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

Initial _____    Initial _____          27

JJR 728

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed under seal by their respective duly authorized officers as of the day and year first written above.

Free Water Company

By: _Arthur Neumann_ (signature)

Name: Arthur Neumann

Title: President/COO

J.J. Reidy & Co., Inc.,

By: _James J. Reidy_ (signature)

Name: James J. Reidy

Title: President

Initial: _____   Initial JJR         28

JJR 729



*Pages 29-64 are copies of the patents

## 27.0 EXHIBIT A

### ASSIGNED PATENTS

### INVENTION PATENTS AND APPLICATIONS

James Reidy

## USPTO PATENT FULL-TEXT AND IMAGE DATABASE

(1 of 1)

| | |
|---|---|
| United States Patent | 5,106,513 |
| Reidy | April 21, 1992 |

Portable air-water generator

### Abstract

A water generating device for obtaining potable water from ambient air inside or outside a structure or dwelling, having ducts for bringing this supply of ambient air to the device and for releasing the air back outside the device after it has been processed. There is an air filter for filtering the air prior to processing of the air. The air filter includes a one-time sensing element which renders it unusable when removed from the generator. A condenser is provided for extracting water vapor in the air brought thereto by the ducts. Within the ducts there is a fan or blower to move air from outside the device through the condenser and for returning the air back outside the device after it has traversed the condenser. Between the condenser and the collection point, there is an immediate temporary holding reservoir, or plumbing to this reservoir, which contains an ultraviolet light to kill existing microorganisms, as well as a pump to transport the water through a subsequent water filter, a second exposure to ultraviolet light, and into the ultimate internal or external water storage unit. The water filter also includes a one-time sensing element which renders it unusable when removed. An internal container is positioned to receive

Initial ⟨⟩    Initial J.S.R.    29

## 28.0 EXHIBIT B

### BILL OF SALE AND DISCLOSURE SCHEDULE

JJR 731

## BILL OF SALE

Pursuant to the Patent Sales Agreement of even date herewith, by and among J.J. Reidy & Co., Inc., (The Corporation) a Massachusetts Corporation organized and existing under the laws of Massachusetts having a place of business at 1260 Main Street, Holden, Massachusetts 01520-1020 and Free Water Company a corporation of the State of Nevada , having its principal place of business at. 525 Reactor Way, Reno, Nevada. 89502, a corporation organized and existing under the laws of the State of Nevada, (The Buyer"), and in consideration of the payments amounting to six million dollars ($6,000,000.00) USD to J.J. Reidy & Co., Inc., J.J Reidy & Co., Inc. does hereby assign, sell, transfer and convey to the Buyer all of the Corporation's right, title and interest as of the date hereof in and to the property and assets of which are listed on Exhibit A hereto (the "Assets").

TO HAVE AND TO HOLD, the Assets hereby conveyed, all said singular, unto the Buyer, to and for its use and benefit.

Corporation represents and warrants to the Buyer that he has good and valid title to and is the lawful owner of the assets, and that Corporation has the right to sell the Assets free and clear of all liens, claims and encumbrances.

Buyer will, at any time and from time to time after the date hereof, upon the reasonable request of the Corporation, do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged or delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney or assurances as may be required for the better transferring, assigning, conveying and confirming to the Buyer, or for aiding and assisting in reducing to possession by the Buyer, any of the Assets or rights being purchased hereunder, or to vest in the Buyer good, valid and marketable title to such Assets and rights.

This Assignment and Bill of Sale shall inure to the benefit of the Buyer and shall be binding upon Corporation and his successors and assigns.

IN WITNESS WHEREOF, Corporation has caused this Assignment and Bill of Sale to be duly executed this _____ day of _____ 2005.

By (Print): James J Reidy

Signature: _____

Initial W      Initial JJR      66

## Legal Proceedings

In January 2005, we received a termination notice from J.J. Reidy & Company, the AirWater patent holders allegedly terminating the Global License Agreement that was entered into in March 2003, alleging Breach of Contract. The company has filed an action in the U.S. District Court for the Southern District of Florida (case no. 05-20650-CIV-Jordan/Klein), seeking Declaratory relief from the court, determining its rights, status and legal relations as well as Money Judgment against J.J. Reidy & Company. Meanwhile, J.J. Reidy & Company had already made a court filing in Boston Massachusetts, in December 2004.

– End –

Initial ⟨signature⟩    initial JJR    67

**EXHIBIT I**

# J.J. Reidy & Co., Inc.

**1260 Main Street, Holden, MA   01520-1020**

**Telephone:**  (508) 829-6550
**Fax:**  (508) 829-6492
**Email:**  J.J.Reidy@earthlink.net
**URL:**  http://www.drinkingwaterfromtheair.com



June 18, 2007

Mr. Arthur Neumann, President                   VIA FEDERAL EXPRESS
Free Water Company                              Airbill No. 8334 7537 9895
525 Reactor Way
Reno, Nevada   89502

Dear Mr. Neumann:

This letter is to inform you that Free Water Company is in default of the PATENT and ASSET
PURCHASE AGREEMENT executed on October 4, 2005 between Free Water Company and
J.J. Reidy & Co., Inc., and its latest, and current, Addendum To Patent and Asset Purchase
Agreement Dated October 4, 2005 signed by both parties on March 21, 2007.

Free Water Company has failed to make its required payment of $10,000.00 due on May 25,
2007 as agreed in the aforementioned Addendum of March 21, 2007. Additionally, you have
stated in your May 29, 2007 email to me that you "don't have the money . . . to take care of . . .
your payments".

In the NOTE AND AGREEMENT which accompanied the aforementioned Addendum, signed
by Joseph F. Dutra, CEO of Free Water Company, SECTION ONE. SECURITY states: "To
secure the payment of this note a lien is placed on the Patents as referenced in the Patent
Assignment Agreement." This referenced PATENT ASSIGNMENT AGREEMENT was also
signed by Joseph Dutra and also accompanied the aforementioned Addendum of March 21, 2007.

In the NOTE AND AGREEMENT, SECTION FOUR. DEFAULT states: "The occurrence of any
of the following events shall constitute a default: A. Nonpayment, when due, of any amount
payable under this note and agreement or failure of debtor to perform any agreement contained in
the agreement."

Page 1 of 2

In the NOTE AND AGREEMENT, SECTION FIVE. REMEDIES states: "Debtor shall, in case of default, revert all Patents, at the expense of debtor, to secured party under this agreement, including reasonable attorney fees and legal expenses and expenses to which any of Patents and note may be affixed."

In the NOTE AND AGREEMENT, SECTION EIGHT. WAIVER states: "No delay by secured party in the exercise of any right or remedy under this note and agreement shall operate as a waiver of the same, and no single or partial exercise by secured party of any such right or remedy shall preclude other or further exercise of the same or the exercise of any other right or remedy."

The PATENT and ASSET PURCHASE AGREEMENT executed on October 4, 2005 between Free Water Company and J.J. Reidy & Co., Inc., in accordance with Article 11.4 states: "This Agreement may be terminated by Seller, upon written notice to Buyer. Such notice shall be deliverable by Seller within 15 days of material breach of this Agreement." and, Article 24.0 which states in part: "NO WAIVER. No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party. . . .".

Accordingly, the PATENT and ASSET PURCHASE AGREEMENT executed on October 4, 2005 between Free Water Company and J.J. Reidy & Co., Inc. and the subsequent Addendum To Patent and Asset Purchase Agreement Dated October 4, 2005 are hereby both terminated and declared null and void.

While J.J. Reidy & Co., Inc. reserves all of its rights to pursue any and all legal remedies available to it to enforce its rights under the Agreements we hope that a successful relationship between Free Water and J.J. Reidy may occur in the future.


Respectfully yours,


James J. Reidy
President

**FedEx** *USA Airbill* **Express**

FedEx Tracking Number: 8334 7537 9895

0215  SFH13  **Sender's Copy**

### 1 From *Please print and press hard.*

Date **June 20 '07**    Sender's FedEx Account Number **1405~8721~4**

Sender's Name **JAMES J REIDY**    Phone **(508) 829~6550**

Company **J J REIDY & COMPANY INC**

Address **1260 MAIN ST**

City **HOLDEN**    State **MA**    ZIP **01520**

### 2 Your Internal Billing Reference
*First 24 characters will appear on invoice.*    OPTIONAL

### 3 To

Recipient's Name **Arthur Neumann**    Phone **(775) 284-9200**

Company **Free Water Company**

Address **525 Reactor Way**
To "HOLD" at FedEx location, print FedEx address.    We cannot deliver to P.O. boxes or P.O. ZIP codes.

Address    Dept./Floor/Suite/Room

City **Reno**    State **NV**    ZIP **89502**

**Try online shipping at fedex.com**

By using this Airbill you agree to the service conditions on the back of this Airbill and in our current Service Guide, including terms that limit our liability.

**Questions? Visit our Web site at fedex.com**
or call 1.800.Go.FedEx® 800.463.3339.

0211134091

### 4a Express Package Service    *Packages up to 150 lbs.*
Delivery commitment may be later in some areas.

☐ FedEx Priority Overnight
Next business morning

☒ FedEx Standard Overnight
Next business afternoon

☐ FedEx First Overnight
Earliest next business morning delivery to select locations

☐ FedEx 2Day
Second business day

☐ FedEx Express Saver
Third business day
FedEx Envelope rate not available. Minimum charge: One-pound rate

### 4b Express Freight Service    *Packages over 150 lbs.*
Delivery commitment may be later in some areas.

☐ FedEx 1Day Freight*
Next business day

☐ FedEx 2Day Freight
Second business day

☐ FedEx 3Day Freight
Third business day

* Call for Confirmation.

### 5 Packaging    * Declared value limit $500

☒ FedEx Envelope*

☐ FedEx Pak*
Includes FedEx Small Pak, FedEx Large Pak, and FedEx Sturdy Pak

☐ Other

### 6 Special Handling    Include FedEx address in Section 3.

☐ SATURDAY Delivery
Available ONLY for
FedEx Priority Overnight and
FedEx 2Day to select ZIP codes

☐ HOLD Weekday
at FedEx Location
NOT Available for
FedEx First Overnight

☐ HOLD Saturday
at FedEx Location
Available ONLY for
FedEx Priority Overnight and
FedEx 2Day to select locations

Does this shipment contain dangerous goods?
One box must be checked.

☒ No
☐ Yes
As per attached
Shipper's Declaration
☐ Yes
Shipper's Declaration
not required
☐ Dry Ice
Dry Ice, 9, UN 1845    x ___ kg

Dangerous Goods (including Dry Ice) cannot be shipped in FedEx packaging.    ☐ Cargo Aircraft Only

### 7 Payment    *Bill to:*
Enter FedEx Acct. No. or Credit Card No. below.

☒ Sender
Acct. No. in Section
1 will be billed.
☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

FedEx Acct. No.
Credit Card No.    Exp. Date

Total Packages ___    Total Weight **/**    Total Declared Value† $ **10** .00

†Our liability is limited to $100 unless you declare a higher value. See back for details.    FedEx Use Only

### 8 Release Signature    *Sign to authorize delivery without obtaining signature.*

By signing you authorize us to deliver this shipment without obtaining a signature and agree to indemnify and hold us harmless from any resulting claims.    **447**

SRS • Rev. Date 10/01 • Part #157610S • ©1994–2001 FedEx • PRINTED IN U.S.A.



FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

June 21,2007

Dear Customer:

The following is the proof of delivery you requested with the tracking number **833475379895**.

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | **Delivery date:** | Jun 21, 2007 12:04 |
| Signed for by: | B.LEAS | | |
| Service type: | Standard Envelope | | |



---

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 833475379895 | Ship date: | Jun 20, 2007 |

**Recipient:**
US

**Shipper:**
HOL US

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

FedEx | Track

Track Shipments
**Detailed Results**

(?) <u>Quick Help</u>

| | | | |
|---|---|---|---|
| **Tracking number** | 833475379895 | **Delivered to** | Receptionist/Front Desk |
| **Signed for by** | B.LEAS | **Service type** | Standard Envelope |
| **Ship date** | Jun 20, 2007 | | |
| **Delivery date** | Jun 21, 2007 12:04 PM | | |
| **Status** | Delivered | | |
| **Signature image available** | <u>Yes</u> | | |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| **Jun 21, 2007** | 12:04 PM | **Delivered** | | |
| | 8:22 AM | On FedEx vehicle for delivery | RENO, NV | |
| | 7:37 AM | At local FedEx facility | RENO, NV | |
| | 5:58 AM | At dest sort facility | RENO, NV | |
| | 4:32 AM | Departed FedEx location | MEMPHIS, TN | |
| | 12:14 AM | Arrived at FedEx location | MEMPHIS, TN | |
| **Jun 20, 2007** | 7:58 PM | Left origin | WEST BOYLSTON, MA | |
| | 5:26 PM | Picked up | WEST BOYLSTON, MA | |

**EXHIBIT J**

# GLOBAL
# MANUFACTURING AND MARKETING
# LICENSING AGREEMENT

EXHIBIT
Rerdy
3
6-25-07ev

This Agreement is made and entered this 21ˢᵗ day of March 2003 by and between;

**J.J. Reidy & Co., Inc.,** a Massachusetts Corporation whose principal address is 1260 Main Street, Holden Massachusetts 01520-1020, hereinafter referred to as "LICENSOR" and;

**AirWater Corporation,** a Florida Corporation, whose principal address is suite 6K, Lincoln Road, Miami Beach Florida 33139, hereinafter referred to as "LICENSEE".

## WITNESSETH

**WHEREAS, LICENSOR** represent and warrants that it has the entire right, title, and interest in and to United States Patents numbered 5,106,512, 5,149,446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and any patents to issue, foreign or domestic on any continuation or division thereof and any new patents, foreign or domestic, granted to LICENSOR relating to the Water Production/Generations System (hereinafter collectively referred to as "LICENSED PATENTS"), and generally known as the WATERSTAR systems, and that LICENSOR has the absolute and undisputed rights to grant the licenses under the LICENSED PATENTS as specified hereinafter; and,

**WHEREAS LICENSEE** represents that it is a US Corporation formed and registered in the State of Florida, and so licensed to do business, and,

**WHEREAS LICENSEE** is a wholly owned subsidiary of Universal Communications Systems Inc, a publicly traded company trading on the NASD OTC BB under the symbol "UCSY", and,

**WHEREAS LICENSEE** has indicated to LICENSOR of its interest in both manufacturing and marketing the WATERSTAR systems and technologies, on a world wide basis, and,





1    JR

WHEREAS LICENSEE is desirous of obtaining a global right and license to manufacture, assemble, use and sell Water Production/Generation System products, and component parts therefore, falling under the scope of any LICENSED PATENT (hereinafter referred to as "LICENSED PROPERTY"); and

WHEREAS LICENSOR is willing to grant such right and license to LICENSEE under the conditions hereinafter set forth;

NOW THEREFORE, in consideration of mutual covenants, promises and undertakings contained herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby reciprocally acknowledged, the undersigned parties agree as follows.

# TERMS OF AGREEMENT

### GRANT OF LICENSE:

LICENSOR hereby grants to LICENSEE, for the term of this AGREEMENT, as a right and license to use and sell LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS, according to the provisions set forth hereinafter with the full right and privilege to alter, change and / or modify the contents and peripheral materials associated with LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY

RIGHTS with the conditions set forth herein, and the right to sublicense sale and distributions of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS according to the provisions and the conditions set forth hereinafter.

### TERM OF LICENSE:

The term of this Agreement shall commence upon the date of execution of this agreement and shall remain binding and continue for a period of not less than 10 years, and / or for the life of the last expiring LICENSED PATENT, whichever comes last, unless terminated sooner as provided herein.



2  JR

## OWNERSHIP OF LICENSED PROPERTY:

This license agreement is not a sale or lease of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS from LICENSOR and the full title, rights and interests shall remain in the name of LICENSOR unless otherwise expressed herein and upon written mutual consent of both parties.

## PURPOSE

The purpose of LICENSEE will be, but is not limited to, the manufacture, sale and distribution of Water Production Generation Systems, and being of the invention of the LICENSOR, or derived or evolved there from, which system(s) is/are designed to produced potable water from the air.

## THE TERRITTORY

LICENSEE agrees that this Global Marketing and License Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions.

## VALIDITY

LICENSOR grants to LICENSEE this LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS for a period not less than 10 years, and / or the life of the last expiring patent, whichever comes last, and in any event agrees that it will not sell, allocate, transfer or sublicense to any third party without the expressed written permission of the LICENSOR.

## PAYMENT AND CONSIDERATION

LICENSEE further agrees to deliver 2 payments to LICENSOR's designated individuals a Global Marketing and Licensing Fee in the amount totaling $100,000 on or before July 1st 2003, (one payment due July 1st 2003, the second payment payable on August 1st 2003) plus four (4) million shares of UCSY to be delivered to the LICENSOR, (or his designees) within 21 days from the date of the execution of this Agreement.



3   JR

These 4 million UCSY shares shall be issued as 144 shares, which in line with SEC regulations are restricted from sale for a period of not less than one year, unless subjected to a registration with the SEC and such registration is approved. These shares will be included in any company filing / registration, which the company undertakes to effect in not more than 180 days from the date of execution of this agreement.

## ROYALTY PAYMENTS

LICENSEE further agrees to pay a royalty fee on all sales of manufactured models in the amount of five per cent (5%) of all gross sales less any applicable taxes, for any machines and or components sold in the amounts not exceeding $10,000 each. For all other sales of units and or components, the Royalty Fee shall be seven percent (7%).

