UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-40049-FDS

(Consolidated with <u>AirWater Patents, Inc. v. J.J. Reidy & Co., Inc., a Massachusetts Corporation</u>; United States District Court Southern District of Florida, Miami Division, Case No. 05-20650-CIV-JORDAN)

J.J. REIDY & CO., INC., )
)
        Plaintiff, )
v. )
)
AIRWATER CORPORATION and )
AIRWATER PATENTS CORPORATION, )
)
        Defendants. )

**AFFIDAVIT OF JAMES REIDY IN SUPPORT OF PLAINTIFF J.J. REIDY & CO., INC.'S OPPOSITION TO MOTION OF AIRWATER CORPORATION AND AIRWATER PATENTS, INC. TO ENFORCE ORAL SETTLEMENT AGREEMENT**

I, James Reidy, hereby depose and state as follows:

1. I am the President of J.J. Reidy & Co., Inc.

2. I am more than a little perplexed by Michael Zwebner's ("Mr. Zwebner") ridiculous claims that we settled our lawsuit with Defendants on terms which can only be construed as highly favorable to them, when we are scheduled to be heard on our Motion for Summary Judgment on July 18. In addition, my attorneys just took the Defendants' deposition on June 8, 2007 and June 25, 2007, in which Mr. Zwebner was the designee, after months of his avoiding it. I sat through the entire proceeding. In my view, the deposition was very damaging to the Defendants' and Mr. Zwebner's case. Mr. Zwebner admitted that he filed statements with the Securities and Exchange Commission ("SEC")

on behalf of the Defendants parent corporation describing our agreement and noting that AirWater Corporation agreed to pay Reidy monthly payments of $10,000 through October 2013, which is the critical issue in our case. Mr. Zwebner personally executed the SEC filings and certified that the information contained in them was true and accurate. In other words, Mr. Zwebner had admitted in filings with the SEC prior to Reidy's filing of this lawsuit that Reidy was entitled to receive from Defendants over $1.1 million for the period from 2003 through the expiration of our Global Manufacturing and Marketing Licensing Agreement (the "License") in 2013, or through the expiration of the last expiring patent whichever was later. It is important to note that these were guaranteed monthly payments, which could increase depending on sales of products relating to the Reidy patents referred to in the License. In light of these newly discovered admissions, it is ludicrous to believe that I would have settled this lawsuit on terms favorable to Defendants and Mr. Zwebner or pay them any money whatsoever. To me, this appears to be nothing more than another desperate attempt by Mr. Zwebner and his counsel to avoid resolution of this case on the merits. After all, it is a pretty simple matter when it comes right down to it as we had a contract and he breached it according to his own filings with the SEC.

3.  Contrary to his pre-suit representations to the SEC, throughout this lawsuit, Mr. Zwebner and Defendants have incredibly claimed that the payments under the License were supposed to stop after a year. This contention is also completely at odds with the plain language of the License.

4.  Also throughout this litigation, Defendants and Mr. Zwebner have claimed on the one hand that the Reidy patents were worthless and on the other they have refused

to acknowledge termination of the License in 2005. They now want Reidy to pay them to partially release the patents, while retaining a non-exclusive license to continue using the very patents they claim are worthless. This makes no sense.

5. Mr. Zwebner further ignores the fact that we agreed to postpone depositions for many weeks, so that we could participate in the mediation of this lawsuit with a professional mediator (David Burbank) on July 25, 2006, which did not result in a settlement of the lawsuit.

6. Now, we are to believe, on the eve of the hearing on Reidy's motion for partial summary judgment, with newly discovered admissions by the Defendants concerning their obligations to make monthly payments through October 2013, that Reidy is suddenly willing to pay the Defendants money and agree to less than a full termination of the License and ties with Defendants, in order to avoid the hearing on its own motion for summary judgment.

