## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,** | |
| **Plaintiff,** | CIVIL ACTION NO. 05-40049-FDS |
| **v.** | |
| **AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,** | |
| **Defendants.** | |

| | |
|---|---|
| **AIRWATER PATENTS, INC.** | |
| **Plaintiff,** | CIVIL ACTION NO. 06-10137-FDS |
| **v.** | |
| **J.J. REIDY & CO., INC.** | |
| **Defendant.** | |

### AFFIDAVIT OF MATTHEW P. ZAYOTTI, ESQ. IN SUPPORT OF REPLY OF AIRWATER CORPORATION AND AIRWATER PATENTS, INC. TO PLAINTIFF J.J. REIDY & CO., INC.'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF AIRWATER'S CROSS-MOTION FOR SUMMARY JUDGMENT

I, Matthew P. Zayotti, Esquire, do hereby state and depose as follows:

1.      I am an associate with the law firm Keegan Werlin LLP, and I am an attorney in good standing of the bar of the Commonwealth of Massachusetts.

2.      Attorney Richard Kirby and I represent the Defendants AirWater Corporation and AirWater Patents, Inc. in connection with the above-captioned consolidated actions.

3.    Attached to this affidavit as <u>Exhibit A</u> is a true and accurate copy of Reidy Patent No. 5,106,512.

4.    Attached to this affidavit as <u>Exhibit B</u> is a true and accurate copy of Reidy Patent No. 5,149,446.

5.    Attached to this affidavit as <u>Exhibit C</u> is a true and accurate copy of Reidy Patent No. 5,203,989.

6.    Attached to this affidavit as <u>Exhibit D</u> is a true and accurate copy of Reidy Patent No. 5,366,705.

7.    Attached to this affidavit as <u>Exhibit E</u> is a true and accurate copy of the Patent Assignment Abstract of Title for Reidy Patent No. 5,106,512 from the United States Patent and Trademark Office website.

8.    Attached to this affidavit as <u>Exhibit F</u> is a true and accurate copy of the Patent Assignment Abstract of Title for Reidy Patent No. 5,149,446 from the United States Patent and Trademark Office website.

9.    Attached to this affidavit as <u>Exhibit G</u> is a true and accurate copy of the Patent Assignment Abstract of Title for Reidy Patent No. 5,203,989 from the United States Patent and Trademark Office website.

10.    Attached to this affidavit as <u>Exhibit H</u> is a true and accurate copy of the Patent Assignment Abstract of Title for Reidy Patent No. 5,366,705 from the United States Patent and Trademark Office website.

11.    Attached to this affidavit as <u>Exhibit I</u> are true and accurate copies of excerpts from the deposition of J.J. Reidy (pages 1, 60, 91-93, 100).

12.     Attached to this affidavit as <u>Exhibit J</u> is true and accurate copy of the Global Manufacturing and Marketing Licensing Agreement.

13.     Attached to this affidavit as <u>Exhibit K</u> are true and accurate copies of the deposition of AirWater (pages 1, 43-46, 107).

14.     Attached to this affidavit as <u>Exhibit L</u> are true and accurate copies of correspondence by and between J.J. Reidy and AirWater as produced by J.J. Reidy.

15.     Contrary to argument in its Motion for Leave to file its Supplemental Memorandum of Law in Support of its Motion for Partial Summary Judgment that it "has recently discovered filings with the SEC, which were "not produced in discovery and Reidy was not aware of these statements in the SEC filings at the time it served its motion for summary judgment", counsel for J.J. Reidy mentioned the statements in these SEC filings to AirWater's counsel during a telephone conversation in October 2005 regarding the preparation of the parties' joint statement.  Moreover, these SEC filings were not produced by AirWater during discovery because they were not responsive to any of J.J. Reidy's discovery requests.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS
_____ DAY OF JULY, 2007.

Matthew P. Zayotti

**CERTIFICATE OF SERVICE**
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on
_____.
_____.

**EXHIBIT A**



US005106512A

# United States Patent [19]

## Reidy

| [11] | Patent Number: | **5,106,512** |
|---|---|---|
| [45] | Date of Patent: | **Apr. 21, 1992** |

[54] **PORTABLE AIR-WATER GENERATOR**

[76] Inventor: **James J. Reidy,** 1260 Main St., Holden, Mass. 01520

[21] Appl. No.: 745,932

[22] Filed: **Aug. 16, 1991**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 648,541, Jan. 30, 1991.

[51] Int. Cl.⁵ ............................ C02F 1/00; B01D 5/00; F25D 17/06

[52] U.S. Cl. .......................... 210/744; 55/20; 55/21; 55/23; 55/80; 55/97; 55/213; 55/215; 55/217; 55/269; 55/279; 55/472; 62/93; 62/272; 210/128; 210/251; 210/806

[58] Field of Search ................. 55/20, 21, 23, 80, 97, 55/213, 215, 217, 267, 269, 279, 322, 472; 62/93, 272; 210/104, 128, 137, 149, 251, 258, 741, 742, 744, 806

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| 4,146,372 | 3/1979 | Groth et al. | 55/80 X |
|---|---|---|---|
| 4,252,003 | 2/1981 | Eckard et al. | 62/93 X |
| 4,319,461 | 3/1982 | Shaw | 62/93 |
| 4,351,651 | 9/1982 | Courveya | 55/267 X |
| 4,505,128 | 3/1985 | Miller | 62/272 |
| 4,735,054 | 4/1988 | Beckey | 62/93 |

*Primary Examiner*—Charles Hart
*Attorney, Agent, or Firm*—Iandiorio & Dingman

[57] **ABSTRACT**

A water generating device for obtaining potable water from ambient air inside or outside a structure or dwelling, having ducts for bringing this supply of ambient air to the device and for releasing the air back outside the device after it has been processed. There is an air filter for filtering the air prior to processing of the air. The air filter includes a one-time sensing element which renders it unusable when removed from the generator. A condenser is provided for extracting water vapor in the air brought thereto by the ducts. Within the ducts there is a fan or blower to move air from outside the device through the condenser and for returning the air back outside the device after it has traversed the condenser. Between the condenser and the collection point, there is an immediate temporary holding reservoir, or plumbing to this reservoir, which contains an ultraviolet light to kill existing microorganisms, as well as a pump to transport the water through a subsequent water filter, a second exposure to ultraviolet light, and into the ultimate internal or external water storage unit. The water filter also includes a one-time sensing element which renders it unusable when removed. An internal container is positioned to receive and collect the water after it leaves the second exposure to ultraviolet light, and there is a water sensor below the top of the internal container for shutting down the device when the container is full of water. Prior to this internal container, which is removable and may be reusable, is a valve for diverting this water instead to external water storage units. A switch is provided for automatically deactivating the device until the nonreusable air filter element is replaced after a predetermined pressure drop in the air after the air filter compared to that of the air before the air filter. A timer is provided for deactivating the device until a nonreusable water filter element is replaced after a predetermined number of hours of operation. A sensor is provided for deactivating the device when the UV light(s) fail to operate. A thermostat and humidistat are settable in conjunction with each other by a user to minimize energy consumption and maximize water yield. There is also a manual override switch to these conditional settings. First, second, and third indicators provide a signal when the air filter element, the water filter element, and the UV light element(s) are in need of being replaced. A fourth indicator provides a signal when the internal water container is full.

**17 Claims, 5 Drawing Sheets**



EXHIBIT
Reidy
2
6-25-07 EV

U.S. Patent



FIG.1



FIG.2



FIG.3



FIG.4



Figure 5
@ 5,500 cfm
32° F Coil
10¢/KW Hour

Derived from controlled laboratory conditions.

5,106,512

**1**

# PORTABLE AIR-WATER GENERATOR

## RELATED APPLICATION

This application is a continuation-in-part of application Ser. No. 07/648,541, filed on Jan. 30, 1991.

## FIELD OF INVENTION

The present invention relates to water making apparatus, and, more particularly, to such a device which makes potable water from the air.

## BACKGROUND OF INVENTION

In recent years, it is becoming more usual for people in both offices and in the home to drink bottled water rather than the water from a water tap. Countless other situations exist where water is difficult to obtain or where available water or water quality leaves much to be desired. In many cases this also creates a need to carry and lift heavy bottles of water periodically and to carry the water from the place where it was purchased to the place where it will be used. Accordingly, there have been some attempts to provide water generating devices to alleviate these problems.

U.S. Pat. No. 1,931,347 to Gay issued Oct. 17, 1933, prepares potable water from a supply of water which is first frozen, to remove impurities. It does not treat water without first freezing it.

U.S. Pat. No. 2,409,624 to Granville issued Oct. 22, 1946, is a complicated system for providing water. It is manually powered and uses the "sulfuric acid system".

U.S. Pat. No. 3,035,418 to Wright issued May 22, 1962, provides water from air, but is lacking in many of the features needed to produce potable water for modern day uses. There is no safety provision allowing only properly operable filters to be used, and no provision to allow water production only when certain temperature/humidity conditions can be met.

U.S. Pat. No. 3,575,009 to Kooney issued Apr. 13, 1971, provides rapidly operating water vapor condensing means for use with a laundry clothes dryer. It uses ice as coolant and uses a filtering material designed to remove only lint from the resulting condensed water. The condensed water vapor is claimed to be suitable for use in steam irons or for any "other" purpose requiring water. There are no provisions for obtaining water of any confident purity level from the ambient air. Also, it has no air filter, has only a coarse water filter, no operational controls except the manually supplied ice filled chill unit, and it can only work during the time that a clothes dryer is operating.

U.S. Pat. No. 3,675,442 to Swanson issued July 11, 1972, discloses an apparatus for recovering potable water from "humid" air. It is thus not designed to operate at varying humidity levels, and fresh water is used as a coolant with water pumps. It has no air or water filters and no refined controls. It diverts condensed water vapor to the cool water bath as needed, and only the overflow is channeled to another container and is called potable. Swanson does not use a fan or blower to move air through his unit.

U.S. Pat. No. 4,182,132 to Nasser et al. issued Jan. 8, 1980, is designed to operate in hot and humid regions only; its primary purpose is to cool and dehumidify ambient air in relatively large areas such as a city neighborhood. There is no provision for protecting the purity of the water. It must be taller than the tallest building in the area, requires a foundation recessed in the ground,

**2**

cannot be in any enclosing structure and must be in an open area free of ground contours, needs at least two air passages, and a heat dissipator in a passageway separate from the passageway containing the air cooler and moisture condenser. It relies on the specific gravity of cold air sinking within the device and hot air rising within the device. It has no air or water filters to protect the water.

U.S. Pat. No. 4,255,937 to Erlich issued Mar. 17, 1981, provides no operational controls for humidity, temperature, or filter conditions. The device also does not use a blower or fan.

U.S. Pat. No. 4,433,552 to Smith issued Feb. 28, 1984, does not mention potable water, has no air or water filters, requires a turbine, a generator, and wind. It has to be large (for example, it may be mounted on a trailer), it cannot be used indoors, there is no provision for protection of the water quality, and no filters for keeping insects, dust, etc. out of the water.

U.S. Pat. No. 4,892,570 to Littrell issued Jan. 9, 1990, is for agricultural water, and it only operates outdoors, is very large, designed for only high temperature regions, requires a wind of at least 5 mph to operate, is made of stone and cinder blocks, and has no refined controls or filters.

## SUMMARY OF THE INVENTION

The present invention provides a potable water generator designed to produce potable water using existing technologies and known devices in a unique combination that safely extracts potable water from the ambient air in a wide range of user definable temperature and humidity conditions.

This invention provides a fine functional air filter to remove impurities from the air, safely, because the potable water generator is arranged to assure that only fresh and properly functioning air filters are used. User neglect or abuse is avoided, thereby contributing to safe, pure water. This unit will not work with a malfunctioning air filter.

This invention provides a fine functional water filter to remove impurities, odors, and objectionable taste, as well as other contaminants, safely, because the generator is permanently programmed by a time meter to assure that only fresh and properly functioning water filters are used and replaced on a regular, timely basis. Each time a water filter is replaced, the timer is automatically reset to zero. User neglect or abuse is avoided, thereby further contributing to safe, pure water. This unit will not work with a water filter exceeding the time meter limits.

Concerning the air filters, these are replaced or cleaned when needed based upon the pressure drop sensed by a pressure differential indicator. When the pressure drop reaches a predetermined amount, the generator ceases operation until the air filter is replaced or cleaned to assure that only fresh and properly functioning, energy efficient, air filters are used and replaced or cleaned on a regular, timely basis. User neglect or abuse is avoided, thereby further contributing to safe, pure water. This unit will not work with an air filter exceeding the pressure differential limits.

The frames of both filters contain a cooperating female sensor, which cooperates with a male pin on an electric switch that deactivates the operation of the entire unit. When either filter is removed for required replacement this original cooperating female sensor is

5,106,512

**3**

destroyed and/or made irreparable. Only new, clean, and safe filters having such sensing structure can be used.

A time meter for the water filter and a pressure differential device for the air filter, as applicable, are programmed to deactivate the entire unit until the filter or filters required to be replaced or cleaned are in fact replaced or cleaned. The sensing device will confirm that the appropriate replacement filter or filters have been properly reinstalled and the generator will operate once again. The time span, or filter life, is determined by the particular model, its intended use and location—such as residential, industrial, commercial, construction, marine, recreational, military, and the like.

Safety and water purity is further enhanced by exposing the condensed water vapor to ultraviolet light on at least two occasions before this water is available to the user. On each single occasion over 99.99% of all bacteria, virus, and algae exposed to this ultraviolet light will be killed. The first exposure to ultraviolet light is accomplished as close to the newly condensed water vapor as possible - either in the initial catch basin or drip pan, or in plumbing to, or inside the immediate sump-pump temporary holding reservoir. The second exposure to ultraviolet light is accomplished after the water filter and immediately before the condensed water vapor exits the device into the removable water container or exterior storage devices as chosen by the user. This second exposure to ultraviolet light will also kill at least 99.99% of all algae, virus, or bacteria that may have reached this point. This double exposure to ultraviolet light can be done with two individual ultraviolet lights or by plumbing the water past one ultraviolet light twice.

A pump is used to enable the passage of the water through a fine water filter and to aid in transporting the water to subsequent locations within the device and/or to exterior storage units.

For those users sensitive to, or conscientious of, energy consumption, the generator includes temperature and humidity gauges as well as a thermostat and humidistat. These devices are intended to be used as follows:

The temperature and humidity gauges will aid the experienced user, as well as the novice in conjunction with a quick reference chart provided with the unit, in determining whether or not they want to operate the unit under present conditions for the likely water yield at that time.

The thermostat and humidistat settings as determined by the user, will allow unattended operation and preclude the need for any user monitoring whatsoever. The user may choose settings that provide only maximum water yield for energy consumed, or those settings that produce water regardless of energy consumed, or the user may choose one of the infinite settings between these two extremes.

It is expected that needs and priorities within an individual's environment are not static and that the flexibility afforded by these items maximizes the functionality and efficiency of the generator.

A custom designed reusable water condensate container is also an integral safety feature of the generator. It is conceivable that human nature or dire need may prompt the reuse of any container not designed for such purpose and may therefore be unsanitary and even dangerous. All containers in all models of the generator are designed to allow easy and proper cleaning by internal access through a wide neck. In addition, all larger con-

**4**

tainers will have an optional spigot. Those containers without spigots will transport more safely than those having spigots.

Other objects, features, and advantages will be apparent from the following detailed description of preferred embodiments taken in conjunction with the accompanying drawings in which:

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a schematic front view of the invention;

FIG. 2 is an isometric view of the device with parts broken away for clarity;

FIG. 3 is a plan view of the cooperating female sensor which is integrated into the filter frames to confirm that the proper filter is in place, and allow only one-time use when the filter is not intended to be reusable.

FIG. 4 is a front view of the cooperating female sensor illustrated in FIG. 3; and

FIG. 5 is a chart of temperature and humidity on a scale which includes the approximate time and cost of producing a gallon of water.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The basic device 10 as shown in FIG. 1 is enclosed in a cabinet 12 which houses the entire apparatus except for certain ductwork on some models which needs to be external of the device as explained below. The cabinet 12 has an insect screen 13, a side door 14 which is hinged at 16 and has a handle 18 with which this door can be opened to provide access to the inside of the device including the water filter element, air filter, UV lights, and the water container and/or temporary reservoir as well as all other serviceable parts.

There are two settable switches 22 and 24 which are a thermostat 22 to measure the temperature and open or close when a predetermined temperature is attained, and a humidistat 24 to measure the humidity and open or close when a predetermined humidity is attained. Complementing the switches there are two gauges 26 and 28 which are temperature and humidity gauges, respectively, for user-optional manual on/off operations, and which are an aid to determine the immediate water yields in conjunction with a simplified quick reference chart supplied with this device. (A more complex chart is shown in FIG. 5.) Switch 25 is the master ON/OFF switch that allows settable switches 22 and 24 to automatically activate or deactivate the basic device 10. Switch 27, when used, is a manual switch, and will override the conditional settings of switches 22 and 24.

More details of the device are visible in FIG. 2, in which portions of the cabinet 12 walls have been broken away for clarity. The cabinet 12 has a side wall 30, a rear wall 32, and front wall 34. An inlet duct 36 and an outlet duct 38 are provided to direct ambient air through the device by means of the ductwork inside the cabinet. This ductwork can be located through an outside wall in some models. In addition to the model illustrated herein, which can vary in size, there can also be countertop models which fit into the kitchen cabinetry and which may have side venting arrangements. Still more variations can be constructed to fit recreational vehicles, mobile homes, and boats of all sizes. There is a fan or blower 40 which assists in bringing ambient air into the device. The air first passes through an air filter element 42 and then through the evaporator coils 44 of condenser coils 46, aided by compressor 47 to cool the air sufficiently to remove water vapor by condensation.

5,106,512

5

There is a cooperating female sensor that blocks orifice 86 (FIG. 3) when removed and is not reusable. This feature, for example, can be made of plastic and is described in more detail below.

The water condensate falls onto a collection pan 49 which immediately diverts this water into tube or piping 51 which empties into a temporary holding reservoir 53, which contains an ultraviolet light 55 to kill 99.99% of any existing microorganisms. This UV light could also be positioned in a coiled arrangement of piping 51. This temporary holding reservoir 53 could be positioned to replace the collection pan 49. When the water level in reservoir 53 reaches a specific level, pump 57 will force this water through tubing or piping 59, continuing through water filter 50, piping 59, and past a second ultraviolet light 61. This second ultraviolet light will kill 99.99% of any surviving microorganisms that may have reached this point. The machine would shut down if either light failed to operate properly. It is also possible with a different piping arrangement to pass the water by ultraviolet light 55 a second time, thereby eliminating the need for two individual ultraviolet lights. The water will continue travelling from ultraviolet light 61 into piping arrangement 63 which includes a diverting valve 65 to direct the water into either the removable internal container 48, or through common fitting 67 which would be used to connect to other exterior containers or tanks. The removable container 48 can be designed to be reusable, safely, by having a wide neck opening for easy cleaning. It can also have an optional spigot 69. There is also a sensor device 52 that is positioned inside the container and below the top, for shutting the machine down when the container 48 is full, to prevent overflowing.

