UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,**<br><br>    **Defendants.** | CIVIL ACTION NO. 05-40049-FDS |
| **AIRWATER PATENTS, INC.**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**J.J. REIDY & CO., INC.**<br><br>    **Defendant.** | CIVIL ACTION NO. 06-10137-FDS |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT
OF AIRWATER CORPORATION'S AND AIRWATER
PATENTS, INC.'S MOTION FOR SUMMARY JUDGMENT**

AirWater Corporation and AirWater Patents, Inc. collectively, ("AirWater")
hereby submit this Supplemental Memorandum of Law in support their Motion for
Summary Judgment.

**SUPPLEMENTAL STATEMENT OF UNDIPSUTED FACTS**

1.    On or about June 24, 2003, J.J. Reidy & Co., Inc. and AirWater
Corporation executed a Global Manufacturing and Marketing Licensing Agreement,
which they back-dated to March 21, 2003.  Zayotti Affidavit, Exh. C, at 63.

2.      The parties drafted the Global Manufacturing and Marketing Licensing Agreement. Zayotti Affidavit, Exh. B, at 147, 163-164 and Exh. D, at 67-68, 77, 83.

3.      Pursuant to the Global Manufacturing and Marketing Licensing Agreement, J.J. Reidy represented and warranted that it had the "entire right, title and interest in and to United States Patents numbered 5,106,512, 5,149,446, 5,203,989 and 5,366,705 relating to a Water Production / Generation System and . . . that LICENSOR has the absolute and undisputed rights to grant the licenses under the LICENSED PATENTS as specified hereinafter. . . ." Global Manufacturing and Marketing Licensing Agreement, at 1.[1]

4.      The Reidy Patents numbered 5,106,512, 5,149,446 and 5,203,989 (the "Reidy Patents") were initially issued to James J. Reidy.[2]

5.      On May 5, 1995, assignments of the Reidy Patents from James J. Reidy to Janice Bethanne Reidy were recorded with the United States Patent and Trademark Office.[3]

6.      Mr. Reidy testified during his deposition that with respect to assignments of the Reidy Patents that he would have asked his patent attorney, Brian Dingman, to effectuate the assignments and that Attorney Dingman would have copies of all materials relating thereto. Zayotti Affidavit, Exh. A, at 100, 106, and Exh. B, at 29-30.

7.      Mr. Reidy does not recall ever seeing a written assignment of any of the Reidy Patents, but believes that Attorney Dingman must have had power of attorney to

---

[1] The parties' Global Manufacturing and Marketing Licensing Agreement is already before the Court as attachments to a previously filed Affidavit of Matthew P. Zayotti in support of AirWater's cross-motion for summary judgment.

[2] The Reidy Patents are already before the Court as attachments to a previously filed Affidavit of Matthew P. Zayotti in support of AirWater's cross-motion for summary judgment.

act on his behalf in connection with the assignments. Zayotti Affidavit, Exh. B, at 29, 31-32.

8.    Mr. Reidy does not know whether Attorney Dingman had power of attorney to act on behalf of Janice Beth Anne Reidy in connection with any purported assignments of the Reidy Patents. Zayotti Affidavit, Exh. B, at 32.

9.    On May 20, 1998, Reidy Patent No. 5,366,705 was assigned to the Bank of America National Trust & Savings Association in connection with a security agreement. There is no record with the United States Patent and Trademark Office of any assignment of the patent from the bank back to J.J. Reidy or to anyone else.

10.    On June 29, 1998, assignments of the Reidy Patents from Janice Bethanne Reidy to J.J. Reidy & Co., Inc. were recorded with the United States Patent and Trademark Office.

11.    On August 18, 2003, assignments of the Reidy Patents from James J. Reidy to J.J. Reidy & Co., Inc. were recorded with the United States Patent and Trademark Office.

12.    By Order of the Court dated January 29, 2007, J.J. Reidy was ordered to produce "[a]ll documents that constitute, relate or refer to communications by and between you and or James J. Reidy on the one hand, and Brian Dingman on the other hand regarding the subject matter of this litigation, including without limitation the patents referred to in paragraph 4 of your First Amended Complaint." Order, at 3.

13.    Although Mr. Reidy understood and was aware that the Court had ordered J.J. Reidy to produce copies of documents that relate or refer to correspondence with

---

[3] The Patent Assignment Abstracts of Title relating to each of the four Reidy Patents are already before the Court as attachments to a previously filed Affidavit of Matthew P. Zayotti in support of AirWater's cross-

Attorney Dingman concerning this litigation and the Reidy Patents, Mr. Reidy has not

asked Attorney Dingman for copies of any documents concerning this litigation, the

Reidy Patents and assignments thereof because he "wouldn't know what to ask for."

Zayotti Affidavit, Exh. B, at 41, 42-43 and 48.

14.    J.J. Reidy has not produced copies of documents relating to any

assignments of the Reidy Patents, except for a purported assignment thereof from J.J.

Reidy to Free Water Company, which J.J. Reidy produced on July 25, 2007.  Zayotti

Affidavit, at ¶ 14.

15.    Although AirWater served a notice of deposition of Janice Bethanne

Reidy on July 20, 2007 and served a subpoena duces tecum on Janice Bethanne Reidy on

July 25, 2007, counsel for J.J. Reidy refused to produce Ms. Reidy for her deposition on

July 31, 2007 on grounds that discovery in this matter closed on June 29, 2007.  Zayotti

Affidavit, Exhs. F and G.

