## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,**<br><br>**Defendants.** | **CIVIL ACTION NO. 05-40049-FDS** |
| **AIRWATER PATENTS, INC.**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**J.J. REIDY & CO., INC.**<br><br>**Defendant.** | **CIVIL ACTION NO. 06-10137-FDS** |

## AFFIDAVIT OF MATTHEW P. ZAYOTTI, ESQ. IN SUPPORT OF MOTION OF AIRWATER CORPORATION AND AIRWATER PATENTS, INC. FOR RECONSIDERATION OF DEFENDANTS' MOTION TO ENFORCE ORAL SETTLEMENT AGREEMENT

I, Matthew P. Zayotti, Esquire, do hereby state and depose as follows:

1.    I am an associate with the law firm Keegan Werlin LLP, and I am an attorney in good standing of the bar of the Commonwealth of Massachusetts.

2.    Attorney Richard Kirby and I represent the Defendants AirWater Corporation and AirWater Patents, Inc. in connection with the above-captioned consolidated actions.

3.    Attached to this affidavit as <u>Exhibit A</u> are true and accurate copies of excerpts from the first volume of the transcript of the deposition of J.J. Reidy.

2.      Attached to this affidavit as <u>Exhibit B</u> are true and accurate copies of excerpts from the second volume of the transcript of the deposition of J.J. Reidy.

3.      Attached to this affidavit as <u>Exhibit C</u> are true and accurate copies of excerpts from the third volume of the transcript of the deposition of J.J. Reidy.

4.      Attached to this affidavit as <u>Exhibit D</u> are true and accurate copies of excerpts from the first volume of the transcript of the deposition of AirWater.

5.      Attached to this affidavit as <u>Exhibit E</u> are true and accurate copies of excerpts from the second volume of the transcript of the deposition of AirWater.

6.      Attached to this affidavit as <u>Exhibit F</u> are true and accurate copies of the Notice of Deposition of Janice Bethanne Reidy, Subpoena Duces Tecum and Return of Service.

7.      Attached to this affidavit as <u>Exhibit G</u> is a true and accurate copy of a letter from J.J.Reidy's counsel dated July 30, 2007.

8.      Attached to this affidavit as <u>Exhibit H</u> is a true and accurate copy of a document produced by J.J. Reidy entitled "J.J. Reidy and Co., Inc. Issued and Pending Patents."

9.      Attached to this affidavit as <u>Exhibit I</u> is a true and accurate copy of correspondence from J.J. Reidy to Airwater dated September 2, 2003.

10.     Attached to this affidavit as <u>Exhibit J</u> is a true and accurate copy of a letter from AirWater to J.J. Reidy dated November 10, 2004.

11.     Attached to this affidavit as <u>Exhibit K</u> is a true and accurate copy of a letter from Airwater to J.J. Reidy dated February 21, 2003.

12.     Attached to this affidavit as <u>Exhibit L</u> is a true and accurate copy of a email correspondence by and between Messrs. Reidy and Zwebner dated May 8, 2003.

13.     To date, J.J. Reidy has failed and refused to respond to AirWater's Fourth Request for Production of Documents served on June 29, 2007, requesting documents relating to the ownership and assignments of the Reidy Patents.

14.     To date, J.J. Reidy has not produced copies of documents relating to any assignments of the Reidy Patents, except for a purported assignment thereof from J.J. Reidy to Free Water Company, which J.J. Reidy produced on July 25, 2007.

15.     Attached to this affidavit as Exhibit M is a true and accurate copy of an email from James Reidy to Michael Zwebner dated Jul 14, 2003.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

_____1st_____ DAY OF AUGUST, 2007.

Matthew P. Zayotti

**CERTIFICATE OF SERVICE**
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on _august 1, 2007_.

3

**EXHIBIT A**

# ORIGINAL

PAGES 1 - 122

EXHS. 1 - 6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

J.J. Reidy & Co., Inc.   \*

v.         \* Civil Action

AirWater Corporation and  \* No. 05-40049-FDS

AirWater Patents Corporation \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

AirWater Patents, Inc.   \*

v.         \* Civil Action

J.J. Reidy & Co., Inc.   \* No. 06-10137-FDS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of James J. Reidy
June 25 and 26, 2007
Bowditch & Dewey, LLP
311 Main Street - 4th Floor
Worcester, Massachusetts 01608

----------- *J. Edward Varallo, RMR, CRR* ----------
*Registered Professional Reporter*
*EPPLEY COURT REPORTING, LLC*
*P.O. Box 382, Hopedale, Massachusetts 01747*
*508.478.9795 ~ Fax 508.478.0595*
*leppley@msn.com*

*James J. Reidy*                                              60

1      A.     Well, I mean, I told Michael -- I don't

2   know -- dozens and dozens of times that the machine

3   he was building was not my machine and the machine

4   he was building was inherently flawed.  I mean, you

5   must have a dozen, you must have two dozen e-mails

6   regarding that.

7      Q.     So you're saying that AirWater was

8   building machines that were not based on your

9   patents?

10     A.     Clearly.

11     Q.     Do you know what the basis of the machines

12  -- Strike the question.  Let me start that again.

13            Do you know what AirWater was basing its

14  machines on?

15     A.     I could only guess what they were basing

16  it on.  I mean, I have an opinion, but what good is

17  my opinion?

18     Q.     Well, are you guessing?  Would you be

19  guessing if you told me what your opinion was?

20     A.     Well, I'd be guessing if I told you the

21  premise of what they were building the machine on.

22  I don't know what the premise was that they were

23  building their machine on, but I wouldn't be

24  guessing on what the machine ultimately would do and

*James J. Reidy*                                    69

1    A.    It would be inappropriate to do so.

2    Q.    Is the answer no?

3    A.    Repeat the question.

4    Q.    Is it accurate to say that your machines

5    have not been certified by any national or

6    international organization --

7    A.    Then the answer would be yes.

8    Q.    You didn't let me finish my question, but

9    I'll ask it again.

10   A.    Oh, I'm sorry.

11   Q.    Is it accurate to say that your machines

12   have not been certified by any national or

13   international organization concerned with water

14   quality?

15   A.    I can't answer that question.  First off,

16   I don't know machines; I have one.  I don't have

17   machines.  This is not a production model.  This is

18   not certifiable.  It's a proof of concept.

19   Q.    Okay, let me ask it differently then.  Has

20   your prototype been certified --

21   A.    No.

22   Q.    -- by any entity at all to produce water

23   that is fit for human consumption?

24   A.    No.

*James J. Reidy*                                     91

1      *A.*     Right.

2      *Q.*     What is your understanding of what rights

3   this agreement is giving to AirWater?

4      *A.*     I am giving AirWater the four existing

5   patents and any patents to issue, foreign or

6   domestic, on any continuation or division thereof

7   and any new patents, foreign or domestic, granted to

8   licensor.  At that time I had I don't know how many

9   international -- Well, let me put it another way.

10  I think, as best I can recall, that at that time I

11  had a PCT application that gave me the right to file

12  a patent in any of the 123 member countries.

13     *Q.*     Can you elaborate on that for me?  What is

14  a PCT application?

15     *A.*     It's a patent cooperation treaty that 123

16  countries recognize.  It gives you the sole right

17  for a year to apply for a patent in any one of those

18  member countries.

19     *Q.*     And when did you file that application?

20     *A.*     I don't recall.  I don't remember because

21  patents are my business.  I filed so many in so many

22  countries for so many things, I couldn't possibly

23  keep track of it.

24     *Q.*     Have you provided all of your patent

*James J. Reidy*                                    92

1     applications to your counsel?

2          A.     Negative.

3          Q.     With regard to the PCT application, does

4     that relate to foreign registration of the four U.S.

5     patents which are the subject of this agreement?

6          A.     Once a patent is issued you cannot ever

7     get a patent elsewhere.

8          Q.     Is it your testimony you cannot have a

9     U.S. patent registered in a foreign country?

10         A.     Absolutely not.

11         Q.     No, it's not your testimony or no, you

12    cannot do so?

13         A.     You cannot do so.

14         Q.     So what were your PCT applications related

15    to?  Or your PCT application, what is that related

16    to?

17         A.     They related to new patents, continuation

18    or division thereof.  Just exactly what it says

19    here.  This is why it was called a global license,

20    because the intent at the moment this thing was

21    signed was that we would have patents all over the

22    world wherever we wanted them.

23         Q.     At the moment this document was signed?

24         A.     That's right.

*James J. Reidy*                    93

1     Q.    And did you have patents all over the

2   world wherever you wanted them?

3     A.    I had the PCT application.  I might -- I

4   had the PCT application.  And I don't remember

5   when -- I may have -- Right now I have at least

6   three patents pending in at least 23 countries.

7     Q.    So that I understand, is it your testimony

8   that at the time you entered into this agreement it

9   was the intent and agreement of the parties that the

10  patents would exist all over the world wherever you

11  wanted them?

12    A.    Wherever I or Mr. Zwebner wanted them.

13    Q.    And is it also your testimony that at the

14  time you entered into this contract, you in fact did

15  not have patents all over the world wherever you

16  wanted them?

17    A.    I never claimed I did.  Show me where I

18  ever claimed I had a foreign patent.

19    Q.    We'll get to that.

20          With regard to the four United States

21  patents referred to on the first page, were the

22  inventions that are the subject of those patents

23  patented anywhere else in the world?

24    A.    No.

*James J. Reidy*                                       100

1      A.      Yes.

2      Q.      And the patents were issued in your name?

3      A.      Yes.  I believe so.  Again, it's either me

4  or my company, but I think it's me.

5      Q.      Do you have any recollection of ever

6  assigning any of these patents --

7      A.      Yes.

8      Q.      -- to J.J. Reidy & Company?

9      A.      Oh, I'm sorry.  I don't recall.

10      Q.      If you had ever assigned any of the four

11  patents to J.J. Reidy & Company, you would have a

12  record of that.  Correct?

13      A.      No.  Patent Office would, I think.

14      Q.      You wouldn't have a record of your own?

15      A.      No.  It's just an electronic notification

16  to the Patent Office.  There's no -- I've never seen

17  any response.  I don't recall ever seeing a

18  response, unless my patent attorney, Brian Dingman,

19  got responses.  I don't know.

20      Q.      Do you have any recollection of ever

21  filing something with the United States Patent and

22  Trademark Office reflecting an assignment of any of

23  the patents that we've been talking about from you

24  personally to J.J. Reidy & Company?

*James J. Reidy*                                               106

1    assignment of the patents to your daughter?

2        A.    No, I don't recall that.  I think I

3    probably called my patent attorney, Brian Dingman,

4    and asked him to do it for me.  I don't recall, but

5    that's probably what I did.

6        Q.    And at some point did your daughter assign

7    the patents back to you?

8        A.    Yes.

9        Q.    When did she assign the patents back to

10   you?

11       A.    During or around 2006.

12       Q.    Is it your testimony or do I have this

13   right, you assigned the patents to your daughter

14   Janice in or about 2003?

15       A.    Yes.

16       Q.    And she held the patents until 2006 when

17   she assigned them back to you?

18       A.    She either assigned them back to me or

19   back to J.J. Reidy & Company, Inc.  I don't recall

20   which one it was.

21       Q.    Sir, if you had assigned the patents to

22   your daughter in 2003 and she didn't assign them

23   back to you until 2006, how could J.J. Reidy &

24   Company make a representation and warranty in the

*James J. Reidy*                                116

1   page, page 3, under the heading The Territory, you

2   see where it says "Licensee agrees that this global

3   marketing and license agreement and licensed

4   property and technology and all proprietary rights

5   are to be valid all over the world without

6   restrictions."  Did I read that correctly?

7        A.    Yes.

8        Q.    Again the phrase "all proprietary rights,"

9   does that refer to the patents?

10       A.    That's the way I would read it.

11       Q.    What does that mean, that the patents are

12  to be valid all over the world without restrictions?

13       A.    I don't have a clue how the hell to read

14  that.

15       Q.    Well, earlier didn't you testify that the

16  intent and agreement between the parties was that

17  the patents and any patents that issue would be

18  worldwide wherever you wanted them?

19       A.    Wherever I wanted them or Mr. Zwebner

20  wanted them.

21       Q.    Right.  So doesn't this paragraph mean

22  that the patents were to be valid and enforceable

23  all over the world?

24            MS. GREENE:  Objection.

*James J. Reidy*                                              117

1          MR. ZAYOTTI:  You can answer.

2       A.      If they exist they're valid and

3    enforceable.

4       Q.      Well, does it say if they exist?

5       A.      No, it does not.  But the intent from the

6    first page is that we would get international

7    patents.  I don't know how -- This is not my

8    wording.  I don't know how any patent could be valid

9    all over the world without restrictions.  That makes

10   no sense to me.

11      Q.      Well, let's talk about that.  You

12   mentioned, was it a PCT application?

13      A.      That's right.

14      Q.      That would cover 123 countries.  Correct?

15      A.      Yes.  Potentially.  You'd have to file 123

16   patent applications.

17      Q.      And the inventions which are the subject

18   of the four U.S. patents were not patented in 123

19   countries across the world, were they?

20      A.      No.

21      Q.      Doesn't this clause that we just read

22   under the heading The Territory state that the

23   inventions which are the subject of the U.S. patents

24   were to be patented all over the world?

**EXHIBIT B**

JAMES J. REIDY                                                                July 25, 2007

```
                                                                    1
00:43:16  1              VOLUME III
          2              PAGES: 1-202
                         EXHIBITS: 7-23
          3        UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
          4
                         SUPERIOR COURT DEPT.
          5               OF THE TRIAL COURT
                          NO. 05-40049-FDS
          6
             *****************************************
          7   J.J. REIDY & CO., INC.,              *
                                                   *
          8   vs.                                  *
                                                   *
          9   AIRWATER CORPORATION AND             *
              AIRWATER PATENTS CORPORATION,        *
         10                                        *
             *****************************************
         11   CIVIL ACTION NO. 06-10137-FDS        *
                                                   *
         12   AIRWATER PATENTS, INC.               *
                                                   *
         13   vs.                                  *
                                                   *
         14   J.J. REIDY & CO., INC.               *
             *****************************************
         15
         16      CONTINUED DEPOSITION OF JAMES J. REIDY
         17            BOWDITCH & DEWEY, LLP
         18               311 Main Street
         19            Worcester, Massachusetts
         20     WEDNESDAY, JULY 25, 2007, 10:38 A.M.
         21
         22      ----- Linda Horne, CSR, RPR -----
                    EPPLEY COURT REPORTING, LLC
         23              Post Office Box 382
                     Hopedale, Massachusetts 01747
         24     (508) 478-9795   (508) 478-0595 (Fax)
                          leppley@man.com
```

```
                                                    3
 1                  I N D E X
 2
 3   W I T N E S S                        P A G E
 4
 5   J A M E S  J.  R E I D Y
 6
 7   Examination by Mr. Zayotti             5
 8
 9
10
11
12                E X H I B I T S
13
14
15   N O.     D E S C R I P T I O N       P A G E
16
17    7    Letter                        9
18    8    Patent and Asset Purchase Agreement 9
19    9    Title Abstract                26
20   10    Title Abstract                26
21   11    Title Abstract                26
22   12    Title Abstract                26
23
24
```

```
                                                    2
 1   APPEARANCES:
 2
 3   Representing J.J. Reidy & Co., Inc.:
 4   BOWDITCH & DEWEY, LLP
 5   The Meadows - 6th Floor
 6   Framingham, MA  01701-9320
 7   BY:  MAURA A. GREENE, ESQ.
 8   (508) 879-5700   (508) 872-1492 (Fax)
 9
10   Representing AirWater Corporation, AirWater
11   Patents Corporation, AirWater Patents, Inc.,:
12   KEEGAN WERLIN LLP
13   265 Franklin Street
14   Boston, MA  02110
15   BY:  MATTHEW P. ZAYOTTI, ESQ.
16   (617) 951-1400   (617) 951-1354 (Fax)
17
18   Also Present (via telephone):
19   Michael J. Zwebner
20
21
22
23
24
```

```
                                                    4
 1                E X H I B I T S
 2
 3   N O.     D E S C R I P T I O N       P A G E
 4
 5   13    E-mail Dated 6/25/03            84
 6   14    E-mail dated 9/10/03            88
 7   15    E-mail Dated 8/12/03            96
 8   16    E-mail                        103
 9   17    E-mail Dated 2/17/03          136
10   18    Letter                        165
11   19    E-mail Dated 5/8/03            176
12   20    Automatic Discovery Disclosure   185
13   21    Notice of Default             187
14   22    Notice of Default             192
15   23    Notice of Termination         194
16
17
18
19
20
21
22
23
24      EXHIBITS RETAINED BY ATTORNEY ZAYOTTI.
```

29

1  of that patent?
2       A.  705.
3       Q.  Did Janice Beth Ann Reidy assign that
4  patent at some point?
5       A.  Yes.
6       Q.  When did she assign it?
7       A.  Executed 4/20 -- wait a minute.
8  Sorry.  Executed 4/20; recorded 5/5/95.
9       Q.  That was the assignment to her?
10      A.  No.  Wait a minute.  I got the dates
11 wrong.  Scratch all that.  Executed 6/11/98;
12 recorded 6/29/98.
13      Q.  To whom did she assign it?
14      A.  J.J. Reidy & Company, Inc.
15      Q.  Have you ever seen those assignments?
16      A.  No.
17      Q.  Did you look for those assignments in
18 preparing for today?
19      A.  No, I don't think they -- I don't
20 think -- I've never seen a document regarding
21 an assignment.
22      Q.  You've never seen any documents
23 concerning an assignment of any of the four
24 Reidy patents; is that correct?

30

1       A.  No.  I suspect my attorney has those,
2  if there is such a thing.
3       Q.  When you say "your attorney," who are
4  you referring to?
5       A.  Brian Dingman.
6       Q.  Have you asked him for copies of the
7  materials relating to --
8       A.  No.
9       Q.  -- any assignments?
10      A.  No.
11      Q.  I know you know what I'm going to ask
12 you but just so the record is clear, if you can
13 wait for me to finish the question.  It's
14 difficult for the court reporter to take down
15 what is being said if we are speaking over each
16 other.
17           Are you aware of a request for
18 documents that constitute, relate, or refer to
19 ownership and assignments of the four Reidy
20 patents?
21      A.  No.
22           MR. ZAYOTTI:  Maura, you're aware that
23 we've asked for that material, correct?
24           MS. GREENE:  To my understanding,

31

1  we've complied with the document request that
2  you've sent us to date.  And we are in the
3  process of responding to the last two or the
4  last one.
5       Q.  Is it your understanding that Brian
6  Dingman would have been the person responsible
7  for preparing any and all assignments of the
8  Reidy patents?
9       A.  Brian Dingman did on my behalf
10 whatever was necessary for the assignment.  I
11 have no idea what that involves.
12      Q.  With regard to the assignment of the
13 patents to Free Water, I think you testified
14 those assignments were done by Free Water's
15 attorney, right?
16      A.  (Nodding).
17      Q.  Okay.  Let me ask it this way:  Apart
18 from the assignments to Free Water, is it your
19 understanding and belief that Brian Dingman
20 would have done anything necessary to carry out
21 an assignment of the Reidy patents?
22      A.  Aside from Free Water, Brian Dingman
23 did 100 percent of all assignments.
24      Q.  Does Brian Dingman have power of

32

1  attorney to act on your behalf personally?
2       A.  He must have.
3       Q.  Do you have a specific recollection,
4  or is it just your belief?
5       A.  It's my belief.
6       Q.  Do you know whether Brian Dingman has
7  power of attorney to act on behalf of Janice
8  Beth Ann Reidy or J.J. Reidy & Company?
9       A.  That's my belief.
10      Q.  As you sit here today, you don't have
11 any specific recollection of J.J. Reidy &
12 Company giving Brian Dingman a power of
13 attorney?
14      A.  I have no recollection.
15      Q.  Would you have any reason to know
16 whether your daughter, Janice Beth Ann Reidy,
17 ever gave Brian Dingman a power of attorney to
18 act on her behalf?
19      A.  I have no recollection.
20      Q.  Sir, with regard to Exhibit No. 12, do
21 you see the reference, Assignments 2 and 3?
22      A.  Yes.
23      Q.  Assignment No. 2, do you have any
24 knowledge about Assignment No. 2 which appears

33

1   to have been recorded on 5/20/1998?
2       A.   I was not aware of it until you
3   brought it to my attention.
4       Q.   Have you investigated that assignment?
5       A.   Yes.
6       Q.   Have you looked at any documents
7   concerning that assignment?
8       A.   Documents?  No.
9       Q.   How did you investigate Assignment No.
10  2 referred to in Exhibit No. 12?
11      A.   This -- wait a minute.  This isn't an
12  assignment.  This is just a security agreement.
13  It's not an assignment.
14      Q.   I don't know what it is.  There is a
15  reference to Assignment No. 2.
16      A.   It's under the heading of Assignment
17  No. 2, but the subtitle is security agreement.
18      Q.   Have you looked into what that
19  security agreement might be?
20      A.   Yes.
21      Q.   Do you have any understanding as to
22  what that security agreement is or what it
23  relates to?
24      A.   No.

