UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| J. J. REIDY & CO., INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AIRWATER CORPORATION and )<br>AIRWATER PATENTS CORPORATION, )<br>)<br>Defendants. )<br>) | Civil No.<br>05-40049-FDS |

**MEMORANDUM AND ORDER ON PARTIES'
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This action involves a dispute about a licensing agreement for a patented system designed to produce drinkable water from the air. Jurisdiction is based on diversity of citizenship.

Plaintiff J.J. Reidy & Co., which owned the four patents at issue, entered into a licensing agreement with defendant AirWater Corporation ("AirWater"), under which it licensed the right to use the technology in return for cash, stock, and future royalty payments. AirWater in turn assigned its rights and obligations under the agreement to a subsidiary, defendant AirWater Patents, Inc. ("AirWater Patents").

According to plaintiff, AirWater Patents failed to pay the royalties required under the agreement. Plaintiff sent AirWater Patents a notice of default in January 2005, for alleged nonpayment and, shortly thereafter, a contract termination notice.

Plaintiff then filed a complaint against defendants alleging breach of contract, intentional misrepresentation, and violation of Mass. Gen. Laws ch. 93A §§ 2 and 11. Plaintiff also seeks

declaratory judgment stating that it properly terminated the parties' licensing agreement.

Plaintiff has moved for summary judgment on its breach of contract and declaratory judgment claims. Defendant has filed a cross-motion for summary judgment on the breach of contract claim. For the reasons set forth below, both motions will be denied.

**I.   Factual Background**

    **A.   Execution of Plaintiff's Patents**

Plaintiff J.J. Reidy & Co., Inc., is a corporation based in Holden, Massachusetts. James J. Reidy, its president, applied for and received four patents for a device for obtaining drinkable water from ambient air. The patents were issued on April 21, 1992; September 22, 1992; April 20, 1993; and November 22, 1994.

On April 20, 1995, James Reidy conveyed all of his rights, title, and interest in the patents to his daughter, Janice Reidy, by executing four separate assignments.[1] On June 11, 1998, Janice Reidy executed four further assignments conveying all of her rights, title, and interest in each of those patents to plaintiff J.J. Reidy & Co., Inc.[2] For reasons that are not apparent from the record, James Reidy executed a further assignment, purportedly assigning all of his rights, title, and interest of the four patents, to plaintiff on August 12, 2003.

    **B.   The Licensing Agreement**

In June 2003, plaintiff and AirWater signed a Global Manufacturing and Marketing Licensing Agreement, under which it granted AirWater a license to use the four patented

---

[1] Each assignment stated that it gave "the entire right, title and interest throughout the world in the inventions and improvements which are the subject of" the relevant patent.

[2] Each of the assignments executed by Janice Reidy were filed in the Patent and Trademark Office on June 29, 1998.

technologies. The agreement was backdated, for reasons that are not clear, to March 21, 2003. On June 25, 2003, AirWater, with the consent of plaintiff, assigned all of its rights and liabilities under the agreement to AirWater Patents.

The agreement was drafted by James Reidy and Michael Zwebner, president of both defendant companies, apparently without the aid of counsel. Whatever the reason, the agreement is riddled with typographical errors and apparent inconsistencies and gaps.

There are three principal areas of dispute under the contract: (1) the payment of royalties, (2) the obtaining of foreign patents, and (3) the termination rights of the parties.

### 1.  **Royalty Payments**

The agreement contains two provisions calling for payment of royalties.

First, under a section entitled "Royalty Payments," the agreement states that the "LICENSEE" (AirWater Patents) shall pay a royalty fee of 5% on certain sales and 7% on all other sales. The provision goes on to state:

> LICENSOR shall receive royalties on the quarterly gross sales of LICENSEE . . . .
>
> This royalty levied on gross sales shall be paid for all sales made on a Quarterly basis.
>
> The payment will be remitted to the LICENSOR on or before the 30th day following the closing of the quarterly period.
>
> LICENSEE will provide LICENSOR on a quarterly basis a full accounting of units shipped, units billed, and a receivables aging, until that time both parties agree to waive this requirement.
>
> The ROYALTY RATE is based upon the quarterly sales of LICENSEE and computed as follows:
>
> Each quarter, LICENSOR shall be paid the applicable Royalties on the gross sales

during that fiscal quarter.