LICENSOR shall receive royalties on the quarterly gross sales of LICENSEE, and any of its sub LICENSEES. The royalties shall be computed based on the sales price, less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes, and other such amounts.

This royalty levied on gross sales shall be paid for all sales made on a Quarterly basis.

The payment will be remitted to the LICENSOR on or before the 30th day following the closing of the quarterly period.

LICENSEE will provide LICENSOR on a quarterly basis a full accounting of units shipped, units billed, and a receivables aging, until that time both parties agree to waive this requirement.

The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:

Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales during that fiscal quarter.



4    JR

## MINIMUM MONTHLY ROYALTY PAYMENTS:

LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above whichever is the more.

LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

## LATE PAYMENT OF ROYALTIES:

LICENSOR may elect, to accept late payment fees from LICENSEE of two percent (2.0%) of any gross amount due LICENSOR should any payment due not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

## MANUFACTURING BY LICENSEE & THIRD PARTIES

LICENSOR further acknowledges that LICENSEE intends to offer to manufacture the said units and models in other countries around the world, and LICENSOR hereby confirms that the LICENSEE is granted the absolute right to so offer 3rd parties the sub-rights at all times adhering to the terms and conditions of this agreement.

## SUBLICENSE CONTRACTS

LICENSEE shall have the right to sublicense the LICENSED PROPERTY to any and all third parties it deems creditable and trustworthy to distribute and or market and or sell the LICENSED PROPERTY within the geographical limits as shall be agreed.

Both parties agree that the definition of Sublicense shall mean, "The right granted by the Licensee to any third party to manufacture, market and or distribute the LICENSED PROPERTY pursuant to the provisions and conditions provided herein, and as shall be amended to accommodate the particular situation.



5    JR

LICENSEE retains the rights to charge and retain, and or waive, finance and or to accept partial payments (down payments) for any and all sublicense fees, as shall be the case on a case-by-case basis.

LICENSEE shall provide and deliver sublicense contracts to LICENSOR as a matter of record.

LICENSEE agrees that all sublicenses and related contracts are to encompass and embrace the parameters of this Agreement, and shall be created so as not to be in violation of any of the provisions contained herein, in part or in whole.

## SUBLICENSE PROPERTY

All sublicenses shall be considered proprietary and confidential and shall remain the property of the LICENSEE and/or the introducing party.

## PRODUCT ENDORSEMENT

LICENSEE may seek endorsements, including celebrity endorsements that LICENSEE deems qualified to represent LICENSED PROPERTY, and such endorsements obtained by LICENSEE shall remain the property of LICENSEE. LICENSOR agrees to acknowledge by letter the right of LICENSEE to use the prior or future endorsements at the discretion of LICENSEE in an appropriate manner of marketing with the consent of the endorser.

## LICENSEE OBJECTIVE AND GLOBAL MARKETING

LICENSEE's overall objective is to establish and maintain the awareness and the exposure of LICENSED PROPERTY to enhance sales and future growth.

LICENSEE will maintain the image and integrity of LICENSED PROPERTY for duration of this License Agreement. No marketing campaign shall be undertaken which fails to project good moral and ethical values. This specifically includes companies, which fail to reflect the highest of moral standards.



6  JR

LICENSEE hereby commits the resources and puts forth best efforts in accomplishing, completing, and fulfillment of the promises contained herein.

LICENSEE shall have the right to create commercial production (radio, television, print) and other means in which to fulfill License Agreement.

LICENSE may create a long-term public relations strategy in which to achieve awareness \ sales, and growth.

## PRODUCT NAME AND LOGO's

LICENSEE retains the right to change the LICENSED PRODUCTS's name without the expressed written consent of LICENSOR.

## DESIGN PACKAGING.

LICENSEE shall hereby have the right to alter, change, add and or remove any item, color, format or material in any existing design packaging with the expressed written consent hereby granted by LICENSOR.

## COPYRIGHT USAGE

LICENSOR hereby grants the right to LICENSEE the use of any and all, in part or in whole, copyright materials as they currently relate to the LICENSED PROPERTY.

## TRADEMARK REGISTRATION – US. / FOREIGN

LICENSEE shall make application and pay filing fees in registering changes to trademark and or trade names, registrations, and service marks when and where applicable.

## GRANT OF TRADEMARK USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trademarks as they currently relate to the LICENSED PROPERTY under the conditions contained herein.



7  JR

## GRANT OF TRADE NAME USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trade names, symbols, or logo's associated with LICENSED PROPERTY as they currently relate, under the conditions contained herein.

## TRADEMARK QUALITY CONTROL

LICENSOR has the right to approve LICENSED PROPERTY sold bearing the trademark licensed herein for conformance with LICENSOR's quality standard.

Before implementing changes in the goods sold under the trademark, LICENSEE shall provide LICENSOR a specimen of the proposed changes.

LICENSOR shall have 2 weeks in which to pass comment, denying or approving the said changes within reason. If LICENSOR does not object within the said 2 weeks, the said changes are deemed approved.

## PRODUCT AND MATERIAL ADDITIONS

LICENSEE shall have the right to make any additions to the LICENSED PROPERTY without the expressed written consent of the LICENSOR for market appeal and or added value. Any such added materials shall remain the property of the LICENSEE at all times, subject to continuing payment of royalties.

## ASSEMBLY

LICENSEE has the right to assemble and or have assembled LICENSED PROPERTY where and whenever applicable.

## UNIVERSAL PRODUCT CODE

LICENSOR shall provide LICENSEE any existing UPC codes for the LICENSED PROPERTY.



8  JR.

## LICENSE PARAMETER

LICENSOR agrees and confirms that this exclusive Agreement is not
limited to any county, state or country worldwide.

## MAINTENANCE OF PATENT(s)

LICENSOR hereby agrees and confirms that the above referenced patents
are all valid, in good standing and that he has disclosed all pertinent and
relevant information relative to the patents, and further confirms that he will
maintain the validity and good standing of the patents.

## PRODUCT LIABILITY INSURANCE

LICENSEE shall during the entire term of this agreement, maintain an
adequate Insurance Policy, to commence upon the first commercial
production and sales of product, such product liability insurance to cover
LICENSED PROPERTY sold by LICENSEE or any of its sub licensees, and
J.J. Reidy & Co Inc., shall be named "additional insured" thereon with
respect to any claims made against LICENSOR as a result of LICENSEE's
or any of its sub licensee's sales of LICENSED PROPERTY.

LICENSEE agrees to provide a copy of such insurance policy within 30
days of execution of its marketing opening dates of sales. LICENSEE shall
also indemnify and hold harmless J.J. Reidy & Co Inc, its employees,
directors, officers, shareholders as to any claims, lawsuits, threatened
litigation or judgments rendered, relating to the LICENSED PROPERTY
sold by the LICENSEE and /or any of its sub licensees.

## TRADE SECRETS

Both parties acknowledge and agree that the other party possesses trade
secrets that are proprietary property, and constitute a valuable trade secret.
Both parties agree not to disclose and or make available to third parties the
information that shall include, but be limited to, this Agreement and any
other Agreement that may be entered into between the parties, without the
expressed written consent of the other party.



## FOREIGN PATENT AND TRADEMARK AND REGISTRATIONS

If at the LICENSEES request the LICENSOR shall make application for foreign trademark and or trade name registration, then the LICENSEE shall pay all fees necessary.

LICENSEE, when applicable shall retain the full rights, title, and interest in any and all trademark(s) and trade name(s) registration in foreign countries as long as this license Agreement is in force.

LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSOR, at his own expense.

## RECORDS AND INSPECTION

LICENSEE shall reduce all sublicenses granted herein written Agreements and copies will be provided to LICENSOR.

## TRANSFER OF CUSTODY, KNOW HOW AND TECHNICAL ASSISTANCE

LICENSOR agrees to provide all information in its possession to assist LICENSEE to distribute and sell LICENSED PROPERTY. LICENSOR shall transfer to the care and custody of LICENSEE within 30 days from the execution of this Agreement, all information requested by LICENSEE in its possession pertaining to the LICENSED PROPERTY, and all information material and pertaining to the sales thereof, and consisting of, for example, but not limited to:

All design Data, films, disks, camera work, negatives, layouts, registration mark copy for production and reprint, logos, type fonts, etc.

Process Specifications-All details, processes, steps and procedures concerning, but not limited to care of product, storage, the do's and don'ts, print specifications, packaging specifications, etc.



10    JR

Commercial Operation Data-volume discounts, minimum order levels, maximum order levels, turn-around production time, shipping costs and requirements, etc.

Endorsement Grant-granting the permission to LICENSEE the use of any and all previous or future endorsements with the permission of the endorser.

LICENSOR shall also make available in timely fashion, all future improvements relating to the LICENSED PROPERTY, including change, and modifications and specifications, methods and materials, during the term of this Agreement.

## TERMINATION OR REVOCATION OF LICENSE

This Agreement and the rights and licenses granted herein shall wholly cease and terminate prior to the termination of the license as described hereinabove upon the occurrence of any of the following events.

Any material breach by either party of the terms of this Agreement, provided the non-breaching party in the one seeking the termination and gives the other party written notice on intention to terminate, which shall state the fault or breach upon which the party relies. The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time; or

If the LICENSOR does not receive the Licensing fee at the time of the joint approval and signing of this agreement or any other subsequent payment due LICENSOR that is not paid within 5 business days within its due date.

This agreement shall terminate upon the insolvency and/or criminal conviction of either party unless other agreed to in writing.

Upon termination, LICENSOR shall have the first right of refusal to purchase Licensee's inventory for cost payable within 30 days of written offer.

The written offer must be accepted within 30 days of being made. In no event shall LICENSEE sell existing inventory after a period of 12 months following the termination notice.



11  -JR

The mutual consent of the parties expressed in writing.

This agreement will terminate with notice, if LICENSEE does not make any required payments to LICENSOR as specified within the stated and agreed time periods.

The LICENSOR agrees to grant to the LICENSEE a 14 day period of notice / grace in which the LICENSEE can make good on any outstanding amount.

## EFFECT OF TERMINATION OR REVOCATION

The termination of this agreement shall not release LICENSEE from the obligation to pay LICENSOR any accrued sums owed to LICENSOR or from fulfilling any other accrued obligation. Additionally such termination shall be without prejudice to any right or remedy, which either party may have or believes it has against the other party.

The termination of this agreement as a result of the provisions and conditions provided herein, and/or the breach thereof, or an uncontrolled act of G-d, government, laws, etc., which prohibit the fulfillment of this Agreement shall not bind the LICENSEE to fulfill any projected sales figures.

In no case shall LICENSEE have any claims for repayment or offset of any sum or sums, which shall have been paid, as required under the terms of this agreement

Upon termination, each party will retain proprietary property(s) and the complete rights title, and interest of any and all proprietary property, information and material introduced.

Upon termination and revocation of License Agreement, each party will properly return, in a timely fashion and all proprietary property to the owner, in the same manner and condition received in relation to paragraph above.

Upon termination and revocation of License Agreement. LICENSOR has the right to purchase from LICENSEE any items not considered LICENSED PROPERTY, such as, but not limited to, changes in the LICENSED PROPERTY name, trade mark or trade name, universal product codes,



12    JR

marketing materials changes, alterations, and/or modifications duly registered etc., at a fair market price.

## DURATION/TERM/MAINTANENCE OF EXCLUSIVITY

The License granted herein exclusive to a geographical territory as defined above and shall remain exclusive unless terminated in accordance with the terms of this agreement.

LICENSEE agrees to put forth its best efforts to sell LICENSED PROPERTY during the period of exclusivity of the Licenses granted herein.

## INFRINGEMENT:

In the event any infringement of LICENSOR's patents is discovered in any country recognizing such patents and/or litigation commences with respect to any claim of infringement of LICENSOR's patents, LICENSEE has the option to pursue any and all litigation to protect the marketing effort.

LICENSEE has the sole discretion to determine how much to incur in legal expenses in pursuing any infringement claim or litigation based upon what is reasonable and in the best interest of LICENSEE.

LICENSOR shall have the option to participate in such claim in proportion to the expense LICENSEE bears, i.e. 50% of litigation expenses = 50% of the claim/settlement. In the event LICENSOR exercises this option to participate, LICENSOR shall be entitled to retain an equal percentage amount, in relation to the percentage amount of expenses incurred, of the receipts from such settlement, judgment, compromise or arbitration.

In the event infringement is discovered and LICENSEE does not act upon settlement of infringement or litigation in a reasonable amount of time as not to effect the marketing campaign, sales, and/or growth, LICENSOR shall have the right to pursue the infringing party for damages, and retain the proceeds.

13    JR

## USE RESTRICTIONS:

LICENSEE agrees not to use LICENSED PROPERTY in any illegal fraudulent, or deceptive manner to damage the good name and / or standing of the LICENSED property

## TRANSFER RESTRICTIONS/ASSIGNABILITY/SUB-LICENSE/SALE

Any party may assign and/or sell this Agreement to any third party, subject to first offering the other party a first right of refusal. Any such assignment and/or sale shall be made in accordance with the provisions herein.

LICENSEE has the right to have other parties manufacture for it, provided the manufacturer enters into a Non-Compete and Non-Disclosure Agreement with LICENSOR. If LICENSEE sells or assigns this License, LICENSOR will receive from LICENSEE fifteen percent (15%) of the assignment/sale price.

## ASSIGNMENT/SALE

LICENSOR agrees to notify LICENSEE of any contemplated assignment /sale of LICENSOR's patents during the term of this Agreement with thirty (30) days notice.

LICENSEE agrees to notify LICENSOR of any contemplated assignment /sale of this License during the term of this Agreement with thirty (30) days notice.

In either of the above cases, each party shall offer the other party the right of first refusal.

14    JR

## WAIVERS:

No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.

The waiver by any party of any of the conditions precedent to its respective obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement.

## BENEFITS:

Except as expressly provided in this Agreement, nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligation, or liability under or by reason of this Agreement

## CONSTRUCTION/JURISDICTION:

Inasmuch as the transactions, which may arise or occur between the parties and/or their principals may cross boundaries of national and or international jurisdiction, this Agreement shall be construed and interpreted in Accordance with the laws of the United States of America and the resident state of the Plaintiff.

## SEVERABILITY:

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

15    ⎯JR

## ARBITRATION

The parties may elect to settle and differences by submitting to Arbitration in the resident state of the plaintiff. The Arbitrators decision shall be and remain binding to either and both parties.

## NOTIFICATION

Any notice hereunder must be in writing and by courier service with signed receipt and shall be deemed to have been given when such notification, properly addressed to the addressee indicated above, is sent by courier and receipt acknowledged. Either party hereto may at any time by thirty (30) days notice to the other; designate any other address in place of those given above.

## FURTHER DOCUMENTS:

Each of the parties hereto agrees to execute and deliver all such documents and to do any and all acts, matters and things as may be necessary or proper in order to carry out the intended purposes of this Agreement.

## PRIOR AGREEMENTS:

This Agreement shall supersede and replace any and all prior Agreements entered into between the parties hereto related to the subject matter hereof and any such prior Agreements shall be, and they are hereby, canceled.

## EMPLOYEE STATUS:

It is understood and agreed by both parties that neither party is an employee of the other.

## EFFECTIVE DATE:

The effective date of this Agreement shall be upon the acceptance and execution thereof by both parties.

16    JR

**ENTIRE AGREEMENT**:

This instrument of 18 pages contains the entire Agreement between LICENSOR and LICENSEE, and no modification hereof shall be binding on the parties unless it is in writing and signed by a duly authorized officer of the parties to be bound.

**AUTHORITY**:

All parties warrant that they have the requisite authority and capacity to execute this Agreement and that its terms and provisions constitute valid and legally enforceable rights and obligations against the parties, their successors, administrators, etc.

**DOCUMENT ORIGINALS:**

This document is considered as an original, binding and enforceable Agreement, whether executed in original, binding counterparts or Facsimile.

**INTENTIONALLY LEFT BLANK.**



17

IN WITNESS WHEREOF, the parties have affixed their names, signatures, and seals, by their executive officers thereto duly authorized, on the day and year first above written.