7. The Defendants' most recent spin on settlement negotiations completely ignores the facts of the earlier mediation, discussions and Reidy's concrete proposals. In particular, prior to and on breaks at the first day of Defendants' deposition on June 8, 2007, Mr. Zwebner and I, with counsel present, engaged in settlement discussions. Reidy's proposal was that we would accept (a) $300,000 cash, (b) full termination of the License, (c) mutual releases, (d) a mutually agreeable press release to be issued by Reidy and the Defendants, and (e) that the Defendants or any of their affiliates would neither subpoena nor request documents or testimony from Reidy or any of its principals or employees in any current court action involving Defendants, Free Water, Air2Water, Worldwide Water or Michael Klein. (This last item was important to Reidy because Mr.

Zwebner, as I have come to learn, is extremely litigious). Defendants initially rejected this proposal and sought to be paid by Reidy for any royalties it may derive from the patents. I rejected this proposal as we were not going to pay Defendants any money and wanted a clean break from them. Then, Mr. Zwebner and Defendants proposed a non-exclusive license in favor of Defendants, which I also rejected. Later that day, Mr. Zwebner on behalf of Defendants indicated that they were willing to agree to (b), (c) and (d) above in the Reidy proposal, but wanted to walk away from paying any money and would not agree to item (e). Mr. Zwebner reinforced his proposal by stating that "even if you win your case, how can you be assured you'll ever collect any money from me or AirWater [corporation]" or words to that effect. I rejected this proposal, because Reidy has been damaged and Defendants have held over its patents well after termination of the License, and I did not want to incur additional legal fees and costs from having to respond to discovery from Defendants in other lawsuits for the reasons mentioned above. As such, a settlement was not reached by the parties and we resumed depositions.

8. We resumed and completed Defendants' deposition on June 25, 2007. The next day, June 26, 2007, Reidy was deposed and I was the designee for that deposition. On a break, I met with Mr. Zwebner, without counsel present, and we discussed settlement terms again. I reiterated that we were willing to negotiate, but that we required a clean break from the Defendants and that I was unwilling to be a witness for or provide any documents to either Defendant or any of their affiliates in any lawsuit. Mr. Zwebner again proposed a nonexclusive license and some other terms, which I again rejected as I had done in our earlier settlement discussions.

9. To move the process along and attempt to resolve it without further expense, I reduced Reidy's cash demand from $300,000 to $100,000 but held firm on points (b), (c), (d) and (e) set forth above. Mr. Zwebner rejected this proposal.

10. I then had discussions with my lawyer and Mr. Zwebner had discussions with his lawyer and we all met a final time in a conference room to discuss the parties' positions on June 26, 2007.

11. In the conference room, Mr. Zwebner demanded that Reidy pay Defendants a certain percentage of a sale price if it sold the patents. I told Mr. Zwebner that I would never agree to that. My attorney stated that the parties needed to make a clean break and that the parties needed to agree that the License had been terminated. Mr. Zwebner was unwilling to consider this proposal. My attorney reiterated that Reidy would be willing to accept $100,000, if the parties would agree that the License was terminated and provided that the Defendants agreed to the other items ((c) through (e)) referenced above. Mr. Zwebner would not agree to this proposal.

12. The attorneys then discussed the rescheduling of my deposition for the next day. Mr. Zayotti, Defendants' counsel, mentioned that he had to be in court at 2:00 p.m. and was not certain that he would be available.

13. At the end of the day, Mr. Zwebner asked us if we had any other possible solutions that would lead to a settlement. We told him no. Mr. Zwebner appeared to be quite anxious to settle the case, and in fact, followed me out to the reception area, asking for my telephone number which I would not give to him.

14. I left my counsel's office at the end of the day with the understanding that my deposition would resume the next day, or shortly afterwards, because the parties were unable to reach an agreement.

15. We never reached agreement on the terms of a settlement, and I never agreed to settle the case. In fact, on June 27, 2007, Mr. Zwebner called me (even though I did not give him my number) and told me that he had a proposal for me. I asked him to email it to me. Mr. Zwebner emailed me a proposed settlement that was not agreeable to me. We did not discuss the terms of the settlement on the telephone as Mr. Zwebner claims. I certainly did not agree to a settlement during that telephone call or in any other discussion with Mr. Zwebner.

16. The parties never reached agreement on the terms of a settlement.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 13th DAY OF JULY, 2007.**

James Reidy

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 16, 2007.

/s/ Thomas J. Conte