A light 54 (FIG. 1) will turn on or flash whenever the water filter is in need of being changed or cleaned. There is another light 56 (FIG. 1) which will turn on whenever the air filter is in need of being changed. A third light 23 (FIG. 1) will indicate that the internal, removable reservoir is full, and a fourth light 109 (FIG. 1) will indicate if one of the ultraviolet light(s) is out. A separate time meter 58 may be set to deactivate the unit until the non-reusable water filter is replaced after a predetermined number of hours of operation. A second separate sensor device 62 may be used which deactivates the unit until the non-reusable air filter is replaced or a reusable air filter is cleaned after a predetermined pressure drop from one side of the air filter to the other, and which increases with time. Thus, the air filter can be arranged with a device 62 for measuring the air pressure both upstream and downstream of the air filter and when the differential reaches a predetermined point, the device will shut down until the air filter is replaced or cleaned. This is based upon the air flow downstream decreasing as the filter becomes more filled with filtered material, causing the machine to become less efficient. Device 62 thereby prevents needless waste of energy. A light sensor, or lighting drive voltage or current sensor 107, and a similar sensor for light 61 (part 109, FIG. 1) will indicate when a light has 60 burned out, and may be enabled to automatically stop the unit from operating as a safety measure.

As shown in FIG. 3 in plan view, the filter 42 or 50 is held in a frame or housing. Each frame may have a one-time use cooperating female sensor 64 built into it. This sensor may be modified by eliminating trap door 74/76 and compression spring 78 to allow repeated use of a reusable, cleanable air filter. It will continue to

6

sense that the proper, reusable air filter is in place. This female sensor 64 is positioned in a special place within the air filter frame or water filter housing 61, which in turn is held in position by guiding channels 66. The female sensor 64 is provided with a basic chassis 68 having a back wall 70, and a retaining wall 72 spaced slightly therefrom and providing sufficient space for holding a "trap door" arrangement including two pieces 74 and 76 weakly connected together along line 80 (FIG. 4), and located in the space between the back wall 70 and the retaining wall 72. The trap door 74, 76 is biased downwardly by compression spring 78.

The female sensor 64 has a stop block 82 on the wall opposite the one containing the trap door opening 86. There is a frame 84 on the generator which slidably holds a pin 88 which is biased toward the filter by compression spring 92. There is an electrical switch contact 90 which is closed when the off/on/off travel of pin 88 is in a certain location within the switch frame 84 held in precise horizontal position by spring 92 holding it against stop block 82. The trap door has a lower part 74 which breaks away when pin 88 is inserted into chassis 68 through opening 86, and an upper part 76 which is held in its original position by pin 88 until the filter with attached female sensor 64 is removed. Then, compression spring 78 forces part 76 down and holds it there, sealing opening 86, preventing further use of this filter. The primary intent, then, of this female sensor 64 is to prevent the user from reusing an expended water filter or air filter once it is removed from the machine or to confirm that the proper reusable air filter is in place. Device 62 (FIG. 2) senses when the air filter becomes inefficient and shuts the machine off until only a new or cleaned air filter is reinstalled. Device 58 (FIG. 2) determines by a specific time period when the water filter should be removed and replaced with a new water filter, and prevents further operation of the machine until this is done. Because female sensor 64 prevents the reuse of either expended filter it thereby assures only safe and energy efficient use of this machine.

In some cases it may be desirable to have an air filter that can be cleaned and reused. In these instances a different air filter, such as an electrostatic filter, intended for repeated use can be used and female sensor 64 would lack compression spring 78 and trap door 74/76. Stop block 82 would then work in conjunction with opening 86 and pin 88 to confirm that only the proper air filter is in place. Energy conservation would still be monitored by device 62.

FIG. 4 shows the one-time use cooperating female sensor from the front. The sensor basic chassis 68 is shown as is the compressed spring 78. There may be a nipple 96 or other guiding parts which holds the spring 78 when it is uncompressed in position during assembly, and the nipple is attached to the chassis. There is another longer nipple 98 attached to part 76 at the bottom end of the spring 78 which holds this spring while it is being compressed by the insertion of the trap door. There is a top piece 95 (shown in FIG. 4 as a side view) which permanently seals the entire chassis. The final assembly piece 95 of the entire device, is shown partially inserted. There is a retaining block 93 which is also part of assembly piece 95 and aids in holding the upper part of the trap door in position while open or closed, including spring 78. The interior of the trap door is "chiselled" to create a weak breaking point. The bottom end of the trap door has a modified corner 91 to

5,106,512

7

allow insertion of the trap door while compressing the spring 78 from an angled starting position.

When the filter is entered into its correct position the pin or male sensor 88 which projects out of its switch frame 84 engages the trap door through an opening 86 in the rear wall 70. The unit will only operate when pin 88 is in its precise, but only partially extended, off/on/-off travel position as precisely determined by block 82. Also, upon pressing of the filter into place, the trap door breaks and the shorter part 74 falls over onto the bottom and upper part 76 slides down due to pressure from compression spring 78 and remains resting upon the top of the pin 88. When it is time to remove the filter, it is removed and the compression spring 78 forces part 76 downward until it reaches the bottom, and it thereafter remains in this position. It is impossible to place this same filter into this same location because the outwardly extending pin 88 will not go beyond wall 70, as it will be blocked by the trap door upper part 76. Thus, the filter cannot be reused. When the filter is first placed into position, the pin 88 breaks the trap door, and the lower part of it, which is at first in a vertical position as shown in dashed lines, moves into and through the solid line position of the part and it then falls down horizontally where it thereafter remains.

FIG. 5 provides a chart showing various ambient conditions and has added thereto the approximate number of minutes to produce one gallon of water at the temperature and relative humidity conditions indicated for a specific coil temperature and rate of air flow. Also, the approximate cost of energy to make a gallon of water is calculated at an assumed cost of 10¢/KWH. Thus, if the humidistat was set for 80% relative humidity, which is the curve designated A in FIG. 5, and the thermostat was set for 87° F.(which is the vertical line designated B), the device would produce a gallon of water in 4.8 minutes and at a cost of less than 13.5¢/gallon as shown on line C at point D in FIG. 5. A second example in FIG. 5 shows vertical line E indicating a thermostat setting at 75° F. and curved line F indicating a humidistat relative humidity setting of 50%, which results in the production of a gallon of water in approximately 12 minutes as designated on line H at point J at an approximate cost of 34¢ per gallon. The settings of the humidistat and thermostat assure that the device will operate only when the ambient air is within the conditions set and at a cost and time period acceptable to the user.

Although specific features of the invention are shown in some drawings and not others, this is for convenience only as each feature may be combined with any or all of the other features in accordance with the invention.

Other embodiments will occur to those skilled in the art and are within the following claims:

What is claimed is:

1. A water generating device for obtaining potable water from ambient air, comprising:

air passage means for bringing a supply of inside or outside ambient air to the device and for returning the air back outside the device after it has been processed;

air filtering means for filtering the air prior to processing of the air;

condenser means for extracting water vapor in the air brought thereto by the duct means;

first ultraviolet light means for killing microorganisms in the extracted water;

8

a temporary holding reservoir for holding the freshly extracted water;

pump means to move the water from the temporary holding reservoir to subsequent locations within the device, or to exterior water storage units;

water filter means downstream of said pump means for filtering the water;

second ultraviolet light means for killing microorganisms in the filtered water;

container means positioned to receive and collect water after it leaves the water filter means; and

said air filter means and said water filter means each including a filter element having means for permitting use of the filter element only one time so that the filter element is not reusable when it is removed.

2. A water generating device as defined in claim 1, further including blower means inside the duct means to move air from outside the device through the condenser means and for returning the air back outside the device after it has traversed the condenser means.

3. A water generating device as defined in claim 2, in which said filter one-time use means includes a plunger on the device and a scored flat element which is broken when the filter element is inserted into place, so that when the filter element is removed, the top portion of said flat element moves downward and prevents reinsertion of said filter due to the plunger hitting the flat element.

4. A water generating device as defined in claim 3, in which the plunger closes a contact when a new filter is inserted and completes a circuit which permits the device to operate.

5. A water generating device as defined in claim 1, further including a water sensor below the top of said container means for shutting down the device when the container means is full of water.

6. A water generating device as defined in claim 1, further including a water sensor below the top of said container means for activating a pump when the container means is full of water to move the water to another location.

7. A water generating device as defined in claim 1, further including a pressure sensitive differential switch for deactivating the device until a nonreusable air filter element is replaced after a predetermined drop in air pressure.

8. A water generating device as defined in claim 1, further including a time meter for deactivating the device until a nonreusable water filter element is replaced after a predetermined number of hours of operation.

9. A water generating device as defined in claim 1, further including thermostat means and humidistat means which are settable in conjunction with each other by a user to minimize energy consumption and maximize water yield.

10. A water generating device as defined in claim 1, further including a thermometer and humidity indicator for manual use of the device.

11. A water generating device as defined in claim 1, further including first, second and third indicator means for providing a signal when the air filter element, the water filter element, and an ultraviolet light, respectively, are in need of being replaced.

12. A water generating device as defined in claim 1 further including means for exposing the water to ultraviolet light a second time downstream of said water filter means to kill additional microorganisms.

5,106,512

**9**

13. A water generating device as defined in claim **12** in which said means for exposing includes a second ultraviolet light.

14. A water generating device as defined in claim **12** in which said means for exposing includes means for 5 running the pumped water past said ultraviolet light means.

15. A water generating device as defined in claim **1** in which said ultraviolet light means is in said temporary holding reservoir, or in plumbing to the holding reser- 10 voir.

16. A water generating device for obtaining potable water from ambient air inside a structure or dwelling or ambient air outside a structure or dwelling, comprising:

air passage means for bringing a supply of inside or 15 outside ambient air to the device and for returning the air back outside the device after it has been processed;

air filter means for filtering the air prior to processing of the air, said filter means including a cooperating 20 female sensor which renders the air filter useless when removed;

condenser means for extracting water vapor in the air brought thereto by the air passage means;

blower means inside the air passage means to move 25 air from outside the device through the condenser means and for returning the air back outside the device after it has traversed the condenser means;

first ultraviolet light means for killing microorganisms in the just extracted water vapor; 30

temporary holding reservoir means or plumbing means to this reservoir for containing said first ultraviolet light means and freshly extracted water vapor;

pump means to move the water from the temporary 35 holding reservoir to subsequent locations within the device, or to exterior water storage units;

water filter means downstream of said pump means for filtering the water, said water filter means including a cooperating female sensor which renders 40 the water filter non-reusable when removed;

second ultraviolet light exposure means to kill remaining microorganisms just prior to the water being deposited into its internal or external container; 45

container means positioned to receive and collect the water after it is exposed to the second ultraviolet light means;

water sensor means below the top of said container means for shutting down the device when the con- 50 tainer means is full of water or for activating a pump;

means for measuring the pressure differential across the air filter for deactivating the device after a predetermined pressure drop in operation until this 55 nonreusable air filter element is replaced;

timing means for deactivating the device after a predetermined number of hours of operation until the nonreusable water filter element is replaced;

thermostat means and humidistat means which are 60 settable in conjunction with each other by a user to

**10**

minimize energy consumption and maximize water yield;

thermometer and humidity indicators for providing a visual measure of the temperature and relative humidity of the air passing through the device; and

first, second, and third indicator means for providing a signal when the air filter element, the water filter element, or an ultraviolet light means, respectively, are in need of being replaced.

17. A water generating method for obtaining potable water from ambient air that is inside or outside a structure or dwelling comprising:

bringing a supply of inside or outside ambient air to a first station and releasing the air after it has been processed;

filtering the air through a filtering element prior to processing of the air, said air filter element becoming useless when removed;

extracting water vapor in the air brought to the first station;

moving air from outside the device through the first station and returning the air back outside the first station;

exposing the extracted water vapor immediately to ultraviolet light;

pumping the water to subsequent locations within the device, or to exterior water storage units;

filtering the water from the extracting step through a filtering element which becomes useless when removed;

exposing the filtered water to ultraviolet light a second time;

collecting the water at a collecting station after the second ultraviolet light exposure;

sensing the water level at the collecting station below the top of the collecting station for shutting down the process or activating a pump when the collecting station is full of water;

deactivating the device when the air filter element is to be replaced and until this nonreusable air filter element is replaced after a preselected pressure drop;

deactivating the device when the water filter element is to be replaced and until this nonreusable water filter element is replaced after a predetermined operating time;

deactivating the device when at least one ultraviolet light is to be replaced and until an operable ultraviolet light is in place and operating;

detecting the temperature and the relative humidity of the air brought to the first station and using this information in accordance with predetermined conditions to initiate and cease the process to minimize energy consumption and maximize water yield according to parameters chosen by the user; and

providing a signal and deactivating the unit when the air filter element or the water filter or an ultraviolet light element are in need of being replaced.

\* \* \* \* \*

65

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

**PATENT NO.** : 5,106,512

**DATED** : April 21, 1992

**INVENTOR(S)** : James J. Reidy

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title page, item [54] and in Col. 1, the Title should
read --Potable Air-Water Generator--.

Signed and Sealed this

Twenty-first Day of September, 1993

*Attest:*

BRUCE LEHMAN

*Attesting Officer*          *Commissioner of Patents and Trademarks*

**EXHIBIT B**



US005149446A

# United States Patent [19]

**Reidy**

[11] **Patent Number:** **5,149,446**

[45] **Date of Patent:** **Sep. 22, 1992**

[54] **POTABLE WATER GENERATOR**

[76] Inventor: **James J. Reidy**, 1260 Main St., Holden, Mass. 01520

[21] Appl. No.: **648,541**

[22] Filed: **Jan. 30, 1991**

[51] Int. Cl.⁵ .......................... C02F 1/00; B01D 5/00; F25D 17/06

[52] U.S. Cl. ...................................... 210/744; 55/20; 55/21; 55/23; 55/80; 55/97; 55/213; 55/215; 55/217; 55/269; 55/472; 62/93; 62/272; 210/128; 210/251; 210/806

[58] Field of Search ................... 55/20, 21, 23, 80, 97, 55/213, 215, 217, 267, 269, 322, 472; 62/93, 272; 210/104, 128, 137, 149, 251, 258, 741, 742, 744, 806

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,146,372 | 3/1979 | Groth et al. | 55/80 X |
| 4,235,054 | 4/1988 | Beckey | 62/93 |
| 4,252,003 | 2/1981 | Eckand et al. | 62/93 X |
| 4,319,461 | 3/1982 | Shaw | 62/93 |
| 4,351,651 | 9/1982 | Courneya | 55/267 X |
| 4,505,128 | 3/1985 | Miller et al. | 62/93 X |

*Primary Examiner*—Charles Hart
*Attorney, Agent, or Firm*—Iandiorio & Dingman

[57] **ABSTRACT**

A water generating device for obtaining potable water from inside or outside ambient air, having ducts for bringing a supply of inside or outside ambient air to the device and for releasing the air back outside the device after it has been processed. There is an air filter for filtering the air prior to processing of the air. The air filter includes at least one filter element which becomes unusable when removed from the generator. A condenser is provided for extracting water vapor in the air brought thereto by the ducts. Within the ducts there is a fan or blower to move air from outside the device through the condenser and for returning the air back outside after it has traversed the condenser. Between the condenser and the collection point, there is a water filter for filtering the water from the condenser. The water filter includes a filter element cooperating female sensor which becomes unusable when removed. A container is positioned to receive and collect the water after it leaves the water filter, and there is a water sensor below the top of the container for shutting down the device or activating a pump to carry the water to another location when the container is full of water. A switch is provided for automatically deactivating the device until the nonreusable air filter element is replaced after a predetermined pressure drop in the air before the air filter compared to that of the air after the air filter. A timer is provided for deactivating the device until a nonreusable water filter element is replaced after a predetermined number of hours operation. A thermostat and humidistat are settable in conjunction with each other by a user to minimize energy consumption and maximize water yield. First and second indicators provide a signal when the air filter element and the water filter element are in need of being replaced.

**13 Claims, 5 Drawing Sheets**





**FIG.1**

**U.S. Patent**        Sep. 22, 1992        Sheet 2 of 5        **5,149,446**



FIG.2



FIG.3



FIG.4



FIG. 5

5,149,446

1

## POTABLE WATER GENERATOR

### FIELD OF THE INVENTION

The present invention relates to water making apparatus, and, more particularly, to such device which makes potable water.

### BACKGROUND OF THE INVENTION

In recent years, it is becoming more usual for people in both offices and in the home to drink bottled water rather than the water from a water tap. Countless other situations exist where water is difficult to obtain or where available water or water quality leaves much to be desired. In many cases this also creates a need to carry and lift heavy bottles of water periodically and to carry the water from the place where it was purchased to the place where it will be used. Accordingly, there have been some attempts to provide water generating devices.

U.S. Pat. No. 1,931,347 to Gay issued Oct. 17, 1933, prepares potable water from a supply of water which is first frozen, to remove impurities. It does not treat water unless it is first frozen.

U.S. Pat. No. 2,409,624 to Granville issued Oct. 22, 1946, is a complicated system for providing water. It is a manually powered and uses the "sulfuric acid system."

U.S. Pat. No. 3,035,418 to Wright issued May 22, 1962, provides water from air, but is lacking in many of the features needed to produce potable water for modern day uses. There is no provision for the safety of being able to use only filters which are properly operable, and also to produce water only when certain temperature/humidity conditions can be met.

U.S. Pat. No. 3,575,009 to Kooney issued Apr. 13, 1971, is to provide rapidly operating water vapor condensing means for use with a laundry clothes dryer. It uses ice as coolant and uses a filtering material designed to remove only lint from the resulting condensed water. The condensed water vapor is claimed to be suitable for use in steam irons or for any "other" purpose requiring water. There are no provisions for obtaining water of any confidant purity level from the ambient air. Also, it has no air filter, has only a coarse water filter, no operational controls except the manually supplied ice filled chill unit, and it can only work during the time that a clothes dryer is operating.

U.S. Pat. No. 3,675,442 to Swanson issued Jul. 11, 1972, is apparatus for recovering potable water from "humid" air. It is thus not designed to operate at all humidity levels, and fresh water is used as a coolant with water pumps. It has no air or water filters and no refined controls. It diverts condensed water vapor to the cool water bath as needed and only the overflow is channeled to another container and is called potable. Swanson does not use a fan or blower to move air through his unit.

U.S. Pat. No. 4,182,132 to Nasser et al issued Jan. 8, 1980, is to operate in hot and humid regions only, and its primary purpose is to cool and dehumidify ambient air in relatively large areas such as a city neighborhood. There is no provision for protecting the purity of the water. It must be taller than the tallest building in the area, requires a foundation recessed in the ground, cannot be in any enclosing structure and must be in an open area free of ground contours, needs at least two air passages, and a heat dissipator in a passageway separate

2

from the passageway containing the air cooler and moisture condenser. It relies on the specific gravity of cold air sinking within the device and hot air rising within the device. It has no air or water filters to protect the water.

U.S. Pat. No. 4,255,937 issued Mar. 17, 1981, provides no operational controls for humidity, temperature, or filter conditions. The device also does not use a blower or fan.

U.S. Pat. No. 4,433,552 to Smith issued Feb. 28, 1984, does not mention potable water, has no air or water filters, requires a turbine, a generator, and wind. It has to be large, may be mounted on a trailer, it cannot be used indoors, there is no provision for protection of the water quality, and no filters, for keeping bugs, dust, etc. out of the water.

U.S. Pat. No. 4,892,570 to Littrell issued Jan. 9, 1990, for agricultural water, and it only operates outdoors, is very large, designed for only high temperature regions, requires a wind of at least 5 mph to operate, is made of stone and cinder blocks, and has no refined controls or filters.

### SUMMARY OF THE INVENTION

The present invention provides a potable water generator designed to produce potable water using existing technologies and known devices in a unique combination that safely extracts potable water from the ambient air in a wide range of user definable temperature and humidity conditions.

This invention provides a fine functional air filter to remove impurities from the air, safely, due to the fact that the potable water generator is arranged to assure that only fresh and properly functioning air filters are used. User neglect or abuse is avoided, thereby contributing to safe, pure water. This unit will not work with a malfunctioning air filter.