16.    With regard to foreign patent protection, the parties' specifically agreed

that the "Global Marketing and Licensing Agreement and LICENSED PROPERTY AND

TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world

without restrictions." Agreement, at 3 (emphasis in original).

17.    The phrase "Proprietary Rights" as used in the foregoing clause referred to

the four Reidy Patents. Zayotti Affidavit, Exh. A, at 116.  Notwithstanding the

foregoing, J.J. Reidy testified that a literal reading of the language in the agreement

makes no sense because:  "how in the world can I force every country in the world to

honor my patents?  It can't be done." Zayotti Affidavit, Exh. B, at 153-154.

---

motion for summary judgment.

18.     In that regard, J.J. Reidy testified that "the intent [of the parties] was that

we would get international patents." Zayotti Affidavit, Exh. A, at 117. Further, J.J.

Reidy testified that "at that time I had a PCT application that gave me the right to file a

patent in any of the 123 member countries," and that the "intent at the moment this thing

was signed was that we would have patents all over the world wherever we wanted

them." Zayotti Affidavit, Exh. A, at 91-92.

19.     Additionally, J.J. Reidy testified that:

> There is other treaties too. There is the Gulf Cooperation
> Treaty, the European Treaty. The intent was – I was
> working. I had patents, foreign patents, pending at the
> time. I intended to file additional foreign patents, which I
> subsequently did do. Then we would go to the expense on
> a country-by-country basis at Zwebner's request. So when
> we say "all over the world," that means all over the world
> where he wants that.

Zayotti Affidavit, Exh. B, at 154-155.

20.     Consistent with the foregoing, in a document entitled "J.J. Reidy and Co.,

Inc. Issued and Pending Patents," J.J. Reidy referred to an International Patent

Application relating to a "Thermoelectric, High Efficiency, Water Generating Device" as

"pending worldwide". J.J. Reidy further testified that this was a patent application for an

improvement to the four original Reidy Patents. Zayotti Affidavit, Exh. C, at 8-9; Zayotti

Affidavit, Exh. H.

21.     Unfortunately, J.J. Reidy failed to register the Reidy Patents in any of the

137 countries that are members of the Patent Cooperation Treaty. Zayotti Affidavit, Exh.

A, at 117, and Exh. E, at 57.

22.    Indeed, contrary to the intent of the parties and the terms of the Global Manufacturing and Marketing Licensing Agreement, J.J. Reidy failed to obtain any foreign patent registrations. Zayotti Affidavit, Exh. A, at 93.

23.    It is undisputed that there is a typographical error in the clause on page 10 of the Global Manufacturing and Marketing Licensing Agreement entitled "Foreign Patent and Trademark Registration." As written, the Agreement provides, in relevant part, that: "LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSOR, at his own expense." Agreement, at 10.

24.    It is undisputed that the second reference to "LICENSOR" in the foregoing clause is a typographical error, and that it should have stated "LICENSEE", such that this clause would read as follows: "LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSEE, at his own expense." Zayotti Affidavit, Exh. B, at 145-147, and Exh.D, at 76-77.

25.    Additionally, it is undisputed that this clause as written with the typographical error makes no sense because the Licensee, as the party with the exclusive right to manufacture and market the Reidy Patents, was the party that would have desired foreign patent registrations. Zayotti Affidavit, Exh. B, at 147, and Exh. D, at 76.

26.    It was J.J. Reidy's obligation to pursue foreign registrations of the Reidy Patents in countries requested by AirWater. Zayotti Affidavit, Exh. B, at 146, and Exh. D, at 75.

27.    Moreover, J.J. Reidy was the only party that had a right to pursue foreign patent registrations pursuant to J.J. Reidy's PCT Application. Zayotti Affidavit, Exh. B, at 145.

28.     AirWater requested J.J. Reidy to pursue foreign registrations of the Reidy Patents in various countries, including Israel, China and India. Zayotti Affidavit, Exh. D, at 74-75, 85-86.

29.     Although J.J. Reidy claimed that it had paid expenses associated with office actions in the six Gulf States and in Egypt, J.J. Reidy subsequently asked AirWater to pay expenses associated with foreign patent registrations claiming that J.J. Reidy could "not afford" to pay these expenses on its own. Notably, J.J. Reidy did not assert that it was AirWater's obligation under the contract to pay these expenses. Zayotti Affidavit, Exh. I and M.

30.     AirWater understood that it was J.J. Reidy's obligation under the Global Manufacturing and Marketing Licensing Agreement to pay costs associated with foreign patent registrations and viewed J.J. Reidy's request for assistance with such costs as an attempt "to offload obligations" to AirWater. Zayotti Affidavit, Exh. E, at 51-52.

31.     When AirWater declined to assume the costs associated with the foreign patent registrations, J.J. Reidy failed and refused to pursue certain foreign patent registrations and the right to do so expired. Zayotti Affidavit, Exh. B, at 149. Thus, the reason why J.J. Reidy failed and refused to pursue the foreign patent registrations was because AirWater refused to assume the costs thereof. Id. Exh. B, at 155.

32.     The Global Manufacturing and Marketing Licensing Agreement requires AirWater to pay J.J. Reidy royalties on sales of air-to-water machines manufactured and sold outside the United States where the Reidy Patents are unenforceable. Zayotti Affidavit, Exh. B, at 83-84.

33.    The Global Manufacturing and Marketing Licensing Agreement requires

AirWater to pay J.J. Reidy quarterly royalties "for a period of not less than 10 years, and /

or for the life of the last expiring LICENSED PATENT, whichever comes last, unless

terminated sooner as provided herein." Agreement, at 2.