34

1       Q.   What did you do to investigate that
2   security agreement?
3       A.   Well, the law firm that put this
4   security agreement on my patent, Mayor, Brown,
5   and Platt, I called them.
6       Q.   What did they say to you?
7       A.   I called them and said that the
8   security agreement was causing me major
9   problems involving millions of dollars and has
10  to be cleared up immediately.  I talked to
11  an -- what I believe was the home office in
12  Pennsylvania or Washington, D.C.  I got a
13  lawyer given to me by the receptionist.  She
14  told me that she would refer that to the
15  appropriate person.
16          Within 90 minutes, I got a phone call
17  from a specific lawyer involved in this action,
18  on vacation.  So they're taking this thing
19  quite seriously.  That was just Friday, three
20  business days ago.  I believe he's still on
21  vacation, but I have talked to him on the
22  phone.  He's expediting the solution to this
23  problem and intends to retract this security
24  agreement.

35

1       Q.   Who is the lawyer that you spoke to?
2       A.   Timothy Ryan.
3       Q.   What did he say to you about the
4   security agreement?
5       A.   He agreed with me that it was probably
6   an error, and he was going to get to the bottom
7   of it and get this lien off my patents as
8   quickly as possible.
9       Q.   He said he believes that the security
10  agreement was an error?
11      A.   He believes -- I don't know how to say
12  it -- he agrees with me that it's more than
13  likely an error.
14      Q.   He called you from vacation?
15      A.   Yes, within 90 minutes of me making
16  the initial phone call.
17      Q.   Did he say when he'd be back from
18  vacation?
19      A.   No, but I think he's still on vacation
20  because I haven't been able to get him on the
21  telephone.
22      Q.   I take it that since he was on
23  vacation, he has not had a chance to
24  investigate it but told you he would?

36

1       A.   Or he would have one of his associates
2   working on it.  I'm sure somebody is working on
3   it because they jumped all over this.
4       Q.   Sir, I saw you reaching into your
5   briefcase and started to pull out a piece of
6   paper.  What was that document?
7       A.   I don't know.
8       Q.   Sir, you're under oath.
9           MS. GREENE:  I'm not going to have him
10  testify as to anything that he may have looked
11  at.
12          MR. ZAYOTTI:  Are you claiming an
13  attorney/client privilege?
14          MS. GREENE:  No.
15          MR. ZAYOTTI:  You're instructing him
16  not to answer?
17          MS. GREENE:  Yeah.  I'm instructing
18  him not to answer.
19          MR. ZAYOTTI:  What is the basis of
20  your instruction?
21          MS. GREENE:  Let me speak to him.
22          MR. ZAYOTTI:  Okay.
23          (Off the record, 11:24-11:26 a.m.)
24          MR. ZAYOTTI:  Back on the record.

JAMES J. REIDY                                                          July 25, 2007

37

1    I understand that the document that I've
2    inquired about is claimed to be an
3    attorney/client privileged communication.  So
4    your instruction to your client not to answer
5    stands.
6         Q.    Sir, was the lawyer that you spoke to
7    concerning the security agreement referred to
8    in Exhibit 12 able to tell you anything about
9    the security agreement or the assignment?
10        A.    No.
11        Q.    Did he have any knowledge when you
12   spoke to him about what that assignment or
13   security agreement is?
14        A.    No.
15        Q.    Did you ask him to send you a copy of
16   the security agreement or the assignment?
17        A.    No.
18        Q.    Why not?
19        A.    I don't -- I didn't -- I still don't
20   **think it's even relevant.  It's clearly an**
21   **error.**
22        Q.    Well, the record speaks for itself.
23        A.    **I disagree.**
24        Q.    Sir, do you see a reference below

38

1    where it says Assignment No. 2 on the document
2    that's been marked as Exhibit 12?
3         A.    Yes.
4         Q.    Do you see below that where there is a
5    reference to Assignment No. 3?
6         A.    Yes.
7         Q.    And I believe -- I don't have it in
8    front of me -- but I believe there is a
9    reference to a security interest; is that
10   correct?
11        A.    Yes.
12        Q.    Do you know what that security
13   interest is?
14        A.    No idea.
15        Q.    Do you know what the reference to
16   Assignment No. 3 -- do you know anything about
17   that?
18        A.    No.
19        Q.    Did you speak with Timothy Ryan about
20   the security interest assignment?
21        A.    **No.  I just talked to him about the**
22   **security agreement.  I suspect the two go hand**
23   **in hand.**
24        Q.    But we don't really know; is that

39

1    right?
2         A.    **That's right.**
3         Q.    Do you know whether the patent
4    assignment agreement between J.J. Reidy &
5    Company and Free Water Company is the document
6    that was recorded and referenced in the four
7    title abstracts we've been looking at?
8         A.    **I don't understand the question.**
9         Q.    With regard to each of the four title
10   abstracts, I believe you noted that there was
11   an assignment from J.J. Reidy & Company to Free
12   Water Company, or at least a reference to that;
13   is that accurate?
14        A.    Yes.
15        Q.    And then there is a reference to a
16   recorded date relative to the assignment from
17   J.J. Reidy & Company to Free Water Company,
18   correct?
19        A.    **Right.**
20        Q.    Do you know whether the document that
21   was recorded is the patent assignment agreement
22   signed by Joseph Dutra, which is referred to in
23   the June 18, 2007 letter?
24        A.    **I don't know off the top of my head.**

40

1         Q.    With regard to each of the four title
2    abstracts which were marked as Exhibits 9
3    through 12, do you see reference to an
4    assignment subsequent to assignments by Janice
5    Beth Ann Reidy from you personally to J.J.
6    Reidy & Company?
7         A.    Yes.
8         Q.    Starting with the document that's been
9    marked as Exhibit 9, which is the title
10   abstract for the Reidy patent number ending
11   512, when was there an assignment from you
12   personally to J.J. Reidy & Company?
13        A.    **Well, there is a recorded assignment**
14   **here.  Execution date 8/12/03; recorded**
15   **8/18/03, as it is on all the other patents too.**
16        Q.    Do you have any memory regarding the
17   circumstances surrounding the assignments from
18   you personally to J.J. Reidy & Company?
19        A.    **I think I know what probably happened,**
20   **but I wouldn't remember a trivial action like**
21   **that.**
22        Q.    So are you saying that you can take a
23   guess at what you think happened?
24        A.    **Yeah.**

JAMES J. REIDY                                                                    July 25, 2007

41

1    Q.   But you don't know?

2    A.   **I know the probability.**

3         MR. ZAYOTTI:  I'll caution you not to

4    guess.  If you have a recollection that's one

5    thing, but I caution you not to guess.

6    Q.   Is it your belief that Brian Dingman

7    would have been the individual responsible for

8    carrying out the assignments from you

9    personally to J.J. Reidy & Company?

10   A.   **That would be my belief.**

11   Q.   You haven't asked Brian Dingman for

12   documents that relate or refer to any of those

13   assignments, correct?

14   A.   **No.**

15   Q.   Have you asked Brian Dingman for

16   copies of any documents concerning this

17   litigation or the patents, which are the

18   subject of this litigation?

19   A.   **I don't think so.**

20   Q.   Have you spoken to Brian Dingman about

21   this litigation since you commenced it?

22        MS. GREENE:  That's just a yes or a

23   no.

24   A.   **Yes.**

42

1    Q.   How many times have you talked to him?

2    A.   **Less than twice.**

3    Q.   Approximately when did you speak to

4    him?

5    A.   **At the beginning of this litigation.**

6    Q.   Both times?

7    A.   **Yeah.**

8    Q.   Sir, you are aware that the court

9    ordered you to produce documents -- strike

10   that.

11        Sir, are you aware that the court

12   ordered J.J. Reidy & Company to produce

13   documents that relate or refer to

14   correspondence with Attorney Dingman regarding

15   this litigation including the patents?

16   A.   **Yes.**

17   Q.   You have not requested documents from

18   Attorney Dingman responsive to that order?

19   A.   **No.  I mean --**

20        MS. GREENE:  You can just leave it.

21   You've answered the question.

22   Q.   Why haven't you asked Attorney Dingman

23   for copies of documents?

24        MS. GREENE:  Objection.

43

1    A.   **I wouldn't know what to ask for.**

2    Q.   Did you speak with Attorney Dingman

3    concerning the security agreement and security

4    interest referred to in the patent assignment

5    abstract, which has been marked as Exhibit 12?

6         MS. GREENE:  I'm going to instruct him

7    not to answer.  I think you're asking him

8    something that's in the realm of

9    attorney/client privilege.

10        MR. ZAYOTTI:  Well, I haven't asked

11   him what he said.  I'd asked him whether he

12   spoke to him or not.

13        MS. GREENE:  Well, if he spoke to him

14   about a certain topic, I would say that's

15   attorney/client privilege.

16   BY MR. ZAYOTTI:

17   Q.   Since you last appeared for your

18   deposition on June 26th, have you spoken with

19   Attorney Dingman?

20   A.   **Yes.**

21   Q.   How many times have you spoken to

22   Attorney Dingman?

23   A.   **Once.**

24   Q.   I thought your testimony before was

44

1    that --

2    A.   **I was wrong.  I forgot.  I'm telling**

3    **you now that I did.**

4    Q.   Approximately when did you speak to

5    him?

6    A.   **Same day we discovered this**

7    **assignment -- lien on the patents, which was at**

8    **our last deposition.**

9    Q.   What did you speak to him about?

10        MS. GREENE:  I'll instruct you not to

11   answer what you spoke to Mr. Dingman about.

12   That is attorney/client privilege.

13        MR. ZAYOTTI:  I think the court has

14   ordered that we are entitled to discover

15   communications between J.J. Reidy & Company and

16   Attorney Dingman that relate to this litigation

17   and that relate to the patents.

18        MS. GREENE:  As I recall it -- and

19   this is based on my memory -- the court ordered

20   that Mr. Reidy produce documents and

21   correspondence between himself and Mr. Dingman

22   and we've produced those.

23        I don't recall any court order

24   relating to any conversations that Mr. Reidy

JAMES J. REIDY                                                    July 25, 2007

45

1   may have had with Mr. Dingman.
2           MR. ZAYOTTI:  Are you taking the
3   position that we would be entitled to discover
4   written correspondence and documents, but we
5   would not be able to discover the substance of
6   those communications through either
7   interrogatories or through a deposition?
8           MS. GREENE:  I don't believe that was
9   the court's order.  We responded by providing
10  all of the documents that Mr. Reidy had
11  relating to communications with Mr. Dingman.
12  As to conversations that he had with
13  Mr. Dingman, I don't recall -- and we can go
14  back and look at the specific court order --
15  but I don't recall that was part of the court's
16  order.
17          MR. ZAYOTTI:  We're going to reserve
18  on that obviously.  I assume you're going to
19  maintain your objection and instruct Mr. Reidy
20  not to answer the question; is that correct?
21          MS. GREENE:  Yes.
22      Q.   Mr. Reidy, have you had any written
23  communications with Attorney Dingman since you
24  last appeared here on June 26th for your

46

1   deposition?
2       A.   I may have sent him an e-mail.  I'm
3   not sure.
4           MS. GREENE:  Let's take a break for a
5   moment.  Let's take a break.
6           MR. ZAYOTTI:  Okay.
7           (Off the record, 11:40-11:46 a.m.)
8           MR. ZAYOTTI:  Back on the record.
9       Q.   Sir, do you know whether you had any
10  written correspondence with Brian Dingman since
11  your deposition on June 26th?
12      A.   I think I had a sent him an e-mail.
13      Q.   What did that e-mail in substance say?
14      A.   It said that we had to make the
15  solution of this security agreement a top
16  priority.
17      Q.   Did Attorney Dingman respond in
18  writing?
19      A.   No.
20      Q.   Did he call you?
21      A.   No.
22      Q.   Did you speak to him after you sent
23  that e-mail?
24      A.   No.

47

1       Q.   Is it your testimony that you sent him
2   an e-mail and you had no response from Attorney
3   Dingman?
4       A.   Yes.
5       Q.   Do you know why?
6       A.   Yes.
7       Q.   Why?
8           MS. GREENE:  I would caution you if
9   it's anything that Mr. Dingman said to you,
10  you're not to testify to that.
11          MR. ZAYOTTI:  We'll reserve on that.
12      A.   You don't have to.  I have no
13  correspondence with Dingman whatsoever because
14  the patent attorney at this firm is handling
15  the matter.
16      Q.   I'm confused.  You sent Attorney
17  Dingman an e-mail asking him to look into the
18  security agreement issue.  Did you send him a
19  follow-up e-mail saying, Don't bother; I have
20  somebody else looking into it?
21      A.   No.
22      Q.   Do you know whether someone else
23  corresponded with Attorney Dingman and told him
24  not to bother looking into the security

48

1   agreement issue?
2       A.   I believe he was contacted by this
3   firm.  I don't know that for a fact.
4       Q.   You testified earlier that Attorney
5   Dingman would have been the individual who
6   would have taken care of any and all
7   assignments of the patents.  Do I have that
8   right?
9       A.   Yes.
10      Q.   Have you asked Attorney Dingman to
11  look for communications and documents
12  concerning assignments of the patents?
13      A.   No.
14      Q.   Why haven't you done that?
15      A.   It never occurred to me that I had to.
16      Q.   You've been aware, at least since June
17  26th, have you not, that there are some
18  substantial questions concerning the
19  assignments of the patents and ownership of the
20  patents?
21          MS. GREENE:  Objection.
22      A.   Not from my view.
23      Q.   You're aware that AirWater made
24  arguments before the court concerning ownership

JAMES J. REIDY                                                    July 25, 2007

81

1  manufacture and market products based on the
2  Reidy patents on a worldwide basis?
3      A.  Well, technically, I don't have the
4  right to give him that.  I can only give him a
5  license for the United States technically.  But
6  he can make of it whatever he wants.
7      Q.  Why is it that you could only give a
8  license for the U.S.?
9      A.  Because these are only U.S. patents.
10 Anybody -- never mind.
11     Q.  Go ahead.
12     A.  No.  I'll stop.
13     Q.  Is it your understanding that a
14 license -- strike the question.
15         Is it your understanding that a
16 worldwide license for United States patents
17 would really only be valid for the territory of
18 the United States?
19         MS. GREENE:  Objection.
20     A.  There is a perceived value that people
21 assume that's beyond my control.
22     Q.  Okay.  But putting aside what the
23 perceived value is of third parties, what is
24 your understanding?

82

1      A.  Those patents are only enforceable in
2  the United States.
3      Q.  Is it accurate to say that there is no
4  value to a license which extends beyond the
5  United States?
6      A.  No.
7      Q.  Well, can you explain to me what it is
8  you're saying?
9      A.  I already did.  There is a perceived
10 value that an incredible percentage of people
11 put on U.S. patents for whatever reason.  It
12 always astounds me.
13     Q.  I'm not talking about what the
14 perceived value is of third parties.  I'm
15 talking about what your understanding is.
16     A.  I already said.  These are --
17         MS. GREENE:  Let him ask you the
18 question.  Let's be sure you know what the
19 question is.
20     Q.  You said before that technically you
21 could only give a license for the United States
22 because the patents are only registered in the
23 United States; is that correct?
24     A.  I didn't say "registered."  I said

83

1  these are U.S. patents.  They're enforceable in
2  the U.S. only.
3      Q.  Your understanding is that you
4  couldn't license the Reidy patents outside of
5  the United States because the patents aren't
6  registered or they're not enforceable outside
7  of the United States; is that right?
8      A.  Technically correct.
9      Q.  So would it also be the case that you
10 could not require the payment of royalties from
11 a licensee of the Reidy patents for sales
12 outside of the United States; is that correct?
13         MS. GREENE:  Objection.
14     A.  That's not correct.
15     Q.  Why isn't that correct?
16     A.  Because if the licensee agrees to pay
17 me royalties under a blanket, then he agrees to
18 pay me under a blanket.
19     Q.  When you say "under a blanket," what
20 do you mean?
21     A.  If the agreement flat out says that I
22 get "X" percent of royalties on all sales of
23 AirWater generators, then I get "X" percentage
24 of royalties on sales of all AirWater

84

1  generators.
2      Q.  Even for AirWater generator sold
3  outside of the United States?
4      A.  Yes.
5          MR. ZAYOTTI:  Can I have this marked
6  as the next exhibit, please.
7              (Reidy Deposition Exhibit 13
8          so marked.)
9      Q.  Mr. Reidy, I'm showing you a document
10 that's been marked as Exhibit 13.  Do you
11 recognize that document?
12     A.  I recognize it.  It's from me to
13 Michael Zwebner.
14     Q.  And what is the date of that e-mail?
15     A.  June 25, 2003.
16     Q.  Have you had a chance to review the
17 content?
18     A.  No.
19     Q.  Why don't you let me know when you're
20 finished reading it.
21     A.  Okay.
22     Q.  The first sentence says, Mike Klein
23 calls me almost daily; he called me twice
24 today; the second time only a few minutes ago;

125

1    word "net," and he told you it's not in the
2    agreement.
3        MR. ZAYOTTI:  I'm asking him questions
4    about the interpretation of this contract.
5        MS. GREENE:  Go ahead and ask him
6    questions about the interpretation of this
7    contract.  That's fine.  I don't have a problem
8    with that.
9        Q.  Mr. Reidy, do you see in the contract
10   in the second sentence of the second paragraph
11   where it reads, Royalties shall be computed
12   based on the sales price less returns,
13   discounts, sales and use taxes, transportation
14   costs, shipping expenses, excise taxes, and
15   other such amounts.  Do you see that?
16       A.  Yes.
17       Q.  Okay.  If the royalties are to be
18   computed on the basis that I just read, is that
19   consistent to your understanding with the
20   previous sentence that says that royalties
21   shall be paid on the quarterly gross sales?
22       A.  I have no problem with the definition
23   of "quarterly gross sales" whatsoever.
24       Q.  That's nonresponsive.