Second, under a section entitled "Minimum Monthly Royalty Payments," the agreement states as follows:

> LICENSEE is to pay LICENSOR a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with those stated above[,] whichever is the more.
>
> LICENSEE agrees that for a period of 12 months commencing November 1st 2003, any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period.

### 2. Foreign Patent Applications

Under the heading "The Territory," the agreement states that AirWater "agrees that this Global Marketing and Licensing Agreement and LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions."

Under the heading "Foreign Patent and Trademark and [*sic*] Registrations," the agreement states: "If at the LICENSEE[']S request the LICENSOR shall make application for foreign trademark and or trade name registration, then the LICENSEE shall pay all fees necessary." It goes on to state: "LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSOR, at his own expense."

### 3. Termination Rights

The agreement contains two separate termination provisions. Under the heading "Termination or Revocation of License," it states:

> Any material breach by either party of the terms of this Agreement, provided the non-breaching party in [*sic*] the one seeking the termination and gives the other

4

> party written notice of intention to terminate, which shall state the fault or breach upon which the party relies. The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time . . . .

Under the same heading, several paragraphs later, it states:

> This agreement will terminate with notice, if LICENSEE does not make any required payments to LICENSOR as specified within the stated and agreed time periods.
>
> The LICENSOR agrees to grant to the LICENSEE a 14 day period of notice/grace in which the LICENSEE can make good on any outstanding amount.

### B.     **The Termination of the Agreement**

Beginning on November 1, 2003, AirWater Patents made the required monthly royalty payments to plaintiff. However, after October 2004, it stopped making the payments, contending that under the agreement such payments were required for a 12-month period only.

On December 15, 2004, plaintiff sent a notice of default to Michael Zwebner. Apparently, the notice was sent to Zwebner in his capacity as president of AirWater only, not AirWater Patents; accordingly, on January 13, 2005, plaintiff separately informed AirWater Patents that it was in default under the agreement. On January 31, 2005, plaintiff sent AirWater Patents a letter stating that the license had been terminated.

### C.     **Procedural History**

On December 16, 2004, plaintiff filed an action against defendants in Massachusetts Superior Court, which was removed to this Court on March 18, 2005. Plaintiff's second amended complaint asserts a breach of contract claim against AirWater Patents; an intentional misrepresentation claim against AirWater; and a claim for violation of Mass. Gen. Laws ch. 93A

against both defendants. The complaint also seeks declaratory judgment against AirWater Patents.

On October 31, 2006, plaintiff filed a motion for summary judgment on the breach of contract and declaratory judgment claims. Defendants filed a cross-motion for partial summary judgment on the breach of contract claim on December 13, 2006.

**II.   Analysis**

    **A.   Summary Judgment Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

    **B.   Breach of Contract Claim**

Both parties have cross-moved for summary judgment on plaintiff's breach of contract claim. Plaintiff contends that AirWater Patents breached the licensing agreement by failing to pay monthly royalty fees beginning on November 1, 2004. Defendants do not deny that AirWater Patents failed to make the payments, but instead contend that minimum monthly payments were required for only one year, or through October 31, 2004. They further assert that they were willing and able to pay the next quarterly royalty payment required by the contract, which was not

due until thirty days after the end of the quarter, or by January 31, 2005.

In the alternative, defendants contend that the failure of AirWater Patents to make the monthly minimum royalty payments was excused because plaintiff materially breached the contract. Finally, defendants contend that they are entitled to summary judgment because the licensing agreement requires them to pay royalties beyond the expiration date of the Reidy patents and for sales in countries where the Reidy patents are not valid.

### 1. Whether AirWater Patents Was Required to Make Payments Monthly or Quarterly

The licensing agreement contains two provisions relating to royalty payments that lie at the heart of the breach of contract claim. The first provision, entitled "Royalty Payments," states that royalty payments must be received quarterly "on or before the 30th day following the closing of the quarterly period." The second provision, entitled "Minimum Monthly Royalty Payments," requires the licensee to pay "a monthly Royalty payment in the amount of $10,000 per month commencing November 1st 2003, or the Royalty payments due in accordance with the [royalty payment provision], whichever is the more." It also states that for a twelve-month period beginning on November 1, 2003, "any unearned minimum monthly royalty shall be credited to any earned Royalties and may (if applicable) be applied at any time during this 12-month period." Defendants contend that AirWater Patents was obligated to pay the minimum monthly payments for 12 months only starting November 1, 2003. Plaintiff, however, contends that the minimum monthly royalty payments were required for the life of the contract.