**ON BEHALF OF LICENSEE**:

_____

M J Zwebner - Chairman
AirWater Corporation

**ON BEHALF OF LICENSOR**:

_____
James J. Reidy, President
J.J. Reidy & Co., Inc.

Subscribed and sworn to before me

This _21st_ day of _March_ 2003

_____
Notary Public Notary Public
My commission expires: _1/9/03_

OFFICIAL NOTARY SEAL
ROLANDO S SABLON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD083309
MY COMMISSION EXP. JAN. 9 2006

18

**EXHIBIT K**



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title
## *NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.*

**Total Assignments: 4**

| | | |
|---|---|---|
| **Patent #:** 5106512 | **Issue Dt:** 04/21/1992 | **Application #:** 07745932 **Filing Dt:** 08/16/1991 |
| **Inventor:** JAMES J. REIDY | | |
| **Title:** PORTABLE AIR-WATER GENERATOR | | |

### Assignment: 1

| | | |
|---|---|---|
| **Reel/Frame:** 007470/0325 | **Recorded:** 05/05/1995 | **Pages:** 2 |
| **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| **Assignor:** REIDY, JAMES J. | | **Exec Dt:** 04/20/1995 |
| **Assignee:** REIDY JANICE BETHANNE | | |
| 1260 MAIN STREET | | |
| HOLDEN, MASSACHUSETTS 01520 | | |
| **Correspondent:** LAW OFFICES OF BRIAN M. DINGMAN, P.C. | | |
| 40 SPEEN STREET | | |
| FRAMINGHAM, MA 01701 | | |

### Assignment: 2

| | | |
|---|---|---|
| **Reel/Frame:** 009279/0303 | **Recorded:** 06/29/1998 | **Pages:** 2 |
| **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| **Assignor:** REIDY, JANICE BETHANNE | | **Exec Dt:** 06/11/1998 |
| **Assignee:** J.J. REIDY & CO., INC. | | |
| 1260 MAIN STREET | | |
| HOLDEN, MASSACHUSETTS 01520 | | |
| **Correspondent:** NIELDS, LEMACK & DINGMAN | | |
| BRIAN M. DINGMAN | | |
| 176 EAST MAIN STREET, SUITE 8 | | |
| WESTBOROUGH, MA 01581 | | |

### Assignment: 3

| | | |
|---|---|---|
| **Reel/Frame:** 014384/0523 | **Recorded:** 08/18/2003 | **Pages:** 2 |
| **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| **Assignor:** REIDY, JAMES J. | | **Exec Dt:** 08/12/2003 |
| **Assignee:** J.J. REIDY AND COMPANY, INC | | |
| 1260 MAIN STREET | | |
| HOLDEN, MASSACHUSETTS 01520 | | |
| **Correspondent:** MIRICK, O'CONNELL, DEMALLIE ET AL | | |
| BRIAN M. DINGMAN, ESQ. | | |
| 1700 WEST PARK DRIVE | | |
| WESTBOROUGH, MA 01581 | | |

### Assignment: 4

| | | |
|---|---|---|
| **Reel/Frame:** 019069/0646 | **Recorded:** 03/27/2007 | **Pages:** 3 |
| **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| **Assignor:** J.J. REIDY & CO., INC. | | **Exec Dt:** 03/24/2007 |
| **Assignee:** FREEWATER COMPANY, INC. | | |
| 525 REACTOR WAY | | |
| RENO, NEVADA 89502 | | |
| **Correspondent:** BRADLEY P. HEISLER | | |

HEISLER & ASSOCIATES
3017 DOUGLAS BVD., SUITE 300
ROSEVILLE, CA 95661

Search Results as of: 07/12/2007 02:17 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

**EXHIBIT L**



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

**_NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff._**

**Total Assignments: 4**

| | | |
|---|---|---|
| **Patent #:** 5149446 | **Issue Dt:** 09/22/1992    **Application #:** 07648541 | **Filing Dt:** 01/30/1991 |
| **Inventor:** JAMES J. REIDY | | |
| **Title:** POTABLE WATER GENERATOR | | |

**Assignment: 1**

| | | |
|---|---|---|
| **Reel/Frame:** 007470/0041 | **Recorded:** 05/05/1995 | **Pages:** 2 |
| **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| **Assignor:** REIDY, JAMES J. | **Exec Dt:** 04/20/1995 | |
| **Assignee:** REIDY, JANICE BETHANNE<br>1260 MAIN STREET<br>HOLDEN, MASSACHUSETTS 01520 | | |
| **Correspondent:** BRIAN M. DINGMAN<br>LAW OFFICES OF BRIAN M. DINGMAN, P.C.<br>40 SPEEN STREET<br>FRAMINGHAM, MA 01701 | | |

**Assignment: 2**

| | | |
|---|---|---|
| **Reel/Frame:** 009279/0298 | **Recorded:** 06/29/1998 | **Pages:** 2 |
| **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| **Assignor:** REIDY, JANICE BETHANNE | **Exec Dt:** 06/11/1998 | |
| **Assignee:** J.J. REIDY & CO., INC.<br>1260 MAIN STREET<br>HOLDEN, MASSACHUSETTS 01520 | | |
| **Correspondent:** NIELDS, LEMACK & DINGMAN<br>BRIAN M. DINGMAN<br>176 EAST MAIN STREET, SUITE 8<br>WESTBOROUGH, MA 01581 | | |

**Assignment: 3**

| | | |
|---|---|---|
| **Reel/Frame:** 014384/0523 | **Recorded:** 08/18/2003 | **Pages:** 2 |
| **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| **Assignor:** REIDY, JAMES J. | **Exec Dt:** 08/12/2003 | |
| **Assignee:** J.J. REIDY AND COMPANY, INC<br>1260 MAIN STREET<br>HOLDEN, MASSACHUSETTS 01520 | | |
| **Correspondent:** MIRICK, O'CONNELL, DEMALLIE ET AL<br>BRIAN M. DINGMAN, ESQ.<br>1700 WEST PARK DRIVE<br>WESTBOROUGH, MA 01581 | | |

**Assignment: 4**

| | | |
|---|---|---|
| **Reel/Frame:** 019069/0646 | **Recorded:** 03/27/2007 | **Pages:** 3 |
| **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| **Assignor:** J.J. REIDY & CO., INC. | **Exec Dt:** 03/24/2007 | |
| **Assignee:** FREEWATER COMPANY, INC.<br>525 REACTOR WAY<br>RENO, NEVADA 89502 | | |

**Correspondent:**  BRADLEY P. HEISLER
HEISLER & ASSOCIATES
3017 DOUGLAS BVD., SUITE 300
ROSEVILLE, CA 95661

Search Results as of: 07/12/2007 02:16 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

**EXHIBIT M**



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

### NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.

**Total Assignments: 4**

**Patent #:** 5203989      **Issue Dt:** 04/20/1993      **Application #:** 07828190      **Filing Dt:** 01/30/1992

**Inventor:** JAMES J. REIDY

**Title:** POTABLE AIR-WATER GENERATOR

## Assignment: 1

**Reel/Frame:** 007470/0327      **Recorded:** 05/05/1995      **Pages:** 2

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** REIDY, JAMES J.      **Exec Dt:** 04/20/1995

**Assignee:** REIDY, JANICE BETHANNE
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520

**Correspondent:** BRIAN M. DINGMAN
LAW OFFICES OF BRAN M. DINGMAN, P.C.
40 SPEEN STREET
FRAMINGHAM, MA 01701

## Assignment: 2

**Reel/Frame:** 009279/0296      **Recorded:** 06/29/1998      **Pages:** 2

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** REIDY, JANICE BETHANNE      **Exec Dt:** 06/11/1998

**Assignee:** J.J. REIDY & CO., INC.
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520

**Correspondent:** NIELDS, LEMACK & DINGMAN
BRIAN M. DINGMAN
176 EAST MAIN STREET
SUITE 8
WESTBOROUGH, MA 01581

## Assignment: 3

**Reel/Frame:** 014384/0523      **Recorded:** 08/18/2003      **Pages:** 2

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** REIDY, JAMES J.      **Exec Dt:** 08/12/2003

**Assignee:** J.J. REIDY AND COMPANY, INC
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520

**Correspondent:** MIRICK, O'CONNELL, DEMALLIE ET AL
BRIAN M. DINGMAN, ESQ.
1700 WEST PARK DRIVE
WESTBOROUGH, MA 01581

## Assignment: 4

**Reel/Frame:** 019069/0646      **Recorded:** 03/27/2007      **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** J.J. REIDY & CO., INC.      **Exec Dt:** 03/24/2007

**Assignee:** FREEWATER COMPANY, INC.
525 REACTOR WAY

RENO, NEVADA 89502

**Correspondent:** BRADLEY P. HEISLER
HEISLER & ASSOCIATES
3017 DOUGLAS BVD., SUITE 300
ROSEVILLE, CA 95661

Search Results as of: 07/12/2007 02:16 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT N

 **United States Patent and Trademark Office**

Home|Site Index|Search|Guides|Contacts|eBusiness|eBiz alerts|News|Help



**Assignments on the Web > Patent Query**

# Patent Assignment Abstract of Title
## *NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.*

**Total Assignments: 6**

**Patent #:** 5366705        **Issue Dt:** 11/22/1994      **Application #:** 08073948      **Filing Dt:** 06/08/1993
**Inventor:** JAMES J. REIDY
**Title:** GRAVITY FEED ULTRAVIOLET LIQUID STERILIZATION SYSTEM

**Assignment: 1**

**Reel/Frame:** 007470/0336        **Recorded:** 05/05/1995        **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.        **Exec Dt:** 04/20/1995
**Assignee:** JANICE BETHANNE REIDY
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** BRIAN M. DINGMAN
LAW OFFICES OF BRIAN M. DINGMAN, P.C.
40 SPEEN STREET
FRAMINGHAM, MA 01701

**Assignment: 2**

**Reel/Frame:** 009342/0379        **Recorded:** 05/20/1998        **Pages:** 252
**Conveyance:** SECURITY AGREEMENT
**Assignors:** EVENFLO & SPALDING HOLDINGS CORPORATION        **Exec Dt:** 03/30/1998
SPALDING & EVENFLO COMPANIES, INC.        **Exec Dt:** 03/30/1998
EVENFLO COMPANY, INC.        **Exec Dt:** 03/30/1998
ETONIC WORLDWIDE CORPORATION        **Exec Dt:** 03/30/1998
LISCO, INC.        **Exec Dt:** 03/30/1998
S&E FINANCE CO., INC.        **Exec Dt:** 03/30/1998
SPALDING SPORTS CENTERS, INC.        **Exec Dt:** 03/30/1998
ETONIC LISCO, INC.        **Exec Dt:** 03/30/1998
LISCO FURNITURE, INC.        **Exec Dt:** 03/30/1998
LISCO FEEDING, INC.        **Exec Dt:** 03/30/1998
LISCO SPORTS, INC.        **Exec Dt:** 03/30/1998
**Assignee:** BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION AS ADMINISTRATIVE AGENT
1455 MARKET STREET, 12TH FLOOR
SAN FRANCISCO, CALIFORNIA 94103
**Correspondent:** MAYER, BROWN & PLATT
NORA A. WHITESCARVER
2000 PENNSYLVANIA AVE., N.W.
SUITE 3900
WASHINGTON, D.C. 20006

**Assignment: 3**

**Reel/Frame:** 009227/0574        **Recorded:** 05/22/1998        **Pages:** 253
**Conveyance:** SECURITY INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignors:** EVENFLO & SPALDING HOLDINGS CORPORATION        **Exec Dt:** 03/31/1998
SPALDING & EVENFLO COMPANIES, INC.        **Exec Dt:** 03/31/1998
EVENFLO COMPANY, INC.        **Exec Dt:** 03/31/1998

ETONIC WORLDWIDE CORPORATION                                   **Exec Dt:** 03/31/1998
LISCO, INC.                                                    **Exec Dt:** 03/31/1998
S&E FINANCE CO., INC.                                          **Exec Dt:** 03/31/1998
SPALDING SPORTS CENTERS, INC.                                  **Exec Dt:** 03/31/1998
ETONIC LISCO, INC.                                             **Exec Dt:** 03/31/1998
LISCO FURNITURE, INC.                                          **Exec Dt:** 03/31/1998
LISCO FEEDING, INC.                                            **Exec Dt:** 03/31/1998
LISCO SPORTS, INC.                                             **Exec Dt:** 03/31/1998

**Assignee:** BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION, AS ADMINISTRATIVE AGENT
1455 MARKET STREET, 12TH FLOOR
SAN FRANCISCO, CALIFORNIA 94103

**Correspondent:** MAYER, BROWN & PLATT
NORA A. WHITESCARVER
2000 PENNSYLVANIA AVE., N.W.
SUITE 3900
WASHINGTON, DC 20006

## Assignment: 4

**Reel/Frame:** 009267/0940          **Recorded:** 06/29/1998                    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JANICE BETHANNE                            **Exec Dt:** 06/11/1998
**Assignee:** J.J. REIDY & CO., INC.
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** NIELDS, LEMACK & DINGMAN
BRIAN M. DINGMAN
176 EAST MAIN STREET
SUITE 8
WESTBOROUGH, MA 01581

## Assignment: 5

**Reel/Frame:** 014384/0523          **Recorded:** 08/18/2003                    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.                                  **Exec Dt:** 08/12/2003
**Assignee:** J.J. REIDY AND COMPANY, INC
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** MIRICK, O'CONNELL, DEMALLIE ET AL
BRIAN M. DINGMAN, ESQ.
1700 WEST PARK DRIVE
WESTBOROUGH, MA 01581

## Assignment: 6

**Reel/Frame:** 019069/0646          **Recorded:** 03/27/2007                    **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** J.J. REIDY & CO., INC.                           **Exec Dt:** 03/24/2007
**Assignee:** FREEWATER COMPANY, INC.
525 REACTOR WAY
RENO, NEVADA 89502
**Correspondent:** BRADLEY P. HEISLER
HEISLER & ASSOCIATES
3017 DOUGLAS BVD., SUITE 300
ROSEVILLE, CA 95661

Search Results as of: 07/12/2007 02:14 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=5366705&pub=...    7/12/2007

**EXHIBIT O**

# KEEGAN WERLIN LLP

ATTORNEYS AT LAW
265 FRANKLIN STREET
BOSTON, MASSACHUSETTS 02110-3113

TELECOPIERS:
(617) 951-1354
(617) 951-0586

(617) 951-1400

June 29, 2007

Maura A. Greene, Esq.
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, Massachusetts 01615-0156

     Re:    J.J. Reidy & Co., Inc. v. Airwater Corporation, et al.,
              United States District Court for the District of Massachusetts
              – Central Division Civil Action Nos. 05-40049-FDS and 06-10137-FDS

Dear Ms. Greene:

     In connection with the above-referenced matters, enclosed herewith please find copies of the following:

1.     Defendant AirWater Patents, Inc.'s Fourth Request for Production of Documents; and

2.     First Request of Defendants AirWater Corporation and AirWater Patents, Inc. to Plaintiff J.J. Reidy & Co., Inc. for Entry Upon Land for Inspection and Other Purposes.

Thank you for your attention to this matter.

     Very truly yours,

     Matthew P. Zayotti

Enclosures

cc:    Richard B. Kirby, Esq.
       Michael J. Zwebner

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,**<br><br>   **Plaintiff,**<br><br>**v.**<br><br>**AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,**<br><br>   **Defendants.** | CIVIL ACTION NO. 05-40049-FDS |
| **AIRWATER PATENTS, INC.**<br><br>   **Plaintiff,**<br><br>**v.**<br><br>**J.J. REIDY & CO., INC.**<br><br>   **Defendant.** | CIVIL ACTION NO. 06-10137-FDS |

**DEFENDANT AIRWATER PATENTS, INC.'S
FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS**

  Pursuant to Fed. R. Civ. P. 34, the AirWater Patents Corporation hereby requests

in accordance with the definitions and instructions set forth herein, that the Plaintiff J.J.

Reidy & Co., Inc. produce the following documents for inspection and copying at the

offices of Keegan Werlin LLP, 265 Franklin Street, Boston, MA 02110 within thirty (30)

days after service of this request.

## II. DEFINITIONS

  A.  The term "document" is used in the broadest sense and includes but is not

limited to originals and non-identical copies, drafts, alterations, modifications, changes or

amendments whether different from the originals by reason of any notation made on such

copies or otherwise, of the following items, whether typed, printed, recorded,

photographed, videotaped, filmed, taped, microfilmed, microfiched or reproduced by any

other mechanical or electronic process, or written or produced by hand, namely:

agreements; communications, including inter-office and intra-office communications; and

inter-company and intra-company communications; bulletins; letters; correspondence;

telegrams; emails; teletypes; telefax; memoranda; agenda; records; books; summaries of

records or notations of any sort of personal or telephone conversations or interviews;

telephone logs; diaries; forecasts; statistical statements; accountants' work papers;

graphs; charts; accounts; analytical records; reports; studies; minutes or records of

meetings or conferences; reports and/or summaries of interviews; reports and/or

summaries of investigations; opinions or reports of consultants; appraisals; reports or

summaries of negotiations; brochures; pamphlets; circulars; trade letters; press releases;

contracts; notes; projections; drafts of any documents; working paper; ledgers, including

securities ledgers; checks, front and back; check stubs or receipts; purchase orders;

statements; returns; summaries; invoices; work sheets; credit memoranda; loan

agreements; loan commitments; loan documents; any other documents or writings of

whatever description including, but not limited to, any information contained in any

computer although not yet printed out within your possession, computer magnetic or

optical disc in your possession, custody or control or the possession, custody or control of

any agent, employee, or other persons acting or purporting to act on your behalf

(including without limitation, attorneys, accountants and investment bankers or advisors).

    B.     A document is deemed to be in the respondent's "control" if the

respondent has the right to secure the document or a copy thereof from another person

(including but not limited to Respondent's counsel) or public or private entity having actual physical possession thereof.

C.      The term "communication" shall mean any transfer of information, data, ideas, fact, non-fact, opinion, whether orally, in writing, by electronic data transfer or otherwise, including but not limited to any memorandum, report, order, note, meeting, utterance, conversation, notation, statement of any nature whatsoever, correspondence, electronic mail, photograph, image, sign or signal, gesture, or oral or telephonic conversation.

D.      The term "person" includes natural persons, corporations, partnerships, unincorporated associations, trusts, municipalities, government bodies, or any agent, division, or sub-part of any person defined above, and all other entities in law or in fact.

E.      The term "relating to" or "relating thereto" means relating or pertaining in any way to, referring to, reflecting, recording, memorializing, mentioning, constituting, supporting or concerning, directly or indirectly.

F.      The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; the word "including" means including without limitation.