This invention provides a fine functional water filter to remove impurities, odors, and objectionable taste, as well as other contaminates, safely, due to the fact that the generator is permanently programmed by a time meter to assure that only fresh and properly functioning water filters are used and replaced on a regular timely basis. Each time a water filter is replaced, the timer is automatically reset to zero. User neglect or abuse is avoided, thereby further contributing to safe, pure water. This unit will not work with a water filter exceeding the time meter limits.

Concerning the air filters, these are replaced when needed based upon the pressure drop sensed by a pressure differential indicator. When the pressure drop reaches a predetermined amount, the generator ceases operation until the air filter is replaced to assure that only fresh and properly functioning air filters are used and replaced on a regular, timely basis. User neglect or abuse is avoided, thereby further contributing to safe, pure water. This unit will not work with an air filter exceeding the pressure differential limits.

The frames of both filters contain a cooperating female sensor, which cooperates with a male pin, that deactivates the operation of the entire unit. When either filter is removed for required replacement this original cooperating female sensor is destroyed and/or made irreparable. Only new and safe filters having such structure can be used.

A time meter for the water filter and a pressure differential device for the air filter, as applicable, are pro-

5,149,446

3

grammed to deactivate the entire unit until the filter or filters required to be replaced are in fact replaced. The sensing device will confirm that the appropriate replacement filter or filters have been properly reinstalled and the generator will operate once again. The time span, or filter life, is determined by the particular model, its intended use and location—such as residential, industrial, commercial, construction, marine, recreational, military, and the like.

For those users sensitive to, or conscientious of, energy consumption, the generator includes temperature and humidity gauges as well as a thermostat and humidistat. These devices are intended to be used as follows:

The temperature and humidity gauges will aid the experienced user, as well as the novice in conjunction with a quick reference chart provided with the unit, in determining whether or not they want to operate the unit under present conditions for the likely water yield at that time.

The thermostat and humidistat settings as determined by the user, will allow unattended operation and preclude the need for any user monitoring whatsoever. The user may choose settings that provide only maximum water yield for energy consumed, or those settings that produce water regardless of energy consumed, or, the user may choose one of the infinite settings between these two extremes.

It is expected that needs and priorities within an individual's environment are not static and that the flexibility afforded by these items maximizes the functionality and efficiency of the generator.

A custom designed reusable water condensate container is also an integral safety feature of the generator. It is conceivable that human nature or dire need may prompt the reuse of any container not designed for such purpose and may therefore be unsanitary and even dangerous. All containers in all models of the generator are designed to allow easy and proper cleaning by internal access through a wide neck. In addition, all larger containers will have an optional spigot. Those containers without spigots will transport safer than those having spigots.

Other objects, features, and advantages will be apparent from the following detailed description of preferred embodiments taken in conjunction with the accompanying drawing in which:

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic front view of the invention.

FIG. 2 is an isometric view of the device with parts broken away for clarity.

FIG. 3 is a plan view of the cooperating female sensor which is integrated into the filter frame and allows only one-time use.

FIG. 4 is a front view of the cooperating female sensor illustrated in FIG. 3.

FIG. 5 is a chart of temperature and humidity on a scale which includes the approximate time and cost of producing a gallon of water.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The basic device 10 as shown in FIG. 1 is enclosed in a cabinet 12 which houses the entire apparatus except for certain duct work on some models which needs to be external of the device as explained below. The cabinet 12 has a lower door 14 which is hinged at 16 and has a handle 18 with which this door can be opened to

4

provide access to the inside of the device including the water filter element and the water container and/or temporary reservoir.

The upper end of the cabinet 12 has a small door 20 in the middle for providing access to the air filter element. It is hinged at 11 and has a handle at 13. There are two settable switches 22 and 24 which are a thermostat 22 to measure the temperature and open or close when a predetermined temperature is attained, and a humidistat 24 to measure the humidity and open or close when a predetermined humidity is attained. Above the switches there are two gauges 26 and 28 which are temperature and humidity gauges, respectively, for manual on/off operations, and which are an aid to determine the immediate water yields in conjunction with a simplified quick reference chart supplied with this device, i.e., the chart shown in FIG. 5.

More details of the device are visible in FIG. 2 in which portions of the cabinet 12 walls have been broken away for clarity. The cabinet 12 has a side walls 30, a rear wall 32, and front wall 34. An inlet duct 36 and an outlet duct 38 are provided to direct ambient air through the device by means of the two ducts which are connected with one another inside the cabinet. These ducts can be located through an outside wall in some models. There can also be floor or countertop models in addition to the model illustrated herein, which fit into the kitchen cabinetry and which may have side venting arrangements. There is a fan or blower 40 which assists in bringing ambient air into the device. The air first passes through an air filter element 42 and then through the coils 44 of a condenser 46 to cool the air sufficiently to remove water vapor by condensation. There is a cooperating female sensor blocks orifice 86 (FIG. 3) when removed and is not reusable. This feature, for example, can be made of plastic and is described in more detail below.

This water condensate falls down into a collection container 48 after first passing through the filter element 50 of a water filter. This container or reservoir is designed to be reusable and has a wide throat for easy cleaning. As an option there is also a spigot 51. The cooperating female sensor is modified when the filter is first inserted into place which prevents further use of this used filter once it is removed from the filter holder. This feature will be described in more detail below. There is a sensor device 52 inside the container and below the top, for shutting the machine down when the container or reservoir 48 is full, to prevent overflowing. An optional audible alarm can be set to sound whenever the container or reservoir is filled with water. Another arrangement pumps the water from a larger second automatic collection container to a larger external container which acts as a reservoir. This can be done with a pump and a Y connection.

A light 54 will turn on or flash whenever the water filter is in need of being changed. There is another light 56 which will turn on whenever the air filter is in need of being changed. A separate time meter 58 may be set to deactivate the unit until the non-reusable water filter is replaced after a predetermined number of hours of operation. A second separate sensor device 62 may be used which deactivates the unit until the non-reusable air filter is replaced after a predetermined pressure drop from one side of the air filter to the other, and which increases with time. Thus, the air filter can be arranged with a device 62 for measuring the air pressure both upstream and downstream of the air filter and when the

5,149,446

| 5 | 6 |
|---|---|

differential reaches a predetermined point, the device will shut down until the air filter is replaced. This is based upon the air flow downstream decreasing as the filter becomes more filled with filtered material and provides efficient use and prevents waste of energy.

As shown in FIG. 3 in plan view the filter 42 or 50 is held in a frame 61, and has a one-time use cooperating female sensor 64 attached thereto. This female sensor 64 fits into a special place in the back of the normal filter guide channels 66 as are frequently provided for holding filters. The female sensor 64 is provided with a basic chassis 68 having a back wall 70, and a retaining wall 72 spaced slightly therefrom and providing sufficient space for holding a "trap door" arrangement including two pieces 74 and 76 weakly connected together along line 80, and they are located in the space between the back wall 70 and the retaining wall 72. The trap door 74, 76 is biased downwardly by compression spring 78.

The female sensor 64 has a stop block 82 on the wall opposite the one containing the trap door opening 86. There is a frame 84 on the generator which slidably holds a pin 88 which is biased toward the filter by compression spring 92. There is an electrical contact 90 which is closed when the pin is in a certain location within the frame 84 held in precise horizontal position by spring 92 holding it against stop block 82. The trap door has a lower part 74 which breaks away when pin 88 is inserted into chassis 68 through opening 86, and an upper part 76 which is held in its original position by pin 88 until the filter with attached sensor 64 is removed. Then, compression spring 78 forces part 76 down and holds it there, sealing opening 86, preventing further use of this filter.

FIG. 4 shows the one-time use cooperating female sensor from the front. The sensor basic chassis 68 is shown as is the compressed spring 78. There is a nipple 96 or other guiding parts which holds the spring 78 when it is uncompressed in position during assembly, and the nipple is attached to the chassis. There is another longer nipple 98 attached to part 76 at the bottom end of the spring 78 which holds this spring while it is being compressed by the insertion of the trap door. There is a top piece 95 which permanently seals the entire chassis. The final assembly piece 95 of the entire device, is shown partially inserted. There is a retaining block 93 which is also part of assembly piece 95 and aids in holding the upper part of the trap door in position open or closed, including spring 78. The interior of the trap door is "chiseled" to create a weak breaking point. The bottom end of the trap door has a modified corner 91 to allow insertion of the trap door while compressing the spring 78 from an angled starting position.

When the filter is entered into its correct position the pin or male sensor 88 which projects out of its frame 84 engages the trap door through an opening 86 in the rear wall 70. The unit will only operate when pin 88 is in its precise, but only partially extended, position as precisely determined by block 82. Also, upon pressing of the filter into place, the trap door breaks and the shorter part 74 falls over onto the bottom and the upper part 76 slides down due to pressure from compression spring 78 and remains resting upon the top of the pin 88. When it is time to remove the filter, it is removed and the compression spring 78 forces part 76 downwardly until it reaches the bottom, and it thereafter remains in this position. If it should be attempted to place this same filter into this same location, it cannot be done because the outwardly extending pin 88 will not go beyond wall 70 as it will be blocked by the trap door upper part 76. Thus, the filter cannot be reused. When the filter is first placed into position, the pin 88 breaks the trap door, and the lower part of it which is at first in a vertical position as shown in dashed lines, moves into and through the solid line position of the part and it then falls down horizontally where it thereafter remains.

FIG. 5 provides a chart showing various ambient conditions and has added thereto the approximate number of minutes to produce one gallon of water at the temperature and relative humidity conditions indicated. Also, the approximate cost of energy to make a gallon of water is calculated at an assumed cost of 10¢/KWH. Thus, if the humidistat was set for 70% relative humidity, which is the curve designated A in FIG. 5, and the thermostat was set for 90° F. (which is the line designated B), the device would produce a gallon of water in 16 minutes and at a cost of about 30¢/gal. as shown at line C in FIG. 5. A second example in FIG. 5 shows line D indicating a thermostat setting at 80° F., and line E indicating a humidistat relative humidity setting of 50%, which results in the production of a gallon in approximately 45 minutes as designated by line F and at an approximate cost of 60¢ per gallon. The settings of the humidistat and thermostat assure that the device will operate only when the ambient air is within the conditions set.

It will now be apparent to those skilled in the art that other embodiments, improvements, details, and uses can be made consistent with the letter and spirit of the foregoing disclosure and within the scope of this patent, which is limited only by the following claims, construed in accordance with the patent law, including the doctrine of equivalents.

I claim:

1. A water generating device for obtaining potable water from ambient air, comprising:

air passage means for bringing a supply of inside or outside ambient air to the device and for returning the air back after it has been processed;

air filter means for filtering the air prior to processing of the air;

condenser means for extracting water vapor in the air brought thereto by the duct means;

water filter means for filtering the water from the condenser means;

container means positioned to receive and collect the water after it leaves the water filter means; and

said air filter means and said water filter means each including a filter element having means for permitting use of the filter element only one time so that the filter element is not reusable when it is removed.

2. A water generating device as defined in claim 1, further comprising blower means inside the duct means to move air from outside the device through the condenser means and for returning the air back outside the device after it has traversed the condenser means.

3. A water generating device as defined in claim 2, wherein said filter one-time use means including a plunger on the device and a scored flat element which is broken when the filter element is inserted into place, so that when the filter element is removed, the top portion of said flat element moves downwardly and prevents reinsertion of said filter due to the plunger hitting the flat element.

4. A water generating device as defined in claim 3, where the plunger closes a contact when a new filter is

5,149,446

**7**

inserted and completes a circuit which permits the device to operate.

5. A water generating device as defined in claim 2, further comprising a water sensor below the top of said container means for shutting down the device when the container means is full of water.

6. A water generating device as defined in claim 2, further comprising a water sensor below the top of said container means for activating a pump when the container means is full of water to move the water to another location.

7. A water generating device as defined in claim 3, further comprising a pressure sensitive differential switch for deactivating the device until a nonreusable air filter element is replaced after a predetermined drop in air pressure.

8. A water generating device as defined in claim 3, further comprising a time meter for deactivating the device until a nonreusable water filter element is replaced after a predetermined number of hours of operation.

9. A water generating device as defined in claim 2, further comprising thermostat means and humidistat means which are settable in conjunction with each other by a user to minimize energy consumption and maximize water yield.

10. A water generating device as defined in claim 2, further comprising a thermometer and humidity indicator for manual use of the device.

11. A water generating device as defined in claim 2, further comprising first and second indicator means for providing a signal when the air filter element and the water filter element are in need of being replaced.

12. A water generating device for obtaining potable water from inside or outside ambient air, comprising:

air passage means for bringing a supply of inside or outside ambient air to the device and for returning the air back after it has been processed;

air filter means for filtering the air prior to processing of the air, said air filter means including a cooperating female sensor which renders the air filter useless when removed;

condenser means for extracting water vapor in the air brought thereto by the air passage means;

blower means inside the air passage means to move air from outside the device through the condenser means and for returning the air back outside the device after it has traversed the condenser means

water filter means for filtering the water from the condenser means, said water filter means including a cooperating female sensor which renders the water filter useless when removed;

container means positioned to receive and collect the water after it leaves the water filter means;

water sensor means below the top of said container means for shutting down the device when the container means is full of water or for activating a pump

**8**

pressure differential means for deactivating the device after a predetermined pressure drop in operation until this nonreusable air filter element is replaced;

timing means for deactivating the device after a predetermined number of hours of operation until the nonreusable water filter element is replaced;

thermostat means and humidistat means which are settable in conjunction with each other by a user to minimize energy consumption and maximize water yield;

thermometer and humidity indicators for providing a visual measure of the temperature and relative humidity of the air passing through the device; and

first and second indicator means for providing a signal when the air filter element or the water filter element are in need of being replaced.

13. A water generating method for obtaining potable water from inside or outside ambient air, comprising:

bringing a supply of inside or outside ambient air to a first station and for releasing the air back after it has been processed;

filtering the air through a filtering element prior to processing of the air, said air filter element becoming useless when removed;

extracting water vapor in the air brought to the first station;

moving air from outside the device through the first station and for returning the air back outside the first station;

filtering the water from the extracting step through a filtering element, which becomes useless when removed;

collecting the water at a collecting station after it is filtered;

sensing the water level at the collecting station below the top of the collecting station for shutting down the process or activating a pump when the collecting station is full of water;

deactivating the device when the air filter element is to be replaced and until this nonreusable air filter element is replaced after a preselected pressure drop;

deactivating the device when the water filter element is to be replaced and until this nonreusable water filter element is replaced after a predetermined time;

detecting the temperature and the relative humidity of the air brought to the first station and using this information in accordance with predetermined conditions to initiate and cease the process to minimize energy consumption and maximize water yield according to parameters chosen by the user; and

providing a signal and deactivating the unit when the air filter element or the water filter element are in need of being replaced.

* * * * *

**EXHIBIT C**



US005203989A

# United States Patent [19]

## Reidy

[11] Patent Number: 5,203,989

[45] Date of Patent: * Apr. 20, 1993

[54] **POTABLE AIR-WATER GENERATOR**

[76] Inventor: **James J. Reidy**, 1260 Main St., Holden, Mass. 01520

[ * ] Notice: The portion of the term of this patent subsequent to Apr. 21, 2009 has been disclaimed.

[21] Appl. No.: **828,190**

[22] Filed: **Jan. 30, 1992**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 648,541, Jan. 30, 1991, Pat. No. 5,149,446, and a continuation-in-part of Ser. No. 749,932, Aug. 16, 1991, Pat. No. 5,106,512.

[51] Int. Cl.5 ........................ B01D 21/30; C02F 1/00; F25D 17/06

[52] U.S. Cl. .................................... 210/137; 210/149; 210/251; 210/258; 55/213; 55/215; 55/217; 55/269; 55/279; 62/93; 62/272

[58] Field of Search ................... 55/20, 21, 23, 80, 97, 55/213, 215, 217, 267, 269, 279, 322, 472, 126; 62/93, 272; 210/104, 128, 137, 149, 251, 258, 741, 742, 744, 748, 806, 140, 257.1

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,575,009 | 4/1971 | Kooney | 62/272 |
| 4,182,132 | 1/1980 | Nasser et al. | 62/93 |
| 4,351,651 | 9/1982 | Courneya | 62/93 X |
| 5,068,030 | 11/1991 | Chen | 210/748 X |

*Primary Examiner*—Charles Hart
*Attorney, Agent, or Firm*—Iandiorio & Dingman

[57] **ABSTRACT**

A water generating device for obtaining portable water from ambient air inside or outside a structure or dwelling. There is an air filter for filtering the air prior to processing of the air. The air filter may include a one-time sensing element which renders it unusable when removed from the generator. A condenser is provided for extracting water vapor in the air. Between the condenser and the collection point, there is an immediate temporary holding reservoir, or plumbing to this reservoir, which contains an ultraviolet light to kill existing microorganisms, as well as a pump to transport the water through a subsequent water filter, a second exposure to ultraviolet light, and ultimately, at the final discharge point to the internal or external water storage unit there may be another ultraviolet light that creates a sterile outlet from the primary system. The water filter may also include a one-time sensing element which renders it unusable when removed. A switch may be provided for automatically deactivating the device until the nonreusable or cleanable air filter element is replaced or cleaned. A timer or flow meter may be provided for deactivating the device until the water filter element is replaced after a predetermined number of hours or water volume of operation. A sensor may be provided for deactivating the device when the UV light(s) fail to operate.

**31 Claims, 6 Drawing Sheets**





EXHIBIT
Reidy
5
6-25-07 EV



FIG.1



FIG.2



FIG.3



**FIG.4**



Figure 5
@ 5,500 cfm
32° F Coil
10¢/KW Hour

# FIGURE 6



5,203,989

1

## POTABLE AIR-WATER GENERATOR

### RELATED APPLICATION

This application is a continuation-in-part of application Ser. No. 07/648,541, filed on Jan. 30, 1991, U.S. Pat. No. 5,149,446 and of Ser. No. 07/745,932, filed on Aug. 16, 1991, U.S. Pat. No. 5,106,512.

### FIELD OF INVENTION

The present invention relates to water making apparatus, and, more particularly, to such a device which makes potable water from the air.

### BACKGROUND OF INVENTION

In recent years, it is becoming more usual for people in offices, industry and in the home to drink bottled water rather than the water from a water tap. Countless other situations exist where water is difficult to obtain or where available water or water quality leaves much to be desired. In many cases this also creates a need to carry and lift heavy containers of water periodically and to transport the water from the place where it was acquired to the place where it will be used. Accordingly, there have been some attempts to provide water generating devices to alleviate these problems.

U.S. Pat. No. 1,931,347 to Gay issued Oct. 17, 1933, prepares potable water from a supply of water which is first frozen, to remove impurities. It does not treat water without first freezing it.

U.S. Pat. No. 2,409,624 to Granville issued Oct. 22, 1946, is a complicated system for providing water. It is manually powered and uses the "sulfuric acid system".

U.S. Pat. No. 3,035,418 to Wright issued May 22, 1962, provides water from air, but is lacking in many of the features needed to produce potable water for modern day uses. There is no safety provision allowing only properly operable filters to be used, and no provision to allow water production only when certain temperature/humidity conditions can be met.

U.S. Pat. No. 3,575,009 to Kooney issued Apr. 13, 1971, provides water vapor condensing means for use with a laundry clothes dryer. It uses ice as coolant and uses a filtering material designed to remove only lint from the resulting condensed water. The condensed water vapor is claimed to be suitable for use in steam irons or for any "other" purpose requiring water. There are no provisions for obtaining water of any confident purity level from the ambient air. Also, it has no air filter, has only a coarse water filter, no operational controls except the manually supplied ice filled chill unit, and it can only work during the time that a clothes dryer is operating.