34.    The section on page 5 of the Global Manufacturing and Marketing

Licensing Agreement entitled "Minimum Monthly Royalties" provides as follows:

> LICENSEE is to pay to Licensor a monthly Royalty
> payment in the amount of $10,000 per month commencing
> November 1st 2003, or the Royalty payments due in
> accordance with those stated above whichever is the more.
>
> LICENSEE agrees that for a period of 12 months
> commencing November 1st 2003, any unearned minimum
> monthly royalty shall be credited to any earned Royalties
> and may (if applicable) be applied at any time during this
> 12-month period.

Agreement, at 5.

35.    When asked to explain what the second clause of the foregoing section

means, Mr. Reidy was unable to provide a coherent interpretation:

> Q.  Okay.  What does that clause mean?
>
> A.  Well, it was a goodwill gesture on my
> part.  It was an -- I didn't know how to explain
> it intelligently, but for 12 months -- when he
> starts paying me ten grand a month on
> November 1, just for 12 months -- let's say he
> paid me ten grand in November with no sales
> and then in December, let's say I would have
> earned $15,000 in royalties but he would have
> only had to pay me ten because I would give
> him credit for the previous's month's ten.  So I
> still end up netting a minimum of $10,000 a
> month but he -- and like I say, it was just a -- I
> thought it was a nice act on my part to do this
> -- I would give him credit for anything
> exceeding ten grand a month as long as it was

one of those ten grands that were paid in the first year. Do you follow what I'm saying?

Q.  I might. Let me ask you the question and depending on your answer, then I understand it. Is it your testimony that this second clause meant that regardless of what AirWater sales were for the first 12-month period, AirWater would only be obligated to pay 10,000 per month for each of those first 12 months?

A.  Well, that's -- no. Because you can go to the other extreme. Let's say -- let me put it a different way. Let's say he pays me 120 grand in that 12-month period. Then let's say the next 12 -- well, it wouldn't be the next 12. It can't work that way. It's got to be six months. Let's say six months, he pays me 60 grand unearned. The next six months of the 12-month period, he pays me –

Q.  Could I stop you for one second? What do you mean "unearned"?

A.  That means there was no sales so there was no royalty.

Q.  There is no percentage royalty under the quarterly royalty provision of the contract?

A.  Right. Right.

Q.  Sorry. Go ahead.

A.  Let's say the second six months – how did I do this? The second six months, let's say I have actual royalties due me of 120. I would give him -- he would only have to pay me 100 because I would give him credit for anything over ten grand a month. I don't know if I'm saying that right. I probably should work out a better example. The idea was that I would get a minimum of 10,000 a month and -- maybe this does it -- and no more than 10,000 a month -- if the royalties were more than ten grand a month, he could deduct it from what he's already paid me in the previous 12 months. I think that's the clearest way of

9

saying it.  Any royalties in that 12-month period that exceed ten grand a month, he doesn't have to pay because he will be building up credit so it's ten grand a month against earned royalties.  I get ten grand a month anyway and he doesn't have to pay me the next excess that has to be in the six-month period.  He doesn't have to pay me more than -- if I did it really stupid -- well, does that make any sense to you?

MS. GREENE:  If you're unclear on it, why don't you think about it and we can come back to it.

THE WITNESS:  It's hard to explain.  I have to come up with an example where --

MS. GREENE:  You don't need to come up with an example.

Q.  I would like an example.  I would like to know how it is supposed to work.  Go ahead.  You can answer.

MS. GREENE:  Jim, why don't you take a break and think about this, if you need to take a break and think about it rather than doing it on the fly.

MR. ZAYOTTI:  This isn't on the fly.  This is an agreement that has been in place since --

MS. GREENE:  But he's trying to give you an example.

A.  I think I can do it this time.  $10,000 in the first month.  The second month, let's say earned royalties of 15,000.  He only has to pay me ten.  And he gets -- he'll have a remaining credit of five for that one.  If the next month, my earned royalties are 20, he would only have to pay me 15 because I still had 5,000 left of unearned royalties.  That's the way it's supposed to work.

Q.  Sorry.  I am having trouble following that.

A.  All right.  Well --

MS. GREENE:  Let him ask you a question.
You've explained it.

BY MR. ZAYOTTI:

Q.  Let's start with the first month of
November 2003.

A.  Yes.

Q.  Let's suppose AirWater has sales of
200,000 for that first month.

A.  Has sales.  Okay.  That would be earned
royalties of 10,000.

Q.  That would be earned royalties of 10,000?

A.  Right.

Q.  What would AirWater be obligated to pay
in that example?

A.  10,000.

Q.  Let's say AirWater had sales of 100,000
during the first month, what would AirWater
be obligated to pay?

A.  He'd give me 5,000 unearned royalties
and 5,000 earned royalties.  I'd still get -- wait
a minute, 100,000?

Q.  Yes.

A.  He would give me 2,500 of earned -- wait
a minute.  Five percent of 100,000 is 5,000.
So he would give me $5,000 of earned
royalties and 5,000 of unearned royalties,
which could be carried forward.  He'd have a
potential credit of $5,000.  Do the next month.

Q.  Okay.  Let's suppose AirWater had sales
of $300,000 during the first month, November
1, 2003 -- sorry -- during the first month,
November of 2003?