126

1        A.  I don't know how to answer the
2    question.  It is above my CPA abilities.  I
3    know --
4        MS. GREENE:  You've answered it.  Let
5    him ask you another question.
6        Q.  Was it your understanding that upon
7    consummation of the global manufacturing and
8    marketing licensing agreement, AirWater would
9    immediately begin selling air-to-water
10   machines?
11       A.  It's my understanding that they would
12   immediately begin the endeavor of selling the
13   machines.
14       Q.  What did the endeavor or the selling
15   air-to-water machines involve, to your
16   understanding?
17       A.  Michael had to find a manufacturer and
18   set up a sales organization.
19       Q.  Was there any work to be done in terms
20   of research and development of the air-to-water
21   machines that were to be based on the Reidy
22   patents?
23       A.  Not in my opinion.
24       Q.  Did AirWater ever tell you that it was

127

1    going to take a period of time to engage in
2    research and development before it could begin
3    selling air-to-water machines?
4        A.  Don't recall.
5        Q.  Was it your understanding it was going
6    to take some period of time for AirWater to
7    find a manufacturer and set up manufacturing
8    operations before AirWater would begin making
9    sales of air-to-water machines?
10       A.  I don't think so.  I had a
11   manufacturer all ready to go.
12       Q.  You just testified that it was your
13   understanding that AirWater was going to have
14   to find a manufacturer.  So was it your
15   understanding that AirWater was going to use
16   your manufacturer?
17       A.  That was the most likely probability,
18   in my opinion.
19       Q.  Was it the most likely probability, or
20   it was the best course of action, in your
21   opinion?
22       A.  At that time, it was the best course
23   of action, in my opinion.
24       Q.  You understood, did you not, that

128

1    AirWater would need time to find a manufacturer
2    that could build the machines before AirWater
3    would begin selling them?
4        A.  I didn't know what AirWater was going
5    to do at that point.  That was Michael
6    Zwebner's decision.  I offered solutions and it
7    was his decision to do what he wanted to do.
8        Q.  What did he decide to do?
9        A.  He went off on his own looking for at
10   that time unknown manufacturers.
11       Q.  Did he ever discuss with you the
12   possibility of using the manufacturer you said
13   you had ready to use?
14       A.  Yeah, at one point that was the game
15   plan.
16       Q.  Who was that manufacturer?
17       A.  Desert Air.
18       Q.  And at some point, did you come to
19   understand that AirWater was not going to use
20   Desert Air?
21       A.  I don't think it was a sudden thing.
22   It just kind of evolved to the resignation that
23   he wasn't going to use Desert Air.
24       Q.  And when did you come to know that

129

1  AirWater was not going to use Desert Air?

2      A.  I don't recall that.  Probably in the

3  beginning of my -- when I sent my e-mails to

4  him complaining about what he was doing,

5  whenever that was.

6      Q.  The working prototype you built, that

7  was a machine that generated two gallons of

8  water; is that correct?

9      A.  No.

10     Q.  What did it generate?

11     A.  It was rated at five gallons a day at

12  80 degrees, 60 percent humidity.

13     Q.  How big was the storage tank?

14     A.  Two-gallon tank.

15     Q.  Okay.  Was it your understanding that

16  that was the only machine that AirWater was

17  going to build and sell?

18     A.  Not at all.  That machine would never

19  be built.

20     Q.  Why is that?

21     A.  That was a proof of concept working

22  prototype.  It's a billion miles away from a

23  production model.

24     Q.  You knew then that AirWater could not

130

1  just simply take your prototype and begin

2  building it and selling it, correct?

3      A.  No, I wouldn't agree.

4      Q.  You just said that the prototype was a

5  billion miles away from a production model or

6  something like that, correct?

7      A.  Right.

8      Q.  What did you mean by that?

9      A.  It means that it was a proof of

10  concept.  All the components are there and

11  proven to work.  An assembly machine would be

12  built visibly different, but the technical

13  components would be identical.

14     Q.  Why is that?

15     A.  Well, for one thing, the proof of

16  concept unit is made out of sheet metal.  For

17  another -- maybe more importantly -- it could

18  be made better in plastic.

19     Q.  You understood it would take some time

20  to develop a production model; did you not?

21     A.  Yes.

22     Q.  So you knew that AirWater was not

23  going to begin making sales immediately upon

24  execution of the global manufacturing and

131

1  marketing agreement, correct?

2      A.  No, I did not know that.

3      Q.  Was it your understanding that

4  AirWater had begun the development of

5  production models prior to entering into the

6  licensing agreement with J.J. Reidy?

7      A.  I wasn't aware of any such activity.

8      Q.  Is it fair to say that you expected

9  that AirWater wouldn't begin to develop

10  production models until after you had an

11  agreement, a final agreement, with AirWater?

12     A.  Say that again.

13     Q.  Would it be accurate to say that you

14  expected that AirWater would not begin

15  developing production models until after you

16  had a final agreement with AirWater?

17     A.  Okay.

18     Q.  Is that accurate?

19     A.  Yes.  Yes.

20     Q.  How long did you expect it would take

21  for AirWater to develop production models and

22  begin sales such that the quarterly royalties

23  provision of the contract would come into play?

24     A.  I have no idea.

132

1      Q.  You knew --

2      A.  I wasn't my decision.  I didn't know

3  what he was going to do, how he was going to do

4  it.

5      Q.  You knew it would be a period of time

6  before AirWater could begin manufacturing and

7  selling production model machines, correct?

8          MS. GREENE:  Objection.

9      A.  A period of time could be ten minutes.

10  I don't know.

11     Q.  Isn't it true that you and AirWater

12  anticipated it would be a year before AirWater

13  would have developed a production model and

14  begun sales such that the quarterly royalty

15  provisions of the contract would come into

16  play?

17     A.  No.

18     Q.  That's not true?

19     A.  That's not true.

20     Q.  How long did you expect it would take

21  before AirWater would be able to begin sales

22  which would trigger the quarterly royalty

23  provisions of the contract?

24     A.  I never related to quarterly sales.  I

JAMES J. REIDY                                                          July 25, 2007

141

1  in which there is a shortage of drinkable water
2  would be an attractive market for the
3  air-to-water technology?
4      **A.   Only if they had the required power**
5  **source.**
6      Q.   The agreement between AirWater and
7  J.J. Reidy, it's a global licensing agreement,
8  correct?
9      **A.   Correct.**
10     Q.   You had an expectation that AirWater
11  would be marketing air-to-water machines in
12  parts of the world other than the United
13  States, correct?
14     **A.   Yes.**
15     Q.   Is it your testimony that you and
16  Mr. Zwebner never talked about a plan to market
17  the air-to-water machines in third world
18  countries where drinkable water is in shortage?
19     **A.   I don't recall.  I just don't recall.**
20  **I mean, obviously, at first glance, another**
21  **sizable market would be countries that don't**
22  **have ready access to drinking water.  Whether**
23  **they're third world or not, I don't know.**
24     Q.   Well, presumably you've spent a lot of

142

1  time thinking about the products that would be
2  based on your patents since you first applied
3  for patents, correct?
4      **A.   Spent a lot of time working on my**
5  **patents?**
6      Q.   Spent a lot of time thinking about
7  where the markets might be?
8      **A.   Yeah.**
9      Q.   Are you saying that it never dawned on
10  you that countries in which water is in
11  shortage would be an attractive market for your
12  product?
13         MS. GREENE:  Objection.  That's not
14  what he said.
15     **A.   Bottled water industry, bottled water**
16  **market is what I perceive to be the biggest**
17  **market.  Another sizable market would be**
18  **countries with water shortages.**
19     Q.   Did you believe that AirWater would be
20  capable of developing a manufacturing
21  operation, developing production model
22  machines, and establishing awareness of the
23  machines in markets across the world within a
24  period of five months after you executed the

143

1  licensing agreement?
2      **A.   No.  That is not what I previously**
3  **said.  He could be selling in just the United**
4  **States in November with a positive cash flow.**
5  **I did not think he'd be selling worldwide in**
6  **five months.**
7      Q.   Do you see Page 1 of the contract at
8  the bottom of the page it says, Whereas
9  licensee has indicated to licensor of its
10  interest in both manufacturing and marketing
11  the Water Star systems and technologies on a
12  worldwide basis.
13     **A.   Yes.**
14     Q.   Is it your testimony that AirWater
15  never discussed with you its intention to
16  market and manufacturer the Water Star system
17  on a worldwide basis?
18     **A.   No.  It's not my contention.  It's**
19  **clear as a bell right here.**
20     Q.   Maybe I misunderstood your prior
21  testimony.
22         Did you and AirWater ever discuss
23  specific countries that AirWater intended to
24  target for its marketing activities relative to

144

1  the air-to-water machines?
2      **A.   Before or after the signing of this?**
3      Q.   Before.
4      **A.   I would think we had, but I don't**
5  **recall.**
6      Q.   You wouldn't be able to tell me
7  specific countries that you may have discussed
8  prior to entering into the licensing agreement?
9      **A.   I can't tell you at this time.  I**
10  **don't recall.**
11     Q.   Before you entered into the licensing
12  agreement, did you inform AirWater that you had
13  a PCT application pending?
14     **A.   I'm sure I did.**
15     Q.   Before you entered into the licensing
16  agreement, did you tell AirWater that you
17  intended to pursue registration of patents in
18  any specific counties pursuant to the PCT
19  application?
20     **A.   No.  That would have been Zwebner's**
21  **decision at that time.**
22     Q.   It would have been Mr. Zwebner's
23  decision which countries to pursue?
24     **A.   Yeah.**

145

1    Q.    Who had the right under the PCT
2    application to pursue foreign registrations of
3    patents?
4    A.    It's in the agreement that I would do
5    it at his request.
6    Q.    With regard to the --
7    A.    At his expense.
8    Q.    With regard to the PCT application,
9    who had the right under the PCT application to
10    apply for and pursue foreign registrations of
11    patents?
12    A.    Me.
13    Q.    Could AirWater, to your understanding,
14    have pursued registration of -- foreign
15    registration -- of patents pursuant to the PCT
16    application?
17    A.    No.  The mechanics of it were that
18    AirWater would request me to do it, and I would
19    do it at their expense.
20    Q.    Is that what the agreement says?
21    A.    Yeah.
22    Q.    I'm drawing your attention to Page 10
23    of the agreement.
24    A.    Yep.

146

1    Q.    Do you see at the top it says, Foreign
2    Patents and Trademark and Registrations?
3    A.    Right.
4    Q.    The last sentence of that section, do
5    you see that sentence?
6    A.    Yes.
7    Q.    It says, Licensor when applicable
8    shall make application for any foreign patents
9    desired by licensor at his own expense.  Did I
10    read that correctly?
11    A.    Right.
12    Q.    Who was the licensor under this
13    agreement?
14    A.    That's a typographical error there.
15    Q.    What should it say?
16    A.    Desired by licensee at his own
17    expense.  Licensor can't be both parties.
18    Q.    It should say, Licensor when
19    applicable shall make application for any
20    foreign patents desired by licensee at his own
21    expense?
22    A.    Yes.
23    Q.    Who is the "his" referred to at the
24    end of that sentence?

147

1    A.    Licensee.  Don't forget, Michael
2    Zwebner typed this.
3    Q.    In fact, with regard to foreign
4    applications -- strike the question, please.
5        You were granting AirWater the
6    exclusive right to market and manufacture the
7    Reidy patents, correct?
8    A.    Sorry.  I was reading.
9    Q.    You granted AirWater the exclusive
10    right to market and manufacturer the patents,
11    correct, market and manufacture products based
12    on the Reidy patents?
13    A.    Yes.
14    Q.    So it makes sense that it would have
15    been the licensee that would have had a desire
16    for registration, foreign registration of the
17    patents?
18    A.    Yes.  That's why that is a typo.
19    That's exactly why that's a typo.
20    Q.    Did J.J. Reidy ever make application
21    for any foreign patents?
22    A.    Yes.
23    Q.    Which ones?
24    A.    I had a PCT application -- at the time

148

1    of this signing, I believe I had one, two, or
2    three other patents pending in several
3    countries.
4        (Telephone rings.)
5        THE WITNESS:  This might be my man.
6        MS. GREENE:  Let's take a break.
7        (Off the record, 3:05-3:18 p.m.)
8        MR. ZAYOTTI:  Back on the record.
9    Q.    I think just before the break we were
10    talking about specific countries in which you
11    may have pursued foreign registration of the
12    Reidy patents pursuant to the PCT application.
13        Did you remember any specific
14    countries where you pursued foreign
15    registrations?
16    A.    The patents I originally mentioned, I
17    said I had PCT applications and one, two or
18    three patents pending in several countries.
19    The only country I can remember off the top of
20    my head is Egypt and Australia.  I'm sure there
21    were more.  But subsequent to those mentioned
22    patents, I now have an additional patent
23    pending in 23 countries.
24    Q.    With regard to the PCT application,

149

1  you had told AirWater before you entered into
2  the agreement that you had that PCT application
3  pending, correct?
4      A.   I don't recall but likely.
5      Q.   Did AirWater specifically ask you to
6  pursue foreign registrations of the patents in
7  any countries other than the ones you've just
8  mentioned?
9      A.   No, just the opposite, in fact.
10     Q.   What do you bean by that?
11     A.   He refused to pay the expenses of my
12  PCT and pending patents and they all expired.
13     Q.   Is it true that the right to pursue
14  foreign registrations in certain countries
15  pursuant to the PCT application had already
16  expired by the time you pursued registration?
17     A.   I never pursued registration.  I filed
18  the PCT application, and then when it was time
19  to file in these countries, Michael refused to
20  pay the cost of doing so, so we lost the
21  opportunity.
22     Q.   For example, did you -- I thought you
23  said that you actually attempted to register in
24  Egypt?

150

1      A.   Well, that's a different issue.
2  That's -- I said I had one, two, or three other
3  patents.  That has nothing to do with the PCT
4  patent.
5      Q.   That's something separate?
6      A.   Yes.
7      Q.   Just before the break, you got a phone
8  call.  Was that a call from the lawyer
9  concerning the assignments?
10     A.   Yes.
11     Q.   What did he say to you?
12         MS. GREENE:  Objection.  This is a
13  lawyer you've retained?  Let's go off the
14  record for a second.
15         (Off the record, 3:21-3:25 p.m.)
16         MR. ZAYOTTI:  Back on the record.
17         We had a conversation off the record
18  about information concerning prior assignments
19  of at least one of the patents, and we've
20  agreed to reserve on the issue, and we can
21  bring it up later, if necessary.
22         MS. GREENE:  That's fine.
23         MR. ZAYOTTI:  Is that okay?
24         MS. GREENE:  Yes.

151

1          MR. ZAYOTTI:  I would add that the
2  concern mentioned by deponent's counsel is
3  there may be some attorney/client privilege
4  which may attach to certain communications that
5  I would otherwise be inquiring into, and we've
6  agreed to try and resolve that issue.
7          MS. GREENE:  That's fine.
8          MR. ZAYOTTI:  Are you only able to go
9  until four today?
10         MS. GREENE:  Let's go off the record.
11        (Off the record, 3:26-3:26 p.m.)
12         MR. ZAYOTTI:  Back on the record.
13     Q.   There's a couple a couple of
14  interruptions.  We went off the record a couple
15  of times, and I may have asked you this before.
16  I think I did, but I have to ask it again.
17         To your memory, did AirWater ever ask
18  you to file or pursue foreign registration of
19  patents pursuant to the PCT application that
20  you had pending at the time you entered into
21  the contract?
22     A.   And I responded that just the opposite
23  was true.  He refused to pay the expenses of
24  foreign pending patents.

152

1      Q.   Did he tell you why he was refusing to
2  pay expenses relating to foreign registrations
3  of the patents?
4      A.   No.
5      Q.   Did he ever tell you that it was his
6  belief that it was J.J. Reidy's obligation to
7  bear the expense of foreign registrations?
8      A.   No.  Maybe after the fact, he might
9  have claimed that, but he certainly didn't
10  claim it at the time because it would have been
11  a stupid argument.
12     Q.   Ultimately, no foreign registrations
13  were ever made pursuant to the PCT application;
14  is that accurate?
15     A.   Best I can recall.  In that
16  particular -- I mean, I have other subsequent
17  PCT applications that I have paid for by
18  myself.
19     Q.   Drawing your attention to Page 3 of
20  the agreement.  Do you see approximately in the
21  middle of the page it says -- there is a
22  heading, Territory?
23     A.   Uh-huh.
24     Q.   We talked about that already a little

153

1    bit.  I want to ask you some follow-up
2    questions.
3           Where it states that the licensed
4    property and technology and all proprietary
5    rights are to be valid all over the world
6    without restrictions, was it your understanding
7    that the intent of the parties was for the
8    patents to be registered pursuant to the PCT
9    application in any or all of the countries that
10   are members of that treaty?
11      A.   Well, first off, to be valid all over
12   the world without restrictions is a nonsensical
13   statement.  I think what this paragraph was
14   meant to convey is the fact that I would honor
15   this agreement with Zwebner all over the world
16   without restrictions.  That's the way I read it
17   because it doesn't -- to read it, Patent is to
18   be valid all over the world without
19   restrictions; that's an absolute impossibility.
20   I mean, that's so stupid.  It can't be read
21   that way.
22      Q.   Why, because it makes no sense?
23      A.   Well, how in the world -- pardon the
24   pun -- but how in the world can I force every

154

1    country in the world to honor my patents?  It
2    can't be done.
3       Q.   In your testimony on one of the prior
4    days, you had stated or testified that the
5    intent at the time the parties entered into
6    this agreement was that you would have patents
7    all over the world or wherever you wanted them;
8    do you remember that testimony?
9       A.   Yeah.  That's true.
10      Q.   What I'm trying to get at is really
11   what was intended.  If this language doesn't
12   make sense, what was intended?  Was it that
13   there would be an ability to register the
14   patents in the specific countries that are
15   members of the Patent Corporation Treaty?
16      A.   Yeah.  There is other treaties too.
17   There is the Gulf Corporation Treaty, the
18   European Treaty.  The intent was -- I was
19   working.  I had patents, foreign patents,
20   pending at the time.  I intended to file
21   additional foreign patents, which I
22   subsequently did do.  Then we would go to the
23   expense on a country-by-country basis at
24   Zwebner's request.  So when we say "all over

155

1    the world," that means all over the world where
2    he wants that.
3       Q.   Your earlier testimony is the reason
4    patents weren't filed in any of the foreign
5    countries pursuant to the PCT application was
6    because Zwebner refused to pay?
7       A.   Right.
8       Q.   It was AirWater's obligation to pay,
9    as you understand the agreement?
10      A.   Yes.
11      Q.   Let's go back and talk about royalties
12   again for a minute.  Turn back to Page 5.
13   We've talked about the first sentence in the
14   section entitled, Minimum monthly royalty
15   payments.
16          Can you take a moment and review the
17   second sentence of this section and tell me
18   when you're done?
19      A.   I'm done.
20      Q.   Okay.  The second sentence reads,
21   Licensee agrees that for a period of 12 months
22   commencing November 1, 2003 any unearned
23   minimum monthly royalties shall be credited to
24   any earned royalties and may, if applicable, be

156

1    applied at any time during this 12-month
2    period.
3       A.   Yeah.
4       Q.   Did I read that correctly?
5       A.   Yes.
6       Q.   Okay.  What does that clause mean?
7       A.   Well, it was a goodwill gesture on my
8    part.  It was an -- I didn't know how to
9    explain it intelligently, but for 12 months --
10   when he starts paying me ten grand a month on
11   November 1, just for 12 months -- let's say he
12   paid me ten grand in November with no sales and
13   then in December, let's say I would have earned
14   $15,000 in royalties but he would have only had
15   to pay me ten because I would give him credit
16   for the previous's month's ten.  So I still end
17   up netting a minimum of $10,000 a month but he
18   -- and like I say, it was just a -- I thought
19   it was a nice act on my part to do this -- I
20   would give him credit for anything exceeding
21   ten grand a month as long as it was one of
22   those ten grands that were paid in the first
23   year.  Do you follow what I'm saying?
24      Q.   I might.  Let me ask you the questions

157

1  and depending on your answer, then I understand
2  it.
3        Is it your testimony that this second
4  clause meant that regardless of what AirWater
5  sales were for the first 12-month period,
6  AirWater would only be obligated to pay 10,000
7  per month for each of those first 12 months?
8     **A.   Well, that's -- no.  Because you can**
9  **go to the other extreme.  Let's say -- let me**
10 **put it a different way.**
11       **Let's say he pays me 120 grand in that**
12 **12-month period.  Then let's say the next 12 --**
13 **well, it wouldn't be the next 12.  It can't**
14 **work that way.  It's got to be six months.**
15 **Let's say six months, he pays me 60 grand**
16 **unearned.  The next six months of the 12-month**
17 **period, he pays me --**
18    **Q.**   Could I stop you for one second?  What
19 do you mean "unearned"?
20    **A.**   **That means there was no sales so**
21 **there was no royalty.**
22    **Q.**   There is no percentage royalty under
23 the quarterly royalty provision of the
24 contract?