Under Massachusetts law, contract interpretation is generally a question of law for the court. *Nadherny v. Roseland Property Co., Inc.*, 390 F.3d 44, 48 (1st Cir. 2004). This is true

even in cases that are considered "close"—"the jury does not become involved when words and context alone are used" to interpret a contract. *McAdams v. Massachusetts Mutual Life Insurance Co.*, 391 F.3d 287, 298 (1st Cir. 2004). However, if a contract is ambiguous, its meaning may present a question of fact for a jury, making summary judgment inappropriate. *Id.*[3]

The determination of whether a contract is ambiguous is also a question of law. *ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1261 (1st Cir. 1991). Contract language is considered ambiguous "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." *Id.* at 1262. In determining ambiguity, courts must be mindful of the "interpretive rule that all of the contract's terms should be construed together to find a coherent whole" and "look to related provisions of a contract to cast light on the meaning of disputed language." *Nadherny*, 390 F.3d at 49. Because contract interpretation depends heavily on context, agreements must be construed "with reference to the situation of the parties when they made it and to the objects sought to be accomplished." *Starr v. Fordham*, 420 Mass. 178, 190 (1995) (quoting *Shea v. Bay State Gas Co.*, 383 Mass. 218, 222-23 (1981)). While parol evidence may be relied upon in making the ambiguity determination, it may "not be admitted to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists." *ITT Corp.*, 926 F.2d at 1261.

---

[3] Ambiguous contracts do not always present a question of fact for the jury. If, despite the ambiguity, "no reasonable person could interpret the contract as one party does, the court may enter judgment against that party." *Nadherny*, 390 F.3d at 48. Furthermore, if the extrinsic facts are not in dispute, "there is some suggestion in Massachusetts law that . . . a judge should decide the issue even if the outcome may be debatable." *Id.* at n.2, citing *Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 303 (1st Cir. 2001); *Atwood v. City of Boston*, 310 Mass. 70 (1941).

With these general principles in mind, the Court turns to the licensing agreement. The "Minimum Monthly Royalty Payments" provision states that defendants may pay "the amount of $10,000 per month . . . *or* the Royalty payments due in accordance with those stated above, *whichever is more*." (emphasis added). In deciding between the two payment options, it is clear that defendants must make the higher payment. Unfortunately, whatever clarity may exist in the agreement ends there. One provision requires the licensee to make a minimum monthly payment, and the other requires quarterly payments, "on or before the 30th day following the closing of the quarterly period."

The contract thus suggests two possible methods of payment. First, AirWater Patents might be required to make minimum monthly payments and then pay the remainder (if any) at the end of the quarter. Alternatively, AirWater Patents could pay their entire obligation at the end of the quarterly period (including all of the quarter's minimum monthly payments in one lump sum). Plaintiff favors the first interpretation, and defendant the latter. Because either interpretation is reasonable and the terms of the two royalty payment provisions are inconsistent, the contract language is ambiguous. The Court may therefore look to extrinsic evidence to resolve the ambiguity. *See Nadherny*, 390 F.3d at 50-51 (concluding that the contract's words did not decide the issue even though clarifying language could easily have been added).[4]

Defendants suggest that the contract's ambiguity may be resolved by viewing the minimum monthly royalty payment as a one-year requirement only. Plaintiff contends that the minimum monthly payment must be made over the entire life of the contract. The plain,

---

[4] The Court may enter summary judgment when the material extrinsic evidence is uncontested. *Nadherny*, 390 F.3d at 49. However, where evidentiary issues must be resolved and a contract's proper interpretation is fairly debatable, summary judgment is inappropriate. *Id.*

unambiguous language of the contract supports plaintiffs' position. The agreement requires that licensee is to pay "a monthly Royalty payment in the amount of $10,000 per month commencing November 1, 2003, or the Royalty payments due in accordance with this stated above whichever is more." The plain wording of this clause does not contain any language of limitation, and must be read in conjunction with the contract's "term of license" provision, which specifies the contract shall "remain binding and continue for a period of not less than 10 years, and/or for the life of the last expiring LICENSED PATENT . . . ."[5]