G.      The term "or" shall mean and/or.

H.      The term "the Patents" refers to United States Patents numbered 5,106,512, 5,149,446, 5,203,989, and 5,366,705, which J.J. Reidy & Co., Inc. licensed to AirWater Corporation pursuant to the Global Manufacturing and Marketing Licensing Agreement that is the subject of this litigation.

I.     The term "AirWater" refers to the Defendants AirWater Patents Corporation and/or AirWater Patents, Inc.

J.     The terms "J.J. Reidy," "Plaintiff," "you," "your" and "yours" refer to the Plaintiff J.J. Reidy & Co., Inc. and any of its agents, employees, servants or contractors, and any person, organization, or entity from which he has a right to request and receive any of the information or documents requested herein.

K.     The term "Global Manufacturing and Marketing Licensing Agreement" refers to the Global Manufacturing and Marketing Licensing Agreement by and between J.J. Reidy & Co., Inc. and AirWater Corporation dated March 21, 2003.

L.     The term "Patent and Asset Purchase Agreement" refers to the Patent and Asset Purchase Agreement by and between J.J. Reidy & Co., Inc. and Free Water Company dated October 4, 2005.

## II. <u>INSTRUCTIONS</u>

A.     Each request for documents set forth herein seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other materials affixed thereto, incorporated by reference therein or referred to therein.

B.     Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Request shall be deemed to be continuing so as to require further and supplemental production if the responding party or its agents or attorneys obtain additional documents between the time of the initial production and the time of hearing or trial.

C.     All documents are to be produced as they are kept in the usual course of business so that the propounding party can ascertain the file in which they are located, their relative order in such files and how such files were maintained or, in the alternative,

shall organize and label the documents produced so as to correspond with the category or categories of the request to which they are responsive.

D.    Segregated Responses:  The responses to these requests shall set forth the number and subdivision of the request before each response and separate responses are sought with respect to each request and subdivision thereof.

E.    Privileged Documents and Communications:  With respect to any document responsive to this request which you may decline to produce by reason of any claim of privilege or immunity, provide a statement setting forth as to each such document:

(1)    the name of the sender of the document;

(2)    the name of the author of the document;

(3)    the name of the person to whom all copies (both indicated and blind) of the document were sent or furnished or to whom, at any time, the document's contents have been disclosed;

(4)    the job title of every person named in a, b, and c above;

(5)    the date of the document;

(6)    the date on which the document was received or sent by you;

(7)    a brief description of the nature and subject matter of the document sufficient to permit the fullest evaluation of the claim of privilege pursuant to which it has been withheld, but without revealing privileged matter;

(8)    the number of pages in the document; and

(9)   the statute, rule or decision on which the claim of privilege or

immunity is based.

F.    <u>Documents No Longer In Existence</u>:  If any document requested was at

one time in existence but is no longer in existence, or has been lost, destroyed, discarded

or otherwise disposed of within the twelve months preceding the date of this Request, any

such document is to be identified as completely as possible by including a statement

setting forth the following as to each such document:

(1)   the type of document:

(2)   the date upon which it ceased to exist;

(3)   the circumstances under which it ceased to exist including a true and

complete copy of any policy with respect to the retention of disposal

of documents claimed to be applicable thereto;

(4)   the identity of all persons having knowledge of the circumstances

under which it ceased to exist;

(5)   the identity of all persons having knowledge of the contents thereof.

### III.  REQUESTS

**REQUEST NO. 1:**

All documents that constitute, relate or refer to any and all assignments and/or transfers of the Reidy patents.

**REQUEST NO. 2:**

All documents that constitute, relate or refer to drawings and/or specifications for any and all prototypes of the air to water machine or machines built by or at the behest of Reidy.

**REQUEST NO. 3:**

All documents that constitute, relate or refer to lab reports concerning the quality of the water generated by any and all prototypes of the air to water machine or machines built by or at the behest of Reidy.

**REQUEST NO. 4:**

All documents that constitute, relate or refer to communications by and between J.J. Reidy & Co., Inc. and AirWater Corporation and/or AirWater Patents, Inc. regarding pending patents and/or improvements to the Reidy patents.

**REQUEST NO. 5:**

All documents that constitute, relate or refer to the Asset and Patent Purchase Agreement by and between J.J. Reidy & Co., Inc. and Free Water Company, including but not limited to any and all related agreements, promissory notes, powers of attorney and correspondence.

DEFENDANT AIRWATER PATENTS, INC.

By its attorneys,

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts  02110-3113
(617) 951-1400

Dated:  June 29, 2007

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document(s) was served upon the attorney of record for each other party by hand-delivery - US Mail on _June 29, 2007_ .

7

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,**<br><br>        **Plaintiff,**<br><br>v.<br><br>**AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,**<br><br>        **Defendants.** | CIVIL ACTION NO. 05-40049-FDS |
| **AIRWATER PATENTS, INC.**<br><br>        **Plaintiff,**<br><br>v.<br><br>**J.J. REIDY & CO., INC.**<br><br>        **Defendant.** | CIVIL ACTION NO. 06-10137-FDS |

### FIRST REQUEST OF DEFENDANTS AIRWATER CORPORATION AND AIRWATER PATENTS, INC. TO PLAINTIFF J.J. REIDY & CO., INC. FOR ENTRY UPON LAND FOR INSPECTION AND OTHER PURPOSES

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, the Defendants AirWater Corporation and AirWater Patents, Inc. hereby make the following requests for entry upon land for inspection and other purposes:

**Request No. 1:**

The Plaintiff J.J. Riedy & Co., Inc. is requested to produce for inspection, testing or sampling by an expert of Defendants' choosing at a mutually convenient time for the parties and counsel, J.J. Reidy & Co., Inc.'s air to water prototype.  .

DEFENDANTS AIRWATER
CORPORATION AND AIRWATER
PATENTS, INC.

By its attorneys,

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts  02110-3113
(617) 951-1400

Dated:  June 29, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document(s) was served upon the attorney of record for each other party by hand delivery - US Mail on *June 29, 2007* .

**EXHIBIT P**

# ORIGINAL

PAGES 1 - 122

EXHS. 1 - 6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

J.J. Reidy & Co., Inc.                    \*

v.                                         \*    Civil Action

AirWater Corporation and                   \*    No. 05-40049-FDS

AirWater Patents Corporation               \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

AirWater Patents, Inc.                     \*

v.                                         \*    Civil Action

J.J. Reidy & Co., Inc.                     \*    No. 06-10137-FDS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of James J. Reidy
June 25 and 26, 2007
Bowditch & Dewey, LLP
311 Main Street - 4th Floor
Worcester, Massachusetts 01608

----------- *J. Edward Varallo, RMR, CRR* ----------
*Registered Professional Reporter*
*EPPLEY COURT REPORTING, LLC*
*P.O. Box 382, Hopedale, Massachusetts 01747*
*508.478.9795 ~ Fax 508.478.0595*
*leppley@msn.com*

*James J. Reidy* 28

1      *A.*      They're judgmentproof.  They have no

2   assets.

3      *Q.*      Have you done an asset search?

4      *A.*      I am intimately familiar with the company.

5   I didn't do any additional searches.

6      *Q.*      Who else have you told if anybody about

7   the termination of the purchase and sale agreement

8   with Free Water?

9            MS. GREENE:  Outside of your attorneys.

10  He's not asking you about your attorneys.

11           MR. ZAYOTTI:  Sir, she can't answer the

12  question for you.

13           (Attorney/client conference)

14           MR. ZAYOTTI:  Just for the record, I want

15  the record to reflect that the witness is conferring

16  with his attorney.

17           MS. GREENE:  Let's have the question

18  again.  What's the question?

19  BY MR. ZAYOTTI:

20     *Q.*      Who else have you told about your

21  termination of the purchase and sale agreement with

22  Free Water?

23     *A.*      I've told Carrier Corporation, Munters,

24  Mike Klein, Aqua-Air, and Ray Anderson in Vancouver.

*James J. Reidy*                                    29

1    Q.    Ray Anderson?

2    A.    Ray Anderson, yes.

3    Q.    Who is Carrier Corp.?

4    A.    The refrigeration people.

5    Q.    And Munters?

6    A.    They're also in the refrigeration

7    business.

8    Q.    And who is Aqua-Air?

9    A.    They're in the same business.  Everybody

10   I've talked to is in the business.

11   Q.    So let's start with Carrier Corp.  Why

12   would you tell Carrier Corp. that you terminated a

13   purchase and sale agreement with Free Water?

14   A.    Well, because I had negotiations with them

15   years ago.  They showed an initial interest in the

16   technology and then I just heard through the

17   grapevine that they're getting back into it.

18   Q.    When did you have your initial

19   negotiations with Carrier Corp.?

20   A.    2000, give or take a couple years.

21   Q.    And why did you tell Munters that you

22   terminated your purchase and sale agreement with

23   Free Water?

24   A.    Well, because they are in the business and

*James J. Reidy* 30

1    I thought they might have an interest in my patents.

2        Q.    How about Mike Klein?  Why did you tell

3    Mike Klein that you had terminated --

4        A.    Same thing, same thing.

5        Q.    I know you know what I'm going to ask, but

6    just so the record is clear, if you'd just wait

7    until I finish my question before you give your

8    answer, the record will be clearer.  So let me ask

9    it again.

10            Why did you tell Mike Klein about the fact

11   that you terminated the purchase and sale agreement

12   with Free Water?

13       A.    Because he's in the business and I thought

14   he might have an interest in my patents.

15       Q.    Have you had other negotiations or

16   discussions with Mike Klein about your patents other

17   than this communication with him about the

18   termination of the purchase and sale agreement?

19       A.    Not since this lawsuit business began.

20       Q.    So am I correct in inferring that you

21   communicated with Mr. Klein about patents prior to

22   the lawsuit between J.J. Reidy & Company and

23   AirWater?

24       A.    Oh, yeah.

*James J. Reidy*                                                   31

1    Q.    But you haven't talked with Mike Klein

2    during the pendency of this litigation?

3    A.    I talk to him frequently.

4    Q.    And what do you talk to him about?

5    A.    Mr. Zwebner mostly.

6    Q.    All right.  Why don't you tell me -- Well,

7    first of all, before I ask you to tell me about your

8    conversations with Mr. Klein about Mr. Zwebner, just

9    so I understand, we've been referring to a purchase

10   and sale agreement with Free Water.  What is that

11   agreement generally?

12   A.    Generally it was I would sell him my

13   patents outright and they would pay me $6 million

14   according to a schedule.

15   Q.    And when you say your patents, are you

16   referring to patents that are the subject of this

17   lawsuit?

18   A.    Yes.

19   Q.    Why don't you tell me generally about the

20   substance of your conversations with Mike Klein

21   about Mr. Zwebner?

22   A.    He asks me how I'm doing in this suit;

23   I ask him how he's doing in his suit; and we talk

24   about the pros and cons, the goods and bads, and

*James J. Reidy*                                    32

1    just general stuff.

2         Q.    The pros and cons and goods and bads of

3    what?

4         A.    Each other's lawsuit position.

5         Q.    So why don't you tell me, what are the

6    pros and cons of each other's lawsuit position?

7              MS. GREENE:  Objection.

8         A.    The pros are we're going to both win.  The

9    cons are it's costing us a lot of time and money.

10        Q.    So you're saying that Mike Klein has a

11   lawsuit with Mr. Zwebner as well?

12        A.    As I understand it.

13        Q.    What do you know about that lawsuit?

14        A.    It's an infringement lawsuit basically, as

15   far as I know.

16        Q.    Tell me more.

17             MS. GREENE:  Well, what is the question?

18   BY MR. ZAYOTTI:

19        Q.    Tell me more about the lawsuit, what you

20   know about the lawsuit.

21        A.    I don't know.  I know he's suing

22   Mr. Zwebner for patent infringement.

23             MR. ZWEBNER:  No.

24             THE WITNESS:  Well, that's what --

*James J. Reidy* 84

1      A.     J.J. Reidy & Company, Inc. and AirWater

2  Corporation.

3      Q.     And you see at the top it's dated 21st day

4  of March 2003?

5      A.     Yes.

6      Q.     Is that when the parties signed this

7  agreement?

8      A.     No.

9      Q.     When did the parties sign this agreement?

10     A.     To the best of my memory, I think it was

11  in June of '03.

12     Q.     So from the time that you first spoke to

13  Mr. Zwebner sometime between November of '02 and

14  February of '03 until the time you actually executed

15  this agreement, what were you doing during that time

16  period?

17     A.     In what sense?

18     Q.     With regard to any relationship you may

19  have been contemplating with AirWater Corporation.

20     A.     Well, we had ongoing communications about

21  the terms herein.

22     Q.     Would it be accurate to characterize those

23  discussions as negotiations?

24     A.     Yes.

*James J. Reidy*                                    85

1    Q.    During this time frame were you discussing

2    with anyone else other than AirWater the possibility

3    of licensing the patents?

4    A.    Yes.

5    Q.    Who else were you talking to during that

6    time period?

7    A.    I was talking to Mike Klein, who was

8    offering me $4 million at the time in conjunction

9    with Hyflux, H-y-f-l-u-x, of Singapore.

10   Q.    Excuse me.  Four million dollars, is that

11   more than what AirWater offered you?

12   A.    Yes.

13   Q.    How come you didn't consummate a deal with

14   Mike Klein?

15   A.    Well, because Mr. Zwebner issued a false

16   press release saying that we had signed a contract.

17   Hyflux being a very sensitive international

18   corporation got totally bent out of shape, didn't

19   want to get involved anymore.

20   Q.    You say Mr. Zwebner issued a false press

21   release?

22   A.    Yes.

23   Q.    When did that happen?

24   A.    I'm guessing, best of my memory, it was in

*James J. Reidy*                              100

1    *A.*    Yes.

2    *Q.*    And the patents were issued in your name?

3    *A.*    Yes.  I believe so.  Again, it's either me

4    or my company, but I think it's me.

5    *Q.*    Do you have any recollection of ever

6    assigning any of these patents --

7    *A.*    Yes.

8    *Q.*    -- to J.J. Reidy & Company?

9    *A.*    Oh, I'm sorry.  I don't recall.

10    *Q.*    If you had ever assigned any of the four

11    patents to J.J. Reidy & Company, you would have a

12    record of that.  Correct?

13    *A.*    No.  Patent Office would, I think.

14    *Q.*    You wouldn't have a record of your own?

15    *A.*    No.  It's just an electronic notification

16    to the Patent Office.  There's no -- I've never seen

17    any response.  I don't recall ever seeing a

18    response, unless my patent attorney, Brian Dingman,

19    got responses.  I don't know.

20    *Q.*    Do you have any recollection of ever

21    filing something with the United States Patent and

22    Trademark Office reflecting an assignment of any of

23    the patents that we've been talking about from you

24    personally to J.J. Reidy & Company?

*James J. Reidy*                                  101

1      *A.*    Didn't you just ask me that question?

2      *Q.*    Well, I'm asking you generally.  I had

3    asked you before, I think, if you had record of an

4    assignment and you said if there was any assignment,

5    it would be on file with the Patent and Trademark

6    Office.

7      *A.*    Correct.

8      *Q.*    Do you have a recollection as you sit here

9    today of ever filing or recording anything with the

10   United States Patent and Trademark Office reflecting

11   an assignment of any of the patents?

12     *A.*    To J.J. Reidy & Company?

13     *Q.*    Yes.

14     *A.*    No, no recollection.

15          MR. ZAYOTTI:  I'll follow up on this in

16   writing, but we would like to request copies of any

17   written assignments of the patents from Mr. Reidy

18   personally to the company J.J. Reidy & Company.

19          THE WITNESS:  I don't even know where

20   I could get that stuff.

21   BY MR. ZAYOTTI:

22     *Q.*    Referring your attention back to Exhibit

23   3, sir, which is the license agreement, the first

24   paragraph under the heading Witnesseth on page 1.

*James J. Reidy*                                      102

1    You see that?

2        A.      Yep.

3        Q.      You see where it says "Whereas licensor."

4    Who is the licensor under this agreement to your

5    understanding?

6        A.      J.J. Reidy & Company, Inc.

7        Q.      You see where it says "Whereas licensor

8    represents and warrants that it has the entire

9    right, title, and interest in and to United States

10   patents numbered" and then it gives the numbers of

11   the four patents.

12       A.      Yep.

13       Q.      Did I read that correctly?

14       A.      Yes.

15       Q.      You've testified you don't recall whether

16   you ever personally assigned the patents to the

17   entity known as J.J. Reidy & Company, Inc.?

18       A.      No, I just plain don't recall.

19       Q.      So would it be also correct to say that

20   you couldn't sit here today and tell me whether or

21   not J.J. Reidy & Company, Inc. in fact had all the

22   right, title and interest to the patents that are

23   the subject of this agreement?

24              MS. GREENE:   Objection.

*James J. Reidy*                          103

1    *A.*    No.  I'll use the same argument that

2    Michael Zwebner used.  I'm in control of both

3    entities, so what difference does it make?

4    *Q.*    Well, I'm going to move to strike that

5    response as nonresponsive.  Sir, I'm going to ask

6    you again:  As you sit here today, you are not able

7    to tell me whether J.J. Reidy & Company, Inc. in

8    fact had all of the right, title and interest to the

9    four patents that were licensed to AirWater under

10   this agreement.  Correct?

11              MS. GREENE:  Objection.

12   *A.*    Today I can't tell you.