U.S. Pat. No. 3,675,442 to Swanson issued Jul. 11, 1972, discloses an apparatus for recovering potable water from "humid" air. It is thus not designed to operate at varying humidity levels, and fresh water is used as a coolant with water pumps. It has no air or water filters and no refined controls. It diverts condensed water vapor to the cool water bath as needed, and only the overflow is channeled to another container and is called potable. Swanson does not use a fan or blower to move air through his unit.

U S. Pat. No. 4,182,132 to Nasser et al. issued Jan. 8, 1980, is designed to operate in hot and humid regions only; its primary purpose is to cool and dehumidify ambient air in relatively large areas such as a city neighborhood. There is no provision for protecting the purity

2

of the water. It must be taller than the tallest building in the area, requires a foundation recessed in the ground, cannot be in any enclosing structure and must be in an open area free of ground contours, needs at least two air passages, and a heat dissipator in a passageway separate from the passageway containing the air cooler and moisture condenser. It relies on the specific gravity of cold air sinking within the device and hot air rising within the device. It has no air or water filters to protect the water.

U.S. Pat. No. 4,255,937 to Erlich issued Mar. 17, 1981, provides no operational controls for humidity, temperature, or filter conditions. The device also does not use a blower or fan.

U.S. Pat. No. 4,433,552 to Smith issued Feb. 28, 1984, does not mention potable water, has no air or water filters, requires a turbine, a generator, and wind. It has to be large (for example, it may be mounted on a trailer), it cannot be used indoors, there is no provision for protection of the water quality, and no filters for keeping insects, dust, etc. out of the water.

U.S. Pat. No. 4,892,570 to Littrell issued Jan. 9, 1990, is for agricultural water, and it only operates outdoors, is very large, designed for only high temperature regions, requires a wind of at least 5 mph to operate, is made of stone and cinder blocks, and has no refined controls or filters.

### SUMMARY OF THE INVENTION

The present invention provides a potable water generator designed to produce potable water using existing technologies and known devices in a unique combination that safely extracts potable water from the ambient air in a safe range of user definable temperature and humidity conditions.

This invention provides a fine functional air filter to remove impurities from the air, safely, because the potable water generator can be arranged to assure that only fresh and properly functioning air filters are used. User neglect or abuse can be avoided, thereby contributing to safe, pure water. This unit can be made to not work with a malfunctioning or inefficient air filter.

This invention provides a fine functional water filter to remove impurities, odors, and objectionable taste, as well as other contaminants, safely. The generator may be programmed with a time or flow meter to remind, or force the user to use only fresh and properly functioning water filters and that the water filter is replaced on a regular, timely basis. Each time a water filter is replaced, the optional timer or flow meter may be automatically reset to zero. User neglect or abuse is avoidable, thereby further contributing to safe, pure water. This unit can be designed to not work with a water filter exceeding the time or flow meter limits.

Concerning the air filters, these are replaced or cleaned when needed based upon a sensed pressure drop, such as with a pressure differential indicator. When the pressure drop reaches a predetermined amount, the generator can be made to cease operation until the air filter is replaced or cleaned to assure that only fresh and properly functioning, energy efficient, air filters are used and replaced or cleaned on a regular, timely basis. User neglect or abuse is avoided, thereby further contributing to safe, pure water. This unit can be designed to not work with an air filter exceeding the pressure differential limits. A sensor can be included to assure that an air filter, in fact, is in place.

5,203,989

3

The frames of either or both filters may contain a cooperating female sensor, which cooperates with a male pin on an electric switch that deactivates the operation of the entire unit or just the condensing function. When either filter is removed for required replacement or cleaning this original cooperating female sensor can be destroyed and/or made irreparable. Then only new, or cleaned, and safe filters having such sensing structure could be used.

A time or flow meter for the water filter and a pressure sensing device for the air filter, as applicable, can be programmed to deactivate the entire unit or just the condensing function until the filter or filters required to be replaced or cleaned are in fact replaced or cleaned. A sensing device can be added to confirm that the appropriate replacement filter or filters have been properly reinstalled and enable the generator to operate once again. The time span or water volume, hence the filter life, can be determined by the particular model, its intended use and location—such as residential, industrial, commercial, construction, marine, recreational, military, and the like.

Safety and water purity is further enhanced by exposing the condensed water vapor to ultraviolet light on at least one occasion before this water is available to the user. On each single occasion over 99.99% of all bacteria, virus, and algae exposed to this ultraviolet light will be killed. The first exposure to ultraviolet light can be accomplished as close to the newly condensed water vapor as possible—either in the initial catch basin or drip pan, or in plumbing to, or inside a sump-pump temporary holding reservoir. A second exposure to ultraviolet light can be accomplished after the water filter and before the condensed water vapor exits the device into the removable water container or exterior storage devices as chosen by the user. This second exposure to ultraviolet light will also kill at least 99.99% of all algae, virus, or bacteria that may have reached this point. A double exposure to ultraviolet light can be done with two individual ultraviolet lights or by plumbing the water past one ultraviolet light twice.

A pump is used to enable the passage of the water through a fine water filter and to aid in transporting the water to subsequent locations within the device and/or to exterior storage units.

For those users sensitive to, or conscientious of, energy consumption, the generator can include temperature and humidity gauges and/or a thermostat and humidistat. These devices could be used as follows:

The temperature and humidity gauges would aid the experienced user, as well as the novice in conjunction with an optional quick reference chart provided with the unit, in determining whether or not they want to operate the unit under present conditions for the likely water yield at that time.

A thermostat and humidistat setting as determined by the user, would allow unattended operation and preclude the need for any user monitoring whatsoever. The user could choose settings that provide only maximum water yield for energy consumed, or those settings that produce water regardless of energy consumed, or the user could choose one of the infinite settings between these two extremes.

It is expected that needs and priorities within an individual's environment are not static and that the flexibility afforded by these items would maximize the functionality and efficiency of the generator.

4

A custom designed reusable water condensate container could also be an integral safety feature of the generator. It is conceivable that human nature or dire need may prompt the reuse of any container not designed for such purpose and may therefore be unsanitary and even dangerous. All containers in all models of the generator may be designed to allow easy and proper cleaning by internal access through a wide neck. In addition, all larger containers may have an optional spigot. Those containers without spigots will transport more safely than those having spigots. Preferably, there is an ultraviolet light at the point the water enters the container to prevent organisms from entering the system through the exit point.

Other objects, features, and advantages will be apparent from the following detailed description of preferred embodiments taken in conjunction with the accompanying drawings in which:

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a schematic front view of the invention;

FIG. 2 is an isometric view of the device with parts broken away for clarity;

FIG. 3 is a plan view of a cooperating female sensor which can be integrated into the filter frames to confirm that the proper filter is in place, and allow only one-time use when the filter is not intended to be reusable.

FIG. 4 is a front view of the cooperating female sensor illustrated in FIG. 3;

FIG. 5 is a chart of temperature and humidity on a scale which includes the approximate time and cost of producing a gallon of water using an arbitrary electrical cost of 10¢ per KWH; and

FIG. 6 is a block diagram of an electronics/sensing/control system for the device of this invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The basic device 10 as shown in FIG. 1 is enclosed in a cabinet 12 which houses the entire apparatus except for certain ductwork on some models which needs to be external of the device as explained below. The cabinet 12 has an insect screen 13, a side door 14 which is hinged at 16 and has a handle 18 with which this door can be opened to provide access to the inside of the device including the water filter element, air filter, UV lights, and the water container and/or temporary reservoir as well as all other serviceable parts.

There are two settable, optional, switches 22 and 24 which are a thermostat 22 to measure the temperature and open or close when a predetermined temperature is attained, and a humidistat 24 to measure the humidity and open or close when a predetermined humidity is attained. Complementing the switches there are two optional gauges 26 and 28 which are temperature and humidity gauges, respectively, for user-preferred manual on/off operations, and which are an aid to determine the immediate water yields in conjunction with an optional simplified quick reference chart supplied with this device. (A more complex chart is shown in FIG. 5.) Switch 25 is the master ON/OFF switch that allows optional settable switches 22 and 24 to automatically activate or deactivate the basic device 10. Switch 27, if used, is a manual switch, and would override the conditional settings of optional switches 22 and 24.

More details of the device are visible in FIG. 2, in which portions of the cabinet 12 walls have been broken away for clarity. The cabinet 12 has a side wall 30, a

5,203,989

5

rear wall 32, and front wall 34. An inlet duct 36 and an outlet duct 38 are provided to direct ambient air through the device by means of the ductwork inside the cabinet. This ductwork can be located through an outside wall in some models. In addition to the model illustrated herein, which can vary in size, there can also be countertop models which fit into the kitchen cabinetry and which may have side venting arrangements. Still more variations can be constructed to fit recreational vehicles, mobile homes, and boats of all sizes as well as military and disaster relief applications. There is a fan or blower 40 which assists in bringing ambient air into the device. The air first passes through an air filter element 42 and then through the evaporator coils 44 of condenser coils 46, aided by compressor 47 to cool the air sufficiently to remove water vapor by condensation.

The water condensate falls onto a collection pan 49 which immediately diverts this water into tube or piping 51 which empties into a temporary holding reservoir 53, which contains an ultraviolet light 55 to kill 99.99% of any existing microorganisms. This UV light could also be positioned in a coiled or extended arrangement of piping 51. This temporary holding reservoir 53 could be positioned to replace the collection pan 49. When the water level in reservoir 53 reaches a specific level, pump 57 will force this water through tubing or piping 59, continuing through water filter 50, piping 59, and past a second ultraviolet light 61. This second ultraviolet light will kill 99.99% of any surviving microorganisms that may have reached this point. The machine could be made to shut down if either light failed to operate properly. It is also possible with a different piping arrangement to pass the water by ultraviolet light 55 a second time, thereby eliminating the need for two individual ultraviolet lights. The water will continue travelling from ultraviolet light 61 into piping arrangement 63 which may include a diverting valve 65 to direct the water into either the removable internal container 48, or through common fitting 67 which would be used to connect to other exterior containers or tanks. A final ultraviolet light 71 may be positioned as close as possible to the final exiting point(s) of the water to act as a sterile outlet in order to avoid the introduction of microorganisms into the unit's system at this point. The removable container 48 can be designed to be reusable, safely, by having a wide neck opening for easy cleaning. It can also have an optional spigot 69. There is also a liquid level sensor device 52 that is positioned inside the container and below the top, for shutting the machine down when the container 48 is full, to prevent overflowing.

A light 54 (FIG. 1) could turn on or flash whenever the water filter is in need of being changed. There could be another light 56 (FIG. 1) which would turn on whenever the air filter is in need of being changed or cleaned. A third light 23 (FIG. 1) could indicate that the internal, removable reservoir is full, and a fourth light 109 (FIG. 1) could indicate if one of the ultraviolet light(s) is out. A fifth and sixth light could be added to individually indicate non-functioning status of a second and third ultraviolet light, if applicable and so desired. Each indicator light could, individually, be programmed to deactivate the entire unit, or just the water condensing function as it may be preferred to allow continued operation of other functions. A separate time or flow meter 58 may be set to deactivate the unit until the non-reusable water filter is replaced after a predetermined number of hours of operation or water volume passage. A second sepa-

6

rate sensor device 62 may be used which deactivates the unit until the non-reusable air filter is replaced or a reusable air filter is cleaned after a predetermined pressure drop from one side of the air filter to the other, and which increases with time. Thus, the air filter, for example, can be arranged with a device 62 for measuring the air pressure both upstream and downstream of the air filter and when the differential reaches a predetermined point, the device will indicate the need for cleaning or shut down until the air filter is replaced or cleaned. This is based upon the air flow downstream decreasing as the filter becomes more filled with filtered material, causing the machine to become less efficient. Device 62 thereby prevents needless waste of energy. A light sensor, or lighting drive voltage or current sensor 107, and similar sensors for lights 61 and 71, in conjunction with an indicator such as part 109, FIG. 1, could sense and indicate when a light has burned out, and may be enabled to automatically stop the unit from operating as a safety measure.

As shown in FIG. 3 in plan view, the air or water filter 42 or 50 is held in a frame or housing. Each frame may have a one-time use cooperating female sensor 64 built into it. This sensor may be modified by eliminating trap door 74/76 and compression spring 78 to allow repeated use of a reusable, cleanable air filter. It will continue to sense that the proper, reusable air filter is in place. This female sensor 64 is positioned in a special place within the air filter frame or water filter housing 61, which in turn is held in position by guiding channels 66. The female sensor 64 is provided with a basic chassis 68 having a back wall 70, and a retaining wall 72 spaced slightly therefrom and providing sufficient space for holding a "trap door" arrangement including two pieces 74 and 76 weakly connected together along line 80 (FIG. 4), and located in the space between the back wall 70 and the retaining wall 72. The trap door 74, 76 is biased downwardly by compression spring 78.

The female sensor 64 has a stop block 82 on the wall opposite the one containing the trap door opening 86. There is a frame 84 on the generator which slidably holds a switch activating pin 88 which is biased toward the filter by compression spring 92. There is an electrical switch contact 90 which is closed when the off/on/off travel of pin 88 is in a certain location within the switch frame 84 held in precise horizontal position by spring 92 holding it against stop block 82. The trap door has a lower part 74 which breaks or bends away when pin 88 is inserted into chassis 68 through opening 86, and an upper part 76 which is held in its original position by pin 88 until the filter with attached female sensor 64 is removed. Then, compression spring 78 forces part 76 down and holds it there, sealing opening 86, preventing further use of this filter. The primary intent, then, of this female sensor 64 would be to prevent the user from reusing an expended water filter or air filter once it is removed from the machine and/or to confirm that the proper reusable air filter is in place. Device 62 (FIG. 2) senses when the air filter becomes inefficient and may shut the machine off until only a new or cleaned air filter is reinstalled. Device 58 (FIG. 2) determines by a specific time period or water flow volume when the water filter should be removed and replaced with a new water filter, and may be enabled to prevent further operation of the machine or just its condensing function, until this is done. Because female sensor 64 can prevent the reuse of either expended filter it would

5,203,989

7

thereby assure only safe and energy efficient use of this machine.

In some cases it may be desirable to have an air filter that can be cleaned and reused. In these instances a different air filter, such as an electrostatic filter, intended for repeated use can be used and female sensor 64 would lack compression spring 78 and trap door 74/76. Stop block 82 would then work in conjunction with opening 86 and pin 88 to confirm that only the proper air filter is in place. Energy conservation would still be monitored by device 62.

FIG. 4 shows the one-time use cooperating female sensor from the front (less wall 70 for clarity). The sensor basic chassis 68 is shown, as is the compressed spring 78. There may be a nipple 96 or other guiding parts which would hold the spring 78 when it is uncompressed in position during assembly, and the nipple is attached to the chassis. There is another longer nipple 98 attached to part 76 at the bottom end of the spring 78 which holds this spring while it is being compressed by the insertion of the trap door. There is a top piece 95 (shown in FIG. 4 as a side view) which permanently seals the entire chassis. The final assembly piece 95 of the entire device, is shown partially inserted. There is a retaining plate 93 which is also part of assembly piece 95 and aids in holding the upper part of the trap door in position while open or closed, including spring 78. The interior of the trap door is "chiselled" or weakened at point 80 to create a breaking or bending point. The bottom end of the trap door may have a modified corner 91 to allow insertion of the trap door while compressing the spring 78 from an angled starting position.

When the filter is entered into its correct position the pin or male sensor 88 which projects out of its slotted frame 84 engages the trap door through an opening 86 in the rear wall 70. The unit will only operate when pin 88 is in its precise, but only partially extended, off/on/-off travel position as precisely determined by block 82. Also, upon pressing of the filter into place, the trap door bends or breaks and the shorter part 74 falls away or bends clear of pin 88's continued travel to stop block 82 and upper part 76 slides down due to pressure from compression spring 78 and remains resting upon the top of the pin 88. When it is time to remove the filter, it is removed and the compression spring 78 forces part 76 downward until it reaches the bottom, and it thereafter remains in this position. It is impossible to place this same filter into this same location because the outwardly extending pin 88 will not go beyond wall 70, as it will be blocked by the trap door upper part 76. Thus, the filter cannot be reused. When the filter is first placed into position, the pin 88 breaks the trap door, and the lower part of it, which is at first in a vertical position as shown in dashed lines, moves into and through the solid line position of the part and it then falls down or bends clear of pin 88 where it thereafter remains.

All the aforementioned features, if utilized, can be monitored by an optional programmed computer chip 73, and in addition to illuminating the appropriate indicator light, can, on an individual basis, deactivate the entire unit, or just the condensing function, until the respective malfunction is appropriately rectified. This would make the entire failsafe as it would be partially or totally deactivated if any one of the following optional or necessary features occurred: 1) the air filter became dirty, 2) the air filter was not properly in place, 3) the water filter's predetermined life had expired, 4) the water filter was not replaced and installed in correct

8

position, 5) one, or more, of the ultraviolet lights failed, 6) the final water reservoir tank was full.

FIG. 5 provides a chart showing various ambient conditions and has added thereto the approximate number of minutes to produce one gallon of water at the temperature and relative humidity conditions indicated for a specific coil temperature and rate of air flow. Also, the approximate cost of energy to make a gallon of water is calculated at an assumed cost of 10¢/KWH. (The current national average is 8¢/kwh). Thus, if the humidistat was set for 80% relative humidity, which is the curve designated A in FIG. 5, and the thermostat was set for 87° F. (which is the vertical dashed line designated B), the device would produce a gallon of water in 4.8 minutes and at a cost of less than 13.5¢/gallon as shown on line C at point D in FIG. 5. A second example in FIG. 5 shows vertical line E indicating a thermostat setting at 75° F. and curved line F indicating a humidistat relative humidity setting of 50%, which results in the production of a gallon of water in approximately 12 minutes as designated on line H at point J at an approximate cost of 34¢ per gallon. The settings of the humidistat and thermostat assure that the device will operate only when the ambient air meets or exceeds the conditions set, and at a cost and time period acceptable to the user.

FIG. 6 details electronics/sensing/control system 103 for the potable air-water generator of this invention. Microcomputer chip 73 monitors each of the sensors in the device that indicate a fault with the device and in response can be programmed to shut down the entire device or compressor 47 so that water is not generated during a fault condition. Alternatively, the fault could merely be signalled to warn the operator that the system is operating in a compromised condition. Power on/off switch 25 powers the entire system 103. Thermostat 22 and humidistat 24, which may be overridden by manual override switch 27, operate as described above. Air filter 42 is monitored by pressure sensor 62 that monitors the pressure drop across the filter for indicating when the filter is dirty and, when a predetermined pressure drop is reached, for lighting fault indicator light 56 and notifying microcomputer 73 of the fault so that the appropriate action can be taken. Likewise, air filter sensor 43 (such as switch 90, FIG. 3) for sensing when the air filter is properly in place indicates a fault by lighting light 56 and notifying microcomputer 73. In a similar fashion, time/water flow meter 58 monitors the operation of water filter 50 to light fault indicator light 54 and notify microcomputer 73 when the device has been in operation for a predetermined period of time and/or a predetermined volume of water has flowed through the filter 50. Water filter sensor 51 (such as switch 90, FIG. 3) senses when the water filter is in place, and indicates by lighting indicator light 54 and notifying microcomputer 73 when a clean filter is not in place. In a similar fashion, light or voltage sensor 107 monitors the operation of ultraviolet light 55 and, when the light goes out, lights fault indicator light 109 and notifies microcomputer 73 so that the appropriate action can be taken. Preferably, when the air filter is dirty, the water filter has been used for the predetermined amount of time or for a predetermined water flow, and any one of the ultraviolet lights is not lit, microcomputer 73 is enabled to turn off compressor 47 but may leave the rest of the system running so that the system will not produce water when in less than satisfactory

5,203,989

9

operating condition to provide only clean, pure water at a reasonable cost.