11

A.  300,000?

Q.  Yes.

A.  I'd get royalties of 15,000.  And there would be no -- nothing creditable to him.

Q.  Would AirWater pay you 15,000?

A.  Yes, $10,000 or 5 percent, whichever is more.

Q.  So let's go back to the second example of the 100,000 for November 2003.  If there is 100,000 in sales, 5 percent of that would be 5,000?

A.  Right.

Q.  What does AirWater actually pay you in that scenario?

A.  10,000.

Q.  And is it 10,000 under the minimum monthly royalty clause?

A.  Yeah.  Yeah.

Q.  Because --

A.  It's either 5 percent or 10,000, whichever is more.  But then I say, if the next month his sales are 300,000, the royalties due me would be 15.  But he's -- I'm giving him a credit of five on the unearned in the first month.  In that case, he'd just pay me ten again.

Q.  And what happens to that $5,000 credit; it's a credit and he doesn't owe it to you?

A.  It's a credit that he can take if -- that 12-month period, it's a credit I'll give him once his royalties start going over ten grand a month.  I mean, give me another.  You can do --

MS. GREENE:  Let him ask you the questions.  You don't need to offer to do things.  Let him ask you the questions.

THE WITNESS:  I don't know how to explain it any better.

MS. GREENE:  That's all right.

BY MR. ZAYOTTI:

Q.   What does the term "unearned minimum monthly royalty" mean in that clause?

A.   Unearned.  In other words, it's not backed up by any sales.  It's not 5 percent of a sale.  But I still get the ten grand a month.  It's like I didn't earn it; it's unearned.  There was no sales so there was no real royalty.

Q.   Who drafted this clause, the second clause under the section, Minimum monthly royalty?

A.   That was my idea.  I was just trying to be nice at the time.

MS. GREENE:  He asked you who drafted it.

A.   Well, Michael did all the typing.

Q.   You came up with this language in this second clause?

A.   I think so.

Zayotti Affidavit, Exh. B, at 156-164.

36.     At the time that the parties entered into the Global Manufacturing and Marketing Licensing Agreement, J.J. Reidy understood that its prototype air-to-water machine "would never be built" because the prototype was "a proof of concept working prototype" that was "a billion miles away from a production model."  Zayotti Affidavit, Exh. B, at 129.

37.     At the time the parties entered into the Global Manufacturing and Marketing Licensing Agreement, J.J. Reidy understood that AirWater "had to find a manufacturer and set up a sales organization." Zayotti Affidavit, Exh. B, at 126.

38.     J.J. Reidy understood that it would take some time for AirWater to develop a production model of the air-to-water machine and that AirWater would not begin to develop production models until after the parties had consummated their agreement. Zayotti Affidavit, Exh. B, at 130-131.

39.     During the first year of the Global Manufacturing and Marketing Licensing Agreement, AirWater was "mainly in R&D mode, trying to make a machine that worked. Having tried to make one based on [the Reidy Patents], we couldn't get the water quality right. So we had to redesign the machine and invent our own." Zayotti Affidavit, Exh. D, at 85.

40.     In accordance with the terms of the Global Manufacturing and Marketing Licensing Agreement, J.J. Reidy was aware of AirWater's "interest in both manufacturing and marketing the WATERSTAR systems and technologies on a world wide basis." Agreement, at 1; Zayotti Affidavit, Exh. B, at 143.

41.     J.J. Reidy did not believe that AirWater would be capable of developing a manufacturing operation, developing production model machines, and establishing awareness of the machines in markets throughout the world in a matter of just a little over four months between June 24, 2003 (the date on time that the parties executed the Global Manufacturing and Marketing Licensing Agreement) and November 1, 2003 (the date on which the first minimum monthly royalty payment was due). Zayotti Affidavit, Exh.B, at 142-143.

42.     J.J. Reidy testified that the parties "agreed to $10,000 a month [as a minimum monthly royalty] as 5 percent [royalty] would be less than two and a half million dollars a year in sales and that the $10,000 a month in the scheme of things was insignificant because if he couldn't sell more than two and a half million dollars a year, [AirWater] would be a failure." Zayotti Affidavit, Exh. C, at 29-30.

43.     AirWater testified that:

> [AirWater] agreed to give [J.J. Reidy] $10,000 a month for one year. At the end of one year we both assumed that sales would kick in. He was crying he didn't have an income. So [AirWater] said [it would] advance [J.J. Reidy] $10,000 a month for the first year. And thereafter it will go to whatever we have to pay.

Zayotti Affidavit, Exh. D, at 99.

44.     Entering into an exclusive licensing arrangement with AirWater concerned Mr. Reidy because that would eliminate the ability to license the Reidy Patents to third parties and other sources of income. Zayotti Affidavit, Exh. C, at 75.

45.     J.J. Reidy's prototype air-to-water machine has never been certified by any national or international organization to produce water that is fit for human consumption. Zayotti Affidavit, Exh. A, at 69.

46.     Prior to executing the Global Manufacturing and Marketing Licensing Agreement, AirWater informed J.J. Reidy, and J.J. Reidy understood, that the 4 million shares of UCSY stock that were to be issued to J.J. Reidy would be restricted from sale for a period of 12 months. Zayotti Affidavit, Exh. C, at 60-61. J.J. Reidy and AirWater discussed the possibility that the 4 million UCSY shares of stock might be included in a registration statement that would make them tradable earlier, and J.J. Reidy wanted the option to sell its UCSY shares earlier than 12 months from the date of issuance, for

reasons which Mr. Reidy testified were "unknown" to himself.  <u>Zayotti Affidavit</u>, Exh. C, at 60-61.