158

1     **A.**   **Right.  Right.**
2     **Q.**   Sorry.  Go ahead.
3     **A.**   **Let's say the second six months -- how**
4  **did I do this?  The second six months, let's**
5  **say I have actual royalties due me of 120.  I**
6  **would give him -- he would only have to pay me**
7  **100 because I would give him credit for**
8  **anything over ten grand a month.  I don't know**
9  **if I'm saying that right.  I probably should**
10 **work out a better example.**
11       **The idea was that I would get a**
12 **minimum of 10,000 a month and -- maybe this**
13 **does it -- and no more than 10,000 a month --**
14 **if the royalties were more than ten grand a**
15 **month, he could deduct it from what he's**
16 **already paid me in the previous 12 months.  I**
17 **think that's the clearest way of saying it.**
18 **Any royalties in that 12-month period that**
19 **exceed ten grand a month, he doesn't have to**
20 **pay because he will be building up credit so**
21 **it's ten grand a month against earned**
22 **royalties.**
23       **I get ten grand a month anyway and he**
24 **doesn't have to pay me the next excess that has**

159

1  **to be in the six-month period.  He doesn't have**
2  **to pay me more than -- if I did it really**
3  **stupid -- well, does that make any sense to**
4  **you?**
5        MS. GREENE:  If you're unclear on it,
6  why don't you think about it and we can come
7  back to it.
8        THE WITNESS:  It's hard to explain.  I
9  have to come up with an example where --
10       MS. GREENE:  You don't need to come up
11 with an example.
12    **Q.**   I would like an example.  I would like
13 to know how it is supposed to work.  Go ahead.
14 You can answer.
15       MS. GREENE:  Jim, why don't you take a
16 break and think about this, if you need to take
17 a break and think about it rather than doing it
18 on the fly.
19       MR. ZAYOTTI:  This isn't on the fly.
20 This is an agreement that has been in place
21 since --
22       MS. GREENE:  But he's trying to give
23 you an example.
24    **A.**   **I think I can do it this time.**

160

1  **$10,000 in the first month.  The second month,**
2  **let's say earned royalties of 15,000.  He only**
3  **has to pay me ten.  And he gets -- he'll have a**
4  **remaining credit of five for that one.  If the**
5  **next month, my earned royalties are 20, he**
6  **would only have to pay me 15 because I still**
7  **had 5,000 left of unearned royalties.  That's**
8  **the way it's supposed to work.**
9     **Q.**   Sorry.  I am having trouble following
10 that.
11    **A.**   **All right.  Well --**
12       MS. GREENE:  Let him ask you a
13 question.  You've explained it.
14 BY MR. ZAYOTTI:
15    **Q.**   Let's start with the first month of
16 November 2003.
17    **A.**   **Yes.**
18    **Q.**   Let's suppose AirWater has sales of
19 200,000 for that first month.
20    **A.**   **Has sales.  Okay.  That would be**
21 **earned royalties of 10,000.**
22    **Q.**   That would be earned royalties of
23 10,000?
24    **A.**   **Right.**

JAMES J. REIDY                                                    July 25, 2007

161

1    Q.   What would AirWater be obligated to
2    pay in that example?
3    A.   10,000.
4    Q.   Let's say AirWater had sales of
5    100,000 during the first month, what would
6    AirWater be obligated to pay?
7    A.   **He'd give me 5,000 unearned royalties**
8    **and 5,000 earned royalties. I'd still get --**
9    **wait a minute, 100,000?**
10   Q.   Yes.
11   A.   **He would give me 2,500 of earned --**
12   **wait a minute. Five percent of 100,000 is**
13   **5,000. So he would give me $5,000 of earned**
14   **royalties and 5,000 of unearned royalties,**
15   **which could be carried forward. He'd have a**
16   **potential credit of $5,000. Do the next month.**
17   Q.   Okay. Let's suppose AirWater had
18   sales of $300,000 during the first month,
19   November 1, 2003 -- sorry -- during the first
20   month, November of 2003?
21   A.   **300,000?**
22   Q.   Yes.
23   A.   **I'd get royalties of 15,000. And**
24   **there would be no -- nothing creditable to him.**

162

1    Q.   Would AirWater pay you 15,000?
2    A.   **Yes, $10,000 or 5 percent, whichever**
3    **is more.**
4    Q.   So let's go back to the second example
5    of the 100,000 for November 2003. If there is
6    100,000 in sales, 5 percent of that would be
7    5,000?
8    A.   **Right.**
9    Q.   What does AirWater actually pay you in
10   that scenario?
11   A.   **10,000.**
12   Q.   And is it 10,000 under the minimum
13   monthly royalty clause?
14   A.   **Yeah. Yeah.**
15   Q.   Because --
16   A.   **It's either 5 percent or 10,000,**
17   **whichever is more. But then I say, if the next**
18   **month his sales are 300,000, the royalties due**
19   **me would be 15. But he's -- I'm giving him a**
20   **credit of five on the unearned in the first**
21   **month. In that case, he'd just pay me ten**
22   **again.**
23   Q.   And what happens to that $5,000
24   credit; it's a credit and he doesn't owe it to

163

1    you?
2    A.   **It's a credit that he can take if --**
3    **that 12-month period, it's a credit I'll give**
4    **him once his royalties start going over ten**
5    **grand a month. I mean, give me another. You**
6    **can do --**
7    MS. GREENE: Let him ask you the
8    questions. You don't need to offer to do
9    things. Let him ask you the questions.
10   THE WITNESS: I don't know how to
11   explain it any better.
12   MS. GREENE: That's all right.
13   BY MR. ZAYOTTI:
14   Q.   What does the term "unearned minimum
15   monthly royalty" mean in that clause?
16   A.   **Unearned. In other words, it's not**
17   **backed up by any sales. It's not 5 percent of**
18   **a sale. But I still get the ten grand a month.**
19   **It's like I didn't earn it; it's unearned.**
20   **There was no sales so there was no real**
21   **royalty.**
22   Q.   Who drafted this clause, the second
23   clause under the section, Minimum monthly
24   royalty?

164

1    A.   **That was my idea. I was just trying**
2    **to be nice at the time.**
3    MS. GREENE: He asked you who drafted
4    it.
5    A.   **Well, Michael did all the typing.**
6    Q.   You came up with this language in this
7    second clause?
8    A.   **I think so.**
9    Q.   Okay. To your understanding, does the
10   contract require AirWater to pay royalties on
11   sales of machines built and sold outside of the
12   United States?
13   A.   **Yeah.**
14   Q.   It does?
15   A.   **Yeah.**
16   Q.   Under the minimum monthly royalty
17   payment clause of the contract, what was to
18   happen after the first 12 months in terms of
19   royalty payments?
20   A.   **It just continued for the life of the**
21   **contract. Doesn't stop after 12 months. That**
22   **second paragraph has no relationship to the**
23   **first paragraph, except for stating the amount.**
24   Q.   So the minimum monthly royalty

169

1    Q.    What were they claiming in the
2  lawsuit?
3    A.    I don't get it.  I mean, the lawsuit
4  -- they got the dates all wrong.
5         MS. GREENE:  He's just asking you what
6  were they claiming in the lawsuit.  Either you
7  know or you don't know.
8    A.    I don't know.
9    Q.    Is it your understanding that AirWater
10 countersued ELGT?
11   A.    Yes.
12   Q.    Do you know what AirWater countersued
13 for?
14   A.    I think it was defamation.  I'm not
15 sure.
16   Q.    Do you know what the outcome of the
17 various claims asserted in the ELGT-related
18 litigation was?
19   A.    I believe he got $50,000 in cash, some
20 stock in ELGT, and title to one patent.
21   Q.    Do you know whether AirWater's claims
22 against ELGT were asserted as counterclaims in
23 the lawsuit initiated by ELGT?
24   A.    No, I don't know.

170

1    Q.    Do you know whether AirWater filed a
2  separate lawsuit countersuing ELGT?
3    A.    I think they did.  Yeah.
4    Q.    Did you participate in the countersuit
5  at all in any way?
6    A.    Mr. Zwebner would not let me.
7    Q.    Did you ever respond to this November
8  10, 2004 letter, which has been marked as
9  Exhibit 18?
10   A.    I think I had my attorney notify them
11 that they were in breach of contract and had a
12 grace period to correct it.
13   Q.    Did you, yourself, ever respond to the
14 statement in AirWater's November 10, 2004
15 letter that the company has been consistent in
16 making the $10,000 advanced royalty payments to
17 you that were agreed to for the year beginning
18 November 1, 2003?
19   A.    I hate to do this to you, but ask the
20 question again.
21   Q.    Did you personally ever respond to the
22 statement in the letter before you that
23 AirWater had been consistent in making the
24 $10,000 advanced royalty payments that were

171

1  agreed to for the year beginning November 1,
2  2003?
3    A.    No.
4    Q.    Is it accurate to say that you never
5  personally disputed in writing AirWater's
6  statement in the November 10, 2004 letter that
7  the agreement called for payment of minimum
8  royalties for a period of one year only?
9         MS. GREENE:  Objection.
10   A.    I never responded in any fashion to
11 this letter personally, that I recall.
12   Q.    Why didn't you respond?
13        MS. GREENE:  Objection.
14   A.    I knew what Zwebner was up to, and I
15 knew I was going to need an attorney.  I just
16 passed it off to the attorney.
17   Q.    As of November 10, 2004, had AirWater
18 paid all royalties and minimum royalties that
19 you claim were due?
20   A.    Yes.
21        MS. GREENE:  Let's go off the record
22 for a second.
23        (Off the record, 3:57-4:06 p.m.)
24        MR. ZAYOTTI:  Back on the record.

172

1    Q.    Mr. Reidy, if you believed that
2  AirWater was obligated to pay J.J. Reidy
3  $10,000 per month at a minimum every month for
4  the term of the license agreement, why is it
5  that you didn't respond to AirWater's November
6  10, 2004 letter and dispute its contention to
7  the contrary?
8         MS. GREENE:  Objection.
9    A.    At that time Mr. Zwebner and I were
10 not getting along at all.  I knew him better,
11 and I knew what the intent of this letter was,
12 and I recognized it as him trying to lay ground
13 work for a defense.
14        I wasn't talking to him anymore.  He
15 forbid his employees to talk to me.  I knew
16 where this was going.  I just went there, gave
17 it to my attorney and said, Let's go through
18 the termination procedure.
19   Q.    At this point in time, November 10,
20 2004, AirWater had already paid everything you
21 claim was due from them?
22   A.    Up until the time of this letter, he
23 was paying as it was due.
24   Q.    Why weren't you and Mr. Zwebner

JAMES J. REIDY                                                July 25, 2007

189

1  late payment fees?

2     A.    $1,600.

3     Q.    Does reviewing this letter, Exhibit

4  21, refresh your recollection as to how J.J.

5  Reidy computed the categories of damages in

6  J.J. Reidy's automatic discovery disclosure,

7  which has been marked as Exhibit 20?

8     A.    It totals very closely to the 22,000.

9  This letter totals 21,600. So that's probably

10  where that number came from rounded off.

11    Q.    And the date of J.J. Reidy's automatic

12  discovery disclosure was May 17, 2005; is that

13  correct?

14    A.    Yes.

15    Q.    As of May 17, 2005, J.J. Reidy was not

16  claiming that AirWater was obligated to pay

17  minimum monthly royalty payments beyond the

18  December 1, 2004 royalty payment; is that

19  correct?

20         MS. GREENE: Objection.

21    A.    I don't know.

22    Q.    Well, if J.J. Reidy was claiming in

23  May of 2005 that AirWater was obligated to

24  continue to pay and is liable for the

190

1  nonpayment of minimum monthly royalties in the

2  amount of 10,000 per month for the life of the

3  license, wouldn't the computation of damages in

4  J.J. Reidy's automatic discovery disclosure

5  have been significantly higher?

6         MS. GREENE: Objection.

7     A.    We didn't know that AirWater wanted to

8  maintain this license at that time. We thought

9  this license would terminate cleanly with just

10  two months due at the time.

11    Q.    Isn't it true that you didn't dispute

12  AirWater's assertion that the minimum monthly

13  royalties were payable for a period of only 12

14  months until after you consulted with your

15  attorney?

16         MS. GREENE: Objection.

17    A.    No. That's not true.

18    Q.    You did dispute that contention?

19    A.    Well, what do you mean by "dispute"?

20    Q.    Did you dispute to AirWater its

21  assertion that it was obligated to pay minimum

22  monthly royalties for a period of 12 months

23  only before you consulted with your lawyer?

24         MS. GREENE: What assertion are you

191

1  talking about? Where, in a particular document

2  or in general?

3         MR. ZAYOTTI: We talked extensively

4  about that assertion. The assertion is in the

5  November 10, 2004 letter, which has been marked

6  as Exhibit 18.

7         MS. GREENE: He testified previously

8  he had a notice of default sent by his

9  attorneys.

10        MR. ZAYOTTI: Maura, are you going to

11  testify for him?

12        MS. GREENE: No, but you --

13        MR. ZAYOTTI: I've asked the question,

14  and you're not letting him answer.

15        MS. GREEN: You've asked this. It's

16  asked and answered, asked and answered.

17        MR. ZAYOTTI: No, it's not. It most

18  certainly is not.

19    A.    I disputed it immediately.

20    Q.    You did?

21    A.    Virtually immediately when I got this

22  letter.

23    Q.    I thought you testified before that

24  you didn't dispute it; you just simply sent the

192

1  letter to your attorney?

2     A.    What is your definition of "dispute"?

3  My definition of dispute is, Hey, we have a

4  legal problem here, and I turned it over to my

5  attorney. That's the dispute.

6     Q.    But you never sent a piece of writing

7  to AirWater telling AirWater or asserting to

8  AirWater that its interpretation of the minimum

9  monthly royalty provision was incorrect?

10        MS. GREENE: Objection.

11    A.    Me personally?

12    Q.    Before you consulted with your lawyer.

13    A.    No, not after getting that letter.

14        MR. ZAYOTTI: Can you mark that as the

15  next exhibit, please.

16        (Reidy Deposition Exhibit 22

17        so marked.)

18    Q.    Mr. Reidy, I'm showing you a document

19  that's been marked as Exhibit 22. Take a

20  moment and review that and let me know if you

21  recognize it.

22    A.    Yeah, I do.

23    Q.    What is what document?

24    A.    It's a notice of default sent to

**EXHIBIT C**

UNCERTIFIED ROUGH DRAFT

Page 1

1                            VOLUME V
                            PAGES: 1-91
2                           EXHIBITS: 24-31

3               UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
4
                           SUPERIOR COURT DEPT.
5                          OF THE TRIAL COURT
                           NO. 05-40049-FDS
6
*************************************
7   J.J. REIDY & CO., INC.,                    *
                                               *
8   vs.                                        *
                                               *
9   AIRWATER CORPORATION AND                   *
    AIRWATER PATENTS CORPORATION,              *
10                                             *
*************************************
11                                             *
                           NO. 06-10137-FDS*
12  AIRWATER PATENTS, INC.                     *
                                               *
13  VS.                                        *
                                               *
14  J.J. REIDY & CO., INC.                     *
*************************************
15

16        CONTINUED DEPOSITION OF JAMES J. REIDY

17               BOWDITCH & DEWEY, LLP

18                 311 Main Street

19              Worcester, Massachusetts

20      WEDNESDAY, JULY 26, 2007, 10:47 A.M.

21

22        ----- Linda Horne, CSR, RPR -----
               EPPLEY COURT REPORTING, LLC
23                Post Office Box 382
            Hopedale, Massachusetts 01747
24      (508) 478-9795   (508) 478-0595 (Fax)

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 6

```
 1      A.   Those are pending patents in various
 2  countries, GCC, European, patent application
 3  and the PCT application and several individual
 4  patent applications.
 5      Q.   What is a GCC patent application?
 6      A.   That the Gulf Corporation Consult.
 7  It's seven Mideast countries there, six or
 8  seven.
 9      Q.   Do you know which ones?
10      A.   If I had a map -- it's six or seven.
11  Saudi, Cutter, all of those abutting countries.
12      Q.   With regard to No. 5, which states,
13  Egyptian patent application pending, then there
14  is a number, No. 100/2000.
15           Do you know what that number
16  indicates?
17      A.   I suspect that's the number that the
18  Egyptian government gave my application.
19      Q.   Does the 2000 refer to the year that
20  the application was filed?
21      A.   I don't know.
22      Q.   Do you have any recollection as to
23  when you made the Egyptian patent application?
24      A.   No.
```

Page 7

```
 1      Q.   Number 6 references again an Egyptian
 2  patent application No. 101/2001.  It relates to
 3  an ultraviolet transmissive tubing in a water
 4  generation device.  What invention does that
 5  refer to or relate to?
 6      A.   You have to rephrase that.  I don't
 7  know what you're saying.
 8      Q.   The reference to ultraviolet
 9  transmissive tubing in a water generation
10  device, what invention is that referring to?
11      A.   It's referring to the specialized
12  tubing I use to transmit -- it's UV
13  transmissive tubing.
14      Q.   Is that tubing patented?
15      A.   What do you mean?
16      Q.   The ultraviolet transmissive tubbing
17  in a water generation device, is that covered
18  within the scope of any of the U.S. Reidy
19  patents?
20      A.   I don't know.
21      Q.   How about --
22      A.   I would...
23      Q.   Go ahead.
24      A.   The implication is that it is not
```

Page 8

```
 1  covered in the other patents because you can't
 2  get a patent on something that's already
 3  patented.
 4      Q.   How about with regard to No. 5, the
 5  sterile air vents and other air ports in a
 6  water generation device.  Is that invention
 7  covered within the scope of any of the Reidy
 8  U.S. patents?
 9      A.   No.  It's coming back to me now.
10  These are improvements.  These are independent
11  improvements on the four original patents.
12      Q.   When you say "these," are you
13  referring to Items 5 through 12?
14      A.   No, five through eight.
15      Q.   Those relate to improvements to one or
16  more of the four U.S. Reidy patents?
17      A.   Yes.
18      Q.   How about Nos. 9 through 12?
19      A.   That's a totally independent
20  alternative method of doing -- of extracting
21  drinking water from the air.  They have no
22  relationship to the four issued patents.
23      Q.   Thermoelectric high-efficiency water
24  generating device is referenced in each of
```

Page 9

```
 1  Items 9 through 12.  What is that?
 2      A.   What do you mean?
 3      Q.   What is a thermoelectric
 4  high-efficiency water generating device?
 5      A.   It's totally electronic.  It operates
 6  with a cold sink and a hot sink.  The hot sink
 7  takes the heat off of the cold sink, thereby,
 8  making it cold.  The ambient air is passed over
 9  the cold sink.  It condenses the moisture out
10  of the air, much like the traditional
11  refrigerant coils do, but it doesn't have
12  coils.  It doesn't have a compressor.  It
13  doesn't have refrigerants.
14      Q.   Okay.  Do you see with regard to Item
15  No. 9, there is a reference that says,
16  International patent application?
17      A.   Yeah.
18      Q.   And then it says, No. PCT?
19      A.   Yes.
20      Q.   That's a PCT application, I take it?
21      A.   That's right.
22      Q.   Do you see where it says, Pending
23  worldwide?
24      A.   Yes.
```

3 (Pages 6 to 9)

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 14

1  possibility of employment with AirWater in
2  connection with the license agreement; do you
3  remember mentioning that?
4      A.  I remember talking about possible
5  employment with AirWater, but I don't believe
6  there is any written agreement about it.
7      Q.  I think your testimony was something
8  to the effect of AirWater was supposed to
9  employ you?
10     A.  Well, early on before this was
11 signed --
12     MS. GREENE:  Okay.  There is no
13 question.
14     Q.  Is that correct?
15     A.  Say it again.
16     Q.  You testified to the effect that
17 AirWater was supposed to employ you; is that
18 correct?
19     A.  I don't think so.
20     Q.  We can go back and look at the
21 transcript, but what was your understanding or
22 what were your discussions concerning the
23 possibility of employment with AirWater in
24 connection with the license agreement?