In support of their respective positions, both parties offer extrinsic evidence. According to Michael Zwebner, plaintiff agreed that the minimum monthly payments were only to continue for one year.[6] An e-mail exchange between James Reidy and Zwebner before the agreement was signed arguably supports defendants' contention that the start-up phase would last about a year.[7] Plaintiff offers extrinsic evidence from after the contract's formation, including statements made to the Securities and Exchange Commission in annual filings submitted by Universal Communications Systems, the parent company of both defendants, indicating that monthly royalty

---

[5] The lack of limiting language is also conspicuous considering that the following clause (the unearned minimum royalty credit provision) does have an explicit expiration date.

[6] The agreement contains a merger and integration clause, which provides as follows:

This instrument of 18 pages contains the entire Agreement between LICENSOR AND LICENSEE, and no modification hereof shall be binding on the parties unless it is in writing and signed by a duly authorized officer of the parties to be bound.

Even when parol evidence may otherwise be permissible, the presence of an integration clause means this Court must "decline[] to read unwritten terms into agreements containing [such] declarations." *McCarthy v. Azure*, 22 F.3d 351, 358 (1st Cir. 1994). An integration clause is generally an "indication of the parties' desire to limit free-ranging judicial discretion to interpolate terms." *Id.* at 358-359 (citation omitted); *see also Northern Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 466 (1st Cir. 1988).

[7] The e-mail is dated May 7, 2003. As previously indicated, this was prior to actual execution of the contract, which was signed in June 2003 and backdated to March.

10

payments of $10,000 were required through October 2013.

The Court does not reach the issue of extrinsic evidence, however, as the contract plainly contains no one-year limitation on minimum monthly royalty payments. If the Court were to consider the extrinsic evidence, it would be doing so to "create ambiguity where none otherwise exists." *ITT Corp.*, 926 F.2d at 1261. Defendants' proposed resolution of the ambiguity must therefore be rejected.

Accordingly, summary judgment must be denied to both parties. Even though the unambiguous language of the contract entitles plaintiff to minimum monthly payments over the life of the contract, there is a genuine issue of material fact as to the proper time and method of payment (obligatory monthly payments plus a possible quarterly remainder, or a quarterly payment in a lump sum).

### 2. Whether Plaintiff Materially Breached the Agreement so as to Excuse AirWater Patents's Performance

Defendants contend that even if the Court finds that AirWater Patents was required to pay the minimum royalty payments beyond October 2004, summary judgment should nonetheless be granted in their favor because plaintiff materially breached the licensing agreement. It is well-established that a material breach by one party excuses the other from further performance under the contract. *Ward v. American Mut. Liability Ins. Co.*, 15 Mass. App. Ct. 98, 100 (1983). A breach is considered "material" when it goes to an "essential and inducing feature of the contract." *Bucholz v. Green Bros. Co.*, 272 Mass. 49, 52 (1930). Defendants contend that plaintiff materially breached the licensing agreement because plaintiff (1) disregarded the mandatory "30-day cure period" provided in the licensing agreement; (2) did not possess any

11

right, title, or interest in the patents as of March 2003; (3) did not obtain world-wide patents prior to the execution of the contract; (4) did not subsequently obtain world-wide patents at the request of defendants and at plaintiff's expense; and (5) failed to defend and indemnify AirWater Patents in a patent infringement suit.

### a. Disregard of the Termination Clause's Cure Period

Defendants first contend that plaintiff breached the agreement by sending a termination letter to AirWater Patents less than 30 days after it received notice of default. The agreement contains two potentially applicable provisions concerning termination. Both are found within the "Termination or Revocation of License" section. The first states: "The termination shall become effective thirty (30) days following receipt of the notice given by the party against whom the termination is sought, if such default or breach is not rectified to the reasonable satisfaction of the parties within that time . . . ." The second states: "This agreement will terminate with notice, if LICENSEE does not make any required payments to LICENSOR as specified within the stated and agreed time periods. The LICENSOR agrees to grant to the LICENSEE a 14 day period of notice/grace in which the LICENSEE can make good on any outstanding amount."

Defendants contend that the first provision, which provides for a 30-day grace period, applies and therefore plaintiff's termination letter (sent 18 days after notice of default) was premature. Defendants do not address, much less attempt to reconcile, the provision for a 14-day grace period for missed payments.