13   *Q.*    And you would agree that if you never

14   personally assigned or transferred the patents to

15   J.J. Reidy & Company, Inc., your representation and

16   warranty in this agreement that J.J. Reidy & Company

17   had all right, title, and interest to the patents

18   would be a misrepresentation.  Correct?

19              MS. GREENE:  Objection.

20   *A.*    Not correct.

21   *Q.*    Would it be false?

22              MS. GREENE:  Objection.

23   *A.*    No, it would not be false.

24   *Q.*    If you never personally assigned or

*James J. Reidy*                                                              104

1   transferred the patents to J.J. Reidy & Company,

2   Inc., then J.J. Reidy & Company, Inc. did not have

3   all right, title, and interest to the patents.

4   Isn't that correct?

5           MS. GREENE:  Objection.

6       *A.*    No.

7       *Q.*    What is the basis for your saying that

8   that's not correct?

9       *A.*    The intent was clear here that J.J. Reidy

10  & Company would license AirWater Corporation, would

11  license AirWater Corporation under these patents.

12  When if ever I transferred I truly don't know, and

13  it's just a trivial oversight if I didn't, on both

14  parties' part.

15          MS. GREENE:  You know what?  I just want

16  to take a break for not even five minutes.  Let's go

17  off the record.

18          (Discussion off the record.)

19          (In recess 1:28 p.m. to 1:31 p.m.)

20  BY MR. ZAYOTTI:

21      *Q.*    Mr. Reed, do you have any recollection of

22  ever assigning any of the four patents that are the

23  subject of the license agreement between J.J. Reidy

24  and AirWater Corporation to anyone other than Free

*James J. Reidy* 105

1    Water or AirWater?

2        *A.*    I assigned them to my daughter at one

3    point.

4        *Q.*    And who is your daughter?

5        *A.*    Janice Beth Ann Reidy -- DiFonso.

6        *Q.*    Janice -- sorry -- Beth Ann DiFonso?

7        *A.*    Yeah.

8        *Q.*    When was that assigned?

9        *A.*    It was during or near 2003.

10       *Q.*    And why did you assign -- Let me strike

11   that.  Did you assign all four patents to your

12   daughter?

13       *A.*    Yes.

14       *Q.*    Why did you do that?

15       *A.*    Well, I thought at the time it was a good

16   estate move.

17       *Q.*    And were you doing your estate plan in

18   2003?

19       *A.*    That's what I said.

20       *Q.*    Well, I think you said you thought it was

21   a good estate move.  But were you generally doing

22   your estate plan at that time?

23       *A.*    Some of it, yes.

24       *Q.*    Do you recall actually making a written

*James J. Reidy* 106

1   assignment of the patents to your daughter?

2        A.    No, I don't recall that.  I think I

3   probably called my patent attorney, Brian Dingman,

4   and asked him to do it for me.  I don't recall, but

5   that's probably what I did.

6        Q.    And at some point did your daughter assign

7   the patents back to you?

8        A.    Yes.

9        Q.    When did she assign the patents back to

10  you?

11       A.    During or around 2006.

12       Q.    Is it your testimony or do I have this

13  right, you assigned the patents to your daughter

14  Janice in or about 2003?

15       A.    Yes.

16       Q.    And she held the patents until 2006 when

17  she assigned them back to you?

18       A.    She either assigned them back to me or

19  back to J.J. Reidy & Company, Inc.  I don't recall

20  which one it was.

21       Q.    Sir, if you had assigned the patents to

22  your daughter in 2003 and she didn't assign them

23  back to you until 2006, how could J.J. Reidy &

24  Company make a representation and warranty in the

# EXHIBIT Q

**LONGO & LONGO, LLP**
280 SOUTH BEVERLY DRIVE
SUITE 210
BEVERLY HILLS, CA 90212
(310) 271-9388
Fax: (310) 271-9194
E-mail: longollp@pacbell.net

Via Mail

April 18, 2005

Elizabeth M. Schwabedissen
Adorno & Yoss
2525 Ponce De Leon Blvd., Suite 400
Miami, Florida 33134-6012

Dear Elizabeth M. Schwabedissen,

Please find enclosed, documents responsive to your subpoena in Case No. 05-20650.

Very Truly Yours,
LONGO & LONGO LLP

FRANK J. LONGO

FJL/gl

Enclosure:

**LONGO & LONGO, LLP**
280 SOUTH BEVERLY DRIVE
SUITE 210
BEVERLY HILLS, CA 90212
(310) 271-9388
Fax: (310) 271-9194
E-mail: frankjlongo@yahoo.com

Via Facsimile

March 23, 2005

Mr. Jim Reidy
1260 Main St.
Holden, MA 01520

Dear Mr. Reidy,

Air2Water, LLC has received your recent March 4, 2005 offer to license your patents. Even though we are extremely interested and have negotiated for these rights over the past 3 to 4 years, for $3 to $4 million, given your pending litigation with Michael Zwebner and his company, we cannot at this time negotiate a deal.

Very truly yours,

LONGO & LONGO, LLP

FRANK J. LONGO

Cc:    Michael Klein

# J.J. Reidy & Co., Inc.

**1260 Main Street, Holden, MA  01520-1020**

**Telephone:**  (508) 829-6550
**Fax:**  (508) 829-6492
**Email:**  jjreidy@earthlink.net
**URL:**  http://www.drinkingwaterfromtheair.com



March 4, 2005

Mr. Mike Klein
World Wide Water
105 Buckskin Road
Bell Canyon, CA  91307

Dear Mike:

You should know that we have terminated our world-wide Exclusive License with AirWater Corp. and AirWater Patents, Inc., both of Miami Beach.

For the last 3 to 4 years you have expressed a continuous interest in obtaining the rights to both our existing and pending patents.

We have decided to sell our intellectual property outright and would look forward to your offer now that these patents are back into our possession.

Please contact me at your convenience. We look forward to working with you.

Respectfully yours,

James J. Reidy
President

# EXHIBIT R

*file*
*Due 4/23*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-40049-FDS

---

**J.J. REIDY & CO., INC.,**

      **Plaintiff,**

**v.**

**AIRWATER CORPORATION AND
AIRWATER PATENTS
CORPORATION,**

      **Defendants.**

---

## DEFENDANT AIRWATER PATENTS CORPORATION'S
## THIRD REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 34, the AirWater Patents Corporation hereby requests

in accordance with the definitions and instructions set forth herein, that the Plaintiff J.J.

Reidy & Co., Inc. produce the following documents for inspection and copying at the

offices of Keegan Werlin LLP, 265 Franklin Street, Boston, MA 02110 within thirty (30)

days after service of this request.

## II. **DEFINITIONS**

A.      The term "document" is used in the broadest sense and includes but is not

limited to originals and non-identical copies, drafts, alterations, modifications, changes or

amendments whether different from the originals by reason of any notation made on such

copies or otherwise, of the following items, whether typed, printed, recorded,

photographed, videotaped, filmed, taped, microfilmed, microfiched or reproduced by any

other mechanical or electronic process, or written or produced by hand, namely:
agreements; communications, including inter-office and intra-office communications; and
inter-company and intra-company communications; bulletins; letters; correspondence;
telegrams; emails; teletypes; telefax; memoranda; agenda; records; books; summaries of
records or notations of any sort of personal or telephone conversations or interviews;
telephone logs; diaries; forecasts; statistical statements; accountants' work papers;
graphs; charts; accounts; analytical records; reports; studies; minutes or records of
meetings or conferences; reports and/or summaries of interviews; reports and/or
summaries of investigations; opinions or reports of consultants; appraisals; reports or
summaries of negotiations; brochures; pamphlets; circulars; trade letters; press releases;
contracts; notes; projections; drafts of any documents; working paper; ledgers, including
securities ledgers; checks, front and back; check stubs or receipts; purchase orders;
statements; returns; summaries; invoices; work sheets; credit memoranda; loan
agreements; loan commitments; loan documents; any other documents or writings of
whatever description including, but not limited to, any information contained in any
computer although not yet printed out within your possession, computer magnetic or
optical disc in your possession, custody or control or the possession, custody or control of
any agent, employee, or other persons acting or purporting to act on your behalf
(including without limitation, attorneys, accountants and investment bankers or advisors).

     B.    A document is deemed to be in the respondent's "control" if the
respondent has the right to secure the document or a copy thereof from another person
(including but not limited to Respondent's counsel) or public or private entity having
actual physical possession thereof.

C.    The term "communication" shall mean any transfer of information, data, ideas, fact, non-fact, opinion, whether orally, in writing, by electronic data transfer or otherwise, including but not limited to any memorandum, report, order, note, meeting, utterance, conversation, notation, statement of any nature whatsoever, correspondence, electronic mail, photograph, image, sign or signal, gesture, or oral or telephonic conversation.

D.    The term "person" includes natural persons, corporations, partnerships, unincorporated associations, trusts, municipalities, government bodies, or any agent, division, or sub-part of any person defined above, and all other entities in law or in fact.

E.    The term "relating to" or "relating thereto" means relating or pertaining in any way to, referring to, reflecting, recording, memorializing, mentioning, constituting, supporting or concerning, directly or indirectly.

F.    The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; the word "including" means including without limitation.

G.    The term "or" shall mean and/or.

H.    The term "the Patents" refers to United States Patents numbered 5,106,512, 5,149,446, 5,203,989, and 5,366,705, which J.J. Reidy & Co., Inc. licensed to AirWater Corporation pursuant to the Global Manufacturing and Marketing Licensing Agreement that is the subject of this litigation.

I.    The term "AirWater" refers to the Defendants AirWater Patents Corporation and/or AirWater Patents, Inc.

J.      The terms "J.J. Reidy," "Plaintiff," "you," "your" and "yours" refer to the Plaintiff J.J. Reidy & Co., Inc. and any of its agents, employees, servants or contractors, and any person, organization, or entity from which he has a right to request and receive any of the information or documents requested herein.

K.      The term "Global Manufacturing and Marketing Licensing Agreement" refers to the Global Manufacturing and Marketing Licensing Agreement by and between J.J. Reidy & Co., Inc. and AirWater Corporation dated March 21, 2003.

L.      The term "Patent and Asset Purchase Agreement" refers to the Patent and Asset Purchase Agreement by and between J.J. Reidy & Co., Inc. and Free Water Company dated October 4, 2005.

## II. <u>INSTRUCTIONS</u>

A.      Each request for documents set forth herein seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other materials affixed thereto, incorporated by reference therein or referred to therein.

B.      Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Request shall be deemed to be continuing so as to require further and supplemental production if the responding party or its agents or attorneys obtain additional documents between the time of the initial production and the time of hearing or trial.

C.      All documents are to be produced as they are kept in the usual course of business so that the propounding party can ascertain the file in which they are located, their relative order in such files and how such files were maintained or, in the alternative, shall organize and label the documents produced so as to correspond with the category or categories of the request to which they are responsive.

D.   Segregated Responses:  The responses to these requests shall set forth the number and subdivision of the request before each response and separate responses are sought with respect to each request and subdivision thereof.

E.   Privileged Documents and Communications:  With respect to any document responsive to this request which you may decline to produce by reason of any claim of privilege or immunity, provide a statement setting forth as to each such document:

(1)   the name of the sender of the document;

(2)   the name of the author of the document;

(3)   the name of the person to whom all copies (both indicated and blind) of the document were sent or furnished or to whom, at any time, the document's contents have been disclosed;

(4)   the job title of every person named in a, b, and c above;

(5)   the date of the document;

(6)   the date on which the document was received or sent by you;

(7)   a brief description of the nature and subject matter of the document sufficient to permit the fullest evaluation of the claim of privilege pursuant to which it has been withheld, but without revealing privileged matter;

(8)   the number of pages in the document; and

(9)   the statute, rule or decision on which the claim of privilege or immunity is based.

F.    <u>Documents No Longer In Existence</u>:  If any document requested was at one time in existence but is no longer in existence, or has been lost, destroyed, discarded or otherwise disposed of within the twelve months preceding the date of this Request, any such document is to be identified as completely as possible by including a statement setting forth the following as to each such document:

(1)    the type of document:

(2)    the date upon which it ceased to exist;

(3)    the circumstances under which it ceased to exist including a true and complete copy of any policy with respect to the retention of disposal of documents claimed to be applicable thereto;

(4)    the identity of all persons having knowledge of the circumstances under which it ceased to exist;

(5)    the identity of all persons having knowledge of the contents thereof.

## III. REQUESTS

**REQUEST NO. 1:**

All documents that constitute, reflect, relate or refer to any and every manner of consideration that you have received from Arthur Neumann and/or Free Water Company pursuant to the Asset and Patent Purchase Agreement, including without limitation copies of any and all bank records, canceled checks, receipts, wire transfer confirmations and/o other records reflecting payment of any kind.

**REQUEST NO. 2:**

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Free Water Company regarding the Asset and Patent Purchase Agreement.

DEFENDANTS AIRWATER PATENTS
CORPORATION

By its attorneys,

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts  02110-3113
(617) 951-1400

Dated:  March 22, 2007

---

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document(s) was served upon the attorney of record for each other party by hand delivery - US Mail on *March 22, 2007*

---

# KEEGAN WERLIN LLP

ATTORNEYS AT LAW
265 FRANKLIN STREET
BOSTON, MASSACHUSETTS 02110-3113

TELECOPIERS:
(617) 951-1354
(617) 951-0586

(617) 951-1400

March 22, 2007

Maura A. Greene, Esq.
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, Massachusetts 01615-0156

    Re:    J.J. Reidy & Col, Inc. v. Airwater Corporation, et al.,
        United States District Court for the District of Massachusetts
        <u>– Central Division Civil Action Nos. 05-40049-FDS and 06-10137-FDS</u>

Dear Ms. Greene:

    In connection with the above-referenced matters, enclosed herewith please find
Defendant AirWater Patents Corporation's Third Request for Production of Documents.

    Thank you for your attention to this matter.

Very truly yours,

Matthew P. Zayotti

Enclosure
cc:    Richard B. Kirby, Esq.
       Mr. Michael J. Zwebner

# EXHIBIT S

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,** | |
| **Plaintiff,** | CIVIL ACTION NO. 05-40049-FDS |
| | **Consolidated with** |
| **v.** | |
| **AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,** | |
| **Defendants.** | |
| **AIRWATER PATENTS, INC.** | |
| **Plaintiff,** | |
| | CIVIL ACTION NO. 06-10137-FDS |
| **v.** | |
| **J.J. REIDY & CO., INC.** | |
| **Defendant.** | |

## DEFENDANT AIRWATER PATENTS CORPORATION'S
## SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 34, the AirWater Patents Corporation hereby requests in accordance with the definitions and instructions set forth herein, that the Plaintiff J.J. Reidy & Co., Inc. produce the following documents for inspection and copying at the offices of Keegan Werlin LLP, 265 Franklin Street, Boston, MA 02110 within thirty (30) days after service of this request.

## II. <u>DEFINITIONS</u>

A.      The term "document" is used in the broadest sense and includes but is not limited to originals and non-identical copies, drafts, alterations, modifications, changes or amendments whether different from the originals by reason of any notation made on such copies or otherwise, of the following items, whether typed, printed, recorded,

photographed, videotaped, filmed, taped, microfilmed, microfiched or reproduced by any

other mechanical or electronic process, or written or produced by hand, namely:

agreements; communications, including inter-office and intra-office communications; and

inter-company and intra-company communications; bulletins; letters; correspondence;

telegrams; emails; teletypes; telefax; memoranda; agenda; records; books; summaries of

records or notations of any sort of personal or telephone conversations or interviews;

telephone logs; diaries; forecasts; statistical statements; accountants' work papers;

graphs; charts; accounts; analytical records; reports; studies; minutes or records of

meetings or conferences; reports and/or summaries of interviews; reports and/or

summaries of investigations; opinions or reports of consultants; appraisals; reports or

summaries of negotiations; brochures; pamphlets; circulars; trade letters; press releases;

contracts; notes; projections; drafts of any documents; working paper; ledgers, including

securities ledgers; checks, front and back; check stubs or receipts; purchase orders;

statements; returns; summaries; invoices; work sheets; credit memoranda; loan

agreements; loan commitments; loan documents; any other documents or writings of

whatever description including, but not limited to, any information contained in any

computer although not yet printed out within your possession, computer magnetic or

optical disc in your possession, custody or control or the possession, custody or control of

any agent, employee, or other persons acting or purporting to act on your behalf

(including without limitation, attorneys, accountants and investment bankers or advisors).

      B.    A document is deemed to be in the respondent's "control" if the

respondent has the right to secure the document or a copy thereof from another person

(including but not limited to Respondent's counsel) or public or private entity having actual physical possession thereof.

C.    The term "communication" shall mean any transfer of information, data, ideas, fact, non-fact, opinion, whether orally, in writing, by electronic data transfer or otherwise, including but not limited to any memorandum, report, order, note, meeting, utterance, conversation, notation, statement of any nature whatsoever, correspondence, electronic mail, photograph, image, sign or signal, gesture, or oral or telephonic conversation.

D.    The term "person" includes natural persons, corporations, partnerships, unincorporated associations, trusts, municipalities, government bodies, or any agent, division, or sub-part of any person defined above, and all other entities in law or in fact.

E.    The term "relating to" or "relating thereto" means relating or pertaining in any way to, referring to, reflecting, recording, memorializing, mentioning, constituting, supporting or concerning, directly or indirectly.