Although specific features of the invention are shown in some drawings and not others, this is for convenience only as each feature may be combined with any or all of the other features in accordance with the invention.

Other embodiments will occur to those skilled in the art and are within the following claims:

What is claimed is:

1. A water generating device for obtaining potable water from ambient air, comprising:

means for bringing a supply of inside or outside ambient air to the device and for returning the air back outside the device after it has been processed;

air filtering means for filtering the air;

condenser means for extracting water vapor from the filtered air;

first ultraviolet light means for killing microorganisms in the extracted water;

a temporary holding reservoir for holding the freshly extracted water;

pump means for moving the water from the temporary holding reservoir to a subsequent location within the device, or to a subsequent location exterior to the device;

water filter means downstream of said pump means for filtering the water; and

outlet means for allowing filtered water to exit the device.

2. The water generating device of claim 1, further including means for sensing the pressure differential across the air filter.

3. The water generating device of claim 2 further including means, responsive to said means for sensing, for deactivating said condenser means after a predetermined pressure differential is reached.

4. The water generating device of claim 2 further including means, responsive to said means for sensing, for signalling when a predetermined pressure differential is reached.

5. The water generating device of claim 1, further including means for determining time of use of said device.

6. The water generating device of claim 5 further including means, responsive to said means for determining, for deactivating at least said condenser means after a predetermined time of use.

7. The water generating device of claim 5 further including means, responsive to said means for determining, for signalling when a predetermined number of hours of operation has been reached.

8. The water generating device of claim 1 further including means for determining the extracted water flow volume.

9. The water generating device of claim 8 further including means, responsive to said means for determining, for deactivating at least said condenser means after a predetermined water volume has been sensed.

10. The water generating device of claim 8 further including means, responsive to said means for determining, for signalling when a predetermined water volume has been sensed.

11. The water generating device of claim 1 further including means for exposing the water to ultraviolet light a second time downstream of said water filter means to kill additional microorganisms.

10

12. The water generating device of claim 11 in which said means for exposing includes a second ultraviolet light.

13. The water generating device of claim 11 in which said means for exposing includes means for running the pumped water past said ultraviolet light means.

14. The water generating device of claim 11 in which said means for exposing includes an ultraviolet light proximate the outlet means for preventing microorganisms from entering the device through the outlet means.

15. The water generating device of claim 11 in which said means for exposing includes a second exposure to said ultraviolet light means.

16. The water generating device of claim 1 in which said air filtering means includes a reusable filter.

17. The water generating device of claim 16 in which said air filter is an electrostatic filter.

18. The water generating device of claim 1 further including means for monitoring said ultraviolet light means for determining when said ultraviolet light means is not activated.

19. The water generating device of claim 18 further including means, responsive to said means for monitoring, for signalling when said ultraviolet light is not activated.

20. The water generating device of claim 18 further including means, responsive to said means for monitoring, for deactivating the device when said ultraviolet light is not activated.

21. The water generating device of claim 1 further including thermostat means and humidistat means which are settable in conjunction with each other by a user to minimize energy consumption and maximize water yield.

22. The water generating device of claim 1 further including a thermometer and humidity indicator for manual use of the device.

23. The water generating device of claim 1 further including means for permitting use of the water filter only one time so that the water filter is not reusable after removal.

24. The water generating device of claim 1 further including means for sensing when said air filtering means is not properly in place in said device.

25. The water generating device of claim 24 further including means, responsive to said means for sensing, for indicating when said air filtering means is not properly in place.

26. The water generating device of claim 24 further including means, responsive to said means for sensing, for deactivating at least said condenser means when said air filtering means is not properly in place.

27. The water generating device of claim 1 further including means for sensing when said water filter means is not properly in place in said device.

28. The water generating device of claim 27 further including means, responsive to said means for sensing, for indicating when said water filter means is not properly in place.

29. The water generating device of claim 27 further including means, responsive to said means for sensing for deactivating at least said condenser means when said water filter means is not properly in place.

30. The water generating device of claim 1 further including means for deactivating at least said condenser means when said air filtering means is not in place or is dirty, said ultraviolet light means is not on, or said water filter means is not in place or has been used for a prede-

5,203,989

11

termined time or to filter a predetermined volume of water.

**31.** A water generating device for obtaining potable water from ambient air inside a structure or dwelling or ambient air outside a structure or dwelling, comprising:

air passage means for bringing a supply of inside or outside ambient air to the device and for returning the air back outside the device after it has been processed;

reusable, electrostatic air filter means for filtering the air prior to processing of the air;

means for sensing and indicating when said air filter is dirty or not properly in place;

condenser means for extracting water vapor in the filtered air;

blower means inside the air passage means to move air from outside the device through the air filter and the condenser means and for returning the air

12

back outside the device after it has traversed the condenser means;

first ultraviolet light exposure means for killing microorganisms in the extracted water vapor;

temporary holding reservoir means for containing said extracted water vapor;

pump means to move the water from the temporary holding reservoir to a subsequent location within or outside of the device;

single-use water filter means downstream of said pump means for filtering the water, said water filter means including a cooperating sensor which renders the water filter non-reusable in the device once removed;

second ultraviolet light exposure means to act as a sterile outlet preventing microorganisms from migrating backwards into the system; and

means for measuring the pressure differential across the air filter for indicating when a predetermined pressure drop across the filter is reached.

* * * * *

**EXHIBIT D**

US005366705A

## United States Patent [19]

**Reidy**

[11] Patent Number: **5,366,705**

[45] Date of Patent: **Nov. 22, 1994**

[54] **GRAVITY FEED ULTRAVIOLET LIQUID STERILIZATION SYSTEM**

[75] Inventor: **James J. Reidy**, 1260 Main St., Holden, Mass. 01520-1020

[73] Assignee: **James J. Reidy**, Holden, Mass.

[21] Appl. No.: **73,948**

[22] Filed: **Jun. 8, 1993**

[51] Int. Cl.⁵ ............................................... **A61L 2/10**

[52] U.S. Cl. ............................ **422/243**; 422/186.3; 422/405; 422/24; 250/434; 250/437; 210/243; 210/748

[58] Field of Search ............... 422/22, 24, 243, 186.3, 422/905; 250/432 R, 434, 437, 438; 210/192, 143, 748

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,193,143 | 8/1916 | Helnronner et al. | 250/437 |
| 2,167,233 | 7/1939 | Dorcas | 250/434 |
| 3,433,946 | 3/1969 | Hardwick | 250/372 |
| 3,485,576 | 12/1969 | McRae et al. | 422/24 |
| 3,562,520 | 2/1971 | Hippen | 250/372 |
| 3,750,370 | 8/1973 | Brauss et al. | 96/140 |
| 3,837,800 | 9/1974 | Wood | 422/24 |
| 3,923,663 | 12/1975 | Reid | 210/251 |
| 3,971,947 | 7/1976 | Lambert et al. | 422/24 |
| 4,017,735 | 4/1977 | Siegel | 422/24 |
| 4,273,660 | 6/1981 | Beitzel | 422/24 |
| 4,274,970 | 6/1981 | Beitzel | 422/24 |
| 4,367,410 | 1/1983 | Wood | 422/24 |
| 4,400,270 | 8/1983 | Hillman | 422/24 |
| 4,467,206 | 8/1984 | Taylor et al. | 422/24 |
| 4,615,799 | 10/1986 | Mortensen | 422/24 |
| 4,757,205 | 7/1988 | Latel et al. | 422/24 |
| 4,757,921 | 7/1988 | Snowball | 422/24 |
| 4,762,613 | 8/1988 | Snowball | 422/24 |
| 4,767,932 | 8/1988 | Ellner | 422/24 |
| 4,769,131 | 9/1988 | Noll et al. | 210/85 |
| 4,798,702 | 1/1989 | Tucker | 210/748 |
| 4,857,204 | 8/1989 | Joklik | 210/695 |
| 4,909,931 | 3/1990 | Bibi | 210/85 |
| 4,968,437 | 11/1990 | Noll et al. | 210/748 |
| 4,968,891 | 11/1990 | Shawar et al. | 250/438 |
| 4,971,687 | 11/1990 | Anderson | 210/85 |
| 5,006,244 | 4/1991 | Maarschalkerwerrd | 210/243 |
| 5,026,477 | 6/1991 | Yen | 210/169 |
| 5,037,618 | 8/1991 | Hager | 422/186.03 |
| 5,069,782 | 12/1991 | Moyher, Jr. et al. | 210/192 |
| 5,078,876 | 1/1992 | Whittier et al. | 210/315 |
| 5,151,252 | 9/1992 | Moss | 422/186.3 |

Primary Examiner—Robert J. Warden
Assistant Examiner—T. A. Trembley
Attorney, Agent, or Firm—Brian M. Dingman

[57]        **ABSTRACT**

An ultraviolet liquid sterilization system including an ultraviolet light source. Provision is made for gravity feeding a liquid to be sterilized past the ultraviolet light source to expose the liquid immediately to the light to sterilize the liquid without the need for a pump, or pressure.

**8 Claims, 3 Drawing Sheets**



EXHIBIT
Reidy
6
6-25-07 ev



FIG. 1

**U.S. Patent**     Nov. 22, 1994     Sheet 2 of 3     **5,366,705**





FIG. 2





FIG. 3

5,366,705

1

# GRAVITY FEED ULTRAVIOLET LIQUID STERILIZATION SYSTEM

## FIELD OF INVENTION

This invention relates to an ultraviolet liquid sterilization system that gravity-feeds a liquid past an ultraviolet light source so that the device can operate without a pump upstream of the sterilization system.

## BACKGROUND OF INVENTION

It is well known that ultraviolet light in the proper dose kills most bacteria, algae, viruses, mold spores, and other microorganisms found in liquids such as water. There have been many ultraviolet water sterilization systems proposed to take advantage of this phenomenon. U.S. Pat. Nos. 4,769,131 and 4,968,437 issued to Noll et al. disclose an ultraviolet purification system in which water is pumped through tubes helically coiled around an ultraviolet lamp to provide maximum ultraviolet exposure time for a given tube length to create a relatively compact sterilization system for potable water.

This system as well as other known systems suffer from a number of drawbacks which make them less than ideal solutions to the water purification problem.

On problems common to these systems is that the liquid must be pumped under pressure past the ultraviolet lamp both before and after filtration. This requires a relatively large pump that draws a relatively great amount of power. In addition, such systems are typically designed to treat tap water, and are incapable of taking water from another source such as collecting water dripping off a condensing coil of a dehumidification or air conditioning system.

## SUMMARY OF INVENTION

It is therefore an object of this invention to provide an ultraviolet liquid sterilization system that allows liquid to be gravity fed by the ultraviolet light source.

It is a further object of this invention to provide such a system that uses less power than other such systems.

It is a further object of this invention to provide such a system that is extremely compact.

It is a further object of this invention to provide such a system that can efficiently sterilize small amounts of water.

This invention results from the realization that sterilization of potable water and other liquids may be accomplished by providing an ultraviolet light source and gravity feeding the liquid to be sterilized past the ultraviolet light source to sterilize the liquid before it reaches any pump required in the liquid distribution system.

This invention features an ultraviolet liquid sterilization system which includes an ultraviolet light source and means for gravity feeding a liquid to be sterilized past the ultraviolet light source to expose the liquid to the light to sterilize the liquid.

In one embodiment, the means for gravity feeding the liquid may include a tube which preferably follows a sinuous path to increase the liquid light exposure time. The path preferably includes at least one elongated almost horizontal section to slow liquid flow and thereby further increase the liquid light exposure time. The tube inlet and outlet are preferably both in a direct light path to the ultraviolet light source to create a sterile liquid entrance and exit, respectively.

2

The system may further include means for passing the liquid by the ultraviolet light source a second time, in one embodiment downstream of a filter and/or other treatment means. The system may further include an enclosure housing the ultraviolet light source and the tube. In that case, there may further be included one or more partitions in the enclosure for supporting tile tube and the ultraviolet light source. In one embodiment there are a plurality of spaced partitions each having a hole for passing the ultraviolet light source and the tube. The enclosure top may be a drip pan or a collection pan for catching water and funneling it into the tube.

In an alternative embodiment, the means for gravity feeding the liquid may include a series of chambers that are in fluid communication. The chambers may be formed in an enclosure by baffle plates creating a series of adjacent chambers. In that case, the baffle plates may include openings arranged toward opposite edges of adjacent plates to create a tortuous liquid flow path. The enclosure may include a second series of chambers for feeding the liquid past the ultraviolet light source a second time. This second series of chambers may be formed as well by baffle plates creating a series of adjacent chambers in which the baffle plates include openings arranged toward opposite edges of adjacent plates to create a tortuous liquid flow path. The inside of the enclosure may be coated with a UV reflective or protective coating. The chamber may include a sterile liquid inlet and outlet directly exposed to the ultraviolet light.

There may further be included a pump for transferring liquid from a chamber, and a liquid filter or treatment system downstream of the pump. The baffle plates may include a central opening for accepting the ultraviolet light source.

In a more specific embodiment, the ultraviolet liquid sterilization system includes an ultraviolet lamp, a tube having an inlet exposed to light from the lamp and bent along a sinuous path along a side of the lamp, in which the path includes an elongated almost horizontal section to slow liquid flow and thereby further increase the liquid light exposure time. Further included in this embodiment is an enclosure for housing the lamp and the tube in which the enclosure includes a series of partitions having openings for supporting the lamp and the tube. Finally, this embodiment includes a sloped enclosure top for collecting liquid and directing it to an opening communicating with the tube inlet for directing liquid into the tube past the ultraviolet lamp.

In another alternative embodiment, the ultraviolet liquid sterilization system of this invention includes an ultraviolet lamp, an enclosure for housing the lamp, a series of space baffle plates in the enclosure dividing the enclosure into a series of adjacent chambers, the baffle plates each including a central opening for supporting the lamp passing therethrough. Further included is an opening at the enclosure top for allowing liquid to enter the first in a series of chambers, an opening through the lower side of the baffle plate adjacent the first chamber to pass liquid to the second chamber, and an opening through the upper side of the baffle plate adjacent the second chamber to pass the liquid out of the second chamber, the baffle plates and openings creating a tortuous liquid flow path past the lamp to increase the liquid light exposure time for greater sterility.

5,366,705

| 3 | 4 |

## BRIEF DESCRIPTION OF THE DRAWINGS

Other objects, features and advantages will occur to those skilled in the art from the following description of preferred embodiments and the accompanying drawings in which:

FIG. 1 is an axonometric, partly cross sectional view of an ultraviolet liquid sterilization system of this invention;

FIG. 2 is a front view of the partitions of the system of FIG. 1 detailing the location of the holes for the location for accomplishing the liquid feed of the system of FIG. 1; and

FIG. 3 is a partly cross sectional axonometric view of an alternative to the system of FIG. 1.

## DISCLOSURE OF PREFERRED EMBODIMENTS

This invention may be accomplished in an ultraviolet liquid sterilization system that includes an ultraviolet light source such as an ultraviolet lamp along with various means for gravity feeding a liquid such as water to be sterilized past the ultraviolet light source in a first exposure just after collection in order to immediately sterilize the liquid. The system may further include an optional second pass past the ultraviolet light source downstream of a filter to further ensure that the water exiting the unit is both clean and sterile.

There is shown in Fig. 1 an embodiment 10 of the ultraviolet liquid sterilization system of this invention. System 10 includes enclosure 12 housing ultraviolet lamp 28 that has projecting from enclosure 12 electrical lamp connection means 30 as is known in the art. System 10 includes means for gravity feeding a liquid to be sterilized past ultraviolet lamp 28 to expose the liquid to the light to sterilize the liquid. This is accomplished with tube 17 that has inlet 18 at central opening 16 in sloped top 14 of enclosure 12 that acts as a drip tray to collect water thereon and focus it into tube 17. This arrangement allows system 10 to be used to collect and sterilize water dripping from a source such as the evaporator coil of a dehumidifier or an air conditioning unit, for example, so that the water collected may be cleaned and sterilized to make potable water from the air.

Tube 17 includes first substantially vertical leg or run 20 that passes through enclosure partitions 34 and 36 as is shown in more detail in FIG. 2. Nearly horizontal leg or run 22 of tube 17 provides a long and slow water flow path to increase the residence time so that the water has sufficient ultraviolet light exposure to kill the organisms therein. Such light exposure levels are well known in the art and can be calculated in advance depending on the qualities of the inlet water to provide the means of determining the length of lamp 28 and tube 17, particularly run 22, to provide sufficient exposure. Run 22 passes through partitions 34 and 32 and ends in more vertical outlet run 24 that exits enclosure 12 at exit point 26 through the bottom of enclosure 12. Preferably, both inlet 18 and outlet 26 of tube 17 from enclosure 12 are directly exposed to the light from lamp 28 to provide both a sterile inlet and outlet that prevents live organisms from entering the system from the outside.

FIG. 2 details tile arrangement of the holes in partitions 32, 34 and 36, FIG. 1, including the holes that support a second tube for providing a second pass past ultraviolet lamp 28 downstream of the first pass. This second-pass arrangement is typically used when there is a filter(s) included in the system to remove particulates

and organics, for example, as is known in the art. Since tile filter requires pressure, in those embodiments with the filter there may be a pump just downstream of outlet 26 to pressurize the water to force it through the filter. In that case, a smaller diameter tube, not shown in Fig. 1 for clarity purposes only, is run through enclosure 12 in a sinuous path that can be more tortuous than the sinuous path of tube 17 because the water is not gravity fed on the second pass. The second pass insures the sterilization of liquid exiting the filtration or treatment system in case there are bacteria or other organisms in the pump, plumbing, and/or filter.

Tube 17 is preferably, but not necessarily, a $\frac{1}{2}''$ diameter convoluted teflon tube that is transmissive to ultraviolet light but can withstand ultraviolet light for long periods of time unlike many other types of UV transmissive plastics. The tubing is preferably convoluted so that it may be bent along the sinuous path shown in FIG. 1. Larger size tubing helps prevent air locks in the tube so that tile liquid can successfully trickle down through the tube past the ultraviolet lamp and be sterilized. On the other hand, the outlet tube may be a smaller diameter non-corrugated teflon tube that is bent to have a number of lengths of tubing parallel to lamp 28 such as shown in FIG. 10 of U.S. Pat. No. 4,479,131. This water flow arrangement may be accomplished, for example, in the embodiment of FIGS. 1 and 2 by including $\frac{1}{2}''$ holes 40 through 45 for allowing $\frac{1}{2}''$ tube 17 to pass therethrough for support of the tube. $\frac{3}{4}''$ holes 46 through 48 in the center of the partitions are included to support lamp 28. $\frac{1}{4}''$, or smaller, holes 50 through 58 provide support for the $\frac{1}{4}''$, or smaller, outlet side tube that, as can be seen from the pattern of holes, makes multiple passes by the ultraviolet lamp.

An alternative embodiment 80, FIG. 3, does not include such teflon tubing, and also may include the ability to accept and sterilize gravity feed water in two passes past the ultraviolet lamp, one before and one after the filter. Embodiment 80 includes enclosure 82 that may or may not have top 84 that, in the same manner as the embodiment of FIG. 1, includes a sloped top leading to opening 86 that acts as the entrance point of water into the sterilization system. As before, opening 86 is exposed to the ultraviolet light to maintain a sterile opening. In this case, enclosure 82 is a rectangular liquid-tight box having a number of partitions/baffle plates 90 through 98 therein that are each sealed to the sides and bottom of enclosure 82 to form a number of adjacent liquid-tight chambers. Partitions 90 through 98, as will become apparent below, are arranged so that they become a series of baffle plates for creating a tortuous liquid flow path past the lamp to increase the liquid light exposure time for greater sterility.