47.    Prior to executing the Global Manufacturing and Marketing Licensing Agreement, J.J. Reidy and AirWater discussed the possibility that Mr. Reidy would be employed by AirWater, and they agreed that they would need to discuss "additional financial remuneration for [his] ongoing services."  <u>Zayotti Affidavit</u>, Exh. C, at 62, and Exh. K.

48.    Ultimately, AirWater did not employ Mr. Reidy.  <u>Zayotti Affidavit</u>, Exh. C, at 17-20.

49.    By letter dated November 10, 2004, AirWater requested that J.J. Reidy contribute to the cost of AirWater's defense of litigation brought against AirWater in which the plaintiff challenged the validity of the Reidy Patents.  In that letter, AirWater pointed out to J.J. Reidy that notwithstanding the litigation,

> "[T]he Company has been consistent in making the
> $10,000 advance royalty payments to you that were agreed
> to for the year, beginning November 1, 2003.  While the
> Company had received advice that these payments could
> have been halted because of the disputes over the patents,
> we determined to keep faith with you for that year."

<u>Zayotti Affidavit</u>, Exh. J.

50.    As of the date of AirWater's November 10, 2004 letter to J.J. Reidy, AirWater had paid J.J. Reidy all amounts that J.J. Reidy claims were due.  <u>Zayotti Affidavit</u>, Exh. B, at 171.

51.    J.J. Reidy never responded to or disputed AirWater's contention that it was obligated to pay minimum monthly royalties of $10,000 for a period of one year.  <u>Zayotti Affidavit</u>, Exh. B, at 170-171, 191-192.

52.    AirWater built its air-to-water machines in Israel based on the

Erlich/ELGT patent and has never sold machines based on the Reidy Patents and designs.

<u>Zayotti Affidavit</u>, Exh. A, at 60, and Exh. D, at 43-46, 118-119.

53.    Contrary to J.J. Reidy's allegations of fraud, by letter to J.J. Reidy dated

February 21, 2003, Mr. Zwebner stated that "UCSY will raise some $2 million of

working capital from a number of private investors, and will utilize these funds as

working capital to help create the manufacture of the units, as well as the marketing team

and to generally commence commercial operations." <u>Zayotti Affidavit</u>, Exh. K, at 2.

Further, Mr. Zwebner stated that the $2 million would be raised "[o]nce the paper

transfers have been completed." <u>Id.</u> In accordance with the Global Manufacturing and

Marketing Licensing Agreement, the parties agreed that the 4 million shares of UCSY

stock would be issued to J.J. Reidy within 21 days from the date the parties executed the

agreement. <u>Agreement</u>, at 3.

54.    Moreover, on May 8, 2003, Messrs. Reidy and Zwebner exchanged emails

in which Mr. Reidy stated to Mr. Zwebner, in relevant part, that "You have told me

several times, as early as your very first telephone call to me on February 27, that you

had over $2 million available at that time." <u>Zayotti Affidavit</u>, Exh. L, at 1. In response,

Mr. Zwebner states "And yes, I did tell you back in March that we have $2 million in

new investment funds coming in for this deal. However, like all investments, the funders

want more information on this, then on that, then they want certain due diligence items

covered etc etc etc. We have now produced the investment memorandum, and this I am

delivering to Israel next week to finalize the cash investment. I should just mention, that

if $2 million was so easy to get for this project, YOU would have gotten it a long time

ago." Id. at 3.

55.    To date, J.J. Reidy has failed and refused to respond to AirWater's Fourth

Request for Production of Documents served on June 29, 2007, requesting documents

relating to the ownership and assignments of the Reidy Patents. Zayotti Affidavit, at ¶

14.

56.    During the deposition of J.J. Reidy, Mr. Reidy refused to answer questions

regarding his communications with Attorneys Dingman and Timothy Ryan concerning

the assignment of the Reidy Patents to the Bank of America National Trust & Savings

Association, and J.J. Reidy's counsel refused to produce Janice Bethanne Reidy to testify

regarding her knowledge of the ownership and assignments of the Reidy Patents. Zayotti

Affidavit, Exh. B, at 33-47.

## SUPPLEMENTAL ARGUMENT

### A.    AIRWATER IS ENTITLED TO SUMMARY JUDGMENT BECAUSE J.J. REIDY CANNOT PROVE THAT IT OWNED THE PATENTS

"It is elementary that if Plaintiff never has owned the patent, it could never license

it so that there would be a complete failure of consideration for Defendants' promise to

pay $15,000." Aqua Flame, Inc. v. Imperial Fountains, Inc., 463 F.Supp. 736, 737

(D.C.Tex., 1979). See also, In re Novon Intern., Inc., 2000 WL 432848, *5 (W.D.N.Y.

2000) ("[O]nly the assignee of the patent is entitled to grant licenses after the transfer.");

Imax Corp. v. In-Three, Inc., 385 F.Supp.2d 1026, 1028 (D.Cal. 2005) ("A party may

bring an action for patent infringement only if it is the 'patentee,' *i.e.,* if it owns the

patent, either by issuance or assignment."). "In order to show that it is the owner of the

patents, "a plaintiff to whom the patent was not originally issued must produce a "written

instrument documenting the transfer of proprietary rights in the patents." Imax Corp. v. In-Three, Inc., 385 F.Supp.2d 1026, 1028 (D.Cal.,2005), citing, Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed.Cir. 2000). "Courts look to the substance of that writing to determine whether it has the effect of assigning the patent rights and accordingly satisfying the statutory requirement that the 'patentee' must sue." Imax Corp. v. In-Three, Inc., 385 F.Supp.2d at 1028, citing, Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1030 (Fed.Cir. 1995).