Page 15

1      A.  There was a distinct possibility that
2  AirWater would hire me.
3      Q.  Was that something you and Mr. Zwebner
4  discussed?
5      A.  Yeah.
6      Q.  When did you discuss that?
7      A.  I don't know, sometime prior to
8  signing this document.
9      Q.  What was the substance of that
10 communication?
11     A.  We didn't get into any details.  One
12 comment I do remember is that I would be doing
13 a lot of traveling.
14     Q.  What do you mean by that; you mean if
15 you were employed by AirWater, you would be
16 traveling a lot?
17     A.  Yeah.
18     Q.  Did you ask Mr. Zwebner or suggest to
19 Mr. Zwebner that you would desire to be
20 employed by AirWater?
21     A.  I don't think so.
22     Q.  Isn't it true that you desired to be
23 employed by AirWater because employment with
24 AirWater would give you a stream of income?

Page 16

1      A.  No, that's not true.
2      MR. ZAYOTTI:  Off the record for a
3  second while I find this reference.
4      (Off the record, 11:01-11:11 a.m.)
5      MR. ZAYOTTI:  Back on the record.
6      Q.  Mr. Reidy, let me ask you this:  With
7  regard to the shares of UCSY stocked that were
8  issued to you, isn't it true that those shares
9  were restricted for a period of one year from
10 the time they were issued to you?
11     A.  Yes.
12     Q.  So you couldn't sell those shares of
13 stock for a period of one year; isn't that
14 right?
15     A.  Right.
16     Q.  Isn't it also true that the question
17 of your possible employment with AirWater arose
18 because you weren't going to have any income
19 during that period of one year through the sale
20 of the shares of stock?
21     A.  No.
22     Q.  Isn't it also true that --
23     A.  I just said it wasn't true.
24     Q.  I'm asking you a different question,

Page 17

1  sir.
2      Isn't it true that the question of
3  monthly royalties, minimum monthly royalties,
4  was brought up because you were not going to be
5  able to sell the shares of UCSY stocked that
6  were issued to you for a period of one year?
7      MS. GREENE:  Objection.
8      A.  I don't recall that.
9      Q.  Isn't it true that you and Mr. Zwebner
10 discussed and agreed that AirWater would pay
11 minimum monthly royalties to J.J. Reidy for a
12 period of 12 months because J.J. Reidy would
13 not be able to sell the shares of UCSY stock
14 for a period of one year?
15     MS. GREENE:  Objection.
16     A.  Not true.
17     Q.  What were the circumstances under
18 which you and Mr. Zwebner discussed the
19 possibility of employment?
20     A.  I think it was just casual, random,
21 and brief.  Never got into details.
22     Q.  Did he suggest to you that he wanted
23 to employ you?
24     A.  He did at one time, I believe.

5 (Pages 14 to 17)

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 18

1    Q.   It's your recollection that he
2  suggested to you that he wanted to have
3  AirWater employ you?
4    A.   I think so.
5    Q.   What was your position going to be?
6    A.   Like I said, the only detail was that
7  I would be doing a lot of traveling.  We never
8  got into duties, that I can recall.
9    Q.   Why was it that you and Mr. Zwebner
10  didn't continue to discuss the details of your
11  possible employment with AirWater?
12    A.   Two reasons.  One, our relationship
13  was degrading; two, he was going off on a wild
14  path on his own.
15    Q.   Your relationship was degrading before
16  you entered into the licensing agreement?
17    A.   No.
18    Q.   I thought you said before that you had
19  discussed the possibility of employment before
20  you entered into the licensing agreement?
21    A.   That's right.
22    Q.   So the deterioration of your
23  relationship played no part in the decision not
24  to employ you; isn't that right?

Page 19

1    A.   No.
2    Q.   Sir, you just said that your
3  relationship wasn't deteriorating before you
4  entered into the license agreement?
5    A.   That's right.  You're confusing the
6  facts.
7    Q.   Why don't you tell me what the facts
8  were?
9    MS. GREENE:  About what?
10    MR. ZAYOTTI:  About the discussions
11  concerning the possibility of employment and
12  why it was that there was no agreement reached
13  concerning Mr. Reidy's possible employment.
14    A.   Prior to signing the agreement, we had
15  casual, brief talks about my possible
16  employment.  After signing the agreement, it
17  became rapidly apparent to me that that was not
18  going to happen.
19    Q.   And when did it become apparent that
20  that wasn't going to happen?
21    A.   When Zwebner went off on his own and
22  built his own machines, totally without my
23  input.
24    Q.   And can you approximate for me in time

Page 20

1  when that happened?
2    A.   No.
3    Q.   Well, was it a month after you signed
4  the license agreement?
5    A.   I would say it was one to six months
6  after.
7    Q.   So is it your contention that you and
8  Mr. Zwebner continued to discuss the
9  possibility of your employment after you
10  entered into the license agreement?
11    A.   The last time we talked about my
12  employment was the second meeting in Boston
13  when he told me he would put me in charge of
14  sex.
15    Q.   That was a discussion concerning
16  employment?
17    A.   Yes.
18    Q.   What else was said?
19    A.   It was a business meeting with my
20  engineer.  We were going over the features of
21  my water machine.
22    Q.   When was that meeting?
23    A.   It was a week to -- I don't know.  It
24  was more than a week from when I signed the

Page 21

1  license.
2    Q.   More than a week after you signed the
3  license agreement?
4    A.   Yeah.
5    Q.   Was it more than a month after you
6  signed the license agreement?
7    A.   I don't recall.
8    Q.   Can you recall whether it would have
9  been more than two months after you signed the
10  license agreement?
11    A.   No.
12    Q.   No, it wasn't or, no, you can't
13  recall?
14    A.   I can't recall.
15    Q.   Is it possible that it could have been
16  six months after you signed the license
17  agreement?
18    A.   It's possible.
19    Q.   Is it possible that you had that
20  conversation more than a year after you signed
21  the license agreement?
22    A.   I don't think so.
23    Q.   Sir, do you recall, before you entered
24  into the license agreement, sending Mr. Zwebner

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 26

1      MS. GREENE:  Objection.
2      A.  I don't know.
3      Q.  After you prepared the first draft of
4  the license agreement --
5      A.  I'll correct myself.  I didn't prepare
6  that draft.  My attorney, Brian Dingman,
7  prepared that draft for another venture, and I
8  gave that draft to Michael as a starting point.
9      Q.  So Attorney Dingman -- you used a
10  draft agreement prepared by Attorney Dingman?
11      A.  Yeah.
12      Q.  Was that the basis for the license
13  agreement that was ultimately signed?
14      A.  No.
15      Q.  What happened after you sent
16  Mr. Zwebner that initial draft license
17  agreement?
18      A.  The way I recall it was the initial
19  draft was very comprehensive, very structured,
20  numbered paragraphs, covered a multitude of
21  things that I gave to Michael to use as a
22  starting point on drafting ours, and he widdled
23  it down to this.
24      Q.  Did he work from the document that you

Page 27

1  sent him?
2      A.  Just on his first draft, as I recall.
3      Q.  Then what happened after?  What did he
4  do; he sent you back comments to the draft
5  agreement?
6      A.  We sent this back and forth, editing
7  and reediting, until we got to this point.
8      Q.  And you said there were how many,
9  eight to ten versions?
10      A.  I said three to ten.
11      Q.  Have you looked for all of the
12  different draft versions of the license
13  agreement that you and Mr. Zwebner sent back
14  and forth to each other?
15      A.  Have I looked for them?
16      Q.  Yes.
17      A.  I suppose I had at one point.
18      Q.  Where would they be?
19      A.  They would be in my office, if I had
20  them.
21      Q.  You would have provided all of the
22  drafts to your attorneys?
23      A.  Yes.
24      MR. ZAYOTTI:  Excuse me a minute.

Page 28

1  Let's go off the record for a second.
2      (Off the record, 11:26-11:28 a.m.)
3      MR. ZAYOTTI:  Back on the record.
4      Q.  Sir, do you remember what the royalty
5  structure was of the first draft license
6  agreement that you prepared?
7      A.  No.  The purpose of that draft was to
8  provide a starting point.
9      Q.  At the point that you provided the
10  initial draft license agreement, had you
11  discussed with Mr. Zwebner minimum monthly
12  royalties?
13      A.  At that particular time?
14      Q.  Correct.
15      A.  No.  I don't know.
16      Q.  Do you remember when you first spoke
17  to Mr. Zwebner about minimum monthly royalties?
18      A.  The only specific I recall is an
19  e-mail to Michael saying that there must be a
20  minimum monthly royalty in the agreement.
21      Q.  Do you recall specifically what the
22  terms of any minimum monthly royalty were that
23  you were suggesting?
24      A.  What the terms were?

Page 29

1      Q.  Did you specifically indicate in your
2  e-mail, for instance, how much the minimum
3  monthly royalty had to be?
4      A.  I don't recall that.
5      Q.  And what was Mr. Zwebner's response to
6  you?
7      A.  I don't recall.  I remember my
8  outgoing e-mail saying there must be a minimum
9  monthly royalty.  I don't know when or how he
10  responded to that, but it did end up in here
11  (indicating).
12      Q.  You had presumably also had some
13  discussions concerning minimum monthly
14  royalties; is that right?
15      A.  I would think.
16      Q.  Do you recall the substance of your
17  discussions with Mr. Zwebner concerning minimum
18  monthly royalties?
19      A.  Yeah.  I recall one discussion.  On
20  the day we signed this, we both agreed to
21  $10,000 a month as 5 percent interest would --
22  would be less than two and a half million
23  dollars a year in sales and that the $10,000 a
24  month in that scheme of things was

UNCERTIFIED ROUGH DRAFT

Page 30

1 insignificant because if he couldn't sell more
2 than two and a half million dollars a year, the
3 company would be a failure. We both agreed
4 that it was a mute point, so to speak.
5    Q. You made reference to 5 percent
6 interest. What were you referring to?
7    A. Five percent refers to 5 percent of
8 the gross sales on the units costing 999 or
9 less.
10    Q. Do you mean a 5 percent royalty?
11    A. Yeah.
12    Q. Do you mean to say a 5 percent
13 royalty?
14    A. What did I say.
15    Q. Five percent interest, I think you
16 said.
17    A. Interest, royalty whatever. It's the
18 same thing to me. We agreed to $10,000 a month
19 was an insignificant sum of money in the total
20 scheme of things, and it would be a small thing
21 if the company succeeded. And if the company
22 couldn't sell over two and half million dollars
23 a year, it would not survive anyway.
24    Q. Let me just clarify what you were

Page 31

1 saying about the 5 percent royalty on sales.
2    Were you saying that 10,000 per month
3 would be equivalent to paying 5 percent
4 royalties on two and a half million in sales?
5    A. That's right. 10,000 a month would be
6 120,000 a year; 120,000 a year is 5 percent of
7 2.4 million dollars.
8    Q. And it was your expectation, your
9 mutual expectation, that AirWater would be able
10 to achieve the goal of 2.4 or 2.5 million
11 dollars in sales per year?
12    A. Yes.
13    Q. Did you talk about how long it would
14 take AirWater to -- le me back up.
15    You guys didn't have an expectation
16 that AirWater would immediately be able to
17 begin in its first year making sales of 2.5
18 million per year; did you?
19    A. That is why I generously offered to
20 postpone the commencement of those monthly
21 payments until November.
22    Q. So you thought that by November --
23 less than five months after you signed this
24 agreement -- AirWater would be making sales

Page 32

1 equivalent to the rate of two and a half
2 million per year?
3    A. No. That is not the -- that is not
4 the correct explanation.
5    Q. Did you discuss at any point with
6 Mr. Zwebner or estimate with Mr. Zwebner when
7 AirWater might be making sales at the rate of
8 two and a half million per year?
9    A. I can't recall specifically, but
10 obviously we both agreed that that was -- he
11 was going to be able to afford to pay me ten
12 grand a month start in November.
13    Q. And is that because the expectation
14 was that -- strike the question.
15    Why was it that you expected that
16 AirWater was going to be able to afford to pay
17 ten grand a month beginning in November?
18    A. Ten grand is 5 percent of 200,000. So
19 200,000 -- if he had 200,000 in sales in
20 November, then he would have the money to pay
21 me the 10,000. It's implied that we both
22 expected it to happen.
23    Q. If AirWater had $200,000 in sales in
24 November -- actually, the payment was due on

Page 33

1 November 1st, correct, the first of each month?
2    A. (Nodding).
3    Q. So the November 1st payment would
4 really be the royalty based on a prior month,
5 is that right, the sales of the prior month?
6    A. Well, we never got that far. It might
7 have been -- royalties are paid quarterly.
8 This is in reference to lack of royalties,
9 10,000 a month.
10    Q. We are talking about the expectation
11 on sales and what was the expectation as to
12 when AirWater would be making sales in any
13 given month, in any given amount. So --
14    A. Well, it's implied that there are
15 going to be enough sales to cover a minimum
16 payment of $10,000 a month, so I don't know how
17 else to say it.
18    Q. So the expectation then was that by
19 November 1, 2003, AirWater was going to have
20 sales of $200,000 per month or thereabouts?
21    MS. GREENE: Objection.
22    A. That's the way I understand it.
23    Q. Okay. If AirWater was having $200,000
24 in sales per month, it would be making sales at

9 (Pages 30 to 33)

UNCERTIFIED ROUGH DRAFT

Page 58

1    (Exhibit 29, Letter, so marked.)
2    Q.   Sir, I'm showing you a document that's
3  been marked as Exhibit 29.  If you can read
4  through that and let me know if you recognize
5  it when you're done.
6    A.   It's two letters.  One --
7    MS. GREENE:  I don't think there is a
8  question.
9    Q.   Tell me if you recognize that
10 document.
11   A.   I don't recognize those, but go ahead.
12   Q.   May I just borrow those for a second.
13      I'm going to -- it looks like it's two
14 letters.  I want to -- I think this one is not
15 correctly attached.  I'm removing the last
16 page, which appears to be a separate letter.
17      You don't recognize the document
18 that's been marked as Exhibit 29?
19   A.   I recognize it as a letter from
20 Michael Zwebner to me.  I don't -- I had not
21 recalled it.  This is one of our very first
22 communications.
23   Q.   Now that you've had a chance to review
24 it, do you recall receiving that document?

Page 59

1    A.   I don't recall.
2    Q.   Do you have any reason to doubt that
3  you received that document?
4    A.   No.
5    Q.   What does that correspondence pertain
6  to?
7    A.   It's a general overview of Michael's
8  thoughts and intents in obtaining a license
9  from me.
10   Q.   Does it contain any proposals
11 concerning possible terms of a license
12 agreement?
13   A.   Several.
14   Q.   Is there any reference in there to a
15 minimum monthly royalty provision?
16   A.   No.
17   Q.   May I see that document for a moment.
18 Thank you.
19      MR. ZAYOTTI:  Mark those as the next
20 two, please and then let's take a short break.
21      (Exhibits 30-31, Letters, so
22      marked.)
23      (Off the record, 12:50-12:53 p.m.)
24   MR. ZAYOTTI:  Back on the record.

Page 60

1    Q.   Before we took the break, we were
2  talking about the document that's been marked
3  as Exhibit 29.  We were talking about that
4  document.
5       I'm going to -- if you don't mind --
6  look over your shoulder.  I only have one copy
7  of this.  I've put it before you and I have it
8  turned to Page 2.
9       If I could direct your attention to
10 the third paragraph on Page 2.  Do you see
11 where it says, In line with our agreement UCSY
12 will issue to you the amount of four million
13 common shares of the company; these shares will
14 be restricted shares pursuant to SCC Rule 144;
15 the restriction from sale is for 12 months from
16 issue.  Did I read that correctly?
17   A.   Yes.
18   Q.   The sentence after that reads, In the
19 event we file a registration statement at any
20 time during the next 12 months, we will include
21 your shares in the registration thus making
22 them tradable earlier.  Did I read that
23 correctly?
24   A.   Yes.

Page 61

1    Q.   Did you discuss the possibility that
2  the shares might be included in a registration
3  statement which would make the shares tradable
4  earlier than 12 months?
5    A.   Yes.
6    Q.   What was the substance of your
7  conversation with Mr. Zwebner?
8    A.   Basically, the best I can recall it
9  was his intent to do a registration within six
10 months.  That's in one of the e-mails
11 somewhere.
12   Q.   Did you express a desire that that
13 occur so that you could sell the shares before
14 the expiration of 12 months from the date of
15 issue?
16   A.   I wanted the option.
17   Q.   Why did you want to be able so sell
18 the shares earlier than 12 months?
19   A.   I didn't necessarily want to.  I
20 wanted the option to do that.
21   Q.   Why did you want the option to do
22 that?
23   A.   For unknown reasons.
24   Q.   Drawing your attention to the second

16 (Pages 58 to 61)

UNCERTIFIED ROUGH DRAFT

Page 62

1  to last paragraph, do you see where it says in
2  the second sentence, We will then need to
3  discuss additional financial remuneration for
4  your ongoing services. Did I read that
5  correctly?
6      A.  Out of context.
7      Q.  Is that referring to the possibility
8  of your employment with AirWater?
9      A.  It's in reference to me joining the
10  board and becoming a director.
11      Q.  Was your understanding that joining
12  the board and becoming a director of AirWater
13  Corporation would be a paid position?
14      A.  That's the way I would read that.
15      Q.  Did that happen?
16      A.  No.
17      Q.  Did you ever discuss additional
18  financial remuneration for your ongoing
19  services?
20      A.  I don't recall us ever getting to a
21  point to do that.
22      Q.  Did you have an interest in continuing
23  to provide services and being paid for your
24  services by AirWater?