The scope of a party's contractual obligations cannot "be delineated by isolating words and interpreting them as though they stood alone." *Boston Elevated Ry. v. Metropolitan Transit Auth.*, 323 Mass. 562, 569 (1949). Indeed, when interpreting an agreement, "no part of the

contract is to be disregarded." *Id*. Instead, written contracts are to be interpreted as a whole, in a manner that gives meaning to every term. *See Johnson v. Worcester Business Development Corp.*, 1 Mass. App. Ct. 527, 529 (1973).

With these principles in mind, it appears that the second section of the termination clause, which provides for a 14-day grace period for missed royalty payments, is necessarily an exception to the first, which generally requires a 30-day grace period. In other words, a 30-day grace period is normally required, except in the case of a missed royalty payment, in which case a 14-day grace period is sufficient. This is the only reasonable interpretation of the contract, as the second provision cannot be ignored and grace periods of different lengths cannot be required simultaneously. Therefore, if AirWater Patents was required to make a minimum monthly royalty payments in November and December, plaintiff did not violate the licensing agreement by sending the termination letter 18 days after giving AirWater Patents notice that it was in default.[8]

### b. Plaintiff's Ability to Assign Patents

The agreement contains an express warranty that plaintiff has "the entire right, title, and interest" in the relevant patents. Defendants contend that plaintiff did not have the title to the patents, and therefore breached the warranty. It cited to two pieces of evidence: first, that James Reidy executed a second set of assignments to plaintiff in August 2003 (after the licensing agreement was entered) and second, that one of the patents, No. 5,366,705, was conveyed to Bank of America in May 1998.

---

[8] On January 13, 2005, plaintiff sent AirWater Patents a letter stating that defendant failed to make the November 1, 2004 and December 1, 2004 payments; that it had 14 days to make the payments; and that the agreement would be terminated if the payments were not received within that time. On January 31, plaintiff sent the notice of termination.

13

As to the former issue, the record does not contain any explanation as to the reason for the second set of purported assignments. The purported transfer therefore appears to have been a nullity. Defendant is correct in asserting the general proposition that "[i]n order to show that it is the owner of the patents, "a plaintiff to whom the patent was not originally issued must produce a 'written instrument documenting the transfer of proprietary rights in the patents.'" *Imax Corp. v. In-Three, Inc.,* 385 F. Supp. 2d 1026, 1028 (C.D. Cal. 2005) (citing *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 1250 (Fed. Cir. 2000)). Plaintiff has filed the following with the court: James Reidy's four assignations of the patents to Janice Reidy, and Janice Reidy's four assignments of the same patents to plaintiff. All were duly witnessed by an attorney and filed with the United States Patent and Trademark Office. For summary judgment purposes, plaintiff has met his burden and defendant's challenge to the validity of the patents must fail.

As to the purported conveyance to Bank of America, it is undisputed that the security agreement purporting to assign rights in the '705 patent to Bank of America was made by grantors who had no interest, right, or title in the patent and had no affiliation with plaintiff, James Reidy, or Janice Reidy. Indeed, by Bank of America's own admission, the execution in its favor appears to have been a clerical error committed by the USPTO. Therefore, plaintiff did not breach its express warranty.

### c.      Failure to Obtain Patents World-Wide

Plaintiff obtained patents for the technology in the United States and three other countries. Defendants contend that plaintiff's failure to obtain the patents "globally" constitutes a material breach of the licensing agreement.

Defendants' position is entirely without merit. As noted, the contract states that the

14

patents are United States patents and that the agreement and the "LICENSED PROPERTY AND TECHNOLOGY AND ALL PROPRIETARY RIGHTS are to be valid all over the world without restrictions." Although awkwardly worded, the plain purpose of the language was to provide that (1) the licensing agreement itself was valid all over the world (e.g., it did not cover only the United States) and (2) the rights to the technology were likewise valid everywhere (e.g., plaintiff had not previously transferred those rights to a third party in a foreign country).

Furthermore, a separate provision in the licensing agreement directly addresses the issue of applications for patents in foreign countries. Obviously, the parties did not understand that patents had been obtained world-wide at the time that the parties entered the licensing agreement.[9] Indeed, defendants themselves claim that plaintiff breached that portion of the agreement, by *failing* to apply for patents in any foreign countries. Defendants do not attempt to explain the obvious inconsistency in those two positions.