F.    The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; the word "including" means including without limitation.

G.    The term "or" shall mean and/or.

H.    The term "the Patents" refers to United States Patents numbered 5,106,512, 5,149,446, 5,203,989, and 5,366,705, which J.J. Reidy & Co., Inc. licensed to AirWater Corporation pursuant to the Global Manufacturing and Marketing Licensing Agreement that is the subject of this litigation.

I.  The term "AirWater" refers to the Defendants AirWater Patents Corporation and/or AirWater Patents, Inc.

J.  The terms "J.J. Reidy," "Plaintiff," "you," "your" and "yours" refer to the Plaintiff J.J. Reidy & Co., Inc. and any of its agents, employees, servants or contractors, and any person, organization, or entity from which he has a right to request and receive any of the information or documents requested herein.

K.  The term "Global Manufacturing and Marketing Licensing Agreement" refers to the Global Manufacturing and Marketing Licensing Agreement by and between J.J. Reidy & Co., Inc. and AirWater Corporation dated March 21, 2003.

## II. **INSTRUCTIONS**

A.  Each request for documents set forth herein seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other materials affixed thereto, incorporated by reference therein or referred to therein.

B.  Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Request shall be deemed to be continuing so as to require further and supplemental production if the responding party or its agents or attorneys obtain additional documents between the time of the initial production and the time of hearing or trial.

C.  All documents are to be produced as they are kept in the usual course of business so that the propounding party can ascertain the file in which they are located, their relative order in such files and how such files were maintained or, in the alternative, shall organize and label the documents produced so as to correspond with the category or categories of the request to which they are responsive.

D.    <u>Segregated Responses</u>:  The responses to these requests shall set forth the number and subdivision of the request before each response and separate responses are sought with respect to each request and subdivision thereof.

E.    <u>Privileged Documents and Communications</u>:  With respect to any document responsive to this request which you may decline to produce by reason of any claim of privilege or immunity, provide a statement setting forth as to each such document:

(1)    the name of the sender of the document;

(2)    the name of the author of the document;

(3)    the name of the person to whom all copies (both indicated and blind) of the document were sent or furnished or to whom, at any time, the document's contents have been disclosed;

(4)    the job title of every person named in a, b, and c above;

(5)    the date of the document;

(6)    the date on which the document was received or sent by you;

(7)    a brief description of the nature and subject matter of the document sufficient to permit the fullest evaluation of the claim of privilege pursuant to which it has been withheld, but without revealing privileged matter;

(8)    the number of pages in the document; and

(9)    the statute, rule or decision on which the claim of privilege or immunity is based.

F.    <u>Documents No Longer In Existence</u>:  If any document requested was at one time in existence but is no longer in existence, or has been lost, destroyed, discarded or otherwise disposed of within the twelve months preceding the date of this Request, any such document is to be identified as completely as possible by including a statement setting forth the following as to each such document:

(1)    the type of document:

(2)    the date upon which it ceased to exist;

(3)    the circumstances under which it ceased to exist including a true and complete copy of any policy with respect to the retention of disposal of documents claimed to be applicable thereto;

(4)    the identity of all persons having knowledge of the circumstances under which it ceased to exist;

(5)    the identity of all persons having knowledge of the contents thereof.

## III. **REQUESTS**

### **REQUEST NO. 1:**

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding the Patents.

### **REQUEST NO. 2:**

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding termination of the Global Manufacturing and Marketing Licensing Agreement.

### **REQUEST NO. 3:**

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding AirWater.

### **REQUEST NO. 4:**

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding this litigation.

**REQUEST NO. 5:**

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding the Global Manufacturing and Marketing Licensing Agreement.

**REQUEST NO. 6:**

All documents that constitute, relate or refer to negotiations by and between you and Arthur Neumann and/or Freewater Company regarding the Patents.

**REQUEST NO. 7:**

All documents that constitute, relate or refer to any and all agreements by and between you and Arthur Neumann and/or Freewater Company regarding the Patents.

**REQUEST NO. 8:**

All documents that constitute, relate or refer to any and all agreements by and between you and Arthur Neumann and/or Freewater Company regarding this litigation.

DEFENDANTS AIRWATER PATENTS CORPORATION

By its attorneys,

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts 02110-3113
(617) 951-1400

Dated: March 9, 2007

---

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document(s) was served upon the attorney of record for each other party by hand-delivery - US Mail on _March 9, 2007_ .

---

7

**EXHIBIT T**

*4/13/07*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-40049-FDS

(Consolidated with <u>AirWater Patents, Inc. v. J.J.
Reidy & Co., Inc., a Massachusetts Corporation</u>;
United States District Court Southern District of
Flordia, Miami Division, Case No. 05-20650-
CIV-JORDAN)

J.J. REIDY & CO., INC.,                          )
                                                 )
                    Plaintiff,                   )
v.                                               )
                                                 )
AIRWATER CORPORATION and                         )
AIRWATER PATENTS CORPORATION,   )
                                                 )
                    Defendants.                  )

## <u>PLAINTIFF J.J. REIDY & CO., INC.'S RESPONSE TO DEFENDANT AIRWATER PATENTS CORPORATION'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS</u>

Pursuant to Rule 34 of the Massachusetts Rules of Civil Procedure, plaintiff, J.J. Reidy &

Co., Inc. ("Reidy") responds to Defendant AirWater Patents Corporation's second request for

production of documents as follows:

### <u>GENERAL OBJECTIONS</u>

1.      The plaintiff objects to any requests for documents which fall beyond the scope of

permitted discovery as defined by Rule 26 of the Massachusetts Rules of Civil Procedure. More

particularly, the plaintiff will not produce documents which are privileged or which were

prepared in anticipation of litigation or for trial by or for plaintiff or by or for any of its

representatives. Additionally, the plaintiff objects to the defendant's specific requests to the

extent that they are irrelevant, unduly burdensome, or purport to impose obligations beyond those imposed by the Massachusetts Rules of Civil Procedure.

The following responses to specific requests are made subject to and without waiving these general objections.

## DOCUMENT RESPONSES

Request No. 1

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding the Patents.

Response No. 1

Reidy objects to Request No. 1 as it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of evidence. Without waiving this objection, Reidy states that it has produced the Patent and Asset Purchase Agreement between Reidy and FreeWater as well as the record of payments from FreeWater. Any additional correspondence does not relate to the claims or the defenses in this action and therefore is not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 2

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding termination of the Global Manufacturing and Marketing Licensing Agreement.

Response No. 2

Reidy objects to Request No. 2 as it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of evidence. Reidy states that it has produced the Patent and Asset Purchase Agreement between Reidy and FreeWater as well as the record of payments from FreeWater. Any additional correspondence or documents that relates to

{Client Files\LIT304269\0002\PLD\F0395385.DOC;1}

communications between Reidy and FreeWater Company does not relate to the claims or the defenses in this action and therefore is not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 3

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding AirWater.

Response No. 3

Reidy objects to Request No. 3 as it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of evidence. Reidy states that it has produced the Patent and Asset Purchase Agreement between Reidy and FreeWater as well as the record of payments from FreeWater. Any additional correspondence or documents that relates to communications between Reidy and FreeWater Company does not relate to the claims or the defenses in this action and therefore is not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 4

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding this litigation.

Response No. 4

Reidy objects to Request No. 4 as it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of evidence. Reidy states that it has produced the Patent and Asset Purchase Agreement between Reidy and FreeWater as well as the record of payments from FreeWater. Any additional correspondence or documents that relates to

3

communications between Reidy and FreeWater Company does not relate to the claims or the defenses in this action and therefore is not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 5

All documents that constitute, relate or refer to communications by and between you and Arthur Neumann and/or Freewater Company regarding the Global Manufacturing and Marketing Licensing Agreement.

Response No. 5

Reidy objects to Request No. 5 as it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of evidence.   Reidy states that it has produced the Patent and Asset Purchase Agreement between Reidy and FreeWater as well as the record of payments from FreeWater.   Any additional correspondence or documents that relates to communications between Reidy and FreeWater Company does not relate to the claims or the defenses in this action and therefore is not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 6

All documents that constitute, relate or refer to negotiations by and between you and Arthur Neumann and/or Freewater Company regarding the Patents.

Response No. 6

Reidy objects to Request No. 6 as it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of evidence.   Reidy states that it has produced the

4

Patent and Asset Purchase Agreement between Reidy and FreeWater as well as the record of

payments from FreeWater.   Any additional correspondence or documents that relates to

communications between Reidy and FreeWater Company does not relate to the claims or the

defenses in this action and therefore is not reasonably calculated to lead to the discovery of

admissible evidence.


Request No. 7

       All documents that constitute, relate or refer to any and all agreements by and between

you and Arthur Neumann and/or Freewater Company regarding the Patents.

       Response No. 7

       Reidy objects to Request No. 6 as it is not reasonably calculated to lead to the discovery

of evidence.   Reidy states that it has produced the Patent and Asset Purchase Agreement

between Reidy and FreeWater as well as the record of payments from FreeWater.  Any

additional correspondence or documents that relates to communications between Reidy and

FreeWater Company does not relate to the claims or the defenses in this action and therefore is

not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 8

       All documents that constitute, relate or refer to any and all agreements by and between

you and Arthur Neumann and/or Freewater Company regarding this litigation.

       Response No. 8

       Reidy objects to Request No. 6 as it is not reasonably calculated to lead to the discovery

of evidence.   Reidy states that it has produced the Patent and Asset Purchase Agreement

between Reidy and FreeWater as well as the record of payments from FreeWater.   Any

additional correspondence or documents that relates to communications between Reidy and

FreeWater Company does not relate to the claims or the defenses in this action and therefore is

not reasonably calculated to lead to the discovery of admissible evidence.


                                        J.J. REIDY & COMPANY, INC.
                                        By its attorneys,


                                        _____
                                        Thomas J. Conte (BBO #566092)
                                        Maura A. Greene (BBO #547204)
                                        Bowditch & Dewey, LLP
                                        311 Main Street
                                        P.O. Box 15156
                                        Worcester, MA 01615-0156
                                        (508) 791-3511

Dated: April 13, 2007


<u>CERTIFICATE OF SERVICE</u>

    I, Maura Greene, hereby certify that on this 2⁰ day of April, 2007, I served a copy of the
foregoing via U.S. mail on Defendants' counsel, Matthew Zayotti, Esq., Keegan Werlin LLP,
265 Franklin Street, Boston, MA 02110-3113.


                                        _____
                                        Maura A. Greene, Esq.


6



*Bowditch*
*&Dewey*
ATTORNEYS

Maura A. Greene
Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

April 13, 2007

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

*Re:    J.J. Reidy Co., Inc. v. AirWater Corporation*
*and AirWater Patents Corporation*
*Civil Action No. 05-40049-FDS*

Dear Mr. Zayotti:

Please find enclosed Plaintiff J.J. Reidy & Co., Inc.'s Response to Defendant Airwater Patents Corporation's Second Request for Production of Documents in the above-captioned matter.

Please contact me if you have any questions.

Very truly yours,

Maura A. Greene

MAG/kbm

cc:    Thomas J. Conte, Esq.

enc.

BOWDITCH & DEWEY, LLP  175 CROSSING BOULEVARD  SUITE 500  FRAMINGHAM, MA 01702
T 508 879 5700  F 508 872 1492  www.bowditch.com          *Boston Framingham Worcester*

**EXHIBIT U**

# STRATEGIC ALLIANCE AGREEMENT

This STRATEGIC ALLIANCE AGREEMENT (the "Agreement") effective as of December 13, 2006 (the "Effective Date") is made by and between FREEWATER COMPANY, Inc. (hereinafter referred to as "FREEWATER"), a Nevada corporation having its principal place of business at 525 Reactor Way, NV. 89502 and AIR2WATER, Inc. (hereinafter referred to as "AIR2WATER") a Delaware corporation having its principal place of business at 2800 28th Street, Suite 201 Santa Monica CA, 90405-6201-

## RECITALS

WHEREAS, AIR2WATER owns patented technology and has expertise in the development and utilization of Atmospheric Water Generators (AWG), and expertise in AWG design, and more specifically, has developed AIR2WATER's consumer AWG (T-16, M-18) units for global sales.

WHEREAS, FREEWATER owns patented technology and has expertise in the development and utilization of Atmospheric Water Generators (AWG), and expertise in AWG design, and more specifically, has developed the manufacturing and sales and marketing service and development of AWG for the commercial and consumer market.

WHEREAS, FREEWATER has developed capabilities in manufacturing and development of AWG technology and products, and more specifically is building a manufacturing facility to manufacture and assemble AWG's.

WHEREAS, FREEWATER desires to purchase certain AIR2WATER Products (as hereinafter defined T-16, M-18) from AIR2WATER to be used for FREEWATER's sales, marketing and service program for the US market.

WHEREAS, FREEWATER and AIR2WATER agree to work towards the mutual development, manufacturing and sales of AWG's that are made in the US (the "collaborative AWG").

WHEREAS, FREEWATER also desires that AIR2WATER provide support in the form of engineering, administrative and managerial personnel interaction with Hyflux Corporation to aid with assembly, design and manufacturing of the collaborative AWG.

WHEREAS, in order to develop the collaborative AWG, AIR2WATER AND FREEWATER wish to further collaborate in developing AWG technology for use in US

sales and international commercial sales and wish to collaborate in marketing each others' products and services; this collaboration effort will not begin or take effect until such time as a Court of competent jurisdiction has adjudicated that Reidy owns his patents free and clear, without encumbrance and has the right to sell and has sold his patents to FREEWATER;

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, FREEWATER and AIR2WATER (each a "party" or collectively the "parties") agree as follows:

## ARTICLE 1.  DEFINITIONS

1.1 "Affiliate" shall mean with respect to either party, a person or entity, including without limiting the generality of the foregoing, organizations, corporations, partnerships and joint ventures, that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such person or entity.

1.1.1 "Control" (and, with correlative meanings, the term "controlled by" and "under common control with") means the possession of the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting stock, by contract or otherwise. In the case of a corporation, "control" shall mean, among other things, the direct or indirect ownership of fifty percent (50%) or more of its outstanding voting stock.

1.2 "Commercial Development Services" shall mean performing development services in conjunction with a diagnostic test to detect malfunctions or defects or performing development services on a direct engineering basis for the AWG projects. For purposes of this Agreement, the parties agree that performance of Commercial Development Services by FREEWATER for Internal Research Purposes and for AWG Development Collaborations is accepted and not considered Commercial Development Services under this definition.

1.3 "Field of Use" shall mean Internal Research Purposes and AWG Development Collaborations. Commercial Development Services that are proprietary to the respective party are specifically excluded from the Field of Use.

1.4 "AIR2WATER and FREEWATER Know-How" shall mean any and all proprietary data, information, know-how, inventions, trade secrets, copyrights, regulatory submissions or other intellectual property of any kind, other than Patent Rights, owned or controlled by AIR2WATER and FREEWATER as of the Effective Date or during the term of this Agreement.

1.5 "Development Collaborator" shall mean a third party, (e.g. Hyflux) including but not limited to any vendor consultant or technology company, or any government or manufacturer, for which FREEWATER performs development for the purposes described in section 1.2

1.6 "Internal Research Purposes" shall mean purposes and activities within either FREEWATER or AIR2WATER that are limited to research and development of AWG technology. Internal Research Purposes includes AWG validation for AIR2WATER or FREEWATER's in-house AWG specific projects. Internal Research Purposes does not mean and is not meant to include activities performed under money, funding, and non-funding arrangements with third party companies, enterprises, or institutions (for example, but not limited to pharmaceutical research or manufacturing organizations) under which results, products, or information from such activities are to be provided to the third party.

1.7 "Products" shall mean the FREEWATER or AIR2WATER AWG Systems

1.8 "Patent Rights" shall mean ownership of or exclusive license rights to (i) any United States or foreign patent application, (ii) any issued United States patent or foreign patent and (iii) any continuation, continuation- in-part, divisional, reissue, re-examination, renewal, substitution, addition, extension, supplementary protection certificate or foreign counterpart thereof of any of the foregoing.

1.9 "AIR2WATER and FREEWATER Know-How" shall mean any and all proprietary data, information, know-how, inventions, trade secrets, copyrights, regulatory submissions or other intellectual property of any kind, other than Patent Rights, owned or controlled by AIR2WATER or FREEWATER, as of the Effective Date or during the term of this Agreement.

## ARTICLE 2. PURCHASING, ORDERS AND COLLABORATION

2.1 FREEWATER agrees to purchase AIR2WATER Products and AIR2WATER agrees to sell and deliver AIR2WATER Products to FREEWATER. Such purchase, sale, and delivery shall be under the terms of this Agreement.

2.2 FREEWATER agrees to use AIR2WATER Products (manufactured by Hyflux) as its preferred development technology as long as AIR2WATER Products remain competitive with alternative products in terms of the following criteria: (i)cost per unit and discounts; (ii) quality levels maintained; (iii) availability and (iv) consistency with industry or regulatory standards. FREEWATER shall notify AIR2WATER if it considers that AIR2WATER products manufactured by Hyflux are no longer competitive with an alternative product . In such a case, FREEWATER agrees to inform AIR2WATER of the specific reasons why FREEWATER believes the AIR2WATER Products are not competitive and will, in good faith, provide

AIR2WATER with an opportunity to address these reasons and an opportunity to participate in the joint sales and development of a new product using the Parties collective technologies and patents to had better meet the parties' needs during the term of the contract.