Because enclosure 82 becomes virtually filled with liquid, the ultraviolet lamp must be protected from liquid exposure with water tight quartz housing 88 that passes centrally through each of the baffle plates and is able to accept an ultraviolet lamp, not shown in the drawing. The liquid entering tile enclosure through opening 86 enters the first chamber created between baffle plates 90 and 94. Hole 100 at or near the bottom edge of plate 90 puts this chamber in fluid communication with the second in the series of chambers formed between plates 90 and 91. Plate 91 has hole 101 at or near top edge so that the liquid entering through entrance 86 must fill up both of these first two chambers before it flows out into the third chamber between plates 91 and 92. Once these first two chambers are

5,366,705

| 5 | 6 |

filled, any more liquid entering must slowly flow down through the first chamber, through hole 100, and then up through the second chamber and out through hole 101 to create a long liquid residence time that also moves the liquid directly past the ultraviolet light source to ensure sterilization. There is a similar arrangement in the third and fourth chambers formed between plates 91 and 92, and 92 and 93, respectively, to further increase residence time. The final chamber in this first pass is formed between baffle plate 93 and the end wall of enclosure 82. Pump 108 may be placed in this chamber, or outside of the chamber, and accepts water through outlet 109 and pumps it out through tube 110 either to additional filtration or treatment or to storage or to an outlet, as desired depending on the application. Pump 108 may be a float operated or liquid sensing pump so that it operates only when liquid is available to be pumped.

This arrangement allows the use of other materials that can be formed into enclosure 82 and baffle plates 90 through 93 for creating the tortuous liquid flow path. The insides of enclosure 82 may be made UV reflective using proper materials or coatings to increase the ultraviolet treatment of the liquid therein and to protect enclosure 82 if its material is otherwise susceptible to ultraviolet exposure.

System 80 also illustrates a second pass past the ultraviolet lamp using the same type of baffled water flow arrangement illustrated in conjunction with the first pass. The second pass is accomplished with a number of chambers formed between plates 94 and 98 and the end wall 99 of enclosure 82 to create multiple liquid flow chambers in which the liquid flows first through inlet hole 112 and then holes 114, 116, 118, 120 and outlet 122 that is exposed directly to the lamp to create a sterile outlet from the system.

In one embodiment, system 80 includes a box approximately 3¼″ on a side and about 16″ long to accept a 14″ ultraviolet lamp. System 80 may vary in the number of chambers as may be required or desired.

Although specific features of tile invention are shown in some drawings and not others, this is for convenience only as some feature may be combined with any or all of the other features in accordance with the invention. For example, other gravity fed flow arrangements are contemplated within tile scope of this invention.

Other embodiments will occur to those skilled in tile art and are within the following claims:

What is claimed is:

1. An ultraviolet liquid sterilization system, comprising:

a liquid tight enclosure having a bottom, top, and plurality of sides there between, said top being sloped inward towards and opening to drain liquid into said liquid-tight enclosure

a series of spaced baffle plates in said liquid tight enclosure dividing said liquid tight enclosure into a first series of adjacent, liquid tight chambers, said series of spaced baffle plates each including an opening;

an ultraviolet lamp supported within the baffle plate openings;

an opening through the lower side of said baffle plate adjacent a first liquid chamber of said first series of adjacent, liquid tight chambers to allow the first liquid tight chamber and a second chambers liquid tight chamber to fill, and to pass liquid from the first liquid tight chamber to the second chamber tight chambers, and

an opening through the upper side of said baffle plate adjacent the second liquid tight chamber to pass liquid out of the second liquid tight chamber, said series of spaced baffle plates and openings creating a tortuous liquid flow path past said ultraviolet lamp to increase the liquid's light exposure time for greater sterility.

2. The ultraviolet liquid sterilization system of claim 1 further including a pump in the last, liquid tight chamber of adjacent, liquid tight the first series of chambers for pumping liquid from the last, liquid tight chamber.

3. The ultraviolet liquid sterilization system of claim 2 further including a liquid filter fluidly connected downstream of said pump.

4. The ultraviolet liquid sterilization system of claim 3 in which said liquid tight enclosure includes a second series of adjacent, liquid tight chambers for feeding the liquid past said ultraviolet lamp a second time.

5. The ultraviolet liquid sterilization system of claim 4 in which said second series of adjacent, liquid tight chambers is formed by baffle plates, said baffle plates including openings arranged toward opposite edges of adjacent plates to create a tortuous liquid flow path past the ultraviolet lamp.

6. The ultraviolet liquid sterilization system of claim 5 further including means for directing liquid from said liquid filter to said second series of adjacent, liquid tight chambers.

7. The ultraviolet liquid sterilization system of claim 1 in which inside surfaces of said liquid tight enclosure have an ultraviolet reflective coating.

8. The ultraviolet liquid sterilization system of claim 1 in which inside surfaces of said liquid tight enclosure have an ultraviolet protective coating.

* * * * *

**EXHIBIT E**

 USPTO Assignments on the Web

**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title
**_NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff._**

**Total Assignments: 4**
**Patent #:** 5106512    **Issue Dt:** 04/21/1992    **Application #:** 07745932    **Filing Dt:** 08/16/1991
**Inventor:** JAMES J. REIDY
**Title:** PORTABLE AIR-WATER GENERATOR

**Assignment: 1**
**Reel/Frame:** 007470/0325    **Recorded:** 05/05/1995    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.    **Exec Dt:** 04/20/1995
**Assignee:** REIDY JANICE BETHANNE
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** LAW OFFICES OF BRIAN M. DINGMAN, P.C.
40 SPEEN STREET
FRAMINGHAM, MA 01701

**Assignment: 2**
**Reel/Frame:** 009279/0303    **Recorded:** 06/29/1998    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JANICE BETHANNE    **Exec Dt:** 06/11/1998
**Assignee:** J.J. REIDY & CO., INC.
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** NIELDS, LEMACK & DINGMAN
BRIAN M. DINGMAN
176 EAST MAIN STREET, SUITE 8
WESTBOROUGH, MA 01581

**Assignment: 3**
**Reel/Frame:** 014384/0523    **Recorded:** 08/18/2003    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.    **Exec Dt:** 08/12/2003
**Assignee:** J.J. REIDY AND COMPANY, INC
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** MIRICK, O'CONNELL, DEMALLIE ET AL
BRIAN M. DINGMAN, ESQ.
1700 WEST PARK DRIVE
WESTBOROUGH, MA 01581

**Assignment: 4**
**Reel/Frame:** 019069/0646    **Recorded:** 03/27/2007    **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** J.J. REIDY & CO., INC.    **Exec Dt:** 03/24/2007
**Assignee:** FREEWATER COMPANY, INC.
525 REACTOR WAY
RENO, NEVADA 89502
**Correspondent:** BRADLEY P. HEISLER

HEISLER & ASSOCIATES
3017 DOUGLAS BVD., SUITE 300
ROSEVILLE, CA 95661

Search Results as of: 07/12/2007 02:17 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

**EXHIBIT F**

USPTO Assignments on the Web
Case 4:05-cv-40049-FDS    Document 107-3    Filed 07/18/2007    Page 27 of 41
Page 1 of 2



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

**NOTE: Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 4**

**Patent #:** 5149446      **Issue Dt:** 09/22/1992      **Application #:** 07648541      **Filing Dt:** 01/30/1991
**Inventor:** JAMES J. REIDY
**Title:** POTABLE WATER GENERATOR

**Assignment: 1**
**Reel/Frame:** 007470/0041      **Recorded:** 05/05/1995      **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.                          **Exec Dt:** 04/20/1995
**Assignee:** REIDY, JANICE BETHANNE
                    1260 MAIN STREET
                    HOLDEN, MASSACHUSETTS 01520
**Correspondent:** BRIAN M. DINGMAN
                    LAW OFFICES OF BRIAN M. DINGMAN, P.C.
                    40 SPEEN STREET
                    FRAMINGHAM, MA 01701

**Assignment: 2**
**Reel/Frame:** 009279/0298      **Recorded:** 06/29/1998      **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JANICE BETHANNE                    **Exec Dt:** 06/11/1998
**Assignee:** J.J. REIDY & CO., INC.
                    1260 MAIN STREET
                    HOLDEN, MASSACHUSETTS 01520
**Correspondent:** NIELDS, LEMACK & DINGMAN
                    BRIAN M. DINGMAN
                    176 EAST MAIN STREET, SUITE 8
                    WESTBOROUGH, MA 01581

**Assignment: 3**
**Reel/Frame:** 014384/0523      **Recorded:** 08/18/2003      **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.                          **Exec Dt:** 08/12/2003
**Assignee:** J.J. REIDY AND COMPANY, INC
                    1260 MAIN STREET
                    HOLDEN, MASSACHUSETTS 01520
**Correspondent:** MIRICK, O'CONNELL, DEMALLIE ET AL
                    BRIAN M. DINGMAN, ESQ.
                    1700 WEST PARK DRIVE
                    WESTBOROUGH, MA 01581

**Assignment: 4**
**Reel/Frame:** 019069/0646      **Recorded:** 03/27/2007      **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** J.J. REIDY & CO., INC.                    **Exec Dt:** 03/24/2007
**Assignee:** FREEWATER COMPANY, INC.
                    525 REACTOR WAY
                    RENO, NEVADA 89502

**Correspondent:**   BRADLEY P. HEISLER
HEISLER & ASSOCIATES
3017 DOUGLAS BVD., SUITE 300
ROSEVILLE, CA 95661

Search Results as of: 07/12/2007 02:16 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=5149446&pub=    7/12/2007

**EXHIBIT G**

USPTO Assignments on the Web

 

**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title
**NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 4**
**Patent #:** 5203989    **Issue Dt:** 04/20/1993    **Application #:** 07828190    **Filing Dt:** 01/30/1992
**Inventor:** JAMES J. REIDY
**Title:** POTABLE AIR-WATER GENERATOR

## Assignment: 1
**Reel/Frame:** 007470/0327    **Recorded:** 05/05/1995    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.    **Exec Dt:** 04/20/1995
**Assignee:** REIDY, JANICE BETHANNE
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** BRIAN M. DINGMAN
LAW OFFICES OF BRAN M. DINGMAN, P.C.
40 SPEEN STREET
FRAMINGHAM, MA 01701

## Assignment: 2
**Reel/Frame:** 009279/0296    **Recorded:** 06/29/1998    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JANICE BETHANNE    **Exec Dt:** 06/11/1998
**Assignee:** J.J. REIDY & CO., INC.
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** NIELDS, LEMACK & DINGMAN
BRIAN M. DINGMAN
176 EAST MAIN STREET
SUITE 8
WESTBOROUGH, MA 01581

## Assignment: 3
**Reel/Frame:** 014384/0523    **Recorded:** 08/18/2003    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.    **Exec Dt:** 08/12/2003
**Assignee:** J.J. REIDY AND COMPANY, INC
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** MIRICK, O'CONNELL, DEMALLIE ET AL
BRIAN M. DINGMAN, ESQ.
1700 WEST PARK DRIVE
WESTBOROUGH, MA 01581

## Assignment: 4
**Reel/Frame:** 019069/0646    **Recorded:** 03/27/2007    **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** J.J. REIDY & CO., INC.    **Exec Dt:** 03/24/2007
**Assignee:** FREEWATER COMPANY, INC.
525 REACTOR WAY

RENO, NEVADA 89502

**Correspondent:** BRADLEY P. HEISLER
HEISLER & ASSOCIATES
3017 DOUGLAS BVD., SUITE 300
ROSEVILLE, CA 95661

Search Results as of: 07/12/2007 02:16 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT H

 USPTO Assignments on the Web

## United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



**Assignments on the Web > Patent Query**

# Patent Assignment Abstract of Title

**NOTE: Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 6**

**Patent #:** 5366705    **Issue Dt:** 11/22/1994    **Application #:** 08073948    **Filing Dt:** 06/08/1993
**Inventor:** JAMES J. REIDY
**Title:** GRAVITY FEED ULTRAVIOLET LIQUID STERILIZATION SYSTEM

## Assignment: 1

**Reel/Frame:** 007470/0336    **Recorded:** 05/05/1995    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** REIDY, JAMES J.    **Exec Dt:** 04/20/1995
**Assignee:** JANICE BETHANNE REIDY
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520
**Correspondent:** BRIAN M. DINGMAN
LAW OFFICES OF BRIAN M. DINGMAN, P.C.
40 SPEEN STREET
FRAMINGHAM, MA 01701

## Assignment: 2

**Reel/Frame:** 009342/0379    **Recorded:** 05/20/1998    **Pages:** 252
**Conveyance:** SECURITY AGREEMENT
**Assignors:** EVENFLO & SPALDING HOLDINGS CORPORATION    **Exec Dt:** 03/30/1998
SPALDING & EVENFLO COMPANIES, INC.    **Exec Dt:** 03/30/1998
EVENFLO COMPANY, INC.    **Exec Dt:** 03/30/1998
ETONIC WORLDWIDE CORPORATION    **Exec Dt:** 03/30/1998
LISCO, INC.    **Exec Dt:** 03/30/1998
S&E FINANCE CO., INC.    **Exec Dt:** 03/30/1998
SPALDING SPORTS CENTERS, INC.    **Exec Dt:** 03/30/1998
ETONIC LISCO, INC.    **Exec Dt:** 03/30/1998
LISCO FURNITURE, INC.    **Exec Dt:** 03/30/1998
LISCO FEEDING, INC.    **Exec Dt:** 03/30/1998
LISCO SPORTS, INC.    **Exec Dt:** 03/30/1998
**Assignee:** BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION AS ADMINISTRATIVE AGENT
1455 MARKET STREET, 12TH FLOOR
SAN FRANCISCO, CALIFORNIA 94103
**Correspondent:** MAYER, BROWN & PLATT
NORA A. WHITESCARVER
2000 PENNSYLVANIA AVE., N.W.
SUITE 3900
WASHINGTON, D.C. 20006

## Assignment: 3

**Reel/Frame:** 009227/0574    **Recorded:** 05/22/1998    **Pages:** 253
**Conveyance:** SECURITY INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignors:** EVENFLO & SPALDING HOLDINGS CORPORATION    **Exec Dt:** 03/31/1998
SPALDING & EVENFLO COMPANIES, INC.    **Exec Dt:** 03/31/1998
EVENFLO COMPANY, INC.    **Exec Dt:** 03/31/1998

ETONIC WORLDWIDE CORPORATION                          Exec Dt: 03/31/1998

LISCO, INC.                                           Exec Dt: 03/31/1998

S&E FINANCE CO., INC.                                 Exec Dt: 03/31/1998

SPALDING SPORTS CENTERS, INC.                         Exec Dt: 03/31/1998

ETONIC LISCO, INC.                                    Exec Dt: 03/31/1998

LISCO FURNITURE, INC.                                 Exec Dt: 03/31/1998

LISCO FEEDING, INC.                                   Exec Dt: 03/31/1998

LISCO SPORTS, INC.                                    Exec Dt: 03/31/1998

**Assignee:** BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION, AS ADMINISTRATIVE AGENT
1455 MARKET STREET, 12TH FLOOR
SAN FRANCISCO, CALIFORNIA 94103

**Correspondent:** MAYER, BROWN & PLATT
NORA A. WHITESCARVER
2000 PENNSYLVANIA AVE., N.W.
SUITE 3900
WASHINGTON, DC 20006

## Assignment: 4

**Reel/Frame:** 009267/0940          **Recorded:** 06/29/1998          **Pages:** 2

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** REIDY, JANICE BETHANNE                  **Exec Dt:** 06/11/1998

**Assignee:** J.J. REIDY & CO., INC.
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520

**Correspondent:** NIELDS, LEMACK & DINGMAN
BRIAN M. DINGMAN
176 EAST MAIN STREET
SUITE 8
WESTBOROUGH, MA 01581

## Assignment: 5

**Reel/Frame:** 014384/0523          **Recorded:** 08/18/2003          **Pages:** 2

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** REIDY, JAMES J.                         **Exec Dt:** 08/12/2003

**Assignee:** J.J. REIDY AND COMPANY, INC
1260 MAIN STREET
HOLDEN, MASSACHUSETTS 01520

**Correspondent:** MIRICK, O'CONNELL, DEMALLIE ET AL
BRIAN M. DINGMAN, ESQ.
1700 WEST PARK DRIVE
WESTBOROUGH, MA 01581

## Assignment: 6

**Reel/Frame:** 019069/0646          **Recorded:** 03/27/2007          **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** J.J. REIDY & CO., INC.                  **Exec Dt:** 03/24/2007

**Assignee:** FREEWATER COMPANY, INC.
525 REACTOR WAY
RENO, NEVADA 89502

**Correspondent:** BRADLEY P. HEISLER
HEISLER & ASSOCIATES
3017 DOUGLAS BVD., SUITE 300
ROSEVILLE, CA 95661

Search Results as of: 07/12/2007 02:14 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=5366705&pub=          7/12/2007

**EXHIBIT I**

# ORIGINAL

PAGES 1 - 122

EXHS. 1 - 6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * *

J.J. Reidy & Co., Inc.                    *

v.                                        *     Civil Action

AirWater Corporation and                  *     No. 05-40049-FDS

AirWater Patents Corporation              *

* * * * * * * * * * * * * * * *

AirWater Patents, Inc.                    *

v.                                        *     Civil Action

J.J. Reidy & Co., Inc.                    *     No. 06-10137-FDS

* * * * * * * * * * * * * * * *


Deposition of James J. Reidy
June 25 and 26, 2007
Bowditch & Dewey, LLP
311 Main Street - 4th Floor
Worcester, Massachusetts 01608


----------    *J. Edward Varallo, RMR, CRR*   ----------
*Registered Professional Reporter*
*EPPLEY COURT REPORTING, LLC*
*P.O. Box 382, Hopedale, Massachusetts 01747*
*508.478.9795 ~ Fax 508.478.0595*
*leppley@msn.com*

*James J. Reidy*                                         60

1      A.    Well, I mean, I told Michael -- I don't

2   know -- dozens and dozens of times that the machine

3   he was building was not my machine and the machine

4   he was building was inherently flawed.  I mean, you

5   must have a dozen, you must have two dozen e-mails

6   regarding that.

7      Q.    So you're saying that AirWater was

8   building machines that were not based on your

9   patents?

10     A.    Clearly.

11     Q.    Do you know what the basis of the machines

12  -- Strike the question.  Let me start that again.

13           Do you know what AirWater was basing its

14  machines on?

15     A.    I could only guess what they were basing

16  it on.  I mean, I have an opinion, but what good is

17  my opinion?

18     Q.    Well, are you guessing?  Would you be

19  guessing if you told me what your opinion was?

20     A.    Well, I'd be guessing if I told you the

21  premise of what they were building the machine on.

22  I don't know what the premise was that they were

23  building their machine on, but I wouldn't be

24  guessing on what the machine ultimately would do and

*James J. Reidy*                              91

1    A.    Right.

2    Q.    What is your understanding of what rights

3    this agreement is giving to AirWater?

4    A.    I am giving AirWater the four existing

5    patents and any patents to issue, foreign or

6    domestic, on any continuation or division thereof

7    and any new patents, foreign or domestic, granted to

8    licensor.  At that time I had I don't know how many

9    international -- Well, let me put it another way.

10   I think, as best I can recall, that at that time I

11   had a PCT application that gave me the right to file

12   a patent in any of the 123 member countries.