Since the patents were originally issued to Mr. James J. Reidy, individually, in order for J.J. Reidy to maintain this action against AirWater J.J. Reidy has the burden of proving that it subsequently acquired title to the Reidy Patents, such that it was able to grant an exclusive license therein to AirWater in accordance with the terms of the Global Manufacturing and Marketing Licensing Agreement. To prove that it was and is the owner of the Reidy Patents, J.J. Reidy was required to produce all written instruments documenting the chain of title to the Reidy Patents and the transfer of all proprietary rights in the patents to J.J. Reidy during the relevant time frame.

In that regard, J.J. Reidy was ordered to produce "[a]ll documents that constitute, relate or refer to communications by and between you and or James J. Reidy on the one hand, and Brian Dingman on the other hand regarding the subject matter of this litigation, including without limitation the patents referred to in paragraph 4 of your First Amended Complaint." Order, at 3 (Document Request 32). In that regard, it is well-settled that "[a] party is charged with knowledge of what its agents know, or what is in records available to it.... A party must disclose facts in its attorneys' possession even though these facts have not been transmitted to the party." Axler v. Scientific Ecology Group, Inc.,

196 F.R.D. 210, 212 (D.Mass. 2000), citing, 8A Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure,* § 2177 (1994) at 318-19. "Similarly, a party must
produce otherwise discoverable documents that are in his attorneys' possession, custody
or control." Axler, 196 F.R.D. at 212. Accordingly, J.J. Reidy was obligated by the
Court's Order to obtain responsive documents from Attorney Dingman and produce them
to AirWater.

Yet, Mr. Reidy testified that although he understood and was aware that the Court
had ordered J.J. Reidy to produce copies of documents that relate or refer to
correspondence with Attorney Dingman concerning this litigation and the Reidy Patents,
J.J. Reidy has not requested from Attorney Dingman copies of documents relating to
ownership and assignments of the Reidy Patents, and no documents (other than the
March 2007 assignment to Free Water Company which was produced on July 25, 2007)
have been produced in blatant disregard of the Court's Order.

J.J. Reidy also had an independent obligation pursuant to Fed. R. Civ. P.
26(a)(1)(B) to produce to AirWater copies of all documents that J.J. Reidy might use to
prove that it owned the Reidy Patents at the relevant time.

Given that discovery has closed and that J.J. Reidy improperly interfered with
AirWater's efforts to discover the facts relating to the ownership and assignments of the
Reidy Patents by failing and refusing to (i) comply with the Court's discovery order, (ii)
produce the relevant documents pursuant to Fed. R. Civ. P. 26(a)(1)(B), (iii) to respond to
AirWater's Fourth Request for Documents served on June 29, 2007; (iv) answer
questions relating thereto at deposition, J.J. Reidy is now barred from introducing any

evidence relating to its purported ownership and AirWater is entitled to judgment as a

matter of law because J.J. Reidy will be unable to prove ownership.

**B.     AIRWATER IS ENTITLED TO SUMARY JUDGMENT BECAUSE J.J.
        REIDY'S FAILURE TO PURSUE FOREIGN REGISTRATIONS OF THE
        REIDY PATENTS CONSTITUTED A PRIOR MATERIAL BREACH OF
        CONTRACT THAT EXCUSED ANY OBLIGATION ON THE PART OF
        AIRWATER TO PERFORM**

AirWater is entitled to summary judgment because J.J. Reidy's failure and refusal

to pursue foreign registrations of the Reidy Patents constituted a prior material breach of

contract that excused any obligation on the part pf AirWater to perform.

It is undisputed that it was J.J. Reidy's obligation to pursue foreign registrations

of the Reidy Patents in countries requested by AirWater.  In that regard, both parties

testified that there is a typographical error in the clause on page 10 of the Global

Manufacturing and Marketing Licensing Agreement entitled "Foreign Patent and

Trademark Registration."  As written, the clause provides that:  "LICENSOR, when

applicable, shall make application for any foreign patents desired by LICENSOR, at his

own expense."  However, both parties testified that the second reference to "LICENSOR"

in the foregoing clause is a typographical error, and that it should have stated

"LICENSEE", such that this clause would read as follows:  "LICENSOR, when

applicable, shall make application for any foreign patents desired by LICENSEE, at his

own expense."

Moreover, the Global Manufacturing and Marketing Licensing Agreement

provides in relevant part that the "LICENSED PROPERTY AND TECHNOLOGY AND

ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions."

In that regard, J.J. Reidy testified that "the intent [of the parties] was that we would get

international patents."  Further, J.J. Reidy testified that "at that time I had a PCT

application that gave me the right to file a patent in any of the 123 member countries," and that the "intent at the moment this thing was signed was that we would have patents all over the world wherever we wanted them."

Although AirWater requested J.J. Reidy to pursue foreign registrations of the Reidy Patents in various countries, including Israel, China and India, J.J. Reidy failed and refused to pursue the foreign registrations when AirWater declined to assume the associated costs at Reidy's request.

Contrary to J.J. Reidy's present contention that it was AirWater's obligation to pay the costs associated with foreign patent registrations, J.J. Reidy specifically asked AirWater for assistance in paying the costs claiming that J.J. Reidy could "not afford" to pay these expenses on its own, J.J. Reidy was the only party that had a right to pursue foreign patent registrations pursuant to J.J. Reidy's PCT Application, and J.J. Reidy had actually paid the expenses associated with foreign patent registrations in the six Gulf States and in Egypt.