Page 63

1      A.  I had an interest in doing whatever I
2  could to make the company successful.
3      Q.  Did you have an interest in having a
4  stream of income as a result of employment with
5  AirWater?
6      A.  I don't think I necessarily did
7  because I was guaranteed an income in the
8  agreement as minimum monthly royalties or
9  royalties.
10      Q.  Do you recall when the shares of stock
11  were to be issued to you?
12      A.  Virtually simultaneously with the
13  signing of the agreement.
14      Q.  That was in June of 2003 that the
15  agreement was signed?
16      A.  Yeah. It's dated March 21st, but it
17  was signed June 24th.
18      Q.  Okay.
19      A.  Notarized by Rolando, by the way.
20      Q.  Drawing your attention to Page 3 of
21  the license agreement. It's Exhibit 3.
22      A.  Okay.
23      Q.  Do you see where it says down toward
24  the bottom, Payment and consideration, halfway

Page 64

1  down that paragraph, four million shares of
2  UCSY to be delivered to the licensor or his
3  designees within 21 days from the date of
4  execution of this agreement?
5      A.  Okay.
6      Q.  Do you now recall that the shares were
7  to be delivered to you or issued to you after
8  you entered into the agreement?
9      A.  I don't recall, but I wouldn't object
10  to it.
11      Q.  Drawing your attention back to Exhibit
12  29. Referring your attention to the last
13  paragraph on this second page, Once the paper
14  transfers have been completed, UCSY will raise
15  some two million of working capital from a
16  number of private investors and will utilize
17  these funds as working capital to help create
18  the manufacture of the units as well as the
19  marketing team and to generally commence
20  commercial operations. Did I read that
21  correctly?
22      A.  Yes.
23      Q.  So is it correct to say that you
24  understood by virtue of this letter -- February

Page 65

1  21, 2003 letter -- that AirWater wasn't going
2  to be raising the two million until after the
3  stock was issued to you?
4      MS. GREENE:  Objection.
5      A.  That's not true.
6      Q.  What does that paragraph mean to you?
7      A.  This is explaining the mechanics of
8  how the two million dollars will end up in the
9  company.
10      Q.  And according to that paragraph, when
11  was the two million dollars to be raised?
12      A.  Once the paper transfers have been
13  completed.
14      Q.  What paper transfers -- what does that
15  term "paper transfers" mean to you?
16      A.  It means nothing to me.
17      Q.  Does it mean once the stock was issued
18  to you?
19      A.  I would have never thought of that.
20  It doesn't mean that to me.
21      Q.  Does it mean once the agreement was
22  entered into?
23      MS. GREENE:  Objection.
24      A.  It may.

17 (Pages 62 to 65)

UNCERTIFIED ROUGH DRAFT

Page 74

1    Q.   And that's because your letter
2  contemplated a nonexclusive relationship,
3  correct?
4    A.   That's right.
5    Q.   What did that mean to you; what would
6  a nonexclusive relationship mean to you?
7    A.   That would mean I could have multiple
8  nonexclusive licensees, multiple sources of
9  income.
10    Q.   So in other words, there was a
11  potential that you could have a stream of
12  income from other licensees during the first 12
13  months --
14    A.   No.
15    Q.   -- after licensing the patents to
16  AirWater; isn't that right?
17      MS. GREENE:  Objection.
18    A.   No, that's totally out of context.
19  That's not -- no.  Absolutely not.
20    Q.   Explain to me what you mean?
21    A.   When we switched over to negotiating
22  for an exclusive license, all the terms and
23  conditions changed.
24    Q.   When did that happen?

Page 75

1    A.   I don't know.  I don't know.  There is
2  a world of difference between a nonexclusive
3  and an exclusive.  In an exclusive, Michael
4  Zwebner is my only source of income.  I have no
5  recourse.
6    Q.   And if by contrast you had entered
7  into a nonexclusive relationship with AirWater,
8  what would that have allowed you to do?
9    A.   Do the same with multiple parties.
10    Q.   That was of concern to you because you
11  could receive additional revenue from other
12  licensees if your relationship with AirWater
13  was nonexclusive, correct?
14    A.   Correct.
15    Q.   By the way, did the fact that the
16  patents had been assigned to your daughter have
17  anything to do with the reason why shares of
18  UCSY stock were issued to her and your wife?
19    A.   No.  At that time --
20      MS. GREENE:  You've answered the
21  question.
22    A.   No.
23    Q.   Why don't you tell me what you were
24  going to say.  At that time what?

Page 76

1    A.   Nothing.  That's okay.  That's enough.
2    Q.   Well, I'm asking you.  At that time --
3    A.   Ask me the question again, please.
4    Q.   You started to say "at that time."
5    A.   No.  What was the question?
6    Q.   The question was:  Did the fact that
7  the Reidy patents were assigned to your
8  daughter have anything to do with the reason
9  why the UCSY shares of stock were issued to
10  your daughter and your wife?
11    A.   No.
12    Q.   What were you going to say about "that
13  time"?
14    A.   I forget.
15    Q.   Sir, you're under oath.
16    A.   I know that.  I forget what I was
17  going to say.
18    Q.   You forgot what you were going to say
19  two seconds ago?
20    A.   Yeah.  You've never forget what you
21  were going to say?
22    Q.   Fair enough.
23      Sir, what is your cell phone number?
24      MS. GREENE:  Why do you need his cell

Page 77

1  phone number, Matt?
2      MR. ZAYOTTI:  Because we are trying to
3  discover communications between Mr. Reidy and
4  Mr. Kline and Mr. Dingman.
5    Q.   You can answer.
6      THE WITNESS:  Don't they need a court
7  order for that?
8      MS. GREENE:  I don't know how this --
9      MR. ZAYOTTI:  I don't need a court
10  order for that.
11      MS. GREENE:  Let's go off the record
12  for a second.
13      (Off the record, 1:13-1:15 p.m.)
14      MR. ZAYOTTI:  Back on the record.
15    Q.   Do you have a fax number, sir?
16    A.   No.
17    Q.   You don't have the capability of
18  receiving faxes?
19    A.   Well, I'm not giving you my fax
20  number.
21    Q.   I think you're obligated to give me
22  your fax number.
23      MS. GREENE:  You can give him your fax
24  number.

20 (Pages 74 to 77)

UNCERTIFIED ROUGH DRAFT

**EXHIBIT D**

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2                      CIVIL ACTION NO. 05-40049-FDS

 3   J.J. REIDY & CO., INC.,            )
          Plaintiff,                    )
 4                                      )
     v.                                 )
 5                                      )
     AIRWATER CORPORATION and AIRWATER)
 6   PATENTS CORPORATION,               )
          Defendants.                   )
 7              DEPOSITION of MICHAEL JOEL ZWEBNER, a

 8   Rule 30(b)(6) designated witness of AIRWATER

 9   CORPORATION and AIRWATER PATENTS CORPORATION,

10   taken at the request of the plaintiff, pursuant to

11   the Federal Rules of Civil Procedure, before

12   Patricia J. Taylor, RPR, Notary Public for the

13   Commonwealth of Massachusetts, on June 8, 2007,

14   commencing at 10 a.m. at the offices of Bowditch &

15   Dewey, 311 Main Street, Worcester, Massachusetts.

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFF:
     BOWDITCH & DEWEY, LLP
18   311 Main Street
     Post Office Box 15156
19   Worcester, MA  01615-0156
          BY:  THOMAS J. CONTE, ESQ.
20
     FOR THE DEFENDANT:
21   KEEGAN & WERLIN, LLP
     265 Franklin Street
22   Boston, MA  02110-3113
          BY:  MATTHEW P. ZAYOTTI, ESQ.
23   ALSO PRESENT:  JAMES J. REIDY
              BAY STATE REPORTING AGENCY
24    76 MILL STREET, WORCESTER, MASSACHUSETTS 01603
                   (508) 753-4121
```

1    e-mails to Coca-Cola and defamed us, as a result

2    of which we believe we lost a contract.  So we

3    sued.

4        Q.    Saying what, essentially?

5        A.    Saying that Mr. Reidy's patents were

6    no good.  Well, he called them AirWater patents.

7    But obviously the company was selling machines

8    that didn't work.  It was undercapitalized.  And

9    countering that his company were experts and had

10    lots of information and were worth $125 million

11    and so on and so on.

12        Q.    And you were in negotiations or

13    Atmospheric was in negotiations with Coca-Cola at

14    that time?

15        A.    Atmospheric through its Indian

16    subsidiary, which is called Water Maker India,

17    were in negotiations with Coca-Cola.

18        Q.    What were the negotiations for?

19        A.    To offer Coca-Cola machinery that

20    would enable them to create water from air.

21        Q.    Machinery based on the Reidy patents?

22        A.    No.

23        Q.    Machinery based on what patent?

24        A.    Machinery that we developed and we

1    make.  For the record, we don't make any machines

2    under the Reidy patents.

3        Q.    But what machines, what were the

4    machines that you were attempting to sell?

5        A.    Air to water machines, large air to

6    water machines.

7        Q.    Understand.  Were those based on any

8    patents?

9        A.    No.

10        Q.    Not based on any patented technology?

11        A.    No.

12        Q.    What were the name of the machines, or

13    the nomenclature?

14        A.    Machines were based on our design that

15    we developed in Israel.  But these were going to

16    be made in India and they would have been called a

17    range of WM machines.  WM stands for Water Maker.

18    And the number I'm going to give you would relate

19    to how much water it would make a day.  We have

20    from 120, 250, 500, 1,000, and 5,000.

21        Q.    And those were so-called Water Maker

22    machines?

23        A.    They were originally based on the

24    design of ELGT.

1          Q.        And the Ehrlich patent?

2          A.        Right.

3          Q.        But that patent has expired?

4          A.        That patent has become public domain.

5     We own some copyrights to the designs.

6          Q.        Just going back to clarify, are you

7     saying that no products have been produced based

8     on the Reidy patents?

9          A.        If you'll allow me to explain it.

10         Q.        I'll let you explain.

11         A.        The answer is yes.

12         Q.        When you say yes, I just want to

13    clarify --

14         A.        I'm not going to spend an hour.

15         Q.        Let me just clarify the question.

16              Am I correct that no products had been

17    manufactured by UCSY or its subsidiaries based on

18    the Reidy patents?

19         A.        That is correct.

20         Q.        Now you may clarify.

21         A.        The reason is two things.

22              Number one, the Reidy patents have not

23    been filed and been granted in most of the world

24    where the company sells its products.   That's

1     number one.

2              Number two, the Reidy patent as it has

3     been written, does not allow for machines to be

4     made that would pass water quality tests to the

5     international standards that it today requires.

6     Major additional amendments to the machines and

7     additional technology have had to have been

8     applied to make the machines.

9         Q.     Let's get back to that issue in a

10    moment.  I just have one follow-up question to

11    make sure I understand the first point you

12    mentioned about the Reidy patents.  That they are

13    not filed.  Can you elaborate on that?

14        A.     The Reidy patents are filed in the

15    United States.  They had rights at the time they

16    were filed, and for several years thereafter, to

17    be refiled, let's call it, in several countries

18    throughout the world.

19             For reasons I was not privy to nor was

20    I there, most of these opportunities to file them

21    around the world were not taken.  And it was not

22    done.  As a consequence of which there is no

23    patent protection in any country, aside, I

24    believe, of two or three.  One of them being

```
 1    ELGT?
 2                MR. ZAYOTTI:  Objection.  Asked and
 3    answered.
 4                MR. CONTE:  I don't think it has been
 5    answered.
 6         A.    Well, the licensor, which in this case
 7    is Mr. Reidy --
 8         Q.    What page are you on?
 9         A.    I'm just looking at the pages
10    generally.
11                MR. ZAYOTTI:  You asked a question.
12    Let him give an answer.
13         Q.    I'd prefer if you read the document to
14    yourself and cite the provision to me?
15         A.    I don't know if there is a specific
16    provision.  But what I'm saying is the licensor in
17    entering into an agreement to license his patent
18    has an obligation to fulfill his license.  And if
19    the license is contested, the licensor has to
20    protect it.
21         Q.    Who drafted this Exhibit 3?
22         A.    We mutually drafted it.
23         Q.    Where did you do that, sir?
24         A.    It was done by e-mail backwards and
```

1    forwards, and eventually it was finalized in my

2    apartment in Miami.

3        Q.     The same day you signed it?

4        A.     I think we drafted it for quite some

5    time before we signed it.

6        Q.     Did you have some help from counsel in

7    drafting this opinion?

8        A.     I think I showed it to counsel at the

9    point we were about to sign it.

10       Q.     But then you took over the

11   negotiations with Mr. Reidy yourself?

12       A.     Yeah.

13       Q.     And you went through all the

14   provisions, you typed some of this out; isn't that

15   correct?

16       A.     That's correct.

17       Q.     So, sir, what I'm asking for is, I'm

18   asking for the provision on which you rely as a

19   sophisticated businessperson to show that

20   Mr. Reidy was obligated to assist you in the

21   defense of a lawsuit brought by ELGT.  Very

22   specific question.

23            MR. ZAYOTTI:  Objection.  Asked and

24   answered.

1    We registered trademarks for our own company.  If

2    you're asking me if I registered anything in

3    relation to Mr. Reidy's trademark or his name, the

4    answer is no.

5         Q.    Or with respect to Reidy's patents?

6         A.    The answer is no.

7         Q.    Okay.  And at any time did you ask

8    Mr. Reidy to make applications for foreign

9    trademark or trade name registration?

10        A.    Certainly.

11        Q.    When?

12        A.    Not foreign trademark.  I'm sorry.

13    The answer to that question is no.  Not to

14    trademark, we didn't ask Mr. Reidy that at all.

15              We talked and discussed a lot about

16    the validity of the patents in other countries,

17    but not the trademark.  We never used, for the

18    record, we never used the Water Star treatment.

19        Q.    Which was what?

20        A.    Mr. Reidy's registered trademark.

21        Q.    Now, what about with respect to

22    patents, did you ever ask Mr. Reidy to file

23    additional patents overseas?

24        A.    Not additional patents, but to file

1          the current patents, yes.

2              Q.      So the four patents under Exhibit 3,

3          you asked him to --

4              A.      More than once.

5              Q.      -- file those?

6                      Where, sir?

7              A.      Where?  Wherever he was, in his home.

8              Q.      And concerning what, which countries?

9              A.      I don't recall.

10                     MR. ZAYOTTI:  Objection.

11             A.      I don't recall asking.

12             Q.      You don't recall what, sir?

13             A.      I think I mentioned Australia, that I

14         do recall.  And I think his response was all our

15         patents are valid in Australia.  That was his

16         comment and you can use our -- something like

17         that, like you can use or notify people that our

18         patents are in Australia.

19             Q.      Why didn't you file in those foreign

20         countries, you being --

21             A.      It wasn't my obligation to file.  It

22         was his obligation to file.

23             Q.      And you're basing that on Exhibit 3?

24             A.      I'm basing that on the fact that when

```
 1   we buy something, paid him a lot of money, he was

 2   going to file it.

 3        Q.      Do you have a provision in Exhibit 3

 4   that you can refer me to which obligated Mr. Reidy

 5   to file applications for foreign patents?

 6        A.      "Licensor, when applicable, shall make

 7   application for any foreign patents desired by

 8   Licensor, at his own expense."

 9              And I think probably, looking at this

10   now, the second licensor is supposed to be

11   licensee.  That would be the people desiring it.

12   Why would he desire to do anything?

13        Q.      So your contention is that's a typo

14   now?

15        A.      Yes.

16        Q.      Because if it's not a typo, he's not

17   obligated to file?

18        A.      Why would he desire to do anything?

19   It's our request, desired by the licensee.

20        Q.      I understand your position, sir.  But

21   hear my question.