In short, it is absurd to interpret the contract as containing a provision representing that patents had been obtained in every nation on earth. Defendants' claim of material breach for failure to do so may be summarily rejected.

### d.     Failure to Apply for Foreign Patents at Defendants' Request

Defendants also contend that plaintiff breached the contract by refusing to apply for patents in foreign countries upon request. The licensing agreement, on its face, does not contain any such requirement. Instead, the relevant provision states: "LICENSOR, when applicable, shall

---

[9] Defendants contend that James Reidy made representations suggesting that the water purification design had been patented and protected all over the world. Even if the representation were made, it is difficult to see how any reasonable person would give it credence; surely defendants did not believe that plaintiff had obtained patents in every sovereign nation on the planet. In any event, the very existence of the provision concerning applications for foreign patents belies defendants' claim.

make application for any foreign patents desired by LICENSOR, at his own expense."

Defendants, however, contend that the second reference to "licensor" was a typographical error and that it should read "licensee. If true, the normal parol evidence bar on extrinsic evidence would not apply because of mutual mistake. *One Beacon America Ins. v. Travelers Indem. Co. of Illinois,* 465 F.3d 38, 41 (1st Cir. 2006) ("When a party asks for reformation of a contract, it is not asking the court to interpret the contract but rather to change it to conform to the parties' intent . . . the parol evidence rule [does not] apply to a court's inquiry into the parties' intent").

The party alleging mutual mistake, however, has a heavy burden of proof. Defendants' must establish "the undisputed material facts fully, clearly and decisively show a mutual mistake." *Id.* Plaintiff has argued, both in its memorandum and at oral argument, that this provision is "clear and unambiguous." However, at his deposition, James Reidy clearly agreed that the second reference to "licensor" in the disputed clause was a typographical error.[10]

Self-serving statements asserting mutual mistake are alone not enough to prove such a claim. Here, however, the only substantive evidence on point is James Reidy's testimony. Given the clarity of the exchange in the deposition and the fact this is information to the plaintiff's own detriment, the undisputed material facts are sufficient to show mutual mistake. *See One Beacon America*, 465 F.3d at 45 (finding mutual mistake in an insurance agreement even though defendant vigorously disagreed, because defendants' own documents and conduct "fully, clearly and decisively" showed mutual mistake). Accordingly, the second occurrence of the word

---

[10] When asked, "it should say, Licensor when applicable shall make application for any foreign patents desired by licensee at his own expense?" Mr. Reidy answered "Yes." Immediately before and after this statement, Mr. Reidy stated affirmatively that the second reference to "licensor" was a typographical error.

"LICENSOR" should be replaced with the word "LICENSEE" in the third clause under the heading "FOREIGN PATENT AND TRADEMARK REGISTRATIONS."

This does not, however, end the inquiry into whether plaintiff materially breached the contract. Both parties acknowledge that plaintiff did not file foreign patent applications at defendants' request because defendants refused to pay for the applications. Both parties contend that the other side is contractually responsible for making the payments. Even as reformed, the disputed clause reads "LICENSOR, when applicable, shall make application for any foreign patents desired by LICENSEE, at his own expense."

As has been true throughout this entire dispute, greater care in drafting the contract would have prevented considerable difficulty. Does the phrase "at his own expense" refer to the licensor or licensee? If the licensee is obligated to pay, then plaintiff's refusal to apply for foreign patents without payment was appropriate. If the licensor is obligated to pay, it is at least possible that plaintiff's refusal to pay is a material breach. The language is ambiguous, and the extrinsic evidence on this point is unclear. The meaning of "at his own expense" is a material dispute of fact for a jury, making summary judgment for defendants on this basis inappropriate. *See McAdams*, 391 F.3d at 298.

### e. Patent Infringement Suits Filed against AirWater Patents

In August 2003, defendants were served with a complaint from a third party for patent infringement, which alleged that the patents had been fraudulently obtained and registered. Plaintiff did not participate in the lawsuit, despite defendants' requests to do so, and did not contribute funds to the costs of defending the litigation. Ultimately, defendants negotiated a settlement agreement in the case.