2.3 This Agreement contains the exclusive terms and conditions which apply to all purchases of AIR2WATER Products manufactured by Hyflux, notwithstanding any acknowledgment or other business forms ("forms" meaning and including FREEWATER purchase orders) transmitted by AIR2WATER or FREEWATER. All of FREEWATER'S orders for AIR2WATER Products must reference this Agreement and all AIR2WATER and FREEWATER acknowledgments and transmittals will reference this Agreement and the applicable FREEWATER purchase order.

2.4 All FREEWATER orders for AIR2WATER (Hyflux) Products must specify delivery within ninety (90) days from the order date. All orders are subject to acceptance by AIR2WATER and to product availability. AIR2WATER shall use its best efforts to fill FREEWATER orders within ninety (90) days from the order date through AIR2WATER'S direct collaboration with Hyflux.

2.5 This Agreement does not constitute a purchase order. Purchases hereunder shall be made utilizing FREEWATER's written purchase orders issued by FREEWATER.

2.6 FREEWATER will use its best efforts to supply AIR2WATER with a forecast of its intended purchases on at least a quarterly basis, and AIR2WATER shall advise FREEWATER within ten (10) business days of its ability to meet such forecast. If AIR2WATER advises that it can meet such forecast and AIR2WATER subsequently determines that it will be unable to meet such forecast, AIR2WATER shall inform FREEWATER within five (5) business days of its inability to meet such forecast and the parties will discuss alternative solutions for meeting the forecast. AIR2WATER shall use its best efforts to meet any forecast for which it advised FREEWATER that it would meet.

2.7 When requested by FREEWATER, AIR2WATER agrees to help design an AWG to be used by FREEWATER and AIR2WATER as set forth in Article 5 below. FREEWATER shall request a meeting at a mutually agreed time and place and shall provide AIR2WATER with the drawing and technology report as it pertains to the patents or technology of each party. AIR2WATER agrees to advise FREEWATER, within five (5) business days of receipt of such request, of the expected meeting date and place for the group of FREEWATER and AIR2WATER representatives, and shall use its best efforts to meet this date.. The Parties will be responsible for and equally bear costs associated with purchasing and performing quality control experiments on all FREEWATER/AIR2WATER technologies that either uses or plans to use.

2.8 FREEWATER is interested in providing its customers with AIR2WATER AWG's, as modified by FREEWATER, together with Standard Operating Procedures (hereinafter "SOPs") and credit validation materials that would assist FREEWATER'S customers in establishing Rental Agreements and Installation and Service for appliance retail and service companies using such FREEWATER Products. FREEWATER is also interested in using AIR2WATER products in conjunction with FREEWATER'S commercial AWG program and manufacturing in a high-output development facility that is compliant with all patents and U.S. regulatory standards and has expertise in obtaining certification of such compliance. As a result, the parties agree as follows:

2.9 The parties agree to collaborate to define and develop a standard consumer water cooler type configuration AWG System (the "collaborative AWG") for use within the consumer and small business rental program including but not limited to, sales to international distributors and Hyflux. This collaborative AWG will be designed to process approximately 5-10 gallons per day.

2.9.1 In addition, FREEWATER intends to build a manufacturing facility to produce the collaborative consumer water cooler type AWG and a commercial AWG product configuration of a high-output AWG Unit in multiple water volume production configurations.

2.9.2 FREEWATER agrees to collaborate with AIR2WATER to define the parties' patented technologies that FREEWATER intends to use in the design and development of the collaborative water cooler type AWG and commercial AWG machines and intends further to create SOPs for use with the production of each of the FREEWATER configurations developed pursuant to this section

2.9.3 The technology and SOPs are intended to validate the standard FREEWATER and AIR2WATER configurations as part of the process of certifying that a facility performing development prototypes using one of the standard AIR2WATER/FREEWATER patented configurations defined herein is compliant with federal and consumer regulations for operation.

(a) The technology will include FREEWATER and AIR2WATER patents for development. FREEWATER and AIR2WATER shall jointly design and retain ownership of their respective technology provided that each party shall receive a non-exclusive license, The use and sales of the technology will be outlined in a separate agreement.

Final                                                                                                    5

2.9.4 AIR2WATER agrees to provide FREEWATER with clear, understandable documentation regarding the development of the collaborative AWG to the extent necessary to allow FREEWATER to define and assemble the unit and for use with FREEWATER's sales, service and customer management system.

2.9.5 In the unlikely event that the parties cannot agree on the definition of a standard AWG configuration, or specifications therefore, then each party will use its best efforts to support alternative based configurations and specifications.

2.10 The parties each agree to recommend the other's products and services to potential customers in the consumer and commercial, markets, and refer publicly to one another as a "Strategic Partner". AIR2WATER will refer to FREEWATER as a provider of manufactured technology that embodies both parties' patented technology and FREEWATER will refer to AIR2WATER as its provider of products and patented technology for use in consumer and commercial water generation programs. Each party will make available to the other party marketing and technical material, including non-proprietary data, to be incorporated into public presentations where appropriate. Each party will also make available a representative to present its respective technology in private meetings with third party potential customers, where it is determined that this will support the execution of a sale.

2.11 Throughout the term of this Agreement, each party will designate a dedicated staff member as its Strategic Alliance Manager whose primary responsibility will be the successful implementation of this Agreement. Each party agrees to notify the other party within ten (10) business days of a change in its Strategic Alliance Manager.

## ARTICLE 3 DELIVERY, SHIPMENT AND RISK OF LOSS

3.1 AIR2WATER'S Delivery of FREEWATER Products to FREEWATER is subject to acceptance of the order by AIR2WATER and to product availability, and to AIR2WATER's lead times which may change from time to time.

3.2 AIR2WATER will ship according to AIR2WATER's standard commercial practice. Special packing or shipping instructions requested by FREEWATER must be agreed to by AIR2WATER in writing, and any charges will be billed to FREEWATER.

3.3 All shipments by AIR2WATER (Hyflux products or parts) shall be FOB AIR2WATER's point of manufacture, unless AIR2WATER has a point of

distribution or manufacturing in the USA, then any shipments by AIR2WATER to FREEWATER's facilities in the USA shall be FOB AIR2WATER's point of distribution in USA. Title to and risk of loss for the FREEWATER Products shall pass to FREEWATER upon delivery by AIR2WATER to a carrier designated by FREEWATER or selected by AIR2WATER if FREEWATER does not designate a carrier.

## ARTICLE 4. PRICE AND PAYMENT TERMS

4.1 AIR2WATER will set the AWG Price for the (T-16, M-18) as best available pricing to be provided to FREEWATER in writing. AIR2WATER will deliver AWG pricing for units to FREEWATER which consist of the quantities and lead times to delivery of items listed on FREEWATER's Purchase Order

4.2 FREEWATER agrees to purchase, and AIR2WATER agrees to sell, additional service parts that will include UV lamps and specifically designed filters, as well as the accompanying components comprising one or both of the AIR2WATER (T-16, M-18) standard configurations. The products, prices, and delivery schedules shall be mutually agreed upon by the parties, with the understanding that the price and delivery schedule shall reflect the lowest price to FREEWATER when compared with the sale price of similar products to other AIR2WATER customers.

4.3 The parties agree that the price per AWG set forth shall be reviewed every six months and shall be reduced if necessary to assure that FREEWATER receives lowest price possible. Should the parties agree to extend this Agreement beyond its three (3) year duration, AIR2WATER reserves the right to adjust the price per product at its option.

4.4 Discounted FREEWATER AWG Pricing Based Upon Increased Consumption. AIR2WATER agrees to charge FREEWATER a reduced per unit price other than that set forth under section 4.1 above, in the event and upon the condition that FREEWATER, during a twelve month calendar year, achieves consumption milestones, to be outlined in a separate agreement. according to a scale where the unit fee is reduced as consumption increases.

4.5 Manner of Payment. Payments to be made by FREEWATER to AIR2WATER under this Agreement shall be payable in United States Dollars and paid to a bank or account of AIR2WATER's choosing.

## ARTICLE 5.  INTELLECTUAL PROPERTY AND LIMITED RIGHT TO USE

5.1 By this Agreement, and subject to the terms and conditions set forth under Section 5, with the purchase of AIR2WATER AWGs, AIR2WATER grants FREEWATER a non-exclusive, limited right, to use and sell AIR2WATER AWGs, in conjunction with developing the collaborative AWG and commercial AWG.

5.2 The purchase price program terms agreed to under Article 4 and this Article 5 of this Agreement, are based upon the parties' mutual understanding of the rights granted to FREEWATER for its use of AIR2WATER Products provided for under this Article. Any other uses of the AIR2WATER Products, and any terms and conditions related thereto, must be agreed to, in writing, by the parties. With the exception of the rights granted under this Agreement no other right or license is granted to FREEWATER either directly, indirectly, by implication, estoppel, or otherwise by AIR2WATER under this limited grant.

5.3 All AIR2WATER and FREEWATER technology for AWGs are hereby designated Confidential Information and the parties use of such shall be limited as set forth in this section 5.3 and Article 11.

5.3.1 For the avoidance of doubt, FREEWATER and AIR2WATER may make, use, offer to sell and sell its commercial AWG's through third parties.

5.3.2 Except as explicitly provided by section 5.3.1, the parties agree that section 5.3.1 does not grant to FREEWATER or AIR2WATER any license to make, use, offer to sell or sell the FREEWATER or AIR2WATER patents or technology referenced in section 5.3.1 under any Patent Rights claiming such technology.

5.3.3 The parties agree that nothing in this Agreement, including any and all of the language in this Article 5, is intended to grant either party an exclusive license to use proprietary technology, or to grant to either party an exclusive license to any Patent Rights of either party.

5.4 FREEWATER and AIR2WATER shall have equal ownership of all right, title and interest in all AWG technologies that are co-discovered from the time of the signing of the agreement by FREEWATER and AIR2WATER or a Development Collaborator, using a FREEWATER or AIR2WATER technology and patent.

5.5 Each party hereto represents and agrees that all employees or others acting on its behalf pursuant to this Agreement shall be obligated under a binding written agreement to assign to FREEWATER and AIR2WATER all inventions made or conceived by such employee or other person.

5.6 Except as provided under section 5.3.1, AIR2WATER and FREEWATER agrees that third parties shall require a license or prior written permission from the parties to use, market or sell co-developed technologies for proprietary AWGs.

5.7 Except as otherwise expressly provided in this Agreement, under no circumstances shall a party hereto, as a result of this Agreement, obtain any ownership interest in or other right to any technology, know-how, patents, patent applications, data, products, or materials of the other party, including items owned, controlled or developed by the other party, or transferred by the other party to said party, at any time pursuant to this Agreement. Any technology or know-how derived, developed or acquired by either party independent of this Agreement or Confidential Information derived from this Agreement shall be the property of such party.

## ARTICLE 6.  TERM AND TERMINATION

6.1. The term of this Agreement will be from the Effective Date and will continue for a period of three (3) years, and will automatically renew on a year by year basis unless terminated by a party or the parties under one of the provisions of this Article 6.

6.2. This Agreement shall terminate upon written notice by one party to the other party in the event the other party shall become insolvent, asks its creditors for a moratorium, files a bankruptcy petition, or suffers appointment of a temporary or permanent receiver, trustee, or custodian, for all or a substantial portion of its assets.

6.3. Either party may terminate this Agreement for default by the other party in performing any of its material obligations under this Agreement by notifying the other party in writing of such default and allowing the other party ninety (90) days within which to cure such default, unless the default is the failure to pay money, in which case the defaulting party shall have only thirty (30) business days to cure such default after receiving written notice of non-payment. If such default is not cured within ninety (90) days from receipt of such notice of default (or thirty (30) business days in the case of non-payment of money owed), the non-defaulting party may terminate this Agreement by written notice to the defaulting party.

6.4. FREEWATER or AIR2WATER may terminate this Agreement if, in its sole judgment, either party has failed to make Products competitive pursuant to section 2.2, by providing ninety (90) days written notice of such termination.

6.5 In addition to the other grounds set forth in this Article 6, either party may terminate this Agreement by providing ninety (90) days written notice if either reasonably believes that this Agreement is no longer consistent with its overall business strategy.

6.6 Effect of Expiration or Termination of Agreement.  Within thirty (30) days after expiration or termination under this Article 6, each party shall return to the other party or destroy any and all Confidential Information provided by the other party pursuant to this Agreement according to section 11 FREEWATER shall have the right to use or sell all AIR2WATER AWGs for which FREEWATER has paid and are in FREEWATER's possession at the time of termination.

## ARTICLE 7.  INSTALLATION AND ACCEPTANCE

7.1 FREEWATER will use commercially reasonable efforts to schedule and complete installation in a timely fashion all commercial AWG units. FREEWATER and AIR2WATER will cooperate with each other to coordinate the installation effort for commercial units.

7.2 Installation shall be complete, and shall occur, when the AWG System passes standard installation and test procedures, or as amended in the future by mutual written agreement of the parties.  In the event the AWG System delivered will not pass standard installation and test procedures, the parties will use reasonable efforts to make the necessary adjustments and/or to replace the AWG System in whole or in part until the AWG System performs as intended and passes such tests.

## ARTICLE 8.  TRAINING

8.1 AIR2WATER will  provide the complete materials outlining the installation, use, and routine maintenance of the AWG Products (T-16, M-18) FREEWATER may request from time to time, due to additional purchases, additional  training materials as the need arises

## ARTICLE 9.  REPRESENTATIONS AND WARRANTY

9.1 Representations, Warranties and Covenants of FREEWATER. FREEWATER represents and warrants to and covenants with AIR2WATER that:

(a) FREEWATER is a corporation duly organized, validly existing and in corporate good standing under the laws of Nevada;

(b) FREEWATER has the legal right, authority and power to enter into this Agreement;

(c) FREEWATER has taken all necessary action to authorize the execution, delivery and performance of this Agreement;

(d) upon the execution and delivery of this Agreement, this Agreement shall constitute a valid and binding obligation of FREEWATER enforceable in

accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' and contracting parties' rights generally and except as enforceability may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(e) the performance of its obligations under this Agreement will not conflict with its charter documents or result in a breach of any agreements, contracts or other arrangements to which it is a party; and

9.2 Representations, Warranties and Covenants of AIR2WATER. AIR2WATER represents and warrants to and covenants with FREEWATER that:

(a) AIR2WATER is a corporation duly organized, validly existing and in corporate good standing under the laws of Delaware;

(b) AIR2WATER has the legal right, authority and power to enter into this Agreement;

(c) AIR2WATER has taken all necessary action to authorize the execution, delivery and performance of this Agreement;

(d) upon the execution and delivery of this Agreement, this Agreement shall constitute a valid and binding obligation of AIR2WATER enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' and contracting parties' rights generally and except as enforceability may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(e) the performance of its obligations under this Agreement will not conflict with its charter documents or result in a breach of any agreements, contracts or other arrangements to which it is a party;

(f) to the best of AIR2WATER'S knowledge, FREEWATER's use of AIR2WATER Products and practice of patented methods and processes in accordance with the product information, notices, and instructions for use provided therewith, do not and will not infringe any issued patent or valid copyright of any third party that is issued or registered prior to the effective date of this Agreement, respectively; and

(g) AIR2WATER will not during the term of this Agreement enter into any agreements, contracts or other arrangements that would be inconsistent with its obligations under this Agreement.

9.3 Limited Warranty Relating to AIR2WATER Products. AIR2WATER warrants that the AWG (T-16, M-18) System will be free from defects in materials and workmanship and will conform to AIR2WATER's current specifications, or as

amended in the future by mutual written agreement of the parties, and perform accordingly, from the time of installation and for a period of at least one (1) year thereafter. The foregoing warranty does not include periodic maintenance or calibration recommended for some AWG Products. This warranty does not apply to defects resulting from improper or inadequate maintenance or calibration by FREEWATER; defects resulting from hardware, software, interfacing, or supplies provided by parties other than AIR2WATER; defects resulting from unauthorized modification, maintenance, or repair, or improper use or operation outside of AIR2WATER's specifications for the AWG Products or by personnel not authorized by FREEWATER or AIR2WATER, and; defects resulting from abuse, negligence, accident, loss or damage in transit. In addition, this warranty does not apply to damage due to (1) environmental conditions at the site of installation; (2) operator failure to perform standard operating procedures and routine maintenance as prescribed in the operator manuals. The warranty hereunder shall pass to the retail purchaser of the AWG.

9.3.1 AIR2WATER's sole obligation and liability for any breach of the limited warranty set forth in section 9.3 shall be at AIR2WATER's sole discretion and option: (1) to replace the AWG Products, in whole or in part, or (2) to repair (and recalibrate as necessitated by repair) the AWG.

9.3.2 The limited warranty set forth in section 9.3 states FREEWATER's sole and exclusive remedy and AIR2WATER's sole and exclusive responsibility with respect to any alleged breach of this limited warranty. Except as provided in section 9.3.

**ARTICLE 10.0  CONFIDENTIALITY**

10.1 For the purpose of this Agreement, Confidential Information means all information, data, and material, labeled or otherwise designated or identified as confidential by AIR2WATER or by FREEWATER or their Affiliates.

10.1.1 All information relating to AIR2WATER or FREEWATER products including but not limited to, price, quantity, discount, delivery schedule, improvements, standard operating procedure documents, operation manuals, schematics, design specifications, manufacturing and related specifications, is hereby designated as Confidential Information. AIR2WATER agrees that it will, in writing, clearly identify as confidential, any and all information that it provides to FREEWATER that it considers to be the Confidential Information of AIR2WATER.