13   Q.    Can you elaborate on that for me?  What is

14   a PCT application?

15   A.    It's a patent cooperation treaty that 123

16   countries recognize.  It gives you the sole right

17   for a year to apply for a patent in any one of those

18   member countries.

19   Q.    And when did you file that application?

20   A.    I don't recall.  I don't remember because

21   patents are my business.  I filed so many in so many

22   countries for so many things, I couldn't possibly

23   keep track of it.

24   Q.    Have you provided all of your patent

James J. Reidy                    92

1    applications to your counsel?

2        A.    Negative.

3        Q.    With regard to the PCT application, does

4    that relate to foreign registration of the four U.S.

5    patents which are the subject of this agreement?

6        A.    Once a patent is issued you cannot ever

7    get a patent elsewhere.

8        Q.    Is it your testimony you cannot have a

9    U.S. patent registered in a foreign country?

10       A.    Absolutely not.

11       Q.    No, it's not your testimony or no, you

12   cannot do so?

13       A.    You cannot do so.

14       Q.    So what were your PCT applications related

15   to?  Or your PCT application, what is that related

16   to?

17       A.    They related to new patents, continuation

18   or division thereof.  Just exactly what it says

19   here.  This is why it was called a global license,

20   because the intent at the moment this thing was

21   signed was that we would have patents all over the

22   world wherever we wanted them.

23       Q.    At the moment this document was signed?

24       A.    That's right.

*James J. Reidy*                                    93

1      Q.      And did you have patents all over the

2   world wherever you wanted them?

3      A.      I had the PCT application.  I might -- I

4   had the PCT application.  And I don't remember

5   when -- I may have -- Right now I have at least

6   three patents pending in at least 23 countries.

7      Q.      So that I understand, is it your testimony

8   that at the time you entered into this agreement it

9   was the intent and agreement of the parties that the

10  patents would exist all over the world wherever you

11  wanted them?

12     A.      Wherever I or Mr. Zwebner wanted them.

13     Q.      And is it also your testimony that at the

14  time you entered into this contract, you in fact did

15  not have patents all over the world wherever you

16  wanted them?

17     A.      I never claimed I did.  Show me where I

18  ever claimed I had a foreign patent.

19     Q.      We'll get to that.

20             With regard to the four United States

21  patents referred to on the first page, were the

22  inventions that are the subject of those patents

23  patented anywhere else in the world?

24     A.      No.

*James J. Reidy*                                    100

1    *A.*    Yes.

2    *Q.*    And the patents were issued in your name?

3    *A.*    Yes.  I believe so.  Again, it's either me

4    or my company, but I think it's me.

5    *Q.*    Do you have any recollection of ever

6    assigning any of these patents --

7    *A.*    Yes.

8    *Q.*    -- to J.J. Reidy & Company?

9    *A.*    Oh, I'm sorry.  I don't recall.

10    *Q.*    If you had ever assigned any of the four

11    patents to J.J. Reidy & Company, you would have a

12    record of that.  Correct?

13    *A.*    No.  Patent Office would, I think.

14    *Q.*    You wouldn't have a record of your own?

15    *A.*    No.  It's just an electronic notification

16    to the Patent Office.  There's no -- I've never seen

17    any response.  I don't recall ever seeing a

18    response, unless my patent attorney, Brian Dingman,

19    got responses.  I don't know.

20    *Q.*    Do you have any recollection of ever

21    filing something with the United States Patent and

22    Trademark Office reflecting an assignment of any of

23    the patents that we've been talking about from you

24    personally to J.J. Reidy & Company?

# EXHIBIT J

# GLOBAL
# MANUFACTURING AND MARKETING
# LICENSING AGREEMENT



This Agreement is made and entered this __21ˢᵀ day__ of March 2003 by and between;

__J.J. Reidy & Co., Inc.,__ a Massachusetts Corporation whose principal address is 1260 Main Street, Holden Massachusetts 01520-1020, hereinafter referred to as "LICENSOR" and;

__AirWater Corporation__, a Florida Corporation, whose principal address is suite 6K, Lincoln Road, Miami Beach Florida 33139, hereinafter referred to as "LICENSEE".

## WITNESSETH

WHEREAS, LICENSOR represent and warrants that it has the entire right, title, and interest in and to United States Patents numbered 5,106,512, 5,149,446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and any patents to issue, foreign or domestic on any continuation or division thereof and any new patents, foreign or domestic, granted to LICENSOR relating to the Water Production/Generations System (hereinafter collectively referred to as "LICENSED PATENTS"), and generally known as the WATERSTAR systems, and that LICENSOR has the absolute and undisputed rights to grant the licenses under the LICENSED PATENTS as specified hereinafter; and,

WHEREAS LICENSEE represents that it is a US Corporation formed and registered in the State of Florida, and so licensed to do business, and,

WHEREAS LICENSEE is a wholly owned subsidiary of Universal Communications Systems Inc, a publicly traded company trading on the NASD OTC BB under the symbol "UCSY", and,

WHEREAS LICENSEE has indicated to LICENSOR of its interest in both manufacturing and marketing the WATERSTAR systems and technologies, on a world wide basis, and,





1  JR

**WHEREAS LICENSEE** is desirous of obtaining a global right and license to manufacture, assemble, use and sell Water Production/Generation System products, and component parts therefore, falling under the scope of any LICENSED PATENT (hereinafter referred to as "LICENSED PROPERTY"); and

**WHEREAS LICENSOR** is willing to grant such right and license to LICENSEE under the conditions hereinafter set forth;

**NOW THEREFORE**, in consideration of mutual covenants, promises and undertakings contained herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby reciprocally acknowledged, the undersigned parties agree as follows.

# TERMS OF AGREEMENT

## GRANT OF LICENSE:

LICENSOR hereby grants to LICENSEE, for the term of this AGREEMENT, as a right and license to use and sell LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS, according to the provisions set forth hereinafter with the full right and privilege to alter, change and / or modify the contents and peripheral materials associated with LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY

RIGHTS with the conditions set forth herein, and the right to sublicense sale and distributions of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS according to the provisions and the conditions set forth hereinafter.

## TERM OF LICENSE:

The term of this Agreement shall commence upon the date of execution of this agreement and shall remain binding and continue for a period of not less than 10 years, and / or for the life of the last expiring LICENSED PATENT, whichever comes last, unless terminated sooner as provided herein.

2  JR

## OWNERSHIP OF LICENSED PROPERTY:

This license agreement is not a sale or lease of LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS from LICENSOR and the full title, rights and interests shall remain in the name of LICENSOR unless otherwise expressed herein and upon written mutual consent of both parties.

## PURPOSE

The purpose of LICENSEE will be, but is not limited to, the manufacture, sale and distribution of Water Production Generation Systems, and being of the invention of the LICENSOR, or derived or evolved there from, which system(s) is/are designed to produced potable water from the air.

## THE TERRITTORY

LICENSEE agrees that this Global Marketing and License Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions.

## VALIDITY

LICENSOR grants to LICENSEE this LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS for a period not less than 10 years, and / or the life of the last expiring patent, whichever comes last, and in any event agrees that it will not sell, allocate, transfer or sublicense to any third party without the expressed written permission of the LICENSOR.

## PAYMENT AND CONSIDERATION

LICENSEE further agrees to deliver 2 payments to LICENSOR's designated individuals a Global Marketing and Licensing Fee in the amount totaling $100,000 on or before July 1st 2003, (one payment due July 1st 2003, the second payment payable on August 1st 2003) plus four (4) million shares of UCSY to be delivered to the LICENSOR, (or his designees) within 21 days from the date of the execution of this Agreement.



3   JR

These 4 million UCSY shares shall be issued as 144 shares, which in line with SEC regulations are restricted from sale for a period of not less than one year, unless subjected to a registration with the SEC and such registration is approved. These shares will be included in any company filing / registration, which the company undertakes to effect in not more than 180 days from the date of execution of this agreement.

## ROYALTY PAYMENTS

LICENSEE further agrees to pay a royalty fee on all sales of manufactured models in the amount of five per cent (5%) of all gross sales less any applicable taxes, for any machines and or components sold in the amounts not exceeding $10,000 each. For all other sales of units and or components, the Royalty Fee shall be seven percent (7%).

LICENSOR shall receive royalties on the quarterly gross sales of LICENSEE, and any of its sub LICENSEES. The royalties shall be computed based on the sales price, less returns, discounts, sales and use taxes, transportation costs, shipping expenses, excise taxes, and other such amounts.

This royalty levied on gross sales shall be paid for all sales made on a Quarterly basis.

The payment will be remitted to the LICENSOR on or before the 30th day following the closing of the quarterly period.

LICENSEE will provide LICENSOR on a quarterly basis a full accounting of units shipped, units billed, and a receivables aging, until that time both parties agree to waive this requirement.

The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:

Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales during that fiscal quarter.



4   JR

## MINIMUM MONTHLY ROYALTY PAYMENTS:

LICENSEE is to pay to LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above whichever is the more.

LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

## LATE PAYMENT OF ROYALTIES:

LICENSOR may elect, to accept late payment fees from LICENSEE of two percent (2.0%) of any gross amount due LICENSOR should any payment due not be made within 15 (fifteen) days of its due date. Such election by LICENSOR does not constitute a waiver by LICENSOR of any other or subsequent breach of this Agreement.

## MANUFACTURING BY LICENSEE & THIRD PARTIES

LICENSOR further acknowledges that LICENSEE intends to offer to manufacture the said units and models in other countries around the world, and LICENSOR hereby confirms that the LICENSEE is granted the absolute right to so offer 3rd parties the sub-rights at all times adhering to the terms and conditions of this agreement.

## SUBLICENSE CONTRACTS

LICENSEE shall have the right to sublicense the LICENSED PROPERTY to any and all third parties it deems creditable and trustworthy to distribute and or market and or sell the LICENSED PROPERTY within the geographical limits as shall be agreed.

Both parties agree that the definition of Sublicense shall mean, "The right granted by the Licensee to any third party to manufacture, market and or distribute the LICENSED PROPERTY pursuant to the provisions and conditions provided herein, and as shall be amended to accommodate the particular situation.



5   JR

LICENSEE retains the rights to charge and retain, and or waive, finance and or to accept partial payments (down payments) for any and all sublicense fees, as shall be the case on a case-by-case basis.

LICENSEE shall provide and deliver sublicense contracts to LICENSOR as a matter of record.

LICENSEE agrees that all sublicenses and related contracts are to encompass and embrace the parameters of this Agreement, and shall be created so as not to be in violation of any of the provisions contained herein, in part or in whole.

## SUBLICENSE PROPERTY

All sublicenses shall be considered proprietary and confidential and shall remain the property of the LICENSEE and/or the introducing party.

## PRODUCT ENDORSEMENT

LICENSEE may seek endorsements, including celebrity endorsements that LICENSEE deems qualified to represent LICENSED PROPERTY, and such endorsements obtained by LICENSEE shall remain the property of LICENSEE. LICENSOR agrees to acknowledge by letter the right of LICENSEE to use the prior or future endorsements at the discretion of LICENSEE in an appropriate manner of marketing with the consent of the endorser.

## LICENSEE OBJECTIVE AND GLOBAL MARKETING

LICENSEE's overall objective is to establish and maintain the awareness and the exposure of LICENSED PROPERTY to enhance sales and future growth.

LICENSEE will maintain the image and integrity of LICENSED PROPERTY for duration of this License Agreement. No marketing campaign shall be undertaken which fails to project good moral and ethical values. This specifically includes companies, which fail to reflect the highest of moral standards.



6   JR

LICENSEE hereby commits the resources and puts forth best efforts in accomplishing, completing, and fulfillment of the promises contained herein.

LICENSEE shall have the right to create commercial production (radio, television, print) and other means in which to fulfill License Agreement.

LICENSE may create a long-term public relations strategy in which to achieve awareness \ sales, and growth.

## PRODUCT NAME AND LOGO's

LICENSEE retains the right to change the LICENSED PRODUCTS's name without the expressed written consent of LICENSOR.

## DESIGN PACKAGING,

LICENSEE shall hereby have the right to alter, change, add and or remove any item, color, format or material in any existing design packaging with the expressed written consent hereby granted by LICENSOR.

## COPYRIGHT USAGE

LICENSOR hereby grants the right to LICENSEE the use of any and all, in part or in whole, copyright materials as they currently relate to the LICENSED PROPERTY.

## TRADEMARK REGISTRATION – US. / FOREIGN

LICENSEE shall make application and pay filing fees in registering changes to trademark and or trade names, registrations, and service marks when and where applicable.

## GRANT OF TRADEMARK USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trademarks as they currently relate to the LICENSED PROPERTY under the conditions contained herein.



7 - JR

## GRANT OF TRADE NAME USAGE LICENSE

LICENSOR shall grant the exclusive license to LICENSEE, to use any and all trade names, symbols, or logo's associated with LICENSED PROPERTY as they currently relate, under the conditions contained herein.

## TRADEMARK QUALITY CONTROL

LICENSOR has the right to approve LICENSED PROPERTY sold bearing the trademark licensed herein for conformance with LICENSOR's quality standard.

Before implementing changes in the goods sold under the trademark, LICENSEE shall provide LICENSOR a specimen of the proposed changes.

LICENSOR shall have 2 weeks in which to pass comment, denying or approving the said changes within reason. If LICENSOR does not object within the said 2 weeks, the said changes are deemed approved.

## PRODUCT AND MATERIAL ADDITIONS

LICENSEE shall have the right to make any additions to the LICENSED PROPERTY without the expressed written consent of the LICENSOR for market appeal and or added value. Any such added materials shall remain the property of the LICENSEE at all times, subject to continuing payment of royalties.

## ASSEMBLY

LICENSEE has the right to assemble and or have assembled LICENSED PROPERTY where and whenever applicable.

## UNIVERSAL PRODUCT CODE

LICENSOR shall provide LICENSEE any existing UPC codes for the LICENSED PROPERTY.



8   JR

## LICENSE PARAMETER

LICENSOR agrees and confirms that this exclusive Agreement is not limited to any county, state or country worldwide.

## MAINTENANCE OF PATENT(s)

LICENSOR hereby agrees and confirms that the above referenced patents are all valid, in good standing and that he has disclosed all pertinent and relevant information relative to the patents, and further confirms that he will maintain the validity and good standing of the patents.

## PRODUCT LIABILITY INSURANCE

LICENSEE shall during the entire term of this agreement, maintain an adequate Insurance Policy, to commence upon the first commercial production and sales of product, such product liability insurance to cover LICENSED PROPERTY sold by LICENSEE or any of its sub licensees, and J.J. Reidy & Co Inc., shall be named "additional insured" thereon with respect to any claims made against LICENSOR as a result of LICENSEE's or any of its sub licensee's sales of LICENSED PROPERTY.

LICENSEE agrees to provide a copy of such insurance policy within 30 days of execution of its marketing opening dates of sales. LICENSEE shall also indemnify and hold harmless J.J. Reidy & Co Inc, its employees, directors, officers, shareholders as to any claims, lawsuits, threatened litigation or judgments rendered, relating to the LICENSED PROPERTY sold by the LICENSEE and /or any of its sub licensees.

## TRADE SECRETS

Both parties acknowledge and agree that the other party possesses trade secrets that are proprietary property, and constitute a valuable trade secret. Both parties agree not to disclose and or make available to third parties the information that shall include, but be limited to, this Agreement and any other Agreement that may be entered into between the parties, without the expressed written consent of the other party.



9   JR

## FOREIGN PATENT AND TRADEMARK AND REGISTRATIONS

If at the LICENSEES request the LICENSOR shall make application for foreign trademark and or trade name registration, then the LICENSEE shall pay all fees necessary.

LICENSEE, when applicable shall retain the full rights, title, and interest in any and all trademark(s) and trade name(s) registration in foreign countries as long as this license Agreement is in force.

LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSOR, at his own expense.

## RECORDS AND INSPECTION

LICENSEE shall reduce all sublicenses granted herein written Agreements and copies will be provided to LICENSOR.

## TRANSFER OF CUSTODY, KNOW HOW AND TECHNICAL ASSISTANCE

LICENSOR agrees to provide all information in its possession to assist LICENSEE to distribute and sell LICENSED PROPERTY. LICENSOR shall transfer to the care and custody of LICENSEE within 30 days from the execution of this Agreement, all information requested by LICENSEE in its possession pertaining to the LICENSED PROPERTY, and all information material and pertaining to the sales thereof, and consisting of, for example, but not limited to:

All design Data, films, disks, camera work, negatives, layouts, registration mark copy for production and reprint, logos, type fonts, etc.

Process Specifications-All details, processes, steps and procedures concerning, but not limited to care of product, storage, the do's and don'ts, print specifications, packaging specifications, etc.



10  JR

Commercial Operation Data-volume discounts, minimum order levels, maximum order levels, turn-around production time, shipping costs and requirements, etc.

Endorsement Grant-granting the permission to LICENSEE the use of any and all previous or future endorsements with the permission of the endorser.

LICENSOR shall also make available in timely fashion, all future improvements relating to the LICENSED PROPERTY, including change, and modifications and specifications, methods and materials, during the term of this Agreement.

## TERMINATION OR REVOCATION OF LICENSE

This Agreement and the rights and licenses granted herein shall wholly cease and terminate prior to the termination of the license as described hereinabove upon the occurrence of any of the following events.

Any material breach by either party of the terms of this Agreement, provided the non-breaching party in the one seeking the termination and gives the other party written notice on intention to terminate, which shall state the fault or breach upon which the party relies. The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time; or

If the LICENSOR does not receive the Licensing fee at the time of the joint approval and signing of this agreement or any other subsequent payment due LICENSOR that is not paid within 5 business days within its due date.

This agreement shall terminate upon the insolvency and/or criminal conviction of either party unless other agreed to in writing.

Upon termination, LICENSOR shall have the first right of refusal to purchase Licensee's inventory for cost payable within 30 days of written offer.

The written offer must be accepted within 30 days of being made. In no event shall LICENSEE sell existing inventory after a period of 12 months following the termination notice.



11   -JR

The mutual consent of the parties expressed in writing.

This agreement will terminate with notice, if LICENSEE does not make any required payments to LICENSOR as specified within the stated and agreed time periods.

The LICENSOR agrees to grant to the LICENSEE a 14 day period of notice / grace in which the LICENSEE can make good on any outstanding amount.

## EFFECT OF TERMINATION OR REVOCATION

The termination of this agreement shall not release LICENSEE from the obligation to pay LICENSOR any accrued sums owed to LICENSOR or from fulfilling any other accrued obligation. Additionally such termination shall be without prejudice to any right or remedy, which either party may have or believes it has against the other party.

The termination of this agreement as a result of the provisions and conditions provided herein, and/or the breach thereof, or an uncontrolled act of G-d, government, laws, etc., which prohibit the fulfillment of this Agreement shall not bind the LICENSEE to fulfill any projected sales figures.

In no case shall LICENSEE have any claims for repayment or offset of any sum or sums, which shall have been paid, as required under the terms of this agreement

Upon termination, each party will retain proprietary property(s) and the complete rights title, and interest of any and all proprietary property, information and material introduced.

Upon termination and revocation of License Agreement, each party will properly return, in a timely fashion and all proprietary property to the owner, in the same manner and condition received in relation to paragraph above.

Upon termination and revocation of License Agreement. LICENSOR has the right to purchase from LICENSEE any items not considered LICENSED PROPERTY, such as, but not limited to, changes in the LICENSED PROPERTY name, trade mark or trade name, universal product codes,



12    JR

marketing materials changes, alterations, and/or modifications duly registered etc., at a fair market price.

## DURATION/TERM/MAINTANENCE OF EXCLUSIVITY

The License granted herein exclusive to a geographical territory as defined above and shall remain exclusive unless terminated in accordance with the terms of this agreement.