Accordingly, AirWater is entitled to judgment as a matter of law because J.J. Reidy's materially breached the Global Manufacturing and Marketing Licensing Agreement by failing and refusing to pursue foreign registrations of the Reidy Patents as requested by AirWater, and that J.J. Reidy's prior material breach of contract excused AirWater's performance.

**C.    AIRWATER IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE PARTIES' AGREEMENT REQUIRES AIRWATER TO PAY ROYALTIES ON SALES OF PRODUCTS BEYOND THE SCOPE OF THE REIDY PATENTS**

In addition to the fact that the Global Manufacturing and Marketing Licensing Agreement requires AirWater to pay royalties beyond the expiration of the Reidy Patents

through March 21, 2013, Airwater is entitled to judgment as a matter of law because the

Agreement requires AirWater to pay royalties on sales of air-to-water machines

manufactured and sold outside the United States.  Because the Reidy Patents are valid

and enforceable in the United States only, the requirement that AirWater pay royalties on

sales beyond the scope of the Reidy Patents is unlawful and there is a total failure of

consideration.  Indeed, "[t]he law is well established in the federal courts that where an

agreement contains a single promise and several considerations, if any part of the

consideration is contrary to public policy, the whole contract is void."  Glen Mfg., Inc. v.

Perfect Fit Industries, Inc., 299 F.Supp. 278, 282 (D.C.N.Y.1969), citing, Hazelton v.

Sheckells, 202 U.S. 71, 50 L.Ed. 939 (1906).  See also, Brulotte v. Thys Co., 379 U.S.

29, 32, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964) ("a patentee's use of a royalty agreement

that projects beyond the expiration date of the patent is unlawful per se"); Bishop v.

Palmer, 146 Mass. 469, 474 (1888) (where, as here, the "bad part of the consideration is

not severable from the good, the whole promise fails"); Glen Mfg. Inc. v. Perfect Fit

Industries, Inc., 324 F.Supp. 1133, 1137 (D.C.N.Y. 1971) (plaintiff's wrongful acts of

conditioning licenses to other toilet tank cover manufacturers bar plaintiff's enforcement

of its contract against this defendant).

   Similar to J.J. Reidy in the present case, the plaintiff in Glen Manufacturing made

one promise- to grant a non-exclusive license to defendant for its toilet tank cover patent.

In return, defendant promised two separate considerations- royalties on toilet tank covers

within the scope of plaintiff's patent, and royalties on toilet tank covers beyond the scope

of plaintiff's patent.  Noting that the one part of the consideration requiring payment of

royalties on the toilet tank covers beyond the scope of plaintiff's patent was illegal, the

Court held that "[i]t is impossible to say that the promise was not induced by both the legal and illegal consideration.  The promise must be dependent on the entire consideration, and the contract is, therefore, unseverable.  In this case, the contract is void and this court may not enforce any part of it."  <u>Glen Mfg., Inc. v. Perfect Fit Industries, Inc.</u>, 299 F.Supp. 278, 283 (D.C.N.Y.1969).

Similarly, because the Global Manufacturing and Marketing Licensing Agreement requires payment of royalties beyond the expiration of the Reidy Patents and on the sale of products beyond the scope of the Reidy Patents.  Indeed, the Global Manufacturing and Marketing Licensing Agreement specifically provides that the "<u>term of this Agreement shall commence upon the date of execution of this agreement</u> and shall remain binding and continue for a period of not less than 10 years, and / or for the life of the last expiring Licensed PATENT, whichever comes last. . . ."  <u>Agreement</u>, at 2 (emphasis supplied).  Because the Agreement was executed on June 24, 2003, and since the last expiring Reidy Patent will admittedly expire before the end of the ten-year period from the date of execution on June 8, 2013, see <u>J.J. Reidy Second Supplemental Memorandum of Law</u>, at 7, there is a total failure of consideration and AirWater is entitled to judgment as a matter of law.  By the same token, since the Global Manufacturing and Marketing Licensing Agreement requires AirWater to pay royalties on sales of products not made or sold in the United States and, therefore, outside the scope of the Reidy Patents, AirWater is entitled to judgment as a matter of law for failure of consideration.

**D.    PAROL EVIDENCE IS ADMISSIBLE TO SHOW THAT THE PARTIES AGREED THAT AIRWATER WOULD PAY $10,000 PER MONTH FOR A PERIOD OF ONE YEAR ONLY, SUCH THAT J.J. REIDY'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO TERMINATION OF THE LICENSE FOR FAILURE TO PAY MINIMUM MONTHLY ROYALTIES BEYOND THE ONE-YEAR PERIOD MUST BE DENIED**

Parol evidence is admissible to show that the parties agreed that AirWater would pay J.J. Reidy a minimum of $10,000 per month for a period of one year only, such that J.J. Reidy's motion for partial summary judgment as to termination of the Global Manufacturing and Marketing Licensing Agreement on account of AirWater's failure to pay minimum monthly royalties beyond the one-year period must be denied.