22              If that is not a typographical error,

23   Mr. Reidy had no obligation to file for foreign

24   patents; isn't that true sir?
```

1              MR. ZAYOTTI:  Objection.

2         A.     My interpretation is that would be

3    correct, but that is a typo.

4         Q.     Because there is no other provision in

5    this agreement that requires Mr. Reidy to file

6    foreign patents for your benefit?

7         A.     You only need it once.

8         Q.     Could you answer the question, please?

9         A.     I just answered it.  You only need

10   that provision in the agreement once.

11        Q.     So my statement was correct?

12        A.     I believe so, yes.

13        Q.     Did you ever make it known before

14   today that this was purportedly a typographical

15   error?

16        A.     I don't recall.

17        Q.     And, again, you drafted this agreement

18   along with Mr. Reidy?

19        A.     We drafted this agreement.

20        Q.     I think I said along with Mr. Reidy;

21   is that correct?

22        A.     That's correct.

23        Q.     And, sir, you've opened multiple

24   businesses?

1       A.    Manufacturing by licensee and third

2    parties, page 5.  Licensee intends to offer and

3    manufacture the said units and models in other

4    countries around the world and licensor hereby

5    confirms that the licensee...around the world.

6            What have you given to me?  What have

7    you delivered to us that is around the world?

8    Zero.

9            Page 9, licensor agrees and confirms

10    that this exclusive agreement is not limited to

11    any countries, state, or country worldwide.

12            It's very limited. .That was a

13    fraudulent inducement.

14       Q.    Did you write that provision in the

15    agreement, sir?

16       A.    I think the question is, did we

17    jointly write it?  I think the answer is yes.

18       Q.    I'm asking you, do you remember typing

19    this in your computer, in your apartment in Miami?

20       A.    I remember typing with input from

21    myself and input from Mr. Reidy.

22       Q.    Was it your understanding that these

23    patents had been filed overseas?

24       A.    In some countries.

1    you're suggesting?

2         Q.      Any other provisions, sir?

3         A.      I think we took the right action and

4    we spent money defending his position.

5                 That seems to be it.

6         Q.      Okay.  Now, with respect to the filing

7    of foreign patents, you mentioned Australia.  Any

8    other requests that you made of Mr. Reidy to file

9    foreign patents?

10        A.      There were several requests with

11   regards to some of the countries we were starting

12   to operate.

13        Q.      Which countries?

14        A.      Israel, China, at some point India.

15                But for the first year we were mainly

16   in R&D mode, trying to make a machine that worked.

17   Having tried to make one based on his patents, we

18   couldn't get the water quality right.  So we had

19   to redesign the machine and invent our own.

20        Q.      But focus on my question, please.

21        A.      I'm trying to tell you that during

22   that year our focus was on R&D.  We had not gotten

23   around to marketing in a big way yet.

24        Q.      When did you ask Mr. Reidy to file a

patent in --

    A.     I don't remember the date, but it was in the course of that year.

    Q.     Which year, sir?

    A.     From March 2003 for approximately twelve months.

    Q.     And how did you do that, did you do that verbally, by e-mail?

    A.     We had many discussions about it, on the phone.

    Q.     Is there any documentary evidence, sir, concerning that purported discussion?

    A.     I think there may have been one or two e-mails that refer to it, but I don't recall exactly.  I know it was a discussion we had several times.

    Q.     Did you have any discussions with Brian Dingman about that?

    A.     We had discussed with Brian Dingman on one or two -- yes, I recall getting an e-mail from him about certain fees that had to be paid for certain countries.

    Q.     And you refused to pay those; is that right?

1    commencing November 1st.  Right?

2        Q.      Right.  In that provision you were

3    very specific about the number of months; isn't

4    that correct?

5        A.      I think the two go together.

6        Q.      How do they go together?

7        A.      It goes together by what we agreed.  I

8    agreed to give him $10,000 a month for one year.

9    At the end of one year we both assumed that sales

10   would kick in.  He was crying he didn't have an

11   income.  So I said I'll advance you 10,000 a month

12   for the first year.  And thereafter it will go to

13   whatever we have to pay.

14       Q.      I don't want to quibble with you.

15   This is a matter of law for the court.  I'm just

16   trying to get your understanding.

17            The paragraph above, doesn't it

18   indicate that you do read the paragraph below, and

19   whichever is more, Reidy gets whichever is more,

20   meaning $10,000 or the royalties each month?

21            MR. ZAYOTTI:  Objection.

22       A.      Absolutely not.

23       Q.      Okay.

24       A.      I don't know where you cook that up.

1    A.    The answer is yes.

2    Q.    Did you at any time or did AirWater

3    Corporation or AirWater Patents take out an

4    insurance policy naming J.J. Reidy as insured?

5    A.    No.  Because we never made a machine

6    under Reidy's patents.

7    Q.    Did you ever attempt to market

8    products relating to Reidy's patents?

9    A.    No.  Because we couldn't make a

10    machine that would work properly under Reidy's

11    patent.

12    Q.    Who attempted to make that machine?

13    A.    Our company in Israel.

14    Q.    Who is that?

15    A.    Company called Pereg, P-E-R-E-G, in

16    Jerusalem.

17    Q.    P-E-R-E-G?

18    A.    Yeah.  Pereg United Industries.

19    Q.    Who at Pereg attempted --

20    A.    The director, Mr. Bakalash,

21    B-A-K-A-L-A-S-H, and a whole team of engineers.

22    Q.    Did they provide you with any reports

23    concerning the Reidy patents?

24    A.    They tried making machines down there.

1    I was there at the time and the water quality

2    didn't pan out.  And subsequently we just stopped

3    looking at his patents and made our own machine.

4         Q.      Were there any documents with respect

5    to that testing or that development, sir?

6         A.      Probably.

7         Q.      They didn't share the results of their

8    research with you?

9         A.      I'm trying to tell you they may have

10   had internal documents.  I went there.  They said

11   the machines don't work, the water quality is no

12   good.  I said, okay, what do we need to do to

13   them?  And we went into a whole different design

14   and different process.

15        Q.      Did you receive reports from Pereg?

16        A.      I received very good reports from

17   Pereg afterwards.

18        Q.      I'm asking you, you never received

19   written reports from Pereg explaining what they

20   attempted to do and how they attempted to do it?

21        A.      I remember being there and working

22   with them for several months on end and not having

23   the results we wanted.

24        Q.      These are engineers engaged in R&D

**EXHIBIT E**

1

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
                 CIVIL ACTION NO. 05-40049-FDS
 3    J.J. REIDY & CO., INC.,          )
              Plaintiff,               )
 4                                     )
      v.                               )
 5                                     )
      AIRWATER CORPORATION and AIRWATER)
 6    PATENTS CORPORATION,             )
              Defendants.              )
 7           DEPOSITION of MICHAEL JOEL ZWEBNER, a
 8    Rule 30(b)(6) designated witness of AIRWATER
 9    CORPORATION and AIRWATER PATENTS CORPORATION,
10    taken at the request of plaintiff, pursuant to the
11    Federal Rules of Civil Procedure, before Patricia
12    J. Taylor, RPR, Notary Public for the Commonwealth
13    of Massachusetts, on June 25, 2007, commencing at
14    12:20 p.m. at the offices of Bowditch & Dewey, 311
15    Main Street, Worcester, Massachusetts.
16    A P P E A R A N C E S :
17    FOR THE PLAINTIFF:
      BOWDITCH & DEWEY, LLP
18    311 Main Street
      Post Office Box 15156
19    Worcester, MA  01615-0156
           BY:  MAURA A. GREENE, ESQ.
20
      FOR THE DEFENDANT:
21    KEEGAN & WERLIN, LLP
      265 Franklin Street
22    Boston, MA  02110-3113
           BY:  MATTHEW P. ZAYOTTI, ESQ.
23    ALSO PRESENT:  JAMES J. REIDY
               BAY STATE REPORTING AGENCY
24    76 MILL STREET, WORCESTER, MASSACHUSETTS 01603
                  (508) 753-4121
```

2

```
 1                    I N D E X
 2         DEPONENT:  MICHAEL JOEL ZWEBNER
 3                                              PAGE
 4    EXAMINATION BY MS. GREENE              3, 59
      EXAMINATION BY MR. ZAYOTTI            49
 5
 6                    EXHIBITS
 7    NUMBER                                  PAGE
 8      6         Patent Sub-License Agreement    6
 9      7         Form 10K                       16
10      8         E-mail                         33
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

3

```
 1          MICHAEL JOEL ZWEBNER, having been
 2  satisfactorily identified by the production of his
 3  passport and duly sworn, was examined and
 4  testified as follows:
 5       EXAMINATION BY MS. GREENE:
 6    Q.    Mr. Zwebner, my name is Maura Greene
 7  and I represent J.J. Reidy Company.
 8          And you realize that you're still
 9  under oath from your previous day of your
10  deposition.
11    A.    Yes, ma'am.
12    Q.    What did you do, if anything, to
13  prepare for today's deposition?
14    A.    I didn't do anything.
15    Q.    Did you review any documents?
16    A.    No.
17    Q.    Did you previously testify that you do
18  not have any third party agreements with respect
19  to Mr. Reidy's patents?
20        MR. ZAYOTTI:  Objection.
21    A.    Did I testify that I had no third -- I
22  don't think so.  No, I don't think so.
23    Q.    Do you have any third party agreements
24  with any --
```

4