Defendants now argue that plaintiff breached the licensing agreement by failing to defend and indemnify AirWater Patents in the infringement litigation. That argument is wholly without merit. The licensing agreement makes no mention of any such indemnification obligation.[11] Defendants contend, however, that even if indemnification is not provided for in the contract itself, plaintiff nonetheless has a common law duty of indemnification. While "an implied duty to indemnify might arise in certain circumstances of a 'special relationship' between the proposed indemnitees and indemnitors, [Massachusetts courts] explicitly prescind from general recognition of an implied duty to indemnify, even in ordinary tort cases." *Nicolaci v. Anapol*, 2003 WL 21877764 at *3 (D. Mass. 2003) (refusing to recognize common law duty to indemnify in dispute relating to a stock purchase agreement) (quoting *Decker v. Black and Decker Mfg. Co.*, 389 Mass. 35, 38-39 (1983)). There is no evidence of any kind of special relationship between the parties. Plaintiff accordingly had no obligation to indemnify defendants in the infringement litigation.

### 3.    **Royalty Payments Beyond Scope of Patents**

Finally, defendants contend that plaintiff's motion for summary judgment should be denied because the entire contract is void due to a lack of consideration. Defendants suggest the licensing agreement lacks consideration because (1) the contract calls for royalty payments beyond the expiration date of the patents and (2) the contract calls for royalty payments from foreign sales in foreign countries where no patents have been obtained.

The relevant provision in the agreement, entitled "Term of License," states as follows:

---

[11] The agreement contains a provision concerning infringement litigation, but it appears to contemplate only "offensive" litigation (that is, litigation to enforce the four patents against infringers).

"The term of this Agreement shall commence upon the date of execution of this agreement and shall remain binding and continue for a period of not less than 10 years, and/or for the life of the last expiring LICENSED PATENT, whichever comes last, unless terminated sooner as provided herein." The last patent to expire, the '705 patent, expires on June 8, 2013. The licensing agreement, although backdated, is dated March 21, 2003.[12] Because June 8, 2013, is later than March 21, 2013, the licensing agreement would have expired on June 8, 2013, and no royalty payments would be due after that time. *Brulotte v. Thys Co.,* 379 U.S. 29, 33-34 (1964) (". . . after expiration of the *last of the patents* incorporated in the machines 'the grant of patent monopoly was spent' and that an attempt to project it into another term by continuation of the licensing agreement is unenforceable") (emphasis added). Therefore, defendants' first ground for contending that the contract lacks consideration must be rejected.

Defendants' second ground also lacks merit. While the royalty payment provision requires a fee "on all sales of manufactured models," it is not clear that defendants ever planned on selling models in countries where the water purification system was not patented. Furthermore, defendants contend that plaintiff was supposed to obtain patent protection for the technology in countries world-wide; their position is thus inconsistent with the contention that the licensing

---

[12] There is arguably a small amount of ambiguity concerning whether the agreement was "executed" on March 21, 2003 or June 24, 2003. The first line of the contract states that it was "made and entered" on March 21, although it was not signed until June 24. Under Massachusetts law, the phrase "made and entered" indicates the date that a contract becomes effective. *Schwenk v. Auburn Sportsplex, LLC,* 483 F. Supp. 2d 81, 86 (D. Mass. 2007) (*citing Suffolk Const. Co., Inc., v. Lanco Scaffolding Co., Inc.,* 47 Mass. App. Ct. 726, 729-730 (1999) (stating that term "made" unambiguously indicated the contract's effective date and no distinction between "made" and "executed" for that purpose). Under the circumstances, the Court concludes that the 10-year period began on March 21, 2003.

agreement lacked consideration because royalties were due from sales made world-wide.[13]

### III.  Conclusion

For the reasons set forth above, plaintiff's motion for partial summary judgment as to the breach of contract and declaratory judgment claims and defendants' motion for partial summary judgment are DENIED.

**So Ordered.**

                                                /s/ F. Dennis Saylor
                                                F. Dennis Saylor IV
                                                United States District Judge

Dated: September 30, 2007

---

[13] Defendants further contend that plaintiff's motion for summary judgment should be denied, and that the contract must be reformed, in order to prevent unjust enrichment. Unjust enrichment is an equitable remedy that is intended to fill remedial gaps only when there is no adequate remedy at law available. *See Fox v. F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 588 (1996). Whatever the merits of that claim, the Court need not reach the issue in light of the fact that it is denying both cross-motions for summary judgment.