10.1.2 Any and all data generated by FREEWATER's sale of FREEWATER products is hereby designated as FREEWATER's Confidential Information. All information that FREEWATER has received from a third party under an obligation of confidentiality to the third party is also hereby designated as FREEWATER's Confidential Information.

10.2 Each party may use the other party's Confidential Information only for the purpose of performing under this Agreement. For the avoidance of doubt, the parties agree that neither party shall include any information relating to a AWG that is the Confidential Information of the other party unless such information is derived independently of such Confidential Information. All Confidential Information remains the sole property of the disclosing party. Upon termination or expiration of this Agreement, all materials and all copies of all materials containing Confidential Information, including but not limited to papers, books, logs, correspondence and records, in any form, whether written, typed, electronic, videotape, audiotape, etc., shall be returned to the disclosing party within thirty (30) days of the termination or expiration of this Agreement, except that each party may retain a single copy of the other party's Confidential Information solely for the purpose of ensuring compliance under this Agreement  and that has been created under this Agreement while this Agreement was in effect, to a regulatory agency or to a Assembly and manufacturing Development Collaborator.

10.3 Except as expressly provided herein, AIR2WATER and FREEWATER Affiliates, officers, employees, agents, consultants, and authorized representatives (a) shall hold in strict confidence all Confidential Information from the other party or any of its Affiliates, officers, employees, agents or representatives and (b) shall not distribute, disclose or disseminate such Confidential Information to any third party without the prior written approval of the other party (that is, the original disclosing party), provided, however, that such approval will not be unreasonably withheld where the receiving party reasonably believes that disclosure of the other party's Confidential Information is reasonably necessary to obtain patents, authorization to conduct product trials, or regulatory approval, and provided that FREEWATER may, at its sole option and discretion, disclose to its Assembly and manufacturing Development Collaborators only that AIR2WATER Confidential Information directly relating to AWG technologies on condition that such Collaborators agree in writing to keep such information confidential to the same extent as FREEWATER is required to keep the Confidential Information confidential.

10.4 For purposes of this section, information will not be considered to be Confidential Information of a party if the information:

(i) was lawfully in the receiving party's possession prior to disclosure under this Agreement and was not acquired directly or indirectly from the disclosing party; or

Final                                                                                      13

(ii) was, at the date of disclosure by the disclosing party, public knowledge; or subsequently becomes public knowledge other than through the failure of the receiving party to comply with its obligations of confidentiality under the terms of this Agreement; or

(iii) was or is acquired by the receiving party from any third party lawfully having possession of such information and who is not under an obligation of confidentiality to the disclosing party; or

(iv) was or becomes independently known by the receiving party without utilizing information provided by the disclosing party and wherein such independent knowledge is supported in contemporaneously written and dated documentation of the receiving party; or

(v) is required to be disclosed, retained, or maintained by either party, or by a Development Collaborator, by applicable law or regulation or under the rules of any regulatory or governmental authority, provided however that each party shall immediately notify the other party in writing of such required disclosure and must provide such notice at least thirty (30) days prior to the date when disclosure is proposed to take place, and provided that the party or third party required to make disclosure shall use its best efforts to secure confidential treatment of any such information required to be disclosed.

10.5 The parties hereto understand and agree that remedies at law may be inadequate to protect against any breach of any of the provisions of this article 11 by either party or their employees, agents, officers or directors or any other person acting in concert with it or on its behalf. Accordingly, each party shall be entitled to the granting of injunctive relief by a court of competent jurisdiction against any action that constitutes any such breach of this Article 10.

10.6 Either party may publish or present data and/or results generated under this Agreement, provided that, the proposed disclosure shall be subject to the prior review by the other party solely to determine (i) whether the proposed disclosure contains the Confidential Information of the other party, (ii) whether the information contained in the proposed disclosure should be the subject of a patent application prior to such disclosure or (iii) whether the disclosure would be adverse to the business interests of the other party. Each party shall provide the other party with the opportunity to review any proposed abstract, manuscript or presentation by delivering a copy thereof to the other party no less than thirty (30) days before its intended submission for publication or presentation. The other party shall have thirty (30) days from its receipt of any such abstract, manuscript or presentation in which to notify the party in writing of any specific objections to the disclosure. In the event a party objects to the disclosure, the other party agrees not to submit the publication or make the presentation containing the objected-to information until the party is given a reasonable additional period of time (not to exceed an additional thirty (30) days) to seek patent protection for any material in the disclosure which it believes is patentable or, in the case of Confidential Information, to allow the party to delete any Confidential Information of the other

party from the proposed disclosure. Each party agrees to delete from the proposed disclosure any Confidential Information or information that would be adverse to the business interests of the other party upon request.

10.7 Except as provided in section 10.3, the provisions of Article 10 shall survive any termination or expiration of this Agreement and continue in force for a period of ten (10) years following the effective date of any such termination or expiration.

## ARTICLE 11. INDEMNIFICATION

11.1 In the event of an accusation, claim or lawsuit brought by a third party for infringement of a patent, copyright, or other proprietary right of a third party, based upon FREEWATER's use of the AIR2WATER Products and performance of AIR2WATER patents, methods and processes in accordance with the product information, notices, and instructions for use provided therewith, AIR2WATER shall use its best efforts to procure for FREEWATER the right to continue such use, or if unable to procure such continued use, then AIR2WATER shall use its best efforts to provide a substitute, non-infringing product which provides substantially the same results. In any event, AIR2WATER shall defend the accusation, claim or lawsuit and indemnify FREEWATER for any damages which may be awarded, provided that FREEWATER (1) provide prompt written notice of the accusation, claim or lawsuit to AIR2WATER; (2) cooperate fully with AIR2WATER and provide AIR2WATER with such reasonable assistance, as AIR2WATER may request in the defense of such accusation, claim or lawsuit; and (3) make no statements or admissions directly or indirectly related to the AWG Products or intellectual property related to the accusation, claim, or lawsuit, or the merits or lack of merit of any accusation, claim, or lawsuit, without the express written permission of AIR2WATER. Nothing in this provision shall be construed to prevent FREEWATER from participating in (but not controlling) the defense of any such action, with its counsel and at its own expense.

## ARTICLE 12. NOTICES

12.1 All notices and requests required or authorized hereunder shall be given in writing either by personal delivery; by registered or certified mail, return receipt requested; or by confirmed facsimile followed by first class mail or express delivery. Such notice shall be deemed to have been given upon such date that it is so personally delivered; the date three (3) days after it is deposited in the mail; or the date the same is received by the receiving party's fax machine, irrespective of the date appearing therein.

| If to FREEWATER: | If to AIR2WATER: |
|---|---|
| Atten: Arthur Neumann | Atten: Michael Klein |
| Address: 525 Reactor Way | Address: 2800 28th Street, Suite 201 |
| City and Zip Reno, NV. 89502 | City and Zip Santa Monica CA, 90405-6201 |

## ARTICLE 13.  GENERAL

13.1 Force Majeure. Except with respect to the payment of money, neither party shall be liable for any failure or delay in its performance under this Agreement due to causes, including, but not limited to, acts of God, acts of civil or military authority, fires, epidemics, floods, earthquakes, riots, wars, sabotage, labor shortages or disputes, and governmental actions, which are beyond its reasonable control; provided that the delayed party: (i) gives the other party written notice of such cause and (ii) uses its reasonable efforts to correct such failure or delay in its performance.

13.2 Relationship of Parties. The parties to this Agreement are independent contractors and, despite use of the term "Strategic Partners", are not partners in the legal sense. Neither party nor their respective Affiliates, employees, consultants, contractors or agents, are Affiliates, agents, employees, joint ventures of the other, nor do they have any authority to bind the other by contract or otherwise to any obligation.  Neither party will represent anything to the contrary, either expressly, implicitly, by appearance or otherwise.

13.3 Assignment. The parties may not assign this Agreement in whole or in part without the consent of the other, except if such assignment occurs in connection with the sale or transfer of all or substantially all of the assets of a party to which the subject matter of this Agreement pertains. Notwithstanding the foregoing, any party may assign its rights (but not its obligations) pursuant to this Agreement in whole or in part to an Affiliate of such party.

13.4 Successors in Interest. Subject to section 14.3, the rights and liabilities of the parties hereto will bind and inure to the benefit of their respective successors, executors and administrators, as the case may be.

13.5 Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of California, U.S.A., exclusive of its conflicts of law rules. Any litigation between the parties relating to this Agreement shall take place in California and the parties consent to the personal jurisdiction of and venue in the state and federal courts within California.

13.6 Dispute Resolution. The parties hereby agree that they will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement promptly by negotiations. If a controversy or claim should arise hereunder, the matter shall be referred to an individual designated by the Chief Executive Officer (or the equivalent position) of FREEWATER and an individual designated by the President (or the equivalent position) of AIR2WATER (the "Representatives"). If the matter has not been resolved within thirty (30) days of the first meeting of the Representatives of the parties (which period may be extended by mutual agreement) concerning such matter, either party may bring suit in an appropriate state or federal court. Nothing herein shall preclude the parties from agreeing to binding arbitration at a location and under rules agreed to by each party.

13.7 Severability. If for any reason a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be unenforceable, that provision of the Agreement shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement shall continue in full force and effect.

13.8 No Waiver. Failure by either party to enforce any term, provision, or condition of this Agreement shall not be deemed a waiver of future enforcement of that or any other term, provision, or condition. No waiver of a term, provision, or condition of this Agreement in any one or more instances, whether by context, implication, express, or otherwise, shall be construed to be a further or continuing waiver of such term, provision, or condition.

13.9 Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which will constitute but one and the same instrument.

13.10 Facsimile Copies. For purposes of this Agreement, a signed facsimile copy shall have the same force and effect as an original signed Agreement.

13.11 Complete Agreement. This Agreement, including all Appendices, constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. No amendment to or modification of this Agreement shall be binding unless in writing and signed by a duly authorized representative of both parties.

13.12 Third Party Beneficiaries. Except as specifically set forth herein, no third party beneficiary rights are conferred or are intended to be conferred by this Agreement.

13.13 Headings. Headings in this Agreement are for convenience only, and shall not be used to and shall not affect the meaning or interpretation of this Agreement.

13.14 Construction. This Agreement shall not be strictly construed against any party hereto, regardless of which party, or how much a party, contributed to the drafting of the Agreement.

13.15 Public Announcements. Any announcements or similar publicity with respect to the execution of this Agreement shall be agreed upon among the parties in advance of such announcement. The parties understand that this Agreement is likely to be of significant interest to investors, analysts and others, and that any of the parties therefore may make such public announcements with respect thereto, provided that the disclosing party has complied with the conditions of this section

The parties agree that any such announcement will not contain confidential business or technical information and, if disclosure of confidential business or technical information is required by law or regulation, the disclosing party will use its best efforts to minimize such disclosure and obtain confidential treatment for any such information which is disclosed to a governmental agency or group.

13.16 Conflicts.  In the event that a conflict arises between this Agreement and any work order, purchase order, billing statement, or invoice related to the purchase of and right to use FREEWATER or AIR2WATER Products, this Agreement will govern and the conflicting terms, provisions, and conditions of any such other documents shall be deemed nonexistent, and shall not be binding upon either party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first indicated above.

FREE WATER, Company          AIR2WATER, Inc


Signed: s/Arthur Neumann        Signed: s/Mike Klein
Title: President/COO             Title: CEO
Date: 12/13/06                   Date: 12-19-06

Final                                                    18

**EXHIBIT V**

# AMSTAR EXPRESS
## ATTORNEY & MESSENGER SERVICES
### 22136 CLARENDON ST., SUITE 1
### WOODLAND HILLS, CA. 91367
### (818)887-2727  FAX(818)887-1256

#### FACSIMILE TRANSMITTAL SHEET

TO: *MATHEW ZAYOTTI*          FROM: *DOUG MACDONALD*

COMPANY: *KEEGAN WERLIN LLP*          DATE: *6-21-07*

FAX NUMBER: *617-951-0586*

TOTAL NO. OF PAGES
INCLUDING COVER: *3*

PHONE NUMBER:

SENDER'S REFERENCE NUMBER:

RE: *MIKE KLEIN*          YOUR REFERENCE NUMBER:

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

It's All The Little Details That Make a Big Difference!

| Attorney or Party without Attorney:<br>Keegan Werlin, LLP<br>265 Franklin Street<br>Boston, MA 02110 | | | For Court Use Only |
|---|---|---|---|
| Telephone No: 617.951.1354    FAX: No: 617.951.0586 | Ref. No or File No.: | | |

Insert name of Court, and Judicial District and Branch Court:
United States District Court, Central District Of California

: J.J. Reidy & Co., Inc.
: Airwater Corporation, et al

| **Affidavit Of Reasonable Diligence** | Hearing Date:<br>Wed, Jun. 27, 2007 | Time:<br>10:00am | Dept/Div: | Case Number;<br>05-40049-FDS/06-10137-FDS |
|---|---|---|---|---|

1. I, Douglas Alan MacDonald, and any employee or independent contractors retained by Amstar Express are and were on the dates mentioned herein over the age of eighteen years and not a party to this action. Personal service was attempted on Defendant Mike Klein, Air 2 Water, LLC as follows:

2. *Documents:*   SUBPOENA DUCES TECUM; Letter Dated June 13, 2007.

| Day | Date | Time | Location | Results |
|---|---|---|---|---|
| Wed | 06/20/07 | 4:50pm | Business | Server arrived and was told by unknown female at location that subject had left "a little while ago". Upon learning of servers identification and purpose of visit, the unknown female then became far less helpful and stated that subject had left "a long time ago" and she didn't know when subject would return. An unknown male inquired as to the nature of the documents which server declined to state. Attempt made by: Douglas Alan MacDonald. Attempt at: 2800 28th Street, Suite 201   Santa Monica CA 90405. |
| Thu | 06/21/07 | 2:00pm | Business | Male receptionist @ front desk. Server asked for subject but before server could ID himself, receptionist stated "the meeting would be held in the next office" pointing to a vacant office adjacent to reception area. As server waited, female spoken to on prior visit, appeared from back office. Before she could speak, male receptionist stated to female that server was "waiting for the meeting with Mr. Klein". Female informed receptionist that server was there to serve Mr. Klein. Female stated subject not in + didn't know when he would be. A minute later she offered to call subject & server agreed. Female went to back office + heard female speak briefly on phone. Female then returned to front desk & handed server phone. Subject ID'd himself + upon learning nature of servers visit, stated that "they're a little late" (referring to hearing date) + he would not return until 6/25/07. Server offered to meet subject. Subject then stated he was in Oahu Hawaii ** Under the circumstances, server believes subject possibly evading & office staff is possibly cooperating in that regard. Attempt made by: Douglas Alan MacDonald. Attempt at: 2800 28th Street, Suite 201   Santa Monica CA 90405 |
| Thu | 06/21/07 | 2:00pm | Business | Returned Not Served on:  Mike Klein, Air 2 Water, LLC Business - 2800 28th Street, Suite 201 Santa Monica, CA. 90405 |

3. *Person Executing*
   a. Douglas Alan MacDonald
   **b. Amstar Express**
      22136 Clarendon St., Suite 1
      WOODLAND HILLS, CA 91367
   c. 818.887.2727

   Recoverable Costs Per CCP 1033.5(a)(4)(B)
   *d. The Fee for service was:* $111.50
   e. I am: (3) registered California process server
      *(i)* Employee
      *(ii) Registration No.:*     283
      *(iii) County:*     Ventura
      *(iv) Expiration Date:*     Tue, Dec. 09, 2008

4. *I declare under penalty of perjury under the laws of the State of California and under the laws of the United States Of America that the foregoing is true and correct.*

Date: Thu, Jun. 21, 2007

**Affidavit Of Reasonable Diligence**

(Douglas Alan MacDonald)

# EXHIBIT W



Ship with Confidence

Good Afternoon,

This is in response to your request for delivery information concerning the shipments listed below.

**Ship date:** June 13, 2007
**Mercury Airbill:** B5192070613172418
**Vendor Airbill:** 1Z0E20900150856382
**Status:** Delivered
**Recipient:** Mike Klein
**Company:** Air 2 Water LLC
**Corrected Delivery Address:** 2800 28th Street, Suite 201 Santa Monica CA 90405
**Delivery Date:** June 14, 2007
**Delivery Time:** 9:44 A.M.
**Delivery Location:** Front Desk
**Signed for by:** Smith



Thank you for giving us this opportunity to serve you.

Sincerely,
Mercury Business Services

# MERCURY BUSINESS SERVICES, INC.
## 61 BATTERYMARCH STREET
### 2ND FLOOR
### BOSTON , MA 02110
### PHONE: (617) 723-5205
### FAX: (617) 723-5214

| | |
|---|---|
| TO: Linda P. | FROM: Jeremy Earls |
| COMPANY: Keegan Werlin LLP | DATE: 6/22/07 |
| FAX NUMBER: lindap@keeganwerlin.com | TOTAL NO. OF PAGES INCLUDING COVER: 2 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: 9618-1 |
| RE: Proof of Delivery Notification | YOUR REFERENCE NUMBER: |

☐ URGENT     ☐ FOR REVIEW     ☐ PLEASE COMMENT     ☐ PLEASE REPLY     ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Good Morning!

Attached is the proof of delivery notification as requested on your shipment.  If you have any questions, please give us a call. Thanks!

Jeremy Earls
Mercury Business Services
61 Batterymarch Street
Boston, MA 02210
(617) 723-5205 Phone
(617) 723-5214 Fax