LICENSEE agrees to put forth its best efforts to sell LICENSED PROPERTY during the period of exclusivity of the Licenses granted herein.

## INFRINGEMENT:

In the event any infringement of LICENSOR's patents is discovered in any country recognizing such patents and/or litigation commences with respect to any claim of infringement of LICENSOR's patents, LICENSEE has the option to pursue any and all litigation to protect the marketing effort.

LICENSEE has the sole discretion to determine how much to incur in legal expenses in pursuing any infringement claim or litigation based upon what is reasonable and in the best interest of LICENSEE.

LICENSOR shall have the option to participate in such claim in proportion to the expense LICENSEE bears, i.e. 50% of litigation expenses = 50% of the claim/settlement. In the event LICENSOR exercises this option to participate, LICENSOR shall be entitled to retain an equal percentage amount, in relation to the percentage amount of expenses incurred, of the receipts from such settlement, judgment, compromise or arbitration.

In the event infringement is discovered and LICENSEE does not act upon settlement of infringement or litigation in a reasonable amount of time as not to effect the marketing campaign, sales, and/or growth, LICENSOR shall have the right to pursue the infringing party for damages, and retain the proceeds.

13    JR

## USE RESTRICTIONS:

LICENSEE agrees not to use LICENSED PROPERTY in any illegal fraudulent, or deceptive manner to damage the good name and / or standing of the LICENSED property

## TRANSFER RESTRICTIONS/ASSIGNABILITY/SUB-LICENSE/SALE

Any party may assign and/or sell this Agreement to any third party, subject to first offering the other party a first right of refusal. Any such assignment and/or sale shall be made in accordance with the provisions herein.

LICENSEE has the right to have other parties manufacture for it, provided the manufacturer enters into a Non-Compete and Non-Disclosure Agreement with LICENSOR. If LICENSEE sells or assigns this License, LICENSOR will receive from LICENSEE fifteen percent (15%) of the assignment/sale price.

## ASSIGNMENT/SALE

LICENSOR agrees to notify LICENSEE of any contemplated assignment /sale of LICENSOR's patents during the term of this Agreement with thirty (30) days notice.

LICENSEE agrees to notify LICENSOR of any contemplated assignment /sale of this License during the term of this Agreement with thirty (30) days notice.

In either of the above cases, each party shall offer the other party the right of first refusal.

14    

## WAIVERS:

No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.

The waiver by any party of any of the conditions precedent to its respective obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement.

## BENEFITS:

Except as expressly provided in this Agreement, nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligation, or liability under or by reason of this Agreement

## CONSTRUCTION/JURISDICTION:

Inasmuch as the transactions, which may arise or occur between the parties and/or their principals may cross boundaries of national and or international jurisdiction, this Agreement shall be construed and interpreted in Accordance with the laws of the United States of America and the resident state of the Plaintiff.

## SEVERABILITY:

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

15  -SR

## ARBITRATION

The parties may elect to settle and differences by submitting to Arbitration in the resident state of the plaintiff. The Arbitrators decision shall be and remain binding to either and both parties.

## NOTIFICATION

Any notice hereunder must be in writing and by courier service with signed receipt and shall be deemed to have been given when such notification, properly addressed to the addressee indicated above, is sent by courier and receipt acknowledged. Either party hereto may at any time by thirty (30) days notice to the other; designate any other address in place of those given above.

## FURTHER DOCUMENTS:

Each of the parties hereto agrees to execute and deliver all such documents and to do any and all acts, matters and things as may be necessary or proper in order to carry out the intended purposes of this Agreement.

## PRIOR AGREEMENTS:

This Agreement shall supersede and replace any and all prior Agreements entered into between the parties hereto related to the subject matter hereof and any such prior Agreements shall be, and they are hereby, canceled.

## EMPLOYEE STATUS:

It is understood and agreed by both parties that neither party is an employee of the other.

## EFFECTIVE DATE:

The effective date of this Agreement shall be upon the acceptance and execution thereof by both parties.

16    JR

**ENTIRE AGREEMENT**:

This instrument of 18 pages contains the entire Agreement between LICENSOR and LICENSEE, and no modification hereof shall be binding on the parties unless it is in writing and signed by a duly authorized officer of the parties to be bound.

**AUTHORITY**:

All parties warrant that they have the requisite authority and capacity to execute this Agreement and that its terms and provisions constitute valid and legally enforceable rights and obligations against the parties, their successors, administrators, etc.

**DOCUMENT ORIGINALS**:

This document is considered as an original, binding and enforceable Agreement, whether executed in original, binding counterparts or Facsimile.

**INTENTIONALLY LEFT BLANK.**



17

IN WITNESS WHEREOF, the parties have affixed their names, signatures, and seals, by their executive officers thereto duly authorized, on the day and year first above written.

**ON BEHALF OF LICENSEE:**

M J Zwebner - Chairman
AirWater Corporation

**ON BEHALF OF LICENSOR:**

James J. Reidy, President
J.J. Reidy & Co., Inc.

Subscribed and sworn to before me

This _21st_ day of _March_ 2003

Notary Public Notary Public
My commission expires: _1/9/03_

OFFICIAL NOTARY SEAL
ROLANDO SSABLON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD083309
MY COMMISSION EXP. JAN. 9 2004

18

**EXHIBIT K**

1

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2                         CIVIL ACTION NO. 05-40049-FDS

 3       J.J. REIDY & CO., INC.,            )
               Plaintiff,                   )
 4                                          )
         v.                                 )
 5                                          )
         AIRWATER CORPORATION and AIRWATER)
 6       PATENTS CORPORATION,               )
               Defendants.                  )
 7                    DEPOSITION of MICHAEL JOEL ZWEBNER, a

 8       Rule 30(b)(6) designated witness of AIRWATER

 9       CORPORATION and AIRWATER PATENTS CORPORATION,

10       taken at the request of the plaintiff, pursuant to

11       the Federal Rules of Civil Procedure, before

12       Patricia J. Taylor, RPR, Notary Public for the

13       Commonwealth of Massachusetts, on June 8, 2007,

14       commencing at 10 a.m. at the offices of Bowditch &

15       Dewey, 311 Main Street, Worcester, Massachusetts.

16       A P P E A R A N C E S:

17       FOR THE PLAINTIFF:
         BOWDITCH & DEWEY, LLP
18       311 Main Street
         Post Office Box 15156
19       Worcester, MA  01615-0156
              BY:  THOMAS J. CONTE, ESQ.
20
         FOR THE DEFENDANT:
21       KEEGAN & WERLIN, LLP
         265 Franklin Street
22       Boston, MA  02110-3113
              BY:  MATTHEW P. ZAYOTTI, ESQ.
23       ALSO PRESENT:  JAMES J. REIDY
                         BAY STATE REPORTING AGENCY
24         76 MILL STREET, WORCESTER, MASSACHUSETTS 01603
                         (508) 753-4121
```

1    e-mails to Coca-Cola and defamed us, as a result

2    of which we believe we lost a contract.  So we

3    sued.

4          Q.     Saying what, essentially?

5          A.     Saying that Mr. Reidy's patents were

6    no good.  Well, he called them AirWater patents.

7    But obviously the company was selling machines

8    that didn't work.  It was undercapitalized.  And

9    countering that his company were experts and had

10   lots of information and were worth $125 million

11   and so on and so on.

12         Q.     And you were in negotiations or

13   Atmospheric was in negotiations with Coca-Cola at

14   that time?

15         A.     Atmospheric through its Indian

16   subsidiary, which is called Water Maker India,

17   were in negotiations with Coca-Cola.

18         Q.     What were the negotiations for?

19         A.     To offer Coca-Cola machinery that

20   would enable them to create water from air.

21         Q.     Machinery based on the Reidy patents?

22         A.     No.

23         Q.     Machinery based on what patent?

24         A.     Machinery that we developed and we

1    make.  For the record, we don't make any machines

2    under the Reidy patents.

3        Q.     But what machines, what were the

4    machines that you were attempting to sell?

5        A.     Air to water machines, large air to

6    water machines.

7        Q.     Understand.  Were those based on any

8    patents?

9        A.     No.

10       Q.     Not based on any patented technology?

11       A.     No.

12       Q.     What were the name of the machines, or

13   the nomenclature?

14       A.     Machines were based on our design that

15   we developed in Israel.  But these were going to

16   be made in India and they would have been called a

17   range of WM machines.  WM stands for Water Maker.

18   And the number I'm going to give you would relate

19   to how much water it would make a day.  We have

20   from 120, 250, 500, 1,000, and 5,000.

21       Q.     And those were so-called Water Maker

22   machines?

23       A.     They were originally based on the

24   design of ELGT.

1        Q.      And the Ehrlich patent?

2        A.      Right.

3        Q.      But that patent has expired?

4        A.      That patent has become public domain.

5   We own some copyrights to the designs.

6        Q.      Just going back to clarify, are you

7   saying that no products have been produced based

8   on the Reidy patents?

9        A.      If you'll allow me to explain it.

10       Q.      I'll let you explain.

11       A.      The answer is yes.

12       Q.      When you say yes, I just want to

13   clarify --

14       A.      I'm not going to spend an hour.

15       Q.      Let me just clarify the question.

16              Am I correct that no products had been

17   manufactured by UCSY or its subsidiaries based on

18   the Reidy patents?

19       A.      That is correct.

20       Q.      Now you may clarify.

21       A.      The reason is two things.

22              Number one, the Reidy patents have not

23   been filed and been granted in most of the world

24   where the company sells its products.   That's

1   number one.

2           Number two, the Reidy patent as it has

3   been written, does not allow for machines to be

4   made that would pass water quality tests to the

5   international standards that it today requires.

6   Major additional amendments to the machines and

7   additional technology have had to have been

8   applied to make the machines.

9       Q.      Let's get back to that issue in a

10  moment.  I just have one follow-up question to

11  make sure I understand the first point you

12  mentioned about the Reidy patents.  That they are

13  not filed.  Can you elaborate on that?

14      A.      The Reidy patents are filed in the

15  United States.  They had rights at the time they

16  were filed, and for several years thereafter, to

17  be refiled, let's call it, in several countries

18  throughout the world.

19          For reasons I was not privy to nor was

20  I there, most of these opportunities to file them

21  around the world were not taken.  And it was not

22  done.  As a consequence of which there is no

23  patent protection in any country, aside, I

24  believe, of two or three.  One of them being

1   made and it was subsequently repaired.   It was

2   refiled and repaired.

3          Q.       What's the error, sir?

4          A.       The error was, first all, that the

5   $10,000 per month was not until 2013.   And this

6   $200,000 was in fact 300,000.

7          Q.       When did you change -- let me finish

8   the question, sir.   Let's go back to page 45.

9                 So you're now saying that note 4, the

10  provision I read for you that you said I read

11  correctly, you're now saying that's an error?

12         A.       I'm saying that the statement of the

13  amount -- I'm sorry.   What page?

14         Q.       Page 45 of 70, note 4.

15         A.       That is an error, yeah.

16         Q.       What is in error specifically, sir?

17         A.       Through October 13. The auditors read

18  the -- we had to submit the copies of the contract

19  and we gave it to the auditors and this is what

20  they wrote, and it slipped through.

21                Next time, we realized the error and

22  we changed it.   And every single filing since then

23  reflects the corrected version.

24         Q.       When was the first filing, sir, the

**EXHIBIT L**

**James J. Reidy**

| | |
|---|---|
| **From:** | "James J. Reidy" <jjreidy@earthlink.net> |
| | "Michael Zwebner" <mjzwebner@sprynet.com> |
| **Sent:** | Thursday, May 08, 2003 7:00 PM |
| **Subject:** | Re: Your new #&*+@ 5/7/03 Draft |

----- Original Message -----
**From:** Michael Zwebner
**To:** James J. Reidy
**Sent:** Thursday, May 08, 2003 3:45 PM
**Subject:** Re: Your new #&*+@ 5/7/03 Draft

Jim
first of all, please do not use this type

Re: Your new #&*+@ 5/7/03 Draft

Sorry, I can interpret #&*+@ as any one of thousands of negative words, most of which are appropriately defined by the reader, not me. It doesn't necessarily mean a profanity.

of text or language with me.. I ((and YOU)) are professional people, and should always address each other in a courteous and professional way.

second, with regards the $100,000... if you look at the Letter of Terms and agreement we drew up and signed you will see the reference to the $100,000 being paid 60 days from the closing of the financing. This is nothing new, and we tyold you this up front, and you agreed to it. We are now merely reprinting it in the Licensing Agreement.

Not quite. But, I can now see how your text, dated February 21st, could be read two ways. I read it as 60 days from then. We are now at 71 days and you are asking for up to 60 more days, which doesn't even start to who knows when.

As it happens, we are about to sign and close, so this term may become mute., as funds will be available.

You have told me several times, as early as your very first telephone call to me on February 27th, that you had over $2 million available at that time.

Thirdly, I have triied to get across to you, that this is a NEW venture for us. You have been at it for 10++ years, and know everything about it that we are still learning.
Simply by signing any agreement and paying you funds and giving you shares, will not do it for us.

How else could you obtain the rights to confidently proceed to do all these things?

We are NOT in this for a week, month or even year. We plan to build this whole business and project properly.
We announced our basic intentions to the world, and let the people, shareholders and industry know we are coming into this business.
Todate, though we now have copies of your patents, and are having patent attornies check them out,

It's a strange time to be just doing this?

we have NOT seen a working model of your design,

You told me on February 28th that you did not need to see my unit. I could easily have shown it to you while you were in Boston.

there is NO manufacturing company that is licensed and can produce machines for us.

Not true. Desert Aire is fully qualified, willing, and standing by.

In fact, it seems that WE will need to hold your hand in nevery stage of the continuing development of thios business.

Developing a business from my technology is exactly what you're supposed to do.

We are happy to do so, but step by step...no mad rush.

5/8/03

If you look at my other company at www.YAK.CA you will see a business that my brother and I started a few years ago, invested several million dollars, and have now created a real public company with over $100 million in revenues, and a stock price of $6 ++

i understand your feelings, you have been bullshitted

That's an understatement.

by many people in the past, and have gotten no-where in 10 plus years vis a vis a serious LICENSEE. Well, this is about to change.

BUT, not at a forced speed, nor on terms that are not good for ALL parties.
The agreement still has many issues that we need to go over and discuss and agree upon.

I agree, and wonder how this could have been done by today.

on the few matters you raise, here are my comments.

1) The $100k will be paid as already agreed and stipulated. If you cannot agree to this, then I guess we will continue to go get the finance in place first,, and then call you when we have the funds. The choice is yours in this respect.

Well, I never knowingly agreed to this ambiguous clause. Anyway, the currently proposed License Agreement clearly states that it supercedes any and all prior "agreements"

2) There will be NO royalties payable untill either we or a sublicensee are in production and sales. There is no logic otherwise.

Logic? That time frame is under your control, not mine. Desert Aire can start manufacturing tomorrow. Giving you a world-wide non-exclusive virtually destroys any other potential Licensing possibilities for me. I'm essentially out of business while you take a year to decide what you want to do. Meanwhile, I'm getting inundated with legal fees and patent expenses. Is THIS fair? i should receive ...ing compensation for this sacrifice and you should pay something for this privilege.

I have stated and continue to state that you are totally FREE to sign any deal with any other potential manufacturer, and or Licensee, and if you have such people lined up, and are ready to sign and pay, then do not wait for us.

Everyone, including you, need months and months to do this. It is a much harder sell and with diminished prospects. But, I will continue to try.

We need to be more secure and feel good about the new business we are getting into. If it takes us another few weeks, so be it.

I thought you were there already. Naturally, no Agreement should be made without knowing what you're doing.

((Just so you are aware, we are talking to several potential manufacturers, and await their responses.))

Been there. Done that. Just remember, they're not likely to be investors. (Unless you're calling investors someone who happens to invest. x ___ menufacture

3) The registration of stock with the SEC, cost us about $100,000 to do. (legal and accounting) We are planning to do a registration within 180 days, and your shares will be included in that registration.

"Planning to" is different from "Promising to".

Our end of year is September 30th 2003. We will prepare the registration documents, and then do the audit in October. We plan to file sometime in November. It literallyu takes a few months of paperwork and acounting to effect a registration with the SEC. I have experience in 3 seperate filings.

I ... appy to discuss these matters and other remainign issues with you further, and come to final resolutions.

We should get all our cards on the table. Can't play with half a deck.

With regards to the Israel trip, if you do not wish to come, then that too is OK with me. I will meet the people I need to meet, and then come back and deal with your issues later. I guess that if they want to see later, we will organize it

then.

Okay  It's not fair at this time to ask me to give them everything they want, and will probably need.

d yes, I did tell you back in March that we have $2 million in new investment funds coming in for this deal.

In February you did not say "coming in".

However, like all investments, the funders want more information on this, then on that, then they want certain due dilignece items covered etc etc etc.

Naturally, that is my point. I've had funds "coming in" up to my ears.

We have now produced the investment memorandum, and this I am delivering to Israel next week to finalize the cash investment.
I should just mention, that If $2 million was so easy to get for this project, YOU would have gotten it a long time ago.

That's why I now deal with people who claim to be already financially qualified. That's people like you. No one knows how hard it is more than me  I don't want any more promises or fund raisers. I want money in the bank.

So lets be real here.

I'm trying very hard to be. Perhaps you should ask your patent attorney son-in-law to show you a License Agreement he drew up for one of his inventor-clients  Then, I think, you'll understand my position a lot better

Jim, lets just come to earth here, understand what both parties want, and work together to accomplish it.

I'm willing to continue to try  But you should know one last thing  I'm offering you the best deal I ever offered anyone. The Indian i met with for the last 2 days has verbally agreed to pay me $300,000 up front plus a minimum of $15,000 per month for the just the USA. He's agreed to do the same, again, for just India! That's just TWO countries. You have about 238 countries available to you for just a small fraction of what he's willing to pay for two.

Respectfully,

Michael


IMPORTANT NOTICE:

This electronic message contains information, which may be confidential, privileged or otherwise protected from disclosure. The information is intended to be used solely by the recipient(s) named. If you are not an intended recipient, be aware that any review, disclosure, copying, distribution or use of this message or it's contents is prohibited. If you have received this message in error, please notify the sender and delete this message from your system. Employees of the company are prohibited from making defamatory statements and from infringing copyright or any other legal right. Any such communication or infringement is contrary to company policy and outside the scope of employment.

—— Original Message ——
From: James J. Reidy
To: Michael Zwebner
Sent: Thursday, May 08, 2003 12:31 AM
Subject: Your new #&*+@ 5/7/03 Draft

I cannot believe your changes. We are worse off then the day we started this whole thing.

Aside from other, maybe lesser, issues, the following is non-negotiable:

1. $100,000 must be wired to my bank account on the day we sign.

2. There must be some significant minimum monthly Royalty.

3. The stock must clearly be registered within 90 days as you had previously promised.

As a bonafide LICENSOR I will need these funds to fulfill my obligations to you – it's not going to be used for a new boat! I'm not going to bother you with details, just accept the fact this Licensing deal cannot be done without significant additional cash available to me. (On March 20th you told me you had $2 million committed to this venture! ???)

I will not meet you in Israel without a fully consummated Agreement.

Be advised I am leaving on a three day trip early Friday morning, which I committed to, based upon your assurances we would have this whole thing resolved before then.

James J. Reidy, J.J. Reidy & Co., Inc.
1260 Main Street, Holden, MA 01520-1020
Telephone: (508) 829-6550, FAX: (508) 829-6492
Email: jjreidy@earthlink.net, Web URL: http://www.drinkingwaterfromtheair.com

5/8/03