"The Parol evidence rule bars introduction of prior or contemporaneous written or oral agreements that contradict, vary, or broaden an integrated writing; it does not bar extrinsic evidence that elucidates the meaning of ambiguous contract terms." Interface Systems Group, Inc. v. CJS Holdings II, Inc., 2006 WL 2848015, *2 (Mass.Super. 2006), citing, Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 496 (1997). (allowing extrinsic evidence to cure ambiguity despite integration clause). Similarly, "[t]he parol evidence rule does not . . . foreclose consideration of statements made *after* the integration of the agreement." First Allmerica Financial Life Ins. Co. v. Minnesota Life Ins. Co., 188 F.Supp.2d 101, 107 (D.Mass. 2002), citing, Mankato Implement, Inc. v. J.I. Case, Inc., et al., 1991 WL 327432, *1 (D.Minn.1991); Northern Timberline Equipment, Inc. v. Gustafson, 386 N.W.2d 778, 780 (Minn.Ct.App.1986).

In the present case, the second clause of the section of the Global Manufacturing and Marketing Licensing Agreement regarding the so-called minimum monthly royalty payments is ambiguous at best. Indeed, during his deposition Mr. Reidy was unable to provide a coherent explanation as to what the relevant language was intended to mean. In

that regard, Mr. Reidy, who drafted the clause, gave confusing and contradictory testimony regarding the manner in which royalties were to be calculated and paid during the twelve-month period commencing on November 1st 2003 pursuant to the minimum monthly royalty payments and quarterly royalty payments clauses of the Global Manufacturing and Marketing Licensing Agreement.  The one and only thing that is clear from Mr. Reidy's testimony and the language itself is that the parties did agree to some sort of time limitation of 12 months with respect to minimum monthly royalties.

AirWater's contends that the parties agreed that AirWater would pay J.J. Reidy $10,000 per month for a period of one year only because the parties anticipated that AirWater would have no sales for purposes of triggering a percentage of sales quarterly royalty payment to J.J., Reidy or any other income for a period of at least one year.  This is consistent with the undisputed facts that (i) J.J. Reidy's prototype air-to-water machine was a "proof of concept" machine that "would never be built" and "was a billion miles away from a production model"; (ii) J.J. Reidy understood that AirWater would need time to "find a manufacturer and set up a sales organization"; (iii) J.J. Reidy understood that AirWater would not begin to develop a production model machine until after the parties consummated their agreement in late June, 2003; (iv) J.J. Reidy's prototype had never been certified by any national or international organization as being able to produce water fit for human consumption; (v) J.J. Reidy did not believe that AirWater would be capable of developing a manufacturing operation, production model machine and international awareness of the machines in markets throughout the world during the four month period of time from when the parties executed their agreement until the time that AirWater was obligation to make its first minimum monthly royalty payment; (vi) J.J.

Reidy understood that the 4 million shares of UCSY stock that were to be issued to J.J. Reidy as part of the consideration to be paid by AirWater pursuant to the Global Manufacturing and Marketing Licensing Agreement would not be tradable for a period of twelve months, and J.J. Reidy wanted the option to sell the shares earlier; (vii) prior to entering into their agreement, the parties had discussed the possibility that AirWater would employ Mr. Reidy and pay him a salary, but that did not come to pass; (viii) entering into an exclusive licensing arrangement with AirWater concerned Mr. Reidy because that would eliminate the ability to license the Reidy Patents to third parties and other sources of income; (ix) J.J. Reidy testified that the parties "agreed to $10,000 a month [as a minimum monthly royalty] as 5 percent [royalty] would be less than two and a half million dollars a year in sales and that the $10,000 a month in the scheme of things was insignificant because if he couldn't sell more than two and a half million dollars a year, [AirWater] would be a failure."

Moreover, AirWater's contention that it agreed to pay J.J. Reidy $10,000 per month for a period of only one year is consistent with the undisputed fact that when AirWater requested by letter dated November 10, 2004 that J.J. Reidy contribute to the cost of AirWater's defense of litigation challenging the validity of the Reidy Patents, pointing out that AirWater had acted in good faith by continuing to make the "10,000 advance royalty payments . . . that were agreed to for the year, beginning on November 1, 2003", J.J. Reidy never responded to AirWater's letter. Indeed, even though AirWater had paid all amounts that J.J. Reidy believed were due as of November 10, 2004, J.J. Reidy never disputed AirWater's interpretation of the contract in response to AirWater's letter.

All of the foregoing undisputed facts are admissible to show that there is a genuine triable issue of fact with regard to the proper interpretation and construction of the minimum monthly royalties payment provisions of the Global Manufacturing and Marketing Licensing Agreement, such that J.J. Reidy's motion for partial summary judgment must be denied.

## CONCLUSION

WHEREFORE, based upon the foregoing supplemental points and authorities AirWater Corporation and AirWater Patents, Inc. hereby request that this Honorable Court enter an order:

1.    Denying Plaintiff J.J. Reidy & Co., Inc.'s Motion for Partial Summary Judgment;

2.    Dismissing all claims brought by J.J. Reidy against AirWater;

3.    Granting summary judgment in favor of AirWater on its breach of contract claim against J.J. Reidy;

4.    Awarding AirWater damages resulting from J.J. Reidy's breach of contract, including but not limited to ordering J.J. Reidy to disgorge to all amounts paid by AirWater to J.J. Reidy pursuant to the Global Manufacturing and Marketing Licensing Agreement; and

5.    Awarding AirWater such other and further relief as this Honorable Court may deem just and proper.

AIRWATER CORPORATION AND
AIRWATER PATENTS, INC.

Respectfully submitted,

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts  02110-3113
(617) 951-1400

Dated:  August ⌐, 2007

**CERTIFICATE OF SERVICE**
    I hereby certify that this document filed through the ECF
system will be sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non registered participants on
_August 1, 2007_ .

29