```
 1    A.    No.
 2    Q.    What third party agreements do you
 3  have?
 4    A.    I'm sorry.  I did testify that I had
 5  distribution agreements.
 6    Q.    And other than distribution
 7  agreements, are there any other type agreements
 8  that you have?
 9    A.    We have one agreement with a company
10  in China for manufacturing for which we have an
11  agreement, yes.
12    Q.    And which company is that?
13    A.    Yuxin electrical, manufacturing,
14  Y-U-X-I-N.
15    Q.    What is the agreement that you have
16  with Yuxin?
17    A.    That they can manufacture machines and
18  that in the event that they would sell them into
19  markets which are potentially cross industry
20  patents, we'll cover based on --
21    Q.    I'm sorry.  I missed the last part of
22  your answer.
23    A.    If they were to sell machines,
24  manufacture and sell machines into areas where
```

**49**

1 requested.  And then we can start with Mr. Reidy's
2 deposition.
3          MR. ZAYOTTI:  I have a couple of
4 follow-up questions.
5          THE WITNESS:  Just one little
6 statement.  Would you please e-mail or letter us,
7 just to remind me what documents specifically you
8 are requesting?
9          MS. GREENE:  I'll do that.
10         THE WITNESS:  So I don't spend time
11 looking for the wrong papers.
12         (Brief break.)
13         MR. ZAYOTTI:  I just have a couple
14 follow-up questions.
15         EXAMINATION BY MR. ZAYOTTI:
16     Q.    Mr. Zwebner, I think on the first day
17 of your testimony at your deposition here at this
18 office you testified regarding the date of
19 execution of your agreement with J.J. Reidy, which
20 I believe has been marked as Exhibit 3.  Do you
21 recall that testimony?
22     A.    Yes, I do.
23     Q.    Do you want to correct your testimony
24 concerning the date that you executed the

**50**

1 contract?
2     A.    Yeah.  I was asked the question as to
3 whether the date of execution as dated on the
4 document is correct, and I believe I stated that
5 it was.
6          I omitted to state that the document
7 was prepared and was signed on or about that date,
8 but we actually did not date it until we made the
9 payment, which was by agreement with Mr. Reidy.
10 And that occurred, I believe, either the end of
11 June or beginning of July.  I don't recall the
12 exact date.
13     Q.    Just to clarify, is it your testimony
14 that you executed this agreement in late June or
15 July of 2003 and backdated to March 21, 2003?
16     A.    That is correct.  That is correct.
17     Q.    Okay.  Turning your attention to
18 Exhibit 8 for a moment, and there are multiple
19 pages attached here of, it looks like, various
20 e-mails and other correspondence.
21          I'm going to show you part of Exhibit
22 8.  It's got a heading of J.J. Reidy and Company,
23 Inc., and it's dated September 2, 2003; do you see
24 that?

**51**

1     A.    Yes, I do.
2     Q.    Do you remember seeing this letter?
3     A.    Yes, I do.
4     Q.    It's not signed.  But can you tell me
5 what it is?
6     A.    This is a letter from Mr. Reidy
7 addressed to our company.  The reason it's not
8 signed is that it was sent by e-mail rather than
9 by mail.  And there's an attachment or fax, and
10 perhaps he was not able to put the signature on
11 the document.
12     Q.    Do you see in the second sentence of
13 the letter where it says, "I need your help with
14 the expenses of the pending patents as I cannot
15 afford to pay them on my own."
16          Did I read that correctly?
17     A.    That is correct.
18     Q.    Why would Mr. Reidy be requesting your
19 assistance to pay for pending patents if it wasn't
20 his obligation or his company's obligation to pay
21 those expenses?
22     A.    Firstly, according to our agreement,
23 they were his obligations.  And I believe perhaps
24 because of the date being September 2003, which

**52**

1 was about a month before we commenced making any
2 payments to him, he may have written that to seek
3 our help.
4          But I recall at the time talking to
5 Mr. Reidy.  And I said we've just given you
6 $100,000 in cash and several $100,000 worth of
7 stock.  Why can't you pay what you're legally
8 required to pay?
9     Q.    Go ahead.
10     A.    I don't recall the exact response,
11 but --
12     Q.    Was it your understanding he was
13 asking for your help to pay for these expenses
14 because he couldn't afford to pay them on his own?
15     A.    Yes.
16     Q.    Is that why Mr. Reidy was asking for
17 your authorization concerning Attorney Dingman's
18 estimated fee of $3,100 to pay filing costs
19 relating to the foreign patents?
20     A.    I think Mr. Reidy was trying to
21 offload obligations or cash requirements to us,
22 when he knew very well that he had to pay them.
23     Q.    I'm going to direct your attention to
24 another piece of correspondence in the same

57

1    Q.    Do you have any understanding as to
2    whether the Reidy patents were ever registered in
3    137 countries?
4    A.    I'm not aware of such a registration.
5    He may have had the right to register.  But they
6    were certainly not enacted.  And in our searches
7    we did not find any patents registered or filed or
8    pending in -- frankly, the latest search was in
9    any country outside of the United States.
10    Unless there's an error with the
11    patent search organization, I would have to say
12    that this is complete nonsense.
13    Q.    Mr. Zwebner, you are not a lawyer, are
14    you, sir?
15    A.    No.
16    Q.    And are you an engineer?
17    A.    No.
18    Q.    You're not a patent lawyer?
19    A.    Certainly not.
20    Q.    Do you or do any of the AirWater
21    companies manufacture any products, any air to
22    water products, in the United States?
23    A.    No.
24    Q.    Does AirWater Corporation or AirWater

58

1    Patents, Inc. have any sales in the United States?
2    A.    We have declared the sales that we
3    have had in the United States.
4    For purposes of clarity, there was one
5    container of 129 machines sold in 2004 to a
6    company in Texas.  There was one single sample
7    machine sold to the Disney Corporation in Los
8    Angeles for sampling purposes.
9    And there was recently some sales to
10    the US Navy, though I need to quantify that the
11    actual machines were delivered to the US Navy,
12    Marine Corps. in Africa.  And I believe all our
13    negotiations and payment were received from the US
14    Navy directly from Djibouti.  We did not negotiate
15    this sale in the United States.
16    Q.    To your understanding, do you -- and
17    when I say you, I'm referring to AirWater Patents
18    and AirWater Corporation -- do you make or sell
19    any products in any jurisdiction where the Reidy
20    patents are issued or presently subsisting?
21    A.    Not to our knowledge.
22    MR. ZAYOTTI:  I have nothing further.
23    THE WITNESS:  One second, please.
24    (Attorney-client discussion.)

59

1    MR. ZAYOTTI:  I'd just like to make a
2    request on the record that plaintiff's lawyers and
3    the plaintiff agree to not publicly divulge both
4    the name of the customer that was revealed by my
5    client earlier pending court determination on that
6    issue as well as information concerning my
7    client's background in the military in Israel.
8    MS. GREENE:  I just have a few more
9    questions, just following up on what was asked.
10    EXAMINATION BY MS. GREENE:
11    Q.    Mr. Zwebner, you've looked at the
12    packet of information and the e-mails relating to
13    the payment of fees for the patents today; is that
14    correct?
15    A.    That's correct.
16    Q.    And what is your understanding as to
17    what was going to happen if the fees were not paid
18    that were being discussed?
19    MR. ZAYOTTI:  Objection.
20    A.    I think, as I recall, that by the time
21    this issue of paying these additional fees was
22    brought up, it became moot inasmuch that after
23    discussions with Mr. Dingman, he made it clear
24    that they would not extend the patents into those

60

1    territories.  They may extend an application or
2    they may extend certain aspects of it.  But there
3    was no definitive statement that said, if you pay
4    this, you will get the patent in Australia or you
5    will get the patent elsewhere.  And it was not our
6    obligation to pay these fees.
7    It was made very clear, both
8    contractually and verbally with Mr. Reidy, that
9    the patent expenses and fees that had to be paid
10    were his responsibility.
11    Q.    When you say the patent expenses to be
12    paid, why did they have to be paid?
13    A.    That's a good question.  We were told
14    in our agreement that he had patents worldwide.
15    Turned out afterwards that he didn't have patents
16    worldwide.  So we were misrepresented
17    dramatically.
18    Q.    With regard to the statements that are
19    made in that various package of documents, was it
20    your understanding that certain fees were due?
21    A.    We were notified by Mr. Reidy and
22    subsequent to the signing of the agreement that
23    there were certain patent payments that needed to
24    be made and certain patent payments that he was

**EXHIBIT F**

# KEEGAN WERLIN LLP

ATTORNEYS AT LAW
265 FRANKLIN STREET
BOSTON, MASSACHUSETTS 02110-3113

TELECOPIERS:
(617) 951-1354
(617) 951-0586

(617) 951-1400

July 20, 2007

***VIA FACSIMILE NO. (508) 416-2421***
***AND FIRST CLASS MAIL***

Maura A. Greene, Esq.
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, Massachusetts 01615-0156

    Re:    J.J. Reidy & Co., Inc. v. Airwater Corporation, et al.,
          United States District Court for the District of Massachusetts
          – Central Division Civil Action Nos. 05-40049-FDS and 06-10137-FDS

Dear Ms. Greene:

    In connection with the above-referenced matters, enclosed herewith please find a copy of a Notice of Deposition of Janice Bethanne Reidy on July 31, 2007.

    Thank you for your attention to this matter.

        Very truly yours,

        Matthew P. Zayotti

Enclosure

cc:    Michael J. Zwebner

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,** | |
| **Plaintiff,** | CIVIL ACTION NO. 05-40049-FDS |
| **v.** | |
| **AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,** | |
| **Defendants.** | |
| **AIRWATER PATENTS, INC.** | |
| **Plaintiff,** | CIVIL ACTION NO. 06-10137-FDS |
| **v.** | |
| **J.J. REIDY & CO., INC.,** | |
| **Defendant.** | |

## NOTICE OF DEPOSITION

**TO:**   Maura A. Greene, Esq.
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, Massachusetts 01615-0156

PLEASE TAKE NOTICE that commencing at **10:00 A.M. on July 31, 2007** at

the offices of Bowditch & Dewey, LLP, 311 Main Street, Worcester, Massachusetts the

Defendants in this action AirWater Corporation and AirWater Patents Corporation, by

and through their attorney, will take the deposition upon oral examination of Janice

Bethanne Reidy, before a Notary Public or before some other officer authorized by law to

administer oaths. The oral examination will continue from day to day until completed.

Additionally, the deponent is required to bring with her the documents described

in the attached Schedule A.

You are invited to attend and cross-examine.

                                    DEFENDANTS AIRWATER
                                    CORPORATION AND AIRWATER
                                    PATENTS CORPORATION

                                    By their attorneys,

                                    Richard Kirby, BBO# 273600
                                    Matthew P. Zayotti, BBO# 638265
                                    Keegan Werlin LLP
                                    265 Franklin Street
                                    Boston, Massachusetts  02110-3113
                                    (617) 951-1400

Dated: July 20 , 2007

---

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document(s) was served upon the attorney of record for each other party by hand-delivery - US Mail and fax on July 20, 2007

---

## SCHEDULE A

1.    Any and all documents that constitute, relate or refer to any assignments of Reidy Patent Nos. 5,106,512, 5,149,446, 5,203,989 and 5,366,705.

2.    Any and all documents that relate or refer to ownership of Reidy Patent Nos. 5,106,512, 5,149,446, 5,203,989 and 5,366,705.

3.    Any and all documents that constitute, relate or refer to any agreements concerning Reidy Patent Nos. 5,106,512, 5,149,446, 5,203,989 and 5,366,705.

4.    Any and all documents that constitute, relate or refer to Reidy Patent Nos. 5,106,512, 5,149,446, 5,203,989 and 5,366,705.

5.    Any and all documents that relate or refer to the litigation pending between J.J. Reidy & Co., Inc., AirWater Corporation and AirWater Patents, Inc.

6.    Any and all documents that constitute, relate or refer to your ownership interests in J.J. Reidy & Co., Inc.

7.    Any and all documents that relate or refer to the shares of stock of Universal Communications Systems, Inc. issued to you, including but not limited to any and all documents that relate or refer to any subsequent sale thereof.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.J. REIDY & CO., INC.,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**AIRWATER CORPORATION AND AIRWATER PATENTS CORPORATION,**<br><br>      **Defendants.** | **CIVIL ACTION NO. 05-40049-FDS** |
| **AIRWATER PATENTS, INC.**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**J.J. REIDY & CO., INC.**<br><br>      **Defendant.** | **CIVIL ACTION NO. 06-10137-FDS** |

## SUBPOENA DUCES TECUM

**To:**    Janice Bethanne Difonso
       124 Ridge Road
       Northborough, Massachusetts 01532

**GREETINGS:**

      **YOU ARE HEREBY COMMANDED** to appear at the law offices of Keegan Werlin LLP, 265 Franklin Street, Boston, MA 02110, on the 31st day of July, 2007, at 10:00 A.M., and to testify at the taking of a deposition in connection with the above-captioned matter.

**YOU ARE FURTHER COMMANDED** to bring with you all documents described in the attached Schedule A.

HEREOF fail not as you will answer your default under the pains and penalties in the law in that behalf made and provided.

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO #638165
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts 02110
(617) 951-1400

Dated: July 24 , 2007

Attorneys for Michael Zwebner, AirWater Corporation and AirWater Patents, Inc.

---

## Rule 45, Federal Rules of Civil Procedure, Parts C & D

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

## (d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## <u>SCHEDULE A</u>

1.    Any and all documents that constitute, relate or refer to any assignments of Reidy Patent Nos. 5,106,512, 5,149,446, 5,203,989 and 5,366,705.

2.    Any and all documents that relate or refer to ownership of Reidy Patent Nos. 5,106,512, 5,149,446, 5,203,989 and 5,366,705.

3.    Any and all documents that constitute, relate or refer to any agreements concerning Reidy Patent Nos. 5,106,512, 5,149,446, 5,203,989 and 5,366,705.

4.    Any and all documents that constitute, relate or refer to Reidy Patent Nos. 5,106,512, 5,149,446, 5,203,989 and 5,366,705.

5.    Any and all documents that relate or refer to the litigation pending between J.J. Reidy & Co., Inc., AirWater Corporation and AirWater Patents, Inc.

6.    Any and all documents that constitute, relate or refer to your ownership interests in J.J. Reidy & Co., Inc.

7.    Any and all documents that relate or refer to the shares of stock of Universal Communications Systems, Inc. issued to you, including but not limited to any and all documents that relate or refer to any subsequent sale thereof.

7-25-07

# RETURN OF SERVICE

I this day summoned the within named _JANICE BETHANNE DIFONSO_

to appear as within directed by delivering to _JANICE BETHANNE DIFONSO_

in hand, ---leaving at _____ last and usual place of

abode, to wit: No _124_ _RIDGE ROAD_ Street,

in the _NORTHBOROUGH_ District of said _MA_ an attested

copy of the subpoena together with _$15.00_ fees for attendance and travel

Service and Travel

_____

_Police Officer, Constable, Deputy Sheriff_

Cop.                                  It being necessary I actually used a motor

Motor Vehicle                         vehicle the distance of _____ miles in the

                                      service of this process

                                      _____

                                      _Police Officer, Constable, Deputy Sheriff_

Subscribed and to before me _____

This                    day of                          , 20

                                      _____

                                                      _Notary Public_

**EXHIBIT G**



**Bowditch**
**&Dewey**
ATTORNEYS

Direct telephone: (508) 416-2421
Direct facsimile: (508) 929-3021
Email: mgreene@bowditch.com

July 30, 2007

***VIA FACSIMILE and FIRST CLASS MAIL***

Matthew P. Zayotti, Esquire
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110-3113

Re:    J.J. Reidy & Co., Inc. v. AirWater Corporation

Dear Mr. Zayotti:

        We have received your notice of taking deposition of Janice Bethanne Reidy, scheduled
for July 31, 2007.  Please be advised that we represent Ms. Reidy in this matter.  Discovery
closed on Friday, June 29, 2007.  The notice of taking deposition is therefore not timely.
Accordingly, Ms. Reidy will not appear at the deposition.  Please contact me if you have any
questions.

                        Very truly yours,

                        Maura A. Greene (aye)

MAG/kbm
cc:  Thomas Conte, Esq.

{Client Files\h03342691.692\COR116116818.DOC 1:}

BOWDITCH & DEWEY, LLP  175 CROSSING BOULEVARD  SUITE 500  FRAMINGHAM, MA 01702
T 508 879 5700  F 508 872 1492  www.bowditch.com          *Boston  Framingham  Worcester*

**EXHIBIT H**

# J.J. Reidy and Co., Inc.
# Issued and Pending Patents



EXHIBIT
#24
REIDY
7/26/07  LH

| Matter | Status |
|---|---|
| 1. US patent number 5,106,512 | issued |
| 2. US patent number 5,149,446 | issued |
| 3. US patent number 5,203,989 | issued |
| 4. US patent number 5,366,705 | issued |

**NOTE: Complete copies of the above patents can be purchased and downloaded, 24/7 at:**
**http://www.uspto.gov/**

**5.** Egyptian patent application     pending
No. 100/2000, **"Sterile Air Vents and Other Air Ports in a Water Generation Device"**

**6.** Egyptian patent application     pending
No. 101/2001, **"Ultraviolet Transmissive Tubing in a Water Generation Device"**

**7.** GCC patent application     pending
No. 981/2001, **"Improvements in Water Generating Devices"**

**8.** European Patent Application No.     pending
00975360.9, **"Improvements in Water Generating Devices"**

**9.** International patent application     pending worldwide
No. PCT/US04/008861, **"Thermoelectric, High-Efficiency, Water Generating Device"**

**10.** GCC patent application     pending
No. 3377, **"Thermoelectric, High-Efficiency, Water Generating Device"**

**11.** Malaysian patent application     pending
No. PI 20041341, **"Thermoelectric, High-Efficiency, Water Generating Device"**

**12.** Thailand patent application     pending
No. 089734, **"Thermoelectric, High-Efficiency, Water Generating Device"**

- Patent, number 5,106,512, which was issued on Apr/21/1992 for a Portable air-water generator.
- Patent, number 5,149,446, which was issued on Sept/22/1992 for a Potable water generator.
- Patent, number 5,203,989, which was issued on Apr/20/1993 for a Portable air-water generator.
- Patent, number 5,366,705, which was issued on Nov/22/1994 for a Gravity feed ultraviolet liquid sterilization system.
- Also any current patents being applied for or any future patents.

JJR 670

**EXHIBIT I**

# J.J. Reidy & Co., Inc.

## 1260 Main Street, Holden, MA   01520-1020

**Telephone:** (508) 829-6550
**Fax:** (508) 829-6492
**Email:** jjreidy@earthlink.net
**URL:** http://www.drinkingwaterfromtheair.com



September 2, 2003

Mr. Michael Zwebner, CEO
UCSY / AirWater Corporation
407 Lincoln Road. Suite 6K
Miami Beach, FL    33139

Dear Michael:

Enclosed are copies of some recent mail and telephone notes from Brian Dingman regarding our issued and pending patents.

I need your help with the expenses of the pending patents as I cannot afford to pay them on my own.

Respectfully yours,

James J. Reidy
President

Enclosures:
Brian Dingman letter, dated Oct. 11, 2002, with telephone notes to July 11, 2003
Brian Dingman letter, dated April 28, 2003, with telephone notes to July 11, 2003
Brian Dingman letter, dated  May 16, 2003, with telephone notes to July 11, 2003
Brian Dingman letter, dated July 28, 2003

**EXHIBIT J**

**EXHIBIT K**



**Universal Communication Systems Inc**
**Suite 6K, 407 Lincoln Road**
**Miami Beach Florida 33139**
**Tel 305 672 6344**
**Fax 305 672 1965**

February 21st, 2003

James J. Reidy,
J.J. Reidy & Co., Inc.
1260 Main Street, Holden,
MA 01520-1020

## SUBJECT; AIR / WATER Project

PRIVATE AND CONFIDENTIAL

Dear Jim,

Further to our recent meeting and telephone discussions, I outline herewith
our plans for entering this unique market, as well as (a draft of) the basic
terms of our plans for mutual co-operation with yourselves.

We have investigated this unique product and technology, and after some
basic market research, have satisfied ourselves as to its potential and
viability for market exploitation.

We have to this end formed a new corporation, through which this company
will organize the new business entity. The company is called AirWater Corp,
and is registered as a Florida corporation.

The purpose of the company is to develop, exploit, and market the entire
concept of the production of water from air, including but not limited to
offering the products and services to all key markets. This will include the
SOHO private business and home markets, the agricultural and industrial
markets, as well as global governmental applications such as the armed
forces, Nato, the UN, all international charities as well as organizations
needing continuous water supplies.

It is the intention of our company UCSY as a public company to embrace AirWater Corp and all its business applications, and as such to also invite your organization to join us. We envisage the following offering.

J.J. Reidy & Co., Inc., will be offered a 10% (ten per cent) stake-holding in AirWater Corp, and will as such become a shareholder of record. We will then transfer AirWater Corp into UCSY, at a price to be agreed, and will issue public common shares to all the shareholders (including yourselves).

In line with our agreement, UCSY will issue to you the amount of 4 million common shares of the company. These shares will be restricted shares pursuant to SEC rule 144. The restriction from sale is for 12 months from issue. In the event we file a registration statement at any time during the next 12 months, we will include your shares in the registration, thus making them tradable earlier.

In addition, upon the closing of the financing, expected to be done within 60 days, the company will pay to J&J Riedy & Co Inc, the one time sum of $100,000 (One hundred thousand US Dollars).

It is further agreed that the company will pay a royalty fee of 4% (four per cent) of all gross sales – less any applicable taxes, to J&J Reidy & Co Inc. Such royalty payments shall be paid within 14 days for receipt of funds from the buyer/ purchaser.

You will be invited to join the board, and become a director of both AirWater Corp, and also to join the board of directors of UCSY. We will then need to discuss additional financial remuneration for your ongoing services.

Once the paper transfers have been completed, UCSY will raise some $2 million of working capital from a number of private investors, and will utilize these funds as working capital to help create the manufacture of the units, as well as the marketing team and to generally commence commercial operations.

In consideration for the above, J&J Reidy & Co Inc shall grant to Universal Communications Systems Inc and its subsidiary AirWater Corporation, all copyright and patent rights as well as applicable legal protection, pursuant to all the patent filings that you have made, as well as all the technical know-how you can bring with you from the years of development that you have accumulated.

We will still need to formally execute an agreement with your organization, but do not see this as any impediment to our planned progression.

Jim, there are many more issues we need to cover, but I see this letter of intent as the first stage in creating the corporate structure needed to make all this happen.

Please peruse the above, and signify your general agreement (subject to final definitive contracts being executed) by signing the letter below and returning it to me soonest.

I, and our entire team look forward to working with you in the future.

Yours sincerely,

Michael Zwebner – Chairman
Universal Communications Systems Inc

**EXHIBIT L**

## James J. Reidy

**From:**      "James J. Reidy" <jjreidy@earthlink.net>
              "Michael Zwebner" <mjzwebner@sprynet.com>
**Sent:**      Thursday, May 08, 2003 7:00 PM
**Subject:**   Re: Your new #&*+@ 5/7/03 Draft

----- Original Message -----
From: Michael Zwebner
To: James J. Reidy
Sent: Thursday, May 08, 2003 3:45 PM
Subject: Re: Your new #&*+@ 5/7/03 Draft

Jim
first of all, please do not use this type

Re: Your new #&*+@ 5/7/03 Draft

Sorry  I can interpret #&*+@ as any one of thousands of negative words, most of which are appropriately defined by the reader, not me. It doesn't necessarily mean a profanity

of text or language with me.. I ((and YOU)) are professional people, and should always address each other in a courteous and professional way.

second, with regards the $100,000... if you look at the Letter of Terms and agreement we drew up and signed you will see the reference to the $100,000 being paid 60 days from the closing of the financing. This is nothing new, and we tyold you this up front, and you agreed to it. We are now merely reprinting it in the Licensing Agreement.

Not quite  But, I can now see how your text, dated February 21st, could be read two ways. I read it as 60 days from then. We are now at 71 days and you are asking for up to 60 more days, which doesn't even start to who knows when.

As it happens, we are about to sign and close, so this term may become mute., as funds will be available.

You have told me several times, as early as your very first telephone call to me on February 27th, that you had over $2 million available at that time.

Thirdly, I have triied to get across to you, that this is a NEW venture for us. You have been at it for 10++ years, and know everything about it that we are still learning.
Simply by signing any agreement and paying you funds and giving you shares, will not do it for us.

How else could you obtain the rights to confidently proceed to do all these things?

We are NOT in this for a week, month or even year. We plan to build this whole business and project properly.
We announced our basic intentions to the world, and let the people, shareholders and industry know we are coming into this business.
Todate, though we now have copies of your patents, and are having patent attornies check them out,

It's a strange time to be just doing this?

we have NOT seen a working model of your design,

You told me on February 26th that you did not need to see my unit. I could easily have shown it to you while you were in Boston

there is NO manufacturing company that is licensed and can produce machines for us.

Not true  Desert Aire is fully qualified, willing, and standing by.

et   In fact, it seems that WE will need to hold your hand in nevery stage of the continuing development of thios business.

Developing a business from my technology is exactly what you're supposed to do.

We are happy to do so, but step by step...no mad rush.



If you look at my other company at www.YAK.CA you will see a business that my brother and I started a few years ago, invested several million dollars, and have now created a real public company with over $100 million in revenues, and a stock price of $6 ++

i understand your feelings, you have been bullshitted

*That's an understatement.*

by many people in the past, and have gotten no-where in 10 plus years vis a vis a serious LICENSEE. Well, this is about to change.

BUT, not at a forced speed, nor on terms that are not good for ALL parties.
The agreement still has many issues that we need to go over and discuss and agree upon.

*I agree  and wonder how this could have been done by today.*

on the few matters you raise, here are my comments.

1) The $100k will be paid as already agreed and stipulated. If you cannot agree to this, then I guess we will continue to go get the finance in place first,, and then call you when we have the funds. The choice is yours in this respect.

*Well, I never knowingly agreed to this ambiguous clause. Anyway, the currently proposed License Agreement clearly states that it supercedes any and all prior "agreements"*

2) There will be NO royalties payable untill either we or a sublicensee are in production and sales. There is no logic otherwise.

*Logic? That time frame is under your control, not mine. Desert Aire can start manufacturing tomorrow. Giving you a world-wide non-exclusive virtually destroys any other potential Licensing possibilities for me. I'm essentially out of business while you take a year to  ...  be what you want to do. Meanwhile, I'm getting inundated with legal fees and patent expenses. Is THIS fair? I should receive  ... ng compensation for this sacrifice and you should pay something for this priviledge.*

I have stated and continue to state that you are totally FREE to sign any deal with any other potential manufacturer, and or Licensee, and if you have such people lined up, and are ready to sign and pay, then do not wait for us.

*Everyone, including you, need months and months to do this. it is a much harder sell and with diminished prospects. But, I will continue to try*

We need to be more secure and feel good about  the new business we are getting into. If it takes us another few weeks, so be it.

*I thought you were there already. Naturally, no Agreement should be made without knowing what you're doing*

((Just so you are aware, we are talking to several potential manufacturers, and await their responses.))

*Been there. Done that. Just remember, they're not likely to be investors  (Unless you're calling investors someone who happens to invest ⟶ manufacture*

3) The registration of stock with the SEC, cost us about $100,000 to do. (legal and accounting) We are planning to do a registration within 180 days, and your shares will be included in that registration.

*"Planning to" is different from "Promising to".*

Our end of year is September 30th 2003. We will prepare the registration documents, and then do the audit in October. We plan to file sometime in November. It literallyu takes a few months of paperwork and acounting to effect a registration with the SEC. I have experience in 3 seperate filings.

I ...  appy to discuss these matters and other remainign issues with you further, and come to final resolutions.

*We should get all our cards on the table. Can't play with half a deck.*

With regards to the Israel trip, if you do not wish to come, then that too is OK with me. I will meet the people I need to meet, and then come back and deal with your issues later. I guess that if they want to see later, we will organize it

then,

Okay. It's not fair at this time to ask me to give them everything they want, and will probably need.

J yes, I did tell you back in March that we have $2 million in new investment funds coming in for this deal.

In February you did not say "coming in".

However, like all investments, the funders want more information on this, then on that, then they want certain due diligence items covered etc etc etc.

Naturally, that is my point. I've had funds "coming in" up to my ears.

We have now produced the investment memorandum, and this I am delivering to Israel next week to finalize the cash investment.
I should just mention, that If $2 million was so easy to get for this project, YOU would have gotten it a long time ago.

That's why I now deal with people who claim to be already financially qualified. That's people like you. No one knows how hard it is more than me. I don't want any more promises or fund raisers. I want money in the bank.

So lets be real here.

I'm trying very hard to be. Perhaps you should ask your patent attorney son-in-law to show you a License Agreement he drew up for one of his inventor-clients. Then, I think, you'll understand my position a lot better.

Jim, lets just come to earth here, understand what both parties want, and work together to accomplish it.

I'm willing to continue to try. But you should know one last thing. I'm offering you the best deal I ever offered anyone. The Indian I met with for the last 2 days has verbally agreed to pay me $300,000 up front plus a minimum of $15,000 per month for the just the USA. He's agreed to do the same, again, for just India! That's just TWO countries. You have about 238 countries available to you for just a small fraction of what he's willing to pay for two.

Respectfully,

Michael


IMPORTANT NOTICE:

This electronic message contains information, which may be confidential, privileged or otherwise protected from disclosure. The information is intended to be used solely by the recipient(s) named. If you are not an intended recipient, be aware that any review, disclosure, copying, distribution or use of this message or it's contents is prohibited. If you have received this message in error, please notify the sender and delete this message from your system. Employees of the company are prohibited from making defamatory statements and from infringing copyright or any other legal right. Any such communication or infringement is contrary to company policy and outside the scope of employment.


—— Original Message ——
From: James J. Reidy
To: Michael Zwebner
Sent: Thursday, May 08, 2003 12:31 AM
Subject: Your new #&*+@ 5/7/03 Draft

I cannot believe your changes. We are worse off then the day we started this whole thing.

Aside from other, maybe lesser, issues, the following is non-negotiable:

1. $100,000 must be wired to my bank account on the day we sign.

2. There must be some significant minimum monthly Royalty.

3. The stock must clearly be registered within 90 days as you had previously promised.

As a bonafide LICENSOR I will need these funds to fulfill my obligations to you – it's not going to be used for a new boat! I'm not going to bother you with details, just accept the fact this Licensing deal cannot be done without significant additional cash available to me. (On March 20th you told me you had $2 million committed to this venture! ???)

I will not meet you in Israel without a <u>fully consummated</u> Agreement.

Be advised I am leaving on a three day trip early Friday morning, which I committed to, based upon your assurances we would have this whole thing resolved before then.

James J. Reidy, J.J. Reidy & Co., Inc.
1260 Main Street, Holden, MA 01520-1020
Telephone: (508) 829-6550, FAX: (508) 829-6492
Email: jjreidy@earthlink.net, Web URL: http://www.drinkingwaterfromtheair.com

**EXHIBIT M**

James J. Reidy

**From:**      "James J. Reidy" <jjreidy@earthlink.net>
**To:**        "Michael Zwebner". <mzwebner@sprynet.com>
**Sent:**      Monday, July 14, 2003 8:18 PM
**Subject:**   Office Action - patents

Hi Michael:

"Office Action" is the term the U.S. Patent Office uses for the final determination of a pending patent. It often involves direct communication and debate with the inventor's attorney – usually at minimal expense.

(I have already paid for the office actions in the 6 Gulf States and in Egypt.)

Office action deadlines can be extended, but at additional monthly costs, which rise quickly. $55 for one month, $200 for the second month, $460 for the third month, etc. The other downside is that we lose our original filing date and <u>might</u> be vulnerable to other patent applications.

The $3,100 my attorney estimated to finish these 2 patents are $1,490 in patent fees and $1,610 in attorney fees.

If we proceed by July 21st we can avoid additional monthly extension fees. I'm sure my attorney needs some time to prepare his response, so it's really before the 21st.

I can't do this myself – I just paid $32,000 in patent-related expenses that were incurred before we made our deal.

Respectfully,

James J. Reidy, J.J. Reidy & Co., Inc.
1260 Main Street, Holden, MA 01520-1020
Telephone: (508) 829-6550, FAX: (508) 829-6492
Email: jjreidy@earthlink.net, Web URL: http://www.drinkingwaterfromtheair.com

